**UNITED STATES DISTRICT COURT**
**OF THE DISTRICT OF COLUMBIA**
**<u>CIVIL DIVISION</u>**

| | |
|---|---|
| **ANA LAPERA** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 15-CV-000447 |
| ) | District Judge: Beryl A. Howell |
| **FANNIE MAE** ) | |
| ) | |
| Defendant. ) | |

**FANNIE MAE'S STATEMENT OF UNDISPUTED FACTS IN**
**<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Fannie Mae, formally known as the Federal National Mortgage Association, by and through its undersigned counsel submits this Statement of Undisputed Facts in Support of its Motion for Summary Judgment. This factual statement is supported by the testimony and stipulated exhibits offered in support of the Parties' claims and defenses which were tried before a neutral arbitrator at JAMS, Alternative Dispute Resolution, in November 2014. Fannie Mae will refer to the arbitration transcript in the following manner: Tr. Pg:_line_ (Witness). Fannie Mae will refer to the exhibits from the prior arbitration as Ex.__. Fannie Mae states that the following facts are undisputed and therefore cannot be disputed:

### *The Financial Crisis and Conservatorship of Fannie Mae by FHFA*

1.      Fannie Mae is a private, shareholder-owned company chartered by Congress under the Federal National Mortgage Association Charter Act (the "Charter Act"). Fannie Mae's mission is to provide liquidity, stability and affordability to the U.S. housing and mortgage markets. Fannie Mae operates in the U.S. secondary mortgage market, which means that rather than making home loans directly to consumers, Fannie Mae buys loans originated by banks, brokers and other primary

mortgage market partners to help ensure these partners have funds to lend to home buyers. *See* http://www.fhfa.gov/Default.aspx?Page=33.

2.      On September 6, 2008, Fannie Mae's regulator, the Federal Housing Finance Agency ("FHFA"), was appointed as Conservator due to the Company's well-publicized financial instability associated with the nation's housing crisis. FHFA dismissed Fannie Mae's CEO and Board of Directors and appointed Herb Allison as the new CEO. As a result of the Conservatorship, Fannie Mae's stock price collapsed and the Company was unable to raise capital. The U.S. Department of Treasury ("Treasury") has since provided significant capital to Fannie Mae to ensure the Company continues to provide liquidity to the mortgage markets in accordance with its mission. *See* FHFA 2008 Rpt. to Congress at 21-26. http://www.fhfa.gov/webfiles/2335/FHFA_ReportToCongress2008508rev.pdf; Tr. 187:9-188:2 (Lapera).

### *The Lean Six Sigma Project: Corporate Teams*

3.      Ana Lapera ("Plaintiff") commenced employment with Fannie Mae on January 24, 1994. She held a variety of different roles, and reported to various officers throughout her tenure at Fannie Mae. Tr. 29:14-32:5 (Lapera).

4.      In 2008, Plaintiff was promoted to Director of Human Capital Performance, also referred to as Director of Lean Six Sigma. Plaintiff reported to Claude Wade (African-American), Vice President of Operational Risk. Tr. 55:12-13-57:12-17; 192:3-10 (Lapera).[1]

---

[1] Plaintiff estimated that Mr. Wade is 5'9" and 170 lbs. *See* Claimant's Answers to interrogatories No.:7 (attached hereto at Ex. 1).

5.    As Director of Lean Six Sigma, Plaintiff was responsible for overseeing a team that used process improvement methodologies to increase efficiencies and to streamline business operations.  Tr. 50:9-57:17 (Lapera).

6.    Plaintiff worked with Michael MacFarland (White), Director of Technical Architecture, and Ted Carter (African-American), Director of Operational Risk, Framework and Reporting, in executing projects across divisions.  Tr. 74:7-76:6 (Lapera).

7.    Dealing primarily with business architecture, Mr. MacFarland did not report to Mr. Wade; he reported within the technology organization.  Plaintiff was not responsible for business architecture.  Tr. 207:21-209:5 (Lapera).

8.    Similarly, Mr. Carter was responsible for enterprise level operational risk, a different area of focus than Plaintiff's position. Plaintiff was the only Director reporting to Mr. Wade for process improvement.  During the relevant period, Mr. Carter reported to Mr. Wade.  Tr. 212:14-213:4 (Lapera).

### *The New Compensation Structure*

9.    During the summer of 2009, Fannie Mae changed its compensation scale from one based on numeric grades (*e.g.*, 1, 2, 3) to one based on alphabetic ratings (*e.g.*, A, B, C).  Under the numeric system, the higher the number grade, the higher the salary range and, under the alphabetic system, a letter later in the alphabet represented a higher salary range than did a letter coming earlier in the alphabet.  Tr. 524:21-525:10 (Westbrook); Exhibit 2 at P0011).

10.    The new compensation arrangement introduced job families, a new concept to Fannie Mae.  Under the new structure, total compensation for any given position was targeted at the 50th percentile of the market.  Job families grouped together a series of jobs involving similar work.  (Exhibit 2 at P0011; Tr. 573:13-18; 525:11-527:14 (Westbrook).

3

11.    Instead of awarding annual bonuses, the new compensation structure was comprised of an employee's salary and Long-term Incentive Compensation ("LTI").  Subject to the new salary range, and as part of the new compensation structure, employees were notified that they may receive a salary increase.  As a result, Plaintiff was awarded an additional $12,456.00. Tr. 530:9-531:16 (Westbrook).

