**UNITED STATES DISTRICT COURT**
**OF THE DISTRICT OF COLUMBIA**
**<u>CIVIL DIVISION</u>**

| | | |
|---|---|---|
| **ANA LAPERA** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-CV-000447 |
| | ) | District Judge: Beryl A. Howell |
| **FANNIE MAE** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# FANNIE MAE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated: October 9, 2015

Respectfully submitted,

**FANNIE MAE**

_____/s/___DGS_____
Damien Stewart
Associate General Counsel
Fannie Mae
3900 Wisconsin Ave., N.W.
Washington, DC 20016
Tel. (202) 752-6871
damien_g_stewart@fanniemae.com

**Attorney for Defendant**

# **Table of Contents**

PRELIMINARY STATEMENT .............................................................................................................1

STANDARD OF REVIEW ..................................................................................................................3

ARGUMENT AND CITATION OF AUTHORITIES ...............................................................................4

    POINT I ........................................................................................................................................4

        PLAINTIFF'S AGE CLAIMS MUST BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE
        REMEDIES .................................................................................................................................4

    POINT II .......................................................................................................................................6

        PLAINTIFF HAS NO LEGALLY-PROTECTED  RIGHTS UNDER 42 U.S.C. § 1981 ......................................6

    POINT III ......................................................................................................................................8

        THERE IS NO EVIDENCE THAT PLAINTIFF SUFFERED DISPARATE TREATMENT BASED ON RACE OR
        PERSONAL APPEARANCE .............................................................................................................8

    POINT IV ......................................................................................................................................16

        PLAINTIFF WAS NOT SELECTED FOR PROMOTION BECAUSE A MORE QUALIFIED CANDIDATE WAS
        CHOSEN .....................................................................................................................................16

CONCLUSION.................................................................................................................................24

# Table of Authorities

## Cases

Abumaw v. Prince Georges Corr. Dep't., 2014 U.S. Dist. LEXIS 13215 at *4 (D.Md. Feb. 3, 2014) ........ 7

Adeyemi v. District of Columbia, 525 F.3d 1222, 1227-28 (D.C. Cir. 2008) .................................... 17, 18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ........... 3, 4

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ...................................................................................... 8

Benefits Comm's Corp. v. Klieforth, 642 A.2d 1299, 1301-02 (D.C. 1994) ...................................... 10

Benton v. Laborers' Joint Training Fund, 2015 U.S. Dist. LEXIS 104176 *50 (D.D.C. Aug. 10, 2015)... 15

Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) ...................................... 9

Brannum v. Fannie Mae, 971 F.Supp.2d 120, 127 (D.D.C. 2013) ................................................ 19

Calhoun v. Johnson, No. 95-CV-2397, 1998 U.S. Dist. LEXIS 22376, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) .................................................................................................................... 4

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .................................... 4

Chappell-Johnson v. Bair, 574 F. Supp. 2d 103, 107 (D.D.C. 2008) .............................................. 9

Childs-Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60, 70 (D.D.C. 2005) .......................... 15

Coleman v. Potomac Elec. Power Co., 310 F. Supp. 2d 154, 158 (D.D.C. 2004) ................................ 5

Cuello Suarez v. Puerto Rico Elec. Power Authority, 798 F. Supp. 876, 890-91 (D.P.R. 1992) ............... 7

Dave v. District of Columbia Metropolitan Police Dep't., 905 F.Supp.2d 1, 14 (D.D.C. 2013) ............... 10

Domino's Pizza, Inc., 546 U.S. 470, 474-75 (2006) ........................................................................ 6

Eder v. City of New York, 2009 U.S. Dist. LEXIS 11501 *24 (S.DN.Y Feb. 9, 2009) ............................ 11

Fletcher v. Phillip Morris USA, Inc., 09-284, 2009 U.S. Dist. LEXIS 63094 at *20 (E.D. VA. Jul. 13, 2009) ................................................................................................................................ 11

Glass v. Lahood, 786 F.Supp. 2d 189, 216 (D.D.C. 2011) ................................................................ 11

Haynes v. Williams, 392 F.3d 478, 481, 364 U.S. App. D.C. 108 (D.C. Cir. 2004) .................................. 3

Hendricks v. Geithner, 568 F.3d 1008, 1012 (D.C. Cir. 2009) ........................................................ 16

Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) ................................................................ 17

Hutson v. Wells Dairy, Inc., 578 F.3d 823, 826 (8th Cir. 2009) ...................................................... 6

Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007 ................................................................ 20

Laningham v. United States Navy, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242 (D.C. Cir. 1987) .......... 4

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ................................................................ 9

National Ass'n of Gov't Employees v. Brown, 556 F.2d 76 (D.C. Cir. 1977) ..................................... 6

Natonal Ass'n of Gov't Employees v. Rumsfeld, 413 F. Supp. 1224, 1228 (D.D.C. 1976) .................. 6, 7

Nurriddin v. Goldin, 382 F. Supp. 2d 79, 95 (D.D.C. 2005) ........................................................... 22

Perry v. Clinton, 831 F Supp. 2d 1, 17 (D.D.C. 2011) .................................................................... 15

Peterson v. Corr. Corp. of Am., 2015 U.S. Dist. LEXIS 130409,*7 at fn. 6 (N.D. Fla. 2015) .................. 11

Quraishi v. Kaiser Foundation Health Plan, 2013 WL 2370449, at *2 (D. Md. May 30, 2013) .............. 7, 8

Robertson v. Dodaro, 767 F. Supp. 2d 185, 194 (D.D.C. 2011) ....................................................... 22

Saint Francis Coll v. Al-Khazraji, 481 U.S. 604, 613 (1987) ........................................................... 7

Saleh v. Univ. of Va., 1999 WL 34798179, at *18 (E.D. Va. Feb. 25, 1999) ...................................... 8

