Arbitration Day 1

Washington, D.C.

November 3, 2014

JAMS ARBITRATION

- - - - - - - - - - - - - -    X

ANA LAPERA,                      :

    Plaintiff,                   :

        v.                       :    JAMS Ref. No.

FEDERAL NATIONAL MORTGAGE        :    1410006405

ASSOCIATION (FANNIE MAE),        :

    Defendant.                   :

- - - - - - - - - - - - - - -    X

                Washington, D.C.

                Monday, November 3, 2014

        Arbitration before THE HONORABLE JAMES

ROBERTSON, in the above-entitled matter, the

witnesses being duly sworn by MARY GRACE CASTLEBERRY,

a Notary Public in and for the District of Columbia,

taken at the offices of JAMS, 555 13th Street, N.W.,

Washington, D.C., at 10:00 a.m., Monday, November 3,

2014, and the proceedings being taken down by

Stenotype by MARY GRACE CASTLEBERRY, RPR, and

transcribed under her direction.

Arbitration Day 1                                                    November 3, 2014

Washington, D.C.

Page 26

experience presenting to Fannie Mae's regulators, including the FHFA and Fannie Mae's management committee, all of which were important aspects for this role, the vice presidency for planning and alignment.

Mr. Branch, in his opening, referred to the fact that -- or referred to Ms. Fraser's resume was accepted after the closing date for this position. You'll hear evidence that the date in the posting was a date -- it wasn't a closing date. It was a date by which applicants were encouraged to apply and that is not a closing date. Rather, it's a minimum time that Fannie Mae has to leave the position open for. You'll also hear that when Ms. Fraser received notice of this job, she was on maternity leave. She was trying to figure out what her role would be when she came back and she had to explore not only with the CFO, but with Ms. Gehring about the job; hence, if you say why her resume came in after the other applications for the position.

At the end of the day, they will not be able to carry their burden to show that the decision

Page 27

to hire Nicola Fraser over Ana Lapera for this position was motivated by race, ethnicity, age of weight.

JUDGE ROBERTSON: All right, sir. Thank you very much. Mr. Branch, your first witness?

MR. BRANCH: Ms. Lapera.

JUDGE ROBERTSON: Very well. Ms. Lapera, would you come over here to the witness place? I can't call it a box because it's not a box.

Whereupon,

ANA CRISTINA LAPERA,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

JUDGE ROBERTSON: When you're ready, Mr. Branch.

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your full name.

A.   My name is Ana Cristina Lapera.

Q.   And Ms. Lapera, what's your date of birth?

A.   I was born September 3rd, 1957.

Page 28

Q.   And so how old are you now?

A.   Fifty-seven.

Q.   And where were you born?

A.   I was born in Caracas, Venezuela.

Q.   And what is your first language?

A.   Spanish.

Q.   And where do you live now?

A.   My official home is in -- my official home is in the northern neck. You want the actual address?

Q.   No, I don't need the address.

A.   It's in the northern neck. During the week, I live in Reston, Virginia.

Q.   Virginia. Do you live alone?

A.   No. I live with my husband.

Q.   And what's his name?

A.   His name is Jesus Lapera.

Q.   Do you have any children?

A.   I have a daughter, 26. Her name is Gaby Lapera.

Q.   And how long have you been in the U.S.?

A.   Since I got married in 1984.

Page 29

Q.   And Ms. Lapera, will you summarize your formal education?

A.   Yes. I'm a systems -- I have a degree in systems engineering, which I got in Venezuela and it's likely different than here. It requires five years of study plus a thesis dissertation where I got the highest honors. And then I came to George Washington University for my master's in engineering administration where I also got best qualifications in the comprehensive exam that they do at the end of that.

Q.   So you have a master's degree?

A.   Correct.

Q.   What period of time did you work at Fannie Mae?

A.   I started working in Fannie Mae in January of 1994 until I left in -- actually, my last day was November 1st of 2013. So it was almost 20 years.

Q.   And where did you work prior to Fannie Mae?

A.   I worked as a consultant, first doing software development and then doing systems

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                November 3, 2014

Washington, D.C.

## Page 30

integration for various government -- well, for contractors that did work with the government and I was the technical lead for some projects such as like the imaging, again, in all of the records from the Air Force to be transferred from microfiche into imaging technology and indexed so the airmen could find all of their records whenever they needed them.

We also won a contract to do the same thing with the Navy. So I worked on technology for a long, long time.

Q. And so you started at Fannie Mae in 1984?

JUDGE ROBERTSON: '94.

BY MR. BRANCH:

Q. I'm sorry, '94.

A. Correct.

Q. And will you summarize the different positions that you've held at Fannie Mae?

A. It was a long time. So I started in what was called the advanced technology division in Fannie Mae. It was within the IT department. And in that division, I was responsible for managing the projects, like the name of the division said, that

## Page 31

were taking Fannie Mae a step forward on technology.

While I was there, some of the things that we did, we brought the technology that would enable Fannie Mae to distribute electronic services such as the underwriting engine and the credit reports that they fed for the lenders. My team was also responsible for bringing the Internet into Fannie Mae. Despite the fact that the CIO at that time wanted to use a different technology, I convinced Bill that we should also invest on the Internet, even though it was just a baby at that time. So that was my work at advanced technology.

After that, I became the development manager leveraging some of that technology that I had helped bring into the company and vending some of our applications through the Internet. And then after that, I was selected to meet the year 2000 efforts and interact with the mortgage bankers associations and basically help our lenders test Fannie Mae applications to make sure they were not going to break when the year 2000 arrived. So it was a very intense job with external relationships, with our

## Page 32

lenders, with the mortgage bankers associations, and also directly with the technical people inside to make sure that we were ready and had the environments that we needed to have in order to prepare for the year 2000.

Q. Will you take a minute to just explain what Fannie Mae does and how they do what they do?

A. Sure. So Fannie Mae is -- I'm going to say sometimes "we" because it's a very hard habit to break. I worked for that organization for a long, long time because I really, really loved the mission and what we did is really very cool. It's a very -- it's a tremendous thing for this country and for homeownership. There is no -- we are very low key. There is no country in the world that has the housing system that we have here and a lot of it is thanks to Fannie Mae and Freddie Mac.

And what we do is pretty much establish the standards of underwriting that are considered the borrowers, the borrowers themselves and the property that they are about to purchase, and then if they meet the requirements for acquiring a loan based on

## Page 33

those underwriting guidelines, then the borrower is granted a loan that enables them to acquire their home. And then Fannie Mae purchases that loan from their origination bank and puts it either in their book and then they collect the difference between the cost of money and the interest as it becomes revenue for the company or they bundle all of these loans into a mortgage-backed security that gets sold to investors in Wall Street.

At the beginning of my career, I worked very closely with the first part, with the origination part, and with the technology that enabled lenders to approve loans to borrowers that would later be then sold to Fannie Mae. So is that --

Q. Well, that's the first part. What else -- after Fannie Mae decides whether to keep the loan in its own books or package it as a mortgage-backed security, what happens?

A. So regardless of whether the loan is kept in Fannie Mae books or is sold as a mortgage-backed security, the loan gets on boarded into our books and

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1

November 3, 2014

Washington, D.C.

Page 50

THE WITNESS: Yes.

JUDGE ROBERTSON: Six, S-i-x?

THE WITNESS: Yes.

JUDGE ROBERTSON: Sigma?

THE WITNESS: Yes. Do you want to know what it is?

JUDGE ROBERTSON: I'm sure I'm going to hear it.

THE WITNESS: Okay. Just stop me when -- so Lean Six Sigma is a process improvement methodology. Lean was invented by Toyota and it's a Lean Six method where you try to reduce waste and you look at everything from the customer perspective. And then Six Sigma was invented by Motorola and it uses statistics to make sure that you always got the output that your customer wants.

So when you combine the two methodologies, it can be very, very powerful to streamline a company, to streamline operations, and to make sure that the output that we're getting is exactly what we want and that we understand the inputs that it takes and all of the steps in between to get to our result.

Page 51

Q. So did you need any type of specialized training to be able to perform this Lean Six Sigma assignment?

A. Yes. At the beginning, we had only a consulting firm doing it and we did three projects and when we demonstrated how powerful it was, to the point that, for example, the reverse mortgage product, at that time people were thinking, well, maybe we should cancel that. And as a result of the work that we did with Lean Six Sigma where we really showed the places where the program could get in trouble, the program is still going.

And to answer your question, yes, you require -- like in my case, I'm a black belt and certified by the American Society for Quality and it requires six months of classes and two projects in order to certified as a master black belt.

JUDGE ROBERTSON: Black belt?

THE WITNESS: Yes. Because it was like the Japanese.

JUDGE ROBERTSON: Okay. I'm getting the lingo here. Black belt in Lean Six Sigma. Got that.

Page 52

Okay. Go ahead.

BY MR. BRANCH:

Q. And what does that mean, a certified black belt?

A. So a certified -- so the grades go like yellow belt, green belt. Yellow and green are pretty junior. Black belt, it's you know how to execute projects from the beginning until the end and you are pretty good with statistics and you have to understand -- there is also a lot of stakeholder management because if you see most projects don't fail because of technology. Most projects fail because of people.

So as a black belt, I further refined my capability of starting processes. And you could also be a master black belt and some of the guys that worked for me were master black belts, but you require a lot of statistics and I didn't need them for my job. But black belt was quite an accomplishment anyway.

Q. And so, I'm sorry, this project was Lean Six Sigma and you were asked to work on it by Mike

Page 53

Williams, the president of Fannie Mae?

A. Yes. And we started, like I said, with a consulting firm and then once we've proven that the methodology was appropriate for Fannie Mae, then I have my own team, the consulting team help me for a little bit, but we had three or four people working that were Fannie Mae employees. And when we became self-sufficient, then we let go of the consulting firm and we took over doing the work ourselves and it went across the entire company.

Q. And you managed a team on this project?

A. Correct. I was the director of Lean Six Sigma. I had a strange title during that time. I do not know why. But yes, I did manage the project, the team during that time.

Q. And what period of time were you working on this assignment?

A. It was probably 2009 or 2010 until I left. I continued to -- I was always the -- I was the director for process improvement all the way through -- through my tenure at Fannie Mae.

Q. And so what type of duties were required

14 (Pages 50 to 53)

Arbitration Day 1                                    November 3, 2014

Washington, D.C.

Page 54

of you in this position?

A.   I had to identify -- well, typically, clients will come -- or different divisions in the company will come and ask for our services. One of the biggest projects that we -- sorry. And then we would decide which ones we're going to do because we had limited number of resources, so we had to make sure that we prioritized correctly.

I can tell you that some of the biggest ones that I did were the mortgage-backed security process where we analyzed how mortgage-backed securities are created from the beginning until the end. And then the second one that we did that was very, very large was the credit management piece where, again, we analyzed what happened when a loan is in trouble all the way through its disposition. So those were two big projects that we managed.

JUDGE ROBERTSON: When did you do this?

THE WITNESS: That must have been, like, 2010.

JUDGE ROBERTSON: After the fall?

THE WITNESS: After the fall. No, before

Page 55

the fall. Actually, the first MBS study was done before the fall. And the reason why I remember that was because one of the sponsors was Rob Levin. So Rob Levin would come and my team and I would present to him and to all of the vice presidents of the company. And Rob Levin was the chief business officer. So that was before the fall. Because the fall was in 2008.

And then after the fall, we did the credit management portion of the work. And in between, we did a lot of, like, other projects, like, with the multifamily division. And at that time, Claude Wade became my boss and we helped him establish the framework for operational risk, because in order to evaluate operational risk, you need to understand what a division does or what a function does and then what can go wrong in the process. So he leveraged the Lean portion of Lean Six Sigma to establish the operational risk framework.

BY MR. BRANCH:

Q.   So did Mike Williams tell you why he wanted you to work on this Lean Six Sigma project?

Page 56

A.   He thought it was important for the company. And actually, I was really upset because I didn't believe that Lean Six Sigma -- Fannie Mae had tried many of these fancy process improvement techniques many times before and had always been unsuccessful. So I was really upset. I told Mike, why are you going to send me to do this when you know it's, you know, not that important. And he said, well, if you don't like this job, come back in three months and I'll get you another job.

And I actually totally fell in love with it because I could see the power and it actually was very successful in the company. We saved the company, through 2009 through 2011, like $250 million in cost savings just through the efforts of Lean Six Sigma. And you can ask Anne that, too, because she was one of my clients at that point.

Q.   And by Anne, you're referring to Anne Gehring?

A.   Correct.

Q.   And when you were working on the Lean Six Sigma project, did you have someone who was more

Page 57

senior to you working on the project or were you primarily responsible for the Lean Six Sigma activities?

A.   I was responsible --

MR. WILSON: Objection. Leading.

THE WITNESS: I was the director of Lean Six Sigma.

JUDGE ROBERTSON: I'll allow that.

THE WITNESS: I don't understand. Does that mean I can answer the question?

JUDGE ROBERTSON: Answer the question.

THE WITNESS: I was the director for Lean Six Sigma, so I was personally responsible for the Lean Six Sigma project. Claude Wade was the vice president of operational risk and Lean Six Sigma, but it was my responsibility to execute all of the process improvement projects for the company.

BY MR. BRANCH:

Q.   And you continued in this role until you left Fannie Mae? In some variation of this role.

MR. WILSON: Objection again, Your Honor. Leading.

15 (Pages 54 to 57)

Page 74

new structure -- on the new compensation structure when we went from the numbers to the letters.

Q.  And did your classification for your position actually change in 2009?

A.  Yes. It went from a level 6 to a level M, like in Mary.

Q.  Did you have colleagues who were working with you on projects at the same level before the classification change?

A.  Yes. We have already talked about Michael MacFarland, who was my partner on this, and Ted Carter. And the reason why I say they had positions similar to mine -- should I answer that now? Later?

Q.  Why did you believe they had positions similar to yours?

A.  Michael had business architecture, I had process improvement, and Ted had operational risk. The three teams were corporate teams serving the entire organization. So even though they were corporate, their reach was broad. It was across the whole organization. All of the teams were relatively small. Mine was a little bit bigger because it was

Page 75

augmented by consultants.

And the three teams work in a very integrated fashion. Michael with the overall business architecture, me with the process improvement, and then Ted leveraging the result of both of those teams to, then, assess operational risk. So, in fact, we were like the three musketeers.

Q.  Now, you have a binder with our exhibits, but there is also a binder with exhibits that Fannie Mae prepared. Turn, if you will, to Exhibit 264. Do you recognize this document?

A.  Actually, I don't. It seems to be the description of the job that I was doing in 2009. And I do not know why I have the title of director of human capital performance. It was a surprise to me, too.

Q.  And you said that you had colleagues, Mr. MacFarland and Mr. Carter?

A.  Yes.

Q.  Turn to Exhibits -- well, first 268 and then 269. Are you at 268?

Page 76

A.  I'm at 268.

Q.  This is the position that Mr. MacFarland was working in?

A.  It was one -- it was essentially the position that Michael was working on. He was working as a director of technical architecture.

MR. WILSON: Objection, Your Honor. Exhibit 268 --

THE WITNESS: The second page, Mr. Wilson.

MR. WILSON: I mean, it describes a few different positions on there.

THE WITNESS: Okay. The first position was Michael, when Michael first joined the company as the director of system design and development. But that was his position in 2005. The second page, based on the formatting, it's the position that I remember Michael having in 2009, because it essentially describes what he was doing at the time.

BY MR. BRANCH:

Q.  And 269.

A.  And 269, it's very similar. 2007, it's the position that Ted Carter had when he first joined

Page 77

Fannie Mae as director of operational risk.

MR. WILSON: Your Honor, same objection.

JUDGE ROBERTSON: Well, I don't know what these --

MR. WILSON: I mean, if she could just specify --

JUDGE ROBERTSON: I don't know what these documents are or where they came from or -- they don't -- I mean, one of them has a date of 2007, one of them has a date of 2005. I'm not sure -- I'm a little at sea here, Mr. Branch.

MR. BRANCH: So, Your Honor, we asked Fannie Mae to produce the positions and descriptions of the duties performed by individuals that Ms. Lapera claimed were similarly situated before the reclassification of her position. So you'll see that for 267, there's a grade level 6, director for Mr. MacFarland. And the same is true for Mr. Carter.

JUDGE ROBERTSON: 267 is not Mr. MacFarland. That's somebody else.

MR. BRANCH: I'm sorry, that's --

THE WITNESS: 268.

Arbitration Day 1

Washington, D.C.

November 3, 2014

## Page 98

their position.

Q. Did anyone contact you to ask you about your responsibilities or duties?

A. I don't remember being contacted on March 2011.

Q. Or any time in 2011, did anyone contact you?

A. No, not as far as this PEP cycle.

Q. Did you get a new supervisor in 2011?

A. Yes.

Q. Who was the new supervisor?

A. When Claude left around May of 2011, Kathy Keller became my supervisor. And Kathy was appalled that I was an M instead of an N because she also knew the structure and the different functions and responsibilities that people worked. So she helped me submit my paperwork again towards the end of 2011 and that's when the position was reclassified effective in February of 2012.

Q. And what was Kathy Keller's position?

A. Kathy Keller was a vice president of planning and alignment.

## Page 99

Q. And turn, if you will, to Exhibit 43.

MR. BRANCH: I'm sorry, Mr. Wilson, I don't think we gave you the photograph of Ms. Keller.

MR. WILSON: That's correct. And I to object because you didn't produce it in discovery either and this is the first we're ever seeing it.

MR. BRANCH: I thought we were going to exchange it. All the other exhibits were exchanged.

MR. WILSON: But you never gave me this exhibit.

JUDGE ROBERTSON: Well, what's the relevance of the photograph?

MR. BRANCH: Well, part of her claim is personal appearance discrimination and there is going to be some testimony on the fact that Ms. Keller was treated in a discriminatory manner because of her personal appearance as well.

MR. WILSON: I would have liked to have had the photograph so I could have kicked the tires to see when it was relevant to the time period. I just want to make my record. The other thing is discrimination against Ms. Keller is irrelevant.

## Page 100

MR. BRANCH: Wait, Ms. Lapera.

JUDGE ROBERTSON: Go ahead.

BY MR. BRANCH:

Q. Is this a photograph of Ms. Keller?

A. Yes, sir.

MR. WILSON: Do you have a copy? I still don't have a copy of it.

JUDGE ROBERTSON: Here, you can have mine because I don't frankly set any store by one photograph reproduced. It's not going to help me decide one way or another whether there's discrimination on the basis of personal appearance.

Go ahead, Mr. Branch. She looks fine to me. So do you.

THE WITNESS: Thank you, sir.

JUDGE ROBERTSON: So do you, Mr. Wilson.

MR. WILSON: Thank you.

JUDGE ROBERTSON: I don't know about this guy over here.

MR. STEWART: What about me?

BY MR. BRANCH:

Q. Just so that we have this on record,

## Page 101

Ms. Lapera, what's your height and weight?

A. You should never ask a woman that, but --

Q. Don't throw anything at me.

A. My height is five feet seven and I weigh at this point 230 pounds.

Q. And so what actions were taken in 2011 and continuing after 2011, in terms of getting your position classified as an N?

A. Kathy understood what the position was all about and she went to compensation and at that point, I do remember being interviewed by Sonia. And I rewrote the job descriptions and I had my position and I wrote position descriptions also for the directors that worked with me. And during the conversation with compensation, I was able to show them the differences and why we thought my position merited to be an N.

Q. Did you provide any substantive information that was different from what you had already provided to compensation and HR?

A. No, I didn't. I mean, the position was the same, so there couldn't have been any substantive

26 (Pages 98 to 101)

Page 102

information that was different. The position and the responsibilities and the number of people reporting to the position were exactly the same.

Q. And had you previously worked with Kathy Keller?

A. Yes, I had.

Q. And how so?

A. Kathy Keller and I started together in the advanced technology division of Fannie Mae. Actually, she started there before I did, so we were peers for a while. And our careers moved in similar ways. And when I was in Dedicated Channel, Kathy reported to me as my manager of business requirements and then she left and went to the credit division and I went and did other things. And then we met again in 2011 and she became my manager in the -- at that time it was called the Corporate Initiative Program Office.

Q. So did Ms. Keller get a new senior vice president in 2012?

A. Yes. Anne Gehring became the vice president of -- she moved from FP&A, from Financial

Page 103

Planning and Analysis, and became the vice president for the Enterprise Program Management Office in September of 2012.

Q. And had you worked with Ms. Gehring before September 2012?

A. Yes, I had worked extensively with Anne and with Nicola before that. They were my clients. As Financial Planning and Analysis, their job was to oversee the budgets of the company. So my team did several engagements with them to reduce costs in Fannie Mae. So yes, I knew them very, very well.

And the other part is Financial Planning and Analysis was also the one who validated that the savings that we were claiming for the Six Sigma team, Lean Six Sigma team, were correct. So they did all of the numbers and validated from the financial perspective that we were not overstating our claims.

Q. And what is Ms. Gehring's race?

A. She's Caucasian.

Q. And can you describe her personal or physical appearance?

A. She's tall and slender.

Page 104

Q. When did she become the SVP of EPMO?

A. September 2012.

Q. And just for the record, EPMO stands for?

A. Enterprise Program Management Office.

Q. EPMO, sorry.

A. Correct.

Q. Did Ms. Gehring make any changes when she arrived?

A. Yes.

Q. What major changes, if any, did she make when she arrived in this position?

A. So when she arrived, there were two vice presidents in Financial Planning and Analysis, Kathy Keller and Carmen Oviedo, and they distributed their responsibilities for managing their -- let me start -- one second.

The Enterprise Program Management Office, one of -- their main responsibility was to allocate the funding for initiatives for projects that needed to be executed by the company. Carmen and Kathy shared that responsibility and one of the first things that Anne did was to say, no, I want to have

Page 105

somebody who is responsible for the planning and I want to have somebody who is responsible for execution.

So Kathy got all of the planning and alignment part and then Carmen actually got moved out of the EPMO into another division of the company. Carmen was also a vice president. And then the position -- that position became available and eventually got filled by Mike Choi, who became the execution branch of the Enterprise Program Management Office.

Q. So did you know Ms. Oviedo before?

A. Oviedo, Carmen?

Q. Yes.

A. Yes. Carmen was one of the few remaining Hispanic officers, female officers in Fannie Mae.

Q. And when you say she was one of the few remaining female officers, what do you mean by that?

A. Fannie Mae had -- I don't know what happened. I cannot explain this, but Fannie Mae had a significant number of female executives that were Hispanic and that acted as mentors of the Hispanic

Arbitration Day 1

Washington, D.C.

November 3, 2014

## Page 110

myself. But then she had very little direct interaction with the teams. Her interactions were during staff meetings or whenever somebody, like, a member of my team will come and do presentations to her.

Q. Did Ms. Gehring make any comments about the personal appearance of individuals who reported to you?

A. Yes, she did.

Q. What were those comments?

A. After Anne became the vice president for --

JUDGE ROBERTSON: When you tell me about these comments, I'm assuming that you heard or saw these yourself.

THE WITNESS: Correct.

JUDGE ROBERTSON: All right.

THE WITNESS: I heard them --

JUDGE ROBERTSON: I don't want to hear what somebody told you.

THE WITNESS: You will not hear from me what somebody told me. She told me directly after

## Page 111

the first meeting with the team -- when Anne became the senior vice president, she called for a town hall -- senior vice president for the EPMO, she called a town hall, which is a sign of a good leader. That's what a good leader does. They come into a new position, they want to meet the team and she explained what her vision was for EPMO. And those were town halls, which means everybody from the staff was present during the town hall. And she did that all the way during her tenure as SVP, which is exactly what a leader does.

After the first meeting, she called me and she wanted to know who were some of the individuals in the team and I told her these are the business architecture team that I manage. And she's like, whoa, those people are going to have a long way to go to be able to represent EPMO the way I want it represented. And I explained to her that many of the people that worked in business architecture had a technology background and that their expertise was different. It was more on helping people see the big picture or helping data. But she said, yeah, but the

## Page 112

way they dress and the way they speak is not the way that I expect people to be. She specifically mentioned Blythe Neumilller and Tricia Brumbaugh and Dina Purcell, which were three ladies who were from business architecture. And --

Q. Did these ladies report to you?

A. Yes, they did.

Q. And can you describe their personal or physical appearance?

A. Yes. Blythe must have been in her 60s and she was fairly big and, therefore, she dressed with clothes that were very -- not tight, but just big clothes. Because she was so large, she also had problems walking. Anne, in front of me in one of her staff meetings said, yes, she waddles and she --

JUDGE ROBERTSON: Anne --

THE WITNESS: Gehring. Blythe waddles while she walks. Shortly after -- so Blythe was in her 60s, very overweight from everybody in the team. She was the person who was the most overweight.

BY MR. BRANCH:

Q. Who was present when Anne Gehring said

## Page 113

that Blythe waddles when she walks?

A. I believe all of the directors were present because it was one of the staff meetings.

Q. So is Ms. Neumiller severally obese?

A. Yes, she is. And then she talked about Tricia Brumbaugh and she said, oh, my God, I could see her tummy from where I was sitting. And she told me, she directed me and she said, you better tell your team that they need to start dressing up better or they are not going to cut it, especially when we have meetings like this or when we're meeting with senior management, which my team, with very few exceptions, really had their direct relationships with senior management. It was -- on the business architecture side. On the process improvement side, yes, we did a lot.

Q. And you said the other employee was Dina Purcell?

A. So Dina Purcell was -- it's an African-American and she is slightly overweight, but I think the biggest comments came about Tricia Brumbaugh, who -- she's overweight. She's probably a

29 (Pages 110 to 113)

Arbitration Day 1

November 3, 2014

Washington, D.C.

Page 186

Q. Are you familiar with Blythe Neumilller?

A. I am.

Q. Was she once on the business architecture team?

A. She was.

Q. She's no longer on that team?

A. No, she's not.

Q. Did she state to you why she left the team?

A. She chose to go to the securitization team. We did have conversations about it, about, you know, that she chose to kind of stay with our former -- to move with our former boss, Michael MacFarland. I don't recall if she had said anything specifically more than that.

Q. Did she express to you concerns about the emphasis on personal or physical appearance that was being pushed by Anne Gehring?

MR. WILSON: Objection. Hearsay.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I don't recall.

MR. BRANCH: No additional questions.

Page 187

MR. WILSON: No questions, Your Honor.

JUDGE ROBERTSON: Ms. Brumbaugh, thank you. You're excused.

(Witness exits arbitration room.)

JUDGE ROBERTSON: Ms. Lapera is back. Mr. Wilson, you may cross-examine.

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. Ms. Lapera, we heard near the beginning of your testimony a lot of discussion about Mike Williams. And am I right, Mike Williams left the company prior to September 2012?

A. Correct.

Q. And he was replaced in the role of president prior to that time by a man named Tim Mayopoulos?

A. There was somebody in between, but then afterwards came Tim Mayopoulos.

Q. And in September 2008, right, Fannie Mae went into conservatorship?

A. That is correct.

Q. And that's of the Federal Housing Finance

Page 188

Administration?

A. Correct.

Q. I'm going to move on. I want to get to your discussion of the challenges to the levelling of your position. Okay? And just so we can be clear here, you're challenging as being discriminatory the decision that was made on the levelling or the request to level your position, a request you made in July 2009?

A. Correct.

Q. And you're also challenging the decision that was made on the request to level your position in April 2011?

A. Correct. March/April 2011.

Q. And just to round out the picture, I'm going to use the term "job code restructure project" to describe what the big process in Fannie Mae in the summer of '09 to go from the numeric to the alpha system. You're not in this case challenging the levelling of your position coming out of that, right?

A. I am. You mean on 2009?

Q. Yes, the summer of 2009.

Page 189

A. Yes, I am.

Q. Do you recall in this case you -- so I'm not talking about the July 2009. I'm talking about the decision that occurred before July 2009.

A. I don't know what you're talking about, Mr. Wilson.

Q. Okay. There was, in the summer of 2009, correct, a process by which Fannie changed its salary level company-wide from a numeric system to an alpha system?

A. Correct.

Q. And as part of that big process, it was announced that the position that you held at the time would be leveled at an M, correct?

A. Correct.

Q. And following the progression, you learned about that levelling and then you made your request in July 2009 to challenge that initial decision, correct?

A. I challenged the decision, yes, as soon as I had a little bit of time to make research on the position itself and what other people had.

48 (Pages 186 to 189)

## Page 190

Q. But I just want to get here that you're not basing your claims of discrimination on what came out initially in the summer, but the decision on your request for reconsideration in July.

A. I do not see the distinction between the two of them.

Q. Okay. Do you recall Fannie Mae in this case filed a motion to bar?

A. Yes, I do.

MR. BRANCH: Objection, Your Honor. You've already addressed this issue in an order. How far back are we going on this?

MR. WILSON: Well, are you going to stipulate that you're not challenging the initial decision?

MR. BRANCH: The judge has already decided that issue.

MR. WILSON: Okay. And if you concur, then, that he'd already decided that the initial decision is not at issue, then I can move on. Mr. Branch?

MR. BRANCH: We have an order on that

## Page 191

point, Joe, already.

MR. WILSON: And that means the initial decision is not at play, correct?

MR. BRANCH: Yeah, that's not -- that issue has already been settled in the order.

MR. WILSON: Okay. Then we can move on. All right.

JUDGE ROBERTSON: Just so that we're all on the same page here, the order you're talking about is my order that characterizes Mr. Branch's argument and Ms. Lapera's argument. And what I said is the job classification claim she argues, Ms. Lapera argues, is not for Fannie Mae's M classification of her position in 2009, but for its rejection of her efforts to have the position reclassified between 2009 and 2012.

MR. WILSON: That's correct. And I'm trying to just draw the distinction here between the initial decision and her subsequent requests to reexam.

THE WITNESS: So I do not know what that conversation means, but I'm going to continue trying

## Page 192

to answer as I can.

BY MR. WILSON:

Q. I appreciate that. In the summer of 2009, as a part of this restructuring process, just prior to that, you had held the position -- or the position you held was called director of human capital performance?

A. That's what it says in the Fannie Mae records. I always thought it was called director of Lean Six Sigma.

Q. But after this job code restructure project, it was changed to director of Lean Six Sigma, correct?

A. Correct.

Q. Ms. Lapera, can I ask you, please, to go to what has been marked as Defendant's Exhibit 5, please. It's in the first volume.

A. Okay.

Q. And if I could ask you to flip to the second to last page of that.

A. Do you want me to explain what it is?

Q. No. I'm going to ask you, that's your

## Page 193

challenge to the levelling of your position, correct?

A. That's my e-mail to Claude Wade, who was my boss, explaining to him why I thought the position should have been classified as an N.

Q. And am I right that's where you had already learned that the position had been leveled as an M and you're asking for the levelling to be reconsidered, correct?

A. Correct.

Q. And you were informed of the decision, right, that it would stay as an M after this, correct?

A. Correct.

Q. And you were informed shortly after this e-mail you sent to Claude Wade?

A. I don't remember exactly when, but it was shortly after.

Q. It was like about a month; is that correct?

A. Probably would have been shorter than that.

Q. Okay. But certainly in the summer, right?

Arbitration Day 1                                    November 3, 2014

Washington, D.C.

Page 194

A.  Correct.

Q.  And the decision was, no, you stayed an M.

A.  Correct.

Q.  Now, I believe you testified on direct, Mr. Branch's examination of you, that the reason that you thought at this time your position should be leveled as an N was because two of your colleagues, Mr. MacFarland and Mr. Carter, were doing substantially similar duties and they went from a 6 under the old system to an N; is that correct?

A.  That is correct.

Q.  If you want to look at your e-mail here to Mr. Wade. And that e-mail is entitled position level challenge, right?

A.  That is correct.

Q.  You don't mention in here anything about the levelling of anyone else's positions, do you?

A.  That is correct. But I do --

Q.  That's just a yes or no question.

A.  That is correct. In the e-mail I didn't mention it.

Q.  Correct. Okay. Now, you don't think

Page 195

Mr. Wade discriminated against you with respect to this request for re-levelling, do you?

A.  I think he didn't fight hard enough and I didn't think he was politically savvy enough to get it to move.

Q.  I'm sorry, that was a yes or no question. Do you think Mr. Wade discriminated against you with respect to this request for reconsideration?

A.  Indirectly.

Q.  Do you remember, was it 10 days ago on October 20th we had a deposition?

A.  Yes.

Q.  And you were sworn by a court reporter just like you were here today?

A.  Yes.

Q.  And I asked you questions just like I am now. I'm going to hand you a copy of your deposition transcript.

MR. WILSON:  And, Your Honor, you have an exhibit of it. It's a mini. It's in the separate Redweld if you care to follow along. You do as well, Mr. Branch. May I approach the witness, Your Honor?

Page 196

JUDGE ROBERTSON:  Yes.

BY MR. WILSON:

Q.  We're going to go to page 40.

MR. WILSON:  And I'm showing the witness the Min-U-Script.

BY MR. WILSON:

Q.  Now, let me ask you. I'm going to read here starting on 23 on page 40.

"But you don't think Claude Wade was the person who did the discrimination?"

This is an answer from you. "I do not think it was Claude."

And I go on to ask on the next page, "What do you think the source of the discrimination was?

"Answer:  I think it was HR.

"Question:  HR. Anyone in particular in HR?

"Answer:  I think it was compensation, like Nicole Harris. And you can see it, when she reviews and tells the story from her perspective, she acknowledges that I did challenge it."

Did I read that testimony correctly?

Page 197

A.  That is correct.

Q.  So you'd agree with me that what you just testified to about Mr. Wade being a source of discrimination is inconsistent from what you said at your deposition?

A.  I think it's slightly inconsistent because --

Q.  It's a yes or no question, Ms. Lapera.

A.  So I'm going to say no, Joe, because there is black and whites. And as I think it over, you know, I do think indirectly he did. At that time, I didn't think it was Claude. I always gave Claude the benefit of the doubt and I thought it was HR. I can truthfully answer then just like I'm answering now. So I didn't say yes, he discriminated I think indirectly because I don't think he went and fought the way he should have fought for me.

Q.  Now, Mr. Wade had been supportive of your career prior to that time, right?

A.  That is correct.

Q.  He was instrumental in bringing you out of the human resources department; is that correct?

50 (Pages 194 to 197)

Page 198

A.   No, he was not instrumental in bringing me out of human resources.

Q.   He had some role in helping you come out of the human resources department.

A.   No, he wasn't.

Q.   Well, tell me how he supported your career.

A.   So Claude Wade became my boss after Andy -- I don't remember his last name -- left the company and he became the vice president of operational risk. And Mike was still the president of the company and he thought there was a lot of relationship between Lean Six Sigma and operational risk, so he thought it was a very good fit. And so that's how I ended up working for Claude.

Q.   Ms. Lapera, I want to move on to your April 2011 request for re-levelling. At the time you made that request, was the Lean Six Sigma team in which you were working, was that still under Mr. Wade?

A.   Yes. But it was about the time when Claude was about to leave the company.

Page 199

Q.   Ms. Lapera, can I show you what's been previously marked as Defendant's Exhibit 10? It's in volume 1 of defendant's exhibits.

A.   I have it.

Q.   And if you can just look down at the bottom of that, that P0016 number, that's the number you use for the documents that you produced in discovery in this case, right?

A.   That is correct. And this is an e-mail exchange between -- and Shandell Harris was the HR business partner who helped me submit the request to, again, move the job from an M to an N. And what she indicates here was that she tried and she was not successful and I'm just saying, okay, thank you. I do not understand their logic, but thank you for trying.

Q.   And the first-in-time e-mail in this string, do you understand that to be Ms. Harris getting back to you with the answer to your April 2011 request for re-levelling?

A.   In this case, this is Shandell Harris, yes, responding to me on my request for reclassifying

Page 200

the position.

Q.   And the answer is it's not going to an N, it's still an M?

A.   Correct.

Q.   I just want to make clear, you said you started with -- Kathy Keller became your boss in May 2011; is that correct?

A.   No, it was a little bit later than that.

Q.   June?

A.   June/July. Claude left Fannie Mae on May 2011 and the position was vacant for a month and a half or so and then Kathy came.

Q.   I want to ask you a question that goes to the process by which -- let me slow down.

I think you said on direct that the position that you held was ultimately leveled as an N in February 2011, correct?

A.   Correct.

Q.   I want to ask you something about the process leading to that. Could I ask you to turn to Defendant's Exhibit 23, please?

A.   Okay.

Page 201

Q.   That's an e-mail from you. Do you have any reason to doubt that it's not from you?

A.   I do not have any reason to doubt.

Q.   And if I could ask you to look at the two attachments to the e-mail, the one that's titled process improvement program director, Ana's position. The next, process improvement program lead, Ana's direct reports on the next page, and then I guess the third process improvement, best practices lead, Dan's position?

A.   Yes.

Q.   Do you know who drafted those?

A.   I did.

Q.   You drafted the whole thing?

A.   Yes, I did.

Q.   I want to go back here a little bit. And forgive me for jumping around.

Could I ask you, please, to look at Defendant's Exhibit 2, Ms. Lapera? And also, you may have talked about this with the same document that was marked under plaintiff's and I'm just not savvy enough to cross-reference both exhibits.

Arbitration Day 1

Washington, D.C.

November 3, 2014

## Page 206

subsequent year, right?

A. Correct.

Q. And it was contingent to receive that first installment that you were still employed at the company, right?

A. Correct.

Q. And it was also the contingent to receive that second installment that you still remained employed at the company at that time, correct?

A. Correct.

Q. Am I right that at least for some of the years from 2009 to when you separated, with that second installment, you still had to meet certain performance measures?

A. Which I always did.

Q. Okay. That wasn't my question.

A. Yes, you are correct.

Q. Ms. Lapera, I believe, with respect to your claim for discrimination in compensation, the basis for your claim is that you saw yourself doing the same or similar work as Mr. MacFarland and Mr. Carter, but they had a higher levelling for their

## Page 207

positions; is that correct?

A. I saw them doing similar work as was demonstrated in the previous conversation. And when the positions were reclassified in 2009, they got to be Ns and I got to be an M.

Q. And you're not basing your discrimination with respect to the levelling of your position on any other evidence?

A. That is the key evidence.

Q. No, that's not my question. You didn't testify to any other evidence on direct. So you're not basing that claim on anything other than your comparison to Mr. Carter.

A. That's essentially the comparison, yes.

Q. So that's the sum and substance of what you're basing that claim on?

A. Yes.

Q. With your indulgence, Ms. Lapera, I just have to find my many documents here.

A. There's a lot of books.

Q. Let's explore a little bit about you and Mr. MacFarland and Mr. Carter. So coming out just

## Page 208

after that job code restructure in the summer of 2009, you reported to Claude Wade at that time, right?

A. Correct.

Q. Mr. MacFarland didn't report to Claude Wade.

A. Correct.

Q. Okay. Mr. MacFarland reported within the technology organization; is that correct?

A. Correct.

Q. Okay. And he was responsible for business architecture, correct?

A. Correct.

Q. You were not responsible for business architecture.

A. We already discussed that. Michael was responsible for business architecture, I was responsible for process improvement, and Ted was responsible for operational risk.

Q. So the answer is no, you were not responsible for business architecture?

A. Not at that time.

## Page 209

Q. And your duties and Mr. MacFarland's duties were not the same, correct?

A. Our areas of focus were different, but our duties, in terms of finding understanding within our areas, were the same.

MR. WILSON: Your Honor, may I approach?

JUDGE ROBERTSON: You may.

MR. BRANCH: Your Honor, I know that this is not intentional, but I would ask that Mr. Wilson not stand over Ms. Lapera when he reviews the transcript.

BY MR. WILSON:

Q. Do you remember in your deposition I asked you, "Nor were your duties" --

MR. BRANCH: I'm sorry, where are you?

MR. WILSON: I'm sorry, page 49.

JUDGE ROBERTSON: You are looming a little bit. Don't you have two copies of this deposition?

MR. WILSON: I do.

JUDGE ROBERTSON: Why don't you leave one with her and take one back to counsel's table.

MR. WILSON: Sure. No ill intent to loom.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1

November 3, 2014

Washington, D.C.

Page 210

THE WITNESS: None taken.

JUDGE ROBERTSON: What page are we on?

MR. WILSON: We're on page 49, line 19.

I'm sorry, line 22.

BY MR. WILSON:

Q. Do you recall that I asked you, "Nor were your duties at that time Mike MacFarland's duties?" And you answered, "Correct, we complimented each other." Did I read that correctly?

A. Correct. And now we're playing with words. Because like I explained this morning, Ted Carter, Mike MacFarland and my duties were different, but very similar in terms of range and scope, each -- and they were different from the focus perspective.

Q. So the answer to my question is they were different, right?

A. They were different in focus like I've been saying since this morning.

Q. At some point you inherited the business architecture duties?

A. I did.

Q. That was what, August 2000- --

Page 211

A. '12.

Q. --'12. And just so we have a clear record, the duties of business -- well, never mind. I think we've established that.

Ms. Lapera, I'm going to show you what's been previously marked as Defendant's Exhibit 11, please. And I would ask you to flip to the third page of that which is Bates marked FNMB 001810. Do you have that before you, Ms. Lapera?

A. I do.

Q. Had you seen this page before?

A. I'm sure I have.

Q. What do you recognize it to be?

A. It's one of the versions of the position description.

Q. And that position that's being described here is the director, Lean Six Sigma, correct?

A. Correct.

Q. And that's the position that you held in the summer of 2009, after this job restructuring? Job code restructuring?

A. Correct.

Page 212

Q. And do you recognize that those are the duties of your job?

A. It's hard because this one doesn't have a date and you can see that there is another one right afterwards. So which date are you asking me? I'm sorry.

Q. In the summer of 2009.

A. I do not know. They are essentially the same. The job did not change all the way from 2009 through 2011. The job only changed in 2012, in the summer of 2012, when I inherited business, architecture. Prior to that, the job had remained essentially the same.

Q. Let's talk about Mr. Carter for a moment. Ted Carter, right? The summer of 2009, I suppose his job duties dealt with operational risk?

A. Director of operational risk.

Q. And operational risk is something that is very important to Fannie Mae? You recognize that?

A. Absolutely.

Q. And just so we can establish, you would agree with me that your duties as director of Lean

Page 213

Six Sigma were not the same as Mr. Carter's duties in his role with operational risk?

A. His area of focus was different. The duties were very similar.

Q. So is the answer to my question yes, they were not the same?

A. Mr. Wilson, I'm sorry, it's not a yes or no. No two jobs are exactly the same. And like you could come back and point me to the place in the deposition. The duties had different areas of focus; however, the span of the positions were similar.

Ted was focused on operational risk, I was focused on process improvement, and Michael was focused on business architecture. The three positions went across the company. The three were focused positions helping the corporation in these three different areas of focus.

Q. You discussed on your direct a job description. I believe it's Plaintiff's Exhibit 17.

A. I don't remember --

Q. It's plaintiff's exhibit, ma'am. So you have to go back to the volume that Mr. Branch

54 (Pages 210 to 213)

Arbitration Day 1

Washington, D.C.

November 3, 2014

Page 230

attachments. I didn't have then and I don't have now.

Q. You've used the term "executive presence" before aside from Anne Gehring asking you to use it?

A. I may have used it during these sessions. I do not remember. And I do know that I used them in my conversations with my staff as a result of and indications on how people should look.

Q. Am I right, executive presence to you means that one who is appropriately dressed for the role being performed is able to command the attention of a group and direct them towards action?

A. Correct.

MR. BRANCH: Judge Robertson, is it okay if I make a two-minute dash to the men's room?

JUDGE ROBERTSON: Let's take a break.

(Recess.)

BY MR. WILSON:

Q. I want to stick with some of the matters surrounding the vice presidency of planning and alignment position selection. Just so we can -- you may have said this before, but Ms. Gehring came over

Page 231

to EPMO from Financial Planning and Analysis?

A. FP&A.

Q. And that was underneath CEO Dave Benson?

A. Correct.

Q. And Nicola Fraser had worked at FP&A with Ms. Gehring?

A. Anne Gehring had promoted Nicola Fraser to a vice president when Nicola worked in FP&A for Anne.

Q. And that was prior to the posting for the vice president for planning and alignment position in EPMO?

A. That was prior to Anne coming to the EPMO, therefore, prior to the opening of the position.

Q. I appreciate that. Let's talk about your interviews for the position for vice president for planning and alignment in EPMO. I believe you said you interviewed on a Monday, right?

A. All of the interviews were on a Monday.

Q. Okay. Was that July 15?

A. I don't remember. But it was around that date.

Q. Fair enough. Do you think if I showed you

Page 232

your demand for arbitration, that would refresh your recollection on what the date was?

JUDGE ROBERTSON: Does it matter?

MR. WILSON: It might put some framework on things, Your Honor, but no, I can move op.

JUDGE ROBERTSON: Why don't you just represent to her what the date was and we can move on.

THE WITNESS: Yes, it was around that date.

BY MR. WILSON:

Q. July 15. And you interviewed with Mike Choi, Anne Gehring and Shandell Harris, correct?

A. Correct.

Q. And in none of your interviews with either of those people for this position was anything mentioned about anybody's race, correct?

A. Correct.

Q. Nor was anything mentioned about anybody's ethnicity, correct?

A. Correct.

Q. Nor was anything mentioned about anybody's

Page 233

national origin, correct?

A. Correct.

Q. Nor was anything mentioned about anybody's age, correct?

A. Correct.

Q. And nor was anything mentioned about anybody's weight, correct?

A. Correct.

Q. And nor was anything mentioned about anybody's body shape, correct?

A. Correct.

Q. And when I referenced anybody, you understood that to include you, yourself, correct?

A. Correct.

Q. And do you recall Ms. Gehring mentioning to you in your interview that she was looking for someone for this vice presidency for planning and alignment position who was able to communicate at all levels, not only with program directors, but with FHFA and at the highest levels of the company?

A. I don't remember, but that doesn't surprise me.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                November 3, 2014

Washington, D.C.

Page 238

Q. But she was coming back from maternity leave and that's the time she applied for the vice presidency for planning and alignment?

A. Uh-huh.

Q. So the answer is, if Ms. Fraser, in your estimation, was a 12, she would not be slender, right?

A. According to this strict definition. She was in excellent shape for just having a baby. Yes, according to the strict definition, Joe, if we're going to mince words, yes, I was incorrect.

Q. I'm using your words, ma'am.

A. I'm incorrect.

Q. So you testified on direct that a few days after your interview with Ms. Gehring and Mr. Choi, you had a meeting with Ms. Gehring and she informed you that Nicola Fraser, but not you, had been selected for the vice presidency for planning and alignment, right?

A. Correct.

Q. And in that meeting, Ms. Gehring didn't say anything about your race, right?

Page 239

A. She did not.

Q. Nor did she say anything about your ethnicity, did she?

A. She did not.

Q. Nor did she say anything about your national origin, did she?

A. She did not.

Q. Nor did she say anything about your age and nor did she say anything about your weight?

A. Nope.

Q. Nor did she say anything about your body shape?

A. Nope.

Q. Nor did she say anything about anybody else's race, right?

A. Nope.

Q. Nor did she say anything about anybody else's ethnicity, right?

A. Nope.

Q. Nor did she say anything about anybody else's national origin?

A. Nope.

Page 240

Q. Nor did she say anything about anybody else's weight?

A. Nope.

Q. Nor did she say anything else about anybody's body shape, right?

A. Nope.

Q. Now, she did make a comment, based on your testimony, that Ms. Fraser was young, right?

A. Yes.

Q. Other than that comment, did she say anything about anybody else's age?

A. No.

Q. Going on here and sticking with the same topic more or less, at the time that you applied for the vice presidency for planning and alignment, you had had very little experience with presenting before Dave Benson who was the CFO at the time, right?

A. Yes. Dave Benson had been recently -- I don't remember how long Benson had been a CFO. But no, from all of the officers of the company, he was one of the ones with whom I had the least familiarity.

Page 241

Q. And you actually had done very limited work for Dave Benson, right?

A. Correct. He was one of the members of the MC, the management committee, so the other members were the head of single family and IT and legal.

Q. Pardon me. I'm looking for the job description. Here we go. Ms. Lapera, I'm showing you what's been marked as Plaintiff's Exhibit 57. I believe you went over that on your direct. It's the plaintiff's binder.

A. Yes, this is the position description for vice president of planning and alignment.

Q. Ms. Lapera, if we can go down to the section, key job functions and duties, in the first bullet where it says, "Responsibilities include act as a trusted advisor and independent lens to the SVP of the EPMO and the CFO." Right?

A. Correct.

Q. Do you see that? I read that correctly? And Dave Benson, again, was the CFO at the time?

A. Correct.

Q. And you had never made a presentation

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1

November 3, 2014

Washington, D.C.

Page 242

before the FHFA, correct?

A.  Correct.

Q.  And you had not presented to the whole management committee for several years prior to July of 2013, correct?

A.  Correct.

Q.  And am I right that you would acknowledge here that Ms. Fraser had more experience than you do in presenting to FHFA?

A.  I assume that she had presented to FHFA.

Q.  And you would also acknowledge that Ms. Fraser had more experience presenting to Fannie Mae upper management than you did?

A.  I do.

Q.  Do you agree with that statement?

A.  I do.

Q.  Thank you. And you would agree, also, that Ms. Fraser's relationship with Mr. Benson at the time of the selection for the vice presidency for planning and alignment in EPMO was stronger than your relationship with Mr. Benson?

A.  So we're going to talk words again. So

Page 243

I'm going to answer the question and I'm going to say, yes, I do agree with that. However, given my prior records and all of my experience, that didn't mean that I couldn't develop the relationship with Dave Benson. I made it just as strong as Nicola had it. I did not have it at that time. However --

Q.  Ms. Lapera, can we just stick with the question that I asked?

A.  Well, we just have to be fair.

Q.  Your counsel, if he would like, can ask follow-up questions.

Ms. Lapera, can I ask you, please, to turn to what has been previously marked as Defendant's Exhibit 222?

A.  I'm there.

Q.  Do you recognize this document?

A.  It's the midyear evaluation for me.

Q.  And you received this back in August of 2013?

A.  This evaluation was received by me in August of 2013, after the position had been assigned to Nicola, yes.

Page 244

Q.  And you understood that Ms. Gehring filled this midyear evaluation out?

A.  Correct.

Q.  Can we turn to the second page there of this? And I'm going to read I guess the first box underneath areas for development, "Ana should continue to focus on executive presence. There are two specific aspects to executive behavior that Ana could think about. The first is to remove herself from the ain't it awful crowd."

I could go on and read it, but did I read that first line or two correctly?

A.  Correct.

Q.  And it says what it says and I won't bore everybody here with this. But talking about the full commentary there in that areas for development, you understood that statement by Ms. Gehring to be referring to your communication aspects, right?

A.  Yes.

Q.  And Ms. Gehring, right, had -- you also met with Ms. Gehring to go over your midyear evaluation for 2013, right?

Page 245

A.  In that midyear evaluation, it was Anne and Nicola were present.

Q.  That was, what, August 7th?

A.  Something like that.

Q.  And you were given this document at that session?

A.  Correct.

Q.  And Ms. Gehring, am I right --

A.  Ms. Gehring what?

Q.  I'm sorry, Ms. Gehring talked about your executive presence at that session?

A.  She at that point described executive presence as communications as you see in this paragraph.

Q.  And at that review session there in August, Ms. Gehring didn't mention anything about your race, right?

A.  Nope.

Q.  Nor did she mention anything about your ethnicity, did she?

A.  Nope.

Q.  Nor did she mention anything about

62  (Pages 242 to 245)

Page 258

JAMS ARBITRATION

- - - - - - - - - - - - - - -   X

ANA LAPERA,                          :

        Plaintiff,                   :

                v.                   :   JAMS Ref. No.

FEDERAL NATIONAL MORTGAGE             :   1410006405

ASSOCIATION (FANNIE MAE),             :

        Defendant.                   :

- - - - - - - - - - - - - - -   X

                          Washington, D.C.

                          Tuesday, November 4, 2014

        Arbitration before THE HONORABLE JAMES

ROBERTSON, in the above-entitled matter, the

witnesses being duly sworn by MARY GRACE CASTLEBERRY,

a Notary Public in and for the District of Columbia,

taken at the offices of JAMS, 555 13th Street, N.W.,

Washington, D.C., at 10:10 a.m., Tuesday, November 4,

2014, and the proceedings being taken down by

Stenotype by MARY GRACE CASTLEBERRY, RPR, and

transcribed under her direction.

Arbitration Day 2                                                    November 4, 2014
Washington, D.C.

Page 259

APPEARANCES:

On behalf of the Claimant:

DAVID A. BRANCH, ESQ.

Law Office of David A. Branch & Associates, PLLC

1828 L Street, N.W., Suite 820

Washington, D.C. 20036

(202) 785-2805

On behalf of the Respondent:

JOSEPH D. WILSON, ESQ.

Kelley Drye & Warren, LLP

3050 K Street, N.W., Suite 400

Washington, D.C. 20007-5108

(202) 342-8504

and

DAMIEN G. STEWART, ESQ.

Associate General Counsel

Fannie Mae

3900 Wisconsin Avenue, N.W.

Washington, D.C. 20016-2892

(202) 752-7000

ALSO PRESENT:

MARVILA AREVALO, Legal Assistant

Page 260

CONTENTS

WITNESS

ANA CRISTINA LAPERA    CROSS(RESUMED) REDIRECT

By Mr. Wilson        275

By Mr. Branch                313

NICOLA FRASER    DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Branch     318        384

By Mr. Wilson         350

MELISSA WERNER    DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Branch     404       457

By Mr. Wilson         447        459

SHANDELL HARRIS    DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Branch     461        494

By Mr. Wilson         482

JESUS LAPERA    DIRECT

By Mr. Branch     497

Afternoon Session - Page 384

Page 261

PROCEEDINGS

MR. WILSON: Your Honor, Mr. Branch has named on his list of witnesses various people who are under Fannie Mae control that he would like to call. Three in particular we object to. Keith Smith, John Hickman and Joe Hallet. We think their testimony would either be irrelevant or certainly cumulative and so we'd like to get a proffer for what he would call them for at a minimum.

JUDGE ROBERTSON: Well, how long has this objection process been going on? Didn't we work this out in advance of the trial?

MR. WILSON: Mr. Hickman, in particular, came out not in advance of trial. He was identified on Wednesday of last week as a new witness and, for the life of us, we don't know why he would be called.

JUDGE ROBERTSON: There was some discussion, wasn't there, in one of our telephone conferences about subpoenas? I don't think I ever received any subpoenas to sign so I didn't sign any.

MR. WILSON: Fannie Mae is making its people under its control -- let me just say its

Page 262

current employees available without subpoena. It does that pursuant to its dispute resolution policy in which this arbitration is brought. So if these people come, they don't have to be subpoenaed, but we just don't want to bother Mr. Hallet. He's a vice president and he was one of the three people interviewed, but he wasn't selected for the vice presidency for planning and alignment position so I don't know what he's going to add to the show here. And again, Mr. Hickman applied, but he was screened out. He wasn't even interviewed for the job. I don't think he met the requirements. And Mr. Smith, while he worked in EPMO, I have no idea what his relevance is to this case.

JUDGE ROBERTSON: Mr. Branch, do you want to respond to that?

MR. WILSON: Yes, Your Honor. First, for Mr. Hallet. Mr. Hallet did apply for this position and he was not selected for the position. He was initially -- and there is evidence and documents in the record that Ms. Gehring initially wanted to place him into the position -- and defense counsel is well

Alderson Reporting Company
1-800-FOR-DEPO

Page 283

Exhibit 17, please? Is this the other position you're talking about, the director middle office position?

A. Yes.

Q. And that was in the single-family management organization of Fannie Mae?

A. That was in Fannie Mae.

Q. And Tomasello didn't hold this position, right?

A. No. But Tomasello --

Q. That's a yes or no question, Ms. Lapera.

A. He did not.

Q. And Lea Nicotra didn't hold this position, correct?

A. That is correct.

Q. And Amilda Gjecovi didn't hold this position, correct?

A. That is correct.

Q. Nor did Keith Smith hold this position.

A. That is correct. However, project --

Q. Ms. Lapera, I don't have a question for you.

Page 284

A. Okay. I thought you wanted the truth.

Q. So are you basing your claim for levelling on the comparison of the positions, the position that you held, director of Lean Six Sigma, opposed to the position that Jim Tomasello held?

A. I'm sorry, can you repeat the question?

MR. WILSON: Madam Court Reporter, can you read back the question?

THE REPORTER: "Question: So are you basing your claim for levelling on the comparison of the positions, the position that you held, director of Lean Six Sigma, opposed to the position that Jim Tomasello held?"

THE WITNESS: Yes.

BY MR. WILSON:

Q. But you didn't testify to that effect yesterday, right?

A. You didn't ask me.

Q. Okay. During your direct examination, you didn't testify to that effect?

A. It did not come up.

Q. Are you basing your claim for

Page 285

discrimination in the levelling of your position on a comparison of the duties of the director of Lean Six Sigma, a position which you held, compared to the duties of a position held by Keith Smith?

A. Yes.

Q. Same question with respect to Amilda Gjecovi.

A. Yes.

Q. Same question with respect to Lea Nicotra.

A. Yes.

Q. Now, Ms. Lapera, I believe you testified in your examination yesterday that after you were informed that you had not been selected for the vice presidency position for planning and alignment, that that told you there were always going to be objections to you becoming an officer; is that correct?

A. Correct.

Q. Were you ever actually told that you would never become an officer at Fannie Mae?

A. Actually on the contrary. I was told several times by Claude Wade, by Kathy Keller, even

Page 286

by Anne, that I would become an officer. However, having a position that is exactly what my experience had given me and not having been selected for that said what's the point of keep trying.

Q. Maybe I wasn't clear in phrasing my question there in the negative. Were you ever told by anyone at Fannie Mae that you would not be made an officer?

A. No.

Q. Thank you. Now, I believe you testified yesterday that you came back from vacation and that's when you decided to resign from Fannie Mae; is that correct?

A. I came back and thinking I was going to come back and be refreshed and I would be able to resume my duties. And, yes, after I had been there for a couple of weeks, I decided I cannot do this anymore.

Q. When did you come back from vacation?

A. I do not remember the exact time.

Q. Was it in October of 2013?

A. Yes. Sometime around there.

8 (Pages 283 to 286)

Page 319

examined and testified as follows.

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. Good morning, Ms. Fraser. My name is David Branch.

A. Good morning.

Q. Ms. Fraser, are you employed?

A. Yes.

Q. And where are you employed?

A. Fannie Mae.

Q. What's your current position?

A. Vice president in counterparty credit risk

Q. I'm sorry, counterparty --

A. Counterparty credit risk analysis.

Q. How long have you been in that position?

A. Three months.

Q. And what's your date of birth?

A. April 3rd, 1976.

Q. So how old are you?

A. I'm 38.

Q. How long have you been employed at Fannie

Page 320

Mae?

A. A little over six years.

Q. So this is 2014. So you would have started sometime in 2008?

A. August 2008.

Q. What was the first position you held at Fannie Mae?

A. Director in accounting policy.

Q. Who did you report to in that position?

A. Kirk Silva.

Q. Did you report to Kirk Silva for the entire period you were a director?

A. I did. Entire period I was a director in that role.

Q. Were you a director in a separate role?

A. Uh-huh.

JUDGE ROBERTSON: You have to say yes or no, please.

THE WITNESS: Yes. Sorry. Yes.

BY MR. BRANCH:

Q. What was the position that you held after being the director reporting to Kirk Silva?

Page 321

A. I was a director of financial analysis.

Q. When did you become director of financial analysis?

A. April 2011. No, April 2010. Excuse me.

Q. Who did you report to in that position?

A. Initially, Shaun Ross.

Q. Did you report to someone else after you reported to Shaun Ross?

A. I did. Effective September 2010, I started reporting to Anne Gehring.

Q. What period of time did you report to Anne Gehring as a director?

A. I was promoted to officer January 2012 and I continued to report to Anne as an officer.

Q. When you say you were promoted to officer, were you promoted to vice president?

A. Yes.

Q. And that was in January 2012?

A. Yes. It was effective the last day of December or December 29th, I believe, of 2011.

Q. Was this a competitive promotion?

A. I don't understand the question.

Page 322

Q. Meaning did you interview -- apply for a vacant position, then interview, be selected by a panel?

A. Yes.

Q. And what is the process that's involved when someone is promoted from a director to a vice president?

A. There's multiple processes. There is whether or not your ability -- you interview for the role itself and then you go through a leadership interview process. So the -- do you want me to explain?

Q. Yes. I'm sorry. Please indulge.

A. So the interview for the role would be assessing whether or not you had the ability to do the job by the local management team, which I was effectively put in the role for a trial period of six months to assess that, whether or not I was capable of doing that.

And then you go through a leadership process where you might be nominated and then you have an interview with a panel of executives, senior

17  (Pages 319 to 322)

Page 323

vice presidents and executive vice presidents. And if the panel supports your promotion, then you continue to go on through an interview process that involved an interview with the head of HR, at the time the head of legal and administrative, our chief admin officer, and then also an interview with the CEO.

Q. And so who placed you into the trial period for six months?

A. Anne Gehring.

Q. So how long did it take from the time you started when you interviewed -- the first interview until you actually became a VP? How long did that process take?

A. I don't remember.

Q. Was it a month or more?

A. Not including the period I was in the role on a trial basis, it probably was.

Q. So you became a VP in January 2012?

A. It was effective the end of December 2011.

Q. Do you recall what your official title was?

Page 324

A. It was vice president, corporate financial planning and analysis.

Q. How long were you in that position?

A. I was in that position until I went on maternity leave in March of 2013.

Q. And when you went on maternity leave, who were you reporting to?

A. When I went on maternity leave, I was reporting to Kaye Simmons.

Q. And when you returned from maternity leave, did you report back to that position?

A. No. I made a decision in about January of 2013, I started conversations with Kaye Simmons, it was around January, about not coming back into the -- actually, it was earlier than January. It was in the fall. And saying that we need to find a successor for me to fulfill that role when I returned from maternity leave.

So effective January, we had another vice president who was shadowing me for three months before I went on maternity leave so she could fulfill the role and step into my shoes.

Page 325

Q. And why did you decide to leave that role?

A. I had been in corporate FP&A for about three and a half years at that time and had decided that I wanted to try something else to broaden my experiences and get closer to the business, hopefully. But at the time I had not identified a specific role.

Q. So the position that you hold now, is that within corporate FP&A?

A. No. It's within our Enterprise Risk Management Group.

Q. Is the Enterprise Risk Management Group different from the EPMO group?

A. Yes, it is.

Q. So what's the highest degree that you've earned?

A. My undergraduate degree.

Q. Do you have a bachelor's degree?

A. I do, bachelor of arts, Franklin & Marshall College.

Q. And do you have a master's degree?

A. I do not.

Page 326

Q. Prior to your return to work in July 2013, did you have any experience managing a business architecture team at Fannie Mae?

A. No, I did not.

Q. And prior to returning to Fannie Mae after maternity leave, did you have any experience managing or directing a Lean Six Sigma team?

A. No, I did not.

Q. Have you attended the Six Sigma Academy?

A. No, I did not.

Q. Do you hold any type of credentials or certifications from the Six Sigma Academy?

A. No.

Q. Do you know what this black belt certification is?

A. Yes, I do.

Q. And you don't hold that certification?

A. No, I don't.

Q. And prior to July 2013, did you have any experience managing a process improvement team?

A. No.

Q. Prior to July 2013, did you have

18  (Pages 323 to 326)

Page 327

responsibility for supervising employees?

A. Yes.

Q. And what period of time did you supervise employees at Fannie Mae?

A. My entire time.

Q. What's the largest number of employees you've supervised at any given time before July 2013?

A. About 20 people.

Q. And what was your position when you did that?

A. Vice president.

Q. For what particular area?

A. For corporate FP&A.

Q. And what type of positions did you supervise as the VP for corporate FP&A?

A. What type of position?

Q. Yes. What are the titles?

A. Of my direct reports?

Q. Yes.

A. I had director overseeing our corporate financial planning team, I had a director over our corporate budget and scorecard reporting team, and I

Page 328

had a senior manager overseeing our strategic financial analysis.

Q. So you had three direct reports.

A. That's correct.

Q. So would the other 17 or so people have reported to your direct reports?

A. And at times, there were managers. So either directly or indirectly.

Q. Did you apply for the position of vice president of planning and alignment in 2013?

A. What do you mean did I apply?

Q. Did you submit an application for --

A. I reached out to Melissa Armstrong and sent my resume and said I was interested in the position.

Q. I'm sorry, who is Melissa Armstrong?

A. I'm sorry, not Melissa Armstrong. Melissa -- who's the head of our -- I don't remember Melissa's last name. I'm sorry.

Q. Is it Melissa Werner?

A. Yes, I believe so.

Q. How did you learn about the position of

Page 329

vice president, planning and alignment?

A. My administrative assistant sent me an e-mail with a job description when I was on maternity leave.

Q. Who was your administrative assistant?

A. Lakisha Preston.

Q. Did you request that?

A. No.

Q. And when did you learn that there was a vacancy?

A. When I got the --

Q. Do you recall the time frame?

A. When I got the e-mail?

Q. Yes.

A. I want to say probably June. I could dig up the e-mail for the specific date.

Q. There is a binder in front of you. If you would turn to Exhibit 43.

JUDGE ROBERTSON: Defendant's Exhibit 43?

MR. BRANCH: Yes.

THE WITNESS: Am I looking at the right binder?

Page 330

MR. WILSON: Is it volume 1?

JUDGE ROBERTSON: You got me.

THE WITNESS: Volume 1, yes. June 4th.

BY MR. BRANCH:

Q. Of 2013?

A. Uh-huh.

Q. And did you submit an application after -- or submit a resume after you received this notice of the position?

A. Yes.

Q. When did you submit your -- well, first, how did you apply for the position?

A. I sent my resume to Melissa. I didn't have access to our online system.

Q. When did you submit your resume to Melissa?

A. It wouldn't have been until July, because I met with Anne, the hiring manager, Anne Gehring. I met with Dave Benson, who was the EVP responsible for EPMO at the time, and I did that in early July, after I met with Dave. So it would have been after that period of time.

Page 331

Q. So you met with Dave Benson in July?

A. Early July.

Q. And what was his position?

A. He was EVP, executive vice president, responsible to the CFO.

Q. And why did you meet with him?

A. Dave I've worked with for a number of years and I talked to him about -- when I was leaving corporate FP&A and wanting to explore other opportunities, I had talked to him about different career opportunities throughout my time at Fannie Mae. So he was a natural person for me to reach out to. I've talked to him throughout.

Q. And so before you met with David Benson, did you have a dinner meeting with Anne Gehring?

A. I did, yes.

Q. And when did that occur?

A. It was before my meeting with Dave. Not long before, I believe. So late June.

Q. And did you discuss applying for the position at that time?

A. I did, yes.

Page 332

Q. And did Anne Gehring ask you to apply for the position?

A. No, she didn't ask me directly. She explained the job to me and asked if I was interested.

Q. And what was your response?

A. I said I would think about it.

Q. Let's turn to Claimant's Exhibit 82. Do you recognize this?

A. Yes.

Q. Does this refresh your memory on when you had dinner with Anne Gehring?

A. Yes.

Q. So it would have been on or about June 17th, 2013?

A. Yes.

Q. And you discussed the vacant VP position at that time?

A. Yes, that's correct.

Q. You said you also had a meeting with David Benson?

A. That's correct.

Page 333

Q. Did you meet with David Benson on or about July 2nd, 2013?

A. That sounds about right.

Q. Had you submitted your resume at that time?

A. No.

Q. And why not?

A. Because I was meeting with Dave to discuss opportunities that existed throughout the company, not just this particular opportunity.

Q. So as of July 2nd, 2013, you had not decided to apply for this VP position in planning and alignment?

A. That's correct.

Q. Let's turn to -- well, after your meeting with Benson, did you decide to apply for the position?

A. Yes.

Q. What actions did you take after you decided to apply for the position?

A. I sent Melissa an e-mail, I believe I sent Dave an e-mail and Anne an e-mail.

Page 334

Q. And now let's turn to Exhibit 47.

A. And Shandell an e-mail.

Q. Do you recognize this document.

A. Yes. This is the e-mail I sent.

Q. Now, prior to sending this e-mail on July 2nd, did you communicate to Anne Gehring that you did not have a position -- or words to the effect that you were homeless and didn't have a position to return to?

A. I expressed that to Dave Benson and to -- and I don't recall whether or not I had that explicit conversation with Anne.

Q. And why did you make that statement?

A. Because I hadn't yet determined what role I was going to come back into.

Q. And did you eventually submit a resume for the position?

A. I did.

Q. And when did you do that?

A. This e-mail was July 14th. I assume it was within a few days, as I indicated on here. I don't remember the exact date.

Page 335

Q. Let's turn to Exhibit 76. Are you there?

A. Yes.

Q. Do you recognize this as an e-mail that you sent to Melissa Werner on or about July 11, 2013?

A. Yes.

Q. And did you attach your resume to this e-mail?

A. Yes.

Q. So is it true that you submitted a resume for this position on July 11, 2013?

A. That's correct.

Q. Did you interview for this position?

A. I did.

Q. When did you learn that you would interview for the position?

A. Melissa called me. I'm not sure if it was after my e-mail or after the resume.

Q. When you say "after the e-mail," are you talking about the July 2nd --

A. The first e-mail where I said I was interested in pursuing the opportunity, but I didn't have my updated resume.

Page 336

Q. So were you offered an interview before you submitted your resume?

A. I don't believe so. It was just discussing the process, to answer your question.

Q. And did you, in fact, interview for this position?

A. I did.

Q. Who did you interview with for the position?

A. I interviewed with Anne Gehring, I interviewed with Shandell Harris, and I interviewed with Mike Choi.

Q. Do you recall when you interviewed for the position?

A. Within a week, I believe, of this submission. A week or two.

Q. Where were your interviews held?

A. At Fannie Mae. I was out on maternity leave. I came into the office in the day. I met with Anne in her office and then we went and did an offsite at lunch, and then I met with Shandell and Mike back in the office.

Page 337

Q. So your first interview was with Anne Gehring?

A. That's correct.

Q. And was the interview actually in her office?

A. No. I met her in her office and then we went to lunch and we conducted it over lunch.

Q. What happened during the interview with Anne Gehring? Were you asked questions?

A. Yes.

Q. What types of questions?

A. I really don't recall specific questions. I'm sorry.

Q. Generally, do you recall the type of questions that you were asked by Anne Gehring during this lunch meeting?

A. No, I really don't.

Q. Was there any discussion of this position?

A. Absolutely. There was a lot of discussion about the role, strategic priorities. I mean, there was questions about -- I would be speculating. I really -- I vaguely remember the conversation.

Page 338

Q. And you don't recall any of the questions that Ms. Gehring asked you at this interview?

A. No.

Q. Do you recall any of the responses that you provided at the interview?

A. No.

Q. And how long was this lunch meeting?

A. An hour.

Q. And you said you also interviewed with Shandell Harris and Mike Choi?

A. Uh-huh.

Q. Who is Shandell Harris?

A. She's in our HR, business partner.

Q. And who is Mike Choi?

A. He was another VP that was in EPMO. He was a peer to this role.

JUDGE ROBERTSON: He was a what?

THE WITNESS: He was a peer to this role.

BY MR. BRANCH:

Q. Did Ms. Gehring take any notes during your interview with her?

A. Not that I remember.

Page 339

Q.   Do you recall any of the questions that you were asked in the interview with Ms. Harris?

A.   No.

Q.   Did she take any notes as part of the interview?

A.   I don't remember.

Q.   Do you recall any of the responses to questions?

A.   I don't remember.

Q.   Were you asked any questions by Ms. Harris?

A.   Yes.

Q.   Generally, what type of questions did she ask you?

A.   I don't remember.

Q.   Do you have any recollection of what you talked about with Ms. Harris during this meeting/interview?

A.   We talked about the EPMO role, but I don't remember any specifics, no.

Q.   You talked about the EPMO role?

A.   We talked about EPMO and the role, but I

Page 340

don't remember any specifics.

Q.   And what about your interview with Mike Choi. Do you recall any of the questions that he asked?

A.   Mike? No.

Q.   Do you recall any of your responses to anything he may have asked you?

A.   No.

Q.   So what happened after your interview with Mike Choi?

A.   I went home.

Q.   Were you told when a decision would be made?

A.   I don't remember.

Q.   Did either Shandell Harris or Anne Gehring tell you when a decision would be made?

A.   I think there was an indication that it was going to be quick, if I remember correctly.

Q.   And who told you that?

A.   I don't remember.

Q.   Had Anne Gehring already told you that the position was yours before the interview?

Page 341

A.   No.

Q.   How did you learn that you were selected for this position?

A.   Melissa called me and Anne called me.

Q.   Melissa Werner?

A.   Uh-huh.

Q.   When did she call you?

A.   I don't remember.

Q.   When did Anne Gehring call you?

A.   I don't remember. I know it was before I came back to work.

Q.   And when did you return to work?

A.   It was late -- I think it was a Monday at the end of July. The 28th or 22nd. I'm not sure.

Q.   Did this VP of planning and alignment have three areas of responsibility?

A.   It did initially.

Q.   And you were in this position from July 2013 until when?

A.   August 2014.

Q.   What were the three areas of responsibility for the position VP of planning and

Page 342

alignment?

A.   Business architecture, Lean Six Sigma and then enterprise planning.

Q.   Prior to your selection for this position, had you directed employees in performing duties on either business architecture, Lean Six Sigma or enterprise planning?

A.   The responsibilities around enterprise planning were similar to some of the responsibilities I had in corporate FP&A from a financial aspect.

Q.   Let's turn to Exhibit 57, please.

A.   In this binder?

Q.   Yes. Is this the position description for the VP of planning and alignment?

A.   I believe so.

Q.   Under the key job functions and duties, the first point is, "Act as a trusted advisor and independence lens to the SVP of the EPMO and the CFO. Provide insights and strategic analysis to facilitate decision-making. Develop a relationship with the SVP and CFO that promotes role as objective sounding board."

Page 343

Did you have any experience making presentations to the CFO before you applied for this position?

A. Absolutely.

Q. And that would have been Dave Benson?

A. No. It was Susan MacFarland, who was our prior CFO. But I did have experience also with Dave Benson.

Q. I'm sorry, MacFarland?

A. Susan MacFarland.

Q. And what was your experience in making presentations to Susan MacFarland?

A. I presented to her regularly on a monthly basis, if not bimonthly, as it relates to our reporting of our results, including our forecasting.

Q. What period of time did you do that?

A. From the time I was in the role as a corporate FP&A.

Q. As vice president?

A. Vice president and the six months prior, when I had taken on additional responsibilities.

Q. So that would have started in January?

Page 344

A. July.

Q. Of 2011?

A. Of 2011. End of July.

Q. When did Benson become a CFO?

A. He became a CFO in July, when -- no, I'm sorry. I believe it was April of 2013, when I was on maternity leave. As soon as we filed our first quarter results, he became the CFO.

Q. And where was he working previously?

A. He was EVP and responsible for our capital markets function and also our corporate strategy work.

Q. And prior to applying for this position, did you have any experience presenting to the management committee?

A. Yes.

Q. And how so?

A. I presented on a monthly, if not bimonthly, basis as it relates to our results of operations, including our forecasts.

Q. And that's for the financial part of it?

A. And our key business metrics that related

Page 345

up to the impact on our financial results.

Q. And was that during the period when you were vice president?

A. Yes, and the six months prior.

Q. Did you have any experience presenting to regulators and the Fannie Mae board of directors?

A. Not our Fannie Mae board of directors, but yes, to regulators. I met with regulators monthly.

Q. After you became the vice president of planning and alignment, how did you communicate with the team?

A. On?

Q. Work-related matters.

MR. WILSON: Objection.

JUDGE ROBERTSON: Overruled. You can answer to the best you can.

THE WITNESS: I'm not sure I understand the nature of the question.

BY MR. BRANCH:

Q. Okay. So after you became vice president of planning and alignment, did you schedule an initial meeting with the staff?

Page 346

A. I'm sure I did.

Q. Do you recall the first meeting that you held with staff after you became the VP of planning and alignment?

A. No.

Q. Do you recall arriving late for the first staff meeting with the new team?

A. It could be possible.

Q. Did you tell the team that they should get used to you arriving late?

A. I don't remember.

Q. Why did you leave this position as the VP of planning and alignment?

A. The role had evolved into less of a strategic nature into more of a financial budgetary role and I had already gained that experience in my role in FP&A in the year there. So I did not believe I was growing and learning at a fast enough pace. And there was a lot less interaction with the business than I had expected.

Q. And when did you conclude that the role was not what you wanted to serve as?

Page 351

A.   Three and a half and one and a half.

Q.   And where are you from originally?

A.   I'm from Ireland.

Q.   And how long did you live in Ireland?

A.   Until I was 16.

Q.   And then you came over to the States?

A.   That's correct.

Q.   And are you married?

A.   I am.

Q.   Where is your husband from?

A.   From South Africa.

Q.   Did Anne Gehring know you were from Ireland?

A.   Yes, she did.

Q.   Did she know your husband was from South Africa?

A.   Yes, she did.

Q.   We've talked a lot in this case about EPMO, and I think you've just established that you worked in EPMO for over a year?

A.   Yes.

Q.   Could you please describe for us what the

Page 352

role of EPMO is within Fannie Mae?

A.   The broader organization? Yes, sure. So the Enterprise Program Management Office is an organization that's an attempt to bring together an enterprise view of a number of strategic projects. We have, as the GSEs, attempted to define their future state. We are working to achieve FHFA's objective for that strategy and its attempt to just try and bring together all those individual projects with a strategy, an end-to-end strategy of achieving that over multiple years and providing oversight and governance for all those projects and the dollars and the resources and making sure that it will be used efficiently and effectively.

In addition, the EPMO organization also offers education as it relates to project management and services around, at the time, Lean Six Sigma, consulting services throughout the company and also business architecture resources to project teams.

Q.   Okay. Are you familiar with the term "multiyear investment plan" as used within Fannie Mae?

Page 353

A.   Yes, I am.

Q.   What's your understanding of what the multiyear investment plan is?

A.   So the multiyear investment plan is used to identify which projects should be worked on when and where do we put our dollars and our people. We have a very complex infrastructure at Fannie Mae and we have neglected to look at it from an enterprise view and we've done everything in silos. So when we're looking at becoming -- potentially being a competitive entity in the future, we need to make sure we've got efficient systems and processes.

So the multiyear investment plan took all these requests, whether they're wanted from a business perspective or technology perspective and then ensuring we're maintaining existing infrastructure, implementing new infrastructure and putting the pieces of the puzzle together.

Q.   How does the work of the EPMO relate, if at all, with the multiyear investment plan?

A.   So most of my time was spent devoted to working on the multiyear investment plan.

Page 354

Q.   And you say most of your time, that's when you mean you were working in EPMO?

A.   That's correct.

Q.   And that's in the position of vice president for planning and alignment, correct?

A.   That's correct, yes.

Q.   I'm going to take you back a bit now to how it is you came to apply for that position. And I believe we established that you were on maternity leave when you learned of the position; is that correct?

A.   That's correct.

Q.   Could we go to Defendant's Exhibit 43? It's going to be volume 1 of the defendant's binder. It should have a blue sticker at the bottom. I believe Mr. Branch explored that with you.

A.   I'm sorry, which --

Q.   Forty-three.

A.   The job description?

Q.   Right. And you got that from your secretary, right?

A.   That's correct.

25 (Pages 351 to 354)

Page 355

Q.   In the "to" line, there's an e-mail address. Do you see that?

A.   Yes.

Q.   Is that your e-mail address?

A.   That's my personal e-mail address.

Q.   Do you have an understanding on why Ms. Preston was sending this to you at your personal e-mail address?

A.   Out of interest to figure out what I was going to do when I came back from maternity leave.

Q.   But why is she using your personal e-mail address?

A.   That was the only e-mail that she could reach me on.

Q.   She couldn't send it to your work e-mail address?

A.   No. I was on short-term disability leave and -- so your e-mail is cut off. Your access to everything at Fannie Mae is cut off.

Q.   Oh, okay. So you had, I believe, stated you had a dinner with Anne Gehring?

A.   That's correct.

Page 356

Q.   And let's explore that. If you could go to the blinder with the yellow stickers. It's Plaintiff's Exhibit 82.

A.   Yes.

Q.   And your dinner with Ms. Gehring you recall was on June 17th?

A.   I don't know if it was that night, if it was that week.

Q.   It certainly wasn't before June 17th?

A.   No, no. I just can't remember the specific day. I made a reservation. It might have been that evening. It sounds, the way the e-mail was written.

Q.   Okay. So could we go back to the beginning of this thread?

A.   Yes, sure.

Q.   And let's go to page FNMA 000116. When I say "beginning," I mean beginning in time.

A.   Yes.

Q.   And the "Hello there" is the e-mail, the subject line.

A.   That's correct.

Page 357

Q.   And you sent this to Ms. Gehring?

A.   Uh-huh.

Q.   And could you tell us what you're doing here?

A.   Reaching out to Anne, trying to network with folks and just connect towards getting ready to come back to work.

Q.   So you're on maternity leave as of May 30th?

A.   That's correct.

Q.   And let's just read up and we have to get the -- you go on, am I right, is it fair to say there's some back and forth between you and Ms. Gehring? And then we come to this June 17 e-mail, right? And that's before you went to dinner with Ms. Gehring, right?

A.   That's correct, before we finalized plans.

Q.   And the second paragraph in that e-mail, could you read that?

A.   "I heard you posted a VP position which included some of the work Kathy covered. Anyway, in all seriousness, I'm hoping you might have a home for

Page 358

me. I'm currently homeless and have not heard from anyone, so I'm starting the search."

Q.   Okay. So you're talking with Ms. Gehring about the particular position before the dinner you go to later either that night --

A.   My intent was to ask her at the dinner about the position.

Q.   Okay. Thanks. I'm going to ask you to turn, please -- we have to switch binders again.

A.   That's fine.

Q.   Can we back up?

A.   Sure.

Q.   Let's look at that same Plaintiff's Exhibit 82.

A.   Yes.

Q.   So on May 30th, am I right, when you were reaching out to Anne, you hadn't even learned of the vacancy for the vice presidency for planning and alignment?

A.   No.

Q.   And am I right, on May 30th -- if you want to look in there -- are you reaching out to

Page 359

Ms. Gehring to meet up for lunch or drinks or dinner or something like that?

A. Yes, that's correct.

Q. And so the June 17th or later dinner meeting was the culmination of what started on May 30th?

A. That's correct.

Q. Now I think we can switch binders again. Let's go to Defendant's Exhibit 74, please. And if you flip in to page -- it's in the lower right-hand corner that begins FNMB 001329. And look at the next page. What do you recognize that document to be?

A. This is my resume.

Q. Your resume at the time you were applying for the position of vice presidency for planning and alignment?

A. That's correct.

Q. If you can pull the first part of that exhibit that's numbered FNMB 001326 through page 001328, what do you recognize that to be?

A. The job description.

Q. The job description for the vice

Page 360

presidency of planning and alignment, correct?

A. That's correct.

Q. I want to go over some of your experience --

A. Okay.

Q. -- at the time that you applied for the vice presidency for planning and alignment position against some of what is stated in the job description, okay?

A. Yes.

Q. If you'll go with me down in key job functions and duties, it says there, "Act as trusted advisor and independent lens to the SVP of the EPMO and the CFO."

At the time that you applied for the position of vice presidency for planning and alignment, what was your experience advising the CFO?

A. I had significant experience advising the CFO. The CFO is Susan MacFarland during my years at corporate FP&A and also Dave Benson in his prior role when he was responsible for all the strategic analysis for the board of directors.

Page 361

Q. And then it goes on and says, "Provide insights and strategic analysis to facilitate decision-making."

What, if any, experience did you have with respect to that at the time you applied for the vice presidency for planning and alignment position?

A. So my role in corporate FP&A was largely focused on the financial aspect when we were doing strategic assessments, but you're involved in everything end to end. And we also worked very closely with the EPMO at the time. It wasn't always called EPMO. It was called CIPO and some other names. But throughout my period of time when I was with FP&A, we worked with Pascal Boillat, who was the leader of CIPO, and before Anne Gehring accepted the EPMO, working on the financial view and that corporate enterprise view.

Q. Now, am I right, when you were working in FP&A for a period of time, you worked underneath Anne Gehring?

A. That's correct.

Q. In dealing with -- would she have had an

Page 362

opportunity to observe work that you did, strategic analysis, while you were working in FP&A?

A. Absolutely.

Q. Now, it goes on, "Develop a relationship with the SVP and the CFO that promotes role as objective sounding board." When you applied for the position of FP&A --

A. FP&A?

Q. I'm sorry, vice president for planning and alignment.

A. Okay.

Q. What, if any, experience did you have working with the CFO as an objective sounding board?

A. I mean, I did it all the time in my corporate FP&A role. So when we were working through -- whether it was -- the current CFO at the time was Susan MacFarland, whether she was working on presentations for external folks, internal, doing analysis and presenting our results of operations, presenting on our forecasts, challenging assumptions. So we went back and forth through that.

And then, also, with Dave Benson, who

Arbitration Day 2                                                    November 4, 2014

Washington, D.C.

Page 363

wasn't the CFO at the time, doing things such as the risk management and the plan that we need to do for FHFA. I worked directly with Dave on a lot of projects.

Q.   Now, let's talk about some organization. Am I right that Fannie Mae generally is split into different business units?

A.   Yes.

Q.   And am I right there are also some projects that go across business units?

A.   Yes. Projects and corporate functions that go across.

Q.   And so with these projects that would go across positions, I take it there are teams that are responsible for a particular project?

A.   Are we talking about --

Q.   I'm talking in general here.

A.   In general, there are many organizations that are cross-functional across businesses. They're more of a function and then we've got business units that are focused within just the silo of their business. So corporate financial planning analysis

Page 364

and Enterprise PMO are functional and go across the businesses.

Q.   I want to go down here on this bullet on the job description here. It's the second bullet in the key job functions and duties. It says, "Develop strong relationships with senior leadership team on the project teams, particularly the program managers."

When you applied for the position for vice president of planning and alignment, what, if any, was your experience with respect to that?

A.   Developing relationships with senior leadership?

Q.   On the project teams or on project teams.

A.   So I knew I had interacted with some of the specific leaders of these certain projects, but not all of them. But I had relationships with other senior leaders throughout the company, depending upon the ones that would have been available to me in my role.

Q.   Well, let's speak more generally. Take a step back here. When you applied for the vice

Page 365

president for planning and alignment position, what was your experience in terms of developing relationships throughout the various leadership of business units within the company?

A.   I had to do that in order to be successful in my roles.

Q.   How so? Could you give us --

A.   So in corporate FP&A, you have to aggregate everything that resides, whether it's in a business or another corporate function. So you're constantly working, whether it's the different corporate CFOs or the leaders of different areas, whether they're within FP&A or within the business.

So relationship management and that interaction across the company is critical because you need to know everything and people need to know that they can trust you and share information so that you can bring together that aggregated story and consolidate all the issues and results for the management committee and board.

Q.   Now, I want to go down to the next bullet point that says, "Communicate effectively at the

Page 366

highest levels of the organization." Do you see that?

A.   Yes.

Q.   And I believe Mr. Branch explored some of the stuff that's in that bullet point. I want to focus on the sentence within that that says, "This will require taking very complex concepts and explaining them in a simple and concise manner."

A.   Yes.

Q.   So when you applied for the position of vice president for planning and alignment, prior to that, had you had any opportunity to present before company senior leadership, a presentation where you may have had to actually take complex concepts and explain them in a simple and concise manner?

A.   I've been doing that since my time in public accounting at Deloitte & Touche. So I spent years in our national office at Deloitte & Touche taking complex accounting matters and presenting them to hundreds of people. I spent time in accounting policy at CapitalSource and I had to meet with the senior leadership, explaining to them complex

28  (Pages 363 to 366)

Washington, D.C.

Page 367

accounting issues in a very plain English way. So that was kind of my bread and butter kind of growing up in my career was taking complex matters and making them understandable for others.

Q. And did you have to do that at Fannie before you applied for the position of vice president of planning and alignment?

A. In my policy role in Fannie Mae, in my first two years, I was the lead director responsible for the implementation of the new consolidation standard, which had a huge impact on Fannie Mae. And it's a very complex, boring technical accounting matter for most people, but constantly trying to make that something that people can understand and digest in a short period of time was my job on day one joining Fannie Mae.

And that evolved when I went into Financial Planning and Analysis doing the strategic financial work. We met with the Treasury and FHFA explaining all the different financial complex analysis and explaining to them what that meant and the results. Again, without spending 40 hours with

Page 368

them, you're doing it in a concise 30, 60-minute discussion. So that was something I've been doing in every role.

Q. Had you been a certified public accountant?

A. I am.

Q. And you still are?

A. Yes.

Q. And you remain current?

A. Yes.

Q. Let's move down. I just want to deal with a couple more bullets on this. Do you see there this bullet that says, "Establish and groom a team of future leaders that are viewed as value added business resources for achieving critical business objectives"?

A. Yes.

Q. At the time that you applied for the vice president for planning and alignment position in the EPMO, could you tell Judge Robertson what experience, if any, that you had with respect to doing what's stated there in that bullet point?

Page 369

A. I have spent a lot of time in my roles investing in people and identifying top talent, whether we've got top talent that has the potential to grow immediately or top talent that needs to diversify their skill set. So that's something also that -- that's just something in every role that I've enjoyed mentoring people.

Q. Now, at the time that you applied for the vice presidency of planning and alignment, let's just make it clear, how long had you already been a vice president at the company?

A. Two and a half years. Is that right? Wait, 2011. Sorry, it would have been 2011. Yes, two and a half years.

Q. Let's talk now briefly about the actual process, the interviews that you went through --

A. Yes.

Q. -- for the vice president for planning and alignment position. What, if anything, was discussed in your interview with Anne Gehring about race?

A. I don't remember any discussion on race.

Q. In that same interview, what, if anything,

Page 370

was discussed about ethnicity?

A. I don't remember any discussion on ethnicity.

Q. Do you think if ethnicity had been discussed, you would have remembered that?

A. That would be rather unusual to have a discussion on that. So yes, I would remember. And it was just a normal interview.

Q. Let's take a little digression here before my litany of questions that I have on that. I take it in your career or tenure at Fannie Mae as a VP, you've interviewed numerous candidates for positions?

A. That's correct.

Q. Have you taken some of those to lunch to conduct that interview?

A. Yes, I have.

Q. Do you find that to be unusual to conduct an interview at lunch for a position?

A. No. I mean, it's not the norm, but it's not unusual.

Q. Does it depend on what your schedule is at the time?

Page 371

A. Yes. Or it depends on whether the -- you know, if the person is -- their timing, flexibility, the position, whether they're an internal or external candidate.

Q. I'm going to come back from that tangent and let's go back again to your actual interview with Anne Gehring for the vice president for planning and alignment position. So we've talked about race and ethnicity. What, if anything, in that interview was discussed about age?

A. Nothing.

Q. And what, if anything, was discussed about weight in that interview?

A. Nothing that I remember.

Q. And what, if anything, was discussed about body shape? Anybody's body shape?

A. Nothing that I remember.

Q. And you've got my litany of questions with respect to your interview with Anne Gehring on race, ethnicity, age, weight and body shape?

A. Yes.

Q. Those same things. What, if anything, was

Page 372

discussed on those topics in your interview with Shandell Harris?

A. Nothing.

Q. And what, if anything, on those topics was discussed in your interview with Mike Choi?

A. Nothing.

Q. Did Melissa Werner ever talk with you with respect to the vice presidency for planning and alignment -- as part of the vice presidency for planning and alignment process, anything about race, ethnicity, age, weight or body shape?

A. No.

Q. We've touched on some of this now. When you went into EPMO, I believe you stated there were three areas that were covered by the vice presidency for planning and alignment position?

A. Yes.

Q. And one of those was business architecture, right?

A. That's correct.

Q. The other was Lean Six Sigma?

A. Yes.

Page 373

Q. And the other was enterprise planning?

A. That's correct.

Q. Is the enterprise planning, does that deal with your work with multiyear investment?

A. Yes, it does.

Q. Putting aside number of bodies that you may have managed under each of those, how much of your time was devoted to dealing with the enterprise planning matter relative to your time working on either business architecture or Lean Six Sigma?

A. The majority of my time was spent on the enterprise planning.

Q. And then let's rank them in order. How much on Lean Six Sigma?

A. Very little. Lean Six Sigma group, we were assessing whether or not it should stay an Enterprise PMO. So that was looked at and it was ultimately decided to transfer that to our human resources organization.

Q. Oh, I'm sorry. So is that where it resides today?

A. That's correct.

Page 374

Q. Was the Lean Six Sigma group jettisoned -- my term -- from EPMO while you were still in EPMO?

A. That's correct, it was.

Q. And what about business architecture relative to the time spent on Lean Six Sigma and enterprise planning? How much time did you spend on that?

A. A lot less than the enterprise planning. Most of the resources in our business architecture group are outsourced to the individual projects and they're working with the project teams directly on a day-to-day basis.

Q. There's an issue in this case on what the functions and what actually business architecture is.

A. Yes.

Q. Since you have some experience working with that, would you mind explaining to Judge Robertson what business architecture is?

A. It's an interesting challenge because I think this is something that we focused a lot of time on, explaining the complexity of business architecture. But ultimately, if you take the

Arbitration Day 2

Washington, D.C.

November 4, 2014

Page 375

business architecture, you identify what your current state, an organization or it could be a smaller process, but generally, kind of your more bigger chunks of organizations, what is your current state of that, whether it's technology, the processes. And then you say, okay, well, where do we want to be? What's the target? Where is our future state? And if you think about GSE reform and the complexity I talked about earlier, you're identifying what do we need to do to get that more simple, more efficient processes in place.

And then you establish your map from one place to the next and then you identify metrics and what metrics will be used to measure that. Not just the progress, but ultimately, when you're running in a future state, what are the key metrics that you want to look at that you're achieving. That's a high-level summary of business architecture.

Q.    Thanks a lot. Given the artificial nature of how we have to introduce evidence here in these hearings, I've got to ask you the question. You used the term GSE. That's an acronym?

Page 376

A.    I was referring to Fannie Mae and Freddie Mac. It's Government-Sponsored Enterprises.

Q.    Okay. Thanks.

A.    I'm sorry.

Q.    No need to apologize. I was just trying to make a record.

In your work when you were in the vice president for planning and alignment, did you end up, as a matter of fact, having to communicate with the heads of various project teams at Fannie?

A.    I'm sorry, I don't understand the question.

Q.    Were there occasions that you had to communicate -- after you became the vice president for planning and alignment, right?

A.    Yes.

Q.    Were there occasions where you actually, in fact, had to communicate with various project teams at Fannie Mae working on --

A.    Absolutely. Yes. Pretty regularly interacting with whether it was either at an officer level or senior vice president level, you would

Page 377

interact quite regularly. We also had a weekly meeting that Anne and then Tricia held with myself and Mike and we would communicate through that with all the heads of the projects, also.

Q.    Focusing on your communications with project team leaders, what, if anything, would you typically have to talk to them about, about how their projects fit within the greater Fannie enterprise?

A.    It depends -- I mean, for the most part, most of the conversations were largely around their project. Funding for their project was always a big topic of discussion. They never got enough funding. And then we would also talk about resources, that even if they had the dollars, could they even get the resources because I think we think we can do more than we actually can. So a lot of trying to understand that and explain, get into -- when you're dealing with your smaller projects, you would be focused on trying to understand what it is we're really trying to achieve and how does this fit in? Is this a project that really needs to be done?

So you've got your bigger projects, your

Page 378

transformational, changing certain aspects of our business, but then you've got little small systems that we've got to maintain and we want to tweak and trying to understand what we're doing here. Is it to address FHFA requests? Is it to address internal audit requests? So you're trying to get into the root cause of different projects and why we're doing what we're doing.

Q.    And I take it it's probably frequently the case that everyone thought their project should be given priority status?

A.    Absolutely.

Q.    And so in doing that, would these be -- what kind of sensitivity would these communications that you had with the project team be?

A.    All the time. You're on-call all the time for frustrated customers, as I view them, and sometimes happy customers. Try to find that balance. I think the biggest thing was providing the insight and eliminating the mystery.

JUDGE ROBERTSON: How much more do you have, Mr. Wilson? It's a quarter to 1:00.

31 (Pages 375 to 378)

Page 379

MR. WILSON: I will be done in less than 10 minutes.

JUDGE ROBERTSON: Let's see if we can finish.

MR. WILSON: Okay.

BY MR. WILSON:

Q. Ms. Fraser, I take it you interviewed other folks -- or let me step back.

What's your understanding, if any, of the emphasis that Fannie Mae puts on the selection of its officers?

A. It's a rigorous process.

Q. Do you know why --

A. So I've had the opportunity to be on a panel interviewing candidates for vice president recently. At that point, when you're talking to someone in a leadership panel, you're not talking about their technical skills to do the job. You're talking about their ability to lead and manage a team and they surround themselves with the technical expertise to get it done. So it's a balance.

Some roles might be subject matter expert

Page 380

roles where you need technicians, but for the most part, at an officer level, that's not the focus. The focus is on leadership skills, ability to collaborate, communicate well, develop people, execute.

Q. What about vision?

A. Absolutely.

Q. When Mr. Branch was questioning you, I believe he -- before you became a VP, I think you said you were in a trial basis position?

A. Yes. You get all the responsibility and you don't get the promotion, to try and assess can you handle that increased responsibility.

Q. What, if anything, is your understanding if that's just done for your position or if that's --

A. No, it's commonly done throughout Fannie Mae.

Q. But it's not necessarily done?

A. No, it's not necessarily, but it's not unusual for that to happen if you've got someone who is kind of growing up through the ranks and has that opportunity.

Page 381

Q. Let's talk about -- you ended up supervising Ana Lapera, right, after you became the vice president for planning and alignment position?

A. That's correct.

Q. Did you have an opportunity to assess her communications skills?

A. I worked with Ana for --

MR. BRANCH: Objection.

JUDGE ROBERTSON: Sustained.

BY MR. WILSON:

Q. When Ms. Lapera was working for you, did there come a time when she talked to you that she was going to be filing a lawsuit against Fannie Mae?

A. Yes, she --

MR. BRANCH: Objection.

JUDGE ROBERTSON: Overruled.

BY MR. WILSON:

Q. What, if anything, did she say her lawsuit was about?

A. We did not discuss it.

Q. So she didn't give you any details about it?

Page 382

A. No. And I didn't want to know.

Q. Fair enough. After Ms. Lapera separated from the EPMO and working for you, what became of her position?

A. It was not backfilled. We ended up -- I stood up a --

MR. BRANCH: Objection. Relevance.

JUDGE ROBERTSON: Yes, I think I'll sustain that, too.

MR. WILSON: No more questions.

JUDGE ROBERTSON: Anything further, Mr. Branch?

MR. BRANCH: Yes.

JUDGE ROBERTSON: Should we go to lunch and come back and do it?

MR. BRANCH: I think so, Your Honor. It's probably going to be about 20 minutes or so.

JUDGE ROBERTSON: All right. We'll be in recess now for an hour until 10 minutes to 2:00 and reconvene at that time. Thank you.

(Whereupon, at 12:50 p.m., the arbitration in the above-entitled matter was recessed, to

Page 383

reconvene at 1:53 p.m., this same day.)

Page 385

was necessary before you could go to a higher level position?

A.   I'm sorry, mastery of what?

Q.   Mastery of the area that you were working in.  You were hired as an account -- let's see, director of accounting policy.

A.   I'm sorry, you talked about vice president, then we're back to director of accounting policy?

Q.   Yes.

A.   I'm not sure I understand.

Q.   So you held the position of director of accounting policy from 2008 to 2010?

A.   Yes.

Q.   And you developed a mastery of that position which led to your promotion from that position.

A.   No.  I then transferred and did a role that I've never done before in Financial Planning and Analysis and then I was promoted to vice president.

Q.   So you were in the position of director of Financial Planning and Analysis from 2010 until the

Page 384

AFTERNOON SESSION

(1:53 p.m.)

Whereupon,

NICOLA FRASER,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows

JUDGE ROBERTSON:  Mr. Branch, redirect.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH

Q.   Ms Fraser, so you started employment at Fannie Mae in 2008, is that correct?

A.   That's correct.

Q.   You started as a director; is that correct?

A.   Yes

Q.   And you demonstrated some level of competence as a director before you took on the role as vice president, correct?

A.   That's correct

Q.   So you understood that mastery of the subject matter that you were working on as director

Page 386

end of 2011?

A.   Yes.

Q.   And you had to serve a period of approximately six months before you were promoted to vice president?

A.   That just happened to be the period of time before I got promoted.  But yes, I got additional responsibilities in July that increased the scope of my role that would be more akin to a vice president.

Q.   All right.  And then you mastered that particular area before you were promoted to vice president?

MR. WILSON:  Objection.  Mischaracterizes testimony.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  I guess I'm -- you keep asking mastered.  I'm not sure, when you say "mastered" --

BY MR. BRANCH:

Q.   Well, why were you promoted from director to vice president?

33  (Pages 383 to 386)

Page 387

A.   So that the process to vice president, we discussed briefly earlier, is around not just the technical expertise of the role. It's the leadership ability. So one of my interviews was focused on -- with Tim Mayopoulos, who was the chief administrative officer at the time, he was very focused on your leadership ability and your ability for officers to move around the company and lead teams. You're not necessarily a subject matter expert in every team that you lead. So that was a key focus of that interview.

So it's a mix. I didn't -- I grew up in public accounting, I moved into accounting policy, which is my specialty, and then I moved into financial analysis. Financial analysis is not something that I had done for my whole career. That was my first time doing it.

Q.   And when you took on the position of vice president for planning and analysis, you were not a subject matter for business architecture or for Lean Six Sigma.

A.   No.

Page 388

Q.   Now, when you were promoted to the position of vice president of planning and alignment, did Anne Gehring tell you that Ms. Lapera would train you in the position?

A.   So it wasn't a promotion. It was a lateral.

Q.   When you took the lateral position --

A.   She would train me? I don't remember her saying she would train me. It was more that Ana was -- we recognized -- I recognized, too -- that Ana was a subject matter expert in Lean Six Sigma and business architecture. So I could definitely learn from Ana just like I had in other roles.

Q.   So is it true that a major responsibility for the VP of planning and alignment was the responsibility for driving the process improvement at Fannie Mae using the Lean Six Sigma methodology throughout the corporation?

A.   I wouldn't say it was a major component of the role.

Q.   It was not a major component?

A.   It was not a major component of the role.

Page 389

So we broke down and we talked about from the three areas that we had and the amount of time that was needed at my level for the different areas.

Q.   And let's turn to Exhibit 74. That's Defendant's Exhibit 74.

A.   Yes.

Q.   Are you there?

A.   Yes.

Q.   And under the overview of job/management and reporting structure, it indicates that, "Reporting to the individual will be the head of operational excellence and Lean Six Sigma, who is responsible for driving process improvement using the Lean Six Sigma methodology across the entire corporation."

A.   Yes.

Q.   Was this the only director that was reporting to you?

A.   I'm sorry, the director that was responsible for Lean Six Sigma, was she --

Q.   Yes. Was that the only director level position that was reporting to you as the VP of

Page 390

planning and alignment?

A.   Initially. And then we built out the team and hired additional directors.

Q.   Well, when you took the position, was that the only director position reporting to you?

A.   Yes, with the intent that we added additional directors.

Q.   I'm sorry, the intent that you add additional directors?

A.   There was an intent, through the interview process, where there was an expectation that we had to build out the team that was focused on the enterprise planning. And we posted two director positions pretty quickly.

Q.   Who communicated to you during the interview process that the intent was to add two additional director level positions?

A.   It wasn't -- sorry. Let me clarify it. The intent was to build out the team that was focused on enterprise planning and it was up to whoever got this role as the vice president to determine what those needs were. So as soon as I assumed those

Arbitration Day 2

November 4, 2014

Washington, D.C.

Page 391

responsibilities, that's where I focused my time, identifying the skills and talents that was needed.

Q. And who told you that it was the intent of the --

A. Those were conversations I had with Anne Gehring.

Q. During the interview process?

A. There was probably some conversation during the interview process to it.

Q. So Anne Gehring told you, during the interview process, that the intent was to build out the team to include additional directors?

A. No. The intent was that -- during the interview process, it was communicated -- and I'm not sure specifically what words, but that, most likely, you will need additional resources and need to build out your enterprise planning team.

Then upon assuming the responsibilities, I assessed what those needs were and we posted two directors positions straight away through consulting with HR and Anne at the time.

Q. And when you say "straight away," how long

Page 392

was it after you took over this responsibility was it that you posted these director positions?

A. I would say it was probably September.

Q. September 2013?

A. Yes. Recruiting takes some time. I think I had the first director hired in December and then the second director hired by January.

Q. Just so that we're clear, the position that you applied for, is it true that the focus was managing this single director who had responsibility for Lean Six Sigma and the --

A. No, that was just a component of the job.

Q. And you did not apply for this position until July 11th, 2013?

A. Yes. We went through the dates.

Q. You could have applied for this position while you were on maternity leave, correct?

A. I wasn't aware of the position until my assistant gave me the job description.

Q. Well, after you learned about the position in early June 2013, you could have applied for the position at any point, correct?

Page 393

A. Yes. I didn't have access to our internal database to apply.

Q. Well, when you eventually applied, you sent your resume to Ms. Werner --

A. Yes.

Q. -- through your own personal e-mail, correct?

A. Yes.

Q. So you didn't access to the internal database to apply, correct?

A. Yes.

Q. You were questioned about whether you interviewed other people for positions at Fannie Mae?

A. Yes.

Q. Are employees or individuals applying for positions at Fannie Mae permitted to apply for positions after the closing date?

A. I don't know.

Q. Did you submit your resume for consideration for this position within the period that the position was posted as being open?

A. I was not aware of any date.

Page 394

Q. I believe you testified on cross that part of your responsibility in your position, before this VP of financial planning and alignment, was to take complex accounting principles and make them simple and explain them to a broader audience; is that correct?

A. Yes.

Q. And is it true that to take complex principles and to make them simple and explain them to broader audiences, you would need some mastery of the principle that you were attempting to convey to the audience?

A. It depends.

Q. And when you say "it depends," what do you mean?

A. If you have a subject matter expert on your team to do that and then you're able to help communicate the message. So as you move up the rank from director to VP, you can't be in the weeds and details on everything. You need to have teams that can do that and then you're able to concisely articulate it and bring it to help --

35 (Pages 391 to 394)

Page 399

Q. Did Anne Gehring refer to an employee at Fannie Mae as a "fat fucker"?

A. Not to my knowledge.

Q. Did Anne Gehring refer to an employee at Fannie Mae as an "asshole"?

A. Not to my knowledge.

Q. For the VP and planning position, when you took over responsibilities for this position, how many employees reported to you in that position?

A. Just two initially.

Q. How many employees were part of the team?

A. There was about 28 maybe in total. Twenty-six.

Q. I believe your prior testimony was that at some point the Lean Six Sigma part of the team went to HR?

A. That's correct. It was about 11 employees.

Q. So after the Lean Six Sigma employees went to HR, how many employees did you have on your team?

A. Oh, at that point, we had hired one of the directors in enterprise planning and so I think at

Page 400

that point, we were probably down to 18 and we had a plan in place to grow our business architecture team based upon the needs and the projects.

Q. So had your title changed at the time that the Lean Six Sigma functions went to HR?

A. No, it did not.

Q. So even though the job description that you held said that you would supervise the head of operational excellence and Lean Six Sigma, that function actually went to HR?

A. That's correct.

Q. Is it true that that function went to HR because this is not a function that you could effectively communicate to officers or stakeholders within Fannie Mae?

A. No.

Q. Did you have any interest in managing this function?

A. Yes.

Q. So why was it decided that it would move to HR?

A. So we had a change in leadership. We had

Page 401

a change in the organizational structure where EPMO was now transferred under a new executive as the chief operating officer and Patricia Black came in and took over EPMO. And as part of that transition, Patricia Black wanted to assess whether looking at the vision and mission of the Enterprise Program Management Office, whether or not the Lean Six Sigma team would be better served in an other corporate organization as opposed to Enterprise Program Management given we were so much focused on the technology and infrastructure transition as opposed to process improvement.

So we spent time with our folks in HR to assess and did research as to whether other organizations and where their Lean Six Sigma organization resides and there was a history of, in some places, it does reside in the HR function and we made that decision.

Q. And so how long was it into your tenure as the VP of planning and alignment before the Lean Six Sigma function left that office?

A. It was about six months. But we did -- it

Page 402

was, like, two months where we were discussing and assessing it.

Q. Did Ms. Gehring tell you that she planned to leave her position before you returned from maternity leave?

A. Yes, she did.

Q. When did Ms. Gehring tell you that she planned to leave her position?

A. When we went to dinner.

Q. So that would have been mid-June 2013?

A. Yes.

Q. Is it your understanding that Anne Gehring made the decision to select you for this position?

A. That she made the decision?

Q. The decision -- is it your understanding that Anne Gehring was the deciding official or deciding officer at Fannie Mae who made the decision to offer you the position of VP of planning and alignment?

A. Yes.

Q. And she did that at a time when she knew that she would not remain at Fannie Mae.

Page 403

A.   Yes.

MR. BRANCH: No additional questions, Your Honor.

JUDGE ROBERTSON: Was the discussion of the spinoff of the Lean Six Sigma module to HR, did that happen while Ms. Lapera was still working there? Was it discussed while she was still working there?

THE WITNESS: When was Ana's last day at --

MS. LAPERA: November 1st.

THE WITNESS: November 1st? I believe those conversations started, yes, because Tricia Black came in around early October. So those conversations probably started late October, early November. It was probably right around that same time.

JUDGE ROBERTSON: And to the best of your recollection, was Ms. Lapera involved in those discussions or did she know about them?

THE WITNESS: No.

MR. WILSON: No further questions from us, Your Honor.

Page 404

JUDGE ROBERTSON  Thank you, Ms Fraser. You're excused

THE WITNESS  Great  Thank you

(Ms. Fraser exits arbitration room.)

MR. BRANCH: Should we get Ms Werner?

MR WILSON  Yes.

(Ms. Werner enters arbitration room.)

JUDGE ROBERTSON  Good afternoon, ma'am. We're going to administer the oath to you and then we're going to ask you some questions

Whereupon,

MELISSA WERNER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR  BRANCH

Q    Good afternoon  Please state your name.

A    Melissa Werner

Q    Ms. Werner, my name is David Branch.  I represent Ana Lapera  I have some questions for you.

A    Sure

Page 405

Q.   So I'll proceed with the questions.  Are you currently employed?

A.   I am.

Q.   Where are you employed?

A.   I'm currently employed with Fannie Mae. Or by Fannie Mae.

Q.   What's your position there?

A.   I am a senior recruiter 4 and I am the executive and officer hiring lead.

Q.   Executive and officer hiring lead?

A.   Correct.

Q.   What does that mean?

A.   I'm the person who manages all the recruitment processes across the enterprise for officers or executives in the company.

Q.   And how long have you worked at Fannie Mae?

A.   Since March of 2008.

Q.   Generally, what are your duties?

A.   My general duties include management and oversight of recruiting processes for executives and officers in the company, which can include everything

Page 406

from posting a job to actively recruiting candidates, to extending offers, to coordinating interview processes, and to following up through the full lifecycle of recruiting.  So actually making sure the hire is on boarded properly.

Q.   Is there a formal policy that's followed for filling vacant positions at Fannie Mae at the director and officer level?

A.   There is, yes.  However, the policy can change based on how the recruitment process is being exercised.

Q.   So first let's start with the policy. What is the formal policy that's followed when you're filling officer or director positions at Fannie Mae?

A.   So generally, the policy is that if we determine a job should be posted, we post the job for five business days, seven calendar days.  Once the posting is completed, we then review the candidates who have applied, to review them for their qualifications for the role, share that candidate information, including qualifications for the role, with the hiring manager.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                November 4, 2014

Washington, D.C.

Page 407

Typically around that time, we're also discussing with the hiring manager what a candidate profile should look like for the job. And then once we've determined whether or not a candidate meets the profile and the qualifications for a role, we'll begin the process of scheduling them for interviews and other stakeholder meetings.

Q. So the process starts with a position being posted?

A. Yes.

Q. Is there something that happens before a position is posted? Does someone need to identify a vacant position or the need to fill a position?

A. Yes, they do.

Q. Okay. Explain how that works.

A. You know, I'm not directly involved in that part of the process. So identifying a role in terms of whether or not it's needed in an organization is usually done at the generalist level working with compensation. So by the time I see a role, it's actually been approved and leveled by compensation, approved through HR channels.

Page 408

Q. So part of the process involves a position being posted?

A. Yes.

Q. Is it generally the case that there is a date by which individuals have to submit applications for posted positions?

A. We have a minimum of the job being posted for five business days or seven calendar days, but it's not a rigid requirement.

Q. I'm sorry, when you say "it's not a rigid requirement," are you talking about how long the position has to be posted or are you talking about something else?

A. I'm talking about something else. We can actually accept candidates well beyond that as well.

Q. So when you say you can accept candidates well beyond that, what's the "that" that you're referring to?

A. Well, beyond the posting close date.

Q. So what's the purpose of a posting close date if you can accept candidates after the posting close date?

Page 409

A. It allows us to open the window up as part of our policy, our recruitment policy that jobs should be posted for a minimum of five business days.

Q. I understand. I'm not talking about how long the job is open. I'm asking about the closing part of it, when you tell people you need to apply by a certain date.

A. Correct. It's a procedural thing that allows us to absolutely have the job open and to receive candidates and bring them into the process, but it isn't necessarily the means that dictates or drives when we would receive an applicant. There could be any number of reasons why we would consider an applicant outside of the posting date.

Q. Is there some policy or guidance that you were following or is this just a practice?

A. It's a practice.

Q. Well, first, is there a policy that says we should apply by a closing date?

A. Well, the job will be posted, but I don't necessarily know that it's a firm policy that they have to apply by that date.

Page 410

Q. Okay. And so tell me what the practice is.

A. The practice is to post the job for five business days or seven calendar days, if a job is going to be posted.

Q. And I think you said that after the job is posted, you review the candidates?

A. I do, yes.

Q. And that would be the candidates who have submitted applications or submitted resumes?

A. Yes.

Q. And you said the practice was to permit people to apply for positions after the closing date?

MR. WILSON: Your Honor, objection. We've heard about posting. We've never heard about a closing date.

JUDGE ROBERTSON: Well, I think the witness is handling this just fine. Overruled.

THE WITNESS: Can you repeat the question, please?

BY MR. BRANCH:

Q. Is the practice at Fannie Mae to permit

39 (Pages 407 to 410)

Arbitration Day 2                                                November 4, 2014

Washington, D.C.

Page 411

employees to -- or permit individuals to apply for positions after the closing date?

A.   Yes, that can be a practice.

Q.   So how would an applicant know that they can apply for a position after the closing date?

A.   They certainly could ask me. Would you be willing to accept my resume? I was out on vacation. There may have been an extenuating circumstance that would have prevented them from meeting the closing date, as it were, of the posting.

Q.   So what about someone who is not at Fannie Mae. Would they be permitted to say, after the closing date, say can I still apply for the position?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Overruled.

THE WITNESS: If the circumstance was reasonable, absolutely, they would be able to.

BY MR. BRANCH:

Q.   So after you receive resumes, there is a review of the candidates?

A.   Correct, yes.

Q.   Is there an initial evaluation or

Page 412

assessment of the candidates?

A.   By whom?

Q.   By your office or by you.

A.   I review the resumes in terms of content and then I share what I believe the candidates to look like from a qualifications perspective with the hiring manager and then we determine the best pathway to who will assess the candidates in person.

Q.   You also mentioned that there is a candidate profile that's involved?

A.   Yes.

Q.   What is that?

A.   It would be generally what types of qualities or attributes we're looking for in a candidate for a leadership position. So we may be looking for someone who has had some substantial management experience, someone who has led across the enterprise, any kind of item that would enhance or be a valuable characteristic to holding a position.

Q.   And following the candidate profile, is there an interview process?

A.   Yes.

Page 413

Q.   What does that involve?

A.   Logistically, it involves determining who will be interviewing the candidates and then actually setting up the interviews.

Q.   And who makes that determination?

A.   Working with the hiring manager, we discuss who will be interviewing candidates. But generally, it's the hiring manager who drives who the interviewers are.

Q.   And after the interviews are scheduled, what's the process?

A.   The interviewers meet with each of the candidates. Then at the end of the process, I will collect feedback, if the hiring manager requests me to do that, or the hiring manager may also collect feedback.

Q.   Now, were you involved in filling the position of vice president of planning and alignment in 2013?

A.   I was, yes.

Q.   Were you the executive and officer lead recruiter for that?

Page 414

A.   Yes, I was.

Q.   Let's look at the position. First, how did you learn that this position was going to become available?

A.   Either I learned directly from the hiring manager or the HR business partner who would support that client. Typically, when I get a position, it comes to me through compensation so I know the position has been approved.

Q.   And let's turn to Exhibit 57.

MR. WILSON: Mr. Branch, could you just identify whether it's plaintiff's exhibit or defendant's because we have lots of binders.

BY MR. BRANCH:

Q.   There are two binders. Are you looking at the plaintiff's binder?

A.   No.

Q.   It's one of the other binders.

A.   This one?

MR. STEWART: Yes.

THE WITNESS: What's the exhibit number? Did you say 37?

Alderson Reporting Company
1-800-FOR-DEPO

Page 415

BY MR. BRANCH:

Q. Fifty-seven.

A. Fifty-seven.

Q. Do you recognize this document?

A. I recognize the e-mail at the bottom, but not the e-mail subsequent to that.

Q. Are you looking -- let's see what binder you're looking at.

A. Fifty-seven, did you say? I'm sorry. Oh, okay. My apologies. Am I familiar with this document?

Q. Yes.

A. Yes, I am.

Q. And so what is it?

A. It's a job description.

Q. Is this for the VP of planning and alignment --

A. Correct.

Q. -- that we talked about previously?

A. Yes.

Q. Who was the hiring manager for this position?

Page 416

A. Anne Gehring.

Q. So prior to this position being posted, were you notified by Anne Gehring that she had an internal candidate that she wanted selected for this position?

A. No, I was not.

Q. Let's turn to Exhibit 63. Are you there?

A. I am.

Q. Do you recognize the e-mails on the first two pages here?

A. Yes.

Q. So it appears that, at the bottom of the first page, there is an e-mail from Karen Jez to you, Sonya Matza and Danielle Clarke concerning the VP planning and alignment position that's dated May 20th, 2013, correct?

A. That's correct.

Q. Did you receive this e-mail?

A. Yes.

Q. And you were informed in this e-mail that there is a candidate identified by Anne already whose name is Joe Hallet. Do you see that?

Page 417

A. I do.

Q. So you were notified May 20th of 2013 that Anne Gehring had an internal candidate that she wanted to place in this position?

A. Yes, I was.

Q. And this e-mail also indicates that Anne is concerned about the amount of time to weed others out of the process, correct? It's in the same e-mail that I just read.

A. Yes, I see it.

Q. It's at the top of the second page. So is this typical of how the interview process would begin for filling a VP position? An individual is identified and the hiring manager would send a request of how do we get him through the process and how do we weed out others? Is that something that would normally happen?

A. In many jobs, it is common that there is a candidate that may be identified for a role. Technically, we wouldn't discuss them as -- other candidates who might apply for the job as being weeded out. We would definitely discuss putting them

Page 418

through an assessment process. So this -- this -- while part of our practice, in the sense that we may already know of talent in the organization who would apply for a role that we're posting, wouldn't necessarily be the best execution of this practice. I wouldn't use the word "weed out."

Q. Okay. And so the question was: Did you learn on May 20th of 2013 that Anne Gehring wanted to have Joe Hallet placed in the position?

A. I did learn that. But you'll note that I did respond accordingly with the comment that as long as there aren't a lot of other internal applicants and they aren't as qualified as Joe, then it should be reasonable to have a timely and efficient process.

Q. Did Anne Gehring inform you on June 6th, 2013 that she had a strong internal candidate for the VP position?

A. I don't recall.

Q. Let's look at Exhibit 54.

MR. STEWART: Which exhibit, Counsel?

MR. BRANCH: Fifty-four.

BY MR. BRANCH:

Page 419

Q.   Do you recognize this e-mail?

A.   I do.

Q.   This is an e-mail from Anne Gehring to you on June 6, 2013 where she indicates that she would like to catch up on the VP job that's opening up in her organization and she has a strong internal candidate for the role, Joe Hallet, and she would like to begin getting him through the VP panel process as soon as possible.

A.   Yes.

Q.   Did I read that correctly?

A.   You did.

Q.   So on June 6, 2013, Ms. Gehring sent you an e-mail asking to catch up on the VP process and she identified Joe Hallet and she wanted to get him through the VP panel process, correct?

A.   That's correct.

Q.   What is this VP panel process that's referenced here?

A.   It is part of our selection processes for officers. It's generally a final step in the process where we put them in front of two to three senior

Page 420

executives who assess their readiness for leadership.

Q.   I'm sorry, when you say you put them in front of a panel of two to three officers --

A.   Senior directors, yes.

Q.   To address their leadership?

A.   Readiness for leadership, correct.

Q.   Have you sat in on these panels?

A.   Yes. Hundreds.

Q.   So what happens in this panel process?

A.   So generally, what we do is we invite two to three senior officers to assess the candidate, the criteria being that the officers are not in the organization that the candidate is either coming from or going into.

We take a look at the job description, the candidate profile. We share those with the assessors and then we create an interview guide by which we ask questions related to competencies needed for the role. And we ask the senior leaders to assess the candidate against those competencies.

Q.   And so how is it that candidates would make it to this level where they're actually having

Page 421

an interview with senior executives?

A.   They could go one of two ways. They could go through a promotional process by which they've been acting in the role for some period of time and their readiness is determined by their leader. So we put them in front of the panel. Or they could go through a competitive search process where they're interviewed against other candidates in a pool and then determined to be the finalist.

Q.   And so if an employee is moving from the position of director to vice president, is it a requirement that they go through this VP panel process?

A.   It is, yes.

Q.   How long does it take for this process to complete?

A.   It can vary. It can be anywhere from 45 days up to 90 days, depending on logistics and scheduling and interviewing.

Q.   So it takes, on average, between 45 to 90 days for persons to progress from the position of --

A.   Candidate all the way straight through to

Page 422

finalist to be complete.

Q.   From director to vice president?

A.   Yes.

Q.   What was your response to this e-mail from Ms. Gehring that she wanted to begin getting Joe Hallet through the VP panel process as soon as possible?

A.   Well, most likely, I would call Anne and say, let's have a kickoff meeting regarding this role because the job was posted. I'm not exactly clear -- I don't remember exactly what date the job was posted. So I probably would pick up the phone, call her and say, let's have a meeting to discuss what the process should be for your selection criteria.

Q.   Would you tell her it's improper to schedule a panel interview for someone who hadn't been advanced to that stage in the process?

A.   Particularly if there are other candidates to consider, yes.

Q.   Had you worked with Anne Gehring on other promotions or selections?

A.   I have, yes.

Page 423

Q.   What was your assessment of Anne Gehring as an officer?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Sustained.

BY MR. BRANCH:

Q.   Did you believe that Anne Gehring was, quote, "a little off the wall"?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Does this come from -- is there a premise for this question?

MR. BRANCH: It is, Your Honor.

JUDGE ROBERTSON: I'll allow it.

THE WITNESS: Anne is very direct and she has a very direct style.

BY MR. BRANCH:

Q.   Were you interviewed as part of an investigation by Fannie Mae's Office of Compliance and Ethics?

A.   I was, yes.

Q.   And were you interviewed by Leslie Arrington?

A.   I was, yes.

Page 424

Q.   Did you tell Ms. Arrington that Anne Gehring is "a little off the wall"?

A.   I don't recall saying that.

Q.   Did you tell Ms. Arrington that Ms. Gehring was emotional in her reactions sometimes?

A.   Yes. I would have said that, correct.

Q.   Did you tell Ms. Arrington that Anne Gehring made quick personal judgments and was not always rational or objective?

A.   No. I would not have said that.

Q.   At some point, did you begin a review of the applicants for the position for VP of planning and alignment?

A.   Yes, I did.

Q.   At what point in the process did you begin that review?

A.   After we had closed the posting and pulled down the posting from the internal website.

Q.   So the posting was available for a period of time?

A.   Correct.

Q.   And at some point it was pulled down from

Page 425

the --

A.   It closes, yes.

Q.   So what happens when it closes?

A.   It's just an arbitrary deadline for me to go ahead and begin working on the search. So typically what I'll do is use that as a benchmark for delivering some sort of result to my internal client, which would be the candidates who applied for the job.

Q.   So is it true that it's really impossible for someone to apply for a position after the closing date because you pulled down the posting?

A.   No, that's not impossible.

Q.   So how would someone know about the position if you've pulled the posting?

A.   Well, there's any number of ways that they could know about it. Officers and directors receive an e-mail announcing the job. So it's possible that they would have received an e-mail about that. It is possible that that e-mail could have been shared with any individual inside or outside of the organization. Because in the text of the e-mail, we say, all

Page 426

internal and external candidates who are qualified for the job are encouraged to apply. So it's possible that the e-mail traveled inside or outside the organization without my knowledge.

Q.   Did you send Anne Gehring an e-mail with a list of internal candidates for the VP position on or about June 12, 2013?

A.   I believe so, yes.

Q.   Let's look at Exhibit 48. Do you recognize this document?

A.   I do.

Q.   And what is it?

A.   It's e-mail correspondence to Anne Gehring regarding the candidates who applied for the role.

Q.   These are all the applicants for the position?

A.   As of Wednesday, June 12th, correct.

Q.   These are all the applicants before the position closed and you pulled the posting.

A.   Correct.

Q.   And Ms. Fraser. Nicola Fraser. was not among the individuals who applied within this time

Arbitration Day 2        November 4, 2014

Washington, D.C.

Page 431

A. Nicola Fraser was hired into the role.

Q. So was she scheduled for an interview?

A. She was not at this time, no.

Q. Well, later in the process, was she scheduled for an interview?

A. Yes, I believe she was.

Q. Did Ms. Fraser submit a resume for this position?

A. She did, yes.

Q. And did she submit that resume to you?

A. She did, yes.

Q. And was it after the time that the position closed?

A. Yes, it was.

Q. Who made the decision that you would accept Nicola Fraser's resume after the position closed?

MR. WILSON: Objection. Mischaracterizes prior testimony.

JUDGE ROBERTSON: If the witness can answer that question, I'll allow it.

THE WITNESS: Could you repeat the

Page 432

question?

BY MR. BRANCH:

Q. Who made the decision that you would receive or accept Nicola Fraser's resume after the position closed?

MR. WILSON: Same objection.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I would say that I made that decision. Ms. Fraser had been out on maternity leave and had submitted, I believe, a resume saying that she was aware -- or e-mailed me saying that she was aware of the position but unable to apply due to being out of the office.

BY MR. BRANCH:

Q. So you believe Ms. Fraser sent you an e-mail saying she was aware of the position but unable to apply?

A. Correct.

Q. And what prohibited her from applying for the position?

A. Well, when you're out on short-term or long-term disability, they disable your access to our

Page 433

systems, so you wouldn't have the ability to necessarily work.

Q. Well, did her application just include sending you a copy of her resume?

A. It did, yes.

Q. So what does being out of the office have to do with -- or what would cause that to prevent you from being able to send your resume simply because you're out of the office?

A. I don't know.

Q. Did you schedule the interviews for the position?

A. I coordinated with another resource in our organization to do that. So no, I didn't do the physical scheduling itself.

Q. Did you confirm that Ms. Fraser would be interviewed for the position on July 8th at 10:56 a.m.?

A. I'm assuming I did.

Q. Let's look at Exhibit 53. Do you recognize this e-mail?

A. I do.

Page 434

Q. And so in the middle of the page, there is an e-mail from you to Anne Gehring and Shandell Harris where you state, "Just to confirm the candidates to interview include Nicola, Joe Hallet, Ana Lapera"?

A. Correct, yes.

Q. And that's at 10:56 a.m. on July 8th, 2013?

A. Yes.

Q. So at that point, had you received Ms. Fraser's resume?

A. I don't know. I don't recall. I probably did.

Q. You believe you had at that point?

A. I believe I had.

Q. Would there be any reason for you to schedule her for an interview before you actually received her resume?

A. Possibly, if I had been advised of that.

Q. So what's required for someone to formally apply for a vice president position at Fannie Mae?

A. Well, they have to express interest in the

Alderson Reporting Company

1-800-FOR-DEPO

Arbitration Day 2                                                    November 4, 2014

Washington, D.C.

Page 435

role.

Q.    Is that enough, just to say I'm interested in the role?

A.    They also have to be qualified for the role to a certain extent, correct.

Q.    So if they say I'm interested in the role and I believe I'm qualified, is that all that's required for their application?

A.    Taking it down, yes. But we do have a process that we like them to follow. We can make exceptions to the process based on extenuating circumstances.

Q.    Well, doesn't Fannie Mae have a policy that says that employees should submit their resume or credentials through the human resources SharePoint?

A.    No. It's not a policy. It's a practice. If we post the job, the policy is to keep it up on the website for five days, but the practice is to submit their credentials through the internal website, Job Opportunities.

As I mentioned earlier, there may be

Page 436

circumstances where I'm willing to accept a resume outside of that period. It could be any number of reasons, somebody was on vacation, they missed a deadline. It should not necessarily be prohibitive for them to apply within that time period.

Q.    And so Fannie Mae's policy, HR policy is that individuals should submit their resumes through human resources through this SharePoint process; is that correct?

MR. WILSON: Objection.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I don't think it's a policy per se. I think it's a practice that we like to adhere to, but there may be reasons why someone cannot submit their resume through the SharePoint site or to the Job Opportunities website.

BY MR. BRANCH:

Q.    Well, let's turn to Exhibit 36. And three pages in, there is a document that has a number at the bottom, P0107.

A.    Yes.

Q.    Is this an excerpt from the Fannie Mae

Page 437

human resources policy and practice handbook?

A.    Yes, it is.

Q.    And this was effective August 14, 2012?

A.    Correct.

Q.    And for the section that says internal staffing practice application, it says, "An employee who wants to be considered for a posted position should apply via the Job Opportunities section of the human resources HR site on SharePoint."

Did I read that correctly?

A.    You did.

Q.    So this was the actual Fannie Mae policy as of August 2012 for employees who want to be considered for a position posted at Fannie Mae; is that correct?

A.    Correct. But that's the practice. The policy is written below, which says, "Positions are filled in a variety of ways. Employees should use this system to access information about and apply for posted positions."

Q.    Where are you reading from?

A.    Bottom paragraph, internal staffing

Page 438

policy.

Q.    The final paragraph, did you say?

A.    Correct, yes.

Q.    It begins with what?

A.    "Internal staffing policy, posting of positions. Positions are filled in a variety of ways. When jobs are posted, they may be displayed on the company's recruiting page" --

Q.    I'm sorry, which page?

A.    P0107, the same exhibit. So the application process is the practice, but the policy is at the bottom of the page.

Q.    And the policy says, "Positions are filled in a variety of ways"?

A.    Correct. "When jobs are posted, they may be displayed on the company's recruiting page for a minimum of five business days. Employees should use this system to access information about and apply for positions."

Q.    So how is that different from --

A.    I think "should" adds some variability into that versus "must."

46 (Pages 435 to 438)

Arbitration Day 2                                                    November 4, 2014

Washington, D.C.

Page 447

JUDGE ROBERTSON: All right. I think that completes your testimony, Ms. Werner.

Oh. Excuse me, you have some questions?

Sorry. I thought Mr. Branch had done everything possibly to cover this. Go ahead. I'm sorry.

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. How are you doing, Ms. Werner?

A. I'm fine. Thank you.

Q. Thanks for being here today. Actually, where did you come from today?

A. My home just outside of Baltimore, Maryland.

Q. Okay. It took some time to drive down?

A. It did.

MR. BRANCH: Objection. Relevance.

BY MR. WILSON:

Q. Ms. Werner, I want to just address some of the things that Mr. Branch asked you. You should have defendant's volume 1, please.

A. This is the defendant's, right?

Q. No, that's the plaintiff's with the yellow

Page 448

stickers. And if I could ask you to turn to Defendant's Exhibit 43, please.

A. Yes.

Q. All right. Do you see that? That's an e-mail from Lakisha Preston to Nicola Fraser?

A. Yes, I see that.

Q. Can you look at that and tell me where on that it states a deadline by which someone is supposed to submit an application for this position?

A. I don't see one.

Q. Did you look closely?

A. I did.

Q. We're going to do a little binder switching here. So bear with me.

A. Okay.

Q. If I can ask you, please, to turn -- no, let's stop. Let's focus on that. Your understanding, if an employee is out on maternity leave, would that person have access to the Job Opportunities side on the Fannie Mae homesite?

A. My understanding is that they would not.

Q. All right. And you received a resume from

Page 449

Ana Lapera for the vice president position for planning and alignment, correct?

A. Correct.

Q. Do you recall how you received her resume?

A. I don't, off the top of my head.

Q. Do you know if you got it through the Job Opportunities site or is that sometimes also called Taleo?

A. Taleo, yes. I probably most likely did, yes.

Q. Okay. Well, let's see if you did. Could I ask you to turn to Defendant's Exhibit 51, please?

A. Yes.

Q. Could you look through that? Just look over the e-mail. And I'm going to ask you is this an e-mail string that you received?

A. Yes.

Q. And does that have Ana Lapera's resume attached to it?

A. Yes. It appears -- no. I don't have an updated version at work.

Q. Okay. But it has a resume from Ana Lapera

Page 450

attached to it.

A. Yes.

Q. All right. And this is -- am I right, this is you're getting Ms. Lapera's resume? She's e-mailing it to you directly.

A. Correct.

Q. It's not coming through from the Taleo system.

A. Correct.

Q. Okay. Am I right, if we go down in this string, there's an e-mail from Ana Lapera to you at June 7th at 3:12 p.m., right? It actually says, "I'm trying to apply, but somehow messed up. The system in my account has been blocked"?

A. Yes.

Q. Okay. That's all with that one. We're going to have to switch over to plaintiff's exhibits again.

A. Okay.

Q. I'll ask you, please, to turn to Plaintiff's Exhibit 36.

A. Yes.

Page 451

Q.   And you talked about this on your direct with Mr. Branch, correct?

A.   Correct.

Q.   Could I ask you to flip to page P0108?

A.   Yes.

Q.   And I'm up at the top of the page here where it says, "Eligibility for Internal Candidates. To be considered for another Fannie Mae position outside of the department (position is outside of the employee's current SVP reporting structure) employee must" -- bullet -- "have completed at least 12 months in their current position (except term employees on 12-month assignments with no extension - permitted at 10 months of the term assignment and employees who have been been given displacement notification with work-through dates)."

Did I read that correctly?

A.   You did, yes.

Q.   Is that the work criteria that would have established -- that Mr. Hickman didn't meet?

A.   Yes.

Q.   We're done with that. Let's stay with a

Page 452

plaintiff's exhibit. Could I ask you to go to Plaintiff's Exhibit 54, please? Do you see that's an e-mail from Anne Gehring to you. June 6th? You talked about that on direct examination?

A.   Yes.

Q.   You would agree with me that nowhere on here does it say Ms. Gehring says she wants Joe Hallet placed in the VP for planning and alignment position, correct?

A.   Correct.

Q.   I believe you spoke -- I want to get now to the process for the vice presidency of planning and alignment position a bit. Your general process. I believe you stated that part of it is you speak with the hiring manager about the qualifications they're looking for the person who would fill the position?

A.   Yes.

Q.   Did you do that with Ms. Gehring, do you recall?

A.   Yes.

Q.   What did you discuss with Ms. Gehring

Page 453

about the qualifications she was looking for for the vice president for planning and alignment position?

A.   We discussed the sum total of the attributes that were on the job description, plus the leadership attributes that we would be looking for in the role since this is a leadership role.

Q.   Let's talk about that a little bit. What emphasis, if any, does Fannie Mae place on the role of leadership when selecting vice presidents, if you can elaborate on that a bit for Judge Robertson?

A.   Sure. It's a primary quality or a criteria that we're looking for. Leadership is defined as the ability to influence across the organization. It's defined as the ability to manage people, to think strategically, to work collaboratively.

So the criteria for leadership is very important to us because these roles are preeminent in helping the company devise its business strategy and execute on its business strategy, so we have to have candidates in these roles that are able to influence across all levels of the company. So it's an

Page 454

important part of our process.

Q.   And is there something at Fannie Mae, to your understanding, or the top talent rating or candidacy or something to that effect?

A.   There is. I'm not entirely clear of the definition of "top talent." It's not in my job purview, but I am familiar with the phrase.

Q.   If you can, just why don't you share with us what your understanding of that is.

A.   Top talent is generally individuals who demonstrate significant performance, both in the execution of their day-to-day job responsibilities, but also the ability to grow into a leadership role. So they've been able to influence, they've been able to network across the organization and collaborate.

So generally, top talent has a mixture of both subject expertise as well as these emerging leadership qualities. If they are leaders, then they have those leadership qualities.

Q.   Okay. All right. And I believe you said prior to -- you knew who Nicola Fraser was --

A.   Yes.

Page 455

Q. -- prior to the posting for the vice presidency for planning and alignment position?

A. Yes.

Q. What was your understanding of her reputation within the company?

MR. BRANCH: Objection. Hearsay.

JUDGE ROBERTSON: Overruled.

THE WITNESS: Well, she is an officer of the company. So my understanding of her reputation is that she has the ability to lead and drive results.

BY MR. WILSON:

Q. So when selecting VPs at Fannie Mae, is it just substantive skills that are important or what beyond that, if anything?

A. Well, certainly, technical expertise and subject matter knowledge is important in some of our opportunities, but in general, we look for a broader scope of general management skills. So we're looking, again, at strategic thinking, the ability to collaborate across the entire enterprise, the ability to influence at all levels in the organization, so

Page 456

up, down and sideways, and the ability to drive results based on whatever strategic direction the company is headed towards or that functional area is responsible for.

Q. And for you in conducting or in your involvement in screening out applicants for the vice presidency for planning and alignment, how, if at all, were you motivated by the applicant's race?

A. Not at all.

Q. How, if at all, were you motivated by an applicant's ethnicity?

A. Not at all.

Q. How, if at all, were you motivated by an applicant's age?

A. Not at all.

Q. How, if at all, were you motivated by applicant's weight?

A. Not at all.

Q. How, if at all, were you motivated by applicant's body shape?

A. Not at all.

Q. In making your recommendation to

Page 457

Ms. Gehring of applicants that she should review further, how, if at all, were you motivated by any of those factors?

A. Not at all.

Q. And in accepting Ms. Fraser's resume when you did, how, if at all, were you motivated by any of those factors to do that?

A. Not at all.

MR. WILSON: If you would give me a moment here, Your Honor. That's all, Your Honor.

JUDGE ROBERTSON: Anything further, Mr. Branch?

MR. BRANCH: Yes.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH

Q. Ma'am, would you turn to Defendant's Exhibit 42?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. And what is it?

A. It's the e-mail that we send out letting

Page 458

directors and officers know that there is a VP position that is open.

Q. Is this the VP position, vice president for planning and alignment that we spent some time this afternoon discussing?

A. Yes, it is.

Q. And is there a requirement in this announcement that the qualified internal and external candidates are encouraged to apply and internal applicants should express their interest and submit their credentials no later than Monday, June 10th, 2013?

A. I would disagree that it's a requirement. It's an encouragement to do that.

Q. Well, it says, "No later than Monday" --

A. It does.

Q. -- "June 10th, 2013," correct?

A. But it says we encouraged. It doesn't say we require.

Q. Were you acquainted with Ms. Lapera before the interview process for this position?

A. No, I was not.

51 (Pages 455 to 458)

Page 459

Q. You did not know her?

A. No.

Q. And did you have an understanding of her reputation at Fannie Mae as a leader in the company?

A. I did not, no.

MR. BRANCH: No additional questions.

MR. WILSON: Your Honor, if I may, it will be like 30 seconds.

RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. Could we stay on Defendant's Exhibit 42?

A. Sure.

Q. Just to highlight, am I right that that e-mail sent to officers at fanniemae.com and to directors at fanniemae.com?

A. Yes.

Q. And one last question. Because this case deals with body shape, let me ask you, what's your dress size?

MR. BRANCH: Objection.

JUDGE ROBERTSON: Sustained.

MR. WILSON: No more questions, Your

Page 460

Honor.

THE WITNESS: I'm done?

JUDGE ROBERTSON: You're done.

THE WITNESS: Thanks.

(Ms. Werner exits arbitration room.)

JUDGE ROBERTSON: Should we take a quick break? It's 2:30.

MR. BRANCH: Yes.

JUDGE ROBERTSON: All right. Let's take a ten-minute recess.

(Recess.)

JUDGE ROBERTSON: And your name is?

THE WITNESS: Shandell Harris.

JUDGE ROBERTSON: Ms. Harris. Will the court reporter please administer the oath to Ms. Harris.

Whereupon,

SHANDELL HARRIS,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

JUDGE ROBERTSON: Mr. Branch.

Page 461

MR. BRANCH: Thank you.

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. Please state your name.

A. Shandell Harris.

Q. Ms. Harris, my name is David Branch. Ms. Harris, are you currently employed?

A. Yes.

Q. And where are you employed?

A. At Fannie Mae.

Q. What's your position there?

A. I'm a human resources business partner.

Q. And how long have you worked at Fannie Mae?

A. Since 1990, with a break between 2003 and 2005.

Q. And so you worked from 1990 until 2003?

A. Yes.

Q. When you left your position in 2003, what was your position?

A. I was a director.

Q. Human resources director?

Page 462

A. Yes.

Q. And when you returned to Fannie Mae in 2005, what was your position?

A. I came back as a consultant, first, for three months and then I came back on full time as an HR business partner.

Q. And you're still in the HR business partner position?

A. Yes.

Q. So when you came back to Fannie Mae as a full-time employee after 2005, you accepted a position that was lower than the human resources director position that you had previously?

A. Yes.

Q. Have you filed an EEO complaint against Fannie Mae?

MR. WILSON: Objection.

JUDGE ROBERTSON: Overruled.

THE WITNESS: Yes.

BY MR. BRANCH:

Q. And did you file a race discrimination claim?

Arbitration Day 2                                            November 4, 2014
Washington, D.C.

Page 471

Q.   So you're going to have to probably move that aside and take one of the other two exhibits in front of you.

A.   Okay.

Q.   And you're at 42?

A.   Yes.

Q.   Do you recognize this document?

A.   I never saw it, but it looks like other announcements that have gone out. This goes to officers and directors. We are not copied.

Q.   Would this be generated by human resources or someone else?

A.   By Nicole Harris in compensation.

Q.   And is this typical of an announcement for a VP position at Fannie Mae? Is this what you expect to see?

A.   I don't typically see them, sir. These typically go to officers and directors. So I don't typically see them.

Q.   Were you asked to participate in the selection process for the VP of planning and aligning?

Page 472

A.   I was asked to participate in the interview process.

Q.   And who asked you to do that?

A.   Anne Gehring.

Q.   Planning and alignment, sorry. Do you recall when that occurred?

A.   When the interviews occurred?

Q.   Yes.

A.   No, I don't recall exactly. It was during the summer of 2013.

Q.   Did you conduct interviews for the position?

A.   Yes.

Q.   And prior to conducting interviews, did you meet with Anne Gehring to discuss interview questions?

A.   No, I didn't.

Q.   And prior to the interviews, did you meet with Anne Gehring to discuss the requirements for the position?

A.   I had the job description so I understood the requirements for the position.

Page 473

Q.   So you did not meet with Anne Gehring to discuss what she was looking for in this position?

A.   You know, as a part of our one-on-ones, we probably did have a conversation about it. I'm not recalling it exactly though. It would have made sense.

Q.   Who did you interview for the positions?

A.   I interviewed Joe Hallet, Ana Lapera and Nicola Fraser.

Q.   Did you rate or score any of the applicants for the position?

A.   I don't score applicants, no.

Q.   And the interviews were held in your office; is that correct?

A.   Yes.

Q.   Did you see your role as you were interviewing the applicants on their technical competency?

A.   No.

Q.   What was your role in this interview process?

A.   Was to assess their leadership

Page 474

capabilities.

Q.   What questions did you ask the applicants in your interviews?

A.   I don't have the exact questions, sir. I pulled the questions from an interview guide and I don't have them, but what typically happens is the way the guide works is you pick competencies. There will be a choice of four or five questions. You choose the questions and that's what you use for your interview.

Q.   Did you take notes during the interview?

A.   I did.

Q.   Where are those notes?

A.   I don't have them.

Q.   Did you ask all the applicants the same questions?

A.   I did.

Q.   What types of questions did you ask the applicants?

A.   They would have been behavioral competency questions.

Q.   Such as what?

55 (Pages 471 to 474)

Alderson Reporting Company
1-800-FOR-DEPO

Page 475

A.   Such as think about a time when you had to convince a group of stakeholders who were not on the same page, how you talked to them, how you moved them through the process to get to where you needed them to be. It would have been those kinds of questions.

Q.   Did you have any issues with Ms. Lapera's answers to the questions in the interview?

A.   No.

Q.   And was it your belief that she performed fine during the interview?

A.   Yes.

Q.   Were you familiar with the other applicants that you interviewed before the interview?

A.   Nicola Fraser.

Q.   Only Nicola Fraser?

A.   Only Nicola.

Q.   You were not familiar with Joe Hallet before the interview?

A.   No.

Q.   How many employees does Fannie Mae have in the Washington, D.C. area?

A.   Just the D.C. campus?

Page 476

Q.   Yes.

A.   Approximately maybe 2,500 or 3,000, somewhere along that number.

Q.   In 2013, were there any director or vice president Hispanic female employees at Fannie Mae?

MR. WILSON:  Objection, Your Honor. This is irrelevant.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  Were there any -- could you repeat the question?

BY MR. BRANCH:

Q.   Hispanic women who held the position of director or vice president or above.

A.   I don't know. I believe so, but I'm not familiar with everyone at Fannie.

Q.   Are you familiar with Carmen Oviedo?

A.   Yes.

Q.   Was she a vice president at Fannie Mae in 2013?

A.   Yes, she was.

Q.   And in 2012?

A.   I believe so, yes.

Page 477

Q.   And she left employment at Fannie Mae?

A.   Yes.

Q.   Did she previously work for -- she was on the team that Anne Gehring supervised at some point?

A.   I'm not sure that she actually ever reported to Anne. I believe she reported to Linda Knight.

Q.   Were you supporting Anne Gehring's team when Ms. Oviedo was moved to another team?

A.   When was Ms. Oviedo moved to another team?

Q.   So if I represent to you that occurred in 2012, were you supporting the team then?

A.   I didn't support the team the entire time of 2012. So I guess I'm not remembering that.

Q.   Prior to your interview of the applicants for this VP of planning and alignment, did Ms. Gehring express to you that she was interested in placing Nicola Fraser in that position?

A.   When Nicola Fraser indicated she was interested in the position, Anne felt that she would be a very strong candidate for the role.

Q.   And that was before the interviews?

Page 478

A.   That was before the interviews, yes.

Q.   So are applicants at Fannie Mae permitted to apply for positions after the closing dates of the positions?

A.   I don't know.

Q.   Have you managed selections for vacant positions at Fannie Mae?

A.   I'm not really in the recruiting process. So no.

Q.   Did you tell Ms. Lapera that your only concern about her was her executive presence?

A.   Yes.

Q.   Did that occur during the interview or after the interview?

A.   After the interview.

Q.   And what was it about her executive presence that caused you concern?

A.   It was a communication style. Sometimes I observed that Ana could ramble, kind of not be on point. I think it's important in communicating with executives that you are crisp and to the point and provide detail as requested.

56 (Pages 475 to 478)

Page 479

Q. And what was the basis of your belief that Ms. Lapera could ramble and not be on point?

A. I had observed her doing a presentation and that was my assessment.

Q. What was the presentation that you observed her doing?

A. It was a discovery insights session that she facilitated for the capital markets. I believe it was the capital markets finance team.

Q. And for this discovery insights presentation, was this within the area of Ms. Lapera's responsibility?

A. She was an insights facilitator.

Q. And did she, in fact, volunteer to assist on this particular project?

A. I assume so.

Q. And what type of information was she presenting at this seminar or at this presentation?

A. Discovery insights is sort of like a Meyers Briggs type exercise where the group takes a test, they get information about themselves and the facilitator helps them read the document, understand

Page 480

the content of it, takes them through several exercises to understand different communication styles, that sort of thing.

Q. And when was this presentation?

A. I don't remember exactly.

Q. It was before the interview?

A. Oh, yes.

Q. Was it years before the interview?

A. I would say probably two years at least before.

Q. Was this the only occasion that you observed Ms. Lapera give a presentation and she rambled and she was not on point?

A. Yes. That's the only time I observed her doing a presentation.

Q. So your conclusion that she lacked executive presence was based on this single incident where she made a presentation a few years before interviewing for this VP position?

A. Yes. I had observed her in staff meetings and she tended to be sometimes emotional in the delivery of her message. So those were my points of

Page 481

reference.

Q. What do you mean "emotional in the delivery of her message"?

A. There was emotion. There was emotion in how she would deliver messages from time to time.

Q. And how many occasions did you observe her at staff meetings being emotional in the delivery of her message?

A. I can't give you a number, sir.

Q. What is it about her delivery at staff meetings that demonstrated that she lacked executive presence?

MR. WILSON: Objection. Asked and answered.

JUDGE ROBERTSON: I'll allow it.

THE WITNESS: I can't remember a particular incident at this time to explain it to you. I can only tell you that was my reflection.

BY MR. BRANCH:

Q. How long was it before the interviews that Ms. Lapera did a presentation at a staff meeting and you were present and she was emotional?

Page 482

A. I can't tell you. I don't know exactly.

Q. Do you know who Ed Watson is?

A. Yes.

Q. And is he a former CFO or CIO?

A. Former CIO.

Q. And was Mr. Watson considered part of senior management at Fannie Mae?

A. Yes.

Q. And was it part of Ms. Lapera's responsibility at some point during her employment to make presentations to Mr. Watson?

A. I'm not sure, sir.

MR. BRANCH: No additional questions.

JUDGE ROBERTSON: Mr. Wilson?

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. Ms. Harris, thank you for being here today. While Anne Gehring was the SVP in charge of EPMO, what was the period of time in time in which you were the business partner responsible for the EPMO?

A. From late April of 2013 until she left,

Page 483

which was, I think, October of 2013.

Q.    Okay. Could we turn to Defendant's Exhibit 42? You testified about that previously.

A.    Yes.

Q.    Do you have that before you?

A.    Yes.

Q.    Did you prepare this?

A.    No.

Q.    Did you have responsibility for preparing this?

A.    No.

Q.    I believe you testified to, when Mr. Branch was asking you questions, that you took notes during the interviews of Ms. Lapera, Mr. Hallet and Ms. Fraser, right?

A.    Yes.

Q.    And that you didn't have those, right?

A.    (Witness nodding.)

Q.    During discovery in this case, did you look for them?

A.    Yes. A number of times, yes.

Q.    And you just didn't find them?

Page 484

A.    Yes.

Q.    You were testifying just a moment ago about Ms. Lapera being emotional in talking. Could you elaborate on what you meant by "emotional" there?

A.    I'm trying to think of an instance that would kind of make it clear, but it was the way that she presented information and the way she presented information was generally with a lot of emotion.

My experience in dealing with the senior executives is that where you can be more to the point, without the emotion, stick to the important pieces, it seems to -- the communication seems to go a little bit better.

JUDGE ROBERTSON: Do you think maybe that's a cultural thing?

THE WITNESS: What's a cultural thing, sir?

JUDGE ROBERTSON: The way people have of expressing themselves?

THE WITNESS: I think it probably could be a personal thing. I'm not sure I understand the cultural piece of it. So I think it could be a style

Page 485

difference, if you will, yes.

JUDGE ROBERTSON: Well, I mean, not to put too fine a point on it, do you think it's possible that Hispanic people communicate differently from Anglo-Saxons? That black people communicate differently from white people? That American Indians communicate differently from cattle rustlers? I don't know. Eskimos rub noses with each other. Nobody would think they're being emotional in Eskimo country, but down here, we'd think they were not executive material.

THE WITNESS: I suppose that's possible, yes.

JUDGE ROBERTSON: Okay. You asked, Mr. Wilson. I just thought I'd -- you asked her to explain emotion. I thought it was an interesting question.

BY MR. WILSON:

Q.    Ms. Harris, could I ask you, please, to turn to what's previously been marked as Defendant's Exhibit 62?

A.    Yes.

Page 486

Q.    Do you see that?

A.    Yes.

Q.    And is this an e-mail you understand that you sent?

A.    Yes, it is.

Q.    And what's the top e-mail? What is that?

A.    It was my feedback on the three interviews that I conducted.

Q.    And you were providing that in response to the e-mail below from Ms. Werner?

A.    Yes.

JUDGE ROBERTSON: Give me the exhibit number again.

MR. WILSON: It's Defendant's Exhibit 62, Your Honor.

BY MR. WILSON:

Q.    And you have a sentence in there that says -- well, two sentences. "Ana has good leadership skills as it relates to managing her team. Her real area of focus would be her executive presence in communicating with the OC and the MC. I think this area of development for her is critical

Page 487

given this role, so I would not see her as the best candidate." Did I read that portion correctly?

A. Yes.

Q. Just to be clear here, in that sentence, what did you mean by OC?

A. The two managing bodies, if you will, of Fannie Mae. One is the operating committee and the other is the management committee.

Q. So OC is operating committee?

A. Yes.

Q. And MC is management committee?

A. Yes.

Q. And you say also above, "Nicola, by far is the best candidate... a seasoned top-talented leader with demonstrated leadership capabilities."

Could you please explain to His Honor why you think or why you thought Ms. Fraser was the best candidate?

A. Yes. I supported Nicola when she worked in FP&A. In that role, she was responsible for regular interface with the management committee, FHFA and the board. So she had demonstrated her ability

Page 488

to be very effective in those venues and I also realized that she had very strong leadership capabilities.

Q. Had you observed, before this time, being July 15, 2013, Ms. Fraser's communication style? Had you seen her present to anybody, for example?

A. Yes.

Q. And have you witnessed her in communications with senior leadership?

A. I had witnessed her with Anne and I had -- actually, I had not witnessed her with senior leadership. I had gotten feedback about her effectiveness in that role.

Q. Is there something at Fannie Mae called "top talent"?

A. Yes.

Q. Briefly, if you could describe what that is.

A. So we have a talent review process every year where we evaluate our officers on a nine-box grid. And at the time I supported Nicola in FP&A, we conducted such a review in finance. And the way it

Page 489

works is, within the individual division, so within controllers and FP&A, there would be a smaller talent review session and then there is a larger session that included the CFO and all the senior vice presidents of finance.

In that large meeting, Nicola had been designated as a top talented officer. And what that means is we're saying that this person has a lot of potential, not only to take on broader responsibilities, but also potential for promotion.

Q. Could I ask you, please, to turn to what has previously been marked as Defendant's Exhibit 61?

A. Yes.

Q. Do you recognize this as an e-mail string on which you're a cc?

A. Yes.

Q. And you don't have any reason to doubt you didn't receive this?

A. No, I received this.

Q. And in there, there's an e-mail from Anne Gehring, July 16th, at 1:14 p.m. in which you're a cc?

Page 490

A. Uh-huh.

Q. Would you agree with me that's feedback that Ms. Gehring is providing to Melissa on her interviews?

A. Yes.

Q. And then if we flip the page, there's another e-mail, right, from Mike Choi to Melissa Werner on which you're a cc?

A. Yes.

Q. July 15 --

MR. BRANCH: Objection. Hearsay.

MR. WILSON: We've established this is a business record, Your Honor.

JUDGE ROBERTSON: Objection is overruled.

BY MR. WILSON:

Q. The 7:07 p.m. e-mail, you're a cc on that one, too?

A. Yes.

Q. Do you recognize that as an e-mail from Mr. Choi providing his feedback on the candidates he interviewed?

A. Yes.

Page 491

Q.    And if you look at the feedback from both Ms. Gehring and Mr. Choi, would you agree with me that they both concluded that Ms. Fraser is the best candidate for this position?

A.    Yes, they did.

Q.    In your recommendation or conclusion that Ms. Fraser was the best candidate for the position for the vice president of planning and alignment, how, if at all, was your decision motivated by anybody's race?

A.    It was not.

Q.    How, if at all, was it motivated by anybody's ethnicity?

A.    No bearing.

Q.    How, if at all, was it motivated by anybody's national origin?

A.    It was not.

Q.    How, if at all, was it motivated by anybody's age?

A.    It was not.

Q.    How, if at all, was it motivated by anybody's weight?

Page 492

A.    It was not.

Q.    How, if at all, was it motivated by anybody's body shape?

A.    It was not.

Q.    Give me just a minute here. Let me check my notes.

Are you aware, in Fannie Mae divisions, right, they give end-of-year performance ratings?

A.    Yes.

Q.    And that's done on a one-to-four or one-to-five scale?

A.    One to four.

Q.    What's your understanding, if any, of whether the head of the division would have the ability to change the rating of a person that they saw in their division?

A.    The senior executive always has last review rights. So what does that mean? When we have a yearend process, usually, an organization will go through an internal calibration process that would involve the leadership of the organization where they will determine what they believe is the appropriate

Page 493

rating.

Usually, the HR business partner, once all of that is concluded, will send the senior executive a spreadsheet with all of the ratings of all of the employees in their organization and the executive does have the opportunity to make any changes to ratings if he or she so chooses.

Q.    Last question. So in the demand for arbitration, in not so many words, there are allegations against you that you may have discriminated against Ms. Lapera because of her weight or body shape. Do you think that allegation is absurd?

A.    Yes.

MR. BRANCH: Objection.

BY MR. WILSON:

Q.    Why, in particular, do you find that to be absurd?

MR. BRANCH: Same objection.

JUDGE ROBERTSON: Well, it's very leading, but I'm going to allow her to answer it.

THE WITNESS: I have a daughter who was

Page 494

obese for the majority of her life.

MR. BRANCH: Objection.

JUDGE ROBERTSON: Overruled.

THE WITNESS: And so I have no biased feelings at all against anyone based on size.

MR. WILSON: Thank you, Ms. Harris. I have no more questions, Your Honor.

JUDGE ROBERTSON: Mr. Branch?

MR. BRANCH: Yes.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.    Ms. Harris, you indicated that you supported Nicola Fraser when she was in FP&A?

A.    Yes.

Q.    What was her title when you supported her?

A.    She was a vice president.

Q.    Do you recall the time period that you supported her in FP&A?

A.    I think it was approximately 2011. It might have been 2010. I can't remember back that far. I'm sorry. And a part of 2012.

Q.    Okay. When was she designated as a top

Page 495

talented performer?

A.   That would have been in the talent review of either 2012 or 2011.

Q.   And did Anne Gehring have any influence on this designation?

A.   She recommended the initial placement of Nicola, but as I indicated, it had to be agreed upon with the other senior leaders of the organization and the CFO.

Q.   And Ms. Gehring had just promoted Ms. Fraser from director to vice president in the 2011-2012 time frame?

A.   I believe it was 2011.

Q.   So your belief that Ms. Lapera lacked executive presence was based on your perception that she became emotional at a staff meeting?

A.   I had observed her communication as emotional, yes.

Q.   And could her ethnicity have influenced your perception?

A.   No.

Q.   I think that's the same question the judge

Page 496

asked. I had to ask it because Ms. Lapera had already passed me a note asking me to ask it.

JUDGE ROBERTSON:  Because you thought that was such a great question.

MR. BRANCH:  Exactly. Thank you.

JUDGE ROBERTSON:  I think that completes your testimony, ma'am. Thank you very much.

THE WITNESS:  Thank you.

(Ms. Harris exits arbitration room.)

JUDGE ROBERTSON:  What's next?

MR. BRANCH:  So if we could just have a couple of minutes for a quick break, Your Honor, and Mr. Lapera is going to testify.

JUDGE ROBERTSON:  Mr. Lapera?

MR. BRANCH:  Yes.

JUDGE ROBERTSON:  All right.

MR. BRANCH:  And Fannie Mae was not able to get any additional witnesses, so I think he's going to be the last witness for today.

JUDGE ROBERTSON:  All right.

MR. BRANCH:  Am I correct, you don't have anyone else?

Page 497

MR. STEWART:  There's no one else.

(Recess.)

Whereupon,

JESUS LAPERA,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your name.

A.   My name is Jesus Lapera.

Q.   And Mr. Lapera, what is your relationship to Ms. Lapera?

A.   Married for 31 years.

Q.   And are you currently employed?

A.   I'm working as a consultant for international organizations and for private organizations in the Washington area.

Q.   Can you summarize your educational background first and then your employment background?

A.   I'm an engineer and architect. I have a master's degree in policy analysis with a specialty

Page 498

in financial management. I also have a graduate degree in green building and renewable energy. And for the last 12 years, I was working for the International Development Bank across the sheet. I was the head of the Social Development Institute, which was a graduate level teaching institute for Latin America in social issues and financial issues.

Q.   Can you describe generally the type of work that you've performed in that position?

A.   We advise countries on financial matters and social areas, specifically in things that have to do with Social Security, health insurance and policies related to safety nets.

After I retired from the IDB, I have been working as a consultant. Last assignment was I worked with an international organization was with the World Bank, was working for the total compensation unit. I developed a knowledge base for compensation and benefits, including the pension issues that are related to total compensation.

Q.   And what type of pension issues did you work on in this last position?

61  (Pages 495 to 498)

JAMS ARBITRATION

- - - - - - - - - - - - - -    X

ANA LAPERA,                        :

    Plaintiff,                     :

        v.                         :    JAMS Ref. No.

FEDERAL NATIONAL MORTGAGE          :    1410006405

ASSOCIATION (FANNIE MAE),          :

    Defendant.                     :

- - - - - - - - - - - - - -    X

                        Washington, D.C.

                        Wednesday, November 5, 2014

        Arbitration before THE HONORABLE JAMES

ROBERTSON, in the above-entitled matter, the

witnesses being duly sworn by MARY GRACE CASTLEBERRY,

a Notary Public in and for the District of Columbia,

taken at the offices of JAMS, 555 13th Street, N.W.,

Washington, D.C., at 11:12 a.m., Wednesday, November

5, 2014, and the proceedings being taken down by

Stenotype by MARY GRACE CASTLEBERRY, RPR, and

transcribed under her direction.

Arbitration Day 3                                November 5, 2014
Washington, D.C.

Page 520

APPEARANCES:

On behalf of the Claimant:
  DAVID A. BRANCH, ESQ.
  Law Office of David A. Branch & Associates, PLLC
  1828 L Street, N.W., Suite 820
  Washington, D.C. 20036
  (202) 785-2805

On behalf of the Respondent:
  JOSEPH D. WILSON, ESQ.
  Kelley Drye & Warren, LLP
  3050 K Street, N.W., Suite 400
  Washington, D.C. 20007-5108
  (202) 342-8504
      and
  DAMIEN G. STEWART, ESQ.
  Associate General Counsel
  Fannie Mae
  3900 Wisconsin Avenue, N.W.
  Washington, D.C. 20016-2892
  (202) 752-7000

Page 521

ALSO PRESENT:
  MARVILA AREVALO, Legal Assistant
  SEAN FLANNAGAN (Afternoon Session)

Page 522

CONTENTS

WITNESS
NICOLE HARRIS WESTBROOK    D    C    RD    RC
  By Mr. Branch         523        643
  By Mr. Wilson          55        653
ANNE GEHRING             D    C    RD    RC    FRD
  By Mr. Branch         596        635        640
  By Mr. Wilson         623        638

      Afternoon Session - Page 596

Page 523

PROCEEDINGS

Whereupon,
      NICOLE HARRIS WESTBROOK,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Good morning, ma'am. Please state your name.

A.   Nicole Harris Westbrook.

Q.   Ms. Westbrook?

A.   Harris is fine.

Q.   Harris. Ms. Harris. I have you in my notes as Harris so that's why I'm confused.

A.   Yes.

Q.   Ms. Harris, my name is David Branch and I have some questions for you this morning.

     Ms. Harris, are you currently employed?

A.   Yes, I am.

Q.   Where are you employed?

A.   At Fannie Mae.

Alderson Reporting Company
1-800-FOR-DEPO

Page 524

Q. And how long have you been employed at Fannie Mae?

A. Since 2005.

Q. What's your current position?

A. Director of compensation.

Q. How long have you been in that position?

A. Since late 2007.

Q. And what are your duties as director of compensation?

A. So I'm responsible for managing Fannie Mae's compensation programs. I also have the benefits strategy team. So setting up the benefits program strategies for the company as well.

Q. When you say you have responsibility for managing the compensation program, what does that entail?

A. So it could entail designing and implementing new programs, making decisions about job positions, making decisions about individual compensation actions for individuals.

Q. In 2009, was there a change in the compensation system for directors and officers at

Page 525

Fannie Mae where you went from a numerical system to an alphabetical system? Alpha system?

A. Yes. So Fannie Mae's entire compensation structure changed in 2009. So it changed for our associates, our directors and our officers.

Q. And how did it change?

A. We moved from -- what we had were kind of broad bands. So a kind of 1, 2, 3 up to 7 structure and we changed that from those big bands to what we now have as grade levels that are alphabetical.

Q. All right. And so can you explain how employees are assigned a particular level of compensation?

A. So in terms of the levels in the structure, the structure was built based on available market data. There are companies that produce compensation surveys and that's how we get our market data. And so the structure was built on that market data. We use market data for positions to determine the grade level in the structure and then kind of by default, if you will, employees end up with a grade level based on the position in which they sit.

Page 526

Q. And I'm not clear I understand exactly what you mean when you say it's based on market data. What specific market data is relied upon?

A. So Fannie Mae uses diversified financial services industry data. And sort of to break that down, so if we were looking at my position, for example, we would look to the market data surveys that we have and we would look for data on compensation for someone who is managing a compensation team and we would then use that data to determine where my job fit into the structure.

So, for example, if the market data said, at the middle of the market, the pay for this kind of job is $50,000, we would look at the grade level in our salary structure and look for the one that's closest to that $50,000. And on a pure basis. I mean, there are other considerations where you're mapping jobs, but that's the use of the market data.

Q. So is it solely the responsibility of the compensation department to set the rate of compensation for employees?

A. So it isn't solely. And I say that

Page 527

because when you're putting jobs into a structure, you're also considering how that job fits into the company. So, for example, at one company, the comp director may be very highly valued by the company. In another company, it may not be the case. So there's also internal considerations. And when you're evaluating those internal considerations, you're also interacting with the business to understand how that job fits into the scope of their organization and then Fannie Mae overall.

Q. And so employees at Fannie Mae at the director level, and let's -- I want to talk specifically about 2009. Were they provided a base rate of pay and additional compensation?

A. Yes. So the new compensation structure had base salary and it had a component that we call a long-term incentive.

Q. And how was the base salary determined and how was the long-term incentive determined?

A. So the new base salary under the new compensation structure considered the fact that Fannie Mae was eliminating its annual bonus. And so,

Arbitration Day 3

November 5, 2014

Washington, D.C.

Page 528

generally, employees saw an increase in base salary to do a tradeoff for a portion of the bonus portion that had been eliminated. So there was a percentage increase to base salary in consideration of that.

Q. Was that the long-term incentive?

A. That's the base salary piece.

Q. Is there a practice at Fannie Mae of adjusting salaries of employees if it's determined that for some reason their salary is below what it should be?

A. We do have what we call a promotion and equity process. And so that equity piece is an opportunity for managers to put forward their requests to make equity adjustments. So if they think that there are differences in salaries that aren't explained by performance or experience, they can request that a PEP action be taken.

Q. And you say promotion and equity. Would that also involve a promotion or just an adjustment in the salary?

A. It could be either the equity or it could be the promotion in job as well.

Page 529

Q. Is there a process -- or was there a process in 2009 where there was a routine review of an employee's salary to determine if the salary should be adjusted?

A. Can you ask the question one more time?

Q. Was there a process at Fannie Mae whereby there was a routine review of employees at a particular level to determine if their salary should be adjusted because the salary was not at the level that it should be?

A. So those would have been actions that would have been requested through the PEP process. And that was a regular process.

Q. And is that action requested by the manager or is it initiated by compensation or some other entity?

A. It's typically initiated by the business.

Q. So that would be the manager?

A. Yes, the manager.

Q. There is a binder in front of you, the black binder. Turn, if you will, to Exhibit 8. Is this document familiar to you? This type of

Page 530

document?

A. It looks to be a screen shot from our employee data system.

Q. And this is the compensation history/salary history for Ana Lapera?

A. Yes.

Q. Do you agree with that?

A. Yes.

Q. And I'm looking for the entry of July 5th, 2009. There is a pay rate change adjustment. Do you see that?

A. Yes, I do.

Q. And it looks like the change is $12,456?

A. Yes.

Q. How would this type of adjustment come into being?

A. So this particular adjustment was related to that change in the compensation structure and so this was the increase that was provided because we were eliminating annual bonuses across the company.

Q. So was everyone's salary adjusted in July 2009?

Page 531

A. Most employees' salaries were adjusted. There were some cases where that was not the case.

Q. Does this indicate that Ms. Lapera was being underpaid for the function she was performing?

A. This change wasn't related to performance in any way. It was just related to the change in the comp program.

Q. So was a decision made that the appropriate salary that Ms. Lapera should receive would be $12,456 more than what she was actually receiving at that point?

A. So the increase to base salary wasn't an individual employee decision. It was based on a structural change that we were making. So it didn't consider the individual. It was related to that structure change.

Q. So were you involved in the classification of Ms. Lapera's position from a level 6 to a level M in 2009?

A. Yes. My team did the work to move from the old structure to the new structure.

Q. When you say your team did the work, who

Page 532

was on your team?

A.    So there was a set of compensation consultants. There were -- myself was on the team and probably four others at that time.

Q.    Compensation consultants?

A.    Yes.

Q.    Were they employees of Fannie Mae?

A.    Yes, they were.

Q.    What are the titles of those positions?

A.    So in the new world, now compensation analysts.

Q.    Were they compensation consultants, was that the title, in 2009?

A.    I'm not sure if that was the title in 2009. That was the capacity in which they served. They were the senior professionals below me within the compensation department.

Q.    So what actions were taken to reach this conclusion that Ms. Lapera's position should be classified as a level M?

A.    So the process of determining the level for a position was based on market data, was also

Page 533

based on internal Fannie Mae considerations. So, again, interacting with business, meeting managers to understand what the positions do, how they fit into their organizations as well.

Q.    And so what action was taken internally to make this determination that the position should be a level M?

A.    So it would have been the process of gathering that market data, putting a grade level with that job based on that market data and then having further discussions with the business so that they understood how the levelling was happening and where their positions fell, and they had the opportunity to give feedback.

Q.    Were you directly involved in this classification of Ms. Lapera's position or was it just someone on your team?

A.    So there was someone on my team who was working on this particular area. So the compensation consultants had different divisions that they were responsible for.

Q.    Did you learn at some point that

Page 534

Ms. Lapera was challenging the initial classification of her position as a level M?

A.    Yes.

Q.    And how did you learn that?

A.    So the first time that I remember it was in 2011 and I received an e-mail from one of our HR business partners.

Q.    What about in 2009? Did you learn that Ms. Lapera was challenging her classification in 2009?

A.    I don't remember a challenge in 2009.

Q.    Do you have any information on whether there was any reconsideration of the initial classification of Ms. Lapera's position in 2009?

A.    So it's my understanding, just in terms of understanding this case, that there was a challenge made.

Q.    And my question is whether there was any -- once the challenge was made, do you have any knowledge of what actions were taken as a result of the challenge?

A.    So my understanding is that the request

Page 535

came to someone on my team.

Q.    Who on your team?

A.    I believe it was Reese Aguilar.

Q.    What's the basis of your understanding that it came to Reese Aguilar?

A.    Just that to ask to relook at the position came to him, that he responded that he didn't think a change was needed.

Q.    So a request for reconsideration came from Ms. Lapera and you believe it went to Reese, is it Aguilar?

A.    That's my understanding.

Q.    And so once -- is Reese a mister or miss?

A.    It's a mister.

Q.    Okay. Once Mr. Aguilar received this request for reconsideration, do you have any information on what actually was done with the request for reconsideration before he determined that no change was necessary?

A.    I do not specifically know.

Q.    Is there a formal process in place at Fannie Mae -- or was there a formal process in place

Arbitration Day 3                                              November 5, 2014

Washington, D.C.

Page 536

where certain actions would be taken if an employee challenged the classification?

A.    There was not.

Q.    So is it true, as far as you know, you're not sure if anything was done with Ms. Lapera's initial request challenging the initial classification?

A.    So I don't know specifically what was done. I can say when we get requests to review information, we do go through the information and make a determination.

Q.    And so when you get a request to review information to make a determination, what is the process that's followed?

A.    So it depends on the nature of the request.

Q.    So if Ms. Lapera sends in a challenge to the classification, sends an e-mail or provides some notice that I don't believe my position has been classified properly and I wish to challenge that, what action is taken by the compensation department or division as a result of that challenge?

Page 537

A.    So back in 2009, when we changed the structure, I wouldn't have expected there to have been a long process to review the position. We would have just done the work to classify positions. And so I would have expected that Reese went back and looked at where the position was slotted and said, you know, we went through this work to slot the position, we worked with your division and so we still feel that the position is noted correctly.

Q.    Would there be any effort to contact the employee to say, why do you believe your position has been slotted inappropriately?

A.    No. So compensation would have either worked through the manager or with the HR business partner for the organization. We wouldn't have gone directly to the employee.

Q.    After 2009, did you receive a request once again from Ms. Lapera challenging the classification of her position?

A.    So yes, I remember a request in 2011.

Q.    Did this challenge come directly to you?

A.    Yes, it came through our business partner.

Page 538

Q.    Do you recall who the business partner was?

A.    Yes, Shandell Harris.

Q.    Shandell Harris. Do you recall the time of the year that this challenge came in 2011?

A.    In the spring.

Q.    And what action, if any, was taken on this challenge that came to your department in the spring of 2011?

A.    So I gave feedback back to Shandell.

Q.    So first, what was your understanding of the challenge that was presented by Ms. Lapera in the spring of 2011?

A.    So I didn't have an understanding of the challenge. The request that I received just said can you look at this job and level it. It didn't have any context.

Q.    And who made that request to you? Was it Shandell Harris?

A.    It was Shandell Harris.

Q.    So Shandell Harris asked you, can you look at this job and level it?

Page 539

A.    Yes.

Q.    And what action did you take after you received that communication?

A.    So I don't remember specifically, but I know I replied to Shandell that this was a job that we had already, it was Ms. Lapera's job and that the job was an M.

Q.    So in response to Ms. -- well, first, is that all that you did?

A.    So I looked at the position to see what it was, if there were individuals in it, to get that understanding. But it didn't come to me as a challenge. It came to me as can you look at this and level it. And so my translation was, oh, we have this job, it's the job that Ms. Lapera is in and it's an M.

Q.    So the request that came to you in early 2011, you did not consider that to be a challenge by Ms. Lapera of her classification?

A.    It was not posed to me as a challenge.

Q.    Other than the request from Ms. Harris to level the position, was anything else presented to

6 (Pages 536 to 539)

Arbitration Day 3                                           November 5, 2014

Washington, D.C.

Page 540

you at the time in early 2011?

A.   I only remember the job description at the initial ask.

Q.   I'm sorry, the job description at the initial --

A.   Ask.

Q.   Oh, when she asked?

A.   Yes. So it being attached to the e-mail that she sent.

Q.   And let's turn to Exhibit 16 in the binder in front of you. Are you there?

A.   Yes, I am.

Q.   Do you recognize this document?

A.   Yes. Looks to be a job description around the Lean Six Sigma role.

Q.   Is this the job description that was sent to you in the spring of 2011 by Ms. Harris?

A.   I can't tell you specifically, but it looks to be.

Q.   And now just turn to Exhibit 17. Do you recognize this document?

A.   Yes. It looks to be one of our job

Page 541

descriptions off of our kind of database.

Q.   So at the time you received Exhibit 16 with Ms. Lapera's position description, did you also receive Exhibit 17?

A.   Not that I recall.

Q.   Did you understand, when you reviewed Exhibit 16, that Ms. Lapera was challenging her classification because the position description that's at 17 was graded or leveled at the N level and had fewer responsibilities than her position that was leveled at the M level?

A.   When I received the request, it didn't come to me as a challenge. And I don't recall this position being part of what was sent to me.

Q.   So in responding to Ms. Harris, you did not consider Exhibits 16 and 17 as part of Ms. Lapera's challenge?

A.   So I considered 16. I don't recall seeing 17.

Q.   And now let's go to Exhibit 12. Well, first, how long did it take you to respond? After you received the initial request from Ms. Harris to

Page 542

level the position, how long did it take you to respond? Did you respond right away?

A.   I'm not sure. I don't recall.

Q.   And so explain to me what happens if an employee makes a challenge to their levelling, what is the process that's followed?

A.   So typically, we would get a request from the business partner or the manager or someone in the management chain within the business itself and they would lay out for us why the information -- or why the level is being challenged or job is being challenged and provide us context for us to do a review.

Q.   Okay. And what happens after that request is made?

A.   So we would take the information that they've provided and we would look at market data, we would look at if there was any history around the position, we would talk to the business or talk to the business partner if we had a need for additional information or had questions.

Q.   Okay. And what happens next?

Page 543

A.   So we would take all that information and then make a determination about the ask.

Q.   And that's the end of the process?

A.   Yes, typically.

Q.   So the steps that you've just described here, they were not taken in the spring of 2011, when you received this request to level the position; is that correct?

A.   Not that I remember. It didn't come to me as a challenge. It came to me as here's a job to look at and level and my response was, oh, we have this job, it's a level M.

Q.   And now just back to 16 and 17. And Number 17 is a position, director of middle office, director of project management. Do you see that?

A.   Yes.

Q.   And the grade is a level N? It's on the second page of the document.

A.   Okay. I see that.

Q.   So I would like you to compare Exhibits 16 and 17 and let me know if there is an explanation of why 16 would be rated a level M and 17 would be rated

7 (Pages 540 to 543)

Arbitration Day 3

November 5, 2014

Washington, D.C.

Page 544

a level N.

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: I'll allow it.

THE WITNESS: So I have no market data as part of my analysis in doing this work and I also don't have an opportunity to have context from the business on this particular position.

BY MR. BRANCH:

Q. And would you agree that just looking at the position description at 16 and comparing it to 17, 16 appears to have broader responsibilities?

A. So I don't know that I can characterize it that way. There is more information available to me if I look at 16 versus 17.

Q. In 2011, when you received this initial request to level --

JUDGE ROBERTSON: Excuse me, Mr. Branch. While we're looking at Exhibit 17, I have a question about it. At the bottom of Number 17, there is what appears to be a URLs or something with a date June 23rd, 2011. Do you have any way of knowing when that date was put on or whether it was part of this

Page 545

document?

MR. WILSON: Your Honor, is that a question for the witness?

JUDGE ROBERTSON: Yes.

THE WITNESS: Oh, I'm sorry.

JUDGE ROBERTSON: I'm sorry, I meant to ask you.

THE WITNESS: Yes.

JUDGE ROBERTSON: Yes is the answer to what question? Is that the date of this document?

THE WITNESS: I'm not sure if this is the date, if that's the date.

JUDGE ROBERTSON: Okay. I'm sorry, Mr. Branch. Go ahead.

BY MR. BRANCH:

Q. So in 2011, was there any effort to inquire of Ms. Lapera's supervisor, the person she reported to, whether he was supportive of having her position placed at the N level?

A. Can you repeat the question? What timing?

Q. 2011. Was there any effort to inquire of Ms. Lapera's supervisor whether he was supportive of

Page 546

placing her position at the N level?

A. So it was later, kind of in 2011 when we started having conversations with the managers from the business.

Q. And when you said you had conversations with the managers from the business in later 2011, was that Kathy Keller?

A. Yes.

Q. So prior to Kathy Keller, when Claude Wade was the manager for that division, did you have any discussions with Mr. Wade about whether he was supportive of placing Ms. Lapera's position at the N level?

A. I don't recall having conversations with Mr. Wade.

Q. Do you know if anyone on the comp team had conversations with him?

A. Someone on my team may have, but I don't know specifically.

Q. And so let's talk about the second effort in the latter part of 2011. Was there another effort to get her position upgraded to the level N in 2011?

Page 547

A. Yes. I remember there was a promotion equity request, and then we did further review of the position and discussions in kind of the May/June time frame of 2011.

Q. So I'm sorry, there was one request in early 2011, the spring of 2011?

A. Yes. So in the spring of 2011, I received a message from Shandell Harris and that was -- the ask was, here's a job description, can you take a look and level it for me? But then there was a question later raised in the May/June time frame that was more specific about the ask and specific to Ms. Lapera.

Q. And where did that request come from?

A. I believe it came through Shandell Harris again as a promotion and equity process request.

Q. And were you involved in reviewing the request?

A. I did not review that particular request.

Q. Did someone on the comp team review that request?

A. Yes.

8 (Pages 544 to 547)

Arbitration Day 3                                                November 5, 2014

Washington, D.C.

Page 548

Q. Who was that person?

A. Sonia Matza.

Q. Did you have any involvement in the levelling of this position or the change in the level of the position after June 2011?

A. Yes. I was involved and was part of the process when the level was changed in early 2012.

Q. What was your involvement?

A. So Sonia and I were working together. I recall having discussions with Kathy Keller, with Shandell Harris, around the position.

Q. And so what was considered at that point?

A. So again, we would have looked at the market data for the position, we would have looked at the job description that was provided to us. We also, I recall, had conversations about what was happening in the business, had conversations with Ms. Keller about her organization.

Q. And had Ms. Lapera's actual duties changed from her earlier request to have the position level changed?

A. So I'm not sure if the duties had changed.

Page 549

As I described, my initial look at the job was, you know, we had this job as a level N. It wasn't a discussion about what old duties were and what new duties were specific to Ms. Lapera.

Q. And so was a decision made that the position should be graded at a level N?

A. Yes. Ultimately, the decision was made to level it as an N.

Q. And why was the position ultimately changed to a level N?

A. It was based on the factors that I mentioned and having those further discussions about the organization and conversations with Ms. Keller about how the duties had changed over time, how she viewed the position relative to other positions in her organization.

Q. Ms. Harris, was it a common practice at Fannie Mae for directors to have other directors reporting to that director at the same level?

A. It is.

Q. It's common for that to happen?

A. There are many cases in the company. Not

Page 550

preferred, but it does happen.

Q. And so how could that happen? What are the circumstances where you have someone who is, for example, at a level M with someone reporting to them as a director at the same level?

A. So it can be an evolution process that happens whereby, you know, one person is sitting in the job or two people are sitting in the job and they're peers and the business makes a decision to have one person report to the other, but it doesn't reflect that their job duties are necessarily different.

Q. So as part of the 2009 initial levelling of the positions, if you had an instance where one director was at a level M and other directors were reporting to that person at the level M, is this something that would have been corrected as part of your levelling process?

A. Not necessarily. And I say that because -- so the compensation team is levelling the position, but it's the management that we work with to understand which employees fit into which

Page 551

positions.

So if the employees are in the same job title, the manager says, yes, this is what their duties are and both have the same duties in the same job title and then the manager changes their organization such that one, then, reports in to another, that's not a case where we would do a correction because the business has decided on the reporting relationship and they've communicated to us the duties are the same.

Q. So have you had instances where you have made the correction when one manager or director had other directors reporting to them at the same level? Have you had instances where you've looked at this and said, hey, this is not proper; one of these folks needs to get moved up?

A. So we have situations where we do make changes, but I wouldn't necessarily refer to it as a correction. So the example would be you have two folks who are managers. The business moves one manager under the other manager and they're in the same job title. The comp team might make a

9 (Pages 548 to 551)

Arbitration Day 3                                                        November 5, 2014

Washington, D.C.

Page 556

A.   I don't recall what the bottom was.

Q.   I think we'll get to some documents that we can elaborate on that.  And so His Honor has the record, your potential or the maximum long-term incentive you could get could vary with your salary level in the alpha system, correct?

A.   Yes.  The incentive is a percent of your base salary.  So it could be higher or lower, depending on your specific base salary.

Q.   Do you recall what the percentage maximum for the level M, as in Mary?

A.   So the LTI associated with that is 20 percent of base salary.

Q.   And that's the maximum that you could get, right?

A.   That's the target amount.

Q.   If you could explain "target amount."

A.   Sure.  Sorry.  So target amount meaning that is your baseline opportunity, but your actual award could go up or down based on your performance.

Q.   Is it just the employee's performance?

A.   It's employee performance and it's company

Page 557

performance.

Q.   And what, if anything, is employee performance relative to?

A.   Employee performance?  I'm sorry, could you ask the question again?

Q.   What, if anything, is the employee performance?  Is the employee benchmarked against anything, for instance?

A.   The employee is compared against their performance against their individual goals and also performance relative to peers.

Q.   So we've got 20 percent down for the M, as in Mary, level.  The N, as in Nancy level, what's the LTI percentage?

A.   The N is 35 percent.

Q.   And just for the record, since you're the director of --

JUDGE ROBERTSON:  That, again, is a target?

THE WITNESS:  Yes, it is.

BY MR. WILSON:

Q.   Since you're the director of compensation,

Page 558

how, if at all, would it affect your ability to receive an LTI award if you're not employed with the company when the award is made?

A.   If you're not employed at the time that an LTI payment is made, you're not eligible for that payment.

Q.   So just to put it more simply, you have to be at the company, working at the company at the time that an LTI payment is made to be able to receive it?

A.   Yes, you do.

Q.   Let's get into the process of levelling positions.

A.   Okay.

Q.   Could you please describe to us what effect, if any, the characteristics or qualifications of the individual person holding a position has on the levelling of a position?

A.   So when we're levelling positions, we are not looking at individuals.  We are looking at the position itself.

Q.   And when you're getting at what the job duties of a position are, what, if anything, is the

Page 559

principal input of your knowledge of what the job duties are?

A.   So the job duties, our primary input for understanding what the job does and what it's responsible for is from the manager or the business unit management.

Q.   What do they give you, if anything?

A.   Sometimes they give a job description.  Sometimes they give us bullet points around what the duties are.  But they're the starting place.

Q.   I believe you testified about a request to level that came in to you for the position held by Ms. Lapera in the spring of 2011.  I'm going to ask you to switch binders on me.  If you could go -- it's called volume I, Exhibits 102 and if you could flip to what's been previously marked as Defendant's Exhibit 9, please.

A.   Okay.

Q.   If you could look at the first-in-time e-mail there, and that's an e-mail from Shandell Harris to a person named Nicole Harris on April 25th, 2011?

11  (Pages 556 to 559)

Page 560

A. Yes.

MR. BRANCH: Wait, I'm sorry, you're at Exhibit 9?

MR. WILSON: Defendant's Exhibit 9. Are you there, Mr. Branch?

MR. BRANCH: Got it. Thank you.

BY MR. WILSON:

Q. In your examination by Mr. Branch, I believe you said you received a request from Ms. Harris to level a position held by Ana Lapera in the spring of 2011. Is this that request?

A. Yes, from what I recall.

Q. And if you could, just flip through the rest of the document. Is this the job description that you were being asked to level?

A. Yes.

Q. And in Defendant's Exhibit 9, could you now pull up Plaintiff's Exhibit 17, please? Leave Defendant's Exhibit 9 before you.

A. Okay.

Q. There's nothing -- the description that's in Plaintiff's Exhibit 17 isn't attached to

Page 561

Defendant's Exhibit 9, correct?

A. No, it's not.

Q. And then let's keep looking at Defendant's Exhibit 9. Could you point out to us where, if anywhere, on this it says that this is a challenge?

A. It does not say that here.

Q. Now, you forwarded this off to Sonia Matza?

A. Yes.

Q. Could you please tell us who Sonia Matza is?

A. Sure. Sonia is on my team, the compensation team. She's a compensation analyst.

Q. Would part of her job duties be looking at positions and using the process that you've described to us earlier this morning to level a position?

A. Yes. She's one of the senior comp analysts on the team.

Q. Do you know if it was you or she who actually did the legwork in levelling this position?

A. I'm assuming it was Sonia.

Q. Could I ask you to go to Defendant's

Page 562

Exhibit 11, please?

A. Okay.

Q. Do you recall receiving this e-mail from Sonia?

A. Yes.

Q. And the e-mail that's last in time there, there is a sentence that says, "I have responded back (attached) saying this job would map to our current level M Six Sigma director." Do you see that?

A. Yes, I do.

Q. What do you recognize that to be? Was that a recommendation from Sonia to you saying, hey, that's --

A. Yes. She's saying to me, I, in this case, responded back to Shandell that this job is our existing Lean Six Sigma director.

Q. And let's flip the page because I think this is one of the attachments. You're cc'd on that? That's also from Ms. Matza?

A. Yes.

Q. And she attaches to that, right -- let's flip that. What's that first document there? It's a

Page 563

system titled Dir Lean Six Sigma?

A. This is the job summary from our -- a database of job descriptions.

Q. Was this the job summary that had come out of the process from the summer of 2009?

A. Yes.

Q. And let's just flip to the next page. You would agree with me that this is the job summary that Ms. Shandell Harris had submitted to you previously and asked you to level, right?

A. Yes.

Q. Do you agree with Ms. Matza's conclusion?

A. Yes.

Q. How, if at all, did Ms. Lapera's race, ethnicity, national origin, age, weight or body shape motivate the decision on the levelling request submitted to you by Shandell Harris in April of 2011?

A. Those factors would not have been considered at all.

Q. And how, if at all, did the outward appearance of Ms. Lapera with regard to bodily condition or characteristics, manner or style of

Page 564

dress and manner or style of personal grooming, including, but not limited to, hairstyle and beards, impact the process of deciding how to level the position that Ms. Shandell Harris submitted to you in April 2011?

A.   It would not have been considered.

Q.   Thanks. So Mr. Branch was asking you if two directors working, I guess, in the same organization or something like that and one person at a director level is reporting to a person in the other director level, what means, if any, does the business unit have to differentiate -- oh, and they're at the same salary level, okay? Let's say they're both at an M.

What means, if any, does the business unit have available to them to differentiate between the two directors with respect to compensation?

A.   So the business unit can differ based on the individual employee's base salary.

Q.   And that's salary within the same level? Here in my question, we're talking about a level M; isn't that right?

Page 565

A.   Yes. So the structure has a range, but individual people can fall at different places within that range.

Q.   If I can ask you, please, to turn to what's been previously marked as Defendant's Exhibit 5.

A.   Okay.

Q.   And if you can go -- it's a page that's marked FNMB 001851. And you've talked about the process that's used in comp for levelling positions. Could I ask you to take a moment and read over the section of the e-mail on that page that says personal experience relevant for the position?

MR. BRANCH: I'm sorry, what page are you directing her to?

MR. WILSON: FNMB 001850 in Defendant's Exhibit 5.

BY MR. WILSON:

Q.   Please let me know when you've had a chance to read that. And again, focusing on the section that's personal experience relevant for the position. Do you see that?

Page 566

A.   Yes.

Q.   Have you had a chance to read that?

A.   Yes.

Q.   Within Fannie Mae's process for levelling a position, what impact, if at all, would any of the factors or the information outlined in there have on how to level a position?

A.   So this information would not be factored in. The position levelling work that we do isn't based on the individual person.

Q.   I believe you testified about Reese Aguilar was in your group?

A.   Yes.

Q.   Do you know Reese's nickname or do you know what his full name is?

A.   His first name is Mauricio.

Q.   Do you know if he's Latino or Hispanic?

A.   He's Latino.

Q.   Ms. Harris, if I could ask you, please, to turn to Defendant's Exhibit 12. I believe you had testified about a PEP request from Ms. Lapera?

A.   Yes.

Page 567

Q.   What do you recognize Defendant's Exhibit 12 to be?

A.   To be information regarding the PEP request.

Q.   All right. And are there PEP cycles in a year?

A.   Yes. There are typically two to three in a year.

Q.   Do they come at the same time every year, those two to three cycles?

A.   Generally, they're pretty close to the same time frame.

Q.   Could you please tell us when, I suppose, in 2011 the cycles were?

A.   So there's usually one in the spring, so April/May-ish. At that point, I think we did have three. There would have been one a little later that year, July-ish maybe, and then usually one in the fall, September/October.

Q.   Do you recall getting PEP requests for Ms. Lapera in July of 2011?

A.   I don't remember a July PEP request.

Arbitration Day 3

Washington, D.C.

November 5, 2014

Page 568

Q. And what about the one later in the year, October?

A. I don't remember one in October.

Q. Am I right, it's the business unit who makes a PEP request to comp?

A. Yes, they do.

Q. And so it goes without saying that if the business unit doesn't think that the employee warrants that, they don't make the request?

MR. BRANCH: Objection. Leading.

JUDGE ROBERTSON: Sustained.

BY MR. WILSON:

Q. Never mind. And the spreadsheet that's attached on this, did you prepare it?

A. No, I wouldn't have prepared it.

Q. Do you understand that Ms. Matza would have prepared it or at least some of it?

A. Yes.

Q. And let's, if we can -- and I realize this is kind of split, so if you want to take them out -- so am I right there's parts to be completed by the division? What's your understanding what that means?

Page 569

A. So yes, there is information that we ask the division to complete around the request that they're making and then there's a section that compensation completes.

Q. And then I gave you the part that says, "To be completed by comp"?

A. Yes.

Q. Or compensation. And there's a line entry here, right, you see that says OPS plan? It's page 9 on the spreadsheet?

A. Yes.

MR. BRANCH: I'm sorry, which page are you referring to?

MR. WILSON: It's in Defendant's Exhibit 9. You need to look at FNMB 001819 through 21.

MR. BRANCH: I understand that, but there's a 9 on each one of those pages.

MR. WILSON: 1819 through 1820 and 21.

JUDGE ROBERTSON: We're in Defendant's Exhibit 9?

MR. WILSON: I'm sorry, we're on Defendant's Exhibit 12, Your Honor.

Page 570

BY MR. WILSON:

Q. So could you look in what -- Ms. Harris, are we all -- everyone got it?

JUDGE ROBERTSON: I've got what looks like three pages of the same spreadsheet or three different spreadsheets. I'm not sure which I'm looking at.

MR. WILSON: It's a spreadsheet, Your Honor, that goes from row A through Y.

JUDGE ROBERTSON: All right.

BY MR. WILSON:

Q. Ms. Harris, could you look at column N which is entitled rationale?

A. Yes.

MR. WILSON: Your Honor, that's on page --

JUDGE ROBERTSON: I got it.

BY MR. WILSON:

Q. And under the rationale for the line for the ops plan, did that come from the business unit? Is that your understanding?

A. Yes, the business unit would have provided that rationale.

Page 571

Q. And so it says there, "Ana is responsible for managing the entire Lean Six Sigma and Operational Excellence Team. As such, her level should be differentiated from the directors that she manages in her team." Did I read that correctly?

A. Yes.

Q. Okay. Then let's go out to column Y, sticking in the same row.

A. Okay.

Q. And this is a part, right, that was completed by compensation?

A. Yes.

Q. And let me read this. "Average salary for SIX120 in operating plan is 170K. Incumbents' salary range from 160 to 184K. Moving Ana to the maximum of the range would create a 28K or 17 percent differential between her and her direct. There is no higher level director job to move her into."

So what, if anything, is the recommendation here coming from compensation?

A. So the feedback from compensation is that there is an opportunity, if the concern is

14 (Pages 568 to 571)

Arbitration Day 3                                    November 5, 2014

Washington, D.C.

Page 572

differentiating Ms. Lapera from her peers, the opportunity to do that is to give an increase to base salary that would create that 17 percent difference.

Q. So the recommendation from compensation is to give Ana Lapera more money?

A. Yes.

JUDGE ROBERTSON: But not to change the level?

THE WITNESS: Correct.

BY MR. WILSON:

Q. Why not change the level there?

A. So as in the notes here, there is no higher level to move to.

Q. I'm sorry, higher level or higher position?

A. There's no higher level director position to move to.

Q. Within that organization?

A. Correct. Yes, within that job family.

Q. If there was an N level at the time, why wouldn't you put the position that she had at the time -- re-level it, at this time, in June of 2011?

Page 573

A. So we wouldn't have re-levelled it based on an individual situation. We would only re-level a position. This was an individual ask to do something.

Q. So PEP requests are based on -- those actually do take into account the individual?

A. They do.

Q. Okay. And am I right, that's unlike the levelling of a position?

A. Correct.

JUDGE ROBERTSON: What did you mean when you said "within that job family"?

THE WITNESS: So Fannie Mae calls job families the series of jobs that are similar. So, for example, if we use the compensation job family, there is an analyst 1, 2, 3, 4 and then there's a director job. That group of positions is called a job family.

JUDGE ROBERTSON: And what is the job family that you were levelling Ms. Lapera's job within?

THE WITNESS: This would have been the

Page 574

Lean Six Sigma job family.

MR. WILSON: Your Honor, I think I can help you on this one.

JUDGE ROBERTSON: You're coming to that?

BY MR. WILSON:

Q. Could you flip back to Defendant's Exhibit 5, please?

JUDGE ROBERTSON: Yes, I saw it in 5 and I wasn't sure what I was looking at.

BY MR. WILSON:

Q. No, not Plaintiff's Exhibit 5, Ms. Harris. Defendant's Exhibit 5.

A. Yes.

Q. Do you see that table there on page FNMB 001850 under position responsibilities?

A. Yes.

Q. Is that the Lean Six Sigma job family that you were just talking about?

A. Yes, it is.

Q. Care to elaborate so we all get an idea?

A. Sure. So in this job family, the first level is the "I" with the manager, the program

Page 575

manager, and then the highest available job is the director, Lean Six Sigma at the M.

Q. So is it your understanding -- or what understanding, if any, do you have if the levelling of these positions would have been done through the same process?

A. They would have been done through the same process.

Q. And that involved looking at market data?

A. Yes.

Q. What's your understanding of market data on Lean Six Sigma positions? Like is it esoteric and there's not a lot of market data, for instance?

A. No, there is market data available for this position.

Q. Ms. Harris, could you please go to Defendant's Exhibit 15 now? I'm sorry, can you go to 13, please, first?

JUDGE ROBERTSON: Thirteen?

MR. WILSON: Yes, Your Honor, Defendant's Exhibit 13. I'm sorry.

BY MR. WILSON:

15 (Pages 572 to 575)

Arbitration Day 3                                                November 5, 2014

Washington, D.C.

Page 576

Q.   Ms. Harris, we established you were privy to this e-mail chain. Could we go down here -- the e-mail, May 10, 2011 at 1:46 p.m. from Sonia Matza to you and Sonia asks, "Did you and Shandell have any further discussions about this?" You agree with me she's talking there about the levelling, right?

A.   Yes, she is.

Q.   Okay. And you responded to her in the following e-mail?

A.   Yes.

Q.   And you say you never had a follow-up call?

A.   Correct.

Q.   Did you get any follow-up information from Ms. Harris on the position?

A.   No, not that I recall.

Q.   And she would have been your source for feedback from the employee or the business unit if they were asking for levelling of the position?

A.   Yes, she would have.

Q.   Okay. And the top one there, "Currently, my recommendation is to move her to the maximum of

Page 577

the range from 184 to 194," that's Ms. Matza's recommendation to you?

A.   Yes, it is.

Q.   Were you in agreement with that?

A.   Yes. That was the opportunity to have flexibility to differentiate.

Q.   Okay. Now can you please go to Defendant's Exhibit 15. And if you could take a look at the e-mail that's June 24, 2011, 11:14, to you from Ms. Matza.

A.   Yes.

Q.   What was your understanding of what this e-mail is?

A.   So this e-mail looks like another look at the Lean Six Sigma position and Sonia going through and reviewing the information and giving me context around what her thoughts are.

Q.   Okay. And she's not recommending that it be leveled at a higher level?

MR. BRANCH: Objection. Leading.

BY MR. WILSON:

Q.   What, if anything, is she recommending

Page 578

here, to your understanding?

A.   It doesn't look like she's recommending anything. It looks like she's giving context.

Q.   And am I right here it says, "But snideness aside, the revised job description definitely had a corporate-wide scope and a strategic slant which the job summary for SIX120 does not."

Do you recognize what she was talking about there?

A.   Yes. She was comparing the job description that -- the new job description that we received relative to our one that existed in the database and giving context that it looks like the scope and the strategic responsibilities are broader than what was in the prior one.

Q.   And just so we know what the prior one -- what you're referencing to the prior one. Could you please turn back to Defendant's Exhibit 11 and go to FNMB 001810. Is that what you mean by "prior one"?

A.   Yes.

Q.   So that e-mail there is dated June 24th. Could I ask you to flip to Defendant's Exhibit 18?

Page 579

A.   Yes.

Q.   And the e-mail down there that's dated 10:59 a.m., do you recall getting that?

A.   Yes.

Q.   And what's your understanding of what that is?

A.   This was the relook at the Lean Six Sigma position.

Q.   And then let's go up to the e-mail later in time, 11:15 a.m., and that's from you to Ms. Harris, correct?

A.   Yes.

Q.   Now, you state that, "Yes, Sonia and I did." What do you mean by that there?

A.   That we reviewed the information that was provided, the two different -- or the two job descriptions that were provided to us.

Q.   Okay. Then it goes on, "We want to discuss an N level, but Bill said that he and Linda are discussing the future of the LSS space, so we shouldn't make any moves with Ana's job until future state is clearer."

16 (Pages 576 to 579)

Arbitration Day 3                                         November 5, 2014

Washington, D.C.

Page 580

Could you elaborate on what you were stating there?

A.   Sure. So Sonia and I had looked at the information that was provided and as was in the other notation, Sonia had said it looks like this has a broader scope, it looks like it's more strategic and so given that, we wanted to talk to Shandell to get additional information to consider the N level.

But it also says here that Bill believed -- Bill Fahey, who was the business partner, the director level business partner. Linda Knight would have been the division head. And that Bill and Linda were having discussions about changing the Lean Six Sigma space. So I was indicating, if things are in flux, then this isn't the time to be making changes to positions.

Q.   You said Linda is the division head. First, does Linda have a last name?

A.   Linda Knight.

Q.   What's Linda Knight's race?

A.   She's Caucasian.

Q.   And did the Lean Six Sigma division come

Page 581

under her at the time?

A.   Yes. There was a point when it came under Linda.

Q.   And would that be common not to address re-levelling if the future state of something is uncertain of a division?

A.   Yes. It's tough to make changes when things are in flux. And we don't want to make a decision one day that may, then, be impacted after a change is complete.

Q.   I believe we established somewhere in the latter part of 2011, compensation was asked again to level a position that was held by Ms. Lapera, right?

A.   Yes.

Q.   Could you please turn to what's been marked as Defendant's Exhibit 20? Do you recall getting this?

A.   Yes, I do.

Q.   And you say there, "Kathy wants to get away from calling the team Lean Six Sigma as that describes a tool that they use."

So who's Kathy referring there, to your

Page 582

understanding?

A.   It's Kathy Keller who, then, was responsible for the then Lean Six Sigma space.

Q.   And it says, "I also think it might be helpful for you to meet with me, Ana and Kathy to flesh out these job descriptions so you can review it and level appropriately"?

A.   Yes, it says that.

Q.   And did you have meetings after that?

A.   Yes, we did.

Q.   And if you can flip through and take a look at what is attached. I take it compensation did re-level Ms. Lapera's position?

A.   We did.

Q.   Was it just hers or was it more broadly? Did you look at also all the positions within the Lean Six Sigma family?

A.   The entire family changed. It moved to process improvement.

Q.   And did you consider at that time the levelling of their positions as well, do you recall? Or those other positions?

Page 583

A.   Yes. We would have mapped them into the levels created for the process improvement job family. So we would have looked at those positions as well.

Q.   What else, if anything, did you look at in levelling the position that was held by Ms. Lapera at this time?

A.   So again, we would have followed our process and we would have looked at this information that was provided. We would have considered the feedback from the business and the discussions that we were having. We would have looked at the market data as well.

Q.   I'm going to ask you to switch binders, if I can. It's going to be volume 3.

Oh, before you get to that. So the position held by Ms. Lapera at this time or shortly thereafter was ultimately leveled at an N level, as in Nancy, correct?

A.   Yes, it was.

Q.   Just so we're clear -- and you may have said this already and I apologize -- why was it

17 (Pages 580 to 583)

Arbitration Day 3

Washington, D.C.

November 5, 2014

Page 584

leveled at an N at that time?

A. So it was re-leveled at an N based on the additional information that we received, so the broader scope, the importance of the job within the organization at that time with the changes that had been happening in that kind of Lean Six Sigma process improvement space as well.

Q. Now if I can ask you to flip to 243. Defendant's Exhibit 243. It's in volume 3.

A. Okay.

Q. Can you look that over, please?

A. Yes.

Q. Do you recognize this?

A. I do.

Q. What is it?

A. This is information that I provided to Leslie Arrington as part of an investigation.

Q. And if you flip to page FNMA 000248, you see an item or a paragraph that's labeled 2. What is that?

A. This paragraph gives an explanation of the process around the levelling of the job as an N. So

Page 585

the history of our review of the position.

Q. Okay. And you prepared that?

A. Yes, I did.

Q. Can we switch back to volume 1 again? Sorry. Turn to Defendant's Exhibit 25.

A. Okay.

Q. Do you recognize this document?

A. Yes. This is an employee change form. So when we're changing information about an employee, we send this notice to our HR service center and they input the change into our employee data system for us.

Q. And this was for the position held by Ms. Lapera at the time?

A. Yes.

Q. It's leveled at an N?

A. Yes. This is the move to the process improvement position.

Q. Now, can we go down there underneath the recommended changes?

A. Yes.

Q. It says, "New job code and title," and

Page 586

there's a Dir process improvement strategy/SIX122?

A. Yes.

Q. What is that?

A. That is the new job code that we moved Ms. Lapera to in February.

Q. Is the the SIX122 is the new job code?

A. Yes, it is.

Q. Okay. And what's the Dir process improvement strategy?

A. That is the new job title.

Q. So is her former job title, is that what's listed above?

A. Yes, it is.

Q. So she got a new job title?

A. Yes.

Q. Do you remember Plaintiff's Exhibit 5? Let's go back to that just briefly in the job family table that you talked about.

A. Plaintiff's Exhibit 5?

Q. Yes. I'm sorry, Defendant's Exhibit 5. It's on page FNMB 001850 in Exhibit 5.

A. Yes.

Page 587

Q. Is that a table of position responsibilities?

A. Yes.

Q. So was there actually a new position that was created in this job family?

A. No.

Q. Not in that table, but if you compare that table to Defendant's Exhibit 25, right, the table that we're looking at on Exhibit 5 doesn't list a Dir director process improvement strategy.

A. Correct.

Q. So am I led to believe in February 2012, was there a new position that was created for this family?

A. There would have been a new -- there was a new process improvement family.

Q. Oh. So the whole process improvement family changed?

A. Yes.

JUDGE ROBERTSON: Mr. Wilson, just a time check here. It's 20 of 1:00. I have a conference call I need to take at 1 o'clock and we have another

18 (Pages 584 to 587)

Page 588

witness on the screen at 1:30.

MR. WILSON: Right.

JUDGE ROBERTSON: Can we finish this witness in 20 minutes?

MR. WILSON: I can finish what I think I need to do with her in five.

JUDGE ROBERTSON: All right.

MR. WILSON: Particularly, if I get a little bit of leeway.

JUDGE ROBERTSON: Okay.

BY MR. WILSON:

Q. So let's go to the levelling of the position that Ms. Lapera held. The process for levelling her position in late December/early 2012, how, if at all, was that process motivated by her race, ethnicity, age, weight or body shape?

A. The decision to re-level had nothing to do with any of those factors.

Q. And how, if at all, was that process motivated by the outward appearance of Ms. Lapera with regard to bodily condition or characteristics, manner or style of dress and manner or style of

Page 589

personal grooming, including, but not limited, to hairstyle and beards?

A. The re-levelling was not at all related to those factors.

Q. We're going to have to switch volumes. If you would go to volume 2, Ms. Harris, and Defendant's Exhibit 143. Do you see that?

A. Yes.

Q. Who prepared this, to your understanding?

A. I did.

Q. Where did you get the information for this?

A. This is from our employee data system.

Q. And briefly, am I right, it shows the division of people, various employees in Fannie Mae, a couple of points within years 2009 to 2013?

A. Yes, it does.

Q. And it also shows there those persons' salary leveling at that time?

A. Yes, it does.

Q. It shows their annualized salary at that time?

Page 590

A. Yes.

Q. All right. Let's look at what Ms. Lapera's salary or – and that's a base salary, right?

A. Yes, it is.

Q. Okay. It doesn't take into account what they received for LTI, right?

A. Correct.

Q. Okay. Let's look at Ms. Lapera's base salary compared to the base salaries of Jim Tomasello, Keith Smith, Amilda Gjecovi and Lea Nicotra. Those last four people I mentioned, could you indicate where, if at all, their base salary was at any time higher than Ms. Lapera's as indicated on this spreadsheet?

A. There isn't a point at which their salaries are higher.

Q. Okay. Were Mr. Tomasello, Mr. Smith, Ms. Gjecovi and Ms. Nicotra, were they reports of Anne Gehring in EPMO, to your understanding?

A. Yes, my understanding is they were in EPMO.

Page 591

Q. I'm going to ask you to turn to what's been previously identified as Defendant's Exhibit 103. What is that document there?

A. This is a compensation statement. We issue this as part of the annual compensation planning process.

Q. So that comes out of the compensation group?

A. Yes, it does.

Q. And so you deal with these frequently?

A. Yes.

MR. WILSON: Your Honor, I have a summary that summarizes information on several of these for Ms. Lapera, Ms. Gjecovi and Ms. Tomasello. I list what the sources of them are. If I could do that rather than having her go over each of the comp statements, are you okay with that?

JUDGE ROBERTSON: I'm okay with that.

BY MR. WILSON:

Q. Ms. Harris, there is, in the pocket part to that volume, a spreadsheet.

MR. BRANCH: Do you have an exhibit number

Arbitration Day 3                                          November 5, 2014

Washington, D.C.

Page 592

for what you're referring to?

MR. WILSON: Well, it hasn't been labeled, but we'll call it now Defendant's Exhibit 271.

MR. BRANCH: Okay. And what are you referring to?

MR. WILSON: It's in the pocket part. I also e-mailed this to you on Sunday. I have another copy for you.

MR. BRANCH: Yes, please. This has been the longest five minutes I've ever --

BY MR. WILSON:

Q. Ms. Harris, I'll represent to you that the information comes from various compensations for various performance years. And then you'll see the total of A and D deals with the merit increase amount, LTI installments.

Could you tell me, for the years 2009, 2010, 2011 and 2012, when, if at all, Ms. Lapera made less in total compensation than Ms. Gjecovi, Ms. Nicotra, Mr. Smith and Mr. Tomasello?

A. There is no point at which she made less.

Q. And let's flip to 2013. You would agree

Page 593

with me that her base salary was greater than Tomasello, Smith, Nicotra and Gjecovi, right?

A. Yes, it's higher.

Q. Now, if you factor in their bonuses, the compensation of those persons was higher, right?

A. Yes.

Q. Bonuses are paid out in the first quarter of the following calendar year?

A. Yes.

Q. So Ms. Lapera would have had to have been at the company in 2014 to get any bonus for 2013, right?

A. That's correct.

MR. WILSON: No more questions, Your Honor.

JUDGE ROBERTSON: Okay. Any re -- I think we're in recross. We'll call it redirect for the sake of clarity.

MR. BRANCH: Yes, Your Honor.

JUDGE ROBERTSON: All right, sir.

MR. BRANCH: First, I need to take a quick bathroom break, but I'm just trying to figure out --

Page 594

MR. WILSON: I guess we're going to have to take her off and call her after Ms. Gehring.

JUDGE ROBERTSON: Well, we hate to do that to you, Ms. Harris, but I think that's where we are.

MR. WILSON: Unless you have an idea -- hopefully, it's not a Joe Wilson five minutes on how long you'll be with her because we could possibly delay Ms. Gehring a little bit.

JUDGE ROBERTSON: Yeah. But you've added a lot to the game here. I'm not going to squeeze Mr. Branch with 10 or 15 minutes here. Your 1:30 witness is somewhere else and is going to be on the screen at 1:30, right? We can't put her off.

MR. WILSON: That's correct.

JUDGE ROBERTSON: Ms. Harris, go see a movie and come back.

MR. WILSON: I'm sorry, Nicole.

THE WITNESS: I understand.

MR. BRANCH: So back at 1:30?

JUDGE ROBERTSON: I think we're back here at 1:30, yes.

(Whereupon, at 12:50 p.m., the arbitration

Page 595

in the above-entitled matter was recessed, to reconvene at 1:34 p.m., this same day.)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                    November 5, 2014

Washington, D.C.

Page 596

AFTERNOON SESSION

(1:34 p.m.)

JUDGE ROBERTSON: All right. Proceed, Mr. Branch.

Whereupon,

ANNE GEHRING,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your name.

A.   Anne Gehring.

Q.   Ms. Gehring, my name is David Branch. Did you previously work at Fannie Mae?

A.   Yes.

Q.   What period of time did you work at Fannie Mae?

A.   September 2010 to October 2013.

Q.   What was your position at Fannie Mae?

A.   Initially, I was the senior vice president of Financial Planning and Analysis and then later, I

Page 597

became the senior vice president of Enterprise Program Management.

Q.   And Ms. Gehring, what's your date of birth?

A.   August 12th, 1964.

Q.   When did you become the senior vice president for EPMO?

A.   September of 2012.

Q.   When you became the senior vice president for EPMO, were there employees working in that division at the vice president level?

A.   Yes.

Q.   Who were those employees?

A.   I believe there was one -- I think there was one open position and then one position that was filled by Kathy Keller, but that's my recollection. I don't remember any other vice presidents.

Q.   Are you acquainted with an individual named Carmen Oviedo?

A.   Carmen Oviedo?

Q.   Yes.

A.   Yes.

Page 598

Q.   Was she a vice president in EPMO when you became the SVP for EPMO in September 2012?

A.   No, I don't believe so. I think she had moved on to her new role.

Q.   When did she move on to her new role?

A.   I don't know.

Q.   Did you ask her to move to the new role?

A.   No.

Q.   What role did she go to?

A.   She took a role in the -- she took a program management role in the securitization utility.

Q.   What was her position before she took this program manager role?

A.   I don't recall. She did not work for me. I don't recall.

Q.   And I'm sorry, the new role that she took, was the position program manager?

A.   I guess, yes. I mean, again, I don't recall.

Q.   Did you ask her to leave EPMO?

A.   No.

Page 599

Q.   Ms. Oviedo is a Hispanic female?

A.   Yes.

Q.   Ms. Gehring, after you became the SVP for EPMO, did you authorize an image consultant to come to Fannie Mae to make a presentation?

A.   Yes.

Q.   Did you direct the employees who worked in the EPMO group to attend this presentation?

A.   I invited all employees who worked in the EPMO to attend.

Q.   And was this presentation given over a two-day period?

A.   I believe it was a half-day presentation and it was conducted twice.

Q.   And did the session on the first day deal with personal appearance?

A.   Yes. Both sessions were identical.

Q.   And so for the first day, the emphasis was on personal appearance?

A.   Both days, part of the content was on personal appearance.

Q.   What were your duties as the SVP for EPMO?

21 (Pages 596 to 599)

Arbitration Day 3

Washington, D.C.

November 5, 2014

Page 600

A.   I was responsible for strategic alignment of $800 million in technology spend.  I was responsible for the execution of a portfolio of $800 million in projects each year.  And I was responsible for the training and education around the execution of those projects.

Q.   And you are acquainted with Ms. Lapera?

A.   Yes.

Q.   And who did Ms. Lapera report to?

A.   Well, I ran EPMO.  Ana Lapera worked for Kathy Keller.

Q.   Did Ms. Lapera have employees reporting to her?

A.   Yes, she did.

Q.   Was one of those employees an individual named Blythe Neumilller?

A.   Yes.  I believe that Blythe Neumilller worked for Ana Lapera for a short period of time.

Q.   And was one of the employees a lady named Patricia Brumbaugh?

A.   Yes, I believe so.

Q.   Did you make comments about the personal

Page 601

appearance of Ms. Neumilller and Ms. Brumbaugh?

A.   Yes.

Q.   Did you tell Ms. Lapera that she should speak to Ms. Neumilller and Ms. Brumbaugh about how they looked and how they sat in meetings?

A.   No.

Q.   Did you mimic, in the presence of Ms. Lapera, how Ms. Neumilller walked?

A.   No.

Q.   Did you state that Ms. Neumilller waddled when she walked because she was so obese?

A.   No.

Q.   Did you make comments about the personal appearance of the federal regulators?

A.   Yes.  They were inappropriately dressed.

Q.   Would that have been in the latter part of 2012?

A.   I don't remember.

Q.   And how is it that they were inappropriately dressed?

A.   They had very casual attire on.  One gentleman had holes in his clothing.

Page 602

Q.   And did you make these comments at an all-hands meeting?

A.   No.

Q.   Who was present when you made these comments?

A.   The other individuals who attended the meeting and I believe that they initiated the comments.

Q.   Who were those individuals?

A.   I agreed.

Q.   Who were those individuals?

A.   Keith Smith, Mike Choi, Amilda Gjecovi.  I think that was it.  I think.

Q.   Are you acquainted with a former Fannie Mae employee named Michael Chen Young?

A.   Yes.

Q.   Did you call Mr. Chen Young a fat fucker during a meeting at Fannie Mae?

A.   No.  Michael Chen Young is a friend of mine.  I certainly did not speak about Michael Chen Young in that way, no.

Q.   And did you use those words to describe

Page 603

any employee at Fannie Mae?

A.   No.

Q.   Did you refer to any Fannie Mae employee -- or did you refer to a Fannie Mae employee as an asshole?

A.   Perhaps.

Q.   Who did you refer to as an asshole?

MR. WILSON:  Objection.  Relevance.

THE WITNESS:  I don't know.  I don't remember any specifics, but perhaps.

JUDGE ROBERTSON:  Overruled.

BY MR. BRANCH:

Q.   Did you tell Ms. Lapera that she should tell her staff that their stomachs or tummies were showing in staff meetings?

A.   No, I never said that.

Q.   Did you tell Ms. Lapera and Ms. Keller that you could see that a KPMG consultant was smart by looking into that person's eyes?

A.   No, I don't recall that.

Q.   Did you participate in a calibration session in the fall of 2012 at Fannie Mae?

22  (Pages 600 to 603)

Page 608

MR. WILSON: Objection. Relevance.

THE WITNESS: I don't recall that he is.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. Was Mr. Hickman excluded from consideration for this position?

A. I don't remember if John Hickman applied for the position.

Q. When were the interviews held?

A. I'm not sure -- you want to know the date? I don't remember.

Q. Do you recall the month?

A. No. May/June, that time frame maybe.

Q. So prior to the interviews being held, did you have dinner with Nicola Fraser to discuss the position?

A. Prior to the interviews being held, I had dinner with Nicola Fraser, yes.

Q. Did you ask her to apply for the position?

A. No.

Q. Did Nicola Fraser apply for the position?

A. Eventually, yes.

Page 609

Q. Did you conduct interviews for this position?

A. Yes.

Q. Did you identify the individuals who would be interviewed?

A. Yes.

Q. And who were those individuals?

A. I believe it was Ana Lapera, Joe Hallet and Nicola Fraser.

Q. And had you received Ms. Fraser's resume before you scheduled her for an interview?

A. I believe so, yes.

Q. So had you received her resume and application for this VP of planning and alignment position before she was scheduled for an interview?

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I believe so, yes.

BY MR. BRANCH:

Q. Were there other individuals who conducted the interviews?

A. Yes.

Page 610

Q. Who were those other individuals?

A. I don't recall the full group of interviewers. I usually give a selection of names. But I do know Mike Choi, who was also a VP in EPMO participated and the HR person always participates. That was Shandell Harris.

Q. Was Mike Choi an employee that you had hired earlier in 2013?

A. Yes.

Q. Did you meet with Ms. Harris or Mr. Choi before the interviews to discuss what the interview questions would be?

A. No.

Q. Did you develop a list of questions for the interviews?

A. No.

Q. Did you interview all three applicants for the position?

A. Yes.

Q. Were all three applicants asked the same questions by you during the interview?

A. No.

Page 611

Q. Did you take any notes during the interview?

A. No, not to my recollection.

Q. Did you rate or rank the applicants?

A. Generally, when I conduct an interview, at the conclusion of the interview, I send feedback to the recruiter.

Q. And the question was: Did you rate or rank the applicants that you interviewed?

A. I know that I sent the recruiter feedback, yes.

Q. Do you recall what questions you asked Ms. Lapera or Ms. Fraser or Mr. Hallet at the interview?

MR. WILSON: Asked and answered. Objection, Your Honor.

THE WITNESS: I don't.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. What was your response, ma'am?

A. So I don't remember the specific questions I asked them. I can tell you in generalities how I

24 (Pages 608 to 611)

Arbitration Day 3

Washington, D.C.

November 5, 2014

Page 612

conduct an interview. I typically ask about their background, how they made decisions to switch jobs. I'll ask them about relevant experience. I'll ask them about how they build relationships across the organization. I ask them what they think they would do in the role.

Q. So is it true you have no idea what questions you asked Mr. Hallet or Ms. Fraser or Ms. Lapera?

A. No, I don't remember specifically what questions I asked them.

Q. How did Ms. Lapera perform at her interview?

A. I think Ana did a nice job at the interview.

Q. Was Ms. Lapera given a performance evaluation at the end of 2012 or the beginning of 2013?

A. I think all employees were given a performance evaluation at the end of 2012.

Q. So was the answer yes?

A. Yes.

Page 613

Q. Do you recall what her rating was?

A. I think it was a good rating. I think it was an excellent rating.

Q. Was her rating a level 1?

A. Yes, I believe it was.

Q. Is that the highest rating you can get at Fannie Mae?

A. Yes.

Q. Did you approve her performance rating?

A. Yes.

Q. Who made the final decision on who would be selected for this position?

A. I did.

Q. And who did you select?

A. Nicola Fraser.

Q. Why was Ms. Lapera not selected for this position?

A. Ana Lapera has difficulties communicating at an executive level. Her written communications are inappropriate and her verbal communications are somewhat crass and unpredictable.

Q. Were any of these concerns about

Page 614

Ms. Lapera's communication skills identified in her performance appraisal in 2012?

A. I did not conduct her performance appraisal in 2012. So I don't know.

Q. Did you approve her performance appraisal in 2012?

A. I approved her ranking, the one ranking that we discussed, but I don't recall -- I typically don't read performance appraisals.

Q. So you said that Ms. Lapera was not selected because of her written communication and verbal communication; did I hear you correctly?

A. Yes.

Q. What was the issue with her verbal communication?

A. This position was required to communicate to the senior executive team, the regulators, including FHFA and the Treasury, and the board of directors. And Ana's written communications were somewhat juvenile and cartoonish and her verbal communications were very unpredictable and she had a negative way of talking about the organization and

Page 615

its objectives.

Q. Is this information that you knew before you scheduled Ms. Lapera for this interview?

A. Yes.

Q. So why was Ms. Lapera given an interview for this position?

A. Ana Lapera was a good performer, a strong performer and I wanted to be thoughtful and make sure that I evaluated all the candidates that were -- you know, I thought could do the job.

Q. So what information did you learn from this interview that you did not know before the interview about Ms. Lapera?

A. I thought that Ana did a nice job in the interview. So I guess I learned that if she wanted to, she could communicate pretty well. The problem was I couldn't rely on her consistency. Like I said, she did a nice job in the interview.

Q. What do you mean by your comment you couldn't rely upon her consistency?

A. I had worked closely with Ana Lapera for three years and I had seen a repeated pattern of poor

25 (Pages 612 to 615)

Arbitration Day 3                                    November 5, 2014

Washington, D.C.

Page 616

communication for an executive.

Q.   And had you counseled her on any occasion about her verbal communications?

A.   Yes.

Q.   What is it that she said that caused you to counsel her on her verbal communications?

A.   In a staff meeting, she second guessed the judgment of the president of the organization in front of more junior members of the staff.

Q.   And how did she do that?

A.   When I shared the vision that the president had rolled out for the organization, the vision and strategy, Ana said out loud, "Like that's going to happen."

Q.   When did this staff meeting take place?

A.   I don't remember.

Q.   Was it during the time period when you were the SVP for EPMO?

A.   Oh, yes.

Q.   So it would have been sometime after September 2012?

A.   Yes.

Page 617

Q.   Did you document this statement anyplace?

A.   No.

Q.   Did you issue any type of counseling or discipline as a result of this statement?

A.   No.

Q.   And was this statement made before she was issued her yearend performance appraisal?

A.   I don't remember.

Q.   Do you recall if it was noted or documented anywhere in her performance appraisal?

A.   Like I said, I didn't read her performance appraisal.  I don't recall.

Q.   And so this is the only example that you're able to provide of negative comments made by Ms. Lapera at a staff meeting; is that correct?

A.   No.  There were others.  That's the one that I can recall and give you specific details. This was a pattern of behavior.  She interrupted every single staff meeting I had with one of these comments.

Q.   And how often would you have staff meetings where Ms. Lapera attended?

Page 618

A.   Weekly.

Q.   So from September 2012 through June 23rd, is it your testimony that at every staff meeting, Ms. Lapera interrupted the staff meeting and made a negative comment?

A.   I don't know if it was every single staff meeting, but the majority of staff meetings, yes, she did make negative comments.  She was a disruptive influence in group settings because of the way she communicated.

Q.   And on any of those occasions where she was a disruptive influence in group settings at these meetings, did you ever counsel her or discipline her in any way?

A.   I think in several meetings, I actually confronted her about it in front of the group.

Q.   And you said what?

A.   I don't remember.

Q.   So those were the verbal comments that you believe Ms. Lapera made.  What about the written work product?  What was the issue with the written work product?

Page 619

A.   It was somewhat preachy, juvenile and cartoonish.  She liked to use a lot of clip art and had little figures in there, and that's just not appropriate at the executive level.

Q.   And is it true that all the issues you had with Ms. Lapera's either verbal communication skills or written work product, you knew those before you interviewed her?

A.   Yes.

Q.   After the selection was made, did you meet with Ms. Lapera?

A.   Yes.

Q.   Did you tell Ms. Lapera that you had selected Nicola Fraser for this position?

A.   I don't remember.  I do, as a practice, meet with individuals who have interviewed for a position face to face to tell them that they did not get the position.  I may have told her during that conversation that Nicola Fraser was the candidate that was selected, but I don't remember specifics of that conversation.

Q.   Did you tell Ms. Lapera that Nicola Fraser

26 (Pages 616 to 619)

Arbitration Day 3                                          November 5, 2014

Washington, D.C.

Page 624

Q.   Ms. Gehring, how are you doing?

A.   Good. How are you?

Q.   I'm doing well. Nice to see you again. You're appearing here today voluntarily, right?

A.   Yes.

Q.   And you appeared at your deposition voluntarily?

A.   Yes.

Q.   Who is your current employer?

A.   JP Morgan Chase.

Q.   And what's your position?

A.   Managing director.

Q.   And so you're taking time out of your workday to be with us today?

A.   Yes.

Q.   Could you tell us about some of your hobbies?

MR. BRANCH: Objection.

JUDGE ROBERTSON: I'll allow it.

BY MR. WILSON:

Q.   You can answer that. I can focus that a little bit more. What experience do you have

Page 625

traveling internationally, if any?

A.   I worked for General Electric and lived in southeast Asia for two years in the '90s. I lived in Europe. I worked for Chiquita Brands International and I spent significant time in South and Central America. And in my personal travel, I've probably traveled to 40 or 50 countries globally. And I just took the last year off work and spent the majority of that time overseas.

Q.   Is there a lesbian, gay, bisexual and transgender employee group at Fannie Mae?

MR. BRANCH: Objection.

JUDGE ROBERTSON: Sustained.

MR. WILSON: I was going to -- Your Honor, may I make a proffer?

JUDGE ROBERTSON: I'd like to hear your proffer.

MR. WILSON: Since discrimination is at issue with Ms. Gehring, Ms. Gehring served as the executive liaison for that group.

JUDGE ROBERTSON: Sustained.

MR. WILSON: Okay.

Page 626

BY MR. WILSON:

Q.   Ms. Gehring, I believe on your direct with Mr. Branch, you testified that Ms. Keller was asked to find another position within Fannie Mae. Am I correct?

A.   Yes.

Q.   And you asked her that?

A.   Yes.

Q.   Could you explain to us why?

A.   A significant portion of the role that the EPMO organization played was to communicate to the senior leadership team, FHFA, the regulator and the board of directors, the strategy for the execution of this portfolio of projects. And Kathy was unable to deliver presentations that were appropriate for that audience and she also was unable to participate in meetings with the senior leadership team and FHFA at an appropriate communication style.

Q.   When you say "appropriate communication style," could you elaborate on that, please?

A.   Kathy went into far too much detail for an executive. I like to say you ask Kathy what time it

Page 627

is and she tells you how to make a watch. At one point the CFO who I worked for, Dave Benson, asked her to stop the presentation and asked me to finish it.

Q.   So did Dave Benson put a premium on concise communications?

A.   Oh, my, yes.

Q.   Mr. Branch asked you a question or some questions on your examination about a conversation with Kathy Keller, you could help her look better, and I believe you said, no, you didn't have a conversation.

A.   Uh-huh.

Q.   Did you have some conversation at some time with Kathy Keller about dressing?

A.   Yes.

Q.   Could you elaborate on that conversation?

A.   I would be happy to. Kathy shared with me that she was trying to lose weight and I shared with her that I had lost a considerable amount of weight and how hard it was. And I encouraged her and she asked for the encouragement and she would share her

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                                November 5, 2014

Washington, D.C.

Page 628

success with me.

And one day she showed me how loose her clothes fit and it was pretty significant. It was, I would say, three sizes. And I offered to her, I said, you know, Kathy, when I lost my weight, I had a friend who also -- she had lost 100 pounds and this friend took me out and helped me dress for my new body shape. And I really had appreciated that and I would love to help you do that in the same way. And I think Kathy, you know, demurred and said, you know, she wasn't sure. And what I remember -- and I remember this very specifically. I said, one woman to another, I said, Kathy, you're a beautiful woman. You deserve this.

Q. Thank you. And I appreciate it.

So Ms. Keller did separate from Fannie Mae, correct?

A. Yes.

Q. I take it that process didn't occur overnight?

A. No.

Q. In your estimation, how long or when did

Page 629

it start, that process of her separating? Or that you knew she would not be working in the EPMO any longer?

A. I believe throughout the fall of 2012, she and I were having conversations about her shortcomings in the area of communication and that, you know, I needed to have somebody in the role that I could rely on to develop these presentations and to meet with these groups of people when I was unable to be there.

And then, I think, in early 2013 is when I shared with her, hey, listen, Kathy, I just don't think that this is going to work. I'd like to give you some time to look for other roles within Fannie Mae.

Q. Thank you. Now, Mr. Branch asked you on your direct, I believe in sum and substance, if you had identified Joe Hallet as the individual you wanted to take the VP for planning and alignment position, and I believe you answered no. Do you want to elaborate on that?

A. So I am always in the process of

Page 630

recruiting talent, always. In fact, I met with a person today in my new role because I think she's an impressive person and it's someone that could play a role in my organization in the future.

Joe Hallet was one of the best program leads that I interacted with and so I was building my relationship with Joe for a long time, thinking that if something came available in my organization, he would be someone I would be interested in having join the team.

Q. And when the position for vice president for planning and alignment was posted, what was Mr. Hallet's positional level within the company, do you recall?

A. I think he was a director.

Q. Today, do you know what his positional level is?

A. Today?

Q. Yes.

A. I think he's a VP now. I think he got promoted.

Q. Mr. Branch asked you or I think you

Page 631

testified on direct that you didn't develop questions with Mr. Choi and Ms. Harris for the interview for the vice president for planning and alignment position.

A. Yes.

Q. And I think you testified that no, you did not. Could you tell me why?

A. Because Mike Choi is a vice president, which is an executive officer. I'm an executive officer and Shandell Harris is a very senior and experienced HR partner and that's just not normal business practice to do that. You assume that these individuals know how to conduct an interview and I just don't -- I've never done that.

Q. We've heard some testimony in this case about lunches and dinners. When you were working in EPMO, when, if at all, had you ever -- or had you ever taken Ana Lapera to lunch or dinner?

A. Yes. I used my lunches to network and coach employees. And so I pretty much had lunch with an employee every single day, whether it was a peer or, you know, someone who was at a level lower than I

29 (Pages 628 to 631)

Arbitration Day 3                                                November 5, 2014

Washington, D.C.

Page 632

was in the organization. And I had dinners probably two or three nights a week.

Q. Before the vice president for planning and alignment position was posted, had you gone to lunch or dinner with Joe Hallet?

A. Yes. And Ana Lapera and Nicola Fraser and a long list of other people.

Q. Again, I want you to listen to the question closely, please. How, if at all, did race, ethnicity, national origin, age, weight or body shape motivate your decision to select Nicola Fraser for the position of vice president for planning and alignment and not select Ana Lapera for that position?

A. The question was how much?

Q. No. How, if at all, did --

A. Zero. Did not.

Q. Okay. Thanks. And then we go to how, if at all, did the outward appearance of Ms. Lapera, Nicola Fraser or anyone else affect -- or pardon me. Outward appearance with regard to bodily condition or characteristics, manner or style of dress and manner

Page 633

or style of personal grooming, including, but not limited to, hairstyle and beards affect that decision?

A. Not at all. They were all three very professionally dressed.

Q. Mr. Branch, on your direct examination, read to you testimony from your deposition in this case and I'll read it over again here. "Did you tell Ms. Lapera that Ms. Lapera, she lacked executive presence?

"Answer: Yes." And then he asked you, "What did you mean by executive presence?" You answered, "Executive presence. There are books written about executive presence, but executive presence is some combination of self-confidence and charisma and personal appearance and your communication style. And in Ana's case, I was giving her feedback on her communication style and I think we've already covered the specifics of my feedback."

Okay. So my question: In that testimony there, is there any connection -- or what connection, if any, is there between Ana's communication style

Page 634

and the definition that you had given of -- or the personal appearance and your definition of executive presence?

A. Can you repeat the question that you want me to answer? I understand the testimony, but I'm not clear on what the question is you want me to answer.

Q. Okay. What your testimony was -- you said you gave Ms. Lapera feedback on her communication style.

A. Yes.

Q. What, if any, reference would that communication style have to personal appearance?

A. Oh. None.

Q. Okay. With respect to any criticism of Ms. Lapera's executive presence --

A. Yes.

Q. -- that you may have had of her executive presence --

A. Yes.

Q. -- what, if any, basis for that was her personal appearance?

Page 635

A. None.

Q. Okay. You talked about a rating of 1 that was given for Ms. Lapera's rating for the year 2012 on your direct, correct?

A. Yes.

Q. What, if anything, did you have to do with respect to any other executives in the company to see that Ms. Lapera got that 1?

A. So the calibration sessions -- actually, if you go to more than one, you first have a calibration session within your own team and then those get combined with the next layer of the organization. In this case, it's the CFO. And he challenged me did I want to give Ana Lapera a 1 and I defended it and said, yes, I did.

MR. WILSON: No more questions, Your Honor.

JUDGE ROBERTSON: Anything further, Mr. Branch?

MR. BRANCH: Yes.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

30  (Pages 632 to 635)

Arbitration Day 3                                                November 5, 2014

Washington, D.C.

Page 636

Q.    Ms. Gehring, for the interviews for the VP of planning and alignment, did you conduct any of those interviews over lunch?

A.    You know, you asked me this during the deposition. I honestly don't remember. I don't remember. I could have, yes, because it is ordinary practice, when a candidate comes in, that someone takes them to lunch. But I don't decide who that is, right? It just shows up on my calendar and that's what I do. So it's possible that I took Nicola to lunch or -- it could be. I don't remember.

Q.    Did you take Ms. Lapera to lunch as part of the interview?

A.    I don't -- that, I don't think I did, because I remember Ana being in my office.

Q.    At the calibration session, is it true that the rating that an employee receives goes through a vetting process where other people who have worked with that employee are permitted to offer their opinion of the employee's performance?

A.    Yes.

Q.    And is it true that for Ms. Lapera to get

Page 637

this rating of a 1 through this calibration session, that meant that the folks who had worked with Ms. Lapera had to agree that her rating should be a level 1?

A.    No.

Q.    And why not? How could she get a rating of level 1 if the people who worked with her did not agree with it?

A.    The ultimate person who decides the rating is the employee's manager and the manager's manager and on up. But feedback is solicited from a broader group.

Q.    And the broader group that you're referring to are these folks who would have worked with Ms. Lapera during the course of the year?

A.    Yes.

Q.    And so after the feedback from the group that Ms. Lapera -- or individuals Ms. Lapera would have worked with for that year, the recommendation was that she receive a level 1 rating; is that correct?

A.    Yes, I supported that. Yes, I supported

Page 638

that.

Q.    Is it true that, during this conversation with Ms. Keller where there was some comment about her clothing fitting her, that at some point you turned to Ms. Lapera and told her, "I could help you look better as well"?

A.    Ana Lapera was not in the room when we had that conversation. That was a private conversation.

MR. BRANCH: No additional questions, Your Honor.

MR. WILSON: Your Honor, if I may, just one.

JUDGE ROBERTSON: Go ahead.

RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q.    Ms. Gehring, why did you select Nicola Fraser for the vice president for planning and alignment position?

MR. BRANCH: Objection. That's beyond --

MR. WILSON: Well, no, I forgot the question on my direct.

JUDGE ROBERTSON: I'll allow it. I mean,

Page 639

it's all going to be -- go ahead. Ask your question. It's the next thing to a leading question, but go ahead.

MR. WILSON: It's open-ended.

JUDGE ROBERTSON: It's a softball. Go ahead and answer the question.

THE WITNESS: I'm going to answer the question. Look, in my role leading the EPMO, it seemed like a process improvement project, if that goes astray, I can fix that. I just go fix the project, do damage control, no problem.

If I put someone in front of the board of directors, FHFA, Treasury and they communicate in an unprofessional way, my judgment of talent comes into question and I just wasn't willing to take that risk. And Nicola Fraser had preexisting relationships with the entire executive team, including Tim Mayopoulos and Dave Benson and many others on the executive team. She had previous relationships with FHFA and Treasury and had successfully presented to them on numerous occasions. And she had previous relationships with the board of directors. She had

31 (Pages 636 to 639)

Arbitration Day 3

Washington, D.C.

November 5, 2014

## Page 640

prepared numerous, numerous, numerous presentations for these groups and that was the critical piece that was missing that I needed to hire. And so that's why I hired Nicola is I had to have someone who could do that.

MR. WILSON: That's it for me, Your Honor.

MR. BRANCH: Just a couple of follow-up.

JUDGE ROBERTSON: You may follow-up.

FURTHER REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. So Ms. Gehring, is it true that Ms. Fraser began employment in 2008 at Fannie Mae?

A. I don't know.

Q. And what period of time was it that Ms. Fraser -- or I'm sorry, what position did Ms. Fraser hold when she presented these numerous, numerous, numerous presentations before the board and regulators and other senior officials at Fannie Mae? What was her title?

A. She was a vice president in the Financial Planning and Analysis group.

Q. Okay. So is it true that Ms. --

## Page 641

A. She prepared all the analysis on credit losses.

Q. She what?

A. She prepared all the analysis on credit losses.

Q. Okay. And is it true that Ms. Fraser became a vice president at Fannie Mae in early 2012?

A. I don't know.

Q. Were there any occasions where you observed Ms. Lapera making presentations to the board of directors or senior officials at Fannie Mae?

A. Yes.

Q. When did she make a presentation --

A. Not the board, but senior leaders.

Q. Was that during the time when you were at EPMO?

A. No. It was when I ran Financial Planning and Analysis.

Q. So on how many occasions did you observe Ms. Lapera making presentations to senior officials at Fannie Mae?

A. I don't know. A handful. But including

## Page 642

me, maybe a lot.

Q. Well, setting yourself aside, on how many occasions did you witness her making presentations to senior officials at Fannie Mae when you were at FP&A?

A. A handful. Three maybe.

Q. Maybe three times?

A. Yes.

Q. Okay. And on how many occasions did you observe Ms. Lapera making presentations to the federal regulators?

A. I didn't.

Q. All right. So your conclusion that Ms. Lapera could not present to federal regulators or senior officials at Fannie Mae was based on observing her on three occasions make presentations?

A. No. Ana Lapera presented to me once a week at least. So my evaluation of her was also based on her ability to present to me. If an individual can't present to the senior vice president, you typically don't let them go on and present to the CFO or the board of directors or the regulators.

## Page 643

Q. Do you know if Ms. Lapera had previously made presentations to the CEO, CFO, the regulators --

MR. WILSON: Your Honor, objection. This kind of goes well beyond my one question.

JUDGE ROBERTSON: Oh, I don't think so. Overruled. You can answer the question.

THE WITNESS: No, I don't know. I don't. Again, this was my personal experience. I was the hiring manager.

MR. BRANCH: No additional questions.

JUDGE ROBERTSON: All right. I think that completes your testimony. Thank you very much.

THE WITNESS: Thank you, sir.

MR. WILSON: Thank you, Ms. Gehring.

(Recess.)

Whereupon,

NICOLE HARRIS WESTBROOK,

was called as a witness by counsel for Plaintiff, and having been previously duly sworn by the Notary Public, was examined and testified as follows:

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                November 5, 2014

Washington, D.C.

Page 648

still at level M, correct?

A.  Yes.

Q.  And the four employees that you compared her to were below level M.  They were at L or below, is that correct?

A.  In 2011, there was a change to -- I'm sorry, I'm not going to get her last name right. Amilda.

Q.  Okay.  So she became the director of financial analysis.

A.  Yes.

Q.  Through midyear 2011.

A.  Yes.

Q.  And her position was at a level N, correct?

A.  Yes.

Q.  And Ms. Lapera's position was still at a level M.

A.  Yes.

Q.  And throughout this period, Ms. Lapera's position could have been moved to a level N, correct?

A.  Yes, the position could have been

Page 649

re-leveled.

Q.  And through the yearend of 2011, is it true that all of the four employees that you compared Ms. Lapera to had their positions moved to a level N while Ms. Lapera remained at a level M?

A.  So they did move to the N.  I don't know the circumstances off the top of my head.

Q.  And once they moved to a level N, their bonus could be up to 35 percent of their base salary?

A.  Thirty-five percent would have been the target.

Q.  And so from 2009, all the way until the end of 2011, Ms. Lapera's position remained a level M; is that correct?

A.  Yes.

Q.  While employees who started out at grades lower than Ms. Lapera in 2009 actually were at the level -- N level by the end of 2011; is that correct?

A.  Yes.  Based on being promoted and the positions they moved into.

Q.  Well, they were all in director level positions, correct?

Page 650

A.  They all are director level positions.

Q.  And there was some testimony concerning the fact that there was a recommendation that Ms. Lapera's salary be adjusted, I think, to the top range of $194,000 a year.

A.  Yes, there was a PEP request.

Q.  And so why was her salary not adjusted?

A.  So that decision would have been that of the business.  It wouldn't have been a compensation decision.

Q.  When you say it would have been the decision of the business, who are you referring to?

A.  It would have been her management.

Q.  So do you know why her salary was not adjusted at the time that the recommendation was made that her salary be adjusted in midyear 2011?

A.  I don't know why her management decided not to make the increase.

Q.  Just one additional question on this chart.  So is it true that when Ms. Lapera's salary was actually raised to the level N, that there was no increase in her base salary?  In other words, at the

Page 651

end of 2011, her base salary was 183,888?

A.  That's correct.

Q.  And when her position was leveled to the N level, her base salary -- annualized salary remained at $183,888?

A.  That's true.

Q.  Do you have an explanation of why there was no adjustment in her salary when it went from an M to an N?

A.  Sure.  So when level grade changes are made, they're not always -- they don't always come with base salary increases.  If an individual is well within the salary range, an increase may not be made. So I believe the midpoint for the N is 175,000 and so at 183, almost 184, that would have been well within the range.

Q.  Who made the decision that there would be no adjustment in her salary when the position went from M to an N?

A.  So I don't believe that compensation made a recommendation to increase the salary and I don't believe there was an ask by the business to increase

34 (Pages 648 to 651)

Page 652

the salary.

Q. But compensation had previously requested that her salary be increased to 194,000, so there would be something like an 18 percent difference between her salary and the person that she supervised?

A. Yes. We made a recommendation at that time, because there wasn't another differentiator, meaning there were folks reporting in to Ms. Lapera that were at the M, but with the move to the position, there was differentiation there with the long-term incentive piece. So total comp opportunity is differentiated.

Q. When Ms. Lapera's position was re-leveled, was this re-levelling in the same job family?

A. When the re-levelling occurred, this was when the new job family came into play. So prior was the Lean Six Sigma job family. The new job family was process improvement.

Q. Was anyone else reclassified at the time Ms. Lapera's position was reclassified?

A. So I don't believe there were other grade

Page 653

level changes, but there were others who had title changes to move them into the process improvement family.

Q. Just so that we're clear on this point, I believe you testified previously that in April 2011, when you received notice that Ms. Lapera was interested in having her position changed, the only thing that you received from Shandell Harris was a position description for Ms. Lapera.

A. That's the only thing that I recall.

MR. BRANCH: No additional questions.

MR. WILSON: I'd like to ask a question. It's not within the scope of the redirect, if I could ask the Court's indulgence. It's very brief.

JUDGE ROBERTSON: You may open another door, but go ahead.

RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. When was the restatement at Fannie Mae?

A. The financial restatement?

Q. Yes.

A. It was ongoing when I joined in 2005. So

Page 654

I believe it started in probably 2004 and ran through part of 2006.

MR. WILSON: That's it.

JUDGE ROBERTSON: Thank you, Ms. Harris. You're excused.

THE WITNESS: Thank you.

(Ms. Harris exited the arbitration room.)

JUDGE ROBERTSON: Now I think we're ready for a general recess. Ten minutes or so.

(Recess.)

JUDGE ROBERTSON: Okay. Folks, where are we at?

MR. BRANCH: From the claimant's perspective, Your Honor, we have two additional witnesses, Leslie Arrington and James Tomasello.

JUDGE ROBERTSON: Now, in light of Ms. Gehring's testimony, which we said after which we would review at least the Tomasello thing, what does Tomasello add or clarify?

MR. BRANCH: I think he's going to dispute, for the most part, just about -- I won't say everything, but a good part of what Ms. Gehring

Page 655

testified to. He was interviewed as part of an investigation. I have a copy of some of the notes -- or I have the notes from the interview. It's not complete, but I have notes from the interview.

He apparently reported to the investigator that Ms. Gehring was more positive about women who were slender and well dressed. He was present at this calibration session. Well, staff meetings as well. All of these staff meetings that Ms. Gehring claims that Ms. Lapera would interrupt and make disruptive comments. He was present at this two-day training session with the consultant, has comments about it was all about appearance, not skills, that he believed it was inappropriate.

JUDGE ROBERTSON: Okay. Fine. You can have Tomasello. What about Arrington?

MR. BRANCH: Arrington actually did the investigation for compliance and ethics. So in addition to Mr. Tomasello, she interviewed all of the other employees -- or a number of other employees as part of the investigation. So we're not trying to call all these different employees, but we have some