## JAMS ARBITRATION

| | |
|---|---|
| ANA LAPERA | ) |
| Claimant | ) |
| v. | ) No. 1410006405 |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION | ) |
| Respondent. | ) |

## CLAIMANT'S ANSWERS TO RESPONDENT'S FIRST SET OF INTERROGATORIES AND RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS

Claimant Ana Lapera, by and through counsel, and files Claimant's Answers and Responses to Fannie Mae's First Set of Interrogatories and Document Requests.

## GENERAL OBJECTIONS

The Claimant hereby makes the following objections to each and every Interrogatory. These objections are not waived even if some objectionable information is made available to the Respondent; nor does the Claimant by supplying the requested information waive any objection to the admission into evidence of any response on the grounds of relevance, materiality or any other proper ground for objection.

1.    The Claimant objects to each interrogatory and request as unduly burdensome and oppressive, to the extent that it seeks information and/or the production of materials that have already been made available to the Respondent or are already in the Respondent's possession.

2.    The Claimant objects to each interrogatory and request to the extent that it calls for information or documents subject to the deliberative process and attorney-client privileges,

1

DEFENDANT'S
EXHIBIT

232

LAPERA DEP. EX.

NUMBER 3

documents protected as attorney work-product or materials otherwise subject to other applicable privileges or immunity.

3.    The Claimant objects to each interrogatory and request to the extent that the request seeks to require the Claimant to provide information not fully known at this time.

4.    Without waiving the above objections, the Claimant will provide only relevant, non-privileged information currently available to her. The Claimant further qualifies that each answer and response to request for production of documents below with the fact that discovery has not yet been completed and additional facts and witnesses may be discovered in the future.

## Interrogatories

1. Identify all persons who have knowledge of any of the acts or matters alleged in your Demand for Arbitration.

Answer:  The following people have knowledge of any of the acts or matters alleged in my Demand for Arbitration:

| Name | Address | Relationship | Detail of knowledge |
|---|---|---|---|
| Jesus Lapera | PO Box 5, Wicomico Church VA 22579 (571)309-2418 | Husband | Very detailed based on what I told him |
| Gaby Lapera | 105 N 8th Street #507 Lincoln NE 68508 (703)347-2371 | Daughter | Medium detail based on what I told her |
| | | | |
| Anne Gehring | Unknown | Fannie Mae's Hiring Manager, SVP of the Enterprise Program | Very detailed since she approved the job description, selected the candidates, and made the decision to hire. She also led previous calibration session |

2

|  |  | Management Office (ePMO) |  |
|---|---|---|---|
| Claude Wade | Unknown | SVP EPMO, Ms. Lapera's manager in 2009 | Very detailed on Ms. Lapera's requests to have her position level adjusted to reflect the responsibilities associated with the position |
| Cristina Miranda |  | Former Director of Communication in Fannie Mae | Hispanic woman, who was fired as part of a "reduction in force" in her 9 month of pregnancy. Her position was reposted shortly thereafter and awarded to an slender blonde Caucasian woman |
| Otto Schulz | Dow Jones | Former Director of Communication in Fannie Mae | Hispanic men over 50 years old, who was fired by a "reduction in force" after 15 years of service at Fannie Mae |
| Amalia Garcia Kastberg | Enterprise Community Partners | Former VP of Communication in Fannie Mae | Hispanic woman, waited almost 1 year acting as interim VP prior to been confirmed in the position |
| Maria Villar |  | Former VP of Data in Fannie Mae | Hispanic over 50 years old woman, who was not given the support needed to perform her work |
| Judy Major | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | MHA National Partner Outreach | Hispanic woman overweight over 45 years old, who has not been promoted to Director in spite of her achievements and responsibilities associated to her position |
| Leslie Zimmerman | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | Fannie Mae's Ethics | Very detailed since she conducted an associated Ethics investigation |
| Shandell Harris | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | Fannie Mae's HR Business Partner | Very detailed since she participated in the hiring process and interviews. She also has direct knowledge of my previous requests to adjust my grade since she was the HR Business Partner supporting Claude Wade |

3

| Kathleen Keller | 20279 Doswell Pl Ashburn VA 20147 (571)918-1011 | Fannie Mae's VP, whose position was being replaced | Key circumstantial knowledge since she witnessed Anne's demeanor towards older and overweight people |
|---|---|---|---|
| Nicola Frazer | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | Fannie Mae's VP, who was awarded the position | High circumstantial knowledge since she went through the interview process and has witnessed Anne's demeanor towards older and overweight people |
| Mike Choi | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | VP in ePMO | Medium circumstantial knowledge since he, Anne and Shandell were the people who interviewed the candidates for the position; he also participated in prior Calibration Session |
| Jim Tomasello, Keith Smith, Hieu Nguyen, Amilda Gjecovi | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | Directors in the ePMO team | Medium circumstantial knowledge since they participated in prior Calibration Sessions and Anne's leadership meetings, witnessing Anne's demeanor towards older and overweight people |
| Amit Mayabhate, Mohit Kashyap, Dina Purcell, Patricia Brumbaugh, Alicia Collins, Dan Cousino, Farley Price | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | Members of the ePMO Team | Low detail of knowledge; they all knew that I had been interviewed for the position and that I was rejected due to lack of "executive presence", which was shocking and disappointing to them. They also participated in the mandatory "Image" training that Anne sponsored for the members of the ePMO |
| Michael Chen-Young | Prospect Mortgage | Former VP, Strategic Analytics & Finance Transformation | Direct knowledge of Anne Gehring's attitude towards overweight people |

4

2. For each person identified in your response to Interrogatory No. 1, set forth in detail the knowledge that such person has about the facts or matters alleged in your Demand for Arbitration.

Answer: See Answer to question 1, column "Detail of Knowledge"

3. Identify the specific amount of money that you are seeking in this arbitration for each of the following: compensatory damages, punitive damages, front pay, back pay, attorneys' fees, expert fees, pre-judgment interest, post-judgment interest, and costs.

Answer: I am seeking total compensation damages of $859,874.00 based on total compensation loss calculation due to early separation from Fannie Mae. I am seeking compensatory and punitive damages for pain and suffering caused by humiliation and lack of closure of my professional career at Fannie Mae of $500,000. I am seeking all attorneys fees at the Laffey rate published by the U.S. Attorneys Office for the District of Columbia.

4. For each of the amounts set forth in your response to interrogatory No. 3, state how you have calculated that amount and the basis for your calculation.

Answer: See Answer 3.

5. Identify all the efforts you have made in an attempt to mitigate the injury(ies) and/or damage(s) that you allegedly suffered as a result of the unlawful discrimination against you by Fannie Mae as alleged in the Demand for Arbitration.

Answer: My intent was to continue working and retire from Fannie Mae at the age of 62. However, my tenure was cut short due to the untenable position where I found myself after not being selected for the position and having to work for Ms. Frazer, who was less qualified from

5

the experience and leadership perspective than I was for the position. Therefore, I diligently sought consulting assignments to minimize the loss of income which would have resulted from leaving my employment at Fannie Mae. Benefits, such as vacations, 401 K contributions, etc. that are derived from full time employment are not available to me. In addition, material compensation will never be enough to mitigate the pain and suffering from the irrefutable proof that my career at Fannie Mae was limited by the way I look, despite my professional results, dedication and leadership skills.

6. Identify each of the peers being referenced in you're the statement in Paragraph 8 of your Demand for Arbitration that "all of her [Ms. Lapera's] peers in the EPMO were classified under an "N" salary ..."

Answer: That statement refers to Jim Tomasello, Keith Smith, and Amilda Gjecovi, and indirectly to Lea Nicotra. The first three people were already identified in the response to Interrogatory No. 1. Lea's identification is below:

| Name | Address | Relationship |
|------|---------|--------------|
| Lea Nicotra | Fannie Mae 3900 Wisconsin Av NW Washington DC 20016 (202)752-7000 | Former member of ePMO, who got promoted to Director of Project Management in Capital Markets at a Level N |

7: For each person that you have described as being "overweight," "slender," or "not overweight" in your Demand for arbitration, state each such person's height and weight at all times relevant to the allegations in your Demand For Arbitration.

Answer: I have no way of knowing the exact height and weight of the persons named, so the numbers below describe them to the best of my ability.

6

| Name | Est. Height | Est. Weight in lbs. | Est. Dress Size |
|---|---|---|---|
| Ana Lapera | 5' 7" | 220 | 2X |
| Anne Gehring | 5' 9" | 160 | 8 |
| Lea Nicotra | 5' 9" | 150 | 4 |
| Jim Tomasello | 5' 8" | 250 | Men's 48 |
| Keith Smith | 6' 1" | 180 | Men's 34 |
| Claude Wade | 5' 9" | 170 | Men's 34 |
| Kathleen Keller | 4' 8" | 180 | 2X |
| Blythe Neumiller | 5' 8" | 230 | 3X |
| Patricia Brumbaugh | 5' 9" | 210 | 2X |
| Dina Purcell | 5' 2" | 190 | 1X |
| Joseph Hallet | 6' 0" | 190 | Men's 38 |
| Shandell Harris | 5' 4" | 150 | 6 |
| Nicola Frazer | 5' 8" | 170 | 12 |

8. How do you know or determine that someone is "overweight" and "slender?"

Answer: As the table above indicates, the criteria that I used is the dress size of a person, with women who wear 1X or above and men who wear 44 or above being overweight, and women who wear 6 or below classified as "slender".

9. With respect to the allegation in your Demand For Arbitration that "Respondent discriminated against Ms. Lapera in the classification of her position at a lower grade than other employees who did comparable or less work" (Demand For Arbitration, paragraph 36; *see also id.* Paragraph 42), identify each such employee who you claim did comparable or less work.

Answer: That statement refers to Michael MacFarland, Jim Tomasello, Keith Smith, and Amilda Gjecovi, and indirectly to Lea Nicotra.

10. Identify by date each "evaluation" as to which you allege that Fannie Mae "discriminated in the evaluation of her [i.e., Ms. Lapera's] performance which resulted in lower compensation" (*see* Demand For Arbitration ¶ 36 and ¶ 42).

Answer:  The lower compensation resulted from the fact that the level of my position was lower than it should have been given my level of responsibility and experience.  A lower level M inherently had lower salary and bonus potential than a level N.  These evaluations occurred on the bonus awarded on 2/14/2010, 4/20/2011 and February 2012; and lack of salary increase in 2011 and 2012 resulting from having reached the salary ceiling for a position classified as an M.

8

11. Prior to filing the Demand For Arbitration, to whom at Fannie Mae, and when (by date), did you ever complain or give notice about any of the allegations of discrimination that you make as set forth in your Demand For Arbitration?

Answer: I complained to no avail when my position was categorized as Level M instead on N in 2009. I wrote e-mails to Claude Wade (my manager) and shared my frustration with the HR Business Partners. I also complained to Kathy Keller when she became my manager. She was able to successfully obtain the re-classification of the position by HR and Compensation, despite the fact that my responsibilities were exactly the same. I did not receive a salary adjustment when the position was re-classified. I complained to Anne Gehring immediately after she told me of her decision to select Ms. Frazer for the position. By that time, I had already seen several examples of employees that had taken their claims to HR and/or Ethics, where the results always had negative consequences to the employee, so I decided to take legal action instead.

12. If you contend that you were qualified for the Vice President of EPMO-Planning and Alignment position for which you allegedly applied at the time you applied for that position, *see. e.g.* Demand for Arbitration ¶ 21, state all facts on which you base your contention.

Answer: It is incorrect to state that I "allegedly applied" for the position. I applied and was selected as a viable candidate for the position. Unfortunately, I do not have the position description since I never imagined that I would have to sue Fannie Mae to obtain justice.

9

However, the table below compares my recollection of the position's requirement against my qualifications:

| Position Requirements | Qualifications |
|---|---|
| Understanding of strategic planning, business architecture and process improvement | I have been with the ePMO since 2009, when it was formed, which enabled me to understand all the strategic initiates funded and establish a relationship with the stakeholders.  Furthermore, I was a direct contributor to the plan adopted in 2011, supported by the framework created by my team, under the direction of Kathy Keller.<br><br>I also have the ideal background combining business, technology and program management required for this position. |
| Leadership experience | I have a demonstrated track record as a leader, and was already managing 80% of the team reporting to the position. |
| Influencing skills | I cultivated the respect of key stakeholders, and had the influencing skills that were key success factors for the success of this position. |
| Results orientation | I have been consistently selected for challenging assignments throughout my career in Fannie Mae, and have a strong track record of delivering results. Examples include: coordination of Year 2000 test efforts for Fannie Mae technology application with external customers; set up of the Dedicated Channel Infrastructure; program management of the Amortization effort during Restatement; establishment of a successful process improvement practice at Fannie Mae; re-alignment of the Business Architecture practice in Fannie Mae as a vehicle to align business needs to technology investments. |
| Team development | I have a demonstrated track record in forming successful teams and developing individuals, who were able to deliver successful results for Fannie Mae. |
| Education | I have a Master's Degree in Engineering Administration, plus certifications as ASQ Black Belt, and The Open Group Architecture Framework (Levels 1 & 2) |

10

13. Identify every reason provided to you why Ms. Fraser was selected for the Vice President of EPMO-Planning and Alignment position for which you allegedly applied (including but not limited to any reasons conveyed by Ms. Gehring or Ms. Harris).

Answer:   As stated in the Demand for Arbitration, both Ms. Gehring and Ms. Harris, indicated that "executive presence" was the only differentiator for selecting Ms. Fraser over me. It was really strange that they both used the same term. They were both complimentary of my leadership skills, and results.

14. State all the reasons why you believe Ms. Fraser was selected over you for the position of Vice President of EPMO-Planning and Alignment.

Answer: In addition to the reasons stated in the Demand for Arbitration, I believe that Ms. Gehring chose Nicola Fraser as VP of ePMO Planning and Alignment because of their close relationship and shared outlook. Ms. Gehring had previously worked with Ms. Fraser, and had sponsored Ms. Fraser to become VP of Finance. While working in Finance, Ms. Gehring had sponsored several projects for my Process Improvement team, with Ms. Fraser as the administrative lead. These projects gave me the opportunity to work closely will both of them, and to observe their close relationship, where Ms. Fraser would not question any of Ms. Gehring's decisions, and shared her perspective on the way team members should look and behave.

11

15. State all the reasons why you believe Ms. Fraser was selected over Mr. Hallet for the position of Vice President of EPMO-Planning and Alignment.

Answer: See Answer 14. I believe the decision to award the position to Ms. Fraser was done well before the position was posted, and before the interviews were conducted.

16. Identify every reason provided to you why Mr. Hallet and any other person who applied for Vice President of EPMO-Planning and Alignment position for which you also allegedly applied was not selected to fill that position (including but not limited to any reasons conveyed by Ms. Gehring or Ms. Harris).

Answer: It is not correct to state that I "allegedly applied" for the position. I applied and was selected as a viable candidate for the position. I did not ask and was not given any reason for the elimination of the remaining internal candidates.

17. With respect to the allegations in Paragraph 26 of your Demand For Arbitration, that Ms. Gehring commended you "for transferring Ms. Neumiller …[,]" identify when you "transferred" Ms. Neumiller, to where you "transferred" her, and why you "transferred" her.

Answer: The Business Architecture team came under my leadership in August 2012. Ms. Neumiller was part of the original Business Architecture team transferred to me. Subsequently, following several conversations with Ms. Neumiller and at her request, I transferred Ms. Neumiller from the Business Architecture team to the Securitization team sometime around September/October 2012. Ms. Neumiller indicated that she thought she would have more

12

professional opportunities in the Securitization team given Ms. Gehring's approach and attitude towards people that were different than her, particularly older and overweight.

18. Identify every fact on which you base your allegation that "executive presence" was Ms. Gehring's euphemism for employees who were racial minorities, older, and overweight. *See* Demand for Arbitration ¶ 30.

Answer: It is impossible to state every fact on which I base my claim. However, below are a few examples of Ms. Gehring's attitudes towards racial minorities, older and overweight people.

a. When Ms. Gehring became SVP of ePMO she indicated that she was going to "re-shape" the team to ensure that every member had the appropriate "executive presence", which she further elaborated to mean looking like consultants. At that point, she specifically asked Kathy Keller and me to direct my team to dress up to ensure that attire was better suited to overweight and older staff; she explicitly mentioned Ms. Brumbaugh and Ms. Purcell, and said that I could do better too.

b. Ms. Gehring mocked FHFA's staff during a Town Hall session with the entire team because of their looks (polyester shirts, pen pockets) and age. She indicated that they didn't know what they were doing, and couldn't survive in corporate America with that appearance.

c. Ms. Gehring hired KPMG as consultants for some elements of the ePMO plan. She frequently indicated that she could see how smart the KPMG consultants were by just looking at their blue eyes, and praised their executive presence.

d. Ms. Gehring during the 2012 calibration specifically challenged my assertion that Ms. Brumbaugh's performance deserved to be qualified as a 2 "Consistently Exceeds Expectations" because of her appearance. Furthermore, she lowered Ms. Brumbaugh's rating after I left the session.

e. Ms. Gehring indicated that the performance of Shirley Cruz Rodriguez (Hispanic female) would not be better than 3 (Meets Expectations) unless her accent improved, despite the fact that Ms. Cruz Rodriguez consistently produced excellent results and her clients loved her.

f. Ms. Gehring with the support of Ms. Harris, was relentless in forcing Kathy Keller (my manager at the time, female over 50 and overweight) to resign from her position at Fannie Mae. Ms. Gehring frequently mentioned lack of "executive presence", and even told Ms. Keller that she would be happy to take her shopping "because she knew what it was like to be fat, and all the tricks to hide it".

19. State what you understood Shandell Harris to mean by "executive presence" in her statement to you as alleged in Paragraph 21 of your Demand for Arbitration.

Answer: Shandell Harris clarified at the beginning of the interview that she was only qualified to evaluate my leadership skill for the job, not my technical skills. I understood Shandell Harris to mean by the term "executive presence" that I was too old and overweight for the job since she had seen me display in numerous occasions the leadership skills (setting direction, taking command of a room or situation, and influencing stakeholders) that were critical for the position.

20. Have you ever used the term "executive presence" in any of your discussions or communications at Fannie Mae or elsewhere in a manner that does not connote the characteristics that you allege in your Demand For Arbitration (*i.e.*, being a minority, overweight, and/or older)?

Answer: Objection, vagueness. I used the term with my team when Ms. Gehring directed me to ask my staff to dress better, in particularly Ms. Brumbaugh and Ms. Purcell, who are overweight, and I explicitly told them that Ms. Gehring had mentioned that they had to be mindful of their executive presence and be careful to ensure that their "tummy didn't show". I have used the term "executive presence", and to me, it means ensuring that one is appropriately dressed for the role being performed, is able to command the attention of the group, and direct them towards action.

21. If your answer to Interrogatory No. 20 is in the affirmative, state what you meant by "executive presence" in each instance for which you used that term.

14

Answer:  See Answer to question 20.

22. State your height, weight, and waist size at each time in which Fannie Mae Allegedly discriminated against you as Demand For Arbitration.

Answer:  Those dimensions are the same as they are now. I'm 5'7", weight approximately 220 pounds and my waist is 42 inches.

23. Identify every person who you believe or know to have had their position at Fannie Mae reclassified from "M" to "N" or "5" to "6" at any time from June 1, 2009 to February 28, 2012.

Answer:  I don't know every person that was classified in such manner, but Fannie Mae can look into its records for this information.   However, I do know that Ted Carter and Michael MacFarland's positions were classified from 6 to N in June 2009.   Ted Carter and Michael MAcFarland were my colleagues and had similar level of responsibility. All Program Management director positions, such as the one that Jim Tomassello and Lea Nicotra occupied were classified as N.  Furthermore, Fannie Mae can look into its own records to see its own pattern of discrimination against female Hispanic employees by simply calculating the ratio of Hispanic women with levels 6 (or M) and higher in the DC area over the total number of employees year over year in the DC area.

24. Identify all your efforts to obtain employment since your employment at Fannie Mae ended and in anticipation of your employment at Fannie Mae ending.

15

Answer: I did not made any effort to obtain employment in anticipation to my employment ending at Fannie Mae. I was disappointed with the selection of Ms. Fraser for the position, and became totally distraught by her lack of competence and leadership skills in the few months that I worked for her. I was very fortunate to have establish a solid reputation in the Financial Services industry, which led to several work offers as soon as my decision to resign from Fannie Mae was public.

25. Identify all employment (whether as an employee, independent contractor, or owner of a business) that you have had since your employment at Fannie Mae, including your title(s), responsibility(ies), and your compensation in each such instance of employment.

Answer: From November 2013 till March 2014, I worked as a consultant for top tier multinational bank in New York City, assisting their Legal team as a program manager in their response to a Consent Order issued by the SEC. My rate for that engagement was $135/hour plus expenses. From mid April 2014 until now, I am consulting for a cooperative in the DC area that provides finance to build electric networks in rural communities. My main responsibilities are to ensure the timely deliver of their new Origination and Servicing system, while participating in the creation of the roadmap for the Information Technology organization. My rate is $120/hour.

I also facilitated a couple of sessions on Innovation for a medium size law firm in downtown DC in early 2014. My partner and I got paid $13,000 for the sessions.

16

**Responses to "Respondent Fannie Mae's First Set of Requests for the Production of**

**Documents and Tangible Things To Claimant Ana Lapera"**

1.  All documents that (a) are referenced in your Demand for Arbitration, (b) that you reviewed in preparing your Demand For Arbitration, and/or (c) that you rely upon to support the allegations, claims and relief requested in your Demand for Arbitration.

Response:  Claimant is producing all responsive documents in her possession.  See the following

Exhibits in response to your request:

1.1. Ana Cristina Lapera's resume at the time the Vice President of EPMO-Planning and Alignment position was posted
1.2. Roster of positions reporting to the Vice President of EPMO-Planning and Alignment position
1.3. Set of e-mails demonstrating Ana Lapera's results, influencing skills and leadership abilities
    1.3.1.  E-mail from David Hisey (CFO)
    1.3.2.  E-mail from Ed Watson (COO and CIO)
    1.3.3.  E-mail from Ed Watson (COO and CIO)
    1.3.4.  Patent award
    1.3.5.  E-mail from Ms. Gehring and Ms. Fraser congratulating the team led by Kathy Keller and Ana Lapera on the results from the Board meeting presenting the plan and associated metrics
    1.3.6.  Ms. Lapera's salary history
    1.3.7.  Key points of new compensation structure – Summer 2009
    1.3.8.  E-mail from Claude Wade acknowledging Ms. Lapera's challenge to the position classification in July 2009
    1.3.9.  Organizational Chart for Ms. Lapera's team in November 2009
    1.3.10. E-mail from Ms. Harris acknowledging Ana Lapera's request to have her position re-evaluated
    1.3.11. Ms. Lapera's Job Summary, with salary range for Level N
    1.3.12. Ms. Lapera's Rating History
    1.3.13. 2012 Compensation Guide
    1.3.14. Position description for "Director of Operational Excellence and Lean Six Sigma" – Level M
    1.3.15. Job description for "Director, Middle Office" – Dir Proj Management – Level N
    1.3.16. 2013 Mid Year Review for Ana Lapera
    1.3.17. 2012 Year-End Review for Ana Lapera
    1.3.18. 2012 Mid Year Review for Ana Lapera

      1.3.19. 2011 Year-End Review for Ana Lapera

      1.3.20. 2011 Mid Year Review for Ana Lapera

      1.3.21. 2010 Year-End Review for Ana Lapera

      1.3.22. 2010 Mid-Year Review for Ana Lapera

      1.3.23. 2009 Year-End Review for Ana Lapera

      1.3.24. Ms Lapera's Org Chart as of September 2013

      1.3.25. Ms Lapera's Org Chart as of 1Q2012

      1.3.26. Process Improvement Job Family

      1.3.27. Job Summary – Dir Process Improvement (Level M)

      1.3.28. Job Summary – Dir Process Improvement Strategy (Level N)

   1.4. Ana Lapera's Compensation Statements

      1.4.1. 2012

      1.4.2. 2011

      1.4.3. 2010

      1.4.4. 2009

   1.5. Material from training class: "Image Impact: Your Professional Presence" – October 2012

   1.6. Excerpts from Fannie Mae's Human Resources Policy and Practice Handbook, August 14, 2012

   1.7. E-mail from Kathy Keller recognizing the team for Mike William's (CEO) acknowledgement of results

2. All documents that (a) are referenced in your answers to Respondent Fannie Mae's Set of Interrogatories to Claimant Ana Lapera (the "Interrogatories"), (b) that you reviewed in preparing your answers to the Interrogatories; or (c) that you rely upon to support your answers to the Interrogatories.

   • See all Exhibits in response to Request 1.

3. All documents which you used or which you base your calculation(s) for the amounts of compensatory damages, punitive damages, front pay, back pay, attorney's fees, expert fees, pre-judgment interest, post-judgment interest, and costs set forth in your answers to Interrogatory Nos. 3 and/or 4 of the Interrogatory.

Response: Claimant is producing all responsive documents in her possession.

   • See Exhibit 3, plus Exhibits: 1.3.13, 1.3.7, 1.4

4. All written or recorded statements that you or anyone acting on your behalf obtained from any person concerning any of the allegations in your Demand For Arbitration.

Response: Claimant has no responsive documents.

5. All versions of your resume or c.v. since the time you left the employ of Fannie Mae.

Response: Claimant is producing all responsive documents in her possession.

- See Exhibit 5.1: Ana Lapera's resume December 2013
- See Exhibit 5.1: Ana Lapera's resume March 2014
- See Exhibit 5.1: Ana Lapera's resume March 2014 – Coaching and Facilitation Experience

6. All documents relating to your allegations that Fannie Mae "denied Ms. Lapera a promotion to the position of Vice President of Planning and Alignment on the basis of her race and personal appearance", including those document o which you rely to support that allegation. *See* Demand For Arbitration ¶ 30.

Response: Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 1.

7. All documents relating to your allegation that Fannie Mae "discriminated against Ms. Lapera in the classification of her position at a lower grade than other employees who did comparable or less work resulting in the loss of compensation ... on the basis of her race," including those documents on which you rely to support that that allegation. *See* Demand For Arbitration ¶ 36.

Response: Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 1.

8. All documents relating to your allegation that Fannie Mae "discriminated in the evaluation of her [i.e., Ms Lapera's] performance which resulted in lower compensation ... on the basis of her race,", including those documents on which you rely to support that allegation. *See* Demand For Arbitration ¶ 36.

Response: Claimant is producing all responsive documents in her possession.

19

- See all Exhibits in response to Request 1.

9. All documents relating to your allegation that Fannie Mae "denied Ms Lapera a promotion to the position of Vice President of Planning and Alignment on the basis of her race," including those documents on which you rely to support that allegation. *See* Demand For Arbitration ¶ 36.

Response: Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 1.

10. All documents relating to your allegation that Fannie Mae "knowingly and intentionally subjected Claimant to discrimination based on her race, Hispanic American, when Respondent classified her position at a lower grade than other employees who did comparable or less work resulting in loss of compensation from 2009 through the present, "including those documents on which you rely to support that allegation. *See* Demand For Arbitration ¶ 42.

Response: Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 1.

11. All documents relating to your allegation that Fannie Mae "knowingly and intentionally subjected Claimant to discrimination based on her race, Hispanic American, when Respondent ... discriminated against her in the evaluation of her performance which resulted in lower compensation," including those documents on which you rely to support that allegation. *See* Demand For Arbitration ¶ 42.

Response: Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 1.

12. All documents relating to your allegation that Fannie Mae "knowingly and intentionally subjected Claimant to discrimination based on race, Hispanic American, when Respondent ... denied Ms. Lapera a promotion to the position of Vice President of Planning and

20

Alignment," including those documents on which you rely to support that allegation. *See* Demand For Arbitration ¶ 42.


Response:  Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 1.


13. All documents relating to your efforts to mitigate the injury(ies) ad damage(s) that you allegedly suffered as a result of the unlawful discrimination against you by Fannie Mae, as alleged in the Demand For Arbitration.


Response:  Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 5, and answers to Interrogatory 24.


14. Documents sufficient to identify all your efforts to obtain employment (whether as an employee, independent contractor, or owner of a business) since (a) your employment at Fannie Mae ended and (b) in anticipation of your employment in Fannie Mae ending.


Response:  Claimant is producing all responsive documents in her possession.

- See all Exhibits in response to Request 5, and answers to Interrogatory 24.


15. Documents sufficient to identify all employment (whether as an employee, independent contractor, or owner of a business) since (a) your employment at Fannie Mae ended, including documents sufficient to identify your title(s) and responsibility(ies) in each such instance of employment, the dates in which you held each such instance of employment, and the amount of compensation that you received in each such instance of employment.


Response:  The Claimant objects to this request as irrelevant since she is not claiming pay for the

period since she ended her employment in Fannie Mae

21

16. All documents containing or reflecting: (a) complaints or notifications that you made to a Fannie Mae employee, contractor, or consultant, the Fannie Mae ethics or compliance departments, about any of the discriminatory acts you suffered, as alleged in your Demand For Arbitration and (b) responses to those complaints or notifications by Fannie Mae.

Response:  Claimant is producing all responsive documents in her possession.

* See all Exhibits in response to Request 1, in particular, Exhibits: 1.3.8, 1.3.10.

17. All documents containing criticism of your job performance at Fannie Mae, your ability to do your job at Fannie Mae, or your ability to do a prospective job at Fannie Mae.

Response:  Claimant is producing all responsive documents in her possession.

* See Exhibits 1.3.16 to 1.3.23 for performance evaluations.
* See Exhibits 13.1 to 1.3.5, and 1.7.

18. All documents, including those consisting of communications, by which you were informed that you had not been selected for the Vice President of EPMO-Planning and Alignment position for which you allegedly applied.

Response:  Claimant has no responsive documents.  Fannie Mae should have the evaluation forms that must be completed after each interview in its Taleo repository.

19. All documents containing a reason(s) provided to you why you or any other person was not selected for the Vice President of EPMO-Planning and Alignment position for which you allegedly applied (including but not limited to reasons conveyed by Ms. Gehring and/or Ms. Harris).

22

Response: Claimant has no responsive documents.  Fannie Mae should have the evaluation forms that must be completed after each interview in its Taleo repository.

20. All documents containing a reason(s) provided to you why Ms. Fraser was selected for the Vice President of EPMO-Planning and Alignment position for which you allegedly applied (including but not limited to reasons conveyed by Ms. Gehring and/or Ms. Harris).

Response: Claimant has no responsive documents. Fannie Mae should have the evaluation forms that must be completed after each interview in its Taleo repository.

21. All documents, including documents reflecting communications, that contain the phrase "executive presence" that you authored or conveyed while at Fannie Mae, or that any Fannie Mae employee, contractor, or consultant sent to you or made available to you.

Response: Claimant is producing all responsive documents in her possession.

- See Exhibit 1.5 in response to Request 1.

22. With respect to the allegation in your Demand For Arbitration that "Respondent discriminated against Ms. Lapera in the classification of her position at a lower grade than other employees who did comparable or less work" (Demand For Arbitration ¶ 36; see also id ¶42), documents sufficient to identify: (a) each such employee referenced in the allegation, (b) the work performed by the employee, and (c) the title, duties and work attendant to the position of the employee.

23

Response: Claimant is producing all responsive documents in her possession.

- See Exhibits 1.3.14 and 1.3.15 in response to Request 1 for a sample in the discrimination in the job classification.

23. With respect to your allegation in your Demand For Arbitration that "... Ms. Lapera's grade remained 'M', while all of her peers in the EPMO were classified under an 'N' salary grade" (Demand For Arbitration ¶ 8), documents sufficient to identify: (a) each such employee referenced in the allegation, (b) the work performed by the employee, and (c) the title, duties and work attendant to the position of the employee.

Response: Claimant is producing all responsive documents in her possession.

- See Exhibits 1.3.14 and 1.3.15 in response to Request 1 for a sample in the discrimination in the job classification.
- See response to Interrogatory 6.

Respectfully submitted,

/s/ David A. Branch

David A. Branch
Law Offices of David A. Branch & Associates, PLLC
1828 L Street, NW, Suite 820
Washington, DC 20036
(202) 785-2805

24

### CERTIFICATE OF SERVICE

I hereby certify this 25th day of July  20114, the foregoing Claimant's First Set of

Discovery was served on Counsel for Respondent:

Joe Wilson
Damien G. Stewart

/s/ David A. Branch
David A. Branch

1