

THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

**TO RESPONDENT:** Federal National Mortgage Association
(Name of the Party on whom Demand for Arbitration is made)

Address 3900 Wisconsin Avenue, NW

City: Washington    State/Province: DC    Zip: 20016

Telephone    Fax:    Email:

Representative/Attorney (if known) Madonna McGwin
(Name of the Representative/Attorney of the Party on whom Demand for Arbitration is made)

Address. 3900 Wisconsin Avenue NW

City: Washington    State/Province: DC    Zip: 20016

Telephone.    Fax    Email madonna_a_mcgwin@fanniemae.com

**FROM CLAIMANT (name):** Ana Lapera

Address: P.O. Box 5

City: Wicomico Church    State/Province: VA    Zip: 22579

Telephone:    Fax    Email

Representative/Attorney of Claimant (if known) David A Branch
(Name of the Representative/Attorney of the Party Demanding Arbitration)

Address: 1828 L Street NW, Suite 820

City: Washington    State/Province: DC    Zip 20036

Telephone: 202-785-2805    Fax 202-785-0289    Email. dablaw@erols com

**Nature of Dispute:** Claimant hereby demands that you submit the following dispute to final and binding arbitration (a more detailed statement of the claim(s) may be attached).

Dispute: See attached.

Updated 7/1/2013
Resolution Centers Worldwide • 1 800.352 5267 • www.jamsadr com

(c) copyright 2013 JAMS All rights reserved

**DEFENDANT'S EXHIBIT 227**

**LAPERA DEP. EX. NUMBER 2**



THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

**Arbitration Agreement:** This demand is made pursuant to the arbitration agreement which the parties made as follows (cite location of arbitration provision and attach two (2) copies of entire agreement).

Arbitration Provision Location | See attached

**Claim & Relief Sought By Claimant:** Claimant asserts the following claim and seeks the following relief (including amount in controversy, if applicable).

Claim: | See attached.

**Response:** Respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. Send the original response and counter-claim to the claimant at the address stated above with two (2) copies to JAMS.

**Request for Hearing:**

JAMS is requested to set this matter for hearing at: Washington, DC

(Preferred Hearing Location)

**Election For Expedited Procedures (Comprehensive Rule 16.1)**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

Signed (Claimant):
(may be signed by an attorney) | *[signature]* | Date: 10/24/2013

Type / Print Name: David A. Branch

Please include a check payable to JAMS for the required initial, non-refundable $400 per party deposit to be applied toward your Case Management Fee and submit to your local JAMS Resolution Center.



THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

## COMPLETION OF THIS SECTION IS REQUIRED FOR CLAIMS INITIATED IN CALIFORNIA

A. Please indicate if this ☐ IS or ☒ IS NOT a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

   1) The contract is with a consumer party, as defined in these standards;

   2) The contract was drafted by or on behalf of the non-consumer party, and

   3) The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following.

   1) An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;

   2) An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;

   3) An individual with a medical malpractice claim that is subject to the arbitration agreement; or

   4) An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

B. If this is an EMPLOYMENT matter, Claimant must complete the following information:

Effective January 1, 2003, private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

Annual Salary.  ☐ Less than $100,000          ☐ More than $250,000

                ☐ $100,000 to $250,000        ☒ Decline to State

C. In California, consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information.

(c) copyright 2013 JAMS. All rights reserved

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of October, 2013, I served by electronic mail the foregoing Demand for Arbitration on counsel for Respondent listed below:

Madonna McGwin
madonna_a_mcgwin@fanniemae.com

David A. Branch

## JAMS ARBITRATION

ANA LAPERA )
P.O. Box 5 )
Wicomico Church, VA 22579 )
)
    Claimant )
)
    v. )
)
FEDERAL NATIONAL MORTGAGE )
ASSOCIATION )
3900 Wisconsin Avenue, NW )
Washington, DC 20016-2892 )
)
    Respondent. )

## DEMAND FOR ARBITRATION

Claimant Ana Lapera, by and through her attorneys, files this Demand for Arbitration against Federal National Mortgage Association ("Fannie Mae"), and for her Demand states as follows.

1.    Claimant Ana Lapera seeks relief pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and the D.C. Human Rights Act, D.C. Code Ann. § 2-1401 et seq. ("DCHRA") including but not limited to declaratory, injunctive and other equitable relief, and compensatory and punitive damages, litigation expenses and reasonable attorneys fees, based on Fannie Mae's deprivation of rights to Ms. Lapera.

2.    As evidence of Fannie Mae's discriminatory practices, Ms. Lapera alleges the following specific examples of disparate treatment.

1

3.      Fannie Mae engaged in discrimination against Ms. Lapera on the basis of race and personal appearance in compensation, evaluation of performance and promotions.

### Parties

4.      Ana Lapera is a Hispanic American, a citizen of the United States, a resident of the Commonwealth of Virginia, and an employee of Fannie Mae.

5.      Respondent Fannie Mae, is a Government Sponsored Enterprise (GSE) with corporate headquarters in Washington, D.C.   Respondent is an employer within the meaning of the DCHRA.

### Facts

6.      Ms. Lapera is a Hispanic female who is 55 years old and has a body size which may be perceived by some as being overweight.   During Ms. Lapera's approximately twenty years of service with Fannie Mae, she has consistently been awarded performance ratings of "Exceeds Expectations" or higher.   She earned a Gold Belt from Six Sigma Academy in 2007, which includes a Black Belt education, plus training in Change Management.   Also, Ms. Lapera has received frequent commendations and accolades for her exceptional performance and unique contributions.   For instance, she was selected to be a representative for the Technology Compensation Advisory Group from 2003 to 2005, the Vice President of Internal Affairs of the Hispanic Employee Network Group from March 2008 to 2009, and a speaker and facilitator for the 2009 "Mentoring Circles" program.   Ms. Lapera has a thorough and unique understanding of the Process Improvement Strategy team because she has worked with the team since its inception, earned a Black Belt certification, and she was instrumental in establishing the Multiyear Investment Plan.   Ms. Lapera's team is currently comprised of twenty-two of the thirty

2

individuals in the Planning and Alignment team of the Enterprise Project Management Office ("EPMO"). Her supervisor is Anne Gehring (Caucasian, approximately 50 years old, slender), EPMO Senior Vice President.

7.      In June 2009, Fannie Mae announced a restructuring of salary scales using an A-Z scale, whereby the most prestigious, demanding and highly compensated positions were classified by letters later in the alphabet. Pursuant to this restructuring, Ms. Lapera received notice that her position, Director of Lean Six Sigma, would be reclassified on August 16, 2009 from a "6" salary grade to an "M" salary grade under the new structure, even though her duties and responsibilities would remain the same.

8.      The position of Director of Lean Six Sigma should have been classified as an "N," rather than an "M," in light of the demanding duties of this position. Ms. Lapera's consistently exemplary performance, and the classifications of similar positions, such as Directors of Project Management. Despite her multiple requests for a reclassification of her position, Ms. Lapera's grade remained "M", while all of her peers in the EPMO were classified under an "N" salary grade. Specific examples include Lea Nicotra (Caucasian, early 30s, slender), Jim Tomasello (Caucasian, late 40s, overweight), and Keith Smith (African American, mid to late 40s, slender), who were assigned significantly less responsibility than the Director of Lean Six Sigma, and were classified under an "N" salary grade. Further, when the Middle Office Director position was posted for hiring (posting #30224), the position was classified as an "N," even though the position only required a Bachelor's degree and eight years of experience, while the position of Director of Lean Six Sigma required a Master's degree and ten to fifteen years of experience.

3

9. The classification of Ms. Lapera's position as an "M" significantly limited her potential for salary increases and, consequently, pension benefits, because her salary as Director of Lean Six Sigma was near the top of the "M" salary scale. The salary range for an "M" was $112,000 to $194,000, whereas the salary range for an "N" was $129,000 to $222,000. Further, Ms. Lapera's bonus potential, at an "M" salary grade was 20 percent of her annual salary. Her bonus potential as an "N" would have been 35 percent of her annual salary.

10. On July 18, 2009, Ms. Lapera emailed Claude Wade (African American male, 45 years old, not overweight), the Senior Vice President of Operations Risk and Process Excellence and Ms. Lapera's manager at that time, challenging the classification of her position as an "M." Mr. Wade denied Ms. Lapera's challenge to the salary grade of her position. In April 2011, Ms. Lapera again challenged the classification of her position at an "M" salary grade. Her challenge was denied on April 26, 2011.

11. Ms. Lapera believes she was discriminated against with regards to her pay when her position, Director of Lean Six Sigma, was improperly re-classified as an "M" rather than an "N" between August 16, 2009 and February 26, 2012.

12. In February 2012, Kathy Keller, the Vice President of EPMO-Planning and Alignment and Ms. Lapera's supervisor, resubmitted Ms. Lapera's request for her position to be reclassified as an "N." In response to Ms. Keller's request, on February 26, 2012, Ms. Lapera's position was reclassified as an "N" and her position title was changed to Director of Process Improvement Strategy. Ms. Lapera did not receive an increase in salary at this time, and the duties and responsibilities of her position were not changed pursuant to the reclassification. Following the reclassification, she received a $48,772 bonus and LTI totaling $24,022.

4

13.     Fannie Mae underwent a change in leadership in September 2012 and Ms. Gehring was appointed the EPMO Senior Vice President. Ms. Gehring began to target employees who did not meet her standard of an ideal personal appearance, which was Caucasian, young, and slender. She expressed dissatisfaction with the personal appearance and dress of the EPMO team and frequently stated that members of the EPMO team had to maintain a "sharp appearance." Also, Ms. Gehring said that she "only want[ed] people working in the EPMO that have the appearance of a business consultant." even though the Fannie Mae's dress code was business casual.

14.     In September 2012, Ms. Gehring began to criticize the appearance of Blythe Neumiller (Caucasian, 60s, overweight) and Patricia Brumbaugh (Caucasian, mid 40s, overweight). During a meeting between Ms. Gehring, Ms. Lapera, and Kathy Keller (Caucasian, late 40s, overweight), Ms. Gehring inappropriately commented about "the way [Ms. Neumiller and Ms. Brumbaugh] were sitting and dressed." She declared that Ms. Neumiller would never be permitted to represent the EPMO team because of "the way that she walk[ed] and sat" and because of the way she dressed. At that time, Ms. Gehring began to regularly use Ms. Neumiller and Ms. Brumbaugh as examples of employees who did not "fit the team's image." On a number of occasions, she referred to Ms. Neumiller and Ms. Brumbaugh as "these people" and criticized "the way they conduct[ed] themselves", "the way they s[a]t", and the way "their tummies sometimes show[ed]."

15.     In October 2012, Ms. Gehring pressured the EPMO staff to attend a class on improving one's "image." During this meeting, an image consultant provided fashion advice to the EPMO staff, such as stating that female employees should always wear makeup and eye makeup and should never wear perfume. Also, the image consultant stated that employees should refrain from wearing colors that clash with their skin color. The consultant said. "In certain cultures, it

5

is acceptable to wear bright colors. You are here, in corporate America, and you must conform to the norm by not wearing bright colors." After this meeting, Ms. Brumbaugh and Dina Purcell (African American, 30s, overweight) expressed concerns that their physical appearance would negatively impact their careers.

16.    Ms. Gehring used the term "executive presence" as a euphemism for the appearance of employees who were minorities, older, and overweight. She consistently characterized employees who were not Caucasian, young, and slender as lacking "executive presence," which is a highly suspect term that specifically refers to the subjective assessment of an individual's appearance. Ms. Gehring has indicated that Ms. Brumbaugh, Ms. Neumiller, and Ms. Purcell lack "executive presence."

17.    In December 2012, Ms. Gehring and other managers of the EPMO team had a Calibration Session to discuss the annual performance of EPMO team members. During a discussion of Ms. Brumbaugh's performance, Ms. Gehring spent an inordinate amount of time discussing Ms. Brumbaugh's appearance, stating that she did not like the way Ms. Brumbaugh dressed or "the way she look[ed]." Ms. Gehring asked Ms. Lapera, "How can you rate [Ms. Brumbaugh] as 'Exceeds Expectations' if she lacks executive presence." Ms. Lapera replied that Ms. Brumbaugh "exceeded expectations regarding her results and leadership characteristics." Due to her lack of "executive presence," Ms. Gehring downgraded Ms. Brumbaugh's performance rating from "Exceeds Expectations" to "Meets Expectations."

18.    In April 2013, Ms. Lapera heard Ms Gehring inform another overweight employee, "I'm going to take you out shopping. I can help you, I know how it is because I used to be fat too."

6

19.    On May 30, 2013, Ms. Keller resigned from her position as Vice President of EPMO-Planning and Alignment. In June 2013, Fannie Mae solicited applications for Ms. Keller's prior position, Vice President of EPMO-Planning.

20.    Ms. Lapera applied for the position of Vice President of EPMO-Planning and Alignment and was informed by Ms. Gehring that there were 12 internal candidates for the position. Ms. Lapera was notified on July 11, 2013 that she was one of three individuals who had been selected to interview for the open position. Ms. Fraser and Joseph Hallet (Caucasian, early 30s, not overweight) were also selected to interview for the position. Ms. Fraser was, at that time, a Vice President. Neither Ms. Lapera nor Mr. Hallet was a Vice President.

21.    Ms. Lapera was scheduled for multiple interviews on Monday, July 15, 2013. During Ms. Lapera's interview with Ms. Gehring, Ms. Gehring stated that Ms. Lapera was a valuable member of the team who had done "a fantastic job turning around the Business Architecture Department." Ms. Gehring said she would announce the new Vice President on Friday, July 19, 2013, only four days after the interviews. Next, Shandell Harris (African American female, mid 40s, slender), Human Resources Business Partner, interviewed Ms. Lapera and indicated that Ms. Lapera's only weakness in her leadership skills was her lack of "executive presence." Ms. Harris also declared that Ms. Gehring would announce her selection for the Vice President of EPMO-Planning and Alignment on Friday, July 19, 2013.

22.    The process for promoting a Fannie Mae employee to the position of Vice President requires the employee to conduct additional interviews with a panel of three Vice Presidents and, usually, the President of Fannie Mae, a process that takes longer than one week to complete. Thus, an employee who was not classified as a Vice President could not be selected for

7

promotion to a Vice President position within a week. Ms. Fraser was the only candidate for the position who could have been promoted within one week of her interview.

23.    On Thursday. July 18. 2013. Ms. Gehring requested a meeting with Ms. Lapera. During this meeting. Ms. Gehring informed Ms. Lapera that Ms. Fraser had been selected for the position of Vice President of Planning and Alignment. She said that Ms. Lapera was a strong candidate for the position but her sole weakness was her "executive presence." Ms. Lapera responded that she already knew that Ms. Fraser would be selected for the position because Ms. Gehring and Ms. Harris provided that the announcement of their selection would take place on Friday. July 19. 2013. Ms. Gehring did not deny this charge and. instead. said that Ms. Lapera was "very perceptive." Ms. Lapera relayed her concerns that Ms. Fraser's inexperience would make it very difficult for her to understand the needs of the EPMO Planning and Alignment staff. Ms. Gehring acknowledged Ms. Fraser's inexperience and suggested that Ms. Fraser would receive Process Improvement training.

24.    Ms. Fraser was significantly less qualified for the position than Ms. Lapera because Ms. Lapera had worked with the EPMO team since its inception and excelled as the Director of Process Improvement Strategy. In contrast. Ms. Fraser had no background in Process Improvement or Business Architecture. even though 80 percent of the staff in the Planning and Alignment team works in these areas. Also, Ms. Fraser's management experience was obtained from working with a significantly smaller and more junior team than Ms. Lapera's team.

25.    Ms. Gehring announced on Friday. July 19. 2013 that Ms. Fraser had been selected for the position of Vice President of EPMO-Planning and Alignment.

8

26. On August 7, 2013, Ms. Gehring met with Ms. Lapera to issue her midyear review and invited Ms. Fraser to attend the meeting. Ms. Gehring declared that Ms. Lapera was a top performer and a "rock star" and commended Ms. Lapera for transferring Ms. Neumiller because Ms. Gehring "couldn't ever see [Ms. Neumiller] conforming to the team's image." Ms. Gehring stated that Ms. Lapera's only weakness was her "executive presence," even though Ms. Lapera always dressed in an undeniably professional manner based on Fannie Mae's dress code.

## COUNT I
### Violation of the District of Columbia Human Rights Act
### (Race and Personal Appearance Discrimination)

27. Claimant realleges and incorporates by reference paragraphs 1 through 26 above as if set forth fully herein.

28. At all pertinent times, Respondent was an employer under the District of Columbia Human Rights Act, D.C. Code Ann. Sec. 2-1401 et seq. of the District of Columbia Code.

29. The D.C. Human Rights Act prohibits discrimination in employment based on an individual's race and personal appearance.

30. Respondent, in violation of the D.C. Human Rights Act, knowingly and intentionally engaged in unlawful discrimination against Claimant based on her race and personal appearance. Specifically, Respondent routinely discriminated against staff based on their personal appearance, including discrimination in compensation; discrimination in the evaluation of performance; criticizing staff about their personal appearance; ordering staff to attend an image consultant class; characterizing overweight staff as lacking "executive presence;" lowering staff performance appraisals based on their personal appearance; denying Ms. Lapera a promotion to the position of Vice President of Planning and Alignment on the basis of her race and personal appearance. Ms. Gehring selected Ms. Fraser, who is Caucasian, in her mid 40s, and slender, for

9

the Vice President of Planning and Alignment position, even though Ms. Fraser lacked Ms. Lapera's superior qualifications and prior experience working for the EPMO team. The only reason provided for Ms. Lapera's non-selection was Ms. Gehring's characterization of her as lacking "executive presence," which Ms. Gehring used as a euphemism for employees who were racial minorities, older, and overweight.

31.    Respondent had no legitimate business reason for any such acts.

32.    Respondent is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Respondent may have engaged in other discriminatory practices that are not yet fully known.

## COUNT II
### Violation of Title VII of the Civil Rights Act of 1964 (Race Discrimination)

33.    Ms. Lapera realleges and incorporates by reference paragraphs 1 through 32 above as if set forth fully herein.

34.    At all pertinent times, Respondent Fannie Mae was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

35.    Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on an individual's race.

36.    Respondent, in violation of Title VII of the Civil Rights Act of 1964, knowingly and intentionally engaged in unlawful discrimination against Ms. Lapera based on her race. Specifically, Respondent discriminated against Ms. Lapera in the classification of her position at a lower grade than other employees who did comparable or less work resulting in loss of compensation; discriminated in the evaluation of her performance which resulted in lower compensation; denied Ms. Lapera a promotion to the position of Vice President of Planning and Alignment on the basis of her race. Ms. Gehring selected Ms. Fraser, who is Caucasian, in her

10

mid 40s. for the Vice President of Planning and Alignment position. even though Ms. Fraser lacked Ms. Lapera's superior qualifications and prior experience working for the EPMO team.

37.    Respondent Fannie Mae at all relevant times had actual and constructive knowledge of the conduct described above.

38.    Respondent Fannie Mae had no legitimate business reason for any such acts.

39.    Ms. Lapera is informed and believes. and based thereon. alleges that. in addition to the practices enumerated above. Fannie Mae may have engaged in other discriminatory practices that are not yet fully known.

## COUNT III
### Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981
### (Discrimination based on Race)

40.    Claimant incorporates by reference paragraphs 1 through 39 as if fully stated herein.

41.    The Civil Rights Act of 1866, 42 U.S.C. § 1981 provides that states that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts as is enjoyed by white citizens and prohibits an employer from discriminating against any individual with respect to the individual's compensation. terms. conditions. or privileges of employment because of such individual's race. ancestry. or ethnicity.

42.    In violation of the Civil Rights Act of 1866. 42 U.S.C. § 1981. Respondent knowingly and intentionally subjected Claimant to discrimination based on her race. Hispanic American. when Respondent classified her position at a lower grade than other employees who did comparable or less work resulting in loss of compensation from 2009 through the present: discriminated against her in the evaluation of her performance which resulted in lower compensation: and denied Ms. Lapera a promotion to the position of Vice President of Planning and Alignment on the basis of her race.  Ms. Gehring selected Ms. Fraser. who is Caucasian. for

11

the Vice President of Planning and Alignment position. even though Ms. Fraser lacked Ms. Lapera's superior qualifications and prior experience working for the EPMO team.

43.    As a result of such acts. Claimant has suffered damages.

## Prayer for Relief

WHEREFORE. Claimant Ana Lapera prays as follows:

A.    That the Arbitrator issue an Order declaring Respondent's actions to be a violation of the District of Columbia Human Rights Act. D.C. Code § 2-1401 *et seq.*. and the Civil Rights Act of 1964 and 42 U.S.C. Sec. 1981. and declaring Respondent eligible to receive equitable and other relief:

B.    Enter judgment against the Respondent:

C.    Issue a permanent injunction prohibiting Respondent from engaging in any discriminatory promotions. discipline and terminations. and retaliation:

D.    Enter judgment in favor of Claimant against Respondent for all equitable monetary damages available under the law, including but not limited to back pay and front pay in amounts to be determined at trial:

E.    Order Respondent to refrain from any retaliation against Respondent or any other person. for participating in or supporting this case in any manner:

F.    Order Respondent to pay compensatory and punitive damages in amounts to be determined at arbitration:

G.    Order Respondent to pay Claimant's reasonable attorneys' fees. expert fees. and costs: and

H.    Order Respondent to pay pre-judgment and post-judgment interest as provided by law.

12

Respectfully submitted.

David A. Branch #438764
Law Offices of David A. Branch &
Associates, PLLC
1828 L Street, NW, Suite 820
Washington, DC 20036
(202) 785-2805

13

## Dispute Resolution Policy

*Policy Effective Date:* March 16, 1998

In any work environment, job-related disputes occasionally arise. At Fannie Mae, these are usually resolved through the Company's open door policy or the efforts of Compliance & Ethics (C&E) which addresses disputes using a variety of alternative dispute resolution tools, including counseling, facilitated negotiation, mediation, and investigation/decision. With the introduction of this Dispute Resolution Policy ("Policy") certain job-related claims must go through arbitration by a neutral independent arbitrator before a suit can be brought on them in court

Arbitration is a process in which a claim is presented to a neutral person (an arbitrator) instead of to a judge or jury in court. The arbitrator makes a decision on the claim after both sides present their evidence and arguments at an arbitration hearing. The hearing is much less formal than a court trial

The effective date of the Policy is March 16, 1998. On that date, the Policy becomes a condition of employment for all Fannie Mae employees. This means that, by starting or continuing work for Fannie Mae on or after that date, each employee is indicating that he or she accepts the Policy as a condition of employment and agrees to be bound by it. Fannie Mae also promises to be bound by the Policy.

1    **Arbitration as Prerequisite to Lawsuit.**

If an employee[1] has a claim that is covered under Section 2 of this Policy, he or she must arbitrate the claim under this Policy before bringing suit on it in court.

2.    **Claims Covered by the Policy.**

The Policy applies to all claims that an employee might make against Fannie Mae (and its directors, officers, agents, or employees, in their representative capacities) involving a legally-protected right, that directly or indirectly relate to his or her employment or the termination of that employment, even if the claim is based on facts or circumstances that occurred before the effective date of the Policy. These include claims involving rights protected by any federal, state, or other governmental constitution, statute, ordinance, regulation, or common law. For example, claims asserting rights protected by the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, 42 U.S.C. § 1981, or the Family and Medical Leave Act would be covered by the Policy. The Policy does not apply to any claim that is filed in court or with the EEOC or any other administrative or fair employment rights agency before the effective date of the Policy. The Policy also does not apply to any claim made in connection with workers' compensation benefits, unemployment compensation benefits, or under any of Fannie Mae's employee welfare benefit, ERISA, or pension plans, or to any claim of unfair competition, disclosure of trade secrets, or breach of trust or fiduciary duty. The Company may assert that the employee's claim is barred because it does not involve a legally-protected right, and the arbitrator may be requested to rule

---

[1]    As used in the Policy, the word "employee" includes current or former Fannie Mae regular, term, and temporary employees (including paid interns). Independent contractors and third party contract employees are not covered by the policy.

on this issue as a preliminary matter before conducting a hearing on the substance of the employee's claim.

### 3.    Right to Pursue Administrative Complaints.

The Policy does not change or in any way affect an employee's right to file a charge or complaint with the EEOC or any other administrative or fair employment rights agency. During an employee's participation or involvement in any of Fannie Mae's dispute resolution processes (including arbitration under the Policy), there will be no suspension, extension, or postponement of any applicable time limit or deadline by which the employee is required to file such an administrative charge or complaint. The Policy does not bar or restrict any employee, at any time, from assisting or cooperating with any such agency's investigations or proceedings. However, if an employee has an administrative charge or complaint pending while arbitrating it under the Policy, Fannie Mae will ask the agency to suspend its proceedings while the matter is arbitrated. Regardless of whether the agency agrees to suspend its proceedings, arbitration under the Policy will proceed.

### 4.    Election of Arbitration.

If C&E has not resolved, to the employee's satisfaction, an employee's complaint involving a legally-protected right, the employee may initiate arbitration by sending a completed "Demand for Arbitration" form (which may be obtained from C&E) to J·A·M·S/ENDISPUTE ("J·A·M·S") and a copy to C&E. J·A·M·S is the independent and neutral national arbitration service that will administer all arbitrations under the Policy. If an employee submits a "Demand for Arbitration" form to J·A·M·S before C&E has investigated the claim, C&E may conduct an internal investigation while the arbitration is proceeding, and the employee will have a continuing obligation to cooperate fully and candidly with C&E investigator. At any time before the arbitration hearing is held, the parties may agree to submit the complaint to mediation.

### 5    Rules and Procedures.

Arbitration will be conducted under the rules and procedures contained in the Policy, supplemented by J·A·M·S's Arbitration Rules and Procedures for Employment Disputes ("J·A·M·S's rules"). In the event of a conflict between J·A·M·S's rules and those contained in the Policy, the Policy will prevail.

### 6    Time Limit on Submission of Claims.

In order for an employee's claim to be eligible for arbitration, J·A·M·S must receive the employee's completed "Demand for Arbitration" form within the time limit set by law for bringing suit on that claim in court. If the Company contends that the claim was not made within the time limit, the arbitrator may be requested to decide the issue before any hearing on the substance of the claim. If J·A·M·S receives the "Demand for Arbitration" form within the time limit for bringing suit in court, but that time limit runs out during the arbitration, the Company will agree to extend the time limit for up to 60 calendar days after the date of the arbitration decision, so that the employee has an opportunity to bring a timely suit on the claim in court, if he or she rejects the decision as provided in this Policy.

### 7.    Arbitrator Selection and Replacement.

For each arbitration under the Policy, the employee and the Company will mutually select one arbitrator from among the qualified arbitrator candidates identified by J·A·M·S. Each arbitrator candidate will have the following qualifications:

2

- attorney or former/retired judge,
- minimum of seven years' experience in legal and/or judicial practice; and
- substantial employment law experience (as determined by J A M S)

After receiving the employee's completed "Demand for Arbitration" form, J A M S will prepare and submit to the employee and the Company, a list containing five arbitrator candidates who have the qualifications stated above, together with their resumes or biographical summaries Within seven calendar days after J A M S sends the list of arbitrator candidates, each party must strike up to two names from it rank the remaining arbitrator candidates in order of preference, and return the list to J A M S. If there is more than one candidate remaining after the parties' strikes, J A M S will appoint as arbitrator the one with the highest total ranking by the parties. If a highest total ranking cannot be determined, then J A M S will designate the arbitrator from among the candidates who have not been stricken. If a party fails to send the list back to J A M S within the seven calendar days, J A M S will assume that the party has accepted all of the arbitrator candidates on the list. If, for any reason, the arbitrator is unable to fulfill his or her duties, a successor arbitrator will be chosen in this manner.

8. **Employee Participation.**

Fannie Mae will excuse from their business duties, without loss of pay or benefits, all employees (including the employee who has made the claim) who are needed to provide testimony or attend arbitration proceedings, for such time as they are needed and actively participating

9. **Representation.**

The employee may have an attorney or other representative, at his or her sole expense, present during any phase of arbitration The Legal Department will arrange for the Company's representation in arbitration However, the Legal Department may advise a manager to secure his or her own representation if it determines that the manager's interests may be in conflict with the Company's.

10. **Exchange of Information.**

The employee and Fannie Mae each will be entitled to obtain relevant information from the other prior to the arbitration hearing, through informal exchange and

- request(s) that the other party produce a reasonable number of relevant documents;
- one request that the other party answer not more than 25 relevant questions, including sub-parts;
- two or fewer "fact" witness depositions; and
- "expert" witness depositions

11. **Fees and Expenses.**

Fannie Mae will pay all arbitration filing, case management, and/or administrative fees charged by J A M S, as well as all hourly or daily fees of the arbitrator. In order to preserve the impartiality of the arbitrator, the Company will make all such payments to J A M S, and J A M S will in turn pay the arbitrator's fees An employee who chooses to have a lawyer or other representative for the arbitration must pay all of that lawyer's or representative's fees and

3

expenses In addition, each party must pay all of its own expenses for acquiring or "discovering" information or testimony (e.g., taking an individual's deposition), and the fees and expenses of its "expert" or outside witness(es).

### 12. The Arbitration Hearing.

Either party may offer as evidence, and the arbitrator may admit into the record or consider, any agreement the parties have reached for resolving any claim(s) being arbitrated, and any findings and remedial actions resulting from a Company investigation into the same or substantially similar facts underlying the claim(s) being arbitrated

### 13. The Award.

The arbitrator's decision ("Award") will consist of a written statement of disposition and relief, if any, and a written statement of reasons supporting the disposition and relief, if any. The Award will be based on the facts and the prevailing judicial interpretation of applicable law. The arbitrator may award any remedy or relief to the employee that is consistent with the arbitrator's authority under the law governing the employee's claim, including attorneys' fees and expenses The Award is admissible as evidence in any litigation or proceeding on any claim arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration.

### 14. Rejection/Acceptance of the Award.

The employee may, *within 30 calendar days of the date of issuance of the Award,* reject it, in its entirety, by sending a completed "Rejection of Arbitration Award" form to J A M S and C&E. If the employee rejects the Award, it will not become binding on the employee or the Company, and the employee may bring suit on the claim at his or her own expense. If the employee does not reject the Award during the 30-day period, the Award becomes binding on both the Company and the employee, and the employee may not bring suit against Fannie Mae (or its directors, officers, agents, or employees, in their representative capacities) on any claims arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration. If the employee does not reject the Award, he or she may not receive any award resulting from his or her EEOC or other administrative charge, or from any lawsuit brought by the EEOC or other administrative or fair employment rights agency on any claim arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration. If the employee has filed a charge with the EEOC or any other administrative or fair employment rights agency, Fannie Mae will notify the agency that the claim has been resolved through arbitration. At the expense of the party requesting it, any court having jurisdiction over a binding Award may enter an order giving it the force of law

### 15. Enforcement of the Award.

Proceedings to enforce, confirm, modify or vacate an Award will be subject to the standard of review set forth in the Federal Arbitration Act (FAA).

### 16. Interpretation and Governing Law.

The arbitrator will resolve all disputes over the interpretation and applicability of the Policy, and over the arbitrability of all matters presented under it. This Policy is an agreement to arbitrate pursuant to the FAA The Policy will, in all respects, be interpreted, enforced and governed under the FAA

4

17.    Severability/Waiver.

If any provision of this Policy is held to be legally invalid or unenforceable, it will not affect the remainder of this Policy, which will continue to be in full force and effect. No failure by the Company or the employee to insist on strict compliance with any part of the Policy will be interpreted as a waiver of that part of the Policy.

18.    Confidentiality and Privacy.

The entire arbitration proceeding, including all statements, documents, evidence, and the Award, is confidential and will not be disclosed to anyone other than the parties, their representatives, the J-A-M-S Case Administrator, the Legal Department, and C&E, except (i) to the extent that the parties agree otherwise in writing; (ii) as necessary to respond to a lawful order of a governmental official or agency; (iii) for use in a judicial proceeding to enforce, confirm, modify, or vacate an Award; or (iv) as offered into evidence in any litigation or proceeding on any claim arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration.

19    Employment-At-Will; Discontinuation of Policy.

Nothing in the Policy, or any of the communications or materials describing or implementing it, changes the employment-at-will relationship between Fannie Mae and its employees. The Company may discontinue the Policy at any time by giving employees 30 calendar days' written notice, but the Policy will continue to apply to all claims submitted for arbitration before or during the notice period.

20.    Complete Agreement.

This Policy is the sole and complete agreement between Fannie Mae and its employees.

5

## Dispute Resolution Policy

*Policy Effective Date:* **March 16, 1998**

In any work environment, job-related disputes occasionally arise. At Fannie Mae, these are usually resolved through the Company's open door policy or the efforts of Compliance & Ethics (C&E) which addresses disputes using a variety of alternative dispute resolution tools, including counseling, facilitated negotiation, mediation, and investigation/decision. With the introduction of this Dispute Resolution Policy ("Policy"), certain job-related claims must go through arbitration by a neutral independent arbitrator before a suit can be brought on them in court.

Arbitration is a process in which a claim is presented to a neutral person (an arbitrator) instead of to a judge or jury in court. The arbitrator makes a decision on the claim after both sides present their evidence and arguments at an arbitration hearing. The hearing is much less formal than a court trial.

**The effective date of the Policy is March 16, 1998.   On that date, the Policy becomes a condition of employment for all Fannie Mae employees. This means that, by starting or continuing work for Fannie Mae on or after that date, each employee is indicating that he or she accepts the Policy as a condition of employment and agrees to be bound by it. Fannie Mae also promises to be bound by the Policy.**

1.       **Arbitration as Prerequisite to Lawsuit.**

If an employee[1] has a claim that is covered under Section 2 of this Policy, he or she must arbitrate the claim under this Policy before bringing suit on it in court.

2.       **Claims Covered by the Policy.**

The Policy applies to all claims that an employee might make against Fannie Mae (and its directors, officers, agents, or employees, in their representative capacities) involving a legally-protected right, that directly or indirectly relate to his or her employment or the termination of that employment, even if the claim is based on facts or circumstances that occurred before the effective date of the Policy. These include claims involving rights protected by any federal, state, or other governmental constitution, statute, ordinance, regulation, or common law. For example, claims asserting rights protected by the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, 42 U.S.C. § 1981, or the Family and Medical Leave Act would be covered by the Policy. The Policy does not apply to any claim that is filed in court or with the EEOC or any other administrative or fair employment rights agency before the effective date of the Policy. The Policy also does not apply to any claim made in connection with workers' compensation benefits, unemployment compensation benefits, or under any of Fannie Mae's employee welfare benefit, ERISA, or pension plans, or to any claim of unfair competition, disclosure of trade secrets, or breach of trust or fiduciary duty. The Company may assert that the employee's claim is barred because it does not involve a legally-protected right, and the arbitrator may be requested to rule

---

[1]     As used in the Policy, the word "employee" includes current or former Fannie Mae regular, term, and temporary employees (including paid interns). Independent contractors and third party contract employees are not covered by the policy.

1

on this issue as a preliminary matter before conducting a hearing on the substance of the employee's claim.

### 3.    Right to Pursue Administrative Complaints.

The Policy does not change or in any way affect an employee's right to file a charge or complaint with the EEOC or any other administrative or fair employment rights agency. During an employee's participation or involvement in any of Fannie Mae's dispute resolution processes (including arbitration under the Policy), there will be no suspension, extension, or postponement of any applicable time limit or deadline by which the employee is required to file such an administrative charge or complaint. The Policy does not bar or restrict any employee, at any time, from assisting or cooperating with any such agency's investigations or proceedings. However, if an employee has an administrative charge or complaint pending while arbitrating it under the Policy, Fannie Mae will ask the agency to suspend its proceedings while the matter is arbitrated. Regardless of whether the agency agrees to suspend its proceedings, arbitration under the Policy will proceed.

### 4.    Election of Arbitration.

If C&E has not resolved, to the employee's satisfaction, an employee's complaint involving a legally-protected right, the employee may initiate arbitration by sending a completed "Demand for Arbitration" form (which may be obtained from C&E) to J·A·M·S/ENDISPUTE ("J·A·M·S") and a copy to C&E. J·A·M·S is the independent and neutral national arbitration service that will administer all arbitrations under the Policy. If an employee submits a "Demand for Arbitration" form to J·A·M·S before C&E has investigated the claim, C&E may conduct an internal investigation while the arbitration is proceeding, and the employee will have a continuing obligation to cooperate fully and candidly with C&E investigator. At any time before the arbitration hearing is held, the parties may agree to submit the complaint to mediation.

### 5.    Rules and Procedures.

Arbitration will be conducted under the rules and procedures contained in the Policy, supplemented by J·A·M·S's Arbitration Rules and Procedures for Employment Disputes ("J·A·M·S's rules"). In the event of a conflict between J·A·M·S's rules and those contained in the Policy, the Policy will prevail.

### 6.    Time Limit on Submission of Claims.

In order for an employee's claim to be eligible for arbitration, J·A·M·S must receive the employee's completed "Demand for Arbitration" form within the time limit set by law for bringing suit on that claim in court. If the Company contends that the claim was not made within the time limit, the arbitrator may be requested to decide the issue before any hearing on the substance of the claim. If J·A·M·S receives the "Demand for Arbitration" form within the time limit for bringing suit in court, but that time limit runs out during the arbitration, the Company will agree to extend the time limit for up to 60 calendar days after the date of the arbitration decision, so that the employee has an opportunity to bring a timely suit on the claim in court, if he or she rejects the decision as provided in this Policy.

### 7.    Arbitrator Selection and Replacement.

For each arbitration under the Policy, the employee and the Company will mutually select one arbitrator from among the qualified arbitrator candidates identified by J·A·M·S. Each arbitrator candidate will have the following qualifications:

2

- o    attorney or former/retired judge;
- o    minimum of seven years' experience in legal and/or judicial practice; and
- o    substantial employment law experience (as determined by J·A·M·S).

After receiving the employee's completed "Demand for Arbitration" form, J·A·M·S will prepare and submit, to the employee and the Company, a list containing five arbitrator candidates who have the qualifications stated above, together with their resumes or biographical summaries. Within seven calendar days after J·A·M·S sends the list of arbitrator candidates, each party must strike up to two names from it, rank the remaining arbitrator candidates in order of preference, and return the list to J·A·M·S. If there is more than one candidate remaining after the parties' strikes, J·A·M·S will appoint as arbitrator the one with the highest total ranking by the parties. If a highest total ranking cannot be determined, then J·A·M·S will designate the arbitrator from among the candidates who have not been stricken. If a party fails to send the list back to J·A·M·S within the seven calendar days, J·A·M·S will assume that the party has accepted all of the arbitrator candidates on the list. If, for any reason, the arbitrator is unable to fulfill his or her duties, a successor arbitrator will be chosen in this manner.

## 8.    Employee Participation.

Fannie Mae will excuse from their business duties, without loss of pay or benefits, all employees (including the employee who has made the claim) who are needed to provide testimony or attend arbitration proceedings, for such time as they are needed and actively participating.

## 9.    Representation.

The employee may have an attorney or other representative, at his or her sole expense, present during any phase of arbitration. The Legal Department will arrange for the Company's representation in arbitration. However, the Legal Department may advise a manager to secure his or her own representation if it determines that the manager's interests may be in conflict with the Company's.

## 10.    Exchange of Information.

The employee and Fannie Mae each will be entitled to obtain relevant information from the other prior to the arbitration hearing, through informal exchange and:

- o    request(s) that the other party produce a reasonable number of relevant documents;
- o    one request that the other party answer not more than 25 relevant questions, including sub-parts;
- o    two or fewer "fact" witness depositions; and
- o    "expert" witness depositions.

## 11.    Fees and Expenses.

Fannie Mae will pay all arbitration filing, case management, and/or administrative fees charged by J·A·M·S, as well as all hourly or daily fees of the arbitrator. In order to preserve the impartiality of the arbitrator, the Company will make all such payments to J·A·M·S, and J·A·M·S will in turn pay the arbitrator's fees. An employee who chooses to have a lawyer or other representative for the arbitration must pay all of that lawyer's or representative's fees and

3

expenses. In addition, each party must pay all of its own expenses for acquiring or "discovering" information or testimony (e.g., taking an individual's deposition), and the fees and expenses of its "expert" or outside witness(es).

## 12.    **The Arbitration Hearing.**

Either party may offer as evidence, and the arbitrator may admit into the record or consider, any agreement the parties have reached for resolving any claim(s) being arbitrated, and any findings and remedial actions resulting from a Company investigation into the same or substantially similar facts underlying the claim(s) being arbitrated.

## 13.    **The Award.**

The arbitrator's decision ("Award") will consist of a written statement of disposition and relief, if any; and a written statement of reasons supporting the disposition and relief, if any. The Award will be based on the facts and the prevailing judicial interpretation of applicable law. The arbitrator may award any remedy or relief to the employee that is consistent with the arbitrator's authority under the law governing the employee's claim, including attorneys' fees and expenses. The Award is admissible as evidence in any litigation or proceeding on any claim arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration.

## 14.    **Rejection/Acceptance of the Award.**

The employee may, *within 30 calendar days of the date of issuance of the Award*, reject it, in its entirety, by sending a completed "Rejection of Arbitration Award" form to J·A·M·S and C&E. If the employee rejects the Award, it will not become binding on the employee or the Company, and the employee may bring suit on the claim at his or her own expense. If the employee does not reject the Award during the 30-day period, the Award becomes binding on both the Company and the employee, and the employee may not bring suit against Fannie Mae (or its directors, officers, agents, or employees, in their representative capacities) on any claims arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration. If the employee does not reject the Award, he or she may not receive any award resulting from his or her EEOC or other administrative charge, or from any lawsuit brought by the EEOC or other administrative or fair employment rights agency on any claim arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration. If the employee has filed a charge with the EEOC or any other administrative or fair employment rights agency, Fannie Mae will notify the agency that the claim has been resolved through arbitration. At the expense of the party requesting it, any court having jurisdiction over a binding Award may enter an order giving it the force of law.

## 15.    **Enforcement of the Award.**

Proceedings to enforce, confirm, modify or vacate an Award will be subject to the standard of review set forth in the Federal Arbitration Act (FAA).

## 16.    **Interpretation and Governing Law.**

The arbitrator will resolve all disputes over the interpretation and applicability of the Policy, and over the arbitrability of all matters presented under it. This Policy is an agreement to arbitrate pursuant to the FAA. The Policy will, in all respects, be interpreted, enforced, and governed under the FAA.

4

17.    **Severability/Waiver.**

If any provision of this Policy is held to be legally invalid or unenforceable, it will not affect the remainder of this Policy, which will continue to be in full force and effect. No failure by the Company or the employee to insist on strict compliance with any part of the Policy will be interpreted as a waiver of that part of the Policy.

18.    **Confidentiality and Privacy.**

The entire arbitration proceeding, including all statements, documents, evidence, and the Award, is confidential and will not be disclosed to anyone other than the parties, their representatives, the J·A·M·S Case Administrator, the Legal Department, and C&E, except: (i) to the extent that the parties agree otherwise in writing; (ii) as necessary to respond to a lawful order of a governmental official or agency; (iii) for use in a judicial proceeding to enforce, confirm, modify, or vacate an Award; or (iv) as offered into evidence in any litigation or proceeding on any claim arising out of the same facts or circumstances that were raised, presented, or decided in the arbitration.

19.    **Employment-At-Will; Discontinuation of Policy.**

Nothing in the Policy, or any of the communications or materials describing or implementing it, changes the employment-at-will relationship between Fannie Mae and its employees. The Company may discontinue the Policy at any time by giving employees 30 calendar days' written notice, but the Policy will continue to apply to all claims submitted for arbitration before or during the notice period.

20.    **Complete Agreement.**

This Policy is the sole and complete agreement between Fannie Mae and its employees.