**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| ANA LAPERA | ) |
| | ) |
|    Plaintiff | ) |
| | ) |
|    v. | )    Case No. 1:15-cv-00447-BAH |
| | ) |
| FEDERAL NATIONAL MORTGAGE | )    Judge Beryl A. Howell |
| ASSOCIATION d/b/a FANNIE MAE | ) |
| | ) |
|    Defendant | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT FANNIE MAE'S MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff Ana Lapera, by and through counsel, and files this Memorandum of

Points and Authorities in Opposition to Defendant Fannie Mae's Motion for Summary

Judgment[1], and in support thereof states as follows.

## Introduction

Plaintiff Ana Lapera is a Hispanic female who was born in 1958 and was 55 years old in

2013, and has a body size which may be perceived by some as being overweight.  She began

employment at Fannie Mae in January 1994 and worked through November 1, 2013. Plaintiff

alleges that in June 2009, there was a restructuring of salary scales at Fannie Mae, and her

position, Director of Lean Six Sigma, was reclassified to an "M" salary grade under the new

structure, even though it should have been classified at the higher level "N" grade, considering

the demanding duties of her position, her consistently exemplary performance, and the

---

[1] Defendant Fannie Mae's "Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment" is cited herein as "FM Mem.", and exhibits attached thereto are cited "FM Ex. [x]."

classifications of other similar positions, such as Directors of Project Management, and the positions of Plaintiff's other peers and her subordinates. Further, Plaintiff contends that her repeated requests to have her position appropriately reclassified were ignored, until her new supervisor insisted that her position be reclassified, and at that time, she was still not provided a corresponding raise in her salary, and later, she was not compensated for an increase in her duties. In September 2012, Ann Gehring was appointed the new EPMO Senior Vice President and in this capacity, she targeted overweight, older, and minority employees for adverse action, including forcing them to resign or transfer. In July 2013, Ms. Gehring denied Ms. Lapera a promotion to the position of Vice President of EPMO-Planning, instead, pre-selecting a young, not-overweight, Caucasian employee for the position, despite the fact that Ms. Lapera's qualifications vastly exceeded the selectee's and Ms. Gehring's sole criticism of Ms. Lapera's performance was her purported lack of "executive presence," a term Ms. Gehring used as a euphemism for the appearance of employees who were minorities, older, and overweight. As a result of these acts, Plaintiff asserts claims of race, age, and personal appearance discrimination under the D.C. Human Rights Act and Section 1981 of the Civil Rights Act of 1866.

Fannie Mae has filed a Motion for Summary Judgment on all claims. First, Fannie Mae argues that Plaintiff has not presented sufficient evidence that she was targeted based on her race or personal appearance to survive summary judgment and cannot rebut Fannie Mae's legitimate justifications for her non-selection for the vice president position or for Fannie Mae's refusal to re-classify her Director position as a level "N". Summary judgment is improper because Ms. Lapera has presented both direct and indirect evidence that Ms. Gehring targeted overweight, older, and minority employees and that she used the term "executive presence" to criticize the appearance of overweight, older, and minority Fannie Mae employees and forced Hispanic and

2

overweight employees from their positions. There is also undisputed evidence that Ms. Gehring pre-selected Ms. Fraser for the vice president position, despite the fact that Ms. Fraser had no experience in working in EPMO, and Ms. Lapera was substantially more qualified for the position and there were no legitimate issues with her communication skills.

In addition, Fannie Mae asserts that Plaintiff, as a Hispanic, has no legally protected rights under Section 1981 because Section 1981 only provides a cause of action for claims of race discrimination and being Hispanic is not a race. This argument should be resoundingly rejected because it is outdated, contradicts precedent of the Supreme Court and this court, and Ms. Lapera has provided facts showing that she was discriminated against based on her Hispanic race and ethnicity, as opposed to exclusively her national origin.

Fannie Mae also contends that Plaintiff's claims of age discrimination under the D.C. Human Rights Act must be dismissed because she did not assert a separate claim for age discrimination in her Demand for Arbitration and her claims of age discrimination are time barred. However, Plaintiff asserted that Ms. Gehring discriminated against her and other age protected employees in her Demand for Arbitration, and Fannie Mae's Dispute Resolution Policy is unconscionably one-sided.

For these reasons, which are set forth fully below, Plaintiff requests the Court deny Fannie Mae's motion.

## FACTS

Plaintiff Ana Lapera is a Hispanic female who was born in 1958 and was 55 years old in 2013, and has a body size which may be perceived by some as being overweight. Tr. 28 (attached at Exhibit A); Ex B (Declaration of Ana Lapera). She worked at Fannie Mae for almost twenty years from January 1994 through November 1, 2013. Tr. 29.

Ms. Lapera holds a degree in systems engineering from Venezuela, which consisted of a five year program that required her to create a thesis dissertation, and she obtained the highest honors. Tr. 29. She also has a Master's degree in Engineering Administration from George Washington University. *Id.* Prior to her employment with Fannie Mae, Ms. Lapera was a software development and systems integration consultant who served as a technical lead for numerous federal contracts. Tr. 29-30.

During Ms. Lapera's approximately twenty years of service with Fannie Mae, she was consistently awarded performance ratings of "Exceeds Expectations" or higher. Ex. B. She earned a Gold Belt from Six Sigma Academy in 2007, which includes a Black Belt education, plus training in Change Management. Ex. B. Also, Ms. Lapera received frequent commendations and accolades for her exceptional performance and unique contributions. *Id.* For instance, she was selected to be a representative for the Technology Compensation Advisory Group from 2003 to 2005, the Vice President of Internal Affairs of the Hispanic Employee Network Group from March 2008 to 2009, and a speaker and facilitator for the 2009 "Mentoring Circles" program. *Id.* Ms. Lapera worked with the Process Improvement Strategy team since its inception, earned a Black Belt certification, and she was instrumental in establishing the Multiyear Investment Plan. *Id.*; Tr. 51-52.

### Plaintiff's Employment at Fannie Mae Before 2009

The start of Ms. Lapera's career at Fannie Mae involved the organization aspect of Fannie Mae's business, and her positions included working with technology to enable lenders to approve loans to borrowers, which would later be sold to Fannie Mae. Tr. 33. She was hired by Fannie Mae in January 1994 to work as a manager in the advanced technology division of the Information Technology department, and her responsibilities included managing projects to

improve Fannie Mae's technology, such as bringing the Internet to Fannie Mae and implementing the electronic underwriting engine and credit report services. Tr. 30-31. Next, Ms. Lapera became the development manager and leveraged the technology that she had previously introduced to the company and was responsible for vending Fannie Mae's applications through the Internet. Tr. 31. In or around 1999, Ms. Lapera was selected to coordinate Fannie Mae's efforts to ensure a smooth transition into the year 2000 by preparing and readying infrastructures to continue communicating with Fannie Mae through the transition to the year 2000, and she interacted with mortgage bankers associations and led lenders in testing Fannie Mae applications to facilitate this goal. Tr. 31, 37-38. The project was a resounding success and ninety percent of lenders' results were submitted to Fannie Mae ahead of time. Tr. 38.

Due to her exemplary performance, the flawless execution of her many projects at Fannie Mae, and the increase of her responsibilities, the President of e-Business, Mike Williams, and Ms. Lapera's direct supervisor, Director Richard McGhee, selected her for a promotion to a Director position. Tr. 40-42. Mr. Williams later recruited Ms. Lapera to serve as a project manager of the FAS 91 team, which consisted of thirty to forty people. Tr. 43, 45. She was responsible for managing the amortization engine in the operations side of Fannie Mae, which required her to coordinate with and assist both business and technical sides of Fannie Mae's business to assess each of Fannie Mae's assets and provide a specific plan of action for amortizing each asset. Tr. 34-45. This was a critical assignment, and she worked with the CFO, David Hisey, Vice Presidents Shaun Ross and Tim McLuckie, and Mike Williams to develop a successful amortization engineer, which Fannie Mae patented.

Tr. 45.  Ms. Lapera and her team were credited with creating the amortization engine, and she was congratulated for being one of the inventors of the patent.  Tr. 45, 69-70; Ex. D.

In 2008, Mike Williams, who had been promoted to president of the company, assigned Ms. Lapera to head the restructuring of operations and information technology at Fannie Mae. Tr. 46-47.  She reviewed and analyzed the processes for creating mortgage-backed securities from beginning through the end and the processes for credit management where a loan is in trouble.  Tr. 54-55.  Ms. Lapera's new responsibilities included giving reports every week to the steering committee, which consisted of Executive Vice President for Capital Market Linda Knight, President Mike Williams, and CFO Hisey, among others.  *Id*.  Mr. Williams never expressed any concerns with Ms. Lapera's ability to communicate with senior executives at Fannie Mae or her style of communication, and he had a close relationship with Ms. Lapera and trusted and valued her judgment.  Tr. 46-69.

### Selection for Director of Lean Six Sigma Team

Ms. Lapera was selected to manage the new Lean Six Sigma team in 2009, and she performed the duties of Director of Lean Six Sigma through the end of her employment with Fannie Mae.  Tr. 49, 53.  Ms. Lapera was selected for this position because of her strong background and extensive qualifications in process improvement strategies, including that she earned a black belt and certification with the American Society for Quality.  Tr. 51.  In addition, she was one of only a few individuals at Fannie Mae who had detailed knowledge of all stages of Fannie Mae's business processes.  Tr. 58.

As Director of Lean Six Sigma, Ms. Lapera was responsible for executing all of the process improvement projects for Fannie Mae and saved Fannie Mae approximately $250 million between 2009 and 2011.  Tr. 56.  She was also responsible for facilitating agreement

and on process ownership and the functions of different teams to create an agreement on the business architecture side.  Tr. 64.  This was a difficult task because Ms. Lapera had to create agreement among the Vice Presidents, despite the fact that each Vice President had to vie for a limited amount of money and would compete to show that their teams provided essential services for FM and the state of their projects.  Tr. 65.  To accomplish this, she communicated frequently with upper management, including the Executive Vice President, Ed Watson.  Tr. 65-66.  Ms. Lapera developed a strong personal and working relationship with Ed Watson, as well as most of the Vice Presidents and was adept at communicating with and working with them.  Tr. 65-67.

Ms. Lapera worked side-by-side with two other Fannie Mae team leaders, Ted Carter (African American) and Michael MacFarland (Caucasian), to manage the organization of Fannie Mae's operations.  Tr. 74, 85.  Mr. Carter was responsible for the operational risk side; Mr. MacFarland was responsible for the business architecture side; and Ms. Lapera was responsible for the process improvement side.  Tr. 74.  These three teams worked in an integrated fashion and Mr. Carter leveraged the results of Ms. Lapera's and Mr. McFarland's teams to assess operational risk.  Tr. 75.  Ms. Lapera's job was very similar to Mr. Carter's and Mr. MacFarland's positions, they had the same scope, breadth, and reach inside the company, and managed similar sized teams, but focused on different functions of Fannie Mae's operations.  Tr. 85-87.  *Compare* Ex. E, F, and G[2].  Ms. Lapera managed the largest of these three teams.  In addition, Mr. Carter and Ms. Lapera both reported directly to Claude Wade.  Ex. B ¶ 6.

---

[2] Fannie Mae produced the position descriptions for Ms. Lapera, Mr. Carter and Mr. MacFarland, but did not produce Mr. Carter's position description dated 2009.  Tr. 75-82.  However, Ms. Lapera testified that Mr. Carter's position was the same in 2009 as it was in 2007, and therefore the 2007 position description accurately reflected his duties in 2009.  Tr. 83.

**Fannie Mae's Restructuring of Salary Scales in 2009**

In June 2009, Fannie Mae announced a restructuring of salary scales using an A-Z scale, whereby the most prestigious, demanding and highly compensated positions were classified by letters in the alphabet. Ex. H. Pursuant to this restructuring, Ms. Lapera received notice that her position, Director of Lean Six Sigma, would be reclassified on August 16, 2009 from a "6" salary grade to an "M" salary grade under the new structure, even though her duties and responsibilities would remain the same. Ex. B.

The position of Director of Lean Six Sigma should have been classified as an "N," rather than an "M," in light of the demanding duties of this position, Ms. Lapera's consistently exemplary performance, and the classifications of similar positions, such as Directors of Project Management. Tr. 73-87. All of her peers in the EPMO were classified under an "N" salary grade. For example, Mr. Carter and Mr. MacFarland's positions, which were very similar to Ms. Lapera's position, were re-classified as level "N" positions. Tr. 85. Two of Ms. Lapera's direct reports were Directors, including Farley Price, who had an "M" rating and Dan Cousino, who had an "L" rating. Tr. 92. Other specific examples include Lea Nicotra (Caucasian, early 30s, slender), James ("Jim") Tomasello (Caucasian, late 40s, overweight), and Keith Smith (African American, mid to late 40s, slender), who were assigned significantly less responsibility than the Director of Lean Six Sigma, and were classified under an "N" salary grade. Ex. B. Further, when the Middle Office Director position was posted for hiring (posting #30224), the position was classified as an "N," even though the position only required a Bachelor's degree and eight years of experience, while the position of Director of Lean Six Sigma required a Master's degree and ten to fifteen years of experience. Tr. 93-97. *Compare* Ex. I, *with* Ex. E.

On July 18, 2009, Ms. Lapera emailed Claude Wade (African American male, 45 years old, not overweight), the Senior Vice President of Operations Risk and Process Excellence and Ms. Lapera's manager at that time, challenging the classification of her position as an "M." Ex. J.  Mr. Wade denied Ms. Lapera's challenge to the salary grade of her position.  Tr. 85-88.  In April 2011, Ms. Lapera again challenged the classification of her position at an "M" salary grade.  Tr. 90-92; Ex. B.  Her challenge was denied on April 26, 2011.  Tr. 97-98; Ex. K.  Despite her requests for a reclassification of her position, Ms. Lapera's grade remained "M" through early 2012.  Tr. 85, 90, 92.

The classification of Ms. Lapera's position as an "M" significantly limited her potential for salary increases and, consequently, pension benefits, because her salary as Director of Lean Six Sigma was near the top of the "M" salary scale.  Ex. B; Ex. L.  The salary range for an "M" was $112,000 to $194,000, whereas the salary range for an "N" was $129,000 to $222,000.  Ex. B; Ex. L.  Further, Ms. Lapera's bonus potential, at an "M" salary grade was 20 percent of her annual salary.  Ex. B; Ex. L.  Her bonus potential as an "N" would have been 35 percent of her annual salary.  Ex. B; Ex. L.

In May 2011, Kathy Keller became the Vice President of Planning and Alignment and Ms. Lapera's direct supervisor.  Tr. 98.  Ms. Keller was shocked when she learned that Ms. Lapera was rated an "M," rather than an "N" considering the structure of Fannie Mae and the EPMO and the functions and responsibilities of Ms. Lapera's position.  Tr. 98.

In February 2012, Ms. Keller resubmitted Ms. Lapera's request for her position to be reclassified as an "N."  Tr. 98.  In response to Ms. Keller's request, on February 26, 2012, Ms. Lapera's position was reclassified as an "N" and her position title was changed to Director of Process Improvement Strategy.  Tr. 98-101.  The reclassification was not the result of any

change in Ms. Lapera's position because her responsibilities were the same and she had the same number of direct reports in 2012 as in 2009.  Tr. 101-102.  Moreover, she did not provide any information in this request for reclassification that she had not provided to the compensation department and Human Resources in 2009 and March 2011.  Tr. 101.  Ms. Lapera did not receive an increase in salary at this time, and the duties and responsibilities of her position were not changed pursuant to the reclassification.  Ex. B.  Following the reclassification, she received a $48,772 bonus and LTI totaling $24,022.  Ex. B.

Ms. Lapera believes she was discriminated against with regards to her pay when her position, Director of Lean Six Sigma, was improperly re-classified as an "M" rather than an "N" between August 16, 2009 and February 26, 2012.  Ex. B.

### Anne Gehring Becomes Vice President of the EPMO

Fannie Mae underwent a change in leadership in September 2012 and Anne Gehring (Caucasian, approximately 50 years old, slender) was appointed the EPMO Senior Vice President.  Tr. 102-103.  During her brief tenure at Fannie Mae, Ms. Gehring had at least four complaints filed against her by Fannie Mae employees, and she had a reputation of being irrational and abrasive.  Tr. 461, 463-68, 669-670, 692-699, 713-14.  According to James Thomasello, only "God knows what [would] come out of [Ms. Gehring's] mouth."  Tr. 689.

Ms. Gehring immediately began to target employees who did not meet her standard of an ideal personal appearance, which was Caucasian, young, and slender.  She forced out a Hispanic female, Carmen Oviedo, who reported to her from her senior level position and replaced her with Mike Choi, Tr. 105-108, 729-31, and she expressed dissatisfaction with the personal appearance and dress of the EPMO team and frequently stated that members of the EPMO team had to maintain a "sharp appearance," Tr. 111-113.  Ms. Gehring said that she only wanted people

10

working in the EPMO that have the appearance of a business consultant, even though the Fannie Mae's dress code was business casual.  Tr. 128-29, 167; Ex. B.  Ms. Lapera testified that she responded by directing her staff to dress differently.  Tr. 114-15.

Ms. Lapera testified that in September 2012, Ms. Gehring began to criticize the appearance of Blythe Neumiller (Caucasian, 60s, overweight) and Patricia Brumbaugh (Caucasian, mid 40s, overweight).  During a meeting between Ms. Gehring, Ms. Lapera, and Kathy Keller (Caucasian, late 40s, overweight), Ms. Gehring commented about the way Ms. Neumiller and Ms. Brumbaugh were sitting in a meeting and how they dressed.  Tr. 111-112.  Gehring stated that Ms. Neumiller would never be permitted to represent the EPMO team because of the way that she "waddled" and sat and because of the way she dressed.  Tr. 111-115.  Ms. Neumiller wore large clothes because she was large, but her clothes fit her well.  Tr. 112.  Gehring demonstrated in a staff meeting how an obese employee, Neumiller, waddled when she walked because of her weight.  Tr. 111-115.  At that time, Ms. Gehring began to regularly use Ms. Neumiller and Ms. Brumbaugh as examples of employees who did not "fit the team's image."  Ex. B.  On a number of occasions, she referred to Ms. Neumiller and Ms. Brumbaugh as "these people" and criticized "the way they conduct[ed] themselves", "the way they s[a]t", and the way "their tummies sometimes show[ed]."  Ex. B.

As a result of Ms. Gehring's comments, Ms. Neumiller became very concerned about her future at Fannie Mae if she continued to stay on Ms. Gehring's team, and she voluntarily left the team and transferred to another team.  Tr. 114-15.  Ms. Gehring congratulated Ms. Lapera on getting Ms. Neumiller to leave the team voluntarily because she was not going to "cut it for the team."  Tr. 115.  Ms. Lapera testified that Ms. Gehring made these comments in reference to Ms. Neumiller's appearance, rather than her performance.  Tr. 115.

11

Ms. Gehring used the term "executive presence" as a euphemism for the appearance of employees who were minorities, older, and overweight.  She consistently characterized employees who were not Caucasian, young, and slender as lacking "executive presence," which is a highly suspect term that specifically refers to the subjective assessment of an individual's appearance.  Tr. 134, 166-67, 689-91.  Ms. Gehring has indicated that Ms. Brumbaugh and Ms. Neumiller lack "executive presence."  Tr. 134, 166-67, 689-91.  James Thomasello also testified that Ms. Gehring used the term "executive presence" to refer to the appearance of Fannie Mae employees and said that Ms. Gehring never made derogatory comments about slender and well-dressed women.  Tr. 714-15.

In contrast, Ms. Gehring praised a KPMG consultant, who was Caucasian, slender, and had blue eyes, for his appearance and stated that she could tell by his appearance and by looking in his eyes that he was smart, despite the fact that the KPMG consultant had repeatedly produced sub-par work.  Tr. 129-130.  Ms. Gehring also would frequently comment in the mornings about how she had just came from the gym and was eating a yogurt and banana to keep her weight and remarked that other Fannie Mae employees should follow her example.  Tr. 139.

In October 2012, Ms. Gehring pressured the EPMO staff to attend a class on improving one's "image."  Tr. 118-129.  Ms. Brumbaugh testified that this meeting was mandatory, and staff was informed that "every[one] in the EPMO needed to attend."  Tr. 183.  During this meeting, an image consultant provided fashion advice to the EPMO staff, such as stating that female employees should always wear makeup and eye makeup and should never wear perfume, and female employees with gray hair should always dye their hair and roots.  Tr. 122-124, Tr. 183.  Also, the image consultant stated that employees should refrain from wearing colors that

12

clash with their skin color. The consultant said, "In certain cultures, it is acceptable to wear bright colors. You are here, in corporate America, and you must conform to the norm by not wearing bright colors." Tr. 122. James Thomasello testified that a few female employees on his team commented that they were offended by the presentation at the class and said that the presentation was derogatory towards women and minorities. Tr. 722. After this meeting, Ms. Brumbaugh and Dina Purcell (African American, 30s, overweight) expressed concerns that their physical appearance would negatively impact their careers. Tr. 124.

Managers held yearly calibration sessions to discuss their suggested performance ratings of their subordinates and to calibrate all performance ratings in the EPMO to fit a curve. During the calibration session in December 2012, Ms. Lapera rated her team appropriately on a curve, and requested Ms. Braumbaugh be rated as a two because of the amazing deliverables that she produced in that year. Tr. 132-33. Ms. Gehring agreed that Ms. Braumbaugh's work was outstanding and that she had done a fantastic job in 2012, but said that Ms. Braumbaugh did not have "executive presence" and that Ms. Braumbaugh did not have the "look" Ms. Gehring wanted her team members to have. Tr. 133-34. Ms. Gehring spent an inordinate amount of time discussing Ms. Brumbaugh's appearance, stating that she did not like the way Ms. Brumbaugh dressed or the way she looked. *Id.* James Thomasello recalled that Ms. Gehring stated that Ms. Brumbaugh looked like a "slob." Tr. 717. Due to her lack of "executive presence," Ms. Gehring downgraded Ms. Brumbaugh's performance rating from "Exceeds Expectations" to "Meets Expectations." Tr. 135. When Ms. Lapera later asked Ms. Gehring why Ms. Brumbaugh's rating had been downgraded, Ms. Gehring responded that Ms. Brumbaugh's "appearance" was "not up to par." Tr. 135.

In addition, during the December 2012 calibration meeting, Ms. Gehring stated that she was dissatisfied with Shirley Cruz Rodriguez (Hispanic), one of Ms. Lapera's subordinates on the process improvement team, because Ms. Rodriguez had an accent. Despite the fact that Ms. Rodriguez' clients consistently expressed immense satisfaction with her work, Ms. Gehring commented that as long as Ms. Rodriguez has a Hispanic accent, she would not be able to progress or obtain any promotion at Fannie Mae.  Tr. 136-37.

Ms. Gehring also criticized Ms. Keller's appearance and weight at staff meetings. Tr. 137-138.  In April 2013, Ms. Lapera was present in a meeting with Ms. Gehring and Ms. Keller when Ms. Gehring commented about exercising and Ms. Keller's personal appearance.  Tr. 137-38, 249.  Ms. Keller told Ms. Gehring that God had made her short and fat and that there was nothing she could do about it, especially considering that she already had her clothes tailored to fit her.  Tr. 138.  Ms. Gehring did not deny that her issue with Keller's appearance was her weight, but responded that she also used to be overweight and could help Ms. Keller.  Tr. 138.  Then, Ms. Gehring turned and addressed Ms. Lapera and said Ms. Lapera could look better too.  Tr. 138-39.

Shortly thereafter Ms. Keller was forced from her position as a Vice President at Fannie Mae by Ms. Gehring.  Tr. 142-43.  Ms. Lapera recalled that Ms. Keller was cried in her office because she was forced from her position by Gehring.  Tr. 143.  Ms. Keller did not want to end her employment because she had a disabled child who required severe medical treatment and she needed to remain employed for an additional two years before he became eligible for medical benefits.  Tr. 142.  On May 30, 2013, Ms. Keller resigned from her position as Vice President of EPMO-Planning and Alignment.  Tr. 143-44.  Gehring

14

selected Nicola Fraser, a slender Caucasian female, whom she promoted from Director to Vice President, to replace Kathy Keller even though Fraser had no substantive experience in the area of responsibility.  Ex. B.

**Ms. Lapera's Non-Selection for Vice President of EPMO-Planning and Alignment**

On June 3, 2013, Fannie Mae solicited applications for Ms. Keller's prior position, the Vice President of EPMO-Planning.  Ex. M.  The deadline for applications for the position was June 10, 2013.  *Id.*  Prior to announcing the position, Ms. Gehring contacted a human resources business partner to get assistance in getting an employee through the selection process, and before a panel of officers so he could be promoted to Vice President.  Tr. 416-419; Ex. N.  That employee was Joseph Hallett, a slender Caucasian male in his 30's  who was a director.  *Id.*  Hallett was a director with experience in a limited area, and did not have the broad experience that Ms. Lapera had.  *Id.*

Ms. Lapera applied for the position of Vice President of EPMO-Planning and Alignment before the June 10, 2013 deadline.  Tr. 144-45; Ex. O; Ex. P.  On June 12, 2013, Melissa Werner, the Executive and Officer Recruiting official at Fannie Mae emailed Ms. Gehring a list of the candidates who applied for the Vice President position before the position closed and the posting was pulled.  Ex. O; Tr. 404, 426.  Ms. Fraser's name was not listed among these candidates.  Ex. O; Tr. 426.  Initially, Ms. Lapera and Joe Hallet were scheduled for an interview for the open position, but Ms. Fraser was not.  Tr. 430-431.

On June 17, 2013, after the deadline for the applications had passed, Ms. Gehring reached out to Ms. Fraser and solicited her application for the Vice President of EPMO-Planning and Alignment position.  Tr. 332.  Specifically, Ms. Gehring met with Ms. Fraser for dinner and asked her if she was interested in the position, and Ms. Fraser replied that she

would think about it.  Tr. 332.  Ms. Fraser was selected to interview for the position on July 8, 2013, before she submitted any application for the position.  Tr. 335, 434; Ex. Q.  Ms. Fraser sent her resume to Ms. Werner on July 11, 2013.  Tr. 335, 434; Ex. Q.

Ms. Lapera was notified on July 11, 2013 that she was one of three individuals who had been selected to interview for the open position.  Tr. 144-45; Ex. B.  Ms. Fraser and Joseph Hallet (Caucasian, early 30s, not overweight) were also selected to interview for the position.  Tr. 150.  Ms. Fraser was, at that time, a Vice President.  Tr. 150.  Neither Ms. Lapera nor Mr. Hallet was a Vice President.  Tr. 150.

Ms. Lapera was scheduled for multiple interviews on Monday, July 15, 2013.  Tr. 149-150.  None of the interviewers appeared to have prepared any questions any questions for Ms. Lapera in advance, and none of them took notes during the interview.  Tr. 152.  During Ms. Lapera's interview with Ms. Gehring, Ms. Gehring stated that Ms. Lapera was a valuable member of the team who had done "a fantastic job turning around the Business Architecture Department."  Ex. B.  Ms. Gehring said she would announce the new Vice President on Friday, July 19, 2013, only four days after the interviews.  Tr. 150.  Next, Shandell Harris (African American female, mid 40s, slender), Human Resources Business Partner, interviewed Ms. Lapera and indicated that Ms. Lapera's only weakness in her leadership skills was her lack of "executive presence."  Tr. 151.  Ms. Harris also declared that Ms. Gehring would announce her selection for the Vice President of EPMO-Planning and Alignment on Friday, July 19, 2013.  Tr. 150-51.

The process for promoting a Fannie Mae employee to the position of Vice President requires the employee to conduct additional interviews with a panel of three Vice Presidents and, usually, the President of Fannie Mae, a process that takes longer than one week to

16

complete.  Tr. 150, 322-23.  Thus, an employee who was not classified as a Vice President could not be selected for promotion to a Vice President position within a week.  Tr. 150, 322-23.  In fact, Melissa Werner, the Executive and Officer Hiring Lead, acknowledged that moving an employee from the position of director to vice president takes between forty-five and ninety days.  Tr. 405, 421.  Ms. Fraser was the only candidate for the position who could have been promoted within one week of her interview.  Tr. 150, 322-23.

On Thursday, July 18, 2013, Ms. Gehring requested a meeting with Ms. Lapera. During this meeting, Ms. Gehring informed Ms. Lapera that Ms. Fraser had been selected for the position of Vice President of Planning and Alignment.  Tr. 152-153.  She said that Ms. Lapera was a strong candidate for the position but her sole weakness was her "executive presence."  Tr. 152-153.  Ms. Lapera responded that she already knew that Ms. Fraser would be selected for the position because Ms. Gehring and Ms. Harris provided that the announcement of their selection would take place on Friday, July 19, 2013.  Tr. 153.  Ms. Gehring did not deny this charge and, instead, said that Ms. Lapera was "very perceptive." Tr. 153.  Ms. Lapera relayed her concerns that Ms. Fraser's inexperience would make it very difficult for her to understand the needs of the EPMO Planning and Alignment staff. Tr. 153.  Ms. Gehring acknowledged Ms. Fraser's inexperience and suggested that Ms. Lapera should not worry because Ms. Lapera would train and teach Ms. Fraser.  Tr. 153. Ms. Gehring also Ms. Gehring informed Ms. Lapera that she would love working for Ms. Fraser because she was young, energetic, and full of ideas.  Tr. 153.

Ms. Fraser was significantly less qualified for the position of Vice President of EPMO-Planning and Alignment than Ms. Lapera because Ms. Lapera had worked with the EPMO team since its inception and excelled as the Director of Process Improvement Strategy.  Tr. 156-163.

17

In fact, during the arbitration hearing, Ms. Fraser recognized that Ms. Lapera "was a subject matter expert in Lean Six Sigma and business architecture." Tr. 388. In contrast, Ms. Fraser had no background in Process Improvement or Business Architecture, even though 80 percent of the staff in the Planning and Alignment team works in these areas. Tr. 156. Also, Ms. Fraser's management experience was obtained from working with a significantly smaller and more junior team than Ms. Lapera's team. Tr. 156, 159. While Ms. Fraser's team was very, very small, Tr. 159, and she had only three direct reports, Tr. 328, Ms. Lapera's team was comprised of twenty-four of the thirty individuals in the EPMO Planning and Alignment team in 2013, Tr. 145. Ms. Fraser was hired by Fannie Mae in August 2008 and had only been employed by Fannie Mae for approximately five years at the time of her selection, whereas Ms. Lapera since 1994. Tr. 29, 319-20. Further, the highest degree Ms. Fraser holds is an undergraduate Bachelor of Arts degree from Franklin & Marshall College and does not hold any black belt certification, while Ms. Lapera has earned multiple degrees, including a Master's degree in engineering administration from George Washington University, and holds a black belt certification. Tr. 325-26.

During the arbitration hearing, Ms. Lapera compared her experience in each of the key job functions and duties of the VP of EPMO Planning and Alignment position with Ms. Fraser's experience. Tr. 156-160. First, the selectee for the position was required to "[d]evelop strong relationships with the senior leadership team on the project teams" and "communicate effectively at the highest levels of the organization." Ex. R. Ms. Lapera already had a strong relationship with the senior leadership team and the project teams, including extensive relationships with each of the project managers, while Ms. Fraser had a strong relationship solely with the CFO and finance officers. Tr. 156. Next, the selectee had to "take ownership of the overall approach for

18

managing EPMO's relationship with key external stakeholders, including FHFA[,] [and] [g]ather input and coordinate responses . . . [and] provid[e] briefings." Ex. R. Ms. Lapera had previously served in this role when she managed Fannie Mae's relationship with the mortgage bankers association. Tr. 158. In addition, the selectee was responsible for "creat[ing] and maintain[ing] tools that document the multiyear investment plan and provid[ing] the ability to quickly evaluate multiple scenarios." Ex. R. While Ms. Fraser had never worked or had any involvement in the multiyear investment plan, Ms. Lapera was part of the team that developed these tools and had extensive experience using the tools. Tr. 158. The selectee also had to "establish and groom a team of future leaders" and assess and optimize the "organizational structure" of the team. Ex. R. Ms. Fraser had only managed a very small team, and in this capacity, she demonstrated an inability to retain staff and had not groomed employees on her team. Tr. 158-59. In contrast, throughout her many years managing teams of Fannie Mae employees, Ms. Lapera demonstrated time and again that she could effectively manage, optimize, and groom large teams of employees. Tr. 158-59. Finally, the selectee had to "consistently support the goals and objectives of the broader EPMO" and "provide expert advice and interpretation of corporate governance activities." Ex. R. Ms. Fraser had no knowledge of business architecture, process improvement or the Lean Six Sigma program. Tr. 156, 162. Ms. Lapera had worked with the EPMO team since its inception, was intimately familiar with the duties of the position and the planning aspect of the position in particular, and managed twenty four of the thirty people on the EPMO team. Tr. 145-147, 159-60. Moreover, Ms. Lapera had performed all these duties in an exemplary manner, and Ms. Gehring had issued her a level one rating in her position as Director of Process Improvement. Tr. 147-48. The Vice President position was the next step upward for a top performer in Ms. Lapera's line of work. Tr. 146-47.

Fannie Mae's Executive and Officer Recruiting official, Ms. Werner, admitted that the interview process for the selection of Ms. Fraser for Vice President of EPMO-Planning and Alignment was improper.  Specifically, she stated that it was improper for an interviewer to have a lunch interview with just one applicant and not the other applicants and that applicants for a position should be scheduled for the same length interview.  Tr. 445-46.  Ms. Fraser was scheduled to meet with Ms. Gehring for an hour long lunch interview for the Vice President of EPMO-Planning and Alignment position, Tr. 337-38, Ex. S at FNMB31, while Ms. Lapera was scheduled to attend a half hour interview in Ms. Gehring's office, Ex. S at FNMB29.

Ms. Gehring announced on Friday, July 19, 2013 that Ms. Fraser had been selected for the position of Vice President of EPMO-Planning and Alignment.  Ex. B.  Ms. Gehring was responsible for selecting Ms. Fraser for the position of Vice President of EPMO-Planning and Alignment.  Tr. 402.  Ms. Fraser remained in the position for under twelve months before she attempted to transfer to a new position, and she accepted another position.  Tr. 346-47; Ex. B.

### Ms. Laper's 2013 Midyear Performance Review

On August 7, 2013, Ms. Gehring met with Ms. Lapera to issue her midyear review and invited Ms. Fraser to attend the meeting.  Ex. B.  Ms. Gehring declared that Ms. Lapera was a top performer and a "rock star" and commended Ms. Lapera for transferring Ms. Neumiller because Ms. Gehring "couldn't ever see [Ms. Neumiller] conforming to the team's image."  Ex. B.  Ms. Gehring stated that Ms. Lapera's only weakness was her "executive presence," even though Ms. Lapera always dressed in an undeniably professional manner based on Fannie Mae's dress code.  Ex. B.

20

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  There is a genuine issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  *Id.* at 250.  The court, therefore, "should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Products, Inc,* 530 U.S. 133, 150 (2000), viewing the evidence in the light most favorable to the non-moving party and according that party the benefit of all reasonable inferences.  *Anderson*, 477 U.S. at 255.  At this stage of the proceedings, the court is not to make credibility determinations or weigh the evidence.  *Reeves*, 530 U.S. at 150.  If the evidence presented on a dispositive issue is subject to conflicting interpretations or reasonable persons might differ as to its significance, summary judgment is improper.  *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  Only if, after examining the evidence, the court finds that a party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," is summary judgment appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jackson v. Finnegan*, 101 F.3d 145, 150 (D.C. Cir. 1996).  Summary judgment will only be granted in clear cases. *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (citation omitted).

Overwhelming authority acknowledges that questions of intent are for the jury, not the court, to decide.  *Beckman v. Farmer*, 579 A.2d 618, 630 (D.C. 1990) ("summary judgment is likely to be inappropriate and should be used sparingly in cases where motive or intent are

material"); *Hollins v. Federal Nat. Mortg. Ass'n*, 760 A.2d 563, 570-71 (D.C. 2000) ("Courts are justifiably hesitant to throw out employment discrimination claims on summary judgment, since they almost always involve issues concerning the employer's [] motive or intent."); *Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999) (questions of motive and intent cannot be resolved on summary judgment); *Atkins v. Fisher*, 331 F.3d 988 (D.C. Cir. 2003) (questions of intent of parties create material disputes inappropriate for decision on summary judgment). "It is the responsibility of the jury (and not the judge) . . . to pass upon the credibility of the witnesses." *Lively v. Flexible Packaging Ass'n*, 765 A.2d 954, 960 (D.C. 2001). *See also Reeves*, 530 U.S. at 151 (courts considering a motion for summary judgment "must disregard all evidence favorable to the moving party that the jury is not required to believe", e.g., self-interested testimony by decisionmakers regarding the reasons for the adverse action); *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545 1552, 143 L.Ed.2d 731 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence.").

## ARGUMENT

**I.     Ms. Lapera has presented sufficient evidence of race, age, and personal appearance discrimination to survive summary judgment.**

Fannie Mae argues that it is entitled to summary judgment on Ms. Lapera's claims of race and personal appearance discrimination because Ms. Lapera has not presented any direct or indirect evidence of discrimination related to her non-selection for the Vice President of EPMO-Planning and Alignment position or the improper classification of her position as an "M" level position. FM Mem. at 8-23. Fannie Mae's motion must fail because Ms. Lapera has presented both direct and indirect evidence that Ms. Gehring was targeted Fannie Mae employees based on their race, age, and personal appearance; Ms. Fraser was preselected for the vice president position and all justifications for Ms. Lapera's non-selection are false and pretext for unlawful

discrimination; and Ms. Lapera was treated differently than her non-protected colleagues when her position was reclassified as a level "M" position and her requests to re-level her position as a level "N" were denied, despite the fact that all of her non-protected peers were classified as level "N" employees.

**B.    Ms. Lapera has presented overwhelming evidence that Fannie Mae's justifications for her non-selection are false and pretextual and that Ms. Gehring discriminated against her based on her race, age, and personal appearance.**

Fannie Mae argues that Ms. Lapera cannot show that her non-selection was discriminatory because Ms. Fraser was more qualified than her for the vice president position and Ms. Gehring's use of the term "executive presence" referred only to Ms. Lapera's communication skills, rather than her appearance.  FM Mem. at 16-23.  This argument ignores and mischaracterizes the overwhelming evidence Ms. Lapera has presented of Ms. Gehring's discriminatory animus and that Ms. Fraser was pre-selected for the vice president position, and the selection process was a sham and pretext for discrimination.

The D.C. Human Rights Act prohibits discrimination based on "personal appearance." The Act defines "personal appearance" as the outward appearance of any person, irrespective of sex, with regard to bodily condition or characteristics, manner or style of dress, and manner or personal grooming, including, but not limited to, hair style and bears.  It shall not relate, however, to the requirement of cleanliness, uniforms, or prescribed standards, when uniformly applied for admittance to a public accommodation, or when such bodily conditions or characteristics, style or manner of dress or personal grooming presents a danger to the health, welfare or safety of an individual."  D.C. Code Sec. 2-1401.02(22).

An employee states a violation of the DCHRA's prohibition against personal appearance discrimination if she alleges that her employer discriminated against her based on obesity.  In

23

*Ivey v. District of Columbia*, 949 A.2d 607, 615 (D.C. 2008), the court noted that Ms. Ivey's complaint alleged all of the facts necessary to make out a claim under the DCHRA for personal appearance discrimination when she alleged that she was obese and that her former supervisor made clear that her obesity was the source of the harassment. *See Atlantic Richfield Company v. District of Columbia Commission on Human Rights*, 515 A.2d 1095 (D.C. 1986)(affirming decision finding personal appearance discrimination under DCHRA based on supervisor's comments about employee's clothing and how they fit the employee and comments about the employee's breasts).

### i.      Ms. Lapera has presented direct evidence of discrimination.

Ms. Lapera has presented direct evidence of Gehring's bias against employees based on their personal appearance, race, and age.[3]  Both Ms. Lapera and James Tomasello testified that Ms. Gehring used the term "executive presence" as a euphemism for an employee's appearance and that she regularly denigrated the appearance of overweight employees, but did not criticize employees who were slender and well dressed.  She consistently characterized employees who were not Caucasian, young, and slender, including Ms. Brumbaugh and Ms. Neumiller, as lacking "executive presence."

In the context of discussing the "executive presence" of Fannie Mae employees on her team, Ms. Gehring explicitly criticized the way certain overweight employees sat and walked or "waddled."  During the 2012 calibration session, Ms. Gehring indicated that her only criticism of Ms. Braumbaugh was her "executive presence," and she followed this comment by a detailed discussion of Ms. Braumbaugh's appearance.  Furthermore, she admitted to Ms. Lapera that she downgraded Ms. Braumbaugh's performance rating only because her "appearance" was "not up

---

[3] This is also evidence that, when combined with the evidence of pretext set forth below, can indirectly establish discrimination.

24

to par." She also regularly commented that some employees should follow her example by working out in the morning and eating a banana for breakfast. Most importantly, Ms. Gehring informed Ms. Lapera that her sole weakness for the vice president position was her lack of "executive presence."

Fannie Mae asserts that the term "executive presence" in no way refers to the personal appearance, race, or age of an employee. FM Mem. at 21-23. While this term, is not discriminatory on its face, it is patently clear that Ms. Gehring used the term "executive presence" as a euphemism for slender, young and Caucasian employees, considering the context of Ms. Gehring's comments and the testimony of two of her direct reports that she only criticized overweight employees as lacking "executive presence."

Ms. Lapera also cites direct evidence of race and age discrimination. Ms. Gehring asserted that she would never promote a Hispanic employee, regardless of the employee's performance, solely because she had an accent, and she stated that Ms. Lapera would like working for Ms. Fraser, the selectee for the vice president position, because Ms. Fraser was young, energetic, and full of ideas. In cases such as these where there is direct evidence of discrimination, the employer can avoid liability only if it demonstrates that it would have reached the same decision even if discriminatory factors were not considered. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### ii. Fannie Mae's asserted reason for not selecting Ms. Lapera for the position is pretextual and its motivation clearly discriminatory.

An employee makes out a prima facie case of disparate treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the adverse action gives rise to an inference of discrimination. *Czekalski, v. Peters*, 475 F.3d 360 (D.C. Cir. 2007). The central issue on a motion for summary

judgment is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason for the adverse action and that the employer intentionally discriminated against the employee on the basis of her protected class. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citations omitted). The employee "may succeed in this either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). This may be accomplished by showing that the proffered reason is false because "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Indeed, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves*, 530 U.S. at 147.

Fannie Mae does not dispute that Ms. Lapera has established a prima facie case of discrimination, but argues that she cannot rebut its non-discriminatory justification for her non-selection. Specifically, Fannie Mae asserts that Ms. Fraser was significantly more qualified for the position than Ms. Lapera because she held higher seniority than Plaintiff, received a high performance rating of "Exceeds Expectations" on her most recent performance evaluation, had experience presenting to senior executives at Fannie Mae, and had strong relationships with Ms. Gehring, the SVP for the EPMO, and CFO David Benson and because Ms. Lapera had difficulties communicating at an executive level. FM Mem. at 17-18. These justifications are

26

false, and Ms. Lapera has shown that she was significantly more qualified for the vice president position than Ms. Fraser and that Ms. Gehring's criticisms of her communication skills were contrived and there is extensive evidence that Ms. Gehring's communication skills were exemplary.

First, Ms. Gehring's complaints about Ms. Lapera's communications skills are patently false.  Ms. Gehring did not appear credible as a witness at arbitration and was unable to provide any evidence of Ms. Lapera's purported communication issues.  Her claim that Ms. Lapera disrupted staff meetings on a weekly basis was roundly refuted by Ms. Lapera and Mr. Thomasello, who testified that Ms. Lapera never made any inappropriate or unusual comments at staff meetings, Tr. 711-13, and contradicted by the significantly exceeds expectations performance appraisal Ms. Lapera received in 2012.  Simply put, Gehring's testimony about Ms. Lapera was not truthful.   For most of her career at Fannie Mae, Ms. Lapera made presentations and produced work product to senior officers at Fannie Mae and federal regulators and there was never an issue with her "executive presence, presentations and/or work product."  Throughout her career she received very good evaluations of her performance.  The claim that there were issues with her written or verbal communication skills is absolutely false.  In fact, all evidence in the record suggested that it was Gehring who had significant issues with appropriate language in the work place.

Next, Ms. Lapera was vastly more qualified for the vice president position than Ms. Fraser, according to the position description.  First, the position required the selectee to "[d]evelop strong relationships with the senior leadership team on the project teams" and "communicate effectively at the highest levels of the organization."  Ex. R.  Ms. Lapera had a strong relationship with the senior leadership team and the project teams, including each of the

project managers, and had extensive experience working directly with the CFO, Vice Presidents, and the President of e-Business as project manager for the amortization engine and vice presidents and other members of upper management, including the Executive Vice President, as Director of Lean Six Sigma.  Ms. Lapera had worked extensively and developed strong relationships with the former President of Fannie Mae and the former Executive Vice President, and neither had ever expressed any concerns with her ability to communicate with senior executives or her style of communication.  In contrast, Ms. Fraser had a strong relationship solely with the CFO and finance officers.  Second, the position description required the selectee had to "take ownership of the overall approach for managing EPMO's relationship with key external stakeholders."  Ex. R.  Ms. Lapera had previously managed Fannie Mae's relationships with key external stakeholders, including the mortgage bankers association.  Third, the selectee was responsible for managing the multiyear investment plan, and while Ms. Lapera had worked as part of that team and developed tools used by this team, Ms. Fraser had never had any involvement in the plan.  Fourth, the selectee had to "establish and groom a team of future leaders" and assess and optimize the "organizational structure" of the team.  Ex. R.  Ms. Lapera had experience effectively managing, optimizing, and grooming large teams of employees throughout her entire nearly twenty year tenure at Fannie Mae, including managing teams of up to forty people, while Ms. Fraser was responsible for managing a team of only a few people. Fifth, the selectee had to "consistently support the goals and objectives of the broader EPMO" and "provide expert advice and interpretation of corporate governance activities."  Ex. R.  Ms. Fraser had no knowledge of business architecture, process improvement or the Lean Six Sigma program.  On the other hand, Ms. Lapera had worked with the EPMO team since its inception, was intimately familiar with the duties of the vice president position and the planning aspect of

28

the position in particular, and already successfully managed twenty four of the thirty people on the EPMO team.  In addition, Ms. Fraser holds only an undergraduate Bachelor of Arts degree and does no black belt certifications, while Ms. Lapera has earned multiple degrees, including a Master's degree in engineering administration from George Washington University, and she holds a black belt certification.  Finally, Ms. Fraser was hired by Fannie Mae in August 2008 and had only been employed by Fannie Mae for approximately five years at the time of her selection, whereas Ms. Lapera had been employed by Fannie Mae since 1994.

The evidence in the record and the testimony elicited at arbitration provided no basis upon which a reasonable factfinder could conclude that Ms. Gehring honestly believed Ms. Lapera lacked executive presence, and this was the reason for her non selection.   First, there is unrefuted evidence of Gehring's discrimination against employees based on their personal appearance and in particular employees who were overweight.  Further, there was direct evidence of Gehring's comments about Ms. Lapera's personal appearance.  Moreover, Gehring commented about Kathy Keller's obesity, and removed her from the Vice President position.

In addition, the selection process for the Vice President position was a "sham" where Ms. Lapera was never seriously considered for the position even though she was the best qualified applicant for the position.  *See Lathram v. Snow,* 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that a jury could draw an inference of discrimination where an employer departed from its normal process without justification).  The selection process was designed so that Gehring could select the person she desired for the position.   Gehring initially attempted to replace Kathy Keller with Joseph Hallett, a slender Caucasian male, who was a Director for a limited area, and to do so without following the normal selection process.  Gehring excluded John Hickman, a obese applicant for the position, and commented to the executive recruiter that

there is no way in hell or he'll ever get the position.  Tr. 427-28, 695-696.  Although Fannie Mae claimed he was excluded because of his short tenure at Fannie Mae, Gehring permitted Fraser to be considered for the position even though she did not apply by the deadline.  Gehring later selected Fraser, a slender Caucasian female, for the position even though Fraser had no substantive experience in the area of responsibility and submitted her resume one month after the position closed.  Gehring's preference for Fraser's personal appearance was the deciding factor in the selection.  To add insult to injury, after the selection, Gehring told Ms. Lapera that she expected Ms. Lapera to train Ms. Fraser.  Finally, Ms. Fraser had no interest in the position after Ms. Lapera ended her employment, presumably because she was unable to perform the job without Ms. Lapera.  The core responsibilities for the position were removed within a few months of Ms. Lapera's departure, and Fraser moved to another position shortly thereafter.

Furthermore, Fannie Mae failed to provide a fairly administered selection process, which raises an inference of discrimination.  *See Salazar v. WMATA,* 401 F.3d 504 (D.C. Cir 2006) (failure to provide a "fairly administered selection process" raises an inference of discrimination).  In *Salazar v. WMATA,* the U.S. Court of Appeals for the District of Columbia Circuit reversed the district court's grant of summary judgment where a supervisor alleged to have discriminated against minority employees, unduly influenced/tainted the selection process.  ("We agree with Salazar that a jury could infer something 'fishy' from the fact that Lewis placed himself squarely at the center of a process designed to exclude him. Specifically, a jury could conclude that WMATA failed to provide a 'fairly administered selection process' and that its claim to the contrary is pretextual.").  Ms. Gehring permitted Ms. Fraser to apply for the vice president position one month after the posting closed, scheduled her for an interview before she had applied for the position or

30

sent in her resume, and scheduled her for an hour long interview with Ms. Gehring over lunch, while the other candidates were scheduled for half hour interviews in Ms. Gehring's office.  Fannie Mae's Executive and Officer Recruiting official, Ms. Werner, even admitted that it is improper for an interviewer to have a lunch interview with just one applicant and not the other applicants and to schedule on applicant for a longer interview than other applicants.

Next, Fannie Mae asserts that Ms. Lapera's level "1" rating somehow undercuts her assertion that Ms. Gehring discriminated against her.  This is nonsensical.  The uncontroverted evidence in the record clearly demonstrates that Ms. Lapera was performed her duties as Director of Lean Six Sigma in an exemplary fashion, which was undeniable even by Ms. Gehring, but that Ms. Gehring wanted to hire Ms. Fraser for the vice president position and made subjective and baseless critiques of Ms. Lapera's "executive presence" to attempt to justify promoting a young, Caucasian employee, who was not overweight, over Ms. Lapera who was more qualified for the position.

Finally, Fannie Mae argues that Ms. Lapera admitted that Fraser was not slender, but provides no support for this statement.  Even if it were true that Ms. Fraser is not skinny, there is no dispute that Ms. Fraser was not overweight.  Fannie Mae asserts that if Ms. Gehring had discriminated against Ms. Lapera based on her appearance, she would have picked the skinniest person for the job, rather than a person who is not overweight.  There is no requirement that a discriminating official select an individual *solely* based on his or her appearance.  Rather, discriminatory animus must only be a *motivating factor* and the ultimate question is whether the employee would have been selected for the position *but for* discrimination.  Furthermore, the evidence in the record conclusively established that Ms. Gehring originally *did* select Mr. Hallett

for the position before the open position was even posted, but later changed her mind and elected to select Ms. Fraser for the position.

> **C.    Ms. Lapera has presented sufficient evidence to create an inference of discrimination regarding Fannie Mae's failure to classify her position appropriately at a level "N".**

One of the ways that Ms. Lapera can show that Fannie Mae's failure to classify her position as a level "N" position, as opposed to a level "M" position, is by showing "that other employees of similar qualifications who were not members of [her] protected group[s] were indeed [classified as level "N's"] at the time the plaintiff's request [to relevel her position] was denied." *Wada v. Tomlinson*, 517 F.Supp.2d 148, 2007 WL 1378516 (D.D.C. 2007) (describing the prima facie case for "failure to promote based on a denial of increased pay or grade [as] . . . Plaintiff must prove (1) that she belongs to a protected group; (2) that she was qualified for and applied for a promotion; (3) that she was considered and denied the promotion; and (4) "that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied.") (*quoting Glenn v. Williams*, Civ. A. No. 98-1278(CKK), 2006 WL 401816, *20 (D.D.C. Feb.21, 2006), *and Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981)). *See also Taylor v. Small*, 350 F.3d 1286, 1294 (D.C.Cir. 2003) (outlining that where the plaintiff is only claiming entitlement to an increase in pay or grade based on current responsibilities rather than promotion to a vacant position, "the plaintiff must show that she sought and was denied a promotion for which she was qualified, and that `other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied.")).  However, an employee does not have to point to similarly situated employees to show an inference of discrimination and instead, can simply demonstrate that she "received unfavorable treatment in the promotion process" because of her

32

protected class. *Wada*, 517 F.Supp.2d 148 (*quoting Stella v. Mineta*, 284 F.3d 135, 145-46 (D.C.Cir.2002)).

Ms. Lapera can show that Fannie Mae failed to appropriately classify her position at a level "N", while other Fannie Mae employees with similar qualifications and duties outside her protected classes were classified at level "N". Ms. Lapera's position was classified as a level "M", even though the positions of all her peers, including Ted Carter (African American) and Michael MacFarland (Caucasian), were classified as level "N's". Ms. Lapera worked side-by-side with Mr. Carter and Mr. MacFarland, to manage the organization of Fannie Mae's operations, and they were each responsible for different sides of the same coin. Tr. 74, 85-87. Their positions were identical in scope, breadth, reach, and management responsibilities, except that Ms. Lapera managed a larger team than Mr. Carter and Mr. MacFarland. Tr. 85-87. In addition, Mr. Carter and Ms. Lapera had the same supervisor. Ex. B; *Childs-Pierce v. Uhl. Workers Union of Am.*, 383 F.Supp.2d 60, 73 (D.D.C. 2005) ("Generally, employees who are similarly situated "have dealt with the same supervisor, have been subject to the same standards," and have similar employment situations."). *See also Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir.1999). Despite the fact that their positions were identical in all respects relevant to the classification of their positions, Ms. Lapera's position was classified as an "M", while Mr. Carter's and Mr. MacFarland's positions were classified at the higher level "N".

Ms. Lapera's other peers, Lea Nicotra (Caucasian, early 30s, slender), James Tomasello (Caucasian, late 40s, overweight), and Kevin Smith (African American, mid to late 40s, slender), were assigned significantly less responsibility than her, but were also classified under an "N" salary grade. In its motion, Fannie Mae admits that Ms. Nicotra, Mr. Tomasello, and Mr. Smith

33

were her comparators.  FM Mem. at 18 (stating that Tomasello, Smith, and Nicotra were Ms. Lapera's "counterparts").

In addition, Ms. Lapera has cited other evidence that her position was improperly rated an "M", and that all other positions at her level received higher ratings.  One of Ms. Lapera's direct reports, Farley, was classified as a Director and rated as an "M" level employee.  Position postings for positions with fewer responsibilities and qualification requirements than Ms. Lapera's position were also posted at higher levels than her position.  For example, the Middle Office Director position was classified as a level "N," even though it required only a Bachelor's degree and eight years experience, whereas Ms. Lapera's position required a Master's degree and ten to fifteen years of experience, but was rated as a level "M."

Further, there is no doubt that Ms. Lapera's position was improperly classified as an "M", considering that Fannie Mae finally reclassified her position as a level "N" at the insistence of Ms. Lapera's new supervisor, Ms. Keller.  Ms. Keller, was shocked that Ms. Lapera's position had previously been classified as a level "M" and insisted that her position be reclassified.  At the time Ms. Lapera's position was finally reclassified as a level "N", her duties had not changed.  Accordingly, by Fannie Mae's own admission, Ms. Lapera's position should have been classified as a level "N" all along.

Finally, Fannie Mae ignores Ms. Lapera's other allegations of discrimination, including that she continued to be paid as if she were a level "M" employee even after she was promoted to a level "N" and that in 2012, the responsibilities of her position increased, but her salary was not adjusted to reflect these changes.  Because Fannie Mae did not address these allegations of discrimination in its motion, it is not entitled to summary judgment on these claims.

II.    **Fannie Mae is not entitled to summary judgment on Ms. Lapera's claims of discrimination based on her race, ethnic, or national origin under Section 1981.**

34

Fannie Mae argues that Ms. Lapera's claims of race, ethnic, or national origin discrimination under Section 1981 must be dismissed because her Hispanic affiliation is not a race, ethnicity or national origin protected by Section 1981. This argument is absurd and outdated.

District of Columbia courts have overwhelmingly recognized claims of race, ethnic and national origin discrimination under Section 1981 based on a plaintiff's Hispanic identity. *See*, *e.g.*, *Amiri v. Hilton Wash. Hotel*, 360 F. Supp. 2d 38, 43 (D.D.C. 2003) ("National origin discrimination is cognizable under § 1981 only when based on racial or ethnic characteristics associated with the national origin in question."); *National Fair Housing Alli. v. Prudential Ins. Co.*, 208 F.Supp.2d 46, 61 (D.D.C., 2002) (finding that Hispanic and African American plaintiffs stated a claim of race discrimination under Section 1981); *Carter v. District of Columbia*, 14 F.Supp.2d 97 (D.D.C., 1998) (recognizing discrimination claims on the basis of race/ethnicity and national origin under both Section 1981 and Section 1983 where the plaintiff is a Hispanic female originally from the Dominican Republic, but dismissing the claims as untimely); *Medina v. District of Columbia*, 517 F.Supp.2d 272 (D.D.C., 2007) (implicitly recognizing the viability of claims of discrimination based on his race and national origin where a plaintiff is of Hispanic origin). Ignoring the vast repository of recent cases recognizing claims of race, ethnic, and national origin discrimination for Hispanic plaintiffs, Fannie Mae relies on overruled precedent from the 1970s to support its outdated assertion that Hispanic is not a recognized race or ethnic group. Fannie Mae cites one D.C. case and one New York District Court case in support of its premise that Section 1981 does not recognize claims of ethnic or national origin description: *National Ass'n of Gov't Employees v. Rumsfeld*, 413 F. Supp. 1224 (D.D.C. 1976), *aff'd* 556 F.2d 76, and *Woods v. New York*, 469 F. Supp. 1127 (S.D.N.Y.), *aff'd*,

35

614 F.2d 1293 (2d Cir. 1979).  However, these cases were overruled by the Supreme Court in 1987.  *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 612-13, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).

In *Saint Francis College v. Al-Khazraji*, the Supreme Court found that the Court of Appeals had properly rejected the district court's determination that Arabs were not protected under Section 1981 because Arabs are classified as Caucasians under the current racial classifications of Congress.  481 U.S. at 604-605, 607.  The Supreme Court explained that the legislative history of Section 1981 indicated that it was enacted with the intention of preventing discrimination against persons based on ethnicity, as well as race.  *Id.* at 613 ("Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. . . [regardless of] whether or not it would be classified as racial in terms of modern scientific theory").  Specifically, the legislative history of Section 1981 demonstrates that Congress intended to protect from discrimination groups of persons who identify as ethnically Scandinavian, Chinese, Spanish, Jewish, Mexican, African American, Mongolian, German, French, and Romani.  *Id*. at 612-13.  The Supreme Court affirmed the Court of Appeals' holding that Section 1981, "'at a minimum,' reaches discrimination against an individual 'because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens,'" but found that "a distinctive physiognomy is not essential to qualify for § 1981 protection."  *Id.* at 613.  The Court concluded that Section 1981 protects against intentional discrimination based on a person's Arab identity, but a person who merely asserts that he was born in an Arab country will not be protected.  *Id.*

There is no compelling support for Fannie Mae's assertion that an individual who is Hispanic is not a part of a distinct racial and/or ethnic group, warranting protection under Section 1981, and the cases cited by Fannie Mae are inapposite. In *Cuello Suarez v. Puerto Rico Elec. Power Authority*, 798 F.Supp. 876 (D.P.R. 1992), the court dismissed a case in which a Hispanic national of the Dominican Republic asserted that she was discriminated against in favor of other Hispanics who were Puerto Rican nationals, even though she was a part of the same racial and ethnic group as the Puerto Rican nationals. *Id.* at 890-91. The plaintiff in *Abunaw v. Prince George's Corr. Dep't*, No. DKC 13-2746 (D. Md., Feb. 3, 2014), sought leave to amend his complaint to state that he was discriminated against based on his ethnicity, but did not identify his ethnicity, and simply asserted that his employer questioned him on his national origin and the status of his citizenship. *Id.* at \*2. The Maryland district court found that he did not assert any facts suggesting discrimination based on any racial or ethnic characteristics and denied his motion to amend his complaint as futile because discrimination based solely on a person's birthplace, rather than any ancestry or ethnic characteristics is not protected by Section 1981. *Id.* at \*5. In contrast, Ms. Lapera has asserted that she is Hispanic, a member of a unique ethnic group, and shares a unique language and culture identifiable as Hispanic.

While Section 1981 may not protect an individual who was simply born in another country, but has no racial, ethnic, or other affiliation with his geographic place of origin, it is clearly intended to protect individuals who are a part of a nation with distinct and identifiable characteristics. In fact, it appears that Fannie Mae is asking this court to adopt a view of Section 1981 that is less expansive and protective than that which was contemplated in the year 1866, as described above. *See Saint Francis College*, 481 U.S. at 612-13. This court should decline to do so.

37

Next, Fannie Mae refers to Ms. Lapera as "allegedly Hispanic" and asserts that she has not cited any ancestral or ethnic characteristics associated with being Hispanic. Fannie Mae seems to be suggesting that Ms. Lapera's claim of race, ethnic, and national origin discrimination should be dismissed because she is not Hispanic enough. Apart from being offensive, this argument is simply untrue. Ms. Lapera was born, raised, and educated in Caracas, Venezuela, her first language is Spanish, and she identifies as Hispanic. Tr. 28-29. She participated in events and activities for Hispanic employees and was involved in several mentorship relationships in the Hispanic community at Fannie Mae. Tr. 105-06. Further, Ms. Lapera explained how Ms. Gehring targeted members of the Hispanic community by asserting that she would never promote a Hispanic employee because of her accent and forcing another Hispanic employee out of her position. Lastly, Ms. Lapera observed the systematic removal of Hispanic employees from leadership and executive positions at Fannie Mae. Tr. 105-108, 136-37. There is no justification for the dismissal of Ms. Lapera's claim of race, ethnic, and national origin discrimination under Section 1981.

## III. Fannie Mae is not entitled to summary judgment on Ms. Lapera's claims of age discrimination under the DCHRA.

Fannie Mae asks the court to dismiss Ms. Lapera's age discrimination claims because she did not present claims of age discrimination during arbitration proceedings and asserts that Ms. Lapera's claims of age discrimination under the DCHRA are time-barred. Summary judgment should be denied because Ms. Lapera asserted in the Arbitration Demand that Ms. Gehring did not select her for the vice president position because she was a racial minority, older, and overweight, the record demonstrates Ms. Gehring's preference for younger employees, and Fannie Mae's arbitration policy is invalid and has been found to be unconscionable.

Ms. Lapera's Demand for Arbitration specifies that "Ms. Gehring selected Ms. Fraser, who is Caucasian, in her mid 40s, and slender, for the Vice President of Planning and Alignment position, even though Ms. Fraser lacked Ms. Lapera's superior qualifications and prior experience working for the EPMO team. The only reason provided for Ms. Lapera's non-selection was Ms. Gehring's characterization of her as lacking "executive presence," which Ms. Gehring used as a euphemism for employees who were racial minorities, older, and overweight." Demand at 9-10. Fannie Mae was on notice of Ms. Gehring allegations that she was discriminated against based on her age when she filed her Demand for Arbitration in October 2013. Also, discovery revealed additional evidence of Ms. Gehring's age discrimination, and the record revealed that Ms. Gehring held a preference for younger employees.

Next, Fannie Mae's Dispute Resolution Policy is invalid and was found to be unconscionable and unfairly lopsided by the Court of Appeal of the State of California in *Cecelia Carter v. Fannie Mae*, Cal. Super. Ct. No. 30-2013-00647896 (Cal. Sup. Ct. Aug. 26, 2014). Ex. T. Specifically, the court found that it "lacks basic fairness and mutuality" because it requires the arbitration of all claims likely to be brought by an employee, such as civil rights and retaliation claims, but exempts from the agreement all claims likely to be filed by the stronger party—Fannie Mae, including trade secret claims. *Id.* at 9-10. The court found that the Dispute Resolution Policy was unconscionable and unenforceable and determined that severance was not an option because there is no language in the agreement that could be severed to make it bilateral. *Id.* at 11. Fannie Mae's Dispute Resolution Policy is unfairly lopsided and unconscionable and cannot be used to bar Ms. Lapera from asserting claims of age discrimination, particularly where she has already pursued arbitration proceedings in accordance with said policy and put Fannie Mae on notice that she would likely bring such claims in court.

Lastly, Fannie Mae is barred from challenging the timeliness of Ms. Lapera's discrimination claims under the DCHRA by the terms of its own Dispute Resolution Policy. Fannie Mae's policy states, as follows:

> If JAMS received the "Demand for Arbitration" form within the time limit for bringing suit in court, but that time limit runs out during the arbitration, the Company will agree to extend the time limit for up to 60 calendar days after the date of the arbitration decision, so that the employee has an opportunity to bring a timely suit on the claim in court, if he or she rejects the decision as provided in this Policy.

The clause in the Dispute Resolution Policy does not differentiate between each cause of action, but tolls the statute of limitations for all of an employee's claims from the date the employee files a Demand for Arbitration. Ms. Lapera asserts that she was subjected to continuous acts of discrimination between June 2009 and August 2013. Ms. Lapera filed her Demand for Arbitration on October 24, 2013 – within the one year time limit for bringing suit in court for claims of discrimination under the DCHRA. Fannie Mae is equitably estopped from asserting that Ms. Lapera's claims under the DCHRA are untimely as a result of her pursuit of arbitration, as required by Fannie Mae's Dispute Resolution Policy. *Ferguson v. Local 689, Amalgamated Transit Union*, 626 F.Supp.2d 55 (D.D.C. 2009) ("courts may equitably toll a statute of limitations where . . . 'affirmative misconduct on the part of a defendant lulled the plaintiff into inaction.'" (*Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir.1988) *and Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)). Fannie Mae agreed not to challenge claims as untimely where the statute of limitations expired as a result of the employee's pursuit of forced arbitration under the DRP. That the arbitration revealed additional information sufficient to support a separate claim for age discrimination in court that was not asserted during the arbitration, does not change Fannie Mae's contractual

obligations to waive any challenge to the timeliness of a claim resulting from an employee pursuing arbitral proceedings before filing suit in court.

## CONCLUSION

For the reasons set forth above, Plaintiff Ana Lapera respectfully requests the Court deny Fannie Mae's Motion for Summary Judgment and set this matter for trial.

Respectfully submitted,

*/s/ David A. Branch*

David A. Branch
Law Offices of David A. Branch & Associates, PLLC
1828 L Street, NW, Suite 820
Washington, DC  20036
(202) 785-2805
Davidbranch@dbranchlaw.com

41

## CERTIFICATE OF SERVICE

I hereby certify this 12th day of November 2015, the foregoing Memorandum of Points and Authorities in Opposition to Defendant Fannie Mae's Motion for Summary Judgment was served electronically on counsel for Defendant:

Damien G. Stewart
Associate General Counsel
Fannie Mae
3900 Wisconsin Avenue, NW
Washington, D.C. 20016
202-752-6871 (Tel)
damien_g_stewart@fanniemae.com

/s/ David A. Branch
David A. Branch

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |  |
|---|---|---|
| **ANA LAPERA** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:15-cv-00447-BAH** |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE** | ) | **Judge Beryl A. Howell** |
| **ASSOCIATION d/b/a FANNIE MAE** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**O R D E R**

Upon Consideration of Defendant Fannie Mae's Motion for Summary Judgment and

Plaintiff's opposition thereto, it is:

ORDERED that the motion for summary judgment be and hereby is DENIED.

 

Judge Beryl A. Howell

43