### *The Classification of Plaintiff's Position*

12.    Nicole Westbrook (African American) became Fannie Mae's Director of compensation in 2005.  Ms. Westbrook manages the Company's compensation programs and the benefits strategy team.  Ms. Westbrook's responsibilities include designing and implementing new programs and making decisions about job positions and compensation actions.  Tr. 523:9-524:13 (Westbrook).

13.    Salary grade decisions were made by the Compensation team which retained final authority for assigning levels to specific positions.  Tr. 524:14-20; 532:18-533:14 (Westbrook).

14.    When Fannie Mae moved to the alphabetic system in the summer of 2009, it classified Plaintiff's position as a grade "M".  Plaintiff previously was a level "6" under the old numeric system.  Plaintiff's job title was also changed to Director - Operational Excellence and Lean Six Sigma and the position was assigned to the Lean Six Sigma job family.  Tr. 573:13-575:10 (Westbrook).

15.    Mauricio Aguilar (Latino), a compensation specialist who reported to Ms. Westbrook, classified the position Plaintiff held as an "M" based on external market data. Compensation determined positions levels by gathering information from the business about the position (e.g., a job description) and then comparing that information to published, external market data.  No consideration was given to the individual holding the position at that time or such

individual's performance.  According to Ms. Westbrook, this data and the role's scope supported classifying Plaintiff's role as director at the "M" grade. Tr. 558:14-559:10; 565:8-566:18 (Westbrook).

16.    Plaintiff does not allege that the initial decision to classify her position as an "M" was motivated by discriminatory bias:

> None of Ms. Lapera's DCHRA claims rest on the 2009 classification decision and Claimant's 2013 mid-year performance review. Claimant's allegations under the DCHRA are listed in paragraphs 27-32.  There is nothing in these paragraphs which state or suggest that Claimant is asserting a claim under the DCHRA for the initial 2009 classification.

*See* Claimant's Opposition to Respondent's Motion to Bar, dated September 2, 2014, attached hereto as Ex. 3.

17.    Plaintiff admits she received notice that her position had been classified as an "M" no later than August 16, 2009. Tr. 192:3-193:13 (Lapera); Ex. 4.

18.    Race, ethnicity, national origin, age, weight or body shape were not considerations when reclassifying positions within Fannie Mae.  Tr. 563:14-564:6 (Westbrook).

19.    Plaintiff acknowledged she had no specific facts indicating the Compensation team's decision to assign her 2009 Director position an "M" salary grade was affected by discrimination. Although Plaintiff accused her supervisor, Mr. Wade, of (indirect) discrimination at the hearing, that testimony was inconsistent with Plaintiff's testimony at her November 4, 2014 deposition, where she identified Compensation personnel of making discriminatory decisions. Tr. 194:2 - 198:15 (Lapera).

20.    Plaintiff did not raise discrimination concerns with this salary grade classification at the time it occurred. Tr. 534:8-11 (Westbrook).

*The Promotion and Equity Process (PEP)*

21.    On Saturday July 18, 2009, Plaintiff emailed Mr. Wade asking for clarification around the new level of her position. (*See* Ex. 4 at FM001849-001851). Mr. Wade forwarded the email to Human Resources on Monday July 20, 2009. After review, the Compensation team concluded that the position in question was correctly classified at the "M" level. Tr. 532:18-537:9 (Westbrook).

22.    Plaintiff did not make any other requests to review her compensation or the level of her position until April 2011. Shandell Harris, a business partner in Human Resources, assisted Plaintiff with that request. Tr. 537:17-538:3 (Westbrook).

23.    On April 25, 2011, Ms. Harris sent Plaintiff's job description to Ms. Westbrook to review for levelling purposes. After reviewing the job description, for Plaintiff's Director of Operational Excellence and Lean Six Sigma position, Ms. Westbrook determined that the job description mapped to a classification of "M." Tr. 538:4-541:19; 560:8-563:13 (Westbrook); Ex. 5 and Ex. 6 at FM001809.

24.    Ms. Westbrook did not interpret the request to review Plaintiff's job level as a "challenge." Indeed, Ms. Harris' email stated, "Nicole, can you take a look at this and level it please?" Tr. 542:4-543:12; 560:3-6 (Westbrook); *See* Ex. 5.

25.    Ms. Westbrook explained, "when we're leveling positions, we are not looking at individuals. We are looking at the position itself." Tr. 558:14-20; 566:4-10 (Westbrook). Plaintiff acknowledged this decision on April 26, 2011. Ex. 7 at P0016; Tr. 199:5-16 (Lapera).

26.    In May 2011, Mr. Wade resigned from Fannie Mae. As Vice President of Planning and Alignment, Kathy Keller became Plaintiff's new supervisor. Plaintiff and Ms. Keller had previously worked together in the advanced technology division of Fannie Mae. Tr. 98:12-102:18 (Lapera).

6

27.    Ms. Harris assisted Ms. Keller in the submission of a Promotion and Equity Process ("PEP") request on Plaintiff's behalf on May 10, 2011.  Tr. 546:20-547:13 (Westbrook); Ex. 8 at FM001819-1821.  Ms. Harris recommended that Plaintiff receive a $10,000 salary increase from $184,000 to $194,000.  Ms. Harris noted in her recommendation that there was no higher level director in Plaintiff's job family to move her into.  Ex. 9 at FM001828.  Sonia Matza, a Compensation analyst reviewed Ms. Harris' PEP request.  Tr. 547:5-548:2 (Westbrook).

28.    PEP requests are utilized to potentially change an employee's salary.  Once initiated by an employee's manager, the request is reviewed by Compensation. Tr. 528:7-529:19 (Westbrook).

29.    Unlike re-leveling requests, PEP requests take into consideration the individual's performance and equity circumstances.  Ultimately, the Compensation team concluded that Plaintiff's base salary should be increased to the maximum of the salary range in order to differentiate her role from other directors on her team who reported to her.  Tr. 571:1-575:15; 576:1-577:6 (Westbrook); See Ex. 9.

30.    On June 24, 2011, Ms. Matza emailed Ms. Westbrook the new job description provided for the position of Director of Operational Excellence and Lean Six Sigma, comparing it to the previous job description provided in April of 2011.  Compare Ex. 10 at FM001801 to Ex. 11 at FN001809-001813; Tr. 577:7-578:3 (Westbrook).  In her email, Ms. Matza noted:

> The Director and VP job descriptions are identical, even to the point of both cite "the Director of Operational Excellence and Lean Six Sigma" in the job purpose.  *See* Ex. 10 at FM001801; Tr. 577:7-578:20 (Westbrook).

31.    However, the revised job description incorporated a wider corporate scope and strategic slant which the job summary for "SIX 120" did not.  *See* Ex. 10 at FM001805 - 001807; Tr. 577:22-578:20 (Westbrook).

32.    Compensation determined that there were sufficient grounds to consider re-leveling Plaintiff's position from an "M" to an "N."  However, Compensation did not recommend any action be taken at that time because it was unclear whether the Lean Six Sigma department would continue to report within the Enterprise Project Management Organization ("EPMO"). Accordingly, in her June 28, 2011 email, Ms. Westbrook postponed making any changes to Plaintiff's position until a future state and home of the Lean Six Sigma team became more clear. Tr. 577:7-581:10 (Westbrook).

> Yes, Sonya and I did.  We want to discuss an "N" level, but Bill said that he and Linda are discussing the future of the LSS space so we shouldn't make any moves with Ana's job until future state is clearer.  (Ex. 12 at FM001830).

### The Lean Six Sigma Family Moves to Process Improvement

33.    In December 2011, in an email to Ms. Westbrook, Ms. Harris relayed Ms. Keller's expressed interest in renaming and reorganizing the Lean Six Sigma group:

> Nicole, Ana has rewritten the job descriptions for herself and her direct reports. Kathy wants to get away from calling the team Lean Six Sigma as that describes a tool they use.  I also think it might be helpful for you to meet with me, Ana and Kathy to flesh out these job descriptions so you can review and level appropriately. (Ex. 13 at FM 001823-001826).

34.    Compensation reviewed a new job description and determined that the entire Lean Six Sigma job family should be mapped to levels created for the Process Improvement job family. Tr. 581:15-583:13 (Westbrook).

35.    As a result, Plaintiff's position was re-leveled to an "N" level by Compensation. Tr. 581:19-583:20 (Westbrook).  The leveling decision was based on the additional information the Compensation team received, the broader scope of the position as indicated by the revised job descriptions, and the importance of the job within the organization at the time the move was made

from the Lean Six Sigma group to the Process Improvement family.    Tr. 583:14-584:7 (Westbrook); Ex. 14 at FM000248.[2]

36.    An Employee Change Notice form for Plaintiff's position was issued on February 24, 2012, and became effective on February 26, 2012.  Plaintiff received a new job code and title, Director of Process Improvement Strategy/SIX 122.  Tr. 585:4-586:15 (Westbrook); Ex. 15 at FM000282.

37.    Race, ethnicity, national origin, age, weight or body shape were not considerations when re-levelling Plaintiff's position to an "N" level.  Tr. 588:12-589:4 (Westbrook).

### The Enterprise Program Management Organization ("EPMO")

38.    The EPMO is responsible for allocating funds to projects and initiatives executed by Fannie Mae.  The purpose of the EPMO was to develop Fannie Mae's end-to-end strategy to achieve its future state following the housing crisis, in accordance with the objectives of its regulator FHFA.  This entailed developing a multi-year investment plan which encompassed providing oversight and governance for all enterprise projects, and determining when and where dollars and resources were allocated to achieve the Company's strategy and to do so in an efficient and effective manner.[3] Tr. 351:22-352:19 (Fraser).

39.    In September 2012, Anne Gehring (White) became the Senior Vice President for the EPMO.[4]  Tr. 597:6-8 (Gehring).

---

[2] Plaintiff's base salary was not adjusted at that time because her total compensation would be differentiated from her direct reports based upon her eligibility for a 35% long-term incentive target that her subordinates were not eligible to receive. Tr. 651:17-652:19 (Westbrook).

[3] The multi-year investment plan took all these requests, whether they're wanted from a business perspective ot technology perspective and then ensuring we're maintaining existing infrastructure, implementing new infrastructure and putting the pieces of the puzzle together.  Tr. 353:13-18 (Fraser).

[4] The previous SVP for the EPMO was Linda Knight.

40.     In this role, Ms. Gehring was responsible for the strategic alignment of $800 million in technology spend, the execution of the portfolio of technology projects including the training and education on the execution of those projects.  Tr. 599:22-600:6 (Gehring).

41.     As part of the chain of command, Ms. Keller and Mike Choi each held Vice President positions and reported to Ms. Gehring.   Tr. Lapera 102:21-105:11; 596:1-598:16 (Gehring).  Plaintiff was responsible for managing a group of employees within the EPMO division and reported directly to Ms. Keller.  Tr. 599:22-600:20 (Gehring).

42.     Plaintiff was the highest paid Director reporting to Ms. Gehring.  In fact, Plaintiff was compensated more than Jim Tomasello, Kevin Smith, Amilda Gjecovi, and Lea Nicotra from at all times while she reported into Ms. Gehring's organization. Tr. 589:5-593:13 (Westbrook); Ex. 16.[5]

43.     Plaintiff received the highest rating she could obtain for her 2012 performance.  Ms. Gehring approved that rating and successfully defended it at a calibration session held by the Chief Financial Officer, David Benson. Tr. 612:16-613:10; 635:2-15 (Gehring); Ex. 17.

44.     When Ms. Gehring joined the EPMO team, she made it one of her priorities to create and develop a personal and organizational brand for the team.  Using the "town hall meeting" as a platform to communicate her ideas, Plaintiff testified:

> [W]hen Anne became the senior vice president for the EPMO, she called a town hall [meeting], which is a sign of a good leader.  That's what a good leader does.  They come into a new position, they want to meet the team and she explained what her vision was for the EPMO.  And those were town halls, which means everybody from the staff was present during the town hall.  And she did that all the way during her tenure as SVP, which is exactly what a leader does.  Tr. 111:1-11 (Lapera).

---

[5] Plaintiff was not compensated as high as Tomasello, Smith, Gjecovi, or Nicotra in 2013 because she was terminated and therefore ineligible to receive a bonus payment for 2013. Tr. 593:4-13 (Westbrook).

45.    Ms. Gehring authorized an image consultant to come to Fannie Mae to make a presentation and invited all employees in her organization.[6]  The consultant prepared a presentation, stating that employees should create a personal "brand" and establish a strong first impression by addressing four components: behavior (body language, eye contact, etiquette), special (office, car, home), visual (wardrobe, personal grooming), and vocal (voice, speech).  The presentation made no reference to weight or race.  Tr. 599:3-21 (Gehring); Ex. 18.  Many embraced the outside consultant's presentation:

> Thank you for arranging today's session, it was fabulous!  I really think this gives the group superb momentum to both focus on our own individual image, while also addressing our overall EPMO brand.  This session created energy for the group… I recommend using this as a launch pad for additional post-work.
> . . .
>
> These sessions are great for many reasons.  They encourage us to collaborate with those that we don't work with each day and, ultimately, become a more united EPMO.  I think connecting our own development to the EPMO's rebranding development needs, where possible, will ensure greater buy-in and follow-through from an internal perspective. (Ex. 19 at FM000733).

### Ms. Gehring's Concerns About Ms. Keller's Lack of Communication

46.    Ms. Gehring expected the officers in her organization to exude "executive presence," a term widely used in business circles to describe "the ability to project mature self-confidence, a sense that you can take control of difficult, unpredictable situations; make tough decisions in a timely way and hold your own with other talented and strong-willed members of the executive team." Ex. 20, John Beeson, Deconstructing Executive Presence, Aug. 22, 2012, Harvard Business Review, https://hbr.org/2012/08/de-constructing-executive-pres/; Ex. 21,  Jun

---

[6] Plaintiff hosted a similar event in 2009, a "Personal Leadership Brand" topic for conversation.  Plaintiff sent an email to members of her team, instructing them to read the attached articles and assess themselves against the "Leadership Self Diagnostic."  (Exhibit 22 at FM001745).

MeDalla, 7 Traits of Executive Presence, The Key to Winning People Over, Sep. 24, 2013, Business Insider, http://www.businessinsider.com/the-7-traits-of-executive-presence-2013-9.

47.    Starting in the fall of 2013, Ms. Gehring expressed concerns with Ms. Keller about perceived shortcomings in Ms. Keller's communications. Tr. 628:22-629:15 (Gehring).  Ms. Gehring strongly emphasized communication skills, especially when presenting to the senior leaders of Fannie Mae:

> A significant portion of the role that the EPMO organization played was to communicate to the senior leadership team, FHFA, the regulator and the board of directors, the strategy for the execution of the portfolio of projects.  And Kathy was unable to deliver presentations that were appropriate for that audience and she also was unable to participate in meetings with the senior leadership team and FHFA at an appropriate communication style.  Tr. 626:10 -18 (Gehring).

48.    Mr. Benson also placed a premium on conciseness and communication skills:

> Kathy went into far too much detail for an executive.  I like to say you ask Kathy what time it is and she tells you how to make a watch.  At one point the CFO who I worked for, Dave Benson, asked her to stop the presentation and asked me to finish it. Tr. 626:21 - 627:4 (Gehring).

### Fannie Mae's Policies for Filling Vacant Executive Positions

49.    Melissa Werner, Senior Recruiter and Executive Office Hiring Lead, managed all of the recruitment for officer positions for the Company.  As part of Fannie Mae's officer selection process, candidates can either go through a "promotional process" by which the candidate has been acting in the role for some period of time and their readiness is determined by their leader, or a "competitive search process" where the candidate is interviewed against other candidates in a pool and then determined to be the finalist.  Tr. 405:4-15; 420:21-421:9 (Werner).

50.    If an employee wishes to move from the position of a Director to Vice President, he or she must go through a Vice President Panel Process, or "competitive search process". *Id*.

12

51.    When selecting Vice Presidents, Fannie Mae places a strong emphasis on the role of leadership, more so than technical ability.  Tr. 386: 21-387:17 (Fraser); 473:13-474:1 (Harris):

> It's a primary quality or a criteria that we're looking for.  Leadership is defined as the ability to influence across the organization.  It's defined as the ability to manage people, to think strategically, to work collaboratively.

> So the criteria for leadership is very important to us because these roles are preeminent in helping the company devise its business strategy and execute on its business strategy, so we have to have candidates in these roles that are able to influence across all levels of the company.  So it's an important part of our process. Tr. 453:11-454:1 (Werner).

> Technical expertise and subject matter knowledge is important in some of our opportunities, but in general, we look for a broader scope of general management skills.  So we're looking, again, at strategic thinking, the ability to collaborate across the entire enterprise, the ability to influence at all levels in the organization. Tr. 455:16-22 (Werner).

> So I've had the opportunity to be on a panel interviewing candidates for vice president recently.  At that point, when you're talking to someone in a leadership panel, you're not talking about their technical skills to do the job.  You're talking about their ability to lead and manage a team and they surround themselves with the technical expertise to get it done.  So it's a balance.  Some roles might be subject matter expert roles where you need technicians, but for the most part, at an officer level, that's not the focus. The focus is on leadership skills, the ability to collaborate, communicate well, develop people, execute.  Tr. 379:14-380:5 (Fraser).

52.    Vacant officer-level positions are posted internally by Human Resources to all Directors and Officers in Fannie Mae and are held open for a period of five business days.

> So generally, the policy is that if we determine a job should be posted, we post the job for five business days, seven calendar days.  Once the posting is completed, we then review the candidates who have applied, to review them for their qualifications for the role, share that candidate information, including qualifications for the role, with the hiring manager.

> Typically around that time, we're also discussing with the hiring manager what a candidate profile should look like for the job.  And then once we've determined whether or not a candidate meets the profile and the qualifications for a role, we'll begin the process of scheduling them for interviews and other stakeholder meetings. Tr. 406:15-407:7 (Werner).

13

53.     The five business days, or seven calendar days rule is not a rigid requirement, however; Recruitment may decide to keep the job posting open past the original deadline.  Or, if an applicant requests such, Recruitment may accept a resume after the closing date.  Tr. 406:12-411:19; 424:19-426:4 (Werner).

54.     Ms. Werner reviewed all applications and related data with the hiring manager for content and qualifications.  The applicants were then selected and scheduled to meet with the interviewers, determined by the hiring manager.  Once the interviews have taken place, Ms. Werner or the hiring manager collected feedback from the interviewers.  On average, it took 45 to 90 days for the entire process.  Tr. 411:19 to 421:19 (Werner).

### *The Position of Vice President of Planning and Alignment Becomes Available*

55.     In early 2013, Ms. Keller left the EPMO, which created a vacancy for an officer position on Ms. Gehring's team.  Tr. 629:11-15 (Gehring); Ex. 23 at FM000400.  Notice of the open position was emailed (internally) to all active Officers and Directors of Fannie Mae on June 3, 2013:

> This position, located in Washington, DC, will report to Anne Gehring and will be responsible for facilitating consensus around a long-term, integrated execution plan for the restructuring of Fannie Mae and the housing industry.  The multi-year investment plan includes project deliverables, project milestones, inter-dependencies and funding requirements.
>
> All qualified internal and external candidates are encouraged to apply.  We encourage all internal applicants to express their interest and submit their credentials via HomeSite, Job Opportunities Database, no later than Monday, June 10, 2013.  [*See* Ex. 25 at 000400].

56.    Lakisha Preston, an Administrative Assistant, forwarded the job description to her boss, Nicola Fraser on June 4, 2013.[7] Ex. 26; Tr. 328:22-329:6 (Fraser).

57.    Ms. Preston sent the email to Ms. Fraser's personal email address because Ms. Fraser was on maternity leave at that time and did not have access to her Fannie Mae email or other corporate systems. Tr. 335:6-19; 330:11-14 (Fraser).

58.    The job description that Ms. Fraser received did not indicate the deadline by which applications should be submitted.  Tr. 447:22-448:12 (Werner); *See* Ex. 24.

59.    Ms. Fraser began working at Fannie Mae on August 11, 2008, as Director in Accounting Policy.  Effective September 2010, Ms. Fraser reported to Ms. Gehring in her role as Director of Financial Analysis in the Corporate Finance department.  Before leaving for maternity leave in March of 2013, Ms. Fraser held the position of Vice President, Corporate Financial Planning and Analysis.  Tr. 319:22-324:5 (Fraser).

60.    During her maternity leave, Ms. Fraser decided that when she returned to Fannie Mae she would pursue opportunities that were broader than her role in the Corporate Finance Department. Tr. 324:10-325:7 (Fraser).

61.    On May 30, 2013, Ms. Fraser contacted Ms. Gehring.  She was unaware at that time of the vacancy created by Ms. Keller's departure. Tr. 356:5-359:6 (Fraser).

62.    After receiving the job posting from Ms. Preston on June 4, 2013, Ms. Fraser and Ms. Gehring arranged to meet for dinner on June 17, 2013.  Ex. 25 at FM000040; Tr. 608:14-20 (Gehring); 356:5-359:7 (Fraser).

63.    At the dinner Ms. Gehring informed Ms. Fraser that she (Ms. Gehring) intended to leave her position at Fannie Mae.  Tr. 402:3-403:1 (Fraser).

---

[7] Ms. Fraser immigrated from Ireland when she was 16 years old. Ms. Gehring was aware that Fraser was not born in the United States. Tr. 351:2-14 (Fraser).

64.     Ms. Fraser scheduled a separate meeting with Mr. Benson.  Having worked with Mr. Benson for "a number of years," Ms. Fraser wanted to discuss potential career opportunities that may exist elsewhere in Fannie Mae.  Tr. 331:1-22; 333:1-14 (Fraser).

65.     Ms. Fraser viewed Mr. Benson as "a natural person . . . to reach out to," because she had discussed her career aspirations with him a number of times. Tr. 331:1-22 (Fraser).

66.     Mr. Benson was supportive of Ms. Fraser applying for a position within the EPMO; specifically, lateraling into the Vice President for Planning and Alignment position from her previous Vice President role.  Tr. 330:11-335:11 (Fraser); Ex. 26 at FM000101.

67.     Ms. Fraser submitted her resume to Ms. Werner on July 11, 2013. Ex. 27 at FM000418-000419.

68.     Ms. Werner accepted Ms. Fraser's resume after the closing date because Ms. Fraser had been on maternity leave and, therefore, did not have access to Fannie Mae's systems or her corporate email. Tr. 431:15-433:10; 435:13-436:16 (Werner); 328:9-21 (Fraser).

69.     Similarly, Plaintiff was unable to submit her resume via Fannie Mae's online portal because of a system malfunction.  Instead, she too emailed her resume directly to Ms. Werner for consideration.  Ex. 28 at P0001-0003; and Ex. 29 at FM000425.

70.     Ms. Werner compiled a list of applicants and emailed it to Ms. Gehring, who then forwarded the list to Ms. Harris for her opinion and thoughts.  Ex. 30 at FM000097.  The list was eventually narrowed down to three candidates: Plaintiff, Ms. Fraser, and Joe Hallet.  Each candidate was scheduled to interview with a three-person panel comprised of Ms. Gehring, Ms. Harris, and Mr. Choi.  *See* Ex. 31 at FM000100; Tr. 609:4-610:13 (Gehring).

71.     Race, ethnicity, age, weight, and body-shape were not mentioned or considered in the interviews.  Tr. 231 (Lapera); 369:18-372:12 (Fraser); 491:12-492:5 (Harris).

16

72.     Ms. Harris is particularly sensitive to issues regarding weight and personal appearance.  Her daughter has been obese for the majority of her life. Tr. 493:8-494:5 (Harris).

73.     During the interviews, Ms. Gehring generally asked the candidates about their backgrounds, their experience, how they built relationships across the organization and for ideas of what they would do in the role. Tr. 611:21-612:6 (Gehring).

*The Decision to Select Nicola Fraser as Vice President of Planning and Alignment*

74.     The Vice President of Planning and Alignment sat within the EPMO.  Tr. 351:22-352:19 (Fraser).

75.     The duties of the Vice President for Planning and Alignment included: (i) acting as a trusted advisor and independent lens to the SVP of the EPMO and the CFO; (ii) provide insights and strategic analysis to facilitate decision making; (iii) develop a relationship with the SVP and CFO that promotes the role as an objective sounding board; (iv) develop strong relationships with senior leadership team on the project teams, particularly the program managers; (v) communicate effectively at the highest levels of the organization.  Tr. 359:8-369:14 (Fraser).

76.     In order to fulfill this important role, the position required excellent communication skills and demonstrated ability to interact and communicate with senior executives in the Company, the FHFA, the Treasury, and Fannie Mae's Board of Directors, on the strategy for execution of the portfolio of projects to be undertaken at Fannie Mae. Tr. 626:2-627:4; 613:16-615:1 (Gehring).

77.     Ms. Fraser's responsibilities as the Vice President for Financial Planning & Analysis in the Corporate Finance department were similar to the responsibilities for the Vice President for Planning and Alignment in the EPMO.  In this regard, Ms. Fraser was responsible for making monthly presentations to senior executives at Fannie Mae and the Fannie Mae

Management Committee.  Also, Ms. Fraser already had strong relationships with Fannie Mae's CFO and SVP for the EPMO; and she regularly interacted with senior leaders and program managers throughout the organization.   Tr. 342:4-345:8; 359:8-369:14 (Fraser); Ex. 32, VP Planning and Alignment Position Description.

78.     Ms. Fraser, a certified public accountant, also had experience meeting with Fannie Mae's regulators from Treasury and FHFA where she was called upon to concisely detail the Company's approach to financial analysis and results in a concise format. Tr. 367:5-368:10 (Fraser).

79.     Ms. Fraser had not led a Lean Six Sigma team and was not credentialed by the Six Sigma Academy. Tr. 326:9-18 (Fraser).

80.     Per Ms. Werner's request, every panel member was to provide feedback from his or her interview with each of the three candidates. Ex. 33 at FM000105; and Ex. 34 at FM000443. Ms. Harris, Mr. Choi, and Ms. Gehring all stated that Ms. Fraser was the best candidate for the Vice President for Planning and Alignment. Tr. 489:14-491:11 (Harris):

|  | Nicola Fraser | Ana Lapera |
|---|---|---|
| Mike Choi | Deep financial background and experience with strong relationships across the organization.  In particular, FP&A, which is a key EPMO partner.  Proven track record for delivery on both tactical and strategic efforts.  Has experience synthesizing financial data to produce information for management consumption.<br><br>Considering the above, I believe Nicola would add the most value to the team at this time.  She possesses the analytical skills, which is imperative.  Her previous experience navigating different client organizations as an auditor is a plus.  I believe Nicola can hit the ground running with minimal ramp up time. | Working knowledge of the EPMO, specifically the P&A team; deep process expertise, extensive Fannie Mae experience and network. |
| Shandell Harris | Nicola, by far is the best candidate…a seasoned-top-talented leader with demonstrated leadership capabilities. | Ana has good leadership skills as it relates to managing her team.  Her real area of focus would be her executive presence and communicating with the |

| | | OC and MC.[8]  I think this area of development for her is critical given this role and I would not see her as the best candidate. |
|---|---|---|
| Anne Gehring | Nicola Fraser is the best candidate, <br> -well established relationships with David Benson and the management committee that will be critical in this role. <br> -experience in public policy and strategic thinking.  This role operationalizes the strategy so deep understanding is important. <br> -tested VP with excellent leadership and expertise influencing skills. | -very execution oriented, self-starter <br> -mature relationships throughout the organization <br> -does not consistently see the big picture, sometimes has a naïve view. <br> -communications skills at executive level need improvement. Not a good fit for MC or FHFA interaction. |

*See* Ex. 33 at FM000105; and Ex. 34 at FM00043.

81.     Ms. Harris recommended Ms. Fraser for the position because she had supported Ms. Fraser in the Financial Planning and Analysis organization, where she observed that Ms. Fraser was already a "top talent" officer who demonstrated an ability to "be very effective" in her interactions with Fannie Mae's Management Committee and felt that Ms. Fraser had good leadership skills.  Tr. 487:16-489:10 (Harris).

82.     Ms. Fraser's designation as a "top talent" officer indicated that the senior leaders in the Finance department and the CFO (Mr. Benson) considered her ready for broader responsibilities and promotion.  Tr. 488:17-489:10; 494:22-495:11 (Harris).

83.     At the time she applied for the Vice President for Planning and Alignment, Ms. Fraser had been rated as "2" Exceeds Expectations on her 2012 year end performance review as the Vice President for Planning and Analysis. Ex. 35.

84.     Plaintiff admitted that at the time she applied for the Vice President for Planning and Alignment that she had "very little experience" with presenting before Mr. Benson and lacked

---

[8] OC and MC refer to the Operating and Management Committees at Fannie Mae; the two managing committees at Fannie Mae. Tr. 486:17-487:12 (Harris).

familiarity with him. Plaintiff never presented to the FHFA. Plaintiff had not presented to the entire Management Committee for several years prior to July 2013. Tr. 240:13-242:16 (Lapera).

85.     Plaintiff agreed that Ms. Fraser had more experience presenting to Fannie Mae senior management. Plaintiff also acknowledged that Ms. Fraser had a stronger relationship with Mr. Benson. Tr. 241:13-243:11 (Lapera).

86.     After interviewing the Plaintiff, Ms. Harris informed the Plaintiff that her only concern with Plaintiff was her lack of executive presence. Tr. 478:10-481:18; 484:2-13; 495:14-21 (Harris).

87.     Ms. Harris formed her impression based on her observation of Plaintiff facilitating a presentation and in regular staff meetings. Ms. Harris explained the root of her concern as follows:

> It was a communication style. Sometimes I observed Ana could ramble, kind of not be on point. I think it's important in communicating with executives that you are crisp and to the point and provide detail as requested. Tr. 478:18-22 (Harris).

> Yes. I had observed her in staff meetings and she tended to be sometimes emotional in the delivery of her message. So those were my points of reference. Tr. 480:20-481:1 (Harris).

88.     Ms. Gehring selected Ms. Fraser for the VP of Planning and Alignment position. Tr. 613:11-15 (Gehring).[9]

89.     Ms. Gehring believed that Ms. Fraser was better qualified for the position than Plaintiff. Ms. Gehring did not trust that Plaintiff would represent the Company appropriately in front of executives or the regulator. Tr. 614:14-619:4 (Gehring). She explained:

> Look, in my role leading the EPMO, it seemed like a process improvement project, if that goes astray, I can fix that. I just go fix the project, do damage control, no problem.

---

[9] Ms. Gehring had not previously informed Ms. Fraser that she would be selected for the VP of Planning and Alignment position. Tr. 340:21-341:8 (Fraser).

20

If I put someone in front of the board of directors, FHFA, Treasury and they communicate in an unprofessional way, my judgment of talent comes into question and I just wasn't willing to take that risk. And Nicola Fraser had preexisting relationships with the entire executive team, including Tim Mayopoulos and Dave Benson and many others on the executive team. She had previous relationships with FHFA and treasury and had successfully presented to them on numerous occasions. And she had previous relationships with the board of directors. She had prepared numerous, numerous presentations for these groups and that was the critical piece that was missing that I needed to hire. And so that's why I hired Nicola is I had to have someone who could do that. Tr. 639:8-640:5 (Gehring).

*      *      *

Q. Well, setting yourself aside, on how many occasions did you witness her [Plaintiff] making presentations to senior officials at Fannie Mae when you were at FP&A?

A. A handful, Three maybe.

Q. Maybe three times?

A. Yes.

Q. Okay. And on how many occasions did you observe Ms. Lapera making presentations to federal regulators?

A. I didn't.

Q. All right. So your conclusion that Ms. Lapera could not present to federal regulators or senior officials at Fannie Mae was based on observing her on three occasions make presentations?

A. No. Ana Lapera presented to me once a week at least. So my evaluation of her was also based on her ability to present to me. If an individual can't present to the senior vice president, you typically don't let them go on and present to the CFO or the board of directors or the regulators. Tr. 642:2-643:2 (Gehring).

90. The Vice President for Planning and Alignment position had three areas of responsibility: Business Architecture, Lean Six Sigma, and Enterprise Planning. Tr. 372:13-373:2 (Fraser).

91. In the performance of the role, Ms. Fraser spent "very little" of her time working on Lean Six Sigma projects. Indeed, the discussions about Lean Six Sigma were whether the

21

function should be transferred out of the EPMO to the Human Resources department – which the transfer took place when Patricia Black replaced Ms. Gehring as the Senior Vice President for the EPMO.  Tr. 373:6-374:3; 399:14-400:10 (Fraser).

92.    Similarly, the demands of Business Architecture were small as compared to Ms. Fraser's Enterprise Planning responsibilities.  The vast majority of Ms. Fraser's time was spent on Enterprise Planning (which included the Multiyear Investment Plan).[10]  Tr. 373:3-12; 374:4-375:18; 390:4-392:12 (Fraser).

> Q.    Focusing on your communications with project team leaders, what, if anything, would you typically have to talk to them about how their projects fit within the greater Fannie enterprise?
>
> A.    It depends, I mean, for the most part, most of the conversations were largely around their project.  Funding for their project was always a big topic of discussion.  They never got enough funding.  And then we would also talk about resources, that even if they had the dollars, could they even get the resources because I think we think we can do more than we actually can.  So a lot of trying to understand that and explain, get into – when you're dealing with your smaller projects, you would be focused on trying to understand what it is we're really trying to achieve and how does it fit in?  Is this a project that really needs to be done?  So you've got your bigger projects, your transformational, changing certain aspects of our business, but then you've got little small systems that we've got to maintain and we want to tweak and trying to understand what we're doing here.  Is it to address FHFA requests?  So you're trying to get into the root cause of different projects and why we're doing what we're doing.
>
> Q.    And I take it it's probably frequently the case that everyone thought their project should be given priority status?
>
> A.    Absolutely.  Tr. 377:5-378:12 (Fraser).

93.    The candidates' race, body shape, national origin, age, weight, personal appearance, or ethnicity were not factors in Ms. Gerhing's decision to select Ms. Fraser for the VP of Planning and Alignment position.  Tr. 632:8-633:5 (Gehring).

---

[10] In fact, soon after transferring to the VP for Planning and Alignment, Ms. Fraser consulted with HR to hire two Director level employees and to staff the Enterprise Planning function of the team. Tr. 390:4-392:12 (Fraser).

94.    After the interview process was over, Ms. Harris and Ms. Gehring called Ms. Fraser to inform her that she had been selected.  Ms. Fraser accepted, and resumed her employment with Fannie Mae at the end of July 2013.  Tr. 341:2-14 (Fraser).  Plaintiff approved Ms. Fraser's selection and welcomed her to the Planning and Alignment team.  Ex. 36 at FM001049.

95.    Plaintiff acknowledged that she had no direct evidence showing that her weight and/or ethnicity played a role in the decision not to select her for the officer role (*e.g*., she was unaware of any disparaging comments about her weight and ethnicity).  Tr. 238:14-240:12 (Lapera).

96.    Plaintiff decided to leave Fannie Mae in October 2013 – two months after Ms. Gehring had already resigned in August 2013.  Plaintiff found employment immediately thereafter as a consultant at a top tier multinational bank in New York City from November 2013 to March 2014, earning a higher salary than she had previously at Fannie Mae.  Tr. 286:10-291:22 (Lapera).

97.    In early 2014, the Lean Six Sigma team was transferred from the EPMO to Human Resources.  Tr. 399:19-402 (Fraser).

### *Final Decision of the Prior Arbitration Decision*

98.    On October 24, 2013, Plaintiff filed for a nonbinding arbitration under Fannie Mae's Dispute Resolution Policy, alleging that Fannie Mae engaged in race and personal appearance discrimination conduct in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; and the D.C. Human Rights Act, D.C. Code Ann. § 2-1401.  A copy of Plaintiff's Demand for Arbitration under Fannie Mae's Dispute Resolution Policy is attached at Ex. 37.  A full evidentiary hearing was conducted over the course of four days in November 2014 before a neutral and impartial arbitrator the Honorable James Robertson, Ret., from JAMS Resolution, Inc.  On November 25, 2014, the Arbitrator

23

entered a Final Award finding that the Plaintiff failed to prove a case of disparate or discriminatory treatment. Ex. 38.

99.     Upon information and belief, Plaintiff did not file a charge of discrimination with the Equal Employment Opportunity Commission, or the District of Columbia Human Rights Office. If she had done so, Fannie Mae never received such a charge. *See* Affidavit of Karl Johnson.

100.    On January 27, 2015, Plaintiff filed the instant action in the Superior Court for the District of Columbia asserting race discrimination claims under 42 U.S.C. § 1981 and race, age and personal appearance discrimination claims pursuant to the DCHRA Human Rights Act, D.C. Code Ann. § 2-1401, restating, with the notable exception of age discrimination, the very same allegations she alleged in her arbitration demand – claims that were rejected in the previous forum.

Dated: October 9, 2015                    Respectfully submitted,

                                          **FANNIE MAE**

                                          ____/s/ __DGS_____
                                          Damien Stewart
                                          Fannie Mae
                                          3900 Wisconsin Ave., N.W.
                                          Washington, DC 20016
                                          Tel. (202) 752-6871
                                          damien_g_stewart@fanniemae.com

                                          **Attorney for Defendant**

24

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this 9th day of October 2015, a copy of the foregoing Fannie Mae's *Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment* was served via the Court's ECF system on the following:

> David A. Branch, Esq.
> Law offices of David Branch & Associates
> 1828 L Street NW
> Suite 820
> Washington, DC 20036
> (202) 785-2805 phone
> (202) 785-0289 fax
> davidbranch@dbranchlaw.com

_____/s/ __DGS_____
Damien G. Stewart

25