Spaeth v. Georgetown Univ., 943 F. Supp. 2d 198, 209 (D.D.C. 2013) ............................................ 20

Toliver v. Cmty. Action Comm'n, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir. 1986) ................................................................................................................................ 11

Valles-Hall v. Ctr. For Nonprofit Advancement, 481 F. Supp. 2d 118, 140 (D.D.C. 2007) .................... 9

Waterhouse v. District of Columbia, 298 F.3d 989, 992, 353 U.S. App. D.C. 205 (D.C. Cir. 2002) ..... 3, 23

Woods v. New York, 469 F. Supp. 1127 (S.D.N.Y.) ......................................................................... 7

**Statutes**

29 U.S.C. § 626(d)(1)(A)................................................................................................................5
42 U.S.C. § 1981.......................................................................................................................2, 6

**Other Authorities**

Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §626........................................5
D.C. Code §2-1403.16 .................................................................................................................6
DCHRA, D.C. Code §2-1401 .......................................................................................................5

**UNITED STATES DISTRICT COURT**
**OF THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

| | |
|---|---|
| **ANA LAPERA** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 15-CV-000447 |
| | ) District Judge: Beryl A. Howell |
| **FANNIE MAE** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**FANNIE MAE'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, the Federal National Mortgage Association ("Fannie Mae"), by and through its undersigned counsel hereby submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.  This Memorandum is supported by the concurrently filed Statement of Undisputed Material Facts which are hereinafter referred to as "Facts ¶_".  Based upon the arguments and authorities set forth below, Fannie Mae submits that judgment should be entered in its favor as to all of the Plaintiff's claims and that a dismissal with prejudice is warranted.

PRELIMINARY STATEMENT

The record in this case is the product of a four-day arbitration conducted by JAMS and presided over by the Honorable James Robertson (Ret.).  During the arbitration, the Parties had an opportunity to conduct discovery, including depositions as well as the exchange of written interrogatories and document production requests.  At the arbitration hearing, the Parties presented witness testimony subject to cross examination, submitted extensive documentary evidence and each filed post-hearing briefs.  Following the evidentiary hearing, Judge Robertson issued an opinion and award finding no merit to any of the claims Plaintiff, Ana Lapera, hereinafter

1

("Plaintiff" or "Lapera"), pursues in this Court. [Facts ¶98] Plaintiff exercised her option under the Fannie Mae arbitration policy to reject Judge Robertson's decision and to re-litigate her claims in this Court.

In this action, Plaintiff reasserts not only the claims she submitted to arbitration, but also a new claim for age discrimination that she was not submitted to Judge Robertson for the arbitration. Her previously arbitrated claims resubmitted in this action are: (1) the "Leveling Claims," in which she seeks relief under 42 U.S.C. § 1981, due to Fannie Mae's denial of her requests to increase the job level of her position from salary grade "M" to salary grade "N"; and (2) the "Failure to Promote Claims," for which she alleges Fannie Mae's decision not to promote her to the role of Vice President for Planning and Alignment ("the Position") in its Enterprise Program Management Office ("EPMO"), was allegedly due to her  race  in violation of § 1981 and the District of Columbia Human Rights Act ("DCHRA"), and allegedly due to her  personal appearance, in violation of the DCHRA, *see id.*

As set forth below, Fannie Mae is entitled to Summary Judgment on all of Plaintiff's claims.  First, her newly asserted age claim is barred as a matter of law due to her failure to exhaust administrative remedies and failure to arbitrate.  Second, her Leveling and Failure to Promote claims must fail because the undisputed facts confirm that Plaintiff's Hispanic national origin and physical appearance had nothing whatsoever to do with the reclassification of her position or the failure to promote her to a different position, and she has not and cannot present any evidence to the contrary.  Plaintiff also cannot establish a § 1981 race claim solely on the basis of her Hispanic national origin, and she has not asserted any other facts to support a theory of intentional race discrimination.

STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment shall be granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (*quoting* Fed. R. Civ. P. 56(c)). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Haynes v. Williams*, 392 F.3d 478, 481, 364 U.S. App. D.C. 108 (D.C. Cir. 2004) (*quoting Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment "against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Waterhouse v. District of Columbia*, 298 F.3d 989, 992, 353 U.S. App. D.C. 205 (D.C. Cir. 2002) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and declarations show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id*. at 255.

The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by declarations or other competent evidence setting forth specific

facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in her favor. *Laningham v. United States Navy*, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

"While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-CV-2397, 1998 U.S. Dist. LEXIS 22376, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd* No. 99-5126, 1999 U.S. App. LEXIS 25165, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999).

<u>ARGUMENT AND CITATION OF AUTHORITIES</u>

<u>POINT I</u>

PLAINTIFF'S AGE CLAIMS MUST BE DISMISSED
FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Fannie Mae is entitled to judgment as a matter of law on the Plaintiff's age discrimination claims brought under the DCHRA because they were not first arbitrated as required by Fannie Mae's Dispute Resolution Policy (the "DRP").  It is a condition of employment at Fannie Mae for employees to litigate employment related claims in pre-dispute arbitration as a prelude to filing an action in Court. Plaintiff failed to bring an age discrimination claim in the action she filed with JAMS.

Pursuant to the DRP, Plaintiff filed a Demand for Arbitration with JAMS, wherein she brought a three-count Demand for alleged race and personal appearance discrimination under the DCHRA (Count I); for race discrimination under Title VII of the Civil Rights Act of 1964 (Count II); and finally a claim for alleged race discrimination under 42 U.S.C. §1981 (Count III). [Facts ¶98].    In early November 2014, the Parties litigated Plaintiff's claims for race and personal appearance discrimination at JAMS.  Plaintiff did not assert an age discrimination claim in the arbitration, nor did Judge Robertson consider age claims in his decision.  Indeed, in his "Summary of claims and responses," Judge Robertson stated, "Ms. Lapera alleges discrimination on the basis of race and personal appearance."  There was no mention of an age claim in the Arbitration and Plaintiff cannot, for the first time, raise an age discrimination claim in this Court.

Plaintiff's age-claim should be dismissed with prejudice at this time, because she cannot cure the failure to arbitrate.  Rule 3 of the DRP states, in pertinent part:

> The Policy does not change or in any way affect an employee's right to file a charge or complaint with the EEOC or any other administrative or fair employment rights agency. During an employee's participation or involvement in any of Fannie Mae's dispute resolution processes (including arbitration under the Policy), there will be no suspension, extension, or postponement of any applicable time limit or deadline by which the employee is required to file such an administrative charge or complaint.  [Facts ¶98].

An aggrieved employee has two statutory vehicles through which to pursue a claim of age discrimination: (1) the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §626 *et seq.*, or the DCHRA, D.C. Code §2-1401 *et seq*.

Under the ADEA, a charge of discrimination must be filed with the EEOC within 180 days of the alleged unlawful practice. 29 U.S.C. § 626(d)(1)(A).  However, because the District of Columbia is a "deferral jurisdiction," an age discrimination charge to the EEOC is timely only if it is filed within 300 days of the alleged discriminatory act. *See, e.g., Coleman v. Potomac Elec. Power Co.*, 310 F. Supp. 2d 154, 158 (D.D.C. 2004). "The timely filing of an EEOC charge is a

5

requirement for bringing a[n] . . . ADEA suit in federal court." *Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 826 (8th Cir. 2009). Here, upon information and belief Plaintiff did not file a claim with the EEOC or the DCHRA and, therefore, is prohibited from pursuing such a claim in this Court.

Alternatively, although a claim asserted under the DCHRA may be pursued without first filing an administrative charge, there is a one-year statute of limitations for such actions. Plaintiff resigned from her employment on November 2, 2013 – nearly two years ago. She, therefore, is time-barred from filing an action for age discrimination. *See* D.C. Code §2-1403.16. Accordingly, Plaintiff's age discrimination claims are time-barred.

<u>POINT II</u>

PLAINTIFF HAS NO LEGALLY-PROTECTED
RIGHTS UNDER 42 U.S.C. § 1981

Section 1981 "protects the equal right of all persons within . . . the United States to make and enforce contracts," including employment contracts, "without respect for race." *Domino's Pizza, Inc.*, 546 U.S. 470, 474-75 (2006). *See* 42 U.S.C. § 1981(a) (providing in pertinent part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts as is enjoyed by white citizens."). Section 1981 "is directed solely at racial discrimination. It is inapplicable to claims of discrimination based upon other grounds." *E.g., Natonal Ass'n of Gov't Employees v. Rumsfeld*, 413 F. Supp. 1224, 1228 (D.D.C. 1976) (internal citation omitted), *aff'd mem. sub nom., National Ass'n of Gov't Employees v. Brown*, 556 F.2d 76 (D.C. Cir. 1977). Thus, §1981 does not provide a cause of action for Plaintiff's theories of discrimination based on her appearance or because of her alleged Hispanic national origin.

For example, the U.S. District Court for the District of Columbia has held, and the D.C. Circuit has affirmed, that the plaintiffs, who worked at a U.S. Army base who were apparently Hispanic-Americans, did not have a §1981 claim because they were not in the class of persons

6

protected by that statute.  *See Nat'l Ass'n of Gov't Employees*, 413 F. Supp. 1224, 1228 (D.D.C. 1976) (holding that plaintiffs' allegation that they were "Spanish-Americans" did not by itself constitute an allegation of racial discrimination for §1981, and therefore, the plaintiffs failed to state a §1981 claim), *aff'd* 56 F.2d 76.  *See also, Woods v. New York*, 469 F. Supp. 1127 (S.D.N.Y.), *aff'd*, 614 F.2d 1293 (2d Cir. 1979) (national origin);

Even if "race" for purposes of a § 1981 claim can be construed to reach a person's ancestry or ethnic characteristics, *see, e.g., Saint Francis Coll v. Al-Khazraji*, 481 U.S. 604, 613 (1987), in a such a case the Plaintiff must still make a higher showing of proof of intentional discrimination related to those characteristics, which she has not done here.  Specifically:

> [A plaintiff] must demonstrate [that] he actually faced intentional discrimination based on his ancestry or ethnic characteristics, rather than solely on his place of origin. . . . Second, where a plaintiff's allegations reference only his place of origin and do not focus on specific ethnic characteristics associated with that place of origin, the broad construction of race under §1981 does not apply.

*Abumaw v. Prince Georges Corr. Dep't.,* 2014 U.S. Dist. LEXIS 13215 at *4 (D.Md. Feb. 3, 2014); *Quraishi v. Kaiser Foundation Health Plan*, 2013 WL 2370449, at *2 (D. Md. May 30, 2013) (quoting *Akinjide v. Univ. of Md. E. Shore,* 2011 WL 4899999, at *8 (D. Md. Oct. 13, 2011). In other words, the absence of "racial animus behind defendant's otherwise illegal practices should result in judgment for the defendant . . . ."  *See Cuello Suarez v. Puerto Rico Elec. Power Authority*, 798 F. Supp. 876, 890-91 (D.P.R. 1992) (dismissing plaintiff's § 1981 claim based on status of being from the Dominican Republic).

Plaintiff bases her race claim solely on the fact that she is allegedly Hispanic and has not alleged any other facts to prove a claim of intentional race discrimination. Consequently,  there is only a "mere possibility" that Plaintiff suffered discrimination because of her ancestral or ethnic

7

characteristics, and not just due to her national origin (*viz.*, originating from Latin America), which is insufficient to support her race claim and justifies dismissal. *See, e.g., Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (stating that allegations in a complaint that do not permit a court "to infer more than the mere possibility of misconduct" fail to state a cognizable claim). Notably, neither the Complaint nor the evidence support any discrimination motivated by Plaintiff's ethnic or ancestral traits. *See, e.g., Qurashi,* 2013 WL 2370449, at *2 (dismissing a § 1981 claim because "while [plaintiff mentions that she was born in Pakistan, she fails to refer to specific ethnic characteristics associated with her Pakistani origin that might suggest that applying the broad definition of race is appropriate in this case"); *Saleh v. Univ. of Va.,* 1999 WL 34798179, at *18 (E.D. Va. Feb. 25, 1999) (finding that the chiding of plaintiff because "he 'talked funny' – is indicative only of foreign-born/national origin discrimination" on a § 1981 claim).

POINT III

THERE IS NO EVIDENCE THAT PLAINTIFF SUFFERED DISPARATE TREATMENT
BASED ON RACE OR PERSONAL APPEARANCE

Plaintiff has offered no direct evidence that race or personal appearance discrimination motivated in whole or part the denial of her requests to re-level her position from an "M" to an "N" or the decision to select Nicola Frazier over her for the Vice President of Planning and Alignment position. In none of her written discovery responses or testimony did Plaintiff allege any facts (much less facts constituting direct evidence) supporting claims for race and personal appearance discrimination. On the contrary, Plaintiff admitted that Ms. Gehring did not reference her race, ethnicity, national origin, weight, body shape or any other person's personal characteristics when informed of Ms. Gehring's decision to select Ms. Fraser for the position. [Facts ¶95].

8

Because Plaintiff lacks direct evidence of race and personal appearance discrimination, she must prove her claims indirectly under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is used to assess § 1981 and DCHRA discrimination claims. *See e.g., Valles-Hall* v. Ctr. For Nonprofit Advancement, 481 F. Supp. 2d 118, 140 (D.D.C. 2007). However, in this Circuit, where an employee brings a disparate treatment claim and an employer asserts a legitimate, non-discriminatory reason for an adverse action, the court does not decide whether the plaintiff established her *prima facie* case. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). On summary judgment, the proper inquiry for the court is: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* "When determining whether summary judgment or judgment as a matter of law is warranted for the employer, the court considers all relevant evidence presented by the plaintiff and defendant." *Id.* at 495. Thus, the court reviews

> the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Chappell-Johnson v. Bair*, 574 F. Supp. 2d 103, 107 (D.D.C. 2008) (internal citations omitted). Here, as set forth below, Fannie Mae's has asserted legitimate, non-discriminatory reasons for its decisions with regards to the leveling of Plaintiff's position and the selection for the Vice President of Planning and Alignment position. There is no evidence from which a reasonably jury could infer discrimination. Even if she could satisfy her burden in this regard, judgment should

nevertheless be entered in favor of Fannie Mae, because it has legitimate, non-discriminatory reasons for her termination and there is no evidence Plaintiff could offer to show that the Company's decision was pretextual.

### 1. Compensation Did Not Re-Level Plaintiff's Position for Legitimate Non-Discriminatory Reasons.

Plaintiff made three inquiries about raising her salary grade from Level M to a Level N, first, in July 2009, another in April 2011, and lastly in May 2011 in the form of a Performance & Equity Promotion ("PEP") request.  Each request was denied for reasons that had nothing to do with Plaintiffs race or personal characteristics.  As a threshold matter, any claim based on the July 2009 request must be denied because it occurred outside the statute of limitations period under both the DCHRA and § 1981.  Plaintiff testified that she was notified in the summer of 2009 – *i.e.,* more than four years before filing her Demand for Arbitration – that her request had been denied. [Facts ¶16-17].

In order to establish a *prima facie* case of race or personal appearance discrimination, with regards to the April and May 2011 requests Plaintiff must show that: (i) she is a member of a protected class; (ii) she suffered an adverse action; (iii) the unfavorable action gives rise to an inference of discrimination.[1] *See Dave v. District of Columbia Metropolitan Police Dep't.*, 905 F.Supp.2d 1, 14 (D.D.C. 2013) (*citing Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

Any inference of discrimination with regard to Plaintiff's position level is dispelled by the fact that the initial decision to level Plaintiff's position as an "M" was made by an individual who is of her same protected class. [Facts ¶15] It is undisputed that when Fannie Mae converted its

---

[1] Courts in the D.C. Circuit generally apply relevant federal precedent, such as cases decided under Title VII, to claims brought under the DCHRA, unless a distinction in the statute requires a different result.  *See generally Benefits Comm's Corp. v. Klieforth*, 642 A.2d 1299, 1301-02 (D.C. 1994).  There is no relevant distinction here between federal discrimination law and D.C. law, and, accordingly, this motion analyzes Plaintiff's claims under federal law and D.C. law together.

compensation scale in the summer of 2009 and introduced the concept of job families, that

Mauricio (Reese) Aguilar, a Hispanic American, made the decision to classify Plaintiff's position.

No inference of discrimination can arise where the individual who makes the allegedly

discriminatory decision is of the same protected class as the aggrieved employee. [Facts ¶10-11,

13-15].  *See Glass v. Lahood,* 786 F.Supp. 2d 189, 216 (D.D.C. 2011); *Peterson v. Corr. Corp. of*

*Am.*, 2015 U.S. Dist. LEXIS 130409,*7 at fn. 6 (N.D. Fla. 2015) (noting, courts have noted that

"it is extremely difficult for a plaintiff to establish discrimination where the allegedly

discriminatory decision-makers are within the same protected class as the plaintiff"); *Eder v. City*

*of New York*, 2009 U.S. Dist. LEXIS 11501 *24 (S.DN.Y Feb. 9, 2009); *Toliver v. Cmty. Action*

*Comm'n*, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir. 1986) (finding

that where decision maker is in the same protected class as plaintiff, claims of discrimination

become less plausible); *Fletcher v. Phillip Morris USA, Inc.*, 09-284, 2009 U.S. Dist. LEXIS

63094 at *20 (E.D. VA. Jul. 13, 2009).

Plaintiff also acknowledged that she had no specific facts indicating Mr. Aguilar's decision

to assign her 2009 Director position an "M" salary grade was affected by discrimination.  That is

because the evidence shows, without doubt, that Mr. Aguilar based his decision on the

responsibilities of the Plaintiff's position, as detailed in the position description, in comparison to

external market data for Lean Six Sigma positions.  It is also undisputed that Mr. Aguilar made his

decision without regard to Ms. Lapera's individual circumstances or performance. [Facts ¶14-20]

It is also undisputed that the Compensation team made all decisions regarding the levelling

of Plaintiff's position. [Facts ¶13]  Although in the arbitration proceedings Plaintiff attempted to

accuse her former supervisor Claude Wade (African American) of "indirect" discrimination, that

testimony was belied by inconsistent testimony Plaintiff gave at her prior deposition where she

11

identified the Compensation team as the alleged discriminators. [Facts ¶13]  It is also undisputed that Mr. Wade supported Plaintiff's requests to re-level her position.   Although the incident occurred in July 2009 and therefore outside the limitations period, it is instructive to note that when Plaintiff raised this issue, Mr. Wade promptly forwarded her request to challenge the level assigned to her position *the next business day* without characterizing or opining on whether he believed a change was necessary.  Mr. Wade's request to Karen Jez, the Vice President of Human Resources was swift and simple: "Can you look at the attached note and let me know what you think?" [Facts ¶21-22]  There simply is no credible evidence that Mr. Wade obfuscated, delayed or otherwise attempted to influence the Compensation team's decision. Instead, the overwhelming weight of the evidence shows that Mr. Wade acted deliberately pursuant to the Plaintiff's demand.  It is also undisputed that when she made her request, Fannie Mae's Compensation team did not consider any of her individual circumstances, experience and performance because their decisions about salary grade are based on the responsibilities of the position as compared to external market data, and in this case those factors  did not support changing Plaintiff's salary grade. [Facts ¶15, 25]

The second inquiry to the Compensation team relating to Plaintiff's salary grade was a request in April 2011 from Human Resources Business Partner Shandell Harris to Nicole Westbrook (African American) simply asking Ms. Westbrook to review a job description and provide the salary grade level.  Ms. Harris did not attribute the request to Plaintiff but simply stated: "*Nicole, can you take a look at this and level it please? Thanks*."   In light of the limited context presented by Ms. Harris, Ms. Westbrook was unaware that the request related to Plaintiff or that Plaintiff sought to contest the existing salary grade for her position.  In response, Ms. Westbrook and her colleague Sonya Matza reviewed the job description Ms. Harris had forwarded and recognized that it was not a new position but rather that it corresponded to an existing position

(i.e., the Director, Lean Six Sigma position that Plaintiff held at the time), and which had already been analyzed and leveled as "M" by Mr. Aguilar [Facts ¶23-24]  There is no credible evidence to suggest that Ms. Westbrook's response  was motivated by any discriminatory bias.

There also is no evidence giving rise to an inference of discrimination relating to the third request relating to Plaintiff's salary level.  This request was made a few weeks later in May 2011 and was formally presented by Ms. Harris to Ms. Westbrook as a Promotion and Equity Process ("PEP") request.  Unlike a request to level a position, a PEP request is used to potentially change an employee's salary and Compensation considers the individual's performance and other equity considerations.  When she submitted the PEP request on Plaintiff's behalf, Ms. Harris also indicated that there were no higher-leveled director positions within the Lean Six Sigma job family into which Plaintiff could have been placed at the time.  As such, Ms. Harris recommended that Plaintiff's salary be increased to the top of the range from $184,000 to $194,000. [Facts ¶25-29]

In response, on or around May 11, 2011, Ms. Matza (with the agreement of Ms. Westbrook) recommended that Plaintiff's salary be increased to $194,000 in order to create "a 17% differential between her [salary] and her direct [reports].  Furthermore, when Plaintiff submitted a revised job description which described a wider corporate scope, external focus and strategic slant that was not present in her previous job description, the Compensation team did recommend that Plaintiff's position be re-leveled to an "N".   However, Ms. Westbrook postponed acting on the recommendation to increase Plaintiff's level because it was unclear whether the Lean Six Sigma function would continue to report within the EPMO. [Facts ¶30-32]  Ms. Westbrook testified as follows:

> Q. And would that be common not to address re-leveling if the future state of something is uncertain of a division?

A. Yes.  It's tough to make changes when things are in flux.  And we don't want to make a decision one day that may, then, be impacted after a change is complete.

The record also shows that after many discussions among senior management, the Lean Six Sigma department was eventually transferred outside the EPMO to Fannie Mae's Human Resources department. [Facts ¶97]

The fact that Compensation (through Ms. Westbrook and Ms. Matza), ultimately agreed to reclassify Plaintiff's position at an "N" level strongly undercuts Plaintiff's conclusory assertion that they were motivated by race or personal appearance discrimination. [Facts ¶35-37] If Ms. Westbrook sought to discriminate against Plaintiff, logic suggests she would have rejected the May 2011 PEP request.  That did not happen.  Instead, the un-contradicted evidence (the contemporaneous documents and Ms. Westbrook's testimony) establish that Ms. Westbrook determined that Plaintiff's position should be re-classified as a level "N".

### 2. The Evidence Demonstrates that Plaintiff was not Treated Unfavorably as Compared to Her Peers.

In regards to her compensation and the level of her position, Plaintiff's disparate treatment claim fails because she cannot show how she was treated less favorably than similarly situated individuals outside her protected class.  The evidence shows that from 2011 through her resignation from Fannie Mae in 2013, Ms. Lapera was compensated at a higher rate than any other Director in the EPMO. Plaintiff's salary was significantly higher than her counterparts: Jim Tomasello, Kevin Smith, Amilda Gjecovi, and Lea Nicotra, despite the level of her position. [Facts ¶42]

Fannie Mae anticipates that Plaintiff will argue that an inference of discrimination arises because her position was initially classified as an "M" in 2009, while the positions of two purported comparators, Ted Carter and Michael McFarland, with whom she often worked were classified as

14

"N".  Courts have determined that in order for comparative information to be useful, the plaintiff should identify an individual whose employment circumstances are nearly identical in all relevant respects to an individual not in the plaintiff's protected class who received more favorable treatment. *See Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 70 (D.D.C. 2005) (*quoting Neuren v. Adduci*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)) ("Plaintiff must demonstrate that all of the relevant aspects of their employment situation are nearly identical."); *Benton v. Laborers' Joint Training Fund*, 2015 U.S. Dist. LEXIS 104176 *50 (D.D.C. Aug. 10, 2015).

The fact that Plaintiff worked with MacFarland and Carter on certain projects does not mean that they were similarly situated to Plaintiff when Fannie Mae restructured its compensation program in 2009.  MacFarland was employed in the Technology division, an entirely separate division from Plaintiff, who was in the Corporate Program Office.  MacFarland and Plaintiff also had different supervisors and therefore could not be deemed similarly situated. *See Perry v. Clinton*, 831 F Supp. 2d 1, 17 (D.D.C. 2011) (finding that alleged comparators who worked in different offices and reported to different supervisors were not nearly identical in all relevant respects).  Moreover, both MacFarland and Carter held different roles and responsibilities than Plaintiff.  In 2009, McFarland was employed as the Director of Technology Architecture where he was responsible for technology-based business architecture.  Plaintiff concedes she was not responsible for architecture at that time.  [Facts ¶5-7].  Similarly, Carter was the Director of Operational Risk, Framework and Reporting and was responsible for enterprise level operational risk.  Plaintiff had no responsibilities for operational risk. [Facts ¶5, 8].

> Ted was focused on operational risk, I was focused on process improvement, and Michael was focused on business architecture.  The three positions went across the company.  The three were focused positions helping the corporation in these three different areas of focus. Tr. 213:12-17 (Lapera).

15

As further evidence that Plaintiff performed a different function than MacFarland or Carter, the terms "operational risk" or "architecture" do not appear anywhere in Plaintiff's contemporaneous description of her responsibilities in the July 2009 request or the job description for the Director of Operational Excellence and Lean Six Sigma position she submitted with her April 2009 request. [Facts ¶30-31]. Plaintiff cannot show any competent evidence that her position was "nearly identical" to either MacFarland or Carter.

Finally, there is no evidence that would suggest that the Compensation team (who she concedes made the decisions on levelling positions) had a personal connection with or had even met MacFarland or Carter in person. And there is certainly no evidence, other than Plaintiff's rank speculation, that either or both were treated more favorably than Plaintiff in connection with the leveling of their respective positions because of their race or personal appearance. In the absence of such evidence, no reasonable jury could reach such a conclusion and judgment should be entered in favor of Fannie Mae.

POINT IV

PLAINTIFF WAS NOT SELECTED FOR PROMOTION
BECAUSE A MORE QUALIFIED CANDIDATE WAS CHOSEN

**1. Nicola Fraser was More Qualified than Plaintiff for the Vice President for Planning and Alignment**.

Fannie Mae is entitled judgment as a matter of law on Plaintiff's failure to promote claim because the successful candidate, Nicola Fraser, was significantly more qualified for the Vice President for Planning and Alignment position than the Plaintiff. It is well-settled in the D.C. Circuit that a "plaintiff can show her employer discriminated by showing that she was 'significantly' or 'markedly' more qualified for the job than was the candidate who actually received it." *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009) (*quoting Lathram v. Snow*, 336

16

F.3d 1085, 1091-92, (D.C. Cir. 2003)); *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

A fact finder can infer discrimination based on such a showing, but "[w]ithout such a decisive

showing," the court "rightfully defer[s] to the business judgment of an employer and ha[s] no cause

to infer discrimination." *Id*; *see also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227-28

(D.C. Cir. 2008). As the D.C. Circuit has instructed:

> The qualifications gap must be "great enough to be inherently indicative of discrimination." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks omitted). Only then could the fact-finder "legitimately infer that the employer consciously selected a less-qualified candidate-something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." Id. (internal quotation marks omitted). In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would "assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (*en banc*); *see also Jackson*, 496 F.3d at 707. We must "respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183, 318 U.S. App. D.C. 186 (D.C. Cir. 1996). To conclude otherwise, we have said, "would be to render the judiciary a super-personnel department that reexamines an entity's business decisions-a role we have repeatedly disclaimed." *Jackson*, 496 F.3d at 707 (internal quotation marks omitted).

*Adeyemi,* 525 F.3d at 1227.

The overwhelming weight of the evidence shows that Anne Gehring selected Nicola Fraser

for the VP of Planning and Alignment position because she was the most qualified candidate.  Ms.

Fraser was an existing Vice President at Fannie Mae – a position of higher seniority than Plaintiff.

As a Vice President, Ms. Fraser was evaluated not just on her technical knowledge but on her

leadership, communication, and influencing skills – all of which were critical and unique to the

officer role at Fannie Mae. [Facts ¶¶51, 59]   Against these requirements, Ms. Fraser had been

identified as "Top Talent," which signified that senior executives viewed her as being ready to

take on a broader scope of responsibilities.  In fact, she received a rating of "Exceeds Expectations"

on her then-most recent performance review.  [Facts ¶¶81-83].

17

Ms. Fraser's responsibilities as the existing Vice President for Planning and Analysis in the Finance Department prepared her for the role of Vice President for Planning and Alignment. In this regard, the responsibilities included making monthly presentations to senior executives at Fannie Mae, the Fannie Mae Management Committee, Fannie Mae's regulators (Treasury and the FHFA). Also, Ms. Fraser already had strong relationships with Fannie Mae's CFO, David Benson, and the SVP for the EPMO; and she regularly interacted with senior leaders and program managers throughout the organization. In the performance of those duties, Ms. Fraser established relationships with other senior officers within the Company. [Facts ¶¶76-78]

Ms. Gehring testified that she did not choose Plaintiff because "[she]" has difficulties communicating at an executive level." *Id.* She testified that she chose Ms. Fraser, who had already been a vice president for over two years, because:

> If I put someone in front of the [Fannie Mae] board of directors, FHFA [Fannie Mae's Conservator], Treasury [a Fannie Mae regulator] and they communicate in an unprofessional way, my judgement of talent comes into question and I just wasn't willing to take that risk. And Nicole Fraser had preexisting relationships with the entire executive team, including Tim Mayopoulos [Fannie Mae's CEO] and Dave Benson [Fannie Mae's CFO] . . . . She had previous relationships with FHFA and Treasury and had successfully presented to them on numerous occasions. And she had previous relationships with the board of directors. She had prepared numerous . . . presentations for these groups and that was the critical piece that was missing that I needed to hire. And so that's why I hired Nicola is I had to have someone who could do that. [Facts ¶89]

Substantial evidence corroborates that these, in fact, were the reasons for Ms. Gehring's decision. First, in addition to Ms. Gehring, Shandell Harris and Mike Choi conducted the interviews for the position, and, in their written feedback, reached the same conclusion as Ms. Gehring: Ms. Fraser was the best candidate. Mr. Choi's feedback states in pertinent part that "I believe Nicola would add the most value to the team at this time. She . . . has strong interpersonal

and communication skills, which is imperative. . . I believe Nicola can hit the ground running with minimal ramp up time." Ms. Harris's feedback states in pertinent part:

> Nicola, by far is the best candidate . . . with demonstrated leadership capabilities. . . .well established relationships with David Benson and the management committee that will be critical in this role. . . [Plaintiff's] real area of focus would be her executive presence and communicating with the OC [Operations Committee] and MC [Management Committee]. I think this area of development is critical given this role . . . [Facts ¶80-81]

Ms. Harris had personally observed Plaintiff's communications in meetings and she did not believe Plaintiff was as polished and prepared as Ms. Fraser for the demands of the Vice resident position where she would routinely make presentations and interact with senior executives and Fannie Mae's regulators. [Facts ¶85-87] Plaintiff cannot credibly assert that Ms. Harris was biased against her based upon her "appearance" considering Ms. Harris' sensitivities in that regard, i.e., her daughter is morbidly obese. [Facts ¶72]

Second, Ms. Gehring's written feedback on the interviewees is consistent with Ms. Harris and Mr. Choi's feedback, and with her testimony on the reasons for her decision. Notably, her feedback states: "[Claimant's] communications skills at executive level need improvement. Not a good fit for MC or FHFA interaction" and Nicola Fraser is "the best candidate" because, *inter alia*, "[she has] well established relationships with Dave Benson and the management committee" and "[is a] tested VP with excellent leadership and enterprise influencing skills." [Facts ¶80]

There is no evidence Plaintiff can reasonably show that the reasons Ms. Gehring gave for her decision were false, or that she discriminated against Plaintiff due to her race or personal appearance. Discrimination cannot be inferred on Plaintiff's qualifications for the Position unless Plaintiff was "*significantly* better qualified for the job than the applicant[] ultimately chosen," *i.e.,* Ms. Fraser. *See e.g., Brannum v. Fannie Mae*, 971 F.Supp.2d 120, 127 (D.D.C. 2013) (finding

plaintiff who was good at numbers failed to demonstrate that he was more qualified for a marketing position, than a higher ranking colleague who was noted for her communication skills); *Spaeth v. Georgetown Univ.,* 943 F. Supp. 2d 198, 209 (D.D.C. 2013); *Jackson v.* Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007 ("the qualifications gap must be great enough to be inherently indicative of discrimination.   To conclude otherwise would be to render the judiciary a 'super-personnel department.'").  Here, the evidence demonstrates that Plaintiff was *not* as qualified as Ms. Fraser for the Vice President of Planning and Alignment position – and certainly not "significantly better qualified."

Ms. Fraser's resume at the time she applied for the Position and her testimony highlight that she had substantial experience and skills corresponding to key qualifications and responsibilities described in the job description for the Position.

| Job Description | Fraser Resume | Fraser Testimony |
| --- | --- | --- |
| "Communicate effectively at the highest levels of the organization.    Prepare and deliver written and verbal communications to the CFO [Dave Benson], the Management Committee, regulators and the Fannie Mae Board of Directors." | "Developed and led the monthly assessment and reporting of the Company's Scorecard . . . to senior management, the Board of Directors, and FHFA," and, "Presented monthly financial reports and various strategic financial analyses to multiple audiences including senior management . . . [and] FHFA" | Before applying for the Position, she was responsible for presenting results of operations to the Management Committee "on a monthly, if not bimonthly, basis."  Throughout her career, she has been called on to take complex concepts and explain them in simple and concise manner. |
| "Act as a trusted advisor and independent lens to . . . the CFO . . . Develop a relationship with the . . . CFO that promotes role as objective sounding board." | | She had prior experience advising and presenting to Dave Benson and the Fannie Mae CFO. |
| "Take ownership of the overall approach for managing the EPMO's relationship with key external stakeholders, including FHFA | "Developed key relationships with regulatory bodies including FHFA and U.S. Treasury" | |

20

| Job Description | Fraser Resume | Fraser Testimony |
|---|---|---|
| . . . provide briefings on a regular and ad hoc basis." | | |
| "[d]emonstrated cross-functional collaboration," including "effectively build relationship and trust with a wide range of personnel." | "Successfully . . . led finance teams through significant change within the Company" | |

By contrast, Plaintiff testified that, when she applied for the Vice President for Planning and Alignment position, she had: (i) little experience presenting to Dave Benson and had done limited work for him, (ii) never presented to the FHFA, and (iii) had not presented to Fannie Mae's Management Committee for several years before applying for the Position.  Plaintiff also admitted that Ms. Fraser had more experience than she in presenting to the FHFA and a stronger relationship with Benson than Plaintiff had with him. [Facts ¶84-85]   While Plaintiff may have had better knowledge and experience than Ms. Fraser regarding Lean Six Sigma and process improvement, those were a small part of the responsibilities for the Vice President of Planning and Alignment position, according to Ms. Fraser.  Moreover, leadership, not technical acumen, was the more highly valued talent for officer positions within Fannie Mae.  And, as set forth previously, Ms. Fraser had already been identified as "top talent" and "Exceeding Expectations" in an officer role. [Facts ¶51, 76, 82-83, 90-92]

**2. Plaintiff Cannot Establish that Fannie Mae's Decision to Promote Ms. Fraser was Pretext to Mask Invidious Discrimination**.

Fannie Mae anticipates that Plaintiff will argue that Ms. Gehring's focus on her reports demonstrating "Executive Presence" is somehow indicative of her discriminatory motive. Such an argument is grounded in speculation at best.  "[Terms] that are not facially discriminatory may, depending on multiple factors, 'including context, inflection, tone of voice, and local custom,' evidence an employer's discriminatory intent.  It is the plaintiff's burden to provide evidence

21

beyond his or her own subjective assertions of discrimination suggesting that a facially neutral term . . . was, in fact, discriminatory." *See e.g., Robertson v. Dodaro*, 767 F. Supp. 2d 185, 194 (D.D.C. 2011).  Under this standard, while Ms. Gehring and Ms. Harris may have told Plaintiff that she lacked or needed to work on her "executive presence" in discussing the Position with her, those statements do not prove that Ms. Gehring or Ms. Harris discriminated against Plaintiff because of race or personal appearance.

The evidence shows that "executive presence" is not a facially discriminatory term[2] and that neither Ms. Gehring nor Ms. Harris used that term in referring to Plaintiff, whether in the selection process for the Position or otherwise, with reference to her race or personal appearance. Rather, the term "executive presence" is widely used in business circles to describe "the ability to project mature self-confidence, a sense that you can take control of difficult, unpredictable situations; make tough decisions in a timely way and hold your own with other talented and strong-willed members of the executive team."  [Facts ¶46, 86]

In this case, the evidence shows that when Ms. Harris or Ms Gehring used the term "Executive Presence" in referring to Plaintiff – which was only in discussing her candidacy for the Vice President of Planning and Alignment position and as part of her 2013 mid-year performance evaluation – it was only as commentary about matters related to her communication skills.  In the final analysis, the only evidence that exists to show they were referring to Plaintiff's race or personal appearance when talking about her executive presence is Plaintiff's own subjective belief – and that is insufficient to prove a discriminatory animus.  *See, e.g., Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 95 (D.D.C. 2005) (not inferring discriminatory intent from employer's reference to

---

[2] For example, Plaintiff testified that the term "is a very big word that can be applied to many things."  Tr. 151:14-15.  Claimant also agreed that, to her, executive presence means that "one [ ] is appropriately dressed for the role being performed [and] is able to command the attention of a group and direct them towards action,"  tr. 230:9-13 – which is a meaning that has no connotations about race or physical characteristics.

plaintiff's "negative attitude" since the employee did not present evidence substantiating his contention that "negative attitude" was a 'code term for 'uppity Negro' who does not know his place").

Finally, the fact that Plaintiff received "1" rating on her 2012 year-end performance evaluation, the highest rating possible, supports an inference that Ms. Gehring did *not* discriminate against her in selecting Ms. Fraser for the Vice President of Planning and Alignment position.  Ms. Gehring approved Plaintiff's "1" rating, and, in fact, Ms. Gehring defended Plaintiff getting it when questioned by Mr. Benson about it in a calibration session. [Facts ¶43]  *Cf. Waterhouse v. Dist. Of Col.,* 298 F.3d 989, 996 (D.C. Cir. 2002) ("when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire") (cit. omitted).

In addition, Plaintiff has disproved her own theory on personal appearance discrimination, which is that Ms. Gehring "target[ed] employees who did not meet her standard of an ideal personal appearance which was White and slender.  Plaintiff stated that Ms. Fraser was not slender. Taking that statement as true, Ms. Gehring should have chosen Joe Hallet for the Position under Claimant's theory because he was the only interviewee who was White and slender, but she chose Ms. Fraser, thereby disproving her theory.

CONCLUSION

Based upon the arguments and authorities set forth above, Fannie Mae respectfully requests that the Court enter judgment as a matter of law in favor of Fannie Mae on all claims asserted in this action.

Dated: October 9, 2015                     Respectfully submitted,


                                           **FANNIE MAE**


                                           _____/s/___DGS_____
                                           Damien Stewart
                                           Fannie Mae
                                           3900 Wisconsin Ave., N.W.
                                           Washington, DC 20016
                                           Tel. (202) 752-6871
                                           damien_g_stewart@fanniemae.com
                                           **Attorney for Defendant**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 9th day of October 2015, a copy of the foregoing Fannie Mae's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment was served via the Court's ECF system on the following:

        David A. Branch, Esq.
        Law Offices of David Branch & Associates
        1828 L Street NW
        Suite 820
        Washington, DC 20036
        (202) 785-2805 phone
        (202) 785-0289 fax
        davidbranch@dbranchlaw.com


                                           _____/s/___DGS_____
                                           Damien G. Stewart

24