# Exhibit A

ʼion Day 1                                                        November 3, 2014
                            Washington, D.C.

Page 22

whether or not their projects can get done or on what schedule because they have to -- and how those comport with Fannie Mae's multiyear investment plan. It's a strategic plan on where the company is headed. So it's looking at disparate parts and saying, no, you don't get that, this is why.

These people in EPMO frequently had to report to senior Fannie Mae executives, including its management committee. In addition, Fannie Mae's regulators, because during this time, Fannie Mae was under the conservatorship of the Federal Home Finance Administration, the FHFA. So there is a premium on being able to communicate at the executive level here. So Anne Gehring comes in, says we need to rebrand. Okay? And yes, Anne Gehring, you will hear as part of this, did want people to dress and behave like consultants, without a dispute.

A lot of what Mr. Branch summarized as evidence of or what he's going to rely on as evidence towards the discrimination is toward Ms. Lapera in the hiring of the vice president for planning and alignment position within EPMO were actually actions

Page 23

taken well before that hiring decision. They were actions that were not directed at all towards Ms. Lapera. And you'll also hear evidence that the statements that were made, at least on their face, had nothing to do with race, had nothing to do with age and had nothing to do with weight or body shape.

One of the key pieces of evidence they're going to rely on is statements made in the calibration session at the end of 2012 Ms. Gehring made about Tricia Brumbaugh. That calibration was part of the end-of-year rating cycle for 2012. And I believe Mr. Branch said that -- or they'll say that Ms. Gehring required that Ms. Brumbaugh be downgraded from a rating of 2 to a 3 because of her appearance.

Interestingly, you're going to hear evidence -- Ms. Gehring will tell you this -- in that same rating cycle, Ms. Lapera was given a 1, the highest rating that you could get. Ms. Gehring actually supported Ms. Lapera in that same rating cycle at that time, getting a 1, and actually went to the CFO, Dave Benson, to assure that Ms. Lapera got that 1. At that time, Ms. Lapera was Hispanic. At

Page 24

that time, Ms. Lapera's body shape and weight is the same as it was a few months down the line when we come to the hiring decision in June/July 2013. So let's actually flash forward now to that decision, the vice presidency for planning and alignment within the EPMO.

You're going to see the job description for that job and you'll also hear testimony about it from Anne Gehring, Nicola Fraser and others, and you'll see in there important aspects of the job are ability to communicate effectively with the highest level of Fannie Mae management, the board of directors and the FHFA. And you're also going to hear evidence that the position was to serve, among other things, as a trusted advisor to the CFO.

Ms. Lapera herself will say, relative to the candidate that was selected, Nicola Fraser, Ms. Fraser had more experience working with the then CFO, Dave Benson, than Ms. Lapera had. You'll hear testimony from Ms. Lapera that she said, relative to herself, Nicola Fraser had more experience presenting to the FHFA and the management committee than

Page 25

herself. You're also going to see the feedback from the three people who conducted the interviews of the candidates, Anne Gehring, Shandell Harris and Mike Choi. All three of them gave their feedback independently and all three of them came to the conclusion Nicola Fraser was the best candidate for the job of the three. And you'll see that feedback and you'll hear from Mr. Harris and Ms. Gehring. Mr. Choi has left the company and not around. He's an Asian-American, by the way. Ms. Harris and Ms. Gehring will both unequivocally testify that their decision on selecting Ms. Fraser over Ms. Lapera was not motivated in any way by race, by national origin, by Ms. Lapera's ethnicity, by her weight or by her age.

You're also going to see why Nicola Fraser. Nicola Fraser by that time was already a vice president. She was a recognized top talent. That's actually a particular category within Fannie Mae leadership. She was seen as an up-and-coming leader. She was known and had worked with Dave Benson before directly. She also had significant

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                November 3, 2014
Washington, D.C.

## Page 26

experience presenting to Fannie Mae's regulators, including the FHFA and Fannie Mae's management committee, all of which were important aspects for this role, the vice presidency for planning and alignment.

Mr. Branch, in his opening, referred to the fact that -- or referred to Ms. Fraser's resume was accepted after the closing date for this position. You'll hear evidence that the date in the posting was a date -- it wasn't a closing date. It was a date by which applicants were encouraged to apply and that is not a closing date. Rather, it's a minimum time that Fannie Mae has to leave the position open for. You'll also hear that when Ms. Fraser received notice of this job, she was on maternity leave. She was trying to figure out what her role would be when she came back and she had to explore not only with the CFO, but with Ms. Gehring about the job; hence, if you say why her resume came in after the other applications for the position.

At the end of the day, they will not be able to carry their burden to show that the decision

## Page 27

to hire Nicola Fraser over Ana Lapera for this position was motivated by race, ethnicity, age of weight.

JUDGE ROBERTSON: All right, sir. Thank you very much. Mr. Branch, your first witness?

MR. BRANCH: Ms. Lapera.

JUDGE ROBERTSON: Very well. Ms. Lapera, would you come over here to the witness place? I can't call it a box because it's not a box.

Whereupon,

ANA CRISTINA LAPERA,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

JUDGE ROBERTSON: When you're ready, Mr. Branch.

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. Please state your full name.

A. My name is Ana Cristina Lapera.

Q. And Ms. Lapera, what's your date of birth?

A. I was born September 3rd, 1957.

## Page 28

Q. And so how old are you now?

A. Fifty-seven.

Q. And where were you born?

A. I was born in Caracas, Venezuela.

Q. And what is your first language?

A. Spanish.

Q. And where do you live now?

A. My official home is in -- my official home is in the northern neck. You want the actual address?

Q. No, I don't need the address.

A. It's in the northern neck. During the week, I live in Reston, Virginia.

Q. Virginia. Do you live alone?

A. No. I live with my husband.

Q. And what's his name?

A. His name is Jesus Lapera.

Q. Do you have any children?

A. I have a daughter, 26. Her name is Gaby Lapera.

Q. And how long have you been in the U.S.?

A. Since I got married in 1984.

## Page 29

Q. And Ms. Lapera, will you summarize your formal education?

A. Yes. I'm a systems -- I have a degree in systems engineering, which I got in Venezuela and it's likely different than here. It requires five years of study plus a thesis dissertation where I got the highest honors. And then I came to George Washington University for my master's in engineering administration where I also got best qualifications in the comprehensive exam that they do at the end of that.

Q. So you have a master's degree?

A. Correct.

Q. What period of time did you work at Fannie Mae?

A. I started working in Fannie Mae in January of 1994 until I left in -- actually, my last day was November 1st of 2013. So it was almost 20 years.

Q. And where did you work prior to Fannie Mae?

A. I worked as a consultant, first doing software development and then doing systems

8 (Pages 26 to 29)

Page 30

integration for various government -- well, for contractors that did work with the government and I was the technical lead for some projects such as like the imaging, again, in all of the records from the Air Force to be transferred from microfiche into imaging technology and indexed so the airmen could find all of their records whenever they needed them.

We also won a contract to do the same thing with the Navy. So I worked on technology for a long, long time.

Q. And so you started at Fannie Mae in 1984?

JUDGE ROBERTSON: '94.

BY MR. BRANCH:

Q. I'm sorry, '94.

A. Correct.

Q. And will you summarize the different positions that you've held at Fannie Mae?

A. It was a long time. So I started in what was called the advanced technology division in Fannie Mae. It was within the IT department. And in that division, I was responsible for managing the projects, like the name of the division said, that

Page 31

were taking Fannie Mae a step forward on technology.

While I was there, some of the things that we did, we brought the technology that would enable Fannie Mae to distribute electronic services such as the underwriting engine and the credit reports that they fed for the lenders. My team was also responsible for bringing the Internet into Fannie Mae. Despite the fact that the CIO at that time wanted to use a different technology, I convinced Bill that we should also invest on the Internet, even though it was just a baby at that time. So that was my work at advanced technology.

After that, I became the development manager leveraging some of that technology that I had helped bring into the company and vending some of our applications through the Internet. And then after that, I was selected to meet the year 2000 efforts and interact with the mortgage bankers associations and basically help our lenders test Fannie Mae applications to make sure they were not going to break when the year 2000 arrived. So it was a very intense job with external relationships, with our

Page 32

lenders, with the mortgage bankers associations, and also directly with the technical people inside to make sure that we were ready and had the environments that we needed to have in order to prepare for the year 2000.

Q. Will you take a minute to just explain what Fannie Mae does and how they do what they do?

A. Sure. So Fannie Mae is -- I'm going to say sometimes "we" because it's a very hard habit to break. I worked for that organization for a long, long time because I really, really loved the mission and what we did is really very cool. It's a very -- it's a tremendous thing for this country and for homeownership. There is no -- we are very low key. There is no country in the world that has the housing system that we have here and a lot of it is thanks to Fannie Mae and Freddie Mac.

And what we do is pretty much establish the standards of underwriting that are considered the borrowers, the borrowers themselves and the property that they are about to purchase, and then if they meet the requirements for acquiring a loan based on

Page 33

those underwriting guidelines, then the borrower is granted a loan that enables them to acquire their home. And then Fannie Mae purchases that loan from their origination bank and puts it either in their book and then they collect the difference between the cost of money and the interest as it becomes revenue for the company or they bundle all of these loans into a mortgage-backed security that gets sold to investors in Wall Street.

At the beginning of my career, I worked very closely with the first part, with the origination part, and with the technology that enabled lenders to approve loans to borrowers that would later be then sold to Fannie Mae. So is that --

Q. Well, that's the first part. What else -- after Fannie Mae decides whether to keep the loan in its own books or package it as a mortgage-backed security, what happens?

A. So regardless of whether the loan is kept in Fannie Mae books or is sold as a mortgage-backed security, the loan gets on boarded into our books and

9 (Pages 30 to 33)

Arbitration Day 1                                                    November 3, 2014
Washington, D.C.

Page 34

then it gets serviced month after month. It's, like, if any of you that own a mortgage, when you pay to your lender, what happens is that payment goes to maybe Bank of America or whoever your lender is, but eventually comes to Fannie Mae. The lender gets paid a servicing fee and then Fannie Mae, if a loan is in its portfolio, puts the profit into its book. If the loan is in a mortgage-backed security, then it distributes the profit and the principal payment that correspond that month to all of the owners of the mortgage-backed security.

And the reason why I know all of this is because after I finished -- later in my career, I was very involved with business architecture and I actually was the manager for business architecture, which enabled me to see the company from the beginning until the end. And both, as part of my work on process improvement and as business architecture, I had the opportunity to examine each one of the processes and understand what was done in each one of the functions of Fannie Mae, how they were doing it, establish operational metrics that --

Page 35

Mr. Stewart can tell you a lot about that, too -- operational metrics for each one of the functions of the company. And even then, I worked with the vice presidents that led each one of those functions to help them improve their operations.

So I was very, very fortunate during that last part of my career to have the honor of being able to work with so many great people and do that kind of, like, very fulfilling job that then helped borrowers have homes. And part of what happened is that if a loan became -- during the mortgage crisis, if a loan became -- if the borrower couldn't pay, we worked with the credit division to also streamline all of their processes to see if there was anything we could do to salvage that loan. Because when a borrower cannot pay a loan, everybody suffers. The borrower suffers, the community suffers, the servicer suffers and, obviously, Fannie Mae suffers because we lose money and the investors lose money. So it's a lose proposition for everybody.

So my team worked with the credit division to figure out what can we do to help that -- you

Page 36

know, to help salvage that loan. What can we do to foresee the circumstances under which borrowers are going to get in trouble so we can get ahead of that? And then in those unfortunate circumstances where the loan did go into default, then what could we do to move that loan that, then, had become a property out of Fannie Mae books as soon as possible because, again, every day that we held the property in our books, it was a day that the lawn had to be cut and there were opportunities for vandalism and all sorts of things. So how could we shorten that period?

And my team, and actually, I personally went to that several times to help them see what are the steps? What can we do to shorten the steps? How can we encourage our partners to help us shorten the steps? So as you could see, it's a pattern of -- that's one of the beauties of Lean Six Sigma and process improvement, that it enables everybody to get better and to win as we do this work.

JUDGE ROBERTSON: You talk about something Sigma and process improvement, I think you're getting ahead of herself. Maybe less of a narrative, Mr.

Page 37

Branch.

BY MR. BRANCH:

Q. Okay. So let's go back to the work on Y2K. Who were you reporting to at the time?

A. Rich McGhee was one of the vice presidents who, in turn, reported to Mike Williams.

Q. Who was Mike Williams?

A. Mike Williams at that time was one of the vice presidents -- actually, McGhee was a director. Mike Williams was one of the vice -- the vice president of maybe e-Business. He was already the president of e-Business.

Q. And what were your duties on this Y2K project?

A. On the Y2K project, I had to coordinate with the mortgage-backed security, what could our lenders do to ensure that their infrastructure was prepared and ready to continue communicating with Fannie Mae through its electronic applications so business wouldn't stop when the Y2K came along.

Q. And did you manage a team of folks?

A. Yes, I did.

10 (Pages 34 to 37)

Arbitration Day 1                                    November 3, 2014
Washington, D.C.

Page 38

Q. Do you remember what your position was at the time?

A. I was a manager. I was just a manager.

Q. And what was the outcome of this project?

A. It went flawless. Y2K came and went. First of all, we had a significant number of our lenders, something like 90-some percent test results ahead of time. Some of them came weekends, Saturdays, Sundays to test. And when Y2K came, all of our applications were perfectly suited for Y2K and our lenders could continue to work. There was no blink whatsoever.

Q. And after your work on the Y2K project, what was the next project -- major project that you worked on?

A. At that time, Mike Williams had become president of e-Business, which was sort of like a technology division for Fannie Mae, and it had two major branches. One, Desktop Underwriting, which is our traditional underwriting service, electronic underwriting service, and then what we had set up was a separate division, a separate team that was going

Page 39

to -- it was called Dedicated Channel. And the reason why it was called Dedicated Channel is because the lenders had worked with us. If their loan met the requirements to sell them to Fannie Mae, they will sell them to us. It was dedicated.

The big difference between Desktop Underwriting and Dedicated Channel is that Desktop Underwriting required around 30 elements to decide if a loan could be granted or not, could be approved or not, whereas Dedicated Channel only needed, like, eight elements, eight pieces of data to decide whether a borrower should be granted a loan. And it was a place where we could experiment and have a little bit more bandwidth on what kinds of loans we could purchase and it was very profitable and very successful because it really narrowed down those credit variables that were important to predict how the loan and the borrower were going to behave.

As a matter of fact, we had less losses in loans that came through Dedicated Channel than the ones that came through Desktop Underwriting because the other thing that was different in Dedicated

Page 40

Channel is that we did risk-based pricing, which meant if somebody depended on their characteristics, then we would price that loan in a way that if it did have problems, we had enough insurance or we had the money to make sure that we were covered and we were protecting our investors as well.

Q. Did someone select you to work on this project?

A. Mike and Rich McGhee selected me to work on that project.

Q. And what was your role on this project?

A. My initial role was -- after Y2K, Dedicated Channel had been going on for a little bit and they were behind in the creation of their infrastructure. And so then Daniel had excellent relationships with the technology infrastructure group and my first task was to make sure that all of their servers and their network and the communications with the lenders were set up in a way that it was seamless and that we could deploy the electronic platform on time. And then after that infrastructure was --

Page 41

JUDGE ROBERTSON: Hold on. I think you answered the question. Ms. Lapera, you have a lot to say and you know a lot and you've done a lot, but this is going to be a very long trial unless you can confine yourself to sort of shorter answers to the question Mr. Branch gives you.

THE WITNESS: Okay.

JUDGE ROBERTSON: You don't need to explain everything surrounding the answer. Just try to confine your answers to the questions, okay?

THE WITNESS: Okay. I'm going to try. And if not, you tell me.

JUDGE ROBERTSON: I will tell you.

THE WITNESS: Thank you so much, sir.

JUDGE ROBERTSON: Go ahead.

THE WITNESS: So my job was --

JUDGE ROBERTSON: Well, next question.

BY MR. BRANCH:

Q. And what was your title?

A. I was a manager there for a long time, and so then I got promoted to director as my responsibilities increased.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                                November 3, 2014
                              Washington, D.C.

Page 42

JUDGE ROBERTSON:  Perfect answer.  Next question.

THE WITNESS:  Thank you.

BY MR. BRANCH:

Q.    And were you successful on this project?

A.    We were extremely successful.  I was extremely successful.

Q.    And how so?

A.    We could keep the Dedicated Channel work seven days a week, 24 hours a day supporting our lenders and we were able to keep our infrastructure and everything running seven days a week, 24 days, 99.98 percent of the time.  So it was something that nobody else in Fannie could do.

Actually, there was a fire and we were able to keep our processes running.  So that was really good.

Q.    And what was the next major project that you work on after Dedicated Channel?

A.    When I was working in Dedicated Channel, OFHEO, who was our previous U.S. regulators, issued -- I don't remember the exact name, but it was

Page 43

a memorandum of concern explaining all of the places where they thought Fannie Mae had weaknesses on their financials.  And Mike specifically, who at that point had moved to -- more to the operation sites of the company, Mike specifically asked that I could come and join him.  So it was Mike, Amy Hugo and me at the beginning of restatement.

Q.    And by "Mike," you're referring to Mike Williams?

A.    Yes, sir.

Q.    And what was his title?

A.    I don't remember at the time, but it was -- he had moved to be operations or senior vice president of operations or something like that.

Q.    And so what was your role on this project?

A.    My role was to be the project manager for their amortization engine.  It's called FAS 91 from the accounting perspective.  And every single asset that Fannie Mae owned had to be amortized properly.  So my role was to make sure that the technical people knew what they needed to do and that the business people, including the policy team, defined exactly

Page 44

how each one of our assets needed to be amortized.

Q.    How important was this project to the survival of Fannie Mae?

A.    Oh, it was critical.  Not only we needed to amortize correctly, but we needed to be able to show the regulators that we were indeed amortizing correctly.

Q.    And did this assignment require that you communicate with senior executives at Fannie Mae or regulators?

A.    Not so much regulator because my business partner was the one who communicated with the regulators.  But yes, my business partners were vice presidents.  One of the finance side was Shaun Ross and Tim McLuckie, who was the vice president of technology, and obviously, communications with Mike Williams and to David Hisey, who was the chief financial officer.  And I don't remember the name of -- I'm sorry, Hisey was a controller and the chief -- Blakely, Mr. Blakely, who was the chief financial officer in charge of the restatement.  We had to every week come back and communicate what were the

Page 45

issues, how we were progressing and anything that was in the way for our schedule.

Q.    Did you have any supervisory responsibilities for the restatement project?

A.    Yes, I did.  I managed the FAS 91 team.

Q.    Approximately, how many employees did you manage?

A.    That was large.  Probably, like, 30 or 40 people.

Q.    And were you able to succeed on this project?

A.    Actually, yes.  We were able to develop an amortization engine, which was later patented by Fannie Mae and that's the patent that they granted us, they granted me and my team for the work that we did.  And actually, the good thing was it didn't matter what kind of asset or what kind of amortization method you wanted to use.  You could use the engine and it will give you the correct answer.  So yes, it was very, very successful.

Q.    And after your work on the restatement project, what was the next major project that you

12  (Pages 42 to 45)

Arbitration Day 1                                                November 3, 2014
Washington, D.C.

Page 46

worked on?

A.   After the restatement project, my daughter was in her last year of high school, so I asked Mike for something that was a little bit more manageable because restatement, it was, again, seven days a week, 14 hours a day, so it was very, very tense. And what he asked me to do was manage the restructuring of IT and operations. We had Mercer, the consulting firm, do all of the legwork, so I managed the set of Mercer consultants that helped us figure out what do we do? How do we organize our operations and technology? Does each division have their own? Do we keep them together? And I managed all of that.

And during that time, I had to give reports every week to the steering committee, which consisted of people like Linda Knight and Hisey, who was the controller, and Mike Williams on how we were doing and why we were doing the things that we were doing.

Q.   And who is Linda Knight?

A.   Linda Knight was at that time the

Page 47

executive vice president for capital market.

Q.   And so this project -- I'm sorry, was there a title for this project?

A.   It was the restructuring of operations and IT.

Q.   And do you recall the time frame that you worked on this project?

A.   That must have been the beginning of 2008, maybe.

Q.   And what was Mike Williams' position at this time?

A.   By that time, Mike had become president of the company.

Q.   President of Fannie Mae?

A.   Yes. At that time, I believe Mike was president of Fannie Mae.

Q.   What type of working relationship did you have with Mike Williams?

A.   I have known Mike all of my life in Fannie Mae. He had always been a very strong supporter and mentor. Mike knew that if there was a problem, I would come to him and I would tell him. And if I

Page 48

didn't think things were going well, I would come to him and tell him and we would go have a coffee and things will get better.

Q.   So in your position in 2008, did you have open access to the president of Fannie Mae?

A.   Yes, I did.

Q.   And what did that mean?

A.   It meant that he trusted and valued my judgment and that he knew that I would only come to him if things were really, really important. Mike was a very busy gentleman, so you don't waste his time with things that are not important and you don't go to his office unless you have a very clear -- clear facts and, hopefully, you have a solution to present to him and say, well, this is what I think is happening, here's my argument and here are some of the things. And sometimes he would do what I suggested. Sometimes he would know far more than I did and do something else. But the important part is I always had access to him and could go to his office and tell him and he helped me move the projects forward. But I only used that power very judiciously

Page 49

because I think that's the way it should be used.

Q.   And so did the president of Fannie Mae ever express to you any concerns about your style of communication or your ability to communicate to senior executives at Fannie Mae?

MR. WILSON: Objection. Vague.

THE WITNESS: Mike never said anything like that.

JUDGE ROBERTSON: Overruled.

THE WITNESS: Mike never expressed any concerns with my communications.

BY MR. BRANCH:

Q.   And so after your work on the restructuring project, what was the next project that you worked on?

A.   My next project was Lean Six Sigma. And it was a project that was very dear to Mike's heart because --

JUDGE ROBERTSON: Lean what?

THE WITNESS: Lean Six Sigma.

JUDGE ROBERTSON: Six Sigma. Lean, L-e-a-n?

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                   November 3, 2014
Washington, D.C.

Page 50

THE WITNESS: Yes.

JUDGE ROBERTSON: Six, S-i-x?

THE WITNESS: Yes.

JUDGE ROBERTSON: Sigma?

THE WITNESS: Yes. Do you want to know what it is?

JUDGE ROBERTSON: I'm sure I'm going to hear it.

THE WITNESS: Okay. Just stop me when -- so Lean Six Sigma is a process improvement methodology. Lean was invented by Toyota and it's a Lean Six method where you try to reduce waste and you look at everything from the customer perspective. And then Six Sigma was invented by Motorola and it uses statistics to make sure that you always got the output that your customer wants.

So when you combine the two methodologies, it can be very, very powerful to streamline a company, to streamline operations, and to make sure that the output that we're getting is exactly what we want and that we understand the inputs that it takes and all of the steps in between to get to our result.

Page 51

Q.    So did you need any type of specialized training to be able to perform this Lean Six Sigma assignment?

A.    Yes. At the beginning, we had only a consulting firm doing it and we did three projects and when we demonstrated how powerful it was, to the point that, for example, the reverse mortgage product, at that time people were thinking, well, maybe we should cancel that. And as a result of the work that we did with Lean Six Sigma where we really showed the places where the program could get in trouble, the program is still going.

And to answer your question, yes, you require -- like in my case, I'm a black belt and certified by the American Society for Quality and it requires six months of classes and two projects in order to certified as a master black belt.

JUDGE ROBERTSON: Black belt?

THE WITNESS: Yes. Because it was like the Japanese.

JUDGE ROBERTSON: Okay. I'm getting the lingo here. Black belt in Lean Six Sigma. Got that.

Page 52

Okay. Go ahead.

BY MR. BRANCH:

Q.    And what does that mean, a certified black belt?

A.    So a certified -- so the grades go like yellow belt, green belt. Yellow and green are pretty junior. Black belt, it's you know how to execute projects from the beginning until the end and you are pretty good with statistics and you have to understand -- there is also a lot of stakeholder management because if you see most projects don't fail because of technology. Most projects fail because of people.

So as a black belt, I further refined my capability of starting processes. And you could also be a master black belt and some of the guys that worked for me were master black belts, but you require a lot of statistics and I didn't need them for my job. But black belt was quite an accomplishment anyway.

Q.    And so, I'm sorry, this project was Lean Six Sigma and you were asked to work on it by Mike

Page 53

Williams, the president of Fannie Mae?

A.    Yes. And we started, like I said, with a consulting firm and then once we've proven that the methodology was appropriate for Fannie Mae, then I have my own team, the consulting team help me for a little bit, but we had three or four people working that were Fannie Mae employees. And when we became self-sufficient, then we let go of the consulting firm and we took over doing the work ourselves and it went across the entire company.

Q.    And you managed a team on this project?

A.    Correct. I was the director of Lean Six Sigma. I had a strange title during that time. I do not know why. But yes, I did manage the project, the team during that time.

Q.    And what period of time were you working on this assignment?

A.    It was probably 2009 or 2010 until I left. I continued to -- I was always the -- I was the director for process improvement all the way through -- through my tenure at Fannie Mae.

Q.    And so what type of duties were required

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                      November 3, 2014
                        Washington, D.C.

Page 54

of you in this position?

A.  I had to identify -- well, typically, clients will come -- or different divisions in the company will come and ask for our services. One of the biggest projects that we -- sorry. And then we would decide which ones we're going to do because we had limited number of resources, so we had to make sure that we prioritized correctly.

I can tell you that some of the biggest ones that I did were the mortgage-backed security process where we analyzed how mortgage-backed securities are created from the beginning until the end. And then the second one that we did that was very, very large was the credit management piece where, again, we analyzed what happened when a loan is in trouble all the way through its disposition. So those were two big projects that we managed.

JUDGE ROBERTSON:  When did you do this?

THE WITNESS:  That must have been, like, 2010.

JUDGE ROBERTSON:  After the fall?

THE WITNESS:  After the fall. No, before

Page 55

the fall. Actually, the first MBS study was done before the fall. And the reason why I remember that was because one of the sponsors was Rob Levin. So Rob Levin would come and my team and I would present to him and to all of the vice presidents of the company. And Rob Levin was the chief business officer. So that was before the fall. Because the fall was in 2008.

And then after the fall, we did the credit management portion of the work. And in between, we did a lot of, like, other projects, like, with the multifamily division. And at that time, Claude Wade became my boss and we helped him establish the framework for operational risk, because in order to evaluate operational risk, you need to understand what a division does or what a function does and then what can go wrong in the process. So he leveraged the Lean portion of Lean Six Sigma to establish the operational risk framework.

BY MR. BRANCH:

Q.  So did Mike Williams tell you why he wanted you to work on this Lean Six Sigma project?

Page 56

A.  He thought it was important for the company. And actually, I was really upset because I didn't believe that Lean Six Sigma -- Fannie Mae had tried many of these fancy process improvement techniques many times before and had always been unsuccessful. So I was really upset. I told Mike, why are you going to send me to do this when you know it's, you know, not that important. And he said, well, if you don't like this job, come back in three months and I'll get you another job.

And I actually totally fell in love with it because I could see the power and it actually was very successful in the company. We saved the company, through 2009 through 2011, like $250 million in cost savings just through the efforts of Lean Six Sigma. And you can ask Anne that, too, because she was one of my clients at that point.

Q.  And by Anne, you're referring to Anne Gehring?

A.  Correct.

Q.  And when you were working on the Lean Six Sigma project, did you have someone who was more

Page 57

senior to you working on the project or were you primarily responsible for the Lean Six Sigma activities?

A.  I was responsible --

MR. WILSON:  Objection. Leading.

THE WITNESS:  I was the director of Lean Six Sigma.

JUDGE ROBERTSON:  I'll allow that.

THE WITNESS:  I don't understand. Does that mean I can answer the question?

JUDGE ROBERTSON:  Answer the question.

THE WITNESS:  I was the director for Lean Six Sigma, so I was personally responsible for the Lean Six Sigma project. Claude Wade was the vice president of operational risk and Lean Six Sigma, but it was my responsibility to execute all of the process improvement projects for the company.

BY MR. BRANCH:

Q.  And you continued in this role until you left Fannie Mae? In some variation of this role.

MR. WILSON:  Objection again, Your Honor. Leading.

Alderson Reporting Company
1-800-FOR-DEPO

Page 58

JUDGE ROBERTSON: This is really foundational. I'm going to allow it.

MR. WILSON: Thank you.

THE WITNESS: And I can tell you that some of the things that we did, for example, around 2011, Ed Watson was the chief -- he was the chief technology officer and he also had operations and he had a steering committee that helped him determine which projects needed to be made. And I led, myself and a group of consultants at that time, we helped break down the impact of those projects in the different areas. So again, in there every week, we would come back to the steering committee and present back the results of our process improvement findings.

The other big things that we did during that time was I personally facilitated the sessions, the business architecture sessions that helped the company have a coherent picture of how Fannie Mae works. There is very few people in Fannie Mae that can really tell you how it works from the beginning to the end. Michael MacFarland is one of them, I'm one of them, some of the business architects.

Page 59

Because everybody knows their portion really, really well, but they do not understand what happens before or what happens after. And by having a coherent picture of the company --

JUDGE ROBERTSON: Excuse me, Ms. Lapera, I'm not sure what question you're answering now. You're discoursing and you've got a lot to say, but you've lost track of the question and so have I.

Ask another question, Mr. Branch.

THE WITNESS: I'm sorry.

BY MR. BRANCH:

Q. So first, what is business architecture?

A. Business architecture is a discipline that enables you to describe the fundamental parts of a business and how they interact with each other.

Q. And why is it significant or important for someone to understand how the different parts work together?

A. Because if you don't understand how different parts work together, you cannot establish a baseline on how well they are doing. And the other part is that, typically, things go wrong when a

Page 60

transaction flows from one unit to another unit and if you don't understand how the transactions flows, the possibility of operational risk increases. So it's important to minimize operational risk, to have a big picture, and it's also important to understand how those functions are working. It also becomes critical, when you start doing investments, to see the places of the company where you should be invested in or not or the places where you're overinvested.

Q. And were you able to develop some type of roadmap which showed how all of the parts worked together?

A. Yes, we did.

Q. What project was that?

A. It was the business architecture reference model. And not only we did, but we got the vice presidents that work on the different divisions to agree that it was an accurate representation of the company and the relationships within them.

Q. There is a binder in front of you. Let's start with Exhibit 13. And are you there?

Page 61

A. Yes, I am.

Q. Okay. What is this document?

A. It's the job summary. It's something that comes out of the system in Fannie Mae and it shows every time your position was adjusted or changed or anything that happened during your job history.

Q. And this takes us back from the beginning of your employment all the way through all of the positions that you held at Fannie Mae?

A. No. The first few years are missing because I believe we didn't have this system then. So it starts in 1998.

MR. BRANCH: Judge Robertson, do you require that we offer documents into evidence?

JUDGE ROBERTSON: No. But I do require -- I mean, I'm only going to consider the documents that somebody has talked about or that you pointed to. In other words, I'm not going to consider all 87 of these documents part of the record unless I've seen them or paid some attention to them during the hearing.

BY MR. BRANCH:

16  (Pages 58 to 61)

Arbitration Day 1                                                November 3, 2014
Washington, D.C.

Page 62

Q. So does this accurately state all of the positions that you've held at Fannie Mae since 1998?

A. Yes.

Q. And now let's turn to Exhibit 1. And what is this document?

A. This is my resume as of 6 -- or 8/13/2013.

Q. And does this accurately summarize the different positions that you've held at Fannie Mae and the work that you did in those different positions?

A. Yes, it does.

Q. And does it also summarize your educational background and certificates and technical skills?

A. Yes, it does.

Q. Turn to Exhibit 3.

A. I'm there.

Q. And what is this document?

A. That's an e-mail. The original e-mail was from Shaun Ross, who was a VP of finance. I believe Shaun at that time was the vice president of financial planning and alignment before Anne Gehring

Page 63

had that position, and he is thanking me and my team for the work that we had done helping him streamline the monthly board reports.

And on top, you can see the message from David Hisey, who was the chief financial officer, saying that he really appreciates the work and that we should keep driving these sort of process improvement opportunities.

Q. And was this work that you were primarily responsible for?

A. Yes.

Q. And Mr. Hisey is -- did you say chief financial officer?

A. Yes.

Q. As part of this project, did you have to correspond with or communicate with senior executives at Fannie Mae?

A. Yes. That was --

MR. WILSON: I'm going to object, Your Honor. That's vague.

THE WITNESS: I had to --

JUDGE ROBERTSON: I don't recognize an

Page 64

objection to vague. I'll let her answer the question if she can.

THE WITNESS: So, as part of this process, we talked, obviously, with Shaun Ross, who was the sponsor, but also with Mr. Hisey, who was the chief financial officer. Mr. Hisey was part of the management committee. So, yes, from the Fannie Mae perspective, he was at some of the highest levels of leadership in fact.

BY MR. BRANCH:

Q. And turn to Exhibit 4. What is this document?

A. So it's an exchange of e-mails between Ed Watson, who was the chief information technology officer for the company. He had IT, information technology, and operations. He was an EVP of all of that area. And it was about getting agreement from all of the other vice presidents on process ownership and the functions and it referred to some of the facilitations that I did for the team to make sure that we got agreement on the business architecture side.

Page 65

Q. So you mentioned getting other vice presidents to agree or participate. What do you mean by that?

A. What I mean by that, it was some pretty contentious sessions because each one of these vice presidents was trying to make an argument for the money that they should receive as funding for investments. And what we did, it's by showing everybody this is what each one of you does for the company and this is the state, your current state. Like in your area, you're doing really well. In your area, we have issues or we may have issues and here is the funding that each one of us had received.

You were able to create that consensus, first, on how all of the pieces fit together and then second, it set the framework and -- the frameworks so that we could evaluate projects correctly. And we also got people to own the different functions and said, yes, I am responsible for this function and this is what I'm going to do to make it better. And these are people at the vice president level.

Q. And I think you mentioned EVP. What does

17 (Pages 62 to 65)

Arbitration Day 1

Washington, D.C.

November 3, 2014

Page 66

that mean?

A. Ed Watson was an executive vice president. And it's the highest level that you could have at Fannie before you become the president of the company.

Q. And so for this process ownership objectives e-mail, did you have to communicate with Mr. Watson?

A. Yes, I did.

Q. Did he express to you any concern about the manner in which you were communicating either to him as executive vice president or to the other vice presidents that you had to address?

A. No, he did not.

Q. And you were not a vice president at the time, correct?

A. Correct. I was a director, which makes life even harder because --

JUDGE ROBERTSON: Just --

THE WITNESS: I was just --

JUDGE ROBERTSON: All right. Thank you.

BY MR. BRANCH:

Page 67

Q. And that was my next question. So since you were director, did you have any challenges in getting vice presidents, higher level positions, on board?

A. The truth is I really -- sometimes it was more challenging. However, I had personal relationships with most of these vice presidents, so I could communicate with them and get them to where they needed to be. It was more challenging. It would have been much easier if I was a vice president, but no, I was able to do my job using influence and communication skills.

Q. Turn to Exhibit 5. And what is this document?

A. So, again, this is a message from Ed Watson, who we just had discussed, the EVP, to Jonathan Gross, who was the vice president responsible for all of the projects in the multifamily division; Philson Lescott, who was a vice president for all of the projects in the single family division; Michael MacFarland, who was my partner on business architecture. Michael owned

Page 68

business architecture at that time. Myself and Joe Giunta, who owned all of the operations for single family and multifamily. And it's about -- he's congratulating us and all of the teamwork that we did in order to create that coherent view of the company.

Q. And what was your role on this assignment?

A. I facilitated all of those sessions. And when I say "facilitate," it's more than what I would typically expect a facilitator because I had to have content knowledge of specifically what happened in each one of the areas to get the people to agree.

Q. I'm sorry, you had to have what type of knowledge?

JUDGE ROBERTSON: Content.

THE WITNESS: Content knowledge. I needed to know what was really happening in each one of the areas to help them communicate with each other.

BY MR. BRANCH:

Q. And why is that?

A. Because if not, it would have been very easy for each person to say, no, what I do is more important than what you do or it doesn't matter the

Page 69

relationship between the different parts. But by having knowledge -- first, knowing the individuals and having a good relationship with them, but having knowledge of exactly what's happening in their areas, I could guide them into creating a coherent whole where all of the pieces work together. It's kind of like assembling a puzzle. If you understand where the pieces are, you can make them -- you can string them in a way that makes sense.

Q. Let's turn to Exhibit 6.

A. This is the patent that I talked about before on the amortization engine. And it's a message from the legal department to Shaun Ross, who was my business partner and later became a financial planning and analysis vice president, to Ted Belay, who was one of the technology managers. Same with Scott Nestor and myself. Congratulating us on having been awarded the patent for the amortization engine.

Q. And who is Nayo Lawrence?

A. One of the assistants in the legal department.

Q. Okay. And the final paragraph says,

18 (Pages 66 to 69)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                November 3, 2014
                            Washington, D.C.

Page 70

"Congratulations to investors Shaun Ross, Ted Belay and Ana Lapera who contributed to this filing." I'm sorry, I said investors. "Congratulations to inventors."

Were you considered an inventor for this?

A.   Yes, because I had my technical -- because of my previous background on technology, we were able to assemble the amortization engine as a service, which meant that it could be used for any kind of financial asset. So it was a very novel way of doing it instead of the more traditional way where amortization is embedded inside the accounting and it's far more rigid, and you cannot change it or maybe cannot handle all of the sorts of assets that our amortization engine could handle.

Q.   Let's turn to Exhibit 7. What is this document?

A.   So this is an e-mail from Anne Gehring to Nicola Fraser, Saiful Amin, myself and Kathy Keller. And the background on this, it all builds on each other. Now that we have the functions, we could go and assess which were the metrics, the operational

Page 71

metrics that were important for each of the functions.

Q.   When you say "metrics," what do you mean?

A.   For anything that you perform, how do you know that you're performing it correctly from the operational perspective? And there are still aspects. There is operational. Am I doing things on time? Am I delivering the number of widgets that need to be delivered? Are they of the quality that they need to be? And then there is the financial aspect. Saif did the financial aspect. How much does it cost us to produce the widgets? I did all of the operational aspects.

And what Anne was referring to, it was the first time in Fannie Mae that we had a very clear picture of all of the parts and how they were performing. And it was a presentation that Anne did to the board that was very innovative because the board had never seen anything like this where we were remeasuring what we were doing in a methodological way. So it's her message of congratulations on how this is going to change the culture of the company.

Page 72

JUDGE ROBERTSON: Mr. Branch, we've been at this for, depending on what time we started, an hour and a half to an hour and 45 minutes. It's time for a short break.

Let me suggest to you that we've spent the entire time demonstrating that Ms. Lapera was highly qualified, did a great job, contributed a lot to Fannie Mae, and I don't think any of that is disputed. At least I'm not sure that it's going to be disputed, is it?

MR. WILSON: Not for the particular -- well, we're going to dispute that she was qualified for the particular position that she applied for in July 2013, but, in general, that she was a good performer and that she did a lot of stuff, no, that's not in dispute prior to this time.

JUDGE ROBERTSON: I mean, I think I've got enough of this, okay?

MR. BRANCH: I understand, Your Honor. I thought one of the defenses was that there were issues with her ability to communicate to senior executives at Fannie Mae.

Page 73

JUDGE ROBERTSON: Well, if and to the extent that's the problem, then keep on with it. But we'll be in recess for 10 minutes.

MR. BRANCH: Thank you.

(Recess.)

JUDGE ROBERTSON: Okay. Mr. Branch.

BY MR. BRANCH:

Q.   So Ms. Lapera, in 2009, did you learn that there was going to be a change in the classification of your position?

A.   Yes, I did.

Q.   So prior to the change in the classification, what was your classification level?

A.   I was a director at a level 6.

Q.   And so how did you learn that there was going to be a classification change?

A.   There was communication from HR and also my boss, Claude Wade, told me.

Q.   And turn to Exhibit 9.

A.   I'm there.

Q.   Do you recognize this document?

A.   It's the explanation that HR gave on the

19 (Pages 70 to 73)

Arbitration Day 1                                     November 3, 2014

Washington, D.C.

Page 74

new structure -- on the new compensation structure when we went from the numbers to the letters.

Q.   And did your classification for your position actually change in 2009?

A.   Yes.  It went from a level 6 to a level M, like in Mary.

Q.   Did you have colleagues who were working with you on projects at the same level before the classification change?

A.   Yes.  We have already talked about Michael MacFarland, who was my partner on this, and Ted Carter.  And the reason why I say they had positions similar to mine -- should I answer that now?  Later?

Q.   Why did you believe they had positions similar to yours?

A.   Michael had business architecture, I had process improvement, and Ted had operational risk.  The three teams were corporate teams serving the entire organization.  So even though they were corporate, their reach was broad.  It was across the whole organization.  All of the teams were relatively small.  Mine was a little bit bigger because it was

Page 75

augmented by consultants.

And the three teams work in a very integrated fashion.  Michael with the overall business architecture, me with the process improvement, and then Ted leveraging the result of both of those teams to, then, assess operational risk.  So, in fact, we were like the three musketeers.

Q.   Now, you have a binder with our exhibits, but there is also a binder with exhibits that Fannie Mae prepared.  Turn, if you will, to Exhibit 264.  Do you recognize this document?

A.   Actually, I don't.  It seems to be the description of the job that I was doing in 2009.  And I do not know why I have the title of director of human capital performance.  It was a surprise to me, too.

Q.   And you said that you had colleagues, Mr. MacFarland and Mr. Carter?

A.   Yes.

Q.   Turn to Exhibits -- well, first 268 and then 269.  Are you at 268?

Page 76

A.   I'm at 268.

Q.   This is the position that Mr. MacFarland was working in?

A.   It was one -- it was essentially the position that Michael was working on.  He was working as a director of technical architecture.

MR. WILSON:  Objection, Your Honor.  Exhibit 268 --

THE WITNESS:  The second page, Mr. Wilson.

MR. WILSON:  I mean, it describes a few different positions on there.

THE WITNESS:  Okay.  The first position was Michael, when Michael first joined the company as the director of system design and development.  But that was his position in 2005.  The second page, based on the formatting, it's the position that I remember Michael having in 2009, because it essentially describes what he was doing at the time.

BY MR. BRANCH:

Q.   And 269.

A.   And 269, it's very similar.  2007, it's the position that Ted Carter had when he first joined

Page 77

Fannie Mae as director of operational risk.

MR. WILSON:  Your Honor, same objection.

JUDGE ROBERTSON:  Well, I don't know what these --

MR. WILSON:  I mean, if she could just specify --

JUDGE ROBERTSON:  I don't know what these documents are or where they came from or -- they don't -- I mean, one of them has a date of 2007, one of them has a date of 2005.  I'm not sure -- I'm a little at sea here, Mr. Branch.

MR. BRANCH:  So, Your Honor, we asked Fannie Mae to produce the positions and descriptions of the duties performed by individuals that Ms. Lapera claimed were similarly situated before the reclassification of her position.  So you'll see that for 267, there's a grade level 6, director for Mr. MacFarland.  And the same is true for Mr. Carter.

JUDGE ROBERTSON:  267 is not Mr. MacFarland.  That's somebody else.

MR. BRANCH:  I'm sorry, that's --

THE WITNESS:  268.

20   (Pages 74 to 77)

Arbitration Day 1                                November 3, 2014
                    Washington, D.C.

Page 78

MR. BRANCH: 268, I'm sorry, for Mr. MacFarland. And 269 is the description of positions by Ted Carter.

JUDGE ROBERTSON: And who described these positions?

MR. WILSON: Your Honor, these were produced by Fannie Mae human resources. And Ms. Lapera, in her testimony with respect to 268, my objection is they described different positions for the person. Ms. Lapera in her testimony about MacFarland pointed to what she was talking about. And my objection to the Carter, 269, is it has multiple -- you know, descriptions of several positions for him. So it's more of just scoping the testimony.

THE WITNESS: May I point out that the thing that is interesting, since Fannie Mae prepared this one and they did the evaluation of Carter's position in 2009, since they did everybody's, it's very interesting that Ted's position in 2009 is missing.

MR. WILSON: Well, I actually think

Page 79

there's a typo on -- if you look on Exhibit 269, page FNMA 001037 that's Bated, and I don't know if that clarifies it. It's job posting dated November 9, 2006. You know, upon information and belief, that should be 2009.

MR. BRANCH: That's not correct.

JUDGE ROBERTSON: All right. Counsel, just hold on a minute. What I want is this witness' understanding of what the content of the jobs of MacFarland and Carter were in 2009, when jobs were reclassified. I want her understanding of what their jobs were.

If she can point to something in these documents that supports her understanding, fine, but the documents themselves don't mean anything to me because they're not adequately identified. I don't know what the dates on them are, I don't know what they were for. They're just pieces of paper as far as I'm concerned.

MR. BRANCH: Your Honor, we've raised this as an issue with Fannie Mae, particularly, as it relates to Mr. Carter. We asked them to provide his

Page 80

position description for 2009 and they have not done that. They've provided a position description before and then they provided a position description, looks like in 2010, when his position was vice president. But between the grade 6 and the time when he became the vice president, his position became an N. His level was an N. And they have not provided that document, although they provided similar documents for all the other employees.

MR. WILSON: Your Honor, if I may.

JUDGE ROBERTSON: Go ahead.

MR. WILSON: We produced the descriptions that we had for the positions that were held by Ted Carter. That didn't necessarily mean that we had all descriptions for him for those positions.

MR. BRANCH: There is a document in the record where they specifically state that Mr. Carter's grade was a level N. So they had to get that information from some point, from someplace.

JUDGE ROBERTSON: Is there going to be a Fannie Mae witness who's going to describe this whole process?

Page 81

MR. WILSON: The process about levelling positions?

JUDGE ROBERTSON: Yes?

MR. WILSON: Yes.

JUDGE ROBERTSON: Okay. Then we'll get it then.

All right. I understand the witness to be saying that she, MacFarland and Carter were the three musketeers, that she was doing process improvement, that MacFarland was doing architecture, that Carter was doing operational risk and that the three of them together were important to the whole process improvement process. So can we move on from there?

MR. BRANCH: Yes.

THE WITNESS: So my understanding of the positions that Michael had in 2009 is in Exhibit 268 under Bates Number FNMA 001032. That is my recollection of what Michael did at that time.

JUDGE ROBERTSON: Okay.

THE WITNESS: And my recollection of what Ted did at that time is Exhibit 269. And the closest that I can find is Fannie Mae Exhibit FNMA 001034,

21 (Pages 78 to 81)

Arbitration Day 1                                         November 3, 2014
Washington, D.C.

Page 82

which -- because Ted's position in 2009 was essentially the same that he had in 2007. And the same number of people and you could see that it's a corporate position that, then, renders service to the entire corporation. And both of us were reporting to Claude Wade at the time.

JUDGE ROBERTSON: And both of these guys were rated N and you were rated M; is that right?

THE WITNESS: That is correct, sir.

JUDGE ROBERTSON: Okay. Let's move on, Mr. Branch.

BY MR. BRANCH:

Q. And turn back to claimant's exhibits, number 87. You're looking at a chart?

A. Yes, sir. So it's a chart -- it seems to be a chart where it compares the compensational structure for several people that I consider to be my peers from the period 2009 to 2013.

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: I'll hear what she has to say about this.

THE WITNESS: Do you want me to describe

Page 83

the chart?

MR. BRANCH: Yes.

JUDGE ROBERTSON: Well, I want to know who put this together, what the basis of it is, who the people are.

MR. BRANCH: Fannie Mae produced this document in response to the interrogatories and document requests where we requested that they provide information on comparative employees.

JUDGE ROBERTSON: Okay.

MR. WILSON: That's not why we produced it, but go on, Your Honor. You'll hear from Nicole Harris, who will provide the foundation for this, Your Honor.

JUDGE ROBERTSON: All right. Go ahead.

THE WITNESS: So if you see here, Ted Michael and myself on the bottom of the first square, it was before 2009 and you could see that Ted was a level 6 and it's slash 16. I was not aware that there were subgrade, sublevels, but Michael and Ted were 16 and I was 15, even though essentially we were doing the same work. You could even see that our

Page 84

annualized salaries were very, very similar.

And then at the end of the year, if you see on the blue section on that first -- on the top quadrant, you could see how Ted became an N, Michael became an N, and I remain an M during that reclassification of positions.

BY MR. BRANCH:

Q. Did that continue through the midyear 2010?

A. During midyear 2010, my -- so Ted continued to be an N and we continued to be peers and MacFarland continued to be an N and we continued to collaborate in all of these projects and I continued to be an M.

And by the way, this is the time during -- I challenged the position, my position classification right then and there when it occurred in 2009. And then by the end of the year, Ted had applied to a vice president position and he got promoted to a P and Michael essentially got promoted to something that was similar to a VP, but was called principal because it was more focused on technology.

Page 85

Q. And so why did you challenge the classification in 2009?

A. Because essentially, Ted Carter and Michael and myself were doing very similar jobs and the positions were similar in scope and reach inside the company and I didn't think it was fair that two guys would get an N where I was an M.

Q. And how did you know that they were Ns?

A. Because they told me and because we also worked very closely together on a day-by-day basis.

Q. And your position continued at the M level until when?

A. So my position continued at the M level until -- it says midyear 2012. It actually changed sometime at the beginning of 2012, when Kathy Keller resubmitted all of the paperwork to have my position evaluated and then I finally got promoted to an N.

Q. What is Mr. MacFarland's race?

A. He's Caucasian.

Q. And your supervisor at that time, was it Mr. Wade?

A. Yes.

22 (Pages 82 to 85)

Arbitration Day 1                                                  November 3, 2014

Washington, D.C.

Page 86

Q. What is his race?

A. African-American.

Q. And what is Ted Carter's race?

A. African-American.

Q. So you submitted a request to have your -- to challenge this grade; is that correct?

A. That is correct.

Q. And let's turn to Exhibit 10. Claimant's Exhibit 10.

A. This is the e-mail that I wrote to Claude Wade, who was my boss, explaining why I felt that the position should be classified as an N, not an M. And it was not just about me. It was about the position itself. It should have been classified as an N.

Q. And why did you challenge the classification?

A. Because at that time, I already knew that Ted and Michael had gotten an N and I told Claude that. The position has the same breadth and in terms of number of people reporting to a position, I actually have more than the other two guys and we worked together day to day. So how come they got to

Page 87

be an N and I got to be an M.

Q. So were you providing services throughout Fannie Mae?

A. Yes, sir.

Q. What about the other two male colleagues?

A. They were, too.

Q. How did your position differ from the positions held by the male colleagues?

A. It was a matter of focus. Michael was focused on architecture and technology. Ted was more focused on operational risk, what could go wrong inside the process. And I was more focused -- I always had an inkling on the business architecture, but I was more focused on the process portion of the functions. So they complimented each other.

Q. And what was the result of your challenge to this classification?

A. Claude told me that he has done some research, that he had talked to HR and that the answer was that the position was classified the way it was classified. I was not given a lot of explanation on why. He did sound apologetic on I

Page 88

wish I could have done more, but he said, well, we'll try again later.

Q. And you were managing a team throughout the end of 2009?

A. Yes, sir. I was managing a team when the position was classified.

Q. And did your duties continue throughout the end of 2009?

A. My duties remained essentially the same all the way until August of 2012, when I got the business architecture team. But all the way from 2009, all the way till August 2012, my team did exactly the same types of projects and the focus was on process improvement. In 2012, I inherited Michael MacFarland's business architecture team.

Q. And let's turn to Exhibit 11.

A. Exhibit 11, it's an org chart of the people that I managed at that time.

Q. And it has the date of November 2009?

A. Correct.

Q. What period of time did you manage these folks?

Page 89

A. From early 2009. And people came and went in and off this -- on the team and off the team. Some of them stayed all the way through. Other people moved to other positions. Because one of the ideas with this team is, for example, take Joe Bryant, he was a green belt and he got, eventually, his black belt under me and he was a rock star. So he moved to the credit division after we did the work with the credit management division and became a director there. And that was actually one of the things that was highly encouraging my team because the idea was to rotate people, get them embedded in the discipline and then helping them move to other positions so they can continue doing the work wherever they landed.

Bob Saylor, for example, same thing. He was a manager under me. And then at some point he moved as director on the operational risk division. So you could see how it was a great way of learning and then opening new opportunities for their careers. But as they left, other people came. So the team stayed, more or less, the same size all the way

23 (Pages 86 to 89)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1    November 3, 2014
Washington, D.C.

Page 90

through.

Q.   So after 2009, did you make additional efforts to get your position classified at the level that you wanted it classified?

A.   I tried again in 2011.

Q.   What did you do in 2011?

A.   There is a process called the PEP, performance -- I don't know what the PEP stands for. Nicole Harris will know. And twice a year, managers can submit to HR and to compensation reviews for -- recommendations for salaries or promotions or grades.

So when the PEP opened for 2011, I submitted, again, a request for my position to be upgraded to an N, through Shandell Harris. And that position, it was denied again.

Q.   What did you submit as part of your request in the 2011 request?

A.   I submitted my position description.

Q.   Did you submit anything other than your own position description?

A.   It was a long time ago. I also submitted position descriptions that were similar to mine.

Page 91

Actually, less than mine. For example, there is a project management position that was a director of project management, which is also classified as an N and that has a significantly narrower scope of responsibility because it's only about certain projects within certain a area and, typically, those directors have maybe one or two people reporting to them, whereas I had a whole team of people reporting to me.

Q.   Let's turn to Exhibit 16.

A.   That looks like a job description that I submitted in 2011 during the PEP process.

Q.   So this is director of operational excellence and Lean Six Sigma. Was this your job description in 2011?

A.   This was my job description in 2011. And you could see that I already had other directors reporting to me, like Farley Price was a director. He was reporting to me.

Q.   Where do you see that? I'm sorry.

A.   I'm sorry, in the previous exhibit, I failed to mention that Farley Price, who reported to

Page 92

me, was a director. And I also had Dan Cousino, who I don't know if he was -- I'm sorry, what was the prior exhibit?

Q.   The prior exhibit was 11.

A.   When this one was drafted, Dan Cousino was not there. But I can tell you that in 2011, Dan Cousino was already in part of my team and he was also a director. So I had two directors reporting to me when I asked for my position to be upgraded in 2011, in March 2011.

Q.   And what were their grades?

A.   Dan was an L and Farley was an M. So we both had the same grade.

Q.   So now Exhibit 16, this is the position description -- 16, 1-6.

A.   Correct.

Q.   This is your position.

A.   Correct.

Q.   What was the educational requirement?

A.   A master's degree. And you also had to be competent on Lean Six Sigma.

Q.   So this was one of the position

Page 93

descriptions that you submitted to HR and compensation in 2011?

A.   Yes.

Q.   Okay. And now turn to Exhibit 17.

A.   This is a job posting for director of middle office. And it's actually -- if you see the title underneath, it's a director of project management. If you see the following page, the grade is N, which was higher than mine at that time, and the position was essentially much more narrow. It was only about customer engagement, which was --

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: Do you want to explain that objection?

MR. WILSON: Well, I mean, she's describing this. She didn't establish that she prepared it, she hasn't established her knowledge, the basis for the position. I don't think she wrote this.

THE WITNESS: I did not write that, Joe. This was part of -- whenever Fannie Mae advertised a new position, these positions get posted so people

Arbitration Day 1                                                November 3, 2014
Washington, D.C.

Page 94

can apply to them and it just describes their responsibilities for the particular position. And my point with this is that the activities and the functions and the responsibilities under this position were significantly narrower than the ones that I performed in 2011. And actually, as a matter of fact, in 2009.

MR. WILSON: Your Honor, she hasn't established personal knowledge of the --

JUDGE ROBERTSON: Well, I'm going to allow her to say that. But frankly, Mr. Branch, it doesn't have much impact on me because for her to just say that this is more narrow than the other, I mean, I'm not sure whether that's an opinion, whether it's -- I'm going to take it as a lay opinion and just leave it at that unless she can explain this.

BY MR. BRANCH:

Q. What's the basis for your belief or position that the functions of this director middle office position had duties and responsibilities more narrow than your own duties and responsibilities?

A. Because if you take the first bullet under

Page 95

the key jobs and functions --

Q. What are you looking at? You're looking at Exhibit 17?

A. Seventeen. Under key job functions, it talks about "develops and manages quality infrastructure that initiates and completes process improvement projects and initiatives which transforms the customer engagement business."

So that position was specifically to handle the origination side, the part of Fannie Mae that dealt with our lenders and talk about originating mortgages.

MR. WILSON: Your Honor, same objection. I mean, if she's just commenting on what these words on the page are to what her current duties were, I'll give you that. But if she's going beyond, I think she has to establish a personal knowledge.

THE WITNESS: I actually --

JUDGE ROBERTSON: I'm going to hear what she has to say on this, Mr. Wilson. Go ahead, Mr. Branch.

THE WITNESS: So actually, no, the person

Page 96

who eventually -- there were two -- at first it was Marva Mackle who took this position and she was helping Philson Lescott, the vice president that was in charge of initiatives for customer engagement, which, like I say, is a front part of the Fannie Mae process where loans get -- where we engage lenders and loans get brought into Fannie Mae and for single family. So it's very, very narrow. Very important, but very narrow part of the company.

And if you see the description of the position, it's all about understanding implementing the process mapping functions and actually broadening the work that my team was already doing. And the reason why I know, Mr. Wilson, is because I partnered with them, too. They were my clients. We were the ones who did the training for them. We were the ones who helped them establish the methodology to do that, except that we did it across the entire company. And this position, it's about customer engagement.

BY MR. BRANCH:

Q. Was there an educational requirement for this position?

Page 97

A. It's a bachelor's degree or equivalent.

Q. So how did the functions for this position, director of middle office, which was rated or graded at the level N, compare to your functions and duties?

JUDGE ROBERTSON: I think she already answered that. More narrow.

THE WITNESS: Correct. This position is significantly narrower and the level of responsibilities significantly less.

BY MR. BRANCH:

Q. So your effort in 2011 to get the position classification change was not successful?

A. That is correct.

Q. What was the next thing that you did to get the position classification changed?

A. When Kathy Keller --

Q. Wait, I'm sorry, before you start there. Did you get a response from human resources on your request to classify?

A. Yes, I got an e-mail from Shandell saying, sorry, I tried, but I couldn't get them to change

25 (Pages 94 to 97)

Arbitration Day 1

Washington, D.C.

November 3, 2014

Page 98

their position.

Q.   Did anyone contact you to ask you about your responsibilities or duties?

A.   I don't remember being contacted on March 2011.

Q.   Or any time in 2011, did anyone contact you?

A.   No, not as far as this PEP cycle.

Q.   Did you get a new supervisor in 2011?

A.   Yes.

Q.   Who was the new supervisor?

A.   When Claude left around May of 2011, Kathy Keller became my supervisor. And Kathy was appalled that I was an M instead of an N because she also knew the structure and the different functions and responsibilities that people worked. So she helped me submit my paperwork again towards the end of 2011 and that's when the position was reclassified effective in February of 2012.

Q.   And what was Kathy Keller's position?

A.   Kathy Keller was a vice president of planning and alignment.

Page 99

Q.   And turn, if you will, to Exhibit 43.

MR. BRANCH: I'm sorry, Mr. Wilson, I don't think we gave you the photograph of Ms. Keller.

MR. WILSON: That's correct. And I to object because you didn't produce it in discovery either and this is the first we're ever seeing it.

MR. BRANCH: I thought we were going to exchange it. All the other exhibits were exchanged.

MR. WILSON: But you never gave me this exhibit.

JUDGE ROBERTSON: Well, what's the relevance of the photograph?

MR. BRANCH: Well, part of her claim is personal appearance discrimination and there is going to be some testimony on the fact that Ms. Keller was treated in a discriminatory manner because of her personal appearance as well.

MR. WILSON: I would have liked to have had the photograph so I could have kicked the tires to see when it was relevant to the time period. I just want to make my record. The other thing is discrimination against Ms. Keller is irrelevant.

Page 100

MR. BRANCH: Wait, Ms. Lapera.

JUDGE ROBERTSON: Go ahead.

BY MR. BRANCH:

Q.   Is this a photograph of Ms. Keller?

A.   Yes, sir.

MR. WILSON: Do you have a copy? I still don't have a copy of it.

JUDGE ROBERTSON: Here, you can have mine because I don't frankly set any store by one photograph reproduced. It's not going to help me decide one way or another whether there's discrimination on the basis of personal appearance.

Go ahead, Mr. Branch. She looks fine to me. So do you.

THE WITNESS: Thank you, sir.

JUDGE ROBERTSON: So do you, Mr. Wilson.

MR. WILSON: Thank you.

JUDGE ROBERTSON: I don't know about this guy over here.

MR. STEWART: What about me?

BY MR. BRANCH:

Q.   Just so that we have this on record,

Page 101

Ms. Lapera, what's your height and weight?

A.   You should never ask a woman that, but --

Q.   Don't throw anything at me.

A.   My height is five feet seven and I weigh at this point 230 pounds.

Q.   And so what actions were taken in 2011 and continuing after 2011, in terms of getting your position classified as an N?

A.   Kathy understood what the position was all about and she went to compensation and at that point, I do remember being interviewed by Sonia. And I rewrote the job descriptions and I had my position and I wrote position descriptions also for the directors that worked with me. And during the conversation with compensation, I was able to show them the differences and why we thought my position merited to be an N.

Q.   Did you provide any substantive information that was different from what you had already provided to compensation and HR?

A.   No, I didn't. I mean, the position was the same, so there couldn't have been any substantive

26 (Pages 98 to 101)

Arbitration Day 1                                        November 3, 2014
Washington, D.C.

Page 102

information that was different. The position and the responsibilities and the number of people reporting to the position were exactly the same.

Q.   And had you previously worked with Kathy Keller?

A.   Yes, I had.

Q.   And how so?

A.   Kathy Keller and I started together in the advanced technology division of Fannie Mae. Actually, she started there before I did, so we were peers for a while. And our careers moved in similar ways. And when I was in Dedicated Channel, Kathy reported to me as my manager of business requirements and then she left and went to the credit division and I went and did other things. And then we met again in 2011 and she became my manager in the -- at that time it was called the Corporate Initiative Program Office.

Q.   So did Ms. Keller get a new senior vice president in 2012?

A.   Yes. Anne Gehring became the vice president of -- she moved from FP&A, from Financial

Page 103

Planning and Analysis, and became the vice president for the Enterprise Program Management Office in September of 2012.

Q.   And had you worked with Ms. Gehring before September 2012?

A.   Yes, I had worked extensively with Anne and with Nicola before that. They were my clients. As Financial Planning and Analysis, their job was to oversee the budgets of the company. So my team did several engagements with them to reduce costs in Fannie Mae. So yes, I knew them very, very well.

And the other part is Financial Planning and Analysis was also the one who validated that the savings that we were claiming for the Six Sigma team, Lean Six Sigma team, were correct. So they did all of the numbers and validated from the financial perspective that we were not overstating our claims.

Q.   And what is Ms. Gehring's race?

A.   She's Caucasian.

Q.   And can you describe her personal or physical appearance?

A.   She's tall and slender.

Page 104

Q.   When did she become the SVP of EPMO?

A.   September 2012.

Q.   And just for the record, EPMO stands for?

A.   Enterprise Program Management Office.

Q.   EPMO, sorry.

A.   Correct.

Q.   Did Ms. Gehring make any changes when she arrived?

A.   Yes.

Q.   What major changes, if any, did she make when she arrived in this position?

A.    So when she arrived, there were two vice presidents in Financial Planning and Analysis, Kathy Keller and Carmen Oviedo, and they distributed their responsibilities for managing their -- let me start -- one second.

The Enterprise Program Management Office, one of -- their main responsibility was to allocate the funding for initiatives for projects that needed to be executed by the company. Carmen and Kathy shared that responsibility and one of the first things that Anne did was to say, no, I want to have

Page 105

somebody who is responsible for the planning and I want to have somebody who is responsible for execution.

So Kathy got all of the planning and alignment part and then Carmen actually got moved out of the EPMO into another division of the company. Carmen was also a vice president. And then the position -- that position became available and eventually got filled by Mike Choi, who became the execution branch of the Enterprise Program Management Office.

Q.   So did you know Ms. Oviedo before?

A.   Oviedo, Carmen?

Q.   Yes.

A.   Yes. Carmen was one of the few remaining Hispanic officers, female officers in Fannie Mae.

Q.   And when you say she was one of the few remaining female officers, what do you mean by that?

A.   Fannie Mae had -- I don't know what happened. I cannot explain this, but Fannie Mae had a significant number of female executives that were Hispanic and that acted as mentors of the Hispanic

27  (Pages 102 to 105)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                      November 3, 2014
                              Washington, D.C.

---

Page 106

population and everybody. They were very generous with their mentoring advice. Like Mercy Jimenez, like Maria Villar. Carmen was one of them.

But little by little, somehow they have managed to reduce their population of Hispanic females that are directors or above to pretty much zero in the Washington, D.C. area.

So I had worked with Carmen. We collaborated a lot on the Hispanic activities and Carmen used to be Mike Williams' chief of staff, so she had a lot of experience on communicating at the board level and with regulators. But at that time, Anne decided that she wanted to keep Kathy and move Carmen to the securitization project, which was another project that was going on outside of EPMO.

Q.    So when was Ms. Oviedo moved?

A.    It was very shortly after Anne became the SVP for EPMO.

Q.    Did Ms. Oviedo want to leave her position?

A.    No, she didn't.

MR. WILSON: Objection. Foundation.

THE WITNESS: Pardon me?

---

Page 107

JUDGE ROBERTSON: Sustained.

BY MR. BRANCH:

Q.    How do you know Ms. Oviedo did not want to leave her position?

A.    Because Carmen was crying. She --

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: Yes. Because Carmen was crying? I'm not -- you need a little better foundation than that, Mr. Branch.

BY MR. BRANCH:

Q.    Did you have any discussions with Ms. Oviedo concerning her vacating her position?

A.    Yes, we did. We talked about the fact that she thought she was doing a good job and --

MR. WILSON: Objection.

JUDGE ROBERTSON: No, I'll allow this.

THE WITNESS: We talked about the fact that she had been doing a very good job. She felt that she and Kathy together partnered very well and their skills complimented each other and that she really had passion for this type of job. And it was a normal progression for her career and she wanted to

---

Page 108

stay. And she felt that moving to the securitization project, even though it was very important, was going to narrow the scope of things, of experiences that she could have.

BY MR. BRANCH:

Q.    What impression, if any, did you gather from your conversation with her?

A.    Carmen was upset. Carmen was very, very upset that she was not given a choice.

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: I'll allow that.

BY MR. BRANCH:

Q.    Were there any other major changes made by Ms. Gehring once she became the SVP for EPMO?

A.    So after Carmen was transferred to the other position, then the people that reported to Carmen reported directly to Anne for a little bit until Mike Choi was hired. And Anne also brought her trusted advisor, Amilda, over as part of the division, as part of the EPMO.

And then it's when she started doing the shift on all of the personal appearance and wanting

---

Page 109

the team to behave and look and act like consultants, which, by the way, we already were. Particularly my team had acted as internal consultants all the way since its foundation. I had recently acquired --

JUDGE ROBERTSON: You're getting ahead of this.

BY MR. BRANCH:

Q.    Let's just start -- okay. So we were talking about the major changes. First, how did Ms. Gehring treat members of the team?

A.    It depends on --

Q.    Well, how did she treat members or people who reported to you?

A.    She didn't have as much one-on-one direct interactions with the people that reported directly to me. The way that Anne structured the team communication was she had a staff meeting that was attended by her direct reports; in this case, it would have been Kathy Keller and Amilda. And then she also had the directors. So it was her senior leadership team. So the directors would have been Keith Smith, Jim Tomasallo and Huai Nguyen and

---

Alderson Reporting Company
1-800-FOR-DEPO

Page 110

myself. But then she had very little direct interaction with the teams. Her interactions were during staff meetings or whenever somebody, like, a member of my team will come and do presentations to her.

Q. Did Ms. Gehring make any comments about the personal appearance of individuals who reported to you?

A. Yes, she did.

Q. What were those comments?

A. After Anne became the vice president for --

JUDGE ROBERTSON: When you tell me about these comments, I'm assuming that you heard or saw these yourself.

THE WITNESS: Correct.

JUDGE ROBERTSON: All right.

THE WITNESS: I heard them --

JUDGE ROBERTSON: I don't want to hear what somebody told you.

THE WITNESS: You will not hear from me what somebody told me. She told me directly after

Page 111

the first meeting with the team -- when Anne became the senior vice president, she called for a town hall -- senior vice president for the EPMO, she called a town hall, which is a sign of a good leader. That's what a good leader does. They come into a new position, they want to meet the team and she explained what her vision was for EPMO. And those were town halls, which means everybody from the staff was present during the town hall. And she did that all the way during her tenure as SVP, which is exactly what a leader does.

After the first meeting, she called me and she wanted to know who were some of the individuals in the team and I told her these are the business architecture team that I manage. And she's like, whoa, those people are going to have a long way to go to be able to represent EPMO the way I want it represented. And I explained to her that many of the people that worked in business architecture had a technology background and that their expertise was different. It was more on helping people see the big picture or helping data. But she said, yeah, but the

Page 112

way they dress and the way they speak is not the way that I expect people to be. She specifically mentioned Blythe Neumilller and Tricia Brumbaugh and Dina Purcell, which were three ladies who were from business architecture. And --

Q. Did these ladies report to you?

A. Yes, they did.

Q. And can you describe their personal or physical appearance?

A. Yes. Blythe must have been in her 60s and she was fairly big and, therefore, she dressed with clothes that were very -- not tight, but just big clothes. Because she was so large, she also had problems walking. Anne, in front of me in one of her staff meetings said, yes, she waddles and she --

JUDGE ROBERTSON: Anne --

THE WITNESS: Gehring. Blythe waddles while she walks. Shortly after -- so Blythe was in her 60s, very overweight from everybody in the team. She was the person who was the most overweight.

BY MR. BRANCH:

Q. Who was present when Anne Gehring said

Page 113

that Blythe waddles when she walks?

A. I believe all of the directors were present because it was one of the staff meetings.

Q. So is Ms. Neumiller severally obese?

A. Yes, she is. And then she talked about Tricia Brumbaugh and she said, oh, my God, I could see her tummy from where I was sitting. And she told me, she directed me and she said, you better tell your team that they need to start dressing up better or they are not going to cut it, especially when we have meetings like this or when we're meeting with senior management, which my team, with very few exceptions, really had their direct relationships with senior management. It was -- on the business architecture side. On the process improvement side, yes, we did a lot.

Q. And you said the other employee was Dina Purcell?

A. So Dina Purcell was -- it's an African-American and she is slightly overweight, but I think the biggest comments came about Tricia Brumbaugh, who -- she's overweight. She's probably a

Arbitration Day 1                                                                November 3, 2014
                                    Washington, D.C.

Page 114

little bit more overweight than I am. She's going to be one of the witnesses, so she's going to be here. And she told me, you need to tell them they need to dress up. So I went downstairs to where my team sat and relayed the comments back.

Q. And what was their response?

A. They were all very concerned because they, up until now, had been very valued for the technical expertise that they brought into the company and by their understanding of how the functions worked together. And actually, Blythe decided that she would rather go with the securitization team and become a business architect with the securitization team and stay with Michael MacFarland there than come to -- than stay with my team, because she didn't think that there was a career.

Q. And when did Blythe leave your team?

A. Blythe left the team October/November, very early.

Q. In 2012?

A. Correct.

Q. And how long had Blythe worked on your

Page 115

team?

A. She had only worked on my team since August, when the business architecture team got transferred. But Blythe had worked at Fannie Mae 20 years, 25 years. She's been at Fannie forever. Same as Tricia. Tricia has been in Fannie 25 years.

Q. And did you report back to Ms. Gehring that Blythe Miller was leaving the team?

A. Yes, I did.

Q. And what was her response?

A. She congratulated me on getting Blythe to move voluntarily to the other team. I actually gave her a choice. I said, you know, I'll be happy to have your expertise, but if you want to have the opportunity in securitization, you are welcome to move there. And Anne thought it was great that Blythe had moved voluntarily to securitization because she said there is no way Blythe is ever going to cut it for the team.

Q. And was that based on Blythe's performance or something else?

A. No, it was based on Blythe's appearance.

Page 116

MR. WILSON: Objection.

JUDGE ROBERTSON: Sustained.

BY MR. BRANCH:

Q. Were there any issues with Ms. Neumiller's performance?

A. No, there weren't.

MR. WILSON: Objection.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. Did Ms. Gehring make any comments about the personal appearance of any of the federal regulators that had oversight responsibilities for Fannie Mae?

A. Yes. Actually, during one of those town hall meetings that she held like every month or so, she mocked the regulators by the way they were dressed and she mocked the regulators saying the left hand doesn't know what the right hand is doing, we have to come and educate them and, you know, they really don't know what they are doing.

Q. And how many people would be present at these monthly town hall meetings?

Page 117

A. All of her staff. So I guess it was like maybe 80 people.

Q. And what specifically did she say about the personal appearance of the regulators?

A. That they didn't know how to dress, that some of them had holes in their clothes, that they wear polyester suits.

JUDGE ROBERTSON: Oh, no.

THE WITNESS: And they had pen protectors in their pockets. It was a no-no.

JUDGE ROBERTSON: Is there a pencil protector provision in any of the human rights or civil rights laws that we're talking about here?

MR. BRANCH: No.

THE WITNESS: No.

JUDGE ROBERTSON: Okay.

BY MR. BRANCH:

Q. Did Ms. Gehring -- first, let me just ask: In 2012, late 2012, was an image consultant brought in to do a presentation at Fannie Mae?

A. Yes. So Anne, when she came, she's like, we're going to rebrand this team. This team had gone

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                            November 3, 2014

Washington, D.C.

Page 118

through several iterations of management. She said, we're going to show Fannie Mae that we could do things differently and part of it is having a new image and she brought in consultants, specialists that was -- and her task was to help with the branding of the team and also the personal brand of the members of the team.

Q.    And turn to Exhibit 35.

MR. WILSON: Your Honor, it looks like we're shifting topics here and we just want to try to -- if we could take a short break to figure out how much longer Mr. Branch is going to go with Ms. Lapera today so we can arrange for other Fannie witnesses in the morning.

JUDGE ROBERTSON: Okay. How about it, Mr. Branch? How long will the balance of Ms. Lapera's direct take?

MR. BRANCH: I would say about an hour.

JUDGE ROBERTSON: If we break now for lunch for an hour, then we can -- she'll be ready for cross about 2:30.

MR. WILSON: And I'll probably have the

Page 119

balance of the day with her on cross.

JUDGE ROBERTSON: All right. So you can bring your witnesses tomorrow. Let's break for lunch.

MR. BRANCH: Thank you.

(Whereupon, at 12:37 p.m., the arbitration in the above-entitled matter was recessed, to reconvene at 1:40 p.m., this same day.)

Page 120

AFTERNOON SESSION

(1:40 p.m.)

Whereupon,

ANA CRISTINA LAPERA,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

JUDGE ROBERTSON: Mr. Branch, you may continue your direct examination of Ms. Lapera.

EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)

Q.    Ms. Lapera, did you attend the image consultant presentation in 2012?

A.    Yes, I did.

Q.    Turn to Exhibit 35. What is this document?

A.    This is the presentation that was the basis for that training.

Q.    What type of information was communicated at this presentation?

A.    It was supposed to be about personal branding and talks about how the pie mold that you see in page P 0084 where it talks about our

Page 121

performance image and exposure and you could see the percentages -- performance is only 10, image is 60 percent and exposure is 30 percent. Those are success factors when growing in your career.

Q.    And so what information was actually communicated?

A.    So, obviously, that image was very important and then the lady talked about facts like, well, it takes 10 seconds for people to make an impression on who you are and after that impression has been conveyed, it's very hard to change it. And then she went through different aspects that it could change of yourself to be perceived differently. And first she talked about what message you want to give and she talked about a lot of external clues that help people brand themselves.

So it was about wardrobe, the way you look, the way your hair is put together or your personal grooming, how do you sound. There was a lot of emphasis, though, on the way people look and personal grooming.

Q.    And when you say "there was a lot of

31  (Pages 118 to 121)

Arbitration Day 1                                          November 3, 2014
Washington, D.C.

Page 122

emphasis placed on the way people look and their personal grooming," can you elaborate there?

A.   She said things about, for women, 80 percent of your clothes must be tailored because there is no way you're going to go off the rack and find something that really fits you. You should wear makeup. You should not wear perfume. And, like, I remember asking her, what about what I'm wearing right now? And she said, no, too little. If you have so little, you're not making enough of a statement, so you need to bring that up.

She acknowledged that there were certain nationalities and races where colorful dress was the way they had been brought up and she's like, well, if you're in corporate America, you shouldn't be dressing in colorful ways. And I know some of the things are not directly in the presentation, but the presentation was complimented by exercises and by talk by the consultant.

Q.   And were you offended by the presentation?

A.   It took me aback because it was not what I expected. And if you see some of the other exhibits

Page 123

that I'm sure Mr. Wilson is going to present, Fannie Mae was always a -- used to be a very diverse company where diversity was encouraged and where we still had to dress professionally, but trying to make people conform to a uniform way of dressing and looking was not something that had been part of the Fannie Mae message up until the time of this class.

Q.   Did any members of your team express concerns about the presentation?

A.   Yes. There were several people that were concerned. For example, there was one lady that said, well, I'm done because I cannot wear makeup because I have an allergy. So does that mean that I cannot progress because I cannot wear makeup just the way this lady said? There was talk about coloring the hair.

MR. WILSON:  Your Honor, if we could just establish that she was told these things herself. So it's an objection to foundation.

JUDGE ROBERTSON:  These are all things that you heard said yourself?

THE WITNESS:  The lady with the makeup?

Page 124

No, she told that to Kathy Keller. But the other stuff I -- I'm sorry. I apologize. That's the only one that I said that I heard through the thirdhand. But the rest of it the lady said in front of the class.

She specifically talked about gray hair and how in men, it looks good but in women, it was frowned upon. So if your hair was gray and you were a woman, you should think about coloring it and then keeping the color up so the roots wouldn't show. So that's the type of things that she said during the class.

BY MR. BRANCH:

Q.   And so what was offensive about those comments?

A.   Well, on the staff, Dina and Tricia after the class said, I guess we have a lot to change in order to conform to these new standards.

Q.   Had you given presentations on branding or image at Fannie Mae?

A.   Yes. I was part of the mentoring circle program that Fannie Mae organized. And on one of the

Page 125

sessions or one of the topics on that series was about personal branding. But again, when you see the materials that HR prepared in that subject were all about being authentic, leading from inside. Yes, there was material about body posture, but it was how your body posture affects the rest of the people and it was not about -- there was some talk about dressing, but it was not specific about change the way you dress, don't color your hair. None of those suggestions were included in the material that Fannie Mae provided for the mentoring circles.

Q.   And when you provided the -- you participated in this mentoring service presentation, where did you get the information that was communicated to the audience?

A.   From the HR team.

Q.   And you have Fannie Mae's exhibits in front of you, Fannie Mae Exhibit Number 1.

A.   Yes.

Q.   And what is Fannie Mae Exhibit Number 1?

A.   Fannie Mae Exhibit Number 1, it refers to the mentoring circles. So if I may, the mentoring

32  (Pages 122 to 125)

Page 126

circles was a program that Fannie Mae put -- that the HR department in Fannie Mae developed so directors could mentor each other and can coach -- there was coaching across director lines.

It was a very powerful program because it was people all at the same level and once they facilitated, had established a level of trust among the participants, the conversations flew very wide. And the way the program was structured, for every -- there were a series of topics that were important for leadership at the director level. The participants could choose the topics that they wanted to explore during the six months that we were together.

And one of the topics was on managing authenticity and personal leadership. I would distribute all of the material ahead of time and then during the session, I would kind of, like, review the key points and then the participants would talk about their experience and how they saw each other and there would be exercises related to the topic.

Q. And so how did that presentation differ from the fall of 2012 presentation of the image

Page 127

consultant?

A. So the background material for the mentoring circle was an article by Harvard Business Review. And if you see, all of the topics are about being authentic. And yes, it is important to manage perception, but it's about learning to know yourself, not about -- and your origins, not about suppressing who you are, getting to know everybody better. I mean, you can see in page 89 of the article or FNMB 001749, that was the message which was completely in line with Fannie Mae's message. So getting to know yourself and your origins, to make sure that you knew what filters you had, what kinds of attitudes you brought to the work, getting to know each other better so you have a richer picture and you could establish communication and empathy with other people and connect in the organizational context better.

So it was all about honoring who each person was so everybody would bring the better -- their entire self to work and be more effective for Fannie Mae. And that was the message during that time.

Page 128

Q. All right. So for the presentation by the image consultant, did you feel compelled to attend?
A. Yes.
Q. And why do you say that?
A. Because Anne Gehring had made it very clear that it was part of her effort for rebranding the team and that it was an investment that the company was making and she encouraged us to attend and to tell our people that they needed to attend.
Q. Does Fannie Mae have a dress code?
A. Yes. It is business casual and there is guidelines as to what's acceptable and not acceptable.
Q. And turn to Exhibit 36.
A. Yes.
Q. And what is the dress code at Fannie Mae?
A. As I said, it's business casual, but it explicitly says that it permits employees to wear either traditional business clothes or business casual clothes in the work environment.

There were pictures on what was acceptable or not acceptable posted on Fannie Mae's website. So

Page 129

things like shorts or tank tops or that sort of things were definitely not acceptable and everybody knew that.
Q. For the employees who reported to you, was their dress in conformance with Fannie Mae's dress code?
A. Yes, it was.
Q. At all times?
A. Yes.
Q. Did Anne Gehring make any comments about the personal appearance of any consultants?
A. Yes, she did. During the last quarter of 2013, something like that, I don't remember the exact timing, but we hired a group of consultants from KPMG and Anne's comment was, finally, I can see somebody smart in this team, somebody intelligent. I can see it in Mike's eyes. And he was white, Caucasian with beautiful blue eyes and, you know, he was totally incompetent, but she saw intelligence in his eyes.
Q. Can you place that in the context of how the comment was made or when the comment was made?
A. It was close to -- it was late on that

Arbitration Day 1                                                November 3, 2014
                          Washington, D.C.

Page 130

year. I'm pretty sure that it was in late 2012. And they had been hired to put together some -- develop some presentations that would then go to the management committee and to FHFA further explaining Fannie Mae investment strategy.

Q.   Who was the consultant?

A.   KPMG.

Q.   And they were hired by --

A.   Anne Gehring.

Q.   -- Anne Gehring? Okay. And she made a comment about one of the consultants?

A.   Correct.

Q.   Where did this comment take place?

A.   It came -- it took place -- and I did hear that directly -- in the corridor in front of our office and she addressed it to me and to Kathy Keller and said, finally, somebody who is smart here.

Q.   And who was she referring to?

A.   Mike, the consultant from KPMG.

Q.   Did she make any comments about the color of his eyes?

A.   No. She just said I can see how smart he

Page 131

is in his eyes.

JUDGE ROBERTSON:  He's what?

THE WITNESS:  I can see how smart he is just by looking at his eyes.

BY MR. BRANCH:

Q.   What is his race?

A.   Caucasian.

Q.   Were you offended by that?

A.   Yes, I was.

Q.   And why?

A.   Because I had seen the work product that Mike had delivered and it was not up to par. And actually, Kathy and I had to work really, really hard to make sure that we brought it up to the standards that Anne had established. So yes, I was very offended.

Q.   Did you participate in a calibration session in 2012?

A.   Yes, I did.

Q.   What is calibration?

A.   At the end of every year, Fannie Mae, all of the managers of each division or each team,

Page 132

depending on the size of the team -- in this case, it was all of the EPMO, all of the managers and directors got together. And the way it works is the manager comes to the table and assesses each one of the employees and says, I think these employees should be qualified either as a 4, which means does not meet expectations; as a 3, which means meets expectations; as a 2, which is exceeds expectations; or as a 1, which is frequently or exceeds expectations. Number 1 is highest performance. And there is guidelines as to what percentage of the company needs to be in each one of those classifications with the bulk of the people being in number 3, meets expectations.

So the managers come in with the grade that they think their people are, there is a discussion among the managers as to why I think my person should be this and that to help people fit within the curve and then the final grades are assigned.

Q.   Did you come to this calibration session with ratings that you were proposing for your

Page 133

employees?

A.   Yes, I did.

Q.   Had you decided on a rating that you were trying to get for Patricia Brumbaugh?

A.   Yes, I did.

Q.   And what happened with Ms. Brumbaugh's rating?

A.   So I had come prepared to request that Tricia was rated as a 2. And I had done the internal curve within my team to make sure that I was not upsetting the curve for the overall EPMO. I had a sizable team, so I knew that it was one of my responsibilities to make sure that people fell within that.

So within my team, I rated Tricia as a 2 because of all of the amazing deliverables that she produced that particular year.

Q.   Who else was present in this meeting?

A.   It would be the same people that attended Anne Gehring's staff meeting. So it would have been Kathy Keller, Mike Choi, Amilda, Keith Smith, Jim Tomasallo. And funny enough, there was nobody from

34  (Pages 130 to 133)

Page 134

HR, which is interesting because normally, there is somebody from HR that attends these sessions.

Q.    So you came into this session and you proposed that Ms. Brumbaugh get a rating of 2?

A.    Correct.

Q.    What happened when you presented this?

A.    She agreed that Tricia had done a fantastic that year.

Q.    She being whom?

A.    Anne Gehring.  And the team.  Particularly the data work that Tricia did that year was outstanding.  But Anne Gehring pushed back and said, but the way that Tricia looks doesn't represent the way I want somebody in my team to look and she doesn't have the executive presence that I want people in my team to have.  So if you give her a 2, it's going to imply that she's already doing a lot of the things that we want her to do and it would be the wrong message to have.

And then the conversation continued and I'm like, no, but I think it should be a 2.  So the conversation continued.  And the way this happens,

Page 135

once it comes time to rate the directors, the directors step out of the room and it's only the vice presidents.  So I stepped out of the room leaving Tricia Brumbaugh's rating as a 2 and then afterwards I was told by my manager who told me you have to downgrade Tricia to a 3.

And when I came back and confronted Anne and I said, well, so what happened?  What's the point of this discussion if I'm her manager, I know how she performed, my curve within my team fitted the parameters of the guidelines of Fannie Mae and it's supposed to be a guideline.  It's not supposed to be exact.  Why did she get downgraded?  And she said, well, because she's still not up to par with her appearance.

Q.    And who made that statement?

A.    Anne Gehring.

Q.    And did you respond to that statement?

A.    I thought it was unfair and I told her so.  And actually, Shandell Harris had to call me, like, two times for me to downgrade it.

Q.    Who is Shandell Harris?

Page 136

A.    Shandell Harris is the HR business partner that supported Anne.

Q.    And I'm sorry, you say she had to call you to downgrade it?

A.    Yes.

Q.    What do you mean by that?

A.    Because the manager has the responsibility of entering the rating into the system.

Q.    So she had to call you two times why?

A.    Because I didn't want to change it.  I thought it was unfair.

Q.    During this calibration session, did Ms. Gehring make any comments about the accent of any employees?

A.    Yes.  Shirley Cruz Rodriguez was mentioned.  Shirley is an Hispanic lady who works for me as a -- at that time she was a green belt, so she worked in my process improvement team.  She does have a very thick accent, but her clients love her.  It's once they get to know her and they see the quality of her work, it's kind of like the accent disappears.  Same comment.  Anne said as long as Shirley has the

Page 137

accent, she's going to need to work on that accent because there is no way she's going to progress with an accent like the one she has.

Q.    Did this impact her evaluation?

A.    She was a meets expectations that year.  So no, it did not impact her evaluation, but it was made very clear that unless her accent changed, she will not have any more opportunities for promotion.

Q.    Do you recall any other comments made by Ms. Gehring at calibration concerning the personal appearance or accent of any employees who were being evaluated?

A.    Not at this time.

Q.    Did Ms. Gehring make any comments about Kathy Keller's weight?

A.    Not in the calibration session, but during the staff meetings.

Q.    Not in the calibration session, but at any time did she make any comments about Kathy Keller's weight?

A.    More than her weight.  It was, again, her appearance.  Anne Gehring is a very smart lady.

Arbitration Day 1                                                                November 3, 2014
                                    Washington, D.C.

Page 138

She's not going to use the wrong words. And I was in Anne Gehring's office either during the staff meeting or short -- actually, it was after this session where Kathy Keller said, listen, God made me short and fat. There is nothing I can do about that. I already have my sleeves tailored because anything that I buy in the store, it's going to be too long for me. There is nothing I can do about that. And Anne was like, well, I can help you. I used to be overweight before and one of my friends helped me, so I can give you tips on how you can look better.

Q. When did this conversation take place?

A. I think it was shortly after the session, but I cannot remember the time that I -- I just remember Kathy was always worried that, with her appearance, at some point it was going to come and haunt her.

Q. Did Ms. Gehring say anything else after that conversation with Ms. Keller? Did she make any comments to you?

A. Well, she said, I could look better, too. She's like -- she was talking to Kathy and saying, by

Page 139

the way, you can also look better. So I'm like, okay, what do you want me to do?

Q. And were you offended by that comment?

A. Up to a point. And I made a lot of off-the-cuff remarks. But yes, it was not appropriate and I knew exactly what she meant. I knew she meant I could also lose weight because Anne made a point of, in the mornings when she would come in, to say, you know, I just came from the gym and I'm eating a yogurt and a banana to keep my weight and people should do more of this, act like I do.

Q. Did you observe the impact Ms. Gehring's comments had on Ms. Keller?

A. Yes, I did.

Q. What did you observe?

A. Kathy became increasingly less confident on her abilities. And Kathy had been a vice president for a long time and she had a lot to offer and actually, she had developed the framework that we used for evaluating the investments, and she became more and more distraught by working under this environment.

Page 140

Q. And how do you know she became distraught by working in this environment?

MR. WILSON: Objection, Your Honor. Relevance. I mean, this whole line of question about the impact of the comments on Kathy Keller, I don't know how it goes --

JUDGE ROBERTSON: How about the relevance, Mr. Branch? This isn't Kathy Keller's case.

MR. BRANCH: Your Honor, it's relevant because these are comments about the personal appearance of Ms. Lapera, the comments were made in the presence of Ms. Lapera, and it demonstrates Ms. Gehring's attitude toward people who did not meet the personal appearance that she believed should be acceptable at Fannie Mae. And basically, it formed a part of Ms. Lapera's opinion on why she believed that the actions were discriminatory.

MR. WILSON: Your Honor, if I may. The impact or the alleged impact that they had on Kathy Keller is of no relevance to anything of what Gehring may have said to her.

JUDGE ROBERTSON: Sustained. Sustain the

Page 141

objection. What she said might be relevant, but the impact on Kathy Keller is not. So next.

BY MR. BRANCH:

Q. How did Ms. Keller's employment come to an end?

A. Kathy Keller was forced out of the company.

MR. WILSON: Objection. Foundation.

THE WITNESS: Foundation means how do I know?

JUDGE ROBERTSON: I'll sustain the objection. Do you want to do a better foundation?

BY MR. BRANCH:

Q. How do you know that Ms. Keller --

JUDGE ROBERTSON: What do you know about her departure?

THE WITNESS: So Kathy Keller didn't talk much about that. However, Kathy Keller was my boss and we had worked together since we started in the company. So I visited her office quite often because she was my boss. And I can tell you that in multiple occasions -- I know that Kathy Keller did not want

36 (Pages 138 to 141)

Arbitration Day 1                                          November 3, 2014
Washington, D.C.

Page 142

any --

MR. WILSON: Objection, Your Honor. This is words from Kathy Keller, not Ms. Lapera's personal knowledge.

THE WITNESS: No. I know that Kathy Keller didn't want to leave because Kathy Keller had a son who had suffered a heart transplant and who needed intensive medical care and she needed Fannie Mae insurance. She didn't want to leave Fannie Mae.

JUDGE ROBERTSON: All right. Enough. Enough of that. Move on, please, Mr. Branch.

MR. BRANCH: Your Honor, I guess I would like to -- I have a couple of questions that I just want to get on the record the fact that the treatment that Ms. Keller received from Ms. Gehring resulted in Ms. Keller crying on many occasions and it may have had some impact on this witness.

MR. WILSON: Your Honor, could we have the witness removed while we have a sidebar on this?

JUDGE ROBERTSON: Look, this is not a jury case. I can winnow out what I need to winnow out. If you need to make a record, go ahead, make a

Page 143

record. I mean, making a record in arbitration is -- well, this is a funny kind of arbitration. So go ahead. Go ahead. Let's not argue about it. Just get on with it.

What did Ms. Keller say to you about the reason she left the company?

THE WITNESS: Sir, I walked into Kathy's office and she was crying and she said, I need -- Fannie Mae is forcing me to take a package and they threatened that if I don't sign this letter by today at 3 o'clock, then they're going to start bringing accusations against my performance and then dismiss me for performance and then I will be out of Fannie Mae without insurance and without the package and I cannot reach my lawyer. And -- and she was distraught. And nobody told me that. Kathy herself told me that.

JUDGE ROBERTSON: Okay.

MR. BRANCH: Thank you.

BY MR. BRANCH:

Q. So when did Ms. Keller leave her employment?

Page 144

A. May 30, 2013.

Q. After Ms. Keller ended her employment, did her position become available?

A. Right after Kathy left Fannie Mae, the position was posted the following Monday.

Q. And turning to Exhibit 45.

A. Exhibit 45 is the position announcement and this was standard procedure in Fannie Mae. When an officer position became available, the position would be circulated among all of the officers and directors to encourage them to apply. And as you see, here's a position, it had a link to the position description, and then it said apply no later than Monday, June 10th.

Q. And you received this e-mail as a director?

A. All of the directors did.

Q. And did you apply for the position?

A. Yes, sir, I did.

Q. Let's turn to Exhibit 57.

A. That's the position description that was linked to that posting.

Page 145

Q. This is Ms. Keller's position?

A. Yes.

MR. WILSON: Objection. Foundation.

THE WITNESS: That was a position for vice president of planning and alignment that Kathy formerly had occupied.

JUDGE ROBERTSON: The objection is overruled.

BY MR. BRANCH:

Q. So why did you apply for this position?

A. As you can see in the overview of the job, it described the responsibilities of the job. "The multiyear investment plan includes project deliverables, milestones, interdependency and funding requirements."

I had worked with Kathy all of these years and I was intimately familiar with the planning aspects of the job. And in addition to that, the positions that reported to the vice president of planning and alignment, it was a team of 30 people. Of the team of 30 people, 24 of them reported directly to me and the other six, including the vice

37  (Pages 142 to 145)

Arbitration Day 1                                                    November 3, 2014

Washington, D.C.

Page 146

president position, were part of what constituted the team. So I already managed 80 percent of the team. I thought it was a natural career progression for me.

Q. And more specifically, did you have responsibilities for any of the other components of this position listed in the overview of the job and management and reporting structure?

A. Yes. I was reporting to the individual -- if you see in the overview again, "Reporting to the individual will be the head of operational excellence and Lean Six Sigma, who is responsible for driving process improvement and using the Lean Six Sigma methodology across the entire corporation." That was my position.

Q. By your position, you mean head of operational excellence?

A. Operational excellence and Lean Six Sigma.

Q. Please continue.

A. So I applied to the position because I thought I met all of their requirements and it was -- you know, I was already the internal candidate that knew the most about the position. So it was just a

Page 147

natural progression in my career. And I had been told that I was being groomed to be a vice president, an officer of the company. So it was logical that given that I managed a significant portion of that team, that I would apply for that position.

Q. And had you been evaluated in your position in the year before you applied for this position?

A. Yes, I did and I got 1, which is significantly exceeds expectations. It's the highest grade you can get.

Q. I'm sorry, turn to Exhibit 19, please.

A. This is the yearend review that I received at the end of 2012 or the beginning of 2013. The evaluations were given out actually at the beginning of 2013.

Q. And is this the last evaluation that you received before you applied for this position?

A. Correct.

Q. And so does this evaluation accurately capture your performance and work for 2012?

A. Yes.

Page 148

Q. So how did you apply for the position?

A. I used the regular procedure that everybody uses. As I said, when the position is posted, it has a link to the position description and from there it has a link to the electronic system that enables you to apply and express your interest. I filled all of the information indicating my interest. I did have a problem submitting my resume because -- I don't know -- my account got locked. And so I contacted the recruiter and I explained to her the situation, that my account got locked and so I submitted my resume directly to the recruiter.

Q. And at the end of 2012, was Anne Gehring your second level supervisor?

A. Yes, she was.

Q. Did she have to approve this evaluation that you received at the end of 2012?

A. Yes, she did.

Q. Did you submit your application for this position by the June 10th, 2013 deadline?

A. Of course.

Q. What happened next after you submitted

Page 149

your application for this position?

A. The same thing that normally happens. You wait a little bit. During that time, the recruitment team puts together all of the resumes and decides which ones are candidates that should be evaluated or interviewed for the position. And then I got a call later saying -- like a month later saying you are going to be interviewed next week for the position and your interviews are two on Monday and one on Thursday. And then subsequent to that, the previous Friday, they called me back and said, no, all of the interviews are going to happen on Monday. And I'm like, okay.

Q. Did you go to the interviews on Monday?

A. Yes. I had Mike Choi at 9:30, I had Anne Gehring at 10:00, and I then had Shandell Harris sometime in the afternoon.

Q. You've already testified that Mike Choi was a vice president that reported to Ms. Gehring?

A. Correct.

Q. So can you tell us what was actually said at the interviews with these three individuals?

38  (Pages 146 to 149)

Page 150

A.   The interview with Mike Choi was very cordial. It was just a conversation. There didn't seem to be any questions or anything in particular. It was more get to know each other better and what would I do in the position and so I explained what I would do. But it was nothing remarkable out of that.

The conversation with Anne, again, was a very cordial interview. The interesting thing in the conversation with Anne was she told me during the interview I'm going to announce the winner, the person who is going to occupy this position by Friday. And right there I knew, okay, she already has another officer who she's going to announce because there is no way she could make an announcement and have someone who is a director become a vice president by Friday. And she said, the position is going to be announced on Friday. And these very same words were repeated by Shandell when I went to interview with her.

The interview with Shandell was a little more interesting because she said, I cannot evaluate you on technical grounds. I can only evaluate you on

Page 151

leadership grounds because I'm not qualified to judge you from your technical capacity. Anne wants to announce the position on Friday, which was the same that Anne had told me earlier in the afternoon. And when I asked her, well, from everything that you have seen and since you're evaluating from leadership capabilities -- she had seen me perform as a leader of the company. I said, is there anything that I'm missing? And she said, the only thing that I think you're missing is the executive presence portion.

Q.   And did she explain what she meant by that? Or I should ask you, did you ask her what she meant by that?

A.   Executive presence is a very big word that can be applied to many things. And at that point -- I don't remember exactly, but I believe she told me it was about relationships with people and being able to communicate with vice presidents, which I have been doing all of my career and particularly late this year at Fannie Mae. But no, she didn't give anything specific that I remember about what she meant by executive presence.

Page 152

Q.   Did she have any pre- prepared questions?

A.   No, she didn't. She didn't appear to have any pre-prepared questions.

Q.   Did she take any notes from the interview?

A.   I didn't see her taking notes.

Q.   Did you see either Mr. Choi or Ms. Gehring take notes at the interview?

A.   No, I didn't.

Q.   And where were these interviews held?

A.   In each one of their offices.

Q.   Did you have a lunch interview with any of these individuals?

A.   No, sir.

Q.   So what happened after your interview with Ms. Harris?

A.   So that happened on Monday and then on Thursday, Anne's secretary, Monica Doxie, called me and scheduled a 15-minute meeting between me and Anne. And so I went to see Anne on Thursday and she said I wanted you to know that the person that I have selected, it's Nicola Fraser.

And at that point, I guess I made one of

Page 153

my comments unexpected and said, I knew I didn't have the position and I knew it from the beginning. And Anne said, why do you say that? And I said, well, it was very clear. You said you were going to have somebody on Friday and the only way you could do that is if the person was already an officer. And there were only three -- there were three candidates, based on what I had understood, and the other candidates were Joe Hallet, Nicola Fraser and myself. And she said, you are very perceptive. That is correct. However, you are going to love working with Nicola. She's young, she's energetic, she brings new ideas. And I told Anne, yes, but you know that Nicola knows nothing about Lean Six Sigma, nothing about business architecture and that's 80 percent of the team. And she said, well, I don't need to worry about that because I know you're going to train her. You're going to teach her what she needs to do. And I'm going to ask Nicola to attend the training classes that your team conducts so she can become educated on Lean Six Sigma.

And I was upset, I told her so and I said,

39  (Pages 150 to 153)

Arbitration Day 1                                        November 3, 2014
Washington, D.C.

Page 154

well, I will still try to work with Nicola, but it's very disappointing. And then I left. It was 15 minutes.

Q.    And how did you feel after you learned you were not selected for this -- you were not going to be selected for this position?

A.    I felt bad because the other thing that she said -- I was very disappointed because I really had thought that it was a logical progression in my career. And then she said the only thing you need to do is work on your executive presence and in communications. And I'm like, that was not in my performance review. It was not something that anybody had told me before. I mean, people always have to improve upon things, right? But it was never put as if you don't improve that, you cannot become an officer. So I was very, very disappointed. And my team was disappointed, too, because they knew I had worked hard and --

MR. WILSON: Objection. Relevance.

THE WITNESS: I was disappointed.

BY MR. BRANCH:

Page 155

Q.    How important was it to you to get an officer position?

A.    It was very important.

Q.    Why?

A.    Because I had spent the bulk of my professional career in Fannie Mae, I believe in Fannie Mae, I believe in the mission and I believe that that was the logical -- it's not that people deserve things just because they deserve them. I believe that I had worked hard and that I could do an excellent job in that position. And it was I wanted to finish my years in Fannie Mae as an officer. It was like my dream and it was the path that I had set up for myself for a long time. It was what I had been working towards for many, many years.

Q.    Had you worked with Nicola Fraser before this selection?

A.    Yes, I had.

Q.    How did your qualifications for this position compare with Nicola Fraser's qualifications?

A.    What's the exhibit for the position?

Q.    The position is at 57. Ms. Fraser's

Page 156

resume is at 66.

A.    So when it comes to the position, we already have established that 80 percent of the position was working on the business architecture and process improvement part. Nicola didn't have any experience in those things. Nicola was a --

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: Overruled.

THE WITNESS: Nicola is extraordinarily good in the finance perspective, on finance, and she did have experience in crafting presentation, but so did I. When it comes to -- so in terms of the duties, I already had a strong relationship with the senior leadership team and the project team, particularly, the project managers. I knew each and every one of those project managers and had extensive relationship with them.

Nicola had extensive relationship with David Benson who was the chief financial officer and with the officers that were related to finance, but not with the broader context of the organization. In finance? Yes, she had tremendous relationships and

Page 157

so did I, but not with Mr. Benson. But with all the other project managers, I did.

I was already familiar with the risks, the opportunities and what was needed to drive the collaboration, to incorporate all of the facts into a multiyear investment plan.

Q.    Are you looking at the job description?

A.    I'm looking at the job functions and responsibility.

Q.    That's Exhibit 57?

A.    Yes, correct. Nicola, by her own admissions, she didn't know all of the directors, she didn't know the projects that were ongoing. She knew the financial aspects, but she didn't know what the projects themselves were all about.

"Communicate effectively at the highest level of the organization." Nicola had the opportunity to work directly with the CFO, but as I have described before, I also had access to different parts of the management committee. I did not have access to the regulator or the board of directors, but there was no reason why I couldn't -- you know, I

40 (Pages 154 to 157)

Arbitration Day 1                                    November 3, 2014
                          Washington, D.C.

Page 158

just didn't have the opportunity to demonstrate that relationship. And I do not know if Nicola had had that opportunity before.

"Take ownership and overall approach for managing the EPMO relationship with external stakeholders, including FHFA and gather the input and coordinator responses." I had done that -- I had not done it with the FHFA; however, I had done it with the mortgage bankers association, I had done it with the program manager and it was an integral part of my job as I work with process improvement and business architecture.

"Create and maintain tools that document the multiyear investment plan and provide the ability to quickly evaluate multiple scenarios." I had been part of the team that had developed the tools and you have to use them. Nicola had nothing to do with that part and had not even worked on that capacity. .

"Establish and groom a team of future leaders that are viewed as value added business resources for achieving critical business objective." I had demonstrated how to groom leaders and not only

Page 159

within my organization but across. I have never seen Nicola do that either. And I worked side by side with Nicola with her as my client for at least a couple of years and I never saw her grooming people that way.

"Assess optimal organizational structure, identify and fill critical skill gaps. Coach team members for progressional growth." I have demonstrated that I could do that over and over and over again during my positions. Again, Nicola's team in finance was very, very small and she actually had a lot of issues with staff retentions as well.

"And consistently support the goals and objectives of the brother EPMO. Build strong relationships with the leaders of each pillar. And consistently engage, partner and communicate with peers to ensure cohesive execution of organizational goals." Again, I was very, very familiar with all of those things. Nicola had to start by understanding the framework and understanding the project, so she was already behind in terms of being able to perform on the job.

Page 160

And then in terms of years of experience, I had at that point almost 20 years of experience in Fannie Mae and Nicola had started working in 2002 and in Fannie Mae only a couple of years, like four years before. So I had more experience, I had more years of experience as a manager, I had expertise in program management which she didn't, I have a master's and she does not and so on and so forth. So you could see how I was far more qualified than Nicola to get this position.

Q.   And if you can just summarize how your qualifications compare to Joe Hallet, the other applicant.

A.   We had talked about Joe a little bit before. Joe is a wonderful guy, great project manager. Again, his experience had been in the customer engagement side, so it was very much more narrow and only in single family and he had excellent relationship with a vice president that was in charge of single-family projects, but he didn't have any reason to have the kind of relationship status that I had with the rest of them.

Page 161

Q.   And is Joe Hallet a Caucasian male?

A.   Yes, he is.

Q.   And Ms. Fraser is a Caucasian female?

A.   Correct.

Q.   And their personal appearance or physical description?

A.   They are both slender.

Q.   Did you have any experience in working with Ms. Fraser after she became the vice president for planning and alignment?

A.   Yes, I did. Nicola waited at least 10 days before she held a staff meeting after she became the vice president of planning and alignment and she came to the meeting. It was for a half an hour. She came late and she said you better get used to me being late because I'm always late.

She proceeded to tell us all about her life and where she was born, how she grew up, her daughter, her husband, all of those things. And she never asked what were the concerns of the team, she never talked about what her vision for the team was or anything. So we started not in the best of ways

41   (Pages 158 to 161)

Page 162

from the leadership perspective.

And then subsequently, we continued to try to meet so I could explain what we were doing and how we were doing it, but it was going to be an uphill battle. So at that point, I'm like --

Q. Did Ms. Fraser know what Lean Six Sigma was?

A. No. She had no clue. I had one of my directors come and explain to her one of the projects that we had. And Ms. Fraser had been my client for a while. More on the streamlining of the projects. But when my director, who was Farley Price, actually came and explained a project that we were doing in IT to help them minimize the number of failures, she exclaimed, oh, so your team knows statistics. How practical and how refreshing to know that. And the name of Six Sigma, it's about -- Six Sigma is about statistics. It's a statistical term. So that's how far behind she was in terms of understanding what we did as a team.

Q. What percentage of the team was actually responsible for Lean Six Sigma?

Page 163

A. It was 12 people. So it was like 40 percent of the team.

Q. When did you leave Fannie Mae?

A. November 1st, 2013.

Q. And why did you decide to leave?

A. I had taken a vacation and I had delegated most of the responsibility to my team. When I came back, they were ready to take it over and I just frankly couldn't take it anymore. I was getting sick, I was not sleeping, it was affecting the relationship with my family.

I figured, you know, if I go on this vacation and then come back, I'm going to come refreshed and I'm going to be ready to put more on for the team, but I came back and it was -- Nicola was still not there, I couldn't see where she was taking the team. I just figured it was a no win situation for me. And I had already received this slap on the face of not being chosen for the position and she had not demonstrated she could do the job either. So I'm like, maybe I shouldn't have quit, but I just couldn't take it. I was at wit's end. So

Page 164

I left.

Q. What impact did not getting this job have on you?

A. I was totally demoralized. I had worked really hard and I didn't -- and, you know, sometimes you apply for jobs and you don't get them. But in this case, it was just a logical step. It told me I was never going to make it in Fannie. It told me there were always going to be objections to me becoming an officer and it was affecting me physically. So it was not worth my health. And it just destroyed the dream of really being an officer of the company.

Q. And when you say "it affected you physically," what do you mean?

A. I mean I was not sleeping, I was physically getting ill, I was depressed.

Q. What do you mean by "depressed"?

A. I didn't feel like I could provide a leadership example, couldn't be totally -- I couldn't be myself and really lead the team the way I needed to lead it because I didn't believe in the

Page 165

leadership. You know, normally, I'm a very, very strong person and it just took me completely off center and I just couldn't get myself to perform again.

And this had happened before. I mean, it's not the first time that I have a setback in my career. But in this case, it was so obvious that it was because I was being discriminated and there was no way I could fight it. And as I had seen already by when I tried to get my position upgraded, it was affecting me. I couldn't eat -- actually, I could eat. I ate more. I couldn't sleep. I don't know what else should I say.

Q. Why do you believe you were not selected for this vice president planning and alignment position?

A. I think it was obvious that the decision was made way before the position was even open that it was never going to be me. If you see the e-mails, it was either going to be Joe and then once Nicola became a candidate, it was Nicola. So they never really considered me a serious candidate for the

Arbitration Day 1                                                                November 3, 2014
Washington, D.C.

Page 166

position.

Q. Why do you believe you were not considered as a serious candidate for the position?

A. I believe it was because of the way I looked. She told me it was because of my executive presence. And I believe that's a euphemism for my appearance because I have already demonstrated that I've been able to communicate at all levels of the organization effectively. So that's the only thing that is left.

Plus, I had already seen how somebody who didn't look the part got pushed out. So, to me, it had to be discrimination because of the way I looked, because of my age, because of my background.

Q. Did you observe Ms. Gehring show any preference for certain types of employees or individuals?

A. For people that were more in shape and that always agreed with her opinions.

Q. You mentioned previously that you believed that you were not selected because of discrimination. Have you stated all the reasons you believe why that

Page 167

there was discrimination?

A. So I was clearly more qualified, both from the technical and the leadership perspective. I had the relationships, which is part of the leadership perspective. The only thing that was pointed out was that I was lacking executive presence. And to me, it was you don't look the part.

Q. Did you observe Ms. Gehring treating employees who were overweight differently than employees who were not?

A. The people that she surrounded herself tended to be people that were in good shape.

Q. Now, have you used the term "executive presence"?

A. I believe I have on the context of appearance.

Q. And what do you mean in the --

A. When Anne gave me feedback on the business architecture team and how they look, I believe I may have used that term to describe how they should look as consultants and have more of the consultant executive presence with the business architecture

Page 168

team.

Q. Other than the impact this had on you physically and your statement about being depressed, were you impacted in any other way?

A. It impacted my relationships with my family because I was not myself. My husband was at wit's end on how to help me overcome all of this. Same with my daughter. I know both of them talked about how could they help me get past from this harsh part.

Q. And how long did you feel depressed?

A. It actually lasted longer than I expected because I didn't want to leave Fannie Mae. I always thought that I was going to stay there until I truly retired. So at least four or five months. And actually, even now, you could still see that I do feel very strongly about all of this.

Q. And what were some of the manifestations of the depressed feelings? How were you different when you were feeling depressed as opposed to how you are normally?

A. I didn't want to participate in other

Page 169

activities. I could close into myself and not talk. It affected the relationships with my husband.

Q. Why do you believe -- or let me -- I won't say why, but -- well, let me ask this: Why do you believe your position was not classified properly?

A. Because I could clearly see that two of my peers that were male that did jobs that were the same as mine that were my partners got a different classification than mine. So people that were -- males that were performing exactly the same job got a position classified different than mine.

Q. Wand ere they of a different race?

A. Yes, they were Caucasian and African-American.

Q. Have you been harmed financially in any way by the improper classification of your position or the loss of the vice president's position?

A. As a result of that, because I left Fannie Mae, I started collecting my Fannie Mae pension sooner; therefore, the monthly amount that I get for my pension is less than if I would have waited until I retired, let's say, at age 62.

43 (Pages 166 to 169)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                    November 3, 2014
Washington, D.C.

Page 170

Obviously, because I left, I was not eligible to collect the bonuses that I could have accrued during the last year that I worked and the long-term incentive from the previous year. So it's pension, earlier pension and the bonuses. But I have an exhibit somewhere that explains.

Q. Let's turn to Exhibit 39. Have you calculated the total estimate of your loss?

A. Yes. It's hard to read in this one that's in black and white, but --

Q. Here. I'll give you a copy. It's probably in here.

MR. WILSON: Do you want to use the blowup that I tried to do? I mean, it might be easier for everyone's benefit.

MR. BRANCH: Where is it?

MR. WILSON: I e-mailed it to you yesterday. I have another copy for you if --

MR. BRANCH: Oh, yeah. No, I have -- that's the copy I'm giving her. I think that's the copy the judge has in his -- we just made your copy. We did use your copy.

Page 171

MR. WILSON: But I'm talking about the one I sent on legal. I have it on legal. It's much bigger. I retyped it.

MR. BRANCH: I think it's fine. The judge is fine.

MR. WILSON: Okay.

THE WITNESS: So essentially, the way you read this, because -- so what it shows, it's my salaries from 2008 to 2013. What you could see is in 2010 and 2011 and 2012, because my position was classified as an M, I was at the 90 percent of the range; therefore, I was not eligible for any merit increases.

BY MR. BRANCH:

Q. So your base salary did not change in those from 2009 until -- it looks like 2012?

A. Correct.

Q. And that was because you were at the maximum?

A. Correct. Also, as you can see, because I was an M instead of an N, my bonus potential from 2009 until 2011 was 20 percent and as an N, it would

Page 172

have been 35 percent.

And I know one of the questions Mr. Wilson is going to ask is, like, why do I think it was 35 percent, that I was going to get it all since the bonuses are really not guaranteed. And the reason is because my performance, if you see all of my evaluation, had been -- you know, I always met or exceeded or far exceeded expectations, so I've always been given the corresponding bonus.

So that summarizes what I thought it would have been in terms of bonuses. And then if I would have stayed employed at Fannie Mae until 62, which would have been the logical thing, at the end, I cannot read the number, but I think at the end, on the bonuses, it would have been like $351,000 difference in terms of bonuses themselves.

I'm not claiming anything for actual compensation because this is not about the actual compensation. I don't know how much it would have been. I'm only claiming the bonuses and the salary up to 2013, and then the difference on the pension comes from calculating the difference on how much I'm

Page 173

receiving today. So today, every month, I have an annualized pension with very defined benefits. So meaning that the pension does not adjust for inflation, so it does not increase. It's an annuity that I get every month. And because I started collecting when I was 57, it's $3,655 per month. And if I would have waited until I was 62 to start collecting, it would have been $4,742 every month. So it's the difference between that pension collection.

Q. And just generally, can you explain everything else that's included in this compensation calculation?

A. So I thought I did. Is there anything else that you want me to explain?

Q. I see that there is a box on the left corner.

A. The box on the left corner that says "no bonuses only," it means that I only considered the bonus. I didn't consider the actual salary. And if you see in that box, I'm only claiming the bonuses up to 2013, not before then and the difference between

44 (Pages 170 to 173)

Arbitration Day 1                                                    November 3, 2014

Washington, D.C.

Page 182

sure if we received direct feedback about the importance of kind of dressing up more, things of that nature.

Q.    And so first let's talk about this training. You said it was what you believed to be mandatory training?

A.    Yes, it was certainly mandatory.

Q.    And why do you believe it was mandatory?

A.    Because we were told that everybody in the EPMO needed to attend.

Q.    What type of information was communicated at this mandatory meeting?

A.    It was facilitated sessions, so there were some exercises. The first exercise to begin with was that we were supposed to look at somebody we didn't know and, based upon how they appeared, describe what we thought of them, basically. And there was a number of -- you know, there was a facilitator who -- you know, I don't recall a whole lot of specific things that I took away as being pieces of information that I thought was really very usable, but I do recall there was a fair amount of discussion

Page 183

about different aspects that were mostly related to appearance, such as should men wear facial hair, should people have ethnic hairstyles, should women above a certain age dye their hair if they were gray, things of that nature. But that was part of the general discussion.

Q.    Were you offended by the content of this presentation?

A.    I wasn't surprised by it. I think there is an aspect of it which is reality in professional life, but I was hoping that there was going to be something that was more meaningful about -- more about the way that you present yourself or, you know, play to your strengths rather than just be focused on appearance.

Q.    And did you have any concerns about possibilities of you advancing at Fannie Mae after attending this conference or seminar?

MR. WILSON: Objection. Leading.

BY MR. BRANCH:

Q.    What, if any, concerns did you have about any impact this could have on your career at Fannie

Page 184

Mae after attending this seminar?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I think it did send a message to the team about what was -- in part, what was being valued.

BY MR. BRANCH:

Q.    And who do you believe was responsible for this mandatory seminar?

A.    Anne Gehring.

Q.    Did Ms. Lapera speak to you on any occasion about your personal appearance?

A.    I don't recall.

Q.    Did Ms. Lapera tell you that Anne Gehring wanted you and Blythe Neumiller to be more conscious about your personal appearance?

A.    I don't specifically recall. I don't recall.

Q.    Did Ms. Lapera state anything to you about your physical appearance? How you presented yourself?

A.    What I do recall is there being from time

Page 185

to time general discussions about, you know, that -- I don't remember being anything very specific about -- anything very specific about -- specifically about the way that I appeared, but I think there were some general discussions about the fact that there were maybe an expectation of making sure that you dress more or more aware of that. I don't recall it being very specific about, you know -- I don't remember feeling like it being very targeted. More in general.

Q.    Do you know who Nicola Fraser is?

A.    I do.

Q.    Did Ms. Gehring describe Nicola Fraser as a young -- well, as young, energetic and full of innovative ideas?

A.    I don't know if I recall those specific words, but I do remember that seeming like the general -- probably in keeping with what I would say how she was described to us when she joined the team.

Q.    And that was when Nicola Fraser became the VP of planning and alignment?

A.    Yes.

47  (Pages 182 to 185)

Arbitration Day 1                                             November 3, 2014

Washington, D.C.

Page 186

Q. Are you familiar with Blythe Neumilller?

A. I am.

Q. Was she once on the business architecture team?

A. She was.

Q. She's no longer on that team?

A. No, she's not.

Q. Did she state to you why she left the team?

A. She chose to go to the securitization team. We did have conversations about it, about, you know, that she chose to kind of stay with our former -- to move with our former boss, Michael MacFarland. I don't recall if she had said anything specifically more than that.

Q. Did she express to you concerns about the emphasis on personal or physical appearance that was being pushed by Anne Gehring?

MR. WILSON: Objection. Hearsay.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I don't recall.

MR. BRANCH: No additional questions.

Page 187

MR. WILSON: No questions, Your Honor.

JUDGE ROBERTSON: Ms. Brumbaugh, thank you. You're excused.

(Witness exits arbitration room.)

JUDGE ROBERTSON: Ms. Lapera is back. Mr. Wilson, you may cross-examine.

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. Ms. Lapera, we heard near the beginning of your testimony a lot of discussion about Mike Williams. And am I right, Mike Williams left the company prior to September 2012?

A. Correct.

Q. And he was replaced in the role of president prior to that time by a man named Tim Mayopoulos?

A. There was somebody in between, but then afterwards came Tim Mayopoulos.

Q. And in September 2008, right, Fannie Mae went into conservatorship?

A. That is correct.

Q. And that's of the Federal Housing Finance

Page 188

Administration?

A. Correct.

Q. I'm going to move on. I want to get to your discussion of the challenges to the levelling of your position. Okay? And just so we can be clear here, you're challenging as being discriminatory the decision that was made on the levelling or the request to level your position, a request you made in July 2009?

A. Correct.

Q. And you're also challenging the decision that was made on the request to level your position in April 2011?

A. Correct. March/April 2011.

Q. And just to round out the picture, I'm going to use the term "job code restructure project" to describe what the big process in Fannie Mae in the summer of '09 to go from the numeric to the alpha system. You're not in this case challenging the levelling of your position coming out of that, right?

A. I am. You mean on 2009?

Q. Yes, the summer of 2009.

Page 189

A. Yes, I am.

Q. Do you recall in this case you -- so I'm not talking about the July 2009. I'm talking about the decision that occurred before July 2009.

A. I don't know what you're talking about, Mr. Wilson.

Q. Okay. There was, in the summer of 2009, correct, a process by which Fannie changed its salary level company-wide from a numeric system to an alpha system?

A. Correct.

Q. And as part of that big process, it was announced that the position that you held at the time would be leveled at an M, correct?

A. Correct.

Q. And following the progression, you learned about that levelling and then you made your request in July 2009 to challenge that initial decision, correct?

A. I challenged the decision, yes, as soon as I had a little bit of time to make research on the position itself and what other people had.

48 (Pages 186 to 189)

Arbitration Day 1                                                    November 3, 2014
Washington, D.C.

Page 246

national origin?

A. Nope.

Q. Nor did she mention anything about your weight?

A. Nope.

Q. Nor did she mention anything about your age?

A. Nope.

Q. Nor did she mention anything about your body shape?

A. Nope.

Q. With the exception of age, if I were to ask about those same topics, she didn't mention anything about that about anyone, right?

A. Correct.

Q. Now, you may have testified to this. Did she mention that Nicola Fraser is young and energetic?

A. I'm going to love working for Nicola, I think you're going to be a great team, things she doesn't know you're going to teach her and you guys are going to be great together.

Page 247

Q. So other than maybe referring to Ms. Fraser as being young, Ms. Gehring in that review session didn't mention anything about anyone else's age, correct?

A. Correct.

Q. Ms. Lapera, I believe on direct you testified that there was an instance that you and Ms. Keller and Ms. Gehring were together and Ms. Gehring used words to the effect about taking Ms. Keller shopping; is that right?

A. Right.

Q. Do you recall that?

A. Yes. And the circumstance was that Kathy said I'm short and fat, what do you want me to do? That's the way God made me.

Q. And that's what Ms. Keller said, that she herself is short and fat.

A. Right, that there was nothing she could do to alter those aspects of her physical presence. And that she already tailored 80 percent of her clothes because if not, they wouldn't fit her.

Q. Ms. Gehring didn't say Ms. Keller was

Page 248

short and fat, did she?

A. Kathy said it as a reaction of the comments from Anne.

Q. But Ms. Gehring -- the question is: Ms. Gehring did not say to Kathy Keller she was short and fat.

A. Anne did not, therefore, she didn't say that.

Q. So the answer is no?

A. Correct.

Q. Okay. And when was this conversation?

A. It was late 2012.

Q. Late 2012? Okay.

A. Or maybe early 2013, something like that.

Q. And I believe on direct you said that Ms. Gehring said also to you, you can also look better, too?

A. Correct.

Q. Could it have been that she said to you you could do better, too?

A. I heard "and you could do better, too," in terms of like looking better.

Page 249

Q. Is that what you understood it to be?

A. That's what I understood it to be.

Q. And was she referring to how you dressed?

A. Yes. Prior to that conversation, we had been talking about exercising.

Q. There is no question.

A. Okay.

Q. When you applied and were going through the interviews process for the vice presidency for planning and alignment position, was your weight and body shape more or less the same as it was back in late 2012/early 2013?

A. It was about the same.

Q. Could I ask you, please, Ms. Lapera, to turn to what's been marked as Defendant's Exhibit 221?

A. It's the yearend review for 2012.

Q. Right. And I think you talked about this and your counsel probably used a version that you have, but this is your end-of-the-year evaluation, right, for 2012?

A. Correct.

63 (Pages 246 to 249)

Arbitration Day 1                                                                      November 3, 2014
Washington, D.C.

Page 250

Q.   And you got a 1?

A.   Correct.  And I didn't get any feedback about --

Q.   Ms. Lapera, there is no question pending.

A.   -- communications.

Q.   There is no question pending.

A.   Okay.

Q.   Ms. Lapera, I want to move away from the vice presidency for planning and alignment issue now and talk about your separation from the company.  If I could ask you, please, to turn to Defendant's Exhibit 95.  If you look at the second page of that, do you recognize that document?

A.   Yes.

Q.   If you look at the second page in that, it's marked FNMA 00011.  Do you see that?

A.   Yes.

Q.   Did you prepare that letter?

A.   I did.

Q.   And is that your resignation letter?

A.   It is.

Q.   And you gave it to Nicola Fraser?

Page 251

A.   Monday of that week.

Q.   And that's October 28th, is that date correct?

A.   Correct.

Q.   And your resignation was effective November 1?

A.   That Friday.

Q.   Am I right in early August, Anne Gehring had announced to the EPMO personnel that she was resigning from Fannie Mae?

A.   Actually, Dave Benson did the announcement for Anne Gehring.

Q.   So let me put it this way.  So you were aware as of early August of 2013 that Anne Gehring was resigning from Fannie Mae?

A.   Yes.

Q.   And your recollection, right, is that her resignation, she was gone from the company about September 30?

A.   Yes.

Q.   Sticking with your resignation letter that's Defendant's Exhibit 95, you don't mention any

Page 252

reasons here why you're resigning, right?

A.   Correct.

Q.   And am I right, you resigned from the company -- or you testified on direct, if I'm characterizing your statement properly -- because of your frustration or disappointment in not having been selected for the vice presidency for planning and alignment; is that correct?

A.   Correct, because I was getting sick.  It was affecting me physically.

Q.   Was also one of the reasons why you resigned because you did not like working for -- or because you were working underneath Nicola Fraser who you thought was incompetent?

A.   That is one of the reasons, correct.

Q.   And you're not alleging in this case that Nicola Fraser did anything discriminatory to you?

A.   It's not about Nicola.  It's about Anne Gehring and HR.

Q.   And those are the only two reasons why you resigned?

A.   Can you state the reasons again?

Page 253

Q.   That you did not get the vice presidency for planning and alignment, one; and then two, you had to work underneath Nicola Fraser who you felt was incompetent.

A.   And it was affecting me physically as well.

Q.   Those two things were affecting you physically?

A.   Correct.

Q.   Ms. Lapera, could I ask you to turn to what's been previously marked as Defendant's Exhibit 87?

A.   Yes.

Q.   I want to take a look at that.  Did you receive this e-mail?

A.   Yes, from Dave Benson.

Q.   And am I right, this e-mail down below on the string dated Friday, July 26, 2013 goes on to the second page -- I'm sorry, at the end of the first page and then into the second page, it announces that Anne's leaving Fannie, Anne Gehring?

A.   Correct.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                          November 4, 2014

Washington, D.C.

Page 319

examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Good morning, Ms. Fraser.  My name is David Branch.

A.   Good morning.

Q.   Ms. Fraser, are you employed?

A.   Yes.

Q.   And where are you employed?

A.   Fannie Mae.

Q.   What's your current position?

A.   Vice president in counterparty credit risk.

Q.   I'm sorry, counterparty --

A.   Counterparty credit risk analysis.

Q.   How long have you been in that position?

A.   Three months.

Q.   And what's your date of birth?

A.   April 3rd, 1976.

Q.   So how old are you?

A.   I'm 38.

Q.   How long have you been employed at Fannie

Page 320

Mae?

A.   A little over six years.

Q.   So this is 2014.  So you would have started sometime in 2008?

A.   August 2008.

Q.   What was the first position you held at Fannie Mae?

A.   Director in accounting policy.

Q.   Who did you report to in that position?

A.   Kirk Silva.

Q.   Did you report to Kirk Silva for the entire period you were a director?

A.   I did.  Entire period I was a director in that role.

Q.   Were you a director in a separate role?

A.   Uh-huh.

JUDGE ROBERTSON:  You have to say yes or no, please.

THE WITNESS:  Yes.  Sorry.  Yes.

BY MR. BRANCH:

Q.   What was the position that you held after being the director reporting to Kirk Silva?

Page 321

A.   I was a director of financial analysis.

Q.   When did you become director of financial analysis?

A.   April 2011.  No, April 2010.  Excuse me.

Q.   Who did you report to in that position?

A.   Initially, Shaun Ross.

Q.   Did you report to someone else after you reported to Shaun Ross?

A.   I did.  Effective September 2010, I started reporting to Anne Gehring.

Q.   What period of time did you report to Anne Gehring as a director?

A.   I was promoted to officer January 2012 and I continued to report to Anne as an officer.

Q.   When you say you were promoted to officer, were you promoted to vice president?

A.   Yes.

Q.   And that was in January 2012?

A.   Yes.  It was effective the last day of December or December 29th, I believe, of 2011.

Q.   Was this a competitive promotion?

A.   I don't understand the question.

Page 322

Q.   Meaning did you interview -- apply for a vacant position, then interview, be selected by a panel?

A.   Yes.

Q.   And what is the process that's involved when someone is promoted from a director to a vice president?

A.   There's multiple processes.  There is whether or not your ability -- you interview for the role itself and then you go through a leadership interview process.  So the -- do you want me to explain?

Q.   Yes.  I'm sorry.  Please indulge.

A.   So the interview for the role would be assessing whether or not you had the ability to do the job by the local management team, which I was effectively put in the role for a trial period of six months to assess that, whether or not I was capable of doing that.

And then you go through a leadership process where you might be nominated and then you have an interview with a panel of executives, senior

Alderson Reporting Company
1-800-FOR-DEPO

Page 323

vice presidents and executive vice presidents. And if the panel supports your promotion, then you continue to go on through an interview process that involved an interview with the head of HR, at the time the head of legal and administrative, our chief admin officer, and then also an interview with the CEO.

Q.   And so who placed you into the trial period for six months?

A.   Anne Gehring.

Q.   So how long did it take from the time you started when you interviewed -- the first interview until you actually became a VP? How long did that process take?

A.   I don't remember.

Q.   Was it a month or more?

A.   Not including the period I was in the role on a trial basis, it probably was.

Q.   So you became a VP in January 2012?

A.   It was effective the end of December 2011.

Q.   Do you recall what your official title was?

Page 324

A.   It was vice president, corporate financial planning and analysis.

Q.   How long were you in that position?

A.   I was in that position until I went on maternity leave in March of 2013.

Q.   And when you went on maternity leave, who were you reporting to?

A.   When I went on maternity leave, I was reporting to Kaye Simmons.

Q.   And when you returned from maternity leave, did you report back to that position?

A.   No. I made a decision in about January of 2013, I started conversations with Kaye Simmons, it was around January, about not coming back into the -- actually, it was earlier than January. It was in the fall. And saying that we need to find a successor for me to fulfill that role when I returned from maternity leave.

So effective January, we had another vice president who was shadowing me for three months before I went on maternity leave so she could fulfill the role and step into my shoes.

Page 325

Q.   And why did you decide to leave that role?

A.   I had been in corporate FP&A for about three and a half years at that time and had decided that I wanted to try something else to broaden my experiences and get closer to the business, hopefully. But at the time I had not identified a specific role.

Q.   So the position that you hold now, is that within corporate FP&A?

A.   No. It's within our Enterprise Risk Management Group.

Q.   Is the Enterprise Risk Management Group different from the EPMO group?

A.   Yes, it is.

Q.   So what's the highest degree that you've earned?

A.   My undergraduate degree.

Q.   Do you have a bachelor's degree?

A.   I do, bachelor of arts, Franklin & Marshall College.

Q.   And do you have a master's degree?

A.   I do not.

Page 326

Q.   Prior to your return to work in July 2013, did you have any experience managing a business architecture team at Fannie Mae?

A.   No, I did not.

Q.   And prior to returning to Fannie Mae after maternity leave, did you have any experience managing or directing a Lean Six Sigma team?

A.   No, I did not.

Q.   Have you attended the Six Sigma Academy?

A.   No, I did not.

Q.   Do you hold any type of credentials or certifications from the Six Sigma Academy?

A.   No.

Q.   Do you know what this black belt certification is?

A.   Yes, I do.

Q.   And you don't hold that certification?

A.   No, I don't.

Q.   And prior to July 2013, did you have any experience managing a process improvement team?

A.   No.

Q.   Prior to July 2013, did you have

Arbitration Day 2                                                    November 4, 2014
                                    Washington, D.C.

Page 327

responsibility for supervising employees?

A. Yes.

Q. And what period of time did you supervise employees at Fannie Mae?

A. My entire time.

Q. What's the largest number of employees you've supervised at any given time before July 2013?

A. About 20 people.

Q. And what was your position when you did that?

A. Vice president.

Q. For what particular area?

A. For corporate FP&A.

Q. And what type of positions did you supervise as the VP for corporate FP&A?

A. What type of position?

Q. Yes. What are the titles?

A. Of my direct reports?

Q. Yes.

A. I had director overseeing our corporate financial planning team, I had a director over our corporate budget and scorecard reporting team, and I

Page 328

had a senior manager overseeing our strategic financial analysis.

Q. So you had three direct reports.

A. That's correct.

Q. So would the other 17 or so people have reported to your direct reports?

A. And at times, there were managers. So either directly or indirectly.

Q. Did you apply for the position of vice president of planning and alignment in 2013?

A. What do you mean did I apply?

Q. Did you submit an application for --

A. I reached out to Melissa Armstrong and sent my resume and said I was interested in the position.

Q. I'm sorry, who is Melissa Armstrong?

A. I'm sorry, not Melissa Armstrong. Melissa -- who's the head of our -- I don't remember Melissa's last name. I'm sorry.

Q. Is it Melissa Werner?

A. Yes, I believe so.

Q. How did you learn about the position of

Page 329

vice president, planning and alignment?

A. My administrative assistant sent me an e-mail with a job description when I was on maternity leave.

Q. Who was your administrative assistant?

A. Lakisha Preston.

Q. Did you request that?

A. No.

Q. And when did you learn that there was a vacancy?

A. When I got the --

Q. Do you recall the time frame?

A. When I got the e-mail?

Q. Yes.

A. I want to say probably June. I could dig up the e-mail for the specific date.

Q. There is a binder in front of you. If you would turn to Exhibit 43.

JUDGE ROBERTSON: Defendant's Exhibit 43?

MR. BRANCH: Yes.

THE WITNESS: Am I looking at the right binder?

Page 330

MR. WILSON: Is it volume 1?

JUDGE ROBERTSON: You got me.

THE WITNESS: Volume 1, yes. June 4th.

BY MR. BRANCH:

Q. Of 2013?

A. Uh-huh.

Q. And did you submit an application after -- or submit a resume after you received this notice of the position?

A. Yes.

Q. When did you submit your -- well, first, how did you apply for the position?

A. I sent my resume to Melissa. I didn't have access to our online system.

Q. When did you submit your resume to Melissa?

A. It wouldn't have been until July, because I met with Anne, the hiring manager, Anne Gehring. I met with Dave Benson, who was the EVP responsible for EPMO at the time, and I did that in early July, after I met with Dave. So it would have been after that period of time.

19 (Pages 327 to 330)

Arbitration Day 2                                                      November 4, 2014
Washington, D.C.

Page 331

Q.   So you met with Dave Benson in July?

A.   Early July.

Q.   And what was his position?

A.   He was EVP, executive vice president, responsible to the CFO.

Q.   And why did you meet with him?

A.   Dave I've worked with for a number of years and I talked to him about -- when I was leaving corporate FP&A and wanting to explore other opportunities, I had talked to him about different career opportunities throughout my time at Fannie Mae. So he was a natural person for me to reach out to. I've talked to him throughout.

Q.   And so before you met with David Benson, did you have a dinner meeting with Anne Gehring?

A.   I did, yes.

Q.   And when did that occur?

A.   It was before my meeting with Dave. Not long before, I believe. So late June.

Q.   And did you discuss applying for the position at that time?

A.   I did, yes.

Page 332

Q.   And did Anne Gehring ask you to apply for the position?

A.   No, she didn't ask me directly. She explained the job to me and asked if I was interested.

Q.   And what was your response?

A.   I said I would think about it.

Q.   Let's turn to Claimant's Exhibit 82. Do you recognize this?

A.   Yes.

Q.   Does this refresh your memory on when you had dinner with Anne Gehring?

A.   Yes.

Q.   So it would have been on or about June 17th, 2013?

A.   Yes.

Q.   And you discussed the vacant VP position at that time?

A.   Yes, that's correct.

Q.   You said you also had a meeting with David Benson?

A.   That's correct.

Page 333

Q.   Did you meet with David Benson on or about July 2nd, 2013?

A.   That sounds about right.

Q.   Had you submitted your resume at that time?

A.   No.

Q.   And why not?

A.   Because I was meeting with Dave to discuss opportunities that existed throughout the company, not just this particular opportunity.

Q.   So as of July 2nd, 2013, you had not decided to apply for this VP position in planning and alignment?

A.   That's correct.

Q.   Let's turn to -- well, after your meeting with Benson, did you decide to apply for the position?

A.   Yes.

Q.   What actions did you take after you decided to apply for the position?

A.   I sent Melissa an e-mail, I believe I sent Dave an e-mail and Anne an e-mail.

Page 334

Q.   And now let's turn to Exhibit 47.

A.   And Shandell an e-mail.

Q.   Do you recognize this document.

A.   Yes. This is the e-mail I sent.

Q.   Now, prior to sending this e-mail on July 2nd, did you communicate to Anne Gehring that you did not have a position -- or words to the effect that you were homeless and didn't have a position to return to?

A.   I expressed that to Dave Benson and to -- and I don't recall whether or not I had that explicit conversation with Anne.

Q.   And why did you make that statement?

A.   Because I hadn't yet determined what role I was going to come back into.

Q.   And did you eventually submit a resume for the position?

A.   I did.

Q.   And when did you do that?

A.   This e-mail was July 14th. I assume it was within a few days, as I indicated on here. I don't remember the exact date.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                          November 4, 2014
                                  Washington, D.C.

Page 335

Q.   Let's turn to Exhibit 76.  Are you there?
A.   Yes.
Q.   Do you recognize this as an e-mail that you sent to Melissa Werner on or about July 11, 2013?
A.   Yes.
Q.   And did you attach your resume to this e-mail?
A.   Yes.
Q.   So is it true that you submitted a resume for this position on July 11, 2013?
A.   That's correct.
Q.   Did you interview for this position?
A.   I did.
Q.   When did you learn that you would interview for the position?
A.   Melissa called me.  I'm not sure if it was after my e-mail or after the resume.
Q.   When you say "after the e-mail," are you talking about the July 2nd --
A.   The first e-mail where I said I was interested in pursuing the opportunity, but I didn't have my updated resume.

Page 336

Q.   So were you offered an interview before you submitted your resume?
A.   I don't believe so.  It was just discussing the process, to answer your question.
Q.   And did you, in fact, interview for this position?
A.   I did.
Q.   Who did you interview with for the position?
A.   I interviewed with Anne Gehring, I interviewed with Shandell Harris, and I interviewed with Mike Choi.
Q.   Do you recall when you interviewed for the position?
A.   Within a week, I believe, of this submission.  A week or two.
Q.   Where were your interviews held?
A.   At Fannie Mae.  I was out on maternity leave.  I came into the office in the day.  I met with Anne in her office and then we went and did an offsite at lunch, and then I met with Shandell and Mike back in the office.

Page 337

Q.   So your first interview was with Anne Gehring?
A.   That's correct.
Q.   And was the interview actually in her office?
A.   No.  I met her in her office and then we went to lunch and we conducted it over lunch.
Q.   What happened during the interview with Anne Gehring?  Were you asked questions?
A.   Yes.
Q.   What types of questions?
A.   I really don't recall specific questions.  I'm sorry.
Q.   Generally, do you recall the type of questions that you were asked by Anne Gehring during this lunch meeting?
A.   No, I really don't.
Q.   Was there any discussion of this position?
A.   Absolutely.  There was a lot of discussion about the role, strategic priorities.  I mean, there was questions about -- I would be speculating.  I really -- I vaguely remember the conversation.

Page 338

Q.   And you don't recall any of the questions that Ms. Gehring asked you at this interview?
A.   No.
Q.   Do you recall any of the responses that you provided at the interview?
A.   No.
Q.   And how long was this lunch meeting?
A.   An hour.
Q.   And you said you also interviewed with Shandell Harris and Mike Choi?
A.   Uh-huh.
Q.   Who is Shandell Harris?
A.   She's in our HR, business partner.
Q.   And who is Mike Choi?
A.   He was another VP that was in EPMO.  He was a peer to this role.
JUDGE ROBERTSON:  He was a what?
THE WITNESS:  He was a peer to this role.
BY MR. BRANCH:
Q.   Did Ms. Gehring take any notes during your interview with her?
A.   Not that I remember.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                    November 4, 2014
                              Washington, D.C.

Page 339

Q.   Do you recall any of the questions that you were asked in the interview with Ms. Harris?

A.   No.

Q.   Did she take any notes as part of the interview?

A.   I don't remember.

Q.   Do you recall any of the responses to questions?

A.   I don't remember.

Q.   Were you asked any questions by Ms. Harris?

A.   Yes.

Q.   Generally, what type of questions did she ask you?

A.   I don't remember.

Q.   Do you have any recollection of what you talked about with Ms. Harris during this meeting/interview?

A.   We talked about the EPMO role, but I don't remember any specifics, no.

Q.   You talked about the EPMO role?

A.   We talked about EPMO and the role, but I

Page 340

don't remember any specifics.

Q.   And what about your interview with Mike Choi. Do you recall any of the questions that he asked?

A.   Mike? No.

Q.   Do you recall any of your responses to anything he may have asked you?

A.   No.

Q.   So what happened after your interview with Mike Choi?

A.   I went home.

Q.   Were you told when a decision would be made?

A.   I don't remember.

Q.   Did either Shandell Harris or Anne Gehring tell you when a decision would be made?

A.   I think there was an indication that it was going to be quick, if I remember correctly.

Q.   And who told you that?

A.   I don't remember.

Q.   Had Anne Gehring already told you that the position was yours before the interview?

Page 341

A.   No.

Q.   How did you learn that you were selected for this position?

A.   Melissa called me and Anne called me.

Q.   Melissa Werner?

A.   Uh-huh.

Q.   When did she call you?

A.   I don't remember.

Q.   When did Anne Gehring call you?

A.   I don't remember.  I know it was before I came back to work.

Q.   And when did you return to work?

A.   It was late -- I think it was a Monday at the end of July.  The 28th or 22nd.  I'm not sure.

Q.   Did this VP of planning and alignment have three areas of responsibility?

A.   It did initially.

Q.   And you were in this position from July 2013 until when?

A.   August 2014.

Q.   What were the three areas of responsibility for the position VP of planning and

Page 342

alignment?

A.   Business architecture, Lean Six Sigma and then enterprise planning.

Q.   Prior to your selection for this position, had you directed employees in performing duties on either business architecture, Lean Six Sigma or enterprise planning?

A.   The responsibilities around enterprise planning were similar to some of the responsibilities I had in corporate FP&A from a financial aspect.

Q.   Let's turn to Exhibit 57, please.

A.   In this binder?

Q.   Yes.  Is this the position description for the VP of planning and alignment?

A.   I believe so.

Q.   Under the key job functions and duties, the first point is, "Act as a trusted advisor and independence lens to the SVP of the EPMO and the CFO. Provide insights and strategic analysis to facilitate decision-making.  Develop a relationship with the SVP and CFO that promotes role as objective sounding board."

22 (Pages 339 to 342)

Arbitration Day 2                                                November 4, 2014
                        Washington, D.C.

Page 343

Did you have any experience making presentations to the CFO before you applied for this position?

A. Absolutely.

Q. And that would have been Dave Benson?

A. No. It was Susan MacFarland, who was our prior CFO. But I did have experience also with Dave Benson.

Q. I'm sorry, MacFarland?

A. Susan MacFarland.

Q. And what was your experience in making presentations to Susan MacFarland?

A. I presented to her regularly on a monthly basis, if not bimonthly, as it relates to our reporting of our results, including our forecasting.

Q. What period of time did you do that?

A. From the time I was in the role as a corporate FP&A.

Q. As vice president?

A. Vice president and the six months prior, when I had taken on additional responsibilities.

Q. So that would have started in January?

Page 344

A. July.

Q. Of 2011?

A. Of 2011. End of July.

Q. When did Benson become a CFO?

A. He became a CFO in July, when -- no, I'm sorry. I believe it was April of 2013, when I was on maternity leave. As soon as we filed our first quarter results, he became the CFO.

Q. And where was he working previously?

A. He was EVP and responsible for our capital markets function and also our corporate strategy work.

Q. And prior to applying for this position, did you have any experience presenting to the management committee?

A. Yes.

Q. And how so?

A. I presented on a monthly, if not bimonthly, basis as it relates to our results of operations, including our forecasts.

Q. And that's for the financial part of it?

A. And our key business metrics that related

Page 345

up to the impact on our financial results.

Q. And was that during the period when you were vice president?

A. Yes, and the six months prior.

Q. Did you have any experience presenting to regulators and the Fannie Mae board of directors?

A. Not our Fannie Mae board of directors, but yes, to regulators. I met with regulators monthly.

Q. After you became the vice president of planning and alignment, how did you communicate with the team?

A. On?

Q. Work-related matters.

MR. WILSON: Objection.

JUDGE ROBERTSON: Overruled. You can answer to the best you can.

THE WITNESS: I'm not sure I understand the nature of the question.

BY MR. BRANCH:

Q. Okay. So after you became vice president of planning and alignment, did you schedule an initial meeting with the staff?

Page 346

A. I'm sure I did.

Q. Do you recall the first meeting that you held with staff after you became the VP of planning and alignment?

A. No.

Q. Do you recall arriving late for the first staff meeting with the new team?

A. It could be possible.

Q. Did you tell the team that they should get used to you arriving late?

A. I don't remember.

Q. Why did you leave this position as the VP of planning and alignment?

A. The role had evolved into less of a strategic nature into more of a financial budgetary role and I had already gained that experience in my role in FP&A in the year there. So I did not believe I was growing and learning at a fast enough pace. And there was a lot less interaction with the business than I had expected.

Q. And when did you conclude that the role was not what you wanted to serve as?

23 (Pages 343 to 346)

Alderson Reporting Company
1-800-FOR-DEPO

Page 347

A.  I started having conversations with the VP of EPMO in February of this year and we were in the middle of assessing the vision and mission of the organization, where was its place and what were potential reorgs and realignments of different roles.

Q.  So you started to have discussions about leaving the position as early as February of 2014?

A.  Yes.

Q.  Who was the SVP of EPMO in February 2014?

A.  Patricia Black.

Q.  Were you evaluated in your performance for the year that you served in that role?

A.  Yes.

Q.  Ms. Fraser, how often did you present to the federal regulators when you were in -- I think it's FP&A?

A.  Uh-huh.

Q.  How often?

A.  We had monthly meetings with FHFA.  Is that regulator the one you're speaking of?

Q.  Yes.  And how often would you make presentations?

Page 348

A.  We presented to them every month, myself and my team.

Q.  And when you were in the position of VP of planning and alignment, how often did you present to regulators?

A.  I believe it wasn't the same regular occurrence.  There was probably about three or four, but they were much more senior meetings throughout the year.

Q.  And when you were in the position of VP of planning and alignment, how often did you present to the management committee?

A.  Twice, I believe.

Q.  As a vice president, are you paid a base rate of pay?

A.  Yes, I am.

Q.  And in 2013, was your base rate of pay $234,000?

A.  That's correct.

Q.  And are you also eligible for a bonus?

A.  Yes, I am.

Q.  And as a vice president, is that target 65

Page 349

percent of your salary?

MR. WILSON:  Objection.  Relevance.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  Yes, it is.

BY MR. BRANCH:

Q.  Do you recall a conversation where you told an employee who reported to you, when you reported on your team when you were VP of planning and alignment, that you did not know that statistics were a part of the metrics that were used -- well, let me ask this:  Did you have a meeting with an employee and there was a discussion on whether statistics were used as part of the Lean Six Sigma process?

A.  There was a meeting where we presented to the entire staff to go through some of the statistical analyses that were done, yes, that's correct.

Q.  But did you tell the employee that you were not aware that statistics was used as part of Lean Six Sigma?

A.  That sounds right.

Page 350

Q.  So at that point, when you took over responsibility of VP of planning and alignment, you did not know that Lean Six Sigma--

A.  I was not an expert in Lean Six Sigma, no.

Q.  Well, you said you were not an expert at Lean Six Sigma.  Did you have any experience with Lean Six Sigma before you assumed this role?

A.  You asked that question earlier and I said no.

MR. BRANCH:  No additional questions.

JUDGE ROBERTSON:  Mr. Wilson?

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q.  Ms. Fraser, how are you doing?

A.  Good.  Thanks.

Q.  I want to go back and just round out some background about you for His Honor.

A.  Sure.

Q.  You've talked about maternity leave.  So let's ask, how many kids do you have?

A.  I have two.

Q.  What are their ages?

24 (Pages 347 to 350)

Arbitration Day 2                                                November 4, 2014
Washington, D.C.

Page 383

reconvene at 1:53 p.m., this same day.)

---

Page 385

was necessary before you could go to a higher level position?

A. I'm sorry, mastery of what?

Q. Mastery of the area that you were working in. You were hired as an account -- let's see, director of accounting policy.

A. I'm sorry, you talked about vice president, then we're back to director of accounting policy?

Q. Yes.

A. I'm not sure I understand.

Q. So you held the position of director of accounting policy from 2008 to 2010?

A. Yes.

Q. And you developed a mastery of that position which led to your promotion from that position.

A. No. I then transferred and did a role that I've never done before in Financial Planning and Analysis and then I was promoted to vice president.

Q. So you were in the position of director of Financial Planning and Analysis from 2010 until the

---

Page 384

AFTERNOON SESSION

(1:53 p.m.)

Whereupon,

NICOLA FRASER,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

JUDGE ROBERTSON: Mr. Branch, redirect.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. Ms. Fraser, so you started employment at Fannie Mae in 2008; is that correct?

A. That's correct.

Q. You started as a director; is that correct?

A. Yes.

Q. And you demonstrated some level of competence as a director before you took on the role as vice president, correct?

A. That's correct.

Q. So you understood that mastery of the subject matter that you were working on as director

---

Page 386

end of 2011?

A. Yes.

Q. And you had to serve a period of approximately six months before you were promoted to vice president?

A. That just happened to be the period of time before I got promoted. But yes, I got additional responsibilities in July that increased the scope of my role that would be more akin to a vice president.

Q. All right. And then you mastered that particular area before you were promoted to vice president?

MR. WILSON: Objection. Mischaracterizes testimony.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I guess I'm -- you keep asking mastered. I'm not sure, when you say "mastered" --

BY MR. BRANCH:

Q. Well, why were you promoted from director to vice president?

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                                November 4, 2014
Washington, D.C.

Page 387

A. So that the process to vice president, we discussed briefly earlier, is around not just the technical expertise of the role. It's the leadership ability. So one of my interviews was focused on -- with Tim Mayopoulos, who was the chief administrative officer at the time, he was very focused on your leadership ability and your ability for officers to move around the company and lead teams. You're not necessarily a subject matter expert in every team that you lead. So that was a key focus of that interview.

So it's a mix. I didn't -- I grew up in public accounting, I moved into accounting policy, which is my specialty, and then I moved into financial analysis. Financial analysis is not something that I had done for my whole career. That was my first time doing it.

Q. And when you took on the position of vice president for planning and analysis, you were not a subject matter for business architecture or for Lean Six Sigma.

A. No.

Page 388

Q. Now, when you were promoted to the position of vice president of planning and alignment, did Anne Gehring tell you that Ms. Lapera would train you in the position?

A. So it wasn't a promotion. It was a lateral.

Q. When you took the lateral position --

A. She would train me? I don't remember her saying she would train me. It was more that Ana was -- we recognized -- I recognized, too -- that Ana was a subject matter expert in Lean Six Sigma and business architecture. So I could definitely learn from Ana just like I had in other roles.

Q. So is it true that a major responsibility for the VP of planning and alignment was the responsibility for driving the process improvement at Fannie Mae using the Lean Six Sigma methodology throughout the corporation?

A. I wouldn't say it was a major component of the role.

Q. It was not a major component?

A. It was not a major component of the role.

Page 389

So we broke down and we talked about from the three areas that we had and the amount of time that was needed at my level for the different areas.

Q. And let's turn to Exhibit 74. That's Defendant's Exhibit 74.

A. Yes.

Q. Are you there?

A. Yes.

Q. And under the overview of job/management and reporting structure, it indicates that, "Reporting to the individual will be the head of operational excellence and Lean Six Sigma, who is responsible for driving process improvement using the Lean Six Sigma methodology across the entire corporation."

A. Yes.

Q. Was this the only director that was reporting to you?

A. I'm sorry, the director that was responsible for Lean Six Sigma, was she --

Q. Yes. Was that the only director level position that was reporting to you as the VP of

Page 390

planning and alignment?

A. Initially. And then we built out the team and hired additional directors.

Q. Well, when you took the position, was that the only director position reporting to you?

A. Yes, with the intent that we added additional directors.

Q. I'm sorry, the intent that you add additional directors?

A. There was an intent, through the interview process, where there was an expectation that we had to build out the team that was focused on the enterprise planning. And we posted two director positions pretty quickly.

Q. Who communicated to you during the interview process that the intent was to add two additional director level positions?

A. It wasn't -- sorry. Let me clarify it. The intent was to build out the team that was focused on enterprise planning and it was up to whoever got this role as the vice president to determine what those needs were. So as soon as I assumed those

34  (Pages 387 to 390)

Arbitration Day 2                                                    November 4, 2014
Washington, D.C.

Page 399

Q.   Did Anne Gehring refer to an employee at Fannie Mae as a "fat fucker"?

A.   Not to my knowledge.

Q.   Did Anne Gehring refer to an employee at Fannie Mae as an "asshole"?

A.   Not to my knowledge.

Q.   For the VP and planning position, when you took over responsibilities for this position, how many employees reported to you in that position?

A.   Just two initially.

Q.   How many employees were part of the team?

A.   There was about 28 maybe in total. Twenty-six.

Q.   I believe your prior testimony was that at some point the Lean Six Sigma part of the team went to HR?

A.   That's correct. It was about 11 employees.

Q.   So after the Lean Six Sigma employees went to HR, how many employees did you have on your team?

A.   Oh, at that point, we had hired one of the directors in enterprise planning and so I think at

Page 400

that point, we were probably down to 18 and we had a plan in place to grow our business architecture team based upon the needs and the projects.

Q.   So had your title changed at the time that the Lean Six Sigma functions went to HR?

A.   No, it did not.

Q.   So even though the job description that you held said that you would supervise the head of operational excellence and Lean Six Sigma, that function actually went to HR?

A.   That's correct.

Q.   Is it true that that function went to HR because this is not a function that you could effectively communicate to officers or stakeholders within Fannie Mae?

A.   No.

Q.   Did you have any interest in managing this function?

A.   Yes.

Q.   So why was it decided that it would move to HR?

A.   So we had a change in leadership. We had

Page 401

a change in the organizational structure where EPMO was now transferred under a new executive as the chief operating officer and Patricia Black came in and took over EPMO. And as part of that transition, Patricia Black wanted to assess whether looking at the vision and mission of the Enterprise Program Management Office, whether or not the Lean Six Sigma team would be better served in an other corporate organization as opposed to Enterprise Program Management given we were so much focused on the technology and infrastructure transition as opposed to process improvement.

So we spent time with our folks in HR to assess and did research as to whether other organizations and where their Lean Six Sigma organization resides and there was a history of, in some places, it does reside in the HR function and we made that decision.

Q.   And so how long was it into your tenure as the VP of planning and alignment before the Lean Six Sigma function left that office?

A.   It was about six months. But we did -- it

Page 402

was, like, two months where we were discussing and assessing it.

Q.   Did Ms. Gehring tell you that she planned to leave her position before you returned from maternity leave?

A.   Yes, she did.

Q.   When did Ms. Gehring tell you that she planned to leave her position?

A.   When we went to dinner.

Q.   So that would have been mid-June 2013?

A.   Yes.

Q.   Is it your understanding that Anne Gehring made the decision to select you for this position?

A.   That she made the decision?

Q.   The decision -- is it your understanding that Anne Gehring was the deciding official or deciding officer at Fannie Mae who made the decision to offer you the position of VP of planning and alignment?

A.   Yes.

Q.   And she did that at a time when she knew that she would not remain at Fannie Mae.

37 (Pages 399 to 402)

Arbitration Day 2                                                                November 4, 2014
Washington, D.C.

Page 403

A.  Yes.

MR. BRANCH:  No additional questions, Your Honor.

JUDGE ROBERTSON:  Was the discussion of the spinoff of the Lean Six Sigma module to HR, did that happen while Ms. Lapera was still working there? Was it discussed while she was still working there?

THE WITNESS:  When was Ana's last day at --

MS. LAPERA:  November 1st.

THE WITNESS:  November 1st? I believe those conversations started, yes, because Tricia Black came in around early October.  So those conversations probably started late October, early November.  It was probably right around that same time.

JUDGE ROBERTSON:  And to the best of your recollection, was Ms. Lapera involved in those discussions or did she know about them?

THE WITNESS:  No.

MR. WILSON:  No further questions from us, Your Honor.

Page 404

JUDGE ROBERTSON:  Thank you, Ms. Fraser. You're excused.

THE WITNESS:  Great.  Thank you.

(Ms. Fraser exits arbitration room.)

MR. BRANCH:  Should we get Ms. Werner?

MR. WILSON:  Yes.

(Ms. Werner enters arbitration room.)

JUDGE ROBERTSON:  Good afternoon, ma'am. We're going to administer the oath to you and then we're going to ask you some questions.

Whereupon,

MELISSA WERNER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.  Good afternoon.  Please state your name.

A.  Melissa Werner.

Q.  Ms. Werner, my name is David Branch.  I represent Ana Lapera.  I have some questions for you.

A.  Sure.

Page 405

Q.  So I'll proceed with the questions.  Are you currently employed?

A.  I am.

Q.  Where are you employed?

A.  I'm currently employed with Fannie Mae. Or by Fannie Mae.

Q.  What's your position there?

A.  I am a senior recruiter 4 and I am the executive and officer hiring lead.

Q.  Executive and officer hiring lead?

A.  Correct.

Q.  What does that mean?

A.  I'm the person who manages all the recruitment processes across the enterprise for officers or executives in the company.

Q.  And how long have you worked at Fannie Mae?

A.  Since March of 2008.

Q.  Generally, what are your duties?

A.  My general duties include management and oversight of recruiting processes for executives and officers in the company, which can include everything

Page 406

from posting a job to actively recruiting candidates, to extending offers, to coordinating interview processes, and to following up through the full lifecycle of recruiting.  So actually making sure the hire is on boarded properly.

Q.  Is there a formal policy that's followed for filling vacant positions at Fannie Mae at the director and officer level?

A.  There is, yes.  However, the policy can change based on how the recruitment process is being exercised.

Q.  So first let's start with the policy. What is the formal policy that's followed when you're filling officer or director positions at Fannie Mae?

A.  So generally, the policy is that if we determine a job should be posted, we post the job for five business days, seven calendar days.  Once the posting is completed, we then review the candidates who have applied, to review them for their qualifications for the role, share that candidate information, including qualifications for the role, with the hiring manager.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                          November 4, 2014
                          Washington, D.C.

Page 415

BY MR. BRANCH:

Q. Fifty-seven.

A. Fifty-seven.

Q. Do you recognize this document?

A. I recognize the e-mail at the bottom, but not the e-mail subsequent to that.

Q. Are you looking -- let's see what binder you're looking at.

A. Fifty-seven, did you say? I'm sorry. Oh, okay. My apologies. Am I familiar with this document?

Q. Yes.

A. Yes, I am.

Q. And so what is it?

A. It's a job description.

Q. Is this for the VP of planning and alignment --

A. Correct.

Q. -- that we talked about previously?

A. Yes.

Q. Who was the hiring manager for this position?

Page 416

A. Anne Gehring.

Q. So prior to this position being posted, were you notified by Anne Gehring that she had an internal candidate that she wanted selected for this position?

A. No, I was not.

Q. Let's turn to Exhibit 63. Are you there?

A. I am.

Q. Do you recognize the e-mails on the first two pages here?

A. Yes.

Q. So it appears that, at the bottom of the first page, there is an e-mail from Karen Jez to you, Sonya Matza and Danielle Clarke concerning the VP planning and alignment position that's dated May 20th, 2013, correct?

A. That's correct.

Q. Did you receive this e-mail?

A. Yes.

Q. And you were informed in this e-mail that there is a candidate identified by Anne already whose name is Joe Hallet. Do you see that?

Page 417

A. I do.

Q. So you were notified May 20th of 2013 that Anne Gehring had an internal candidate that she wanted to place in this position?

A. Yes, I was.

Q. And this e-mail also indicates that Anne is concerned about the amount of time to weed others out of the process, correct? It's in the same e-mail that I just read.

A. Yes, I see it.

Q. It's at the top of the second page. So is this typical of how the interview process would begin for filling a VP position? An individual is identified and the hiring manager would send a request of how do we get him through the process and how do we weed out others? Is that something that would normally happen?

A. In many jobs, it is common that there is a candidate that may be identified for a role. Technically, we wouldn't discuss them as -- other candidates who might apply for the job as being weeded out. We would definitely discuss putting them

Page 418

through an assessment process. So this -- this -- while part of our practice, in the sense that we may already know of talent in the organization who would apply for a role that we're posting, wouldn't necessarily be the best execution of this practice. I wouldn't use the word "weed out."

Q. Okay. And so the question was: Did you learn on May 20th of 2013 that Anne Gehring wanted to have Joe Hallet placed in the position?

A. I did learn that. But you'll note that I did respond accordingly with the comment that as long as there aren't a lot of other internal applicants and they aren't as qualified as Joe, then it should be reasonable to have a timely and efficient process.

Q. Did Anne Gehring inform you on June 6th, 2013 that she had a strong internal candidate for the VP position?

A. I don't recall.

Q. Let's look at Exhibit 54.

MR. STEWART: Which exhibit, Counsel?

MR. BRANCH: Fifty-four.

BY MR. BRANCH:

41 (Pages 415 to 418)

Page 419

Q.    Do you recognize this e-mail?

A.    I do.

Q.    This is an e-mail from Anne Gehring to you on June 6, 2013 where she indicates that she would like to catch up on the VP job that's opening up in her organization and she has a strong internal candidate for the role, Joe Hallet, and she would like to begin getting him through the VP panel process as soon as possible.

A.    Yes.

Q.    Did I read that correctly?

A.    You did.

Q.    So on June 6, 2013, Ms. Gehring sent you an e-mail asking to catch up on the VP process and she identified Joe Hallet and she wanted to get him through the VP panel process, correct?

A.    That's correct.

Q.    What is this VP panel process that's referenced here?

A.    It is part of our selection processes for officers. It's generally a final step in the process where we put them in front of two to three senior

Page 420

executives who assess their readiness for leadership.

Q.    I'm sorry, when you say you put them in front of a panel of two to three officers --

A.    Senior directors, yes.

Q.    To address their leadership?

A.    Readiness for leadership, correct.

Q.    Have you sat in on these panels?

A.    Yes. Hundreds.

Q.    So what happens in this panel process?

A.    So generally, what we do is we invite two to three senior officers to assess the candidate, the criteria being that the officers are not in the organization that the candidate is either coming from or going into.

We take a look at the job description, the candidate profile. We share those with the assessors and then we create an interview guide by which we ask questions related to competencies needed for the role. And we ask the senior leaders to assess the candidate against those competencies.

Q.    And so how is it that candidates would make it to this level where they're actually having

Page 421

an interview with senior executives?

A.    They could go one of two ways. They could go through a promotional process by which they've been acting in the role for some period of time and their readiness is determined by their leader. So we put them in front of the panel. Or they could go through a competitive search process where they're interviewed against other candidates in a pool and then determined to be the finalist.

Q.    And so if an employee is moving from the position of director to vice president, is it a requirement that they go through this VP panel process?

A.    It is, yes.

Q.    How long does it take for this process to complete?

A.    It can vary. It can be anywhere from 45 days up to 90 days, depending on logistics and scheduling and interviewing.

Q.    So it takes, on average, between 45 to 90 days for persons to progress from the position of --

A.    Candidate all the way straight through to

Page 422

finalist to be complete.

Q.    From director to vice president?

A.    Yes.

Q.    What was your response to this e-mail from Ms. Gehring that she wanted to begin getting Joe Hallet through the VP panel process as soon as possible?

A.    Well, most likely, I would call Anne and say, let's have a kickoff meeting regarding this role because the job was posted. I'm not exactly clear -- I don't remember exactly what date the job was posted. So I probably would pick up the phone, call her and say, let's have a meeting to discuss what the process should be for your selection criteria.

Q.    Would you tell her it's improper to schedule a panel interview for someone who hadn't been advanced to that stage in the process?

A.    Particularly if there are other candidates to consider, yes.

Q.    Had you worked with Anne Gehring on other promotions or selections?

A.    I have, yes.

Arbitration Day 2                                                      November 4, 2014
Washington, D.C.

---

Page 423

Q. What was your assessment of Anne Gehring as an officer?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Sustained.

BY MR. BRANCH:

Q. Did you believe that Anne Gehring was, quote, "a little off the wall"?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Does this come from -- is there a premise for this question?

MR. BRANCH: It is, Your Honor.

JUDGE ROBERTSON: I'll allow it.

THE WITNESS: Anne is very direct and she has a very direct style.

BY MR. BRANCH:

Q. Were you interviewed as part of an investigation by Fannie Mae's Office of Compliance and Ethics?

A. I was, yes.

Q. And were you interviewed by Leslie Arrington?

A. I was, yes.

---

Page 424

Q. Did you tell Ms. Arrington that Anne Gehring is "a little off the wall"?

A. I don't recall saying that.

Q. Did you tell Ms. Arrington that Ms. Gehring was emotional in her reactions sometimes?

A. Yes. I would have said that, correct.

Q. Did you tell Ms. Arrington that Anne Gehring made quick personal judgments and was not always rational or objective?

A. No, I would not have said that.

Q. At some point, did you begin a review of the applicants for the position for VP of planning and alignment?

A. Yes, I did.

Q. At what point in the process did you begin that review?

A. After we had closed the posting and pulled down the posting from the internal website.

Q. So the posting was available for a period of time?

A. Correct.

Q. And at some point it was pulled down from

---

Page 425

the --

A. It closes, yes.

Q. So what happens when it closes?

A. It's just an arbitrary deadline for me to go ahead and begin working on the search. So typically what I'll do is use that as a benchmark for delivering some sort of result to my internal client, which would be the candidates who applied for the job.

Q. So is it true that it's really impossible for someone to apply for a position after the closing date because you pulled down the posting?

A. No, that's not impossible.

Q. So how would someone know about the position if you've pulled the posting?

A. Well, there's any number of ways that they could know about it. Officers and directors receive an e-mail announcing the job. So it's possible that they would have received an e-mail about that. It is possible that that e-mail could have been shared with any individual inside or outside of the organization. Because in the text of the e-mail, we say, all

---

Page 426

internal and external candidates who are qualified for the job are encouraged to apply. So it's possible that the e-mail traveled inside or outside the organization without my knowledge.

Q. Did you send Anne Gehring an e-mail with a list of internal candidates for the VP position on or about June 12, 2013?

A. I believe so, yes.

Q. Let's look at Exhibit 48. Do you recognize this document?

A. I do.

Q. And what is it?

A. It's e-mail correspondence to Anne Gehring regarding the candidates who applied for the role.

Q. These are all the applicants for the position?

A. As of Wednesday, June 12th, correct.

Q. These are all the applicants before the position closed and you pulled the posting.

A. Correct.

Q. And Ms. Fraser, Nicola Fraser, was not among the individuals who applied within this time

---

43 (Pages 423 to 426)

Arbitration Day 2                                                    November 4, 2014
Washington, D.C.

Page 427

period, correct?

A. Correct.

Q. After you developed this list of individuals who applied for the position, did you do some further assessment of the individuals?

A. I did. I took a look at their resumes and reviewed them.

Q. Why did you do that?

A. As part of my job responsibilities.

Q. And after you looked at their resumes, what was the next step in the process?

A. I made recommendations to Ms. Gehring about who I felt was qualified for the role and who should be considered for interview.

Q. Let's turn to Exhibit 61. Do you recognize this document?

A. I do.

Q. And what is it?

A. It was my review of the resumes of the candidates who applied for the role.

Q. So one of the individuals who applied was John Hickman?

Page 428

A. Correct.

Q. And he's not included on your list of people who were being advanced in the selection process.

A. Correct.

Q. Why was John Hickman excluded?

A. He had less than one year of service with the company.

Q. Is there a requirement that an applicant for a vacant position have more than one year of employment with the company?

A. They have to have a minimum of one year in their current job, correct.

Q. Is that something that can be waived if the manager agrees to it?

A. Yes, there could be an exception made for that.

Q. Who made the decision that John Hickman would not be interviewed for this position?

A. It was my recommendation that he not be interviewed for the role and I believe that Anne accepted that.

Page 429

Q. And why did Anne accept the recommendation?

A. I think as I outlined here, it was because he didn't meet the policy requirements.

Q. And we've already confirmed that Ms. Fraser was not on this list of applicants, correct?

A. Correct.

Q. And she was not excluded even though she had not applied at that time.

A. Correct.

Q. So after June 13, what was the next step in the process?

A. Obviously, it would be to wait for Anne's response, determine who the key stakeholders are and start scheduling the interviews.

Q. Who decided which of these applicants would be interviewed?

A. I would say that Anne made the final decision on that.

Q. So after June 13th, what was the next step in the selection process?

Page 430

A. It would be to determine who, based on Anne's feedback, was going to be scheduled for interviews and start scheduling the interviews.

Q. So at some point did Anne Gehring tell you who should be scheduled for interviews?

A. Yes. Because I do not believe that we scheduled interviews with all of these individuals.

Q. When were the interviews scheduled?

A. Working off the top of my head, I'm going to say based on this, probably towards the end of June and early July.

Q. Who was actually scheduled for interviews?

A. I believe Joe Hallet was, Ana Lapera was, and I don't know if Peter was, but I don't remember off the top of my head.

Q. Joe Hallet, Ana Lapera. Anyone else scheduled for interview for the VP planning and alignment?

A. I don't remember off the top of my head.

Q. Who was selected for the position?

A. Who was ultimately hired into the role?

Q. Yes.

44 (Pages 427 to 430)

Arbitration Day 2                                      November 4, 2014
                      Washington, D.C.

Page 431

A.  Nicola Fraser was hired into the role.

Q.  So was she scheduled for an interview?

A.  She was not at this time, no.

Q.  Well, later in the process, was she scheduled for an interview?

A.  Yes, I believe she was.

Q.  Did Ms. Fraser submit a resume for this position?

A.  She did, yes.

Q.  And did she submit that resume to you?

A.  She did, yes.

Q.  And was it after the time that the position closed?

A.  Yes, it was.

Q.  Who made the decision that you would accept Nicola Fraser's resume after the position closed?

MR. WILSON:  Objection.  Mischaracterizes prior testimony.

JUDGE ROBERTSON:  If the witness can answer that question, I'll allow it.

THE WITNESS:  Could you repeat the

Page 432

question?

BY MR. BRANCH:

Q.  Who made the decision that you would receive or accept Nicola Fraser's resume after the position closed?

MR. WILSON:  Same objection.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  I would say that I made that decision.  Ms. Fraser had been out on maternity leave and had submitted, I believe, a resume saying that she was aware -- or e-mailed me saying that she was aware of the position but unable to apply due to being out of the office.

BY MR. BRANCH:

Q.  So you believe Ms. Fraser sent you an e-mail saying she was aware of the position but unable to apply?

A.  Correct.

Q.  And what prohibited her from applying for the position?

A.  Well, when you're out on short-term or long-term disability, they disable your access to our

Page 433

systems, so you wouldn't have the ability to necessarily work.

Q.  Well, did her application just include sending you a copy of her resume?

A.  It did, yes.

Q.  So what does being out of the office have to do with -- or what would cause that to prevent you from being able to send your resume simply because you're out of the office?

A.  I don't know.

Q.  Did you schedule the interviews for the position?

A.  I coordinated with another resource in our organization to do that.  So no, I didn't do the physical scheduling itself.

Q.  Did you confirm that Ms. Fraser would be interviewed for the position on July 8th at 10:56 a.m.?

A.  I'm assuming I did.

Q.  Let's look at Exhibit 53.  Do you recognize this e-mail?

A.  I do.

Page 434

Q.  And so in the middle of the page, there is an e-mail from you to Anne Gehring and Shandell Harris where you state, "Just to confirm the candidates to interview include Nicola, Joe Hallet, Ana Lapera"?

A.  Correct, yes.

Q.  And that's at 10:56 a.m. on July 8th, 2013?

A.  Yes.

Q.  So at that point, had you received Ms. Fraser's resume?

A.  I don't know.  I don't recall.  I probably did.

Q.  You believe you had at that point?

A.  I believe I had.

Q.  Would there be any reason for you to schedule her for an interview before you actually received her resume?

A.  Possibly, if I had been advised of that.

Q.  So what's required for someone to formally apply for a vice president position at Fannie Mae?

A.  Well, they have to express interest in the

45 (Pages 431 to 434)

Arbitration Day 2                                                    November 4, 2014
Washington, D.C.

Page 435

role.

Q.    Is that enough, just to say I'm interested in the role?

A.    They also have to be qualified for the role to a certain extent, correct.

Q.    So if they say I'm interested in the role and I believe I'm qualified, is that all that's required for their application?

A.    Taking it down, yes. But we do have a process that we like them to follow. We can make exceptions to the process based on extenuating circumstances.

Q.    Well, doesn't Fannie Mae have a policy that says that employees should submit their resume or credentials through the human resources SharePoint?

A.    No. It's not a policy. It's a practice. If we post the job, the policy is to keep it up on the website for five days, but the practice is to submit their credentials through the internal website, Job Opportunities.

As I mentioned earlier, there may be

Page 436

circumstances where I'm willing to accept a resume outside of that period. It could be any number of reasons, somebody was on vacation, they missed a deadline. It should not necessarily be prohibitive for them to apply within that time period.

Q.    And so Fannie Mae's policy, HR policy is that individuals should submit their resumes through human resources through this SharePoint process; is that correct?

MR. WILSON:  Objection.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  I don't think it's a policy per se. I think it's a practice that we like to adhere to, but there may be reasons why someone cannot submit their resume through the SharePoint site or to the Job Opportunities website.

BY MR. BRANCH:

Q.    Well, let's turn to Exhibit 36. And three pages in, there is a document that has a number at the bottom, P0107.

A.    Yes.

Q.    Is this an excerpt from the Fannie Mae

Page 437

human resources policy and practice handbook?

A.    Yes, it is.

Q.    And this was effective August 14, 2012?

A.    Correct.

Q.    And for the section that says internal staffing practice application, it says, "An employee who wants to be considered for a posted position should apply via the Job Opportunities section of the human resources HR site on SharePoint."

Did I read that correctly?

A.    You did.

Q.    So this was the actual Fannie Mae policy as of August 2012 for employees who want to be considered for a position posted at Fannie Mae; is that correct?

A.    Correct. But that's the practice. The policy is written below, which says, "Positions are filled in a variety of ways. Employees should use this system to access information about and apply for posted positions."

Q.    Where are you reading from?

A.    Bottom paragraph, internal staffing

Page 438

policy.

Q.    The final paragraph, did you say?

A.    Correct, yes.

Q.    It begins with what?

A.    "Internal staffing policy, posting of positions. Positions are filled in a variety of ways. When jobs are posted, they may be displayed on the company's recruiting page" --

Q.    I'm sorry, which page?

A.    P0107, the same exhibit. So the application process is the practice, but the policy is at the bottom of the page.

Q.    And the policy says, "Positions are filled in a variety of ways"?

A.    Correct. "When jobs are posted, they may be displayed on the company's recruiting page for a minimum of five business days. Employees should use this system to access information about and apply for positions."

Q.    So how is that different from --

A.    I think "should" adds some variability into that versus "must."

46  (Pages 435 to 438)

Arbitration Day 2                                                November 4, 2014
Washington, D.C.

Page 439

Q. And so we just looked at Exhibit 53 where you attempted to confirm that Ms. Fraser would be interviewed for this position?

A. Yes.

Q. And did Ms. Fraser submit a resume to you later that day on July 11, 2013 at approximately 2:09 p.m.?

A. I'm assuming so. I can't remember the details off the top of my head, but I would have been in receipt of her resume.

Q. So Exhibit 76, please. Are you there?

A. Yes, I am.

Q. Do you recognize this e-mail?

A. Yes, I do.

Q. This is from Ms. Fraser?

A. Yes.

Q. Okay. And she sent this from her home e-mail account?

A. Yes.

Q. Okay. So she didn't need to work at Fannie Mae to send in her resume, correct?

A. I'm sorry, could you repeat that?

Page 440

Q. It's not necessary for her to be at work at Fannie Mae to apply for this position.

A. Correct. But she wouldn't have had systems access to Fannie Mae systems at that time that I'm aware of.

Q. So who decided that Ms. Fraser would be scheduled for an interview before she submitted her resume?

A. I'm assuming at this point in time either myself or Ms. Gehring did.

Q. Did you know Ms. Fraser before she applied for this position?

A. Yes.

Q. And you say you assume it was either you or Ms. Gehring who made this decision?

A. Correct. We may have had a conversation about it.

Q. But you don't know for certain?

A. I don't remember, correct.

Q. Did you actually sit in on any of the interviews?

A. No, I did not.

Page 441

Q. Would it be improper for a hiring manager to have dinner with an applicant for a position at Fannie Mae before the interview?

A. No.

Q. And so what is the purpose of the interview process?

A. It's to assess the skills of the candidate for the role.

Q. Is the goal to have a totally objective interview process to be fair to all applicants?

A. I would say it's to have a process that helps the hiring manager make the best decision. Selection is not always an objective process.

Q. Is the process supposed to be fair to all applicants?

A. It should be fair, correct.

Q. So when you say "it should be fair," does that mean that certain applicants should not be provided advantages that other applicants are not provided?

A. I don't know what "advantages" would be. I'm not sure what turn of phrase that is, what that

Page 442

means.

Q. Well, would you consider having dinner with one of the applicants before you interviewed for the position an unfair advantage?

A. No.

Q. Where are interviews typically held?

A. Usually in our offices.

Q. Is there any guidance given to interview panel members on questions that they should ask during the interviews?

A. Generally, the hiring managers can give some guidance on that, yes.

Q. Is there a policy where the hiring manager meets with the other individuals who are going to conduct the interviews and they discuss the questions that are going to be asked at the interview?

A. I wouldn't say there is a policy, but it's a best practice to prepare your interviewers for what you're looking for in the role.

Q. What is the normal practice?

A. The normal practice is just that, that once the hiring manager has determined who their

47  (Pages 439 to 442)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                      November 4, 2014
                              Washington, D.C.

Page 443

interviewers are, they generally sit down with them, whether it's in person or through correspondence or over the phone, to discuss what attributes they're looking for in the role.

Q.   What's the purpose of having the hiring manager sit down with the other people who are going to interview for the position to discuss the expectations for the role?

A.   I think the general purpose is to build some sense of what the hiring manager is looking for and understand if there are needs that the interviewers see for the role that maybe the hiring manager isn't aware of.  I think, conceptually, it's about making sure that the interview process is assessing the candidates consistently and with business objectives in mind.

Q.   Is there any rating or ranking of applicants as part of the interview process?

A.   Not to my knowledge.

Q.   Did you actually discuss with Ms. Gehring her selection for this position?

A.   Her finalist?

Page 444

Q.   Yes, the person she selected for this position.

A.   No, I did not.

Q.   How did you learn who had been selected?

A.   I don't recall directly.  But generally, either the hiring manager or the HR business partner will advise me as to who the finalist is once the interviews are complete.

Q.   Is it a common practice at Fannie Mae for hiring managers to schedule lunch interviews for applicants?

A.   They can.

Q.   And when hiring managers schedule lunch interviews for applicants, do they schedule lunch interviews for all the applicants or are they permitted to select who they want to have a lunch interview for?

A.   I think it varies based on schedule and availability.  So I don't know.

Q.   Do you have any experience where a hiring manager has scheduled a lunch interview for an applicant?

Page 445

A.   Yes.

Q.   At the vice president level?

A.   I have, yes.

Q.   Were other applicants also given lunch interviews?

A.   Yes.

Q.   So for that instance where a position was being filled and there was a lunch interview, all of the applicants had lunch interviews.

A.   In that particular instance, all of the applicants had lunch interviews with the hiring manager together.

Q.   Do you have any experience where there has been an interview process where only one of the applicants is provided a lunch interview?

A.   No.

Q.   Would that be improper for a lunch interview for just one applicant and not the other applicants?

A.   Yes.

Q.   Do you expect all of the applicants to have the same length interviews?

Page 446

A.   Yes.  We do schedule them for equal time increments based on what the hiring manager or the key stakeholders prefer for time increments.

Q.   So would it be improper for a hiring manager to schedule one applicant, for example, for a half hour interview and another applicant for a full hour interview?

A.   I would say no, because there could be many factors that influence why the interviews go long.  But I would also say we should be consistent with the length of time in the interview process.

Q.   Do you know how long the interviews were scheduled for the applicants for this particular position?

A.   I'm going to say off the top of my head, probably 30 minutes each.  That's our standard interview time.

Q.   Was Ms. Fraser scheduled for an hour interview?

A.   I don't remember.

MR. BRANCH:  I have no additional questions of this witness.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                          November 4, 2014
                          Washington, D.C.

Page 455

Q.   -- prior to the posting for the vice presidency for planning and alignment position?

A.   Yes.

Q.   What was your understanding of her reputation within the company?

MR. BRANCH:  Objection.  Hearsay.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  Well, she is an officer of the company.  So my understanding of her reputation is that she has the ability to lead and drive results.

BY MR. WILSON:

Q.   So when selecting VPs at Fannie Mae, is it just substantive skills that are important or what beyond that, if anything?

A.   Well, certainly, technical expertise and subject matter knowledge is important in some of our opportunities, but in general, we look for a broader scope of general management skills.  So we're looking, again, at strategic thinking, the ability to collaborate across the entire enterprise, the ability to influence at all levels in the organization, so

Page 456

up, down and sideways, and the ability to drive results based on whatever strategic direction the company is headed towards or that functional area is responsible for.

Q.   And for you in conducting or in your involvement in screening out applicants for the vice presidency for planning and alignment, how, if at all, were you motivated by the applicant's race?

A.   Not at all.

Q.   How, if at all, were you motivated by an applicant's ethnicity?

A.   Not at all.

Q.   How, if at all, were you motivated by an applicant's age?

A.   Not at all.

Q.   How, if at all, were you motivated by applicant's weight?

A.   Not at all.

Q.   How, if at all, were you motivated by applicant's body shape?

A.   Not at all.

Q.   In making your recommendation to

Page 457

Ms. Gehring of applicants that she should review further, how, if at all, were you motivated by any of those factors?

A.   Not at all.

Q.   And in accepting Ms. Fraser's resume when you did, how, if at all, were you motivated by any of those factors to do that?

A.   Not at all.

MR. WILSON:  If you would give me a moment here, Your Honor.  That's all, Your Honor.

JUDGE ROBERTSON:  Anything further, Mr. Branch?

MR. BRANCH:  Yes.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Ma'am, would you turn to Defendant's Exhibit 42?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It's the e-mail that we send out letting

Page 458

directors and officers know that there is a VP position that is open.

Q.   Is this the VP position, vice president for planning and alignment that we spent some time this afternoon discussing?

A.   Yes, it is.

Q.   And is there a requirement in this announcement that the qualified internal and external candidates are encouraged to apply and internal applicants should express their interest and submit their credentials no later than Monday, June 10th, 2013?

A.   I would disagree that it's a requirement. It's an encouragement to do that.

Q.   Well, it says, "No later than Monday" --

A.   It does.

Q.   -- "June 10th, 2013," correct?

A.   But it says we encouraged.  It doesn't say we require.

Q.   Were you acquainted with Ms. Lapera before the interview process for this position?

A.   No, I was not.

51  (Pages 455 to 458)

Page 459

Q.   You did not know her?

A.   No.

Q.   And did you have an understanding of her reputation at Fannie Mae as a leader in the company?

A.   I did not, no.

MR. BRANCH:  No additional questions.

MR. WILSON:  Your Honor, if I may, it will be like 30 seconds.

RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q.   Could we stay on Defendant's Exhibit 42?

A.   Sure.

Q.   Just to highlight, am I right that that e-mail sent to officers at fanniemae.com and to directors at fanniemae.com?

A.   Yes.

Q.   And one last question.  Because this case deals with body shape, let me ask you, what's your dress size?

MR. BRANCH:  Objection.

JUDGE ROBERTSON:  Sustained.

MR. WILSON:  No more questions, Your

Page 460

Honor.

THE WITNESS:  I'm done?

JUDGE ROBERTSON:  You're done.

THE WITNESS:  Thanks.

(Ms. Werner exits arbitration room.)

JUDGE ROBERTSON:  Should we take a quick break?  It's 2:30.

MR. BRANCH:  Yes.

JUDGE ROBERTSON:  All right.  Let's take a ten-minute recess.

(Recess.)

JUDGE ROBERTSON:  And your name is?

THE WITNESS:  Shandell Harris.

JUDGE ROBERTSON:  Ms. Harris.  Will the court reporter please administer the oath to Ms. Harris.

Whereupon,

SHANDELL HARRIS,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

JUDGE ROBERTSON:  Mr. Branch.

Page 461

MR. BRANCH:  Thank you.

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your name.

A.   Shandell Harris.

Q.   Ms. Harris, my name is David Branch.  Ms. Harris, are you currently employed?

A.   Yes.

Q.   And where are you employed?

A.   At Fannie Mae.

Q.   What's your position there?

A.   I'm a human resources business partner.

Q.   And how long have you worked at Fannie Mae?

A.   Since 1990, with a break between 2003 and 2005.

Q.   And so you worked from 1990 until 2003?

A.   Yes.

Q.   When you left your position in 2003, what was your position?

A.   I was a director.

Q.   Human resources director?

Page 462

A.   Yes.

Q.   And when you returned to Fannie Mae in 2005, what was your position?

A.   I came back as a consultant, first, for three months and then I came back on full time as an HR business partner.

Q.   And you're still in the HR business partner position?

A.   Yes.

Q.   So when you came back to Fannie Mae as a full-time employee after 2005, you accepted a position that was lower than the human resources director position that you had previously?

A.   Yes.

Q.   Have you filed an EEO complaint against Fannie Mae?

MR. WILSON:  Objection.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  Yes.

BY MR. BRANCH:

Q.   And did you file a race discrimination claim?

Arbitration Day 2                                                                November 4, 2014
Washington, D.C.

Page 463

A.   Yes.

Q.   Was that related to your position as HR director?

A.   Yes.

Q.   As an HR business partner, what are your responsibilities?

A.   I am the primary point of contact for my clients for all HR-related activities, including hiring, performance management, termination of course, coaching, development, those kinds of things.

Q.   And what duties were you performing in 2012 and 2013?

A.   Similar duties.

Q.   Did you have clients at that time?

A.   Yes.

Q.   Was EPMO one of your clients?

A.   When?

Q.   2012-2013.

A.   For a portion of 2012 and a portion of 2013, but not continually.

Q.   Was there a senior vice president responsible for EPMO in 2012 and 2013?

Page 464

A.   Yes.

Q.   And who was that individual?

A.   What time frame in 2012?

Q.   At any point in 2012 and 2013.

A.   Anne Gehring moved over to support EPMO, I believe, in late 2012.  I don't recall who was running EPMO previous to that.  I believe it might have been Linda Knight, but I don't remember exactly.

Q.   And you're familiar with Ana Lapera?

A.   Yes.

Q.   Have you supported Ms. Lapera as an HR business partner?

A.   Yes.

Q.   And when is the last time you supported her as an HR business partner?

A.   The last time I was supporting EPMO.

Q.   And that would have been what period of time?

A.   That would have been from approximately late April/early May of 2013 until -- I don't remember the exact date at the end of the year, but -- and then I supported her not in the EPMO, but

Page 465

when it was the old OPS plan organization under Linda Knight, which was 2011, maybe early 2012.

Q.   How was Ms. Lapera regarded as a performer at Fannie Mae?

A.   She was seen as a strong performer.

Q.   And we've already established that you're familiar with Anne Gehring?

A.   Yes.

Q.   Are you aware of any complaints being made against Anne Gehring about the language that she's used in referring to Fannie Mae employees?

A.   I have third-party knowledge of one complaint.

Q.   And what is that complaint?

MR. WILSON:  Objection.  Hearsay.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  It was a complaint that an employee filed regarding some language that she used. I believe it was the F word.  But I don't really know any details.

BY MR. BRANCH:

Q.   Was that complaint investigated?

Page 466

A.   I assume so.

Q.   And when you say "the F word," you're referring to profanity, F word?

A.   Yes.

Q.   What other information do you have about this use of the F word by Ms. Gehring?

A.   I don't have any other information about that case.

Q.   Was the employee who made that complaint Michael Chen Young?

A.   That's what I understand.

Q.   Did Mr. Chen Young make a complaint that Anne Gehring called him "a fat fucker" in a staff meeting?

A.   I don't know the details of the complaint.

Q.   Do you know who Kathy Keller is?

A.   Yes.

Q.   And did Ms. Keller at some point report to Ms. Gehring?

A.   Yes.

Q.   And was she also Ms. Lapera's supervisor?

A.   Yes.

53  (Pages 463 to 466)

Arbitration Day 2                                                   November 4, 2014
Washington, D.C.

Page 467

Q.   Did she end her employment in May 2013?

A.   Yes.

Q.   Was Ms. Keller asked to resign from her position?

A.   No.

Q.   And how do you know Ms. Keller was not asked to resign from her position?

A.   Because Ms. Keller came to me and asked me for a package.

Q.   And before she came to you and asked for a package, was Ms. Keller told that if she did not accept a package, actions would be taken against her on her performance?

A.   Ms. Keller was given feedback on her poor performance by Anne Gehring.  Yes, she was.

Q.   So was it Ms. Gehring's assessment that Ms. Keller was performing poorly?

A.   Yes.

Q.   And had Ms. Keller worked at Fannie Mae as a vice president?

A.   Yes.

Q.   And has she been at Fannie Mae for 20

Page 468

years or so?

A.   She was a long-tenured employee.  I don't know the years exactly.

Q.   And when she left employment at Fannie Mae, she was a vice president?

A.   Correct.

Q.   Did Ms. Keller make any complaint to Fannie Mae about mistreatment of her by Ms. Gehring?

A.   Complaints to?

Q.   Human resources, compliance and ethics or any entity within Fannie Mae that receives complaints from employees.

A.   I believe she complained to compliance and ethics, but I'm -- I believe she did.

Q.   After Ms. Keller was no longer in her position, were you involved in filling the position vacated by Ms. Keller?

A.   Yes.

Q.   What was your involvement?

A.   I worked with Anne to update the job description and then the position was posted.

Q.   Before the position was posted, did

Page 469

Ms. Gehring identify an internal candidate that she wanted to select for the position?

A.   No.  She identified a candidate that she thought would have strong potential for the job.  I believe his name was John Hickman.

Q.   Was it John Hickman or Joe Hallet?

A.   I mean Joe Hallet.  I'm sorry, Joe Hallet, yes.  Thank you.

Q.   And your belief is that she identified someone who she thought would be a strong candidate?

A.   Correct.

Q.   At some point was the VP of planning and alignment position announced?

A.   Yes.

Q.   How was that announcement made?

A.   It was, I believe, an e-mail from Brian McQuaid to the directors in the organization announcing the position.

Q.   So do announcements for vacant positions at Fannie Mae typically include a closing date?

A.   I don't know.

Q.   I'm sorry?

Page 470

A.   I don't know if they typically have a closing date.  That was your question.

Q.   Well, is that a common practice for announcements to include a closing date?  A date by which people should submit their applications?

A.   I think so.  I'm not sure that it happens all the time.  And I don't really see the announcement, so I really don't know specifically.

Q.   What's the purpose of a closing date?

MR. WILSON:  Objection.  Foundation.

JUDGE ROBERTSON:  If you know, you can answer.

THE WITNESS:  Normally, they would want anyone who is interested in applying to have applied by that date.

BY MR. BRANCH:

Q.   Turn to -- there's a couple of binders in front of you, but one of them has defendant's exhibits.  I think the one in front of you is probably plaintiff's.  But Defendant's Exhibit Number 42.

A.   Okay.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                             November 4, 2014
                          Washington, D.C.

Page 471

Q.   So you're going to have to probably move that aside and take one of the other two exhibits in front of you.

A.   Okay.

Q.   And you're at 42?

A.   Yes.

Q.   Do you recognize this document?

A.   I never saw it, but it looks like other announcements that have gone out. This goes to officers and directors. We are not copied.

Q.   Would this be generated by human resources or someone else?

A.   By Nicole Harris in compensation.

Q.   And is this typical of an announcement for a VP position at Fannie Mae? Is this what you expect to see?

A.   I don't typically see them, sir. These typically go to officers and directors. So I don't typically see them.

Q.   Were you asked to participate in the selection process for the VP of planning and aligning?

Page 472

A.   I was asked to participate in the interview process.

Q.   And who asked you to do that?

A.   Anne Gehring.

Q.   Planning and alignment, sorry. Do you recall when that occurred?

A.   When the interviews occurred?

Q.   Yes.

A.   No, I don't recall exactly. It was during the summer of 2013.

Q.   Did you conduct interviews for the position?

A.   Yes.

Q.   And prior to conducting interviews, did you meet with Anne Gehring to discuss interview questions?

A.   No, I didn't.

Q.   And prior to the interviews, did you meet with Anne Gehring to discuss the requirements for the position?

A.   I had the job description so I understood the requirements for the position.

Page 473

Q.   So you did not meet with Anne Gehring to discuss what she was looking for in this position?

A.   You know, as a part of our one-on-ones, we probably did have a conversation about it. I'm not recalling it exactly though. It would have made sense.

Q.   Who did you interview for the positions?

A.   I interviewed Joe Hallet, Ana Lapera and Nicola Fraser.

Q.   Did you rate or score any of the applicants for the position?

A.   I don't score applicants, no.

Q.   And the interviews were held in your office; is that correct?

A.   Yes.

Q.   Did you see your role as you were interviewing the applicants on their technical competency?

A.   No.

Q.   What was your role in this interview process?

A.   Was to assess their leadership

Page 474

capabilities.

Q.   What questions did you ask the applicants in your interviews?

A.   I don't have the exact questions, sir. I pulled the questions from an interview guide and I don't have them, but what typically happens is the way the guide works is you pick competencies. There will be a choice of four or five questions. You choose the questions and that's what you use for your interview.

Q.   Did you take notes during the interview?

A.   I did.

Q.   Where are those notes?

A.   I don't have them.

Q.   Did you ask all the applicants the same questions?

A.   I did.

Q.   What types of questions did you ask the applicants?

A.   They would have been behavioral competency questions.

Q.   Such as what?

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                    November 4, 2014
                              Washington, D.C.

Page 475

A.    Such as think about a time when you had to convince a group of stakeholders who were not on the same page, how you talked to them, how you moved them through the process to get to where you needed them to be. It would have been those kinds of questions.

Q.    Did you have any issues with Ms. Lapera's answers to the questions in the interview?

A.    No.

Q.    And was it your belief that she performed fine during the interview?

A.    Yes.

Q.    Were you familiar with the other applicants that you interviewed before the interview?

A.    Nicola Fraser.

Q.    Only Nicola Fraser?

A.    Only Nicola.

Q.    You were not familiar with Joe Hallet before the interview?

A.    No.

Q.    How many employees does Fannie Mae have in the Washington, D.C. area?

A.    Just the D.C. campus?

Page 476

Q.    Yes.

A.    Approximately maybe 2,500 or 3,000, somewhere along that number.

Q.    In 2013, were there any director or vice president Hispanic female employees at Fannie Mae?

MR. WILSON: Objection, Your Honor. This is irrelevant.

JUDGE ROBERTSON: Overruled.

THE WITNESS: Were there any -- could you repeat the question?

BY MR. BRANCH:

Q.    Hispanic women who held the position of director or vice president or above.

A.    I don't know. I believe so, but I'm not familiar with everyone at Fannie.

Q.    Are you familiar with Carmen Oviedo?

A.    Yes.

Q.    Was she a vice president at Fannie Mae in 2013?

A.    Yes, she was.

Q.    And in 2012?

A.    I believe so, yes.

Page 477

Q.    And she left employment at Fannie Mae?

A.    Yes.

Q.    Did she previously work for -- she was on the team that Anne Gehring supervised at some point?

A.    I'm not sure that she actually ever reported to Anne. I believe she reported to Linda Knight.

Q.    Were you supporting Anne Gehring's team when Ms. Oviedo was moved to another team?

A.    When was Ms. Oviedo moved to another team?

Q.    So if I represent to you that occurred in 2012, were you supporting the team then?

A.    I didn't support the team the entire time of 2012. So I guess I'm not remembering that.

Q.    Prior to your interview of the applicants for this VP of planning and alignment, did Ms. Gehring express to you that she was interested in placing Nicola Fraser in that position?

A.    When Nicola Fraser indicated she was interested in the position, Anne felt that she would be a very strong candidate for the role.

Q.    And that was before the interviews?

Page 478

A.    That was before the interviews, yes.

Q.    So are applicants at Fannie Mae permitted to apply for positions after the closing dates of the positions?

A.    I don't know.

Q.    Have you managed selections for vacant positions at Fannie Mae?

A.    I'm not really in the recruiting process. So no.

Q.    Did you tell Ms. Lapera that your only concern about her was her executive presence?

A.    Yes.

Q.    Did that occur during the interview or after the interview?

A.    After the interview.

Q.    And what was it about her executive presence that caused you concern?

A.    It was a communication style. Sometimes I observed that Ana could ramble, kind of not be on point. I think it's important in communicating with executives that you are crisp and to the point and provide detail as requested.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                            November 4, 2014
                                   Washington, D.C.

Page 479

Q.  And what was the basis of your belief that Ms. Lapera could ramble and not be on point?

A.  I had observed her doing a presentation and that was my assessment.

Q.  What was the presentation that you observed her doing?

A.  It was a discovery insights session that she facilitated for the capital markets, I believe it was the capital markets finance team.

Q.  And for this discovery insights presentation, was this within the area of Ms. Lapera's responsibility?

A.  She was an insights facilitator.

Q.  And did she, in fact, volunteer to assist on this particular project?

A.  I assume so.

Q.  And what type of information was she presenting at this seminar or at this presentation?

A.  Discovery insights is sort of like a Meyers Briggs type exercise where the group takes a test, they get information about themselves and the facilitator helps them read the document, understand

Page 480

the content of it, takes them through several exercises to understand different communication styles, that sort of thing.

Q.  And when was this presentation?

A.  I don't remember exactly.

Q.  It was before the interview?

A.  Oh, yes.

Q.  Was it years before the interview?

A.  I would say probably two years at least before.

Q.  Was this the only occasion that you observed Ms. Lapera give a presentation and she rambled and she was not on point?

A.  Yes.  That's the only time I observed her doing a presentation.

Q.  So your conclusion that she lacked executive presence was based on this single incident where she made a presentation a few years before interviewing for this VP position?

A.  Yes.  I had observed her in staff meetings and she tended to be sometimes emotional in the delivery of her message.  So those were my points of

Page 481

reference.

Q.  What do you mean "emotional in the delivery of her message"?

A.  There was emotion.  There was emotion in how she would deliver messages from time to time.

Q.  And how many occasions did you observe her at staff meetings being emotional in the delivery of her message?

A.  I can't give you a number, sir.

Q.  What is it about her delivery at staff meetings that demonstrated that she lacked executive presence?

MR. WILSON:  Objection.  Asked and answered.

JUDGE ROBERTSON:  I'll allow it.

THE WITNESS:  I can't remember a particular incident at this time to explain it to you.  I can only tell you that was my reflection.

BY MR. BRANCH:

Q.  How long was it before the interviews that Ms. Lapera did a presentation at a staff meeting and you were present and she was emotional?

Page 482

A.  I can't tell you.  I don't know exactly.

Q.  Do you know who Ed Watson is?

A.  Yes.

Q.  And is he a former CFO or CIO?

A.  Former CIO.

Q.  And was Mr. Watson considered part of senior management at Fannie Mae?

A.  Yes.

Q.  And was it part of Ms. Lapera's responsibility at some point during her employment to make presentations to Mr. Watson?

A.  I'm not sure, sir.

MR. BRANCH:  No additional questions.

JUDGE ROBERTSON:  Mr. Wilson?

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q.  Ms. Harris, thank you for being here today.  While Anne Gehring was the SVP in charge of EPMO, what was the period of time in time in which you were the business partner responsible for the EPMO?

A.  From late April of 2013 until she left,

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                November 4, 2014
Washington, D.C.

Page 483

which was, I think, October of 2013.

Q. Okay. Could we turn to Defendant's Exhibit 42? You testified about that previously.

A. Yes.

Q. Do you have that before you?

A. Yes.

Q. Did you prepare this?

A. No.

Q. Did you have responsibility for preparing this?

A. No.

Q. I believe you testified to, when Mr. Branch was asking you questions, that you took notes during the interviews of Ms. Lapera, Mr. Hallet and Ms. Fraser, right?

A. Yes.

Q. And that you didn't have those, right?

A. (Witness nodding.)

Q. During discovery in this case, did you look for them?

A. Yes. A number of times, yes.

Q. And you just didn't find them?

Page 484

A. Yes.

Q. You were testifying just a moment ago about Ms. Lapera being emotional in talking. Could you elaborate on what you meant by "emotional" there?

A. I'm trying to think of an instance that would kind of make it clear, but it was the way that she presented information and the way she presented information was generally with a lot of emotion.

My experience in dealing with the senior executives is that where you can be more to the point, without the emotion, stick to the important pieces, it seems to -- the communication seems to go a little bit better.

JUDGE ROBERTSON: Do you think maybe that's a cultural thing?

THE WITNESS: What's a cultural thing, sir?

JUDGE ROBERTSON: The way people have of expressing themselves?

THE WITNESS: I think it probably could be a personal thing. I'm not sure I understand the cultural piece of it. So I think it could be a style

Page 485

difference, if you will, yes.

JUDGE ROBERTSON: Well, I mean, not to put too fine a point on it, do you think it's possible that Hispanic people communicate differently from Anglo-Saxons? That black people communicate differently from white people? That American Indians communicate differently from cattle rustlers? I don't know. Eskimos rub noses with each other. Nobody would think they're being emotional in Eskimo country, but down here, we'd think they were not executive material.

THE WITNESS: I suppose that's possible, yes.

JUDGE ROBERTSON: Okay. You asked, Mr. Wilson. I just thought I'd -- you asked her to explain emotion. I thought it was an interesting question.

BY MR. WILSON:

Q. Ms. Harris, could I ask you, please, to turn to what's previously been marked as Defendant's Exhibit 62?

A. Yes.

Page 486

Q. Do you see that?

A. Yes.

Q. And is this an e-mail you understand that you sent?

A. Yes, it is.

Q. And what's the top e-mail? What is that?

A. It was my feedback on the three interviews that I conducted.

Q. And you were providing that in response to the e-mail below from Ms. Werner?

A. Yes.

JUDGE ROBERTSON: Give me the exhibit number again.

MR. WILSON: It's Defendant's Exhibit 62, Your Honor.

BY MR. WILSON:

Q. And you have a sentence in there that says -- well, two sentences. "Ana has good leadership skills as it relates to managing her team. Her real area of focus would be her executive presence in communicating with the OC and the MC. I think this area of development for her is critical

58 (Pages 483 to 486)

Arbitration Day 2                                                November 4, 2014
Washington, D.C.

Page 487

given this role, so I would not see her as the best candidate." Did I read that portion correctly?

A. Yes.

Q. Just to be clear here, in that sentence, what did you mean by OC?

A. The two managing bodies, if you will, of Fannie Mae. One is the operating committee and the other is the management committee.

Q. So OC is operating committee?

A. Yes.

Q. And MC is management committee?

A. Yes.

Q. And you say also above, "Nicola, by far is the best candidate... a seasoned top-talented leader with demonstrated leadership capabilities."

Could you please explain to His Honor why you think or why you thought Ms. Fraser was the best candidate?

A. Yes. I supported Nicola when she worked in FP&A. In that role, she was responsible for regular interface with the management committee, FHFA and the board. So she had demonstrated her ability

Page 488

to be very effective in those venues and I also realized that she had very strong leadership capabilities.

Q. Had you observed, before this time, being July 15, 2013, Ms. Fraser's communication style? Had you seen her present to anybody, for example?

A. Yes.

Q. And have you witnessed her in communications with senior leadership?

A. I had witnessed her with Anne and I had -- actually, I had not witnessed her with senior leadership. I had gotten feedback about her effectiveness in that role.

Q. Is there something at Fannie Mae called "top talent"?

A. Yes.

Q. Briefly, if you could describe what that is.

A. So we have a talent review process every year where we evaluate our officers on a nine-box grid. And at the time I supported Nicola in FP&A, we conducted such a review in finance. And the way it

Page 489

works is, within the individual division, so within controllers and FP&A, there would be a smaller talent review session and then there is a larger session that included the CFO and all the senior vice presidents of finance.

In that large meeting, Nicola had been designated as a top talented officer. And what that means is we're saying that this person has a lot of potential, not only to take on broader responsibilities, but also potential for promotion.

Q. Could I ask you, please, to turn to what has previously been marked as Defendant's Exhibit 61?

A. Yes.

Q. Do you recognize this as an e-mail string on which you're a cc?

A. Yes.

Q. And you don't have any reason to doubt you didn't receive this?

A. No, I received this.

Q. And in there, there's an e-mail from Anne Gehring, July 16th, at 1:14 p.m. in which you're a cc?

Page 490

A. Uh-huh.

Q. Would you agree with me that's feedback that Ms. Gehring is providing to Melissa on her interviews?

A. Yes.

Q. And then if we flip the page, there's another e-mail, right, from Mike Choi to Melissa Werner on which you're a cc?

A. Yes.

Q. July 15 --

MR. BRANCH: Objection. Hearsay.

MR. WILSON: We've established this is a business record, Your Honor.

JUDGE ROBERTSON: Objection is overruled.

BY MR. WILSON:

Q. The 7:07 p.m. e-mail, you're a cc on that one, too?

A. Yes.

Q. Do you recognize that as an e-mail from Mr. Choi providing his feedback on the candidates he interviewed?

A. Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                November 4, 2014
Washington, D.C.

Page 491

Q.   And if you look at the feedback from both Ms. Gehring and Mr. Choi, would you agree with me that they both concluded that Ms. Fraser is the best candidate for this position?

A.   Yes, they did.

Q.   In your recommendation or conclusion that Ms. Fraser was the best candidate for the position for the vice president of planning and alignment, how, if at all, was your decision motivated by anybody's race?

A.   It was not.

Q.   How, if at all, was it motivated by anybody's ethnicity?

A.   No bearing.

Q.   How, if at all, was it motivated by anybody's national origin?

A.   It was not.

Q.   How, if at all, was it motivated by anybody's age?

A.   It was not.

Q.   How, if at all, was it motivated by anybody's weight?

Page 492

A.   It was not.

Q.   How, if at all, was it motivated by anybody's body shape?

A.   It was not.

Q.   Give me just a minute here.  Let me check my notes.

Are you aware, in Fannie Mae divisions, right, they give end-of-year performance ratings?

A.   Yes.

Q.   And that's done on a one-to-four or one-to-five scale?

A.   One to four.

Q.   What's your understanding, if any, of whether the head of the division would have the ability to change the rating of a person that they saw in their division?

A.   The senior executive always has last review rights.  So what does that mean?  When we have a yearend process, usually, an organization will go through an internal calibration process that would involve the leadership of the organization where they will determine what they believe is the appropriate

Page 493

rating.

Usually, the HR business partner, once all of that is concluded, will send the senior executive a spreadsheet with all of the ratings of all of the employees in their organization and the executive does have the opportunity to make any changes to ratings if he or she so chooses.

Q.   Last question.  So in the demand for arbitration, in not so many words, there are allegations against you that you may have discriminated against Ms. Lapera because of her weight or body shape.  Do you think that allegation is absurd?

A.   Yes.

MR. BRANCH:  Objection.

BY MR. WILSON:

Q.   Why, in particular, do you find that to be absurd?

MR. BRANCH:  Same objection.

JUDGE ROBERTSON:  Well, it's very leading, but I'm going to allow her to answer it.

THE WITNESS:  I have a daughter who was

Page 494

obese for the majority of her life.

MR. BRANCH:  Objection.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  And so I have no biased feelings at all against anyone based on size.

MR. WILSON:  Thank you, Ms. Harris.  I have no more questions, Your Honor.

JUDGE ROBERTSON:  Mr. Branch?

MR. BRANCH:  Yes.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Ms. Harris, you indicated that you supported Nicola Fraser when she was in FP&A?

A.   Yes.

Q.   What was her title when you supported her?

A.   She was a vice president.

Q.   Do you recall the time period that you supported her in FP&A?

A.   I think it was approximately 2011.  It might have been 2010.  I can't remember back that far.  I'm sorry.  And a part of 2012.

Q.   Okay.  When was she designated as a top

60   (Pages 491 to 494)

Arbitration Day 2

November 4, 2014

Washington, D.C.

Page 495

talented performer?

A.   That would have been in the talent review of either 2012 or 2011.

Q.   And did Anne Gehring have any influence on this designation?

A.   She recommended the initial placement of Nicola, but as I indicated, it had to be agreed upon with the other senior leaders of the organization and the CFO.

Q.   And Ms. Gehring had just promoted Ms. Fraser from director to vice president in the 2011-2012 time frame?

A.   I believe it was 2011.

Q.   So your belief that Ms. Lapera lacked executive presence was based on your perception that she became emotional at a staff meeting?

A.   I had observed her communication as emotional, yes.

Q.   And could her ethnicity have influenced your perception?

A.   No.

Q.   I think that's the same question the judge

Page 496

asked. I had to ask it because Ms. Lapera had already passed me a note asking me to ask it.

JUDGE ROBERTSON:  Because you thought that was such a great question.

MR. BRANCH:  Exactly. Thank you.

JUDGE ROBERTSON:  I think that completes your testimony, ma'am. Thank you very much.

THE WITNESS:  Thank you.

(Ms. Harris exits arbitration room.)

JUDGE ROBERTSON:  What's next?

MR. BRANCH:  So if we could just have a couple of minutes for a quick break, Your Honor, and Mr. Lapera is going to testify.

JUDGE ROBERTSON:  Mr. Lapera?

MR. BRANCH:  Yes.

JUDGE ROBERTSON:  All right.

MR. BRANCH:  And Fannie Mae was not able to get any additional witnesses, so I think he's going to be the last witness for today.

JUDGE ROBERTSON:  All right.

MR. BRANCH:  Am I correct, you don't have anyone else?

Page 497

MR. STEWART:  There's no one else.

(Recess.)

Whereupon,

JESUS LAPERA,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your name.

A.   My name is Jesus Lapera.

Q.   And Mr. Lapera, what is your relationship to Ms. Lapera?

A.   Married for 31 years.

Q.   And are you currently employed?

A.   I'm working as a consultant for international organizations and for private organizations in the Washington area.

Q.   Can you summarize your educational background first and then your employment background?

A.   I'm an engineer and architect. I have a master's degree in policy analysis with a specialty

Page 498

in financial management. I also have a graduate degree in green building and renewable energy. And for the last 12 years, I was working for the International Development Bank across the sheet. I was the head of the Social Development Institute, which was a graduate level teaching institute for Latin America in social issues and financial issues.

Q.   Can you describe generally the type of work that you've performed in that position?

A.   We advise countries on financial matters and social areas, specifically in things that have to do with Social Security, health insurance and policies related to safety nets.

After I retired from the IDB, I have been working as a consultant. Last assignment was I worked with an international organization was with the World Bank, was working for the total compensation unit. I developed a knowledge base for compensation and benefits, including the pension issues that are related to total compensation.

Q.   And what type of pension issues did you work on in this last position?

Page 499

A.   Basically, when we developed the knowledge base, it was geared towards an initiative to convert the current pension system, which is a defined benefit pension, into a lump sum and for people to put that money into a 401. And after using some of the leading experts in the area, including Mercer, Aon Hewett and Tower Watson, we conclude that it was not possible because of tax issues.

Q.   And what do you mean by "tax issues"?

A.   If you have a social contract, I mean, in a pension and you explain to somebody, okay, I'm going to get employment and then you get a set of rules with that employment saying, okay, if you work with us, you are going to get this amount of pension after a particular set amount of years when you're vested. When -- if you convert that money into a net present value amount of money without taking into account taxes, which in the case of an international organization is mandatory to take into account, I mean, you're shortchanging the person basically because -- let's make it a very simple and a lay way of doing it.

Page 500

Some of -- I guess everybody knows what is early distribution. And if I get an early distribution, the IRS will ask me to pay the taxes at the present level of the tax bracket. In this case, let's say I get $500,000 --

MR. WILSON:  Your Honor, could I object to this line of testimony? It seems like they're putting on Mr. Lapera as an expert regarding either pensions or the calculation of Ms. Lapera's lost pension and he was not disclosed as an expert in this case.

JUDGE ROBERTSON:  I don't think they're going to offer him as an expert. They're asking him what work he does. If they ask him an opinion question about this case, it will be another question. But the objection is overruled.

Continue, Mr. Lapera.

THE WITNESS:  Okay. So when you get $500,000, then you get -- and you have to pay taxes at the current level -- let's say if you have $500,000, most likely you will have to pay -- if you live in Virginia, you have to pay almost 45 percent

Page 501

in taxes towards the federal government and the state government of Virginia. So that means that the amount that you get left after that won't be able to cover for the pension you were promised. And this is something that has been going on and is being debated now in courts. So I was asked why and that's the answer.

BY MR. BRANCH:

Q.   Thank you. Mr. Lapera, did you have any involvement in assisting Ms. Lapera in preparing the -- there should be a binder in front of you with exhibits. This is the Exhibit 39.

A.   This one?

Q.   Let me see if I can find the pocket part.

A.   Yes, I did.

Q.   What was your level of involvement?

A.   I did the numbers for it.

Q.   And can you explain what you've included on this document?

MR. WILSON:  Objection, Your Honor.

JUDGE ROBERTSON:  Yeah, come on. You are making him an expert now, aren't you?

Page 502

MR. BRANCH:  Well, Your Honor, I'm not making him an expert. Ms. Lapera has testified that he assisted her in preparing the document, preparing this document, and we're not designating him as an expert, but basically he assisted in the preparation of this document and we want him to provide his testimony on the basis for the numbers included in this document.

MR. WILSON:  I think it's cumulative and irrelevant, Your Honor. I mean, this was explored at length both in my cross and in Mr. Branch's direct in Ms. Lapera's testimony.

JUDGE ROBERTSON:  I'm inclined to agree that it's cumulative. I mean, what -- just on the first few bars here, what do you want him to say about what's on here?

MR. BRANCH:  There has been a representation made that there was not a discount for the present value for the total amount that would have been paid.

JUDGE ROBERTSON:  Okay.

MR. BRANCH:  And he's going to provide an

Arbitration Day 2                                                November 4, 2014
Washington, D.C.

Page 503

explanation of why there was no discount.

JUDGE ROBERTSON: No. That's expert testimony. I won't allow it. Next. I thought you were going to bring him on for a completely different reason.

THE WITNESS: Me, too.

MR. BRANCH: I do have other reasons.

JUDGE ROBERTSON: All right. Let's get to the other reasons. His explanation for this spreadsheet -- we've been over the spreadsheet.

BY MR. BRANCH:

Q. And you've been married to Ms. Lapera for 31 years?

A. Thirty-one years.

Q. And generally, how would you describe your wife's personality?

A. Gentle, driven and truly believing in apple pie and America.

Q. And when you were in Venezuela, where did you work?

A. She worked for --

Q. No, where did you work in Venezuela?

Page 504

A. I was the deputy secretary of housing.

Q. And so how did Ms. Lapera feel about her work at Fannie Mae?

A. Well, that's something that we discussed at length and basically, because my involvement with housing issues and especially because of the teaching institute, especially when the crisis came in the 2008, I guess it was, so I remember telling her that if Fannie Mae will exist, it will have to be recreated because it's the only mechanism that, I think, at the international level that may be able to fulfill the agreement for lower middle class for having housing. And she truly believed, I mean, that thing in the mission and something that I really admire of her.

Q. And so how important was her job and the work that she did at Fannie Mae to her?

A. Very important because I -- especially when she started having issues within the company. And I told her to quit. I mean, she repeatedly told me that she believe in the mission and she wanted to do good.

Page 505

Q. And what sacrifices did you make and did your marriage make as a result of her commitment to Fannie Mae?

A. Well, I think that it may be in the form of personal relations, family issues. I mean, after the restatement -- I guess you have been talking about that -- I mean, she started getting low energy and she started getting very, very upset, headaches, migraines, all sorts of problems for her, pains that translated into frequent visits to a chiropractor, anxiety, decreasing the level of sexual drive and I'll say some sort of pessimist and because of pessimism, sometimes really bordering to depression. Bad temper, I will say, then and started to isolate as a family from friends and close family because she wasn't feeling like, you know, having interaction with them.

Q. And did Ms. Lapera report to you any concerns about how she was treated in the classification of her position at Fannie Mae?

MR. WILSON: Objection, Your Honor. It's hearsay.

Page 506

JUDGE ROBERTSON: Overruled.

THE WITNESS: Can I answer?

JUDGE ROBERTSON: Yes, you can answer.

THE WITNESS: Okay. What she told me? Well, we have a daughter and we always trained her to be -- we always told her that she was equal to everybody else. And then one of the things that my wife was feeling is that she was not treated as equal as the men and she was not taken into -- in taking into account as a professional, but she was being some sort of -- or discriminated because of the fact she was Hispanic and a woman.

And later, with the presence of -- I guess her name is Anne Gehring or something like that, I mean, repeatedly she came home sometimes crying because, I mean, she was telling her with actions more than anything else that she didn't like her because she was fat.

MR. WILSON: Objection, Your Honor. That's double hearsay.

JUDGE ROBERTSON: I'm going to allow it. It's arbitration. Go ahead.

63 (Pages 503 to 506)

Arbitration Day 2                                         November 4, 2014
Washington, D.C.

Page 507

BY MR. BRANCH:

Q.   And what impact did you observe -- or what did you observe in the difference in how Ms. Lapera conducted herself at home based on the treatment at work?

A.   Well, she was reverting to herself and being less communicative. Again, the worst part was the pessimism and the borderline depression that she was starting to have. And the other thing is that at one point, she was feeling like she was in denial. I mean, this is not happening to me, I'm doing something wrong, I have to do better. And even at one particular point, I set up an LLC for her to say, well, let's -- please leave the place and let's change our lives.

So I set it up, an LLC that -- by the way, I'm the only one using it for consulting assignments, which is called Seagull Quest. And the thing is, she never used it and she even nowadays is not using it because she's working directly for a company. So she doesn't kind of have a drive to work by herself. And the main issue, from my point of view, is that she

Page 508

felt that she was not doing good enough, she had to do better because it couldn't be true what was happening to her.

It was denial, but at the same time was affecting her really, really, really badly. And also was affecting our daughter because we're talking about our daughter at the time was finishing college. I mean, she was, you know, really -- she couldn't believe what was going on. And as a responsible parent, you are trying to really shape the way your daughter is going to see the world. I mean, and that was a really bad example. And that was one of the main reasons I wanted her to leave. And she declined because she thought I'm going to do better, they're going to do good for me.

She always believed in the mission of Fannie Mae and she always thought that she could do better. Eventually, one day she came home and said, I quit. It was a big surprise to me and also a big sigh of relief, to tell you the truth.

Q.   So what period of time did you see her exhibit depressed behavior?

Page 509

A.   It started with -- the issues with the weight gain and the increased appetite and the nervous eating, it started with the restatement. But it really went really, really, reallly bad when she started working for Anne Gehring. That's when the things that -- the anxiety and the borderline depression started to show up.

Q.   And how severe was this depression?

A.   Well, I asked her to go and get professional help, which she didn't.

Q.   I'm sorry?

A.   Which she didn't.

Q.   And what impact was this depressed state having on your relationship?

A.   Again, it's difficult if you're working the whole day, you come home and you share what is happening to you and then the person you have shared your life with doesn't want to talk to you, doesn't want to share because, I mean, every time that she share, I will be telling her just why do you keep complaining? Just do something about it and leave. And so we started to get apart.

Page 510

Q.   And how long did this depressed state last?

A.   I will say -- again, I didn't take note of that, but it lasted at least more than a year.

Q.   You also mentioned that there was a weight gain?

A.   Yes. I mean, she gained, from the restatement on, she gained at least 60 to 80 pounds.

Q.   You said there was a period of time when she would come home crying?

A.   Yes.

Q.   How long did that last?

A.   That was mainly during the Anne Gehring situation, especially when things were going really bad with Kathy Keller. I mean, she really resented what was happening to her. But again, even at that time, she thought it was not going to happen to her. But then, I mean, I guess she was wrong. I mean, she got really burned with that relationship with that particular lady.

Q.   Did you notice any other changes either in Ms. Lapera's physical health or mental health?

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                                November 4, 2014
Washington, D.C.

Page 511

A.  I guess we have covered her physical and behavioral issues already.

Q.  Did you notice any other changes in Ms. Lapera as a result of what she was experiencing at Fannie Mae?

A.  I don't know what to tell you about it. So, I guess, it's more or less, like, what I already stated.

Q.  You said that it was an issue with her temper?

A.  Yes.

Q.  What was that issue?

A.  Well, short fuse. I mean, we couldn't discuss things that were important because she would start making a big fuss of something that was, you know, sometimes idiotic, so I stopped even asking her things.

Q.  Did it have any other impact on your marriage?

A.  After 30 years, I mean, I knew that it was something temporary that was going to happen. So I decided to let the events go and wait for her best

Page 512

back, which was the person I fell in love with and married 30 years ago.

Q.  And since she left Fannie Mae, have you seen an improvement in her emotional --

A.  Oh, I have my wife back.

Q.  What do you mean by that?

A.  She is the gentle person, she is the dreamer, full of drive to do new things, help people, to do the right thing. I mean, that's the people I fell in love with.

Q.  So before this incident with Fannie Mae, what are some of the things you enjoyed as a family or couple?

A.  We travel a lot. We have a sailboat that we constantly sail. I'm a racer. So we have a house at the beach. So these kind of things that usually were a family thing. I mean, they were kind of being set apart and now they're happening again. So we're getting again friends to visit us and share with us, I mean, the blessings that we have at home.

Q.  Was there a period of time when Ms. Lapera was experiencing some of these issues at Fannie Mae

Page 513

that she didn't do the normal things she did with you and your family?

A.  Absolutely. She was totally, I mean, out of the circle of close family and friends.

Q.  What are some of the things that she withdrew when she had these issues with family?

A.  Like let's go sailing or let's go to the beach or let's get together with friends and she'd say, well, no, I don't feel like doing that. So that's really pulling back a lot.

Q.  And how long did she pull back or withdraw?

A.  Mainly during the time that she was working for Anne Gehring.

MR. BRANCH:  No additional questions.

MR. WILSON:  No questions, Your Honor.

JUDGE ROBERTSON:  Thank you, Mr. Lapera.

(Mr. Lapera exits arbitration room.)

JUDGE ROBERTSON:  All right. Anything else today, Mr. Branch?

MR. BRANCH:  No.

JUDGE ROBERTSON:  Is that the end of your

Page 514

case?

MR. BRANCH:  No, it is not.

JUDGE ROBERTSON:  Where are we going tomorrow?

MR. BRANCH:  Tomorrow morning, what additional witnesses -- we still have Tomasello.

JUDGE ROBERTSON:  You said we'd hold that until after Gehring.

MR. BRANCH:  Nicole Harris, Leslie Arrington.

MR. STEWART:  Anyone else?

MR. BRANCH:  Anne Gehring.

MR. STEWART:  Anne Gehring is set up for tomorrow.

MR. WILSON:  She's set up for tomorrow afternoon.

MR. BRANCH:  I understand that. You asked me who else we have, so I told you.

JUDGE ROBERTSON:  So the other two people, are they going to be here tomorrow morning?

MR. STEWART:  Arrington will not, Your Honor. She has a conflict. I think, from the last

65  (Pages 511 to 514)

Arbitration Day 2                                                November 4, 2014

Washington, D.C.

Page 515

time I communicated with her, she would have been available on Thursday or Friday. I've been unable to reach anyone today because yesterday my Blackberry basically died.

JUDGE ROBERTSON: All right. If you don't have any more witnesses for Mr. Branch's case, do you have any witnesses for your case?

MR. STEWART: The issue is because I haven't been able to contact anyone today. I'll be reaching out tonight to try to set things up.

JUDGE ROBERTSON: Well, I think my question is should we come in at 9:30 tomorrow morning or 1 o'clock in the afternoon?

MR. STEWART: Well, I believe Mr. Branch has other witnesses on his side. I don't know if they're available tomorrow morning.

MR. BRANCH: Those are the only -- we're only going to call these additional Fannie Mae witnesses.

MR. STEWART: So Ms. Keller is not coming?

MR. BRANCH: Yes. We're only calling the three additional Fannie Mae witnesses.

Page 516

MR. STEWART: All right. Then I will reach out -- what I'll do, then, when I get home, I will send out a note to Ms. Harris and Sonia Matza would be our witness. It doesn't matter if we take them out of turn at this point. And if Ms. Arrington is free, if I can get her, I'll try to do that as well. But the last I communicated to her, she was going to be available on Thursday or Friday.

JUDGE ROBERTSON: All right. So you think it makes sense to come in at 9:30 in the morning?

MR. STEWART: I'll try to have Nicole Harris here at 9:30 in the morning.

JUDGE ROBERTSON: Okay. Good.

MR. BRANCH: Well, if that's the only person he's going to have, do we need to come at 9:30? I can't imagine that she's going to be four hours. Maybe --

MR. STEWART: Did you say Michael Chen Young is not coming?

MR. BRANCH: He's not coming. I just told you no additional employees.

MR. STEWART: Because these were the folks

Page 517

on your witness list.

JUDGE ROBERTSON: All right. Let's take it easy tomorrow morning. We'll see you here at 11 o'clock. How is that?

MR. STEWART: Perfect.

JUDGE ROBERTSON: All right. 11 o'clock. Done. Thank you, everybody. Good night.

(Whereupon, at 5:09 p.m., the taking of the instant arbitration adjourned, to reconvene at 11:00 a.m. on Wednesday, November 5, 2014.)

Page 518

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss.:
DISTRICT OF COLUMBIA      )

I, MARY GRACE CASTLEBERRY, RPR, the officer before whom the foregoing proceedings was taken, do hereby certify that the testimony of said proceedings was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this proceedings was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

-----------------------------
Notary Public in and for
the District of Columbia

My commission expires: 07/14/2016

66 (Pages 515 to 518)

Arbitration Day 3                                                   November 5, 2014
                          Washington, D.C.

Page 520

APPEARANCES:

On behalf of the Claimant:
    DAVID A. BRANCH, ESQ.
    Law Office of David A. Branch & Associates, PLLC
    1828 L Street, N.W., Suite 820
    Washington, D.C. 20036
    (202) 785-2805

On behalf of the Respondent:
    JOSEPH D. WILSON, ESQ.
    Kelley Drye & Warren, LLP
    3050 K Street, N.W., Suite 400
    Washington, D.C. 20007-5108
    (202) 342-8504
        and
    DAMIEN G. STEWART, ESQ.
    Associate General Counsel
    Fannie Mae
    3900 Wisconsin Avenue, N.W.
    Washington, D.C. 20016-2892
    (202) 752-7000

Page 521

ALSO PRESENT:
    MARVILA AREVALO, Legal Assistant
    SEAN FLANNAGAN (Afternoon Session)

Page 522

CONTENTS

WITNESS
NICOLE HARRIS WESTBROOK    D    C    RD    RC
By Mr. Branch          523       643
By Mr. Wilson               55       653
ANNE GEHRING             D    C    RD    RC    FRD
By Mr. Branch          596       635          640
By Mr. Wilson               623       638

    Afternoon Session - Page 596

Page 523

PROCEEDINGS

Whereupon,
        NICOLE HARRIS WESTBROOK,
was called as a witness by counsel for Plaintiff, and
having been duly sworn by the Notary Public, was
examined and testified as follows:
        DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
        BY MR. BRANCH:
    Q.    Good morning, ma'am.  Please state your
name.
    A.    Nicole Harris Westbrook.
    Q.    Ms. Westbrook?
    A.    Harris is fine.
    Q.    Harris.  Ms. Harris.  I have you in my
notes as Harris so that's why I'm confused.
    A.    Yes.
    Q.    Ms. Harris, my name is David Branch and I
have some questions for you this morning.
        Ms. Harris, are you currently employed?
    A.    Yes, I am.
    Q.    Where are you employed?
    A.    At Fannie Mae.

2  (Pages 520 to 523)

Arbitration Day 3                                                    November 5, 2014

Washington, D.C.

Page 524

Q.    And how long have you been employed at Fannie Mae?

A.    Since 2005.

Q.    What's your current position?

A.    Director of compensation.

Q.    How long have you been in that position?

A.    Since late 2007.

Q.    And what are your duties as director of compensation?

A.    So I'm responsible for managing Fannie Mae's compensation programs.  I also have the benefits strategy team.  So setting up the benefits program strategies for the company as well.

Q.    When you say you have responsibility for managing the compensation program, what does that entail?

A.    So it could entail designing and implementing new programs, making decisions about job positions, making decisions about individual compensation actions for individuals.

Q.    In 2009, was there a change in the compensation system for directors and officers at

Page 525

Fannie Mae where you went from a numerical system to an alphabetical system?  Alpha system?

A.    Yes.  So Fannie Mae's entire compensation structure changed in 2009.  So it changed for our associates, our directors and our officers.

Q.    And how did it change?

A.    We moved from -- what we had were kind of broad bands.  So a kind of 1, 2, 3 up to 7 structure and we changed that from those big bands to what we now have as grade levels that are alphabetical.

Q.    All right.  And so can you explain how employees are assigned a particular level of compensation?

A.    So in terms of the levels in the structure, the structure was built based on available market data.  There are companies that produce compensation surveys and that's how we get our market data.  And so the structure was built on that market data.  We use market data for positions to determine the grade level in the structure and then kind of by default, if you will, employees end up with a grade level based on the position in which they sit.

Page 526

Q.    And I'm not clear I understand exactly what you mean when you say it's based on market data.  What specific market data is relied upon?

A.    So Fannie Mae uses diversified financial services industry data.  And sort of to break that down, so if we were looking at my position, for example, we would look to the market data surveys that we have and we would look for data on compensation for someone who is managing a compensation team and we would then use that data to determine where my job fit into the structure.

So, for example, if the market data said, at the middle of the market, the pay for this kind of job is $50,000, we would look at the grade level in our salary structure and look for the one that's closest to that $50,000.  And on a pure basis.  I mean, there are other considerations where you're mapping jobs, but that's the use of the market data.

Q.    So is it solely the responsibility of the compensation department to set the rate of compensation for employees?

A.    So it isn't solely.  And I say that

Page 527

because when you're putting jobs into a structure, you're also considering how that job fits into the company.  So, for example, at one company, the comp director may be very highly valued by the company.  In another company, it may not be the case.  So there's also internal considerations.  And when you're evaluating those internal considerations, you're also interacting with the business to understand how that job fits into the scope of their organization and then Fannie Mae overall.

Q.    And so employees at Fannie Mae at the director level, and let's -- I want to talk specifically about 2009.  Were they provided a base rate of pay and additional compensation?

A.    Yes.  So the new compensation structure had base salary and it had a component that we call a long-term incentive.

Q.    And how was the base salary determined and how was the long-term incentive determined?

A.    So the new base salary under the new compensation structure considered the fact that Fannie Mae was eliminating its annual bonus.  And so,

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                        November 5, 2014
Washington, D.C.

## Page 528

generally, employees saw an increase in base salary to do a tradeoff for a portion of the bonus portion that had been eliminated. So there was a percentage increase to base salary in consideration of that.

Q.    Was that the long-term incentive?

A.    That's the base salary piece.

Q.    Is there a practice at Fannie Mae of adjusting salaries of employees if it's determined that for some reason their salary is below what it should be?

A.    We do have what we call a promotion and equity process. And so that equity piece is an opportunity for managers to put forward their requests to make equity adjustments. So if they think that there are differences in salaries that aren't explained by performance or experience, they can request that a PEP action be taken.

Q.    And you say promotion and equity. Would that also involve a promotion or just an adjustment in the salary?

A.    It could be either the equity or it could be the promotion in job as well.

## Page 529

Q.    Is there a process -- or was there a process in 2009 where there was a routine review of an employee's salary to determine if the salary should be adjusted?

A.    Can you ask the question one more time?

Q.    Was there a process at Fannie Mae whereby there was a routine review of employees at a particular level to determine if their salary should be adjusted because the salary was not at the level that it should be?

A.    So those would have been actions that would have been requested through the PEP process. And that was a regular process.

Q.    And is that action requested by the manager or is it initiated by compensation or some other entity?

A.    It's typically initiated by the business.

Q.    So that would be the manager?

A.    Yes, the manager.

Q.    There is a binder in front of you, the black binder. Turn, if you will, to Exhibit 8. Is this document familiar to you? This type of

## Page 530

document?

A.    It looks to be a screen shot from our employee data system.

Q.    And this is the compensation history/salary history for Ana Lapera?

A.    Yes.

Q.    Do you agree with that?

A.    Yes.

Q.    And I'm looking for the entry of July 5th, 2009. There is a pay rate change adjustment. Do you see that?

A.    Yes, I do.

Q.    And it looks like the change is $12,456?

A.    Yes.

Q.    How would this type of adjustment come into being?

A.    So this particular adjustment was related to that change in the compensation structure and so this was the increase that was provided because we were eliminating annual bonuses across the company.

Q.    So was everyone's salary adjusted in July 2009?

## Page 531

A.    Most employees' salaries were adjusted. There were some cases where that was not the case.

Q.    Does this indicate that Ms. Lapera was being underpaid for the function she was performing?

A.    This change wasn't related to performance in any way. It was just related to the change in the comp program.

Q.    So was a decision made that the appropriate salary that Ms. Lapera should receive would be $12,456 more than what she was actually receiving at that point?

A.    So the increase to base salary wasn't an individual employee decision. It was based on a structural change that we were making. So it didn't consider the individual. It was related to that structure change.

Q.    So were you involved in the classification of Ms. Lapera's position from a level 6 to a level M in 2009?

A.    Yes. My team did the work to move from the old structure to the new structure.

Q.    When you say your team did the work, who

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                November 5, 2014
                          Washington, D.C.

Page 532

was on your team?

A.   So there was a set of compensation consultants. There were -- myself was on the team and probably four others at that time.

Q.   Compensation consultants?

A.   Yes.

Q.   Were they employees of Fannie Mae?

A.   Yes, they were.

Q.   What are the titles of those positions?

A.   So in the new world, now compensation analysts.

Q.   Were they compensation consultants, was that the title, in 2009?

A.   I'm not sure if that was the title in 2009. That was the capacity in which they served. They were the senior professionals below me within the compensation department.

Q.   So what actions were taken to reach this conclusion that Ms. Lapera's position should be classified as a level M?

A.   So the process of determining the level for a position was based on market data, was also

Page 533

based on internal Fannie Mae considerations. So, again, interacting with business, meeting managers to understand what the positions do, how they fit into their organizations as well.

Q.   And so what action was taken internally to make this determination that the position should be a level M?

A.   So it would have been the process of gathering that market data, putting a grade level with that job based on that market data and then having further discussions with the business so that they understood how the levelling was happening and where their positions fell, and they had the opportunity to give feedback.

Q.   Were you directly involved in this classification of Ms. Lapera's position or was it just someone on your team?

A.   So there was someone on my team who was working on this particular area. So the compensation consultants had different divisions that they were responsible for.

Q.   Did you learn at some point that

Page 534

Ms. Lapera was challenging the initial classification of her position as a level M?

A.   Yes.

Q.   And how did you learn that?

A.   So the first time that I remember it was in 2011 and I received an e-mail from one of our HR business partners.

Q.   What about in 2009? Did you learn that Ms. Lapera was challenging her classification in 2009?

A.   I don't remember a challenge in 2009.

Q.   Do you have any information on whether there was any reconsideration of the initial classification of Ms. Lapera's position in 2009?

A.   So it's my understanding, just in terms of understanding this case, that there was a challenge made.

Q.   And my question is whether there was any -- once the challenge was made, do you have any knowledge of what actions were taken as a result of the challenge?

A.   So my understanding is that the request

Page 535

came to someone on my team.

Q.   Who on your team?

A.   I believe it was Reese Aguilar.

Q.   What's the basis of your understanding that it came to Reese Aguilar?

A.   Just that to ask to relook at the position came to him, that he responded that he didn't think a change was needed.

Q.   So a request for reconsideration came from Ms. Lapera and you believe it went to Reese, is it Aguilar?

A.   That's my understanding.

Q.   And so once -- is Reese a mister or miss?

A.   It's a mister.

Q.   Okay. Once Mr. Aguilar received this request for reconsideration, do you have any information on what actually was done with the request for reconsideration before he determined that no change was necessary?

A.   I do not specifically know.

Q.   Is there a formal process in place at Fannie Mae -- or was there a formal process in place

5 (Pages 532 to 535)

Page 536

where certain actions would be taken if an employee challenged the classification?

A.    There was not.

Q.    So is it true, as far as you know, you're not sure if anything was done with Ms. Lapera's initial request challenging the initial classification?

A.    So I don't know specifically what was done. I can say when we get requests to review information, we do go through the information and make a determination.

Q.    And so when you get a request to review information to make a determination, what is the process that's followed?

A.    So it depends on the nature of the request.

Q.    So if Ms. Lapera sends in a challenge to the classification, sends an e-mail or provides some notice that I don't believe my position has been classified properly and I wish to challenge that, what action is taken by the compensation department or division as a result of that challenge?

Page 537

A.    So back in 2009, when we changed the structure, I wouldn't have expected there to have been a long process to review the position. We would have just done the work to classify positions. And so I would have expected that Reese went back and looked at where the position was slotted and said, you know, we went through this work to slot the position, we worked with your division and so we still feel that the position is noted correctly.

Q.    Would there be any effort to contact the employee to say, why do you believe your position has been slotted inappropriately?

A.    No. So compensation would have either worked through the manager or with the HR business partner for the organization. We wouldn't have gone directly to the employee.

Q.    After 2009, did you receive a request once again from Ms. Lapera challenging the classification of her position?

A.    So yes, I remember a request in 2011.

Q.    Did this challenge come directly to you?

A.    Yes, it came through our business partner.

Page 538

Q.    Do you recall who the business partner was?

A.    Yes, Shandell Harris.

Q.    Shandell Harris. Do you recall the time of the year that this challenge came in 2011?

A.    In the spring.

Q.    And what action, if any, was taken on this challenge that came to your department in the spring of 2011?

A.    So I gave feedback back to Shandell.

Q.    So first, what was your understanding of the challenge that was presented by Ms. Lapera in the spring of 2011?

A.    So I didn't have an understanding of the challenge. The request that I received just said can you look at this job and level it. It didn't have any context.

Q.    And who made that request to you? Was it Shandell Harris?

A.    It was Shandell Harris.

Q.    So Shandell Harris asked you, can you look at this job and level it?

Page 539

A.    Yes.

Q.    And what action did you take after you received that communication?

A.    So I don't remember specifically, but I know I replied to Shandell that this was a job that we had already, it was Ms. Lapera's job and that the job was an M.

Q.    So in response to Ms. -- well, first, is that all that you did?

A.    So I looked at the position to see what it was, if there were individuals in it, to get that understanding. But it didn't come to me as a challenge. It came to me as can you look at this and level it. And so my translation was, oh, we have this job, it's the job that Ms. Lapera is in and it's an M.

Q.    So the request that came to you in early 2011, you did not consider that to be a challenge by Ms. Lapera of her classification?

A.    It was not posed to me as a challenge.

Q.    Other than the request from Ms. Harris to level the position, was anything else presented to

Arbitration Day 3                                                                November 5, 2014
Washington, D.C.

Page 540

you at the time in early 2011?

A.  I only remember the job description at the initial ask.

Q.  I'm sorry, the job description at the initial --

A.  Ask.

Q.  Oh, when she asked?

A.  Yes.  So it being attached to the e-mail that she sent.

Q.  And let's turn to Exhibit 16 in the binder in front of you.  Are you there?

A.  Yes, I am.

Q.  Do you recognize this document?

A.  Yes.  Looks to be a job description around the Lean Six Sigma role.

Q.  Is this the job description that was sent to you in the spring of 2011 by Ms. Harris?

A.  I can't tell you specifically, but it looks to be.

Q.  And now just turn to Exhibit 17.  Do you recognize this document?

A.  Yes.  It looks to be one of our job

Page 541

descriptions off of our kind of database.

Q.  So at the time you received Exhibit 16 with Ms. Lapera's position description, did you also receive Exhibit 17?

A.  Not that I recall.

Q.  Did you understand, when you reviewed Exhibit 16, that Ms. Lapera was challenging her classification because the position description that's at 17 was graded or leveled at the N level and had fewer responsibilities than her position that was leveled at the M level?

A.  When I received the request, it didn't come to me as a challenge.  And I don't recall this position being part of what was sent to me.

Q.  So in responding to Ms. Harris, you did not consider Exhibits 16 and 17 as part of Ms. Lapera's challenge?

A.  So I considered 16.  I don't recall seeing 17.

Q.  And now let's go to Exhibit 12.  Well, first, how long did it take you to respond?  After you received the initial request from Ms. Harris to

Page 542

level the position, how long did it take you to respond?  Did you respond right away?

A.  I'm not sure.  I don't recall.

Q.  And so explain to me what happens if an employee makes a challenge to their levelling, what is the process that's followed?

A.  So typically, we would get a request from the business partner or the manager or someone in the management chain within the business itself and they would lay out for us why the information -- or why the level is being challenged or job is being challenged and provide us context for us to do a review.

Q.  Okay.  And what happens after that request is made?

A.  So we would take the information that they've provided and we would look at market data, we would look at if there was any history around the position, we would talk to the business or talk to the business partner if we had a need for additional information or had questions.

Q.  Okay.  And what happens next?

Page 543

A.  So we would take all that information and then make a determination about the ask.

Q.  And that's the end of the process?

A.  Yes, typically.

Q.  So the steps that you've just described here, they were not taken in the spring of 2011, when you received this request to level the position; is that correct?

A.  Not that I remember.  It didn't come to me as a challenge.  It came to me as here's a job to look at and level and my response was, oh, we have this job, it's a level M.

Q.  And now just back to 16 and 17.  And Number 17 is a position, director of middle office, director of project management.  Do you see that?

A.  Yes.

Q.  And the grade is a level N?  It's on the second page of the document.

A.  Okay.  I see that.

Q.  So I would like you to compare Exhibits 16 and 17 and let me know if there is an explanation of why 16 would be rated a level M and 17 would be rated

7  (Pages 540 to 543)

Page 544

a level N.

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: I'll allow it.

THE WITNESS: So I have no market data as part of my analysis in doing this work and I also don't have an opportunity to have context from the business on this particular position.

BY MR. BRANCH:

Q. And would you agree that just looking at the position description at 16 and comparing it to 17, 16 appears to have broader responsibilities?

A. So I don't know that I can characterize it that way. There is more information available to me if I look at 16 versus 17.

Q. In 2011, when you received this initial request to level --

JUDGE ROBERTSON: Excuse me, Mr. Branch. While we're looking at Exhibit 17, I have a question about it. At the bottom of Number 17, there is what appears to be a URLs or something with a date June 23rd, 2011. Do you have any way of knowing when that date was put on or whether it was part of this

Page 545

document?

MR. WILSON: Your Honor, is that a question for the witness?

JUDGE ROBERTSON: Yes.

THE WITNESS: Oh, I'm sorry.

JUDGE ROBERTSON: I'm sorry, I meant to ask you.

THE WITNESS: Yes.

JUDGE ROBERTSON: Yes is the answer to what question? Is that the date of this document?

THE WITNESS: I'm not sure if this is the date, if that's the date.

JUDGE ROBERTSON: Okay. I'm sorry, Mr. Branch. Go ahead.

BY MR. BRANCH:

Q. So in 2011, was there any effort to inquire of Ms. Lapera's supervisor, the person she reported to, whether he was supportive of having her position placed at the N level?

A. Can you repeat the question? What timing?

Q. 2011. Was there any effort to inquire of Ms. Lapera's supervisor whether he was supportive of

Page 546

placing her position at the N level?

A. So it was later, kind of in 2011 when we started having conversations with the managers from the business.

Q. And when you said you had conversations with the managers from the business in later 2011, was that Kathy Keller?

A. Yes.

Q. So prior to Kathy Keller, when Claude Wade was the manager for that division, did you have any discussions with Mr. Wade about whether he was supportive of placing Ms. Lapera's position at the N level?

A. I don't recall having conversations with Mr. Wade.

Q. Do you know if anyone on the comp team had conversations with him?

A. Someone on my team may have, but I don't know specifically.

Q. And so let's talk about the second effort in the latter part of 2011. Was there another effort to get her position upgraded to the level N in 2011?

Page 547

A. Yes. I remember there was a promotion equity request, and then we did further review of the position and discussions in kind of the May/June time frame of 2011.

Q. So I'm sorry, there was one request in early 2011, the spring of 2011?

A. Yes. So in the spring of 2011, I received a message from Shandell Harris and that was -- the ask was, here's a job description, can you take a look and level it for me? But then there was a question later raised in the May/June time frame that was more specific about the ask and specific to Ms. Lapera.

Q. And where did that request come from?

A. I believe it came through Shandell Harris again as a promotion and equity process request.

Q. And were you involved in reviewing the request?

A. I did not review that particular request.

Q. Did someone on the comp team review that request?

A. Yes.

8 (Pages 544 to 547)

Arbitration Day 3                                                                 November 5, 2014

Washington, D.C.

Page 548

Q.   Who was that person?

A.   Sonia Matza.

Q.   Did you have any involvement in the levelling of this position or the change in the level of the position after June 2011?

A.   Yes.  I was involved and was part of the process when the level was changed in early 2012.

Q.   What was your involvement?

A.   So Sonia and I were working together.  I recall having discussions with Kathy Keller, with Shandell Harris, around the position.

Q.   And so what was considered at that point?

A.   So again, we would have looked at the market data for the position, we would have looked at the job description that was provided to us.  We also, I recall, had conversations about what was happening in the business, had conversations with Ms. Keller about her organization.

Q.   And had Ms. Lapera's actual duties changed from her earlier request to have the position level changed?

A.   So I'm not sure if the duties had changed.

Page 549

As I described, my initial look at the job was, you know, we had this job as a level N.  It wasn't a discussion about what old duties were and what new duties were specific to Ms. Lapera.

Q.   And so was a decision made that the position should be graded at a level N?

A.   Yes.  Ultimately, the decision was made to level it as an N.

Q.   And why was the position ultimately changed to a level N?

A.   It was based on the factors that I mentioned and having those further discussions about the organization and conversations with Ms. Keller about how the duties had changed over time, how she viewed the position relative to other positions in her organization.

Q.   Ms. Harris, was it a common practice at Fannie Mae for directors to have other directors reporting to that director at the same level?

A.   It is.

Q.   It's common for that to happen?

A.   There are many cases in the company.  Not

Page 550

preferred, but it does happen.

Q.   And so how could that happen?  What are the circumstances where you have someone who is, for example, at a level M with someone reporting to them as a director at the same level?

A.   So it can be an evolution process that happens whereby, you know, one person is sitting in the job or two people are sitting in the job and they're peers and the business makes a decision to have one person report to the other, but it doesn't reflect that their job duties are necessarily different.

Q.   So as part of the 2009 initial levelling of the positions, if you had an instance where one director was at a level M and other directors were reporting to that person at the level M, is this something that would have been corrected as part of your levelling process?

A.   Not necessarily.  And I say that because -- so the compensation team is levelling the position, but it's the management that we work with to understand which employees fit into which

Page 551

positions.

So if the employees are in the same job title, the manager says, yes, this is what their duties are and both have the same duties in the same job title and then the manager changes their organization such that one, then, reports in to another, that's not a case where we would do a correction because the business has decided on the reporting relationship and they've communicated to us the duties are the same.

Q.   So have you had instances where you have made the correction when one manager or director had other directors reporting to them at the same level?  Have you had instances where you've looked at this and said, hey, this is not proper; one of these folks needs to get moved up?

A.   So we have situations where we do make changes, but I wouldn't necessarily refer to it as a correction.  So the example would be you have two folks who are managers.  The business moves one manager under the other manager and they're in the same job title.  The comp team might make a

9 (Pages 548 to 551)

Page 552

suggestion to say, we see this reporting relationship, would you consider making one of those managers -- the reporting manager the director? There is a director job in this job family.

JUDGE ROBERTSON: Is anybody at Fannie Mae less than a manager?

THE WITNESS: Yes, there are people below managers.

JUDGE ROBERTSON: I'm glad to hear that.

BY MR. BRANCH:

Q. So Ms. Harris, if you have two directors who are doing similar roles with similar salaries, would you expect them to be leveled at the same level?

A. So they could be leveled at the same level. We would expect some differentiation in salary.

Q. But you would expect them to be at the same level if they're doing similar roles, similar salaries?

A. If they have similar roles, I would expect them to be at the same level. And when I say

Page 553

"similar," if you're in the same job, you will have the same level.

Q. In 2009, before the levelling of the positions, do you recall if Ms. Lapera's level was a level 6?

A. Yes, it would have been. Directors all had a level 6.

Q. And was there some subset within that grade? I mean, were people rated at a level 6 at different steps?

A. There were subsets of that 6, yes.

Q. And what did those subsets represent?

A. They were tied to the incentive opportunity. At that point, Fannie Mae didn't communicate what the incentive, the bonus, if you will, was as a percent of base salary and so those subcategories tied to particular incentive levels.

Q. And so were employees such as Ms. Lapera even notified that their level was grade 6 and some subset of that?

MR. WILSON: Objection. Relevance. The old structure is of no relevance to this claim.

Page 554

JUDGE ROBERTSON: I'll hear it.

THE WITNESS: So at that time, I don't believe that Fannie Mae communicated that sublevel.

BY MR. BRANCH:

Q. And what was the range for sublevels? Was there a numerical system or letter system?

A. It was numerical at that time.

Q. And it went up to what?

A. It went all the way up through the officer ranks.

Q. No, I mean the numbers. From 1 to what?

A. I don't remember where it started. They were in the teens.

Q. And was it the employee's manager who made the decision on the subset number that would be assigned to the employee or was that done by compensation?

A. It was done by compensation. And again, it would have been done working with the business unit, with the manager.

MR. BRANCH: No additional questions, Your Honor.

Page 555

JUDGE ROBERTSON: Mr. Wilson?

MR. WILSON: Yes.

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. Ms. Harris, thank you for being here and taking time out of your schedule. I want to ask some questions. We've been talking about salary levels in the Fannie Mae alpha system, okay?

A. Uh-huh.

Q. How, if at all, do those levels overlap?

A. So the grades in our salary structure overlap significantly. So you could have the same salary as someone in a higher or lower grade level.

Q. Let's just focus. How, if at all, does a level M and a level N overlap? And we'll do this in the late 2009 time period, if you can recall.

A. So if I think of the tops of the ranges, I believe the top of the N is 222. The top of the M is, I want to say, 181. There is a significant amount of overlap in the ranges.

Q. So I guess to establish the overlap, do you recall where the bottom of the N was?

Arbitration Day 3                                                                    November 5, 2014
Washington, D.C.

Page 556

A.   I don't recall what the bottom was.

Q.   I think we'll get to some documents that we can elaborate on that.  And so His Honor has the record, your potential or the maximum long-term incentive you could get could vary with your salary level in the alpha system, correct?

A.   Yes.  The incentive is a percent of your base salary.  So it could be higher or lower, depending on your specific base salary.

Q.   Do you recall what the percentage maximum for the level M, as in Mary?

A.   So the LTI associated with that is 20 percent of base salary.

Q.   And that's the maximum that you could get, right?

A.   That's the target amount.

Q.   If you could explain "target amount."

A.   Sure.  Sorry.  So target amount meaning that is your baseline opportunity, but your actual award could go up or down based on your performance.

Q.   Is it just the employee's performance?

A.   It's employee performance and it's company

Page 557

performance.

Q.   And what, if anything, is employee performance relative to?

A.   Employee performance?  I'm sorry, could you ask the question again?

Q.   What, if anything, is the employee performance?  Is the employee benchmarked against anything, for instance?

A.   The employee is compared against their performance against their individual goals and also performance relative to peers.

Q.   So we've got 20 percent down for the M, as in Mary, level.  The N, as in Nancy level, what's the LTI percentage?

A.   The N is 35 percent.

Q.   And just for the record, since you're the director of --

JUDGE ROBERTSON:  That, again, is a target?

THE WITNESS:  Yes, it is.

BY MR. WILSON:

Q.   Since you're the director of compensation,

Page 558

how, if at all, would it affect your ability to receive an LTI award if you're not employed with the company when the award is made?

A.   If you're not employed at the time that an LTI payment is made, you're not eligible for that payment.

Q.   So just to put it more simply, you have to be at the company, working at the company at the time that an LTI payment is made to be able to receive it?

A.   Yes, you do.

Q.   Let's get into the process of levelling positions.

A.   Okay.

Q.   Could you please describe to us what effect, if any, the characteristics or qualifications of the individual person holding a position has on the levelling of a position?

A.   So when we're levelling positions, we are not looking at individuals.  We are looking at the position itself.

Q.   And when you're getting at what the job duties of a position are, what, if anything, is the

Page 559

principal input of your knowledge of what the job duties are?

A.   So the job duties, our primary input for understanding what the job does and what it's responsible for is from the manager or the business unit management.

Q.   What do they give you, if anything?

A.   Sometimes they give a job description.  Sometimes they give us bullet points around what the duties are.  But they're the starting place.

Q.   I believe you testified about a request to level that came in to you for the position held by Ms. Lapera in the spring of 2011.  I'm going to ask you to switch binders on me.  If you could go -- it's called volume 1, Exhibits 102 and if you could flip to what's been previously marked as Defendant's Exhibit 9, please.

A.   Okay.

Q.   If you could look at the first-in-time e-mail there, and that's an e-mail from Shandell Harris to a person named Nicole Harris on April 25th, 2011?

11 (Pages 556 to 559)

Page 560

A. Yes.

MR. BRANCH: Wait, I'm sorry, you're at Exhibit 9?

MR. WILSON: Defendant's Exhibit 9. Are you there, Mr. Branch?

MR. BRANCH: Got it. Thank you.

BY MR. WILSON:

Q. In your examination by Mr. Branch, I believe you said you received a request from Ms. Harris to level a position held by Ana Lapera in the spring of 2011. Is this that request?

A. Yes, from what I recall.

Q. And if you could, just flip through the rest of the document. Is this the job description that you were being asked to level?

A. Yes.

Q. And in Defendant's Exhibit 9, could you now pull up Plaintiff's Exhibit 17, please? Leave Defendant's Exhibit 9 before you.

A. Okay.

Q. There's nothing -- the description that's in Plaintiff's Exhibit 17 isn't attached to

Page 561

Defendant's Exhibit 9, correct?

A. No, it's not.

Q. And then let's keep looking at Defendant's Exhibit 9. Could you point out to us where, if anywhere, on this it says that this is a challenge?

A. It does not say that here.

Q. Now, you forwarded this off to Sonia Matza?

A. Yes.

Q. Could you please tell us who Sonia Matza is?

A. Sure. Sonia is on my team, the compensation team. She's a compensation analyst.

Q. Would part of her job duties be looking at positions and using the process that you've described to us earlier this morning to level a position?

A. Yes. She's one of the senior comp analysts on the team.

Q. Do you know if it was you or she who actually did the legwork in levelling this position?

A. I'm assuming it was Sonia.

Q. Could I ask you to go to Defendant's

Page 562

Exhibit 11, please?

A. Okay.

Q. Do you recall receiving this e-mail from Sonia?

A. Yes.

Q. And the e-mail that's last in time there, there is a sentence that says, "I have responded back (attached) saying this job would map to our current level M Six Sigma director." Do you see that?

A. Yes, I do.

Q. What do you recognize that to be? Was that a recommendation from Sonia to you saying, hey, that's --

A. Yes. She's saying to me, I, in this case, responded back to Shandell that this job is our existing Lean Six Sigma director.

Q. And let's flip the page because I think this is one of the attachments. You're cc'd on that? That's also from Ms. Matza?

A. Yes.

Q. And she attaches to that, right -- let's flip that. What's that first document there? It's a

Page 563

system titled Dir Lean Six Sigma?

A. This is the job summary from our -- a database of job descriptions.

Q. Was this the job summary that had come out of the process from the summer of 2009?

A. Yes.

Q. And let's just flip to the next page. You would agree with me that this is the job summary that Ms. Shandell Harris had submitted to you previously and asked you to level, right?

A. Yes.

Q. Do you agree with Ms. Matza's conclusion?

A. Yes.

Q. How, if at all, did Ms. Lapera's race, ethnicity, national origin, age, weight or body shape motivate the decision on the levelling request submitted to you by Shandell Harris in April of 2011?

A. Those factors would not have been considered at all.

Q. And how, if at all, did the outward appearance of Ms. Lapera with regard to bodily condition or characteristics, manner or style of

12 (Pages 560 to 563)

Page 564

dress and manner or style of personal grooming, including, but not limited to, hairstyle and beards, impact the process of deciding how to level the position that Ms. Shandell Harris submitted to you in April 2011?

A. It would not have been considered.

Q. Thanks. So Mr. Branch was asking you if two directors working, I guess, in the same organization or something like that and one person at a director level is reporting to a person in the other director level, what means, if any, does the business unit have to differentiate -- oh, and they're at the same salary level, okay? Let's say they're both at an M.

What means, if any, does the business unit have available to them to differentiate between the two directors with respect to compensation?

A. So the business unit can differ based on the individual employee's base salary.

Q. And that's salary within the same level? Here in my question, we're talking about a level M; isn't that right?

Page 565

A. Yes. So the structure has a range, but individual people can fall at different places within that range.

Q. If I can ask you, please, to turn to what's been previously marked as Defendant's Exhibit 5.

A. Okay.

Q. And if you can go -- it's a page that's marked FNMB 001851. And you've talked about the process that's used in comp for levelling positions. Could I ask you to take a moment and read over the section of the e-mail on that page that says personal experience relevant for the position?

MR. BRANCH: I'm sorry, what page are you directing her to?

MR. WILSON: FNMB 001850 in Defendant's Exhibit 5.

BY MR. WILSON:

Q. Please let me know when you've had a chance to read that. And again, focusing on the section that's personal experience relevant for the position. Do you see that?

Page 566

A. Yes.

Q. Have you had a chance to read that?

A. Yes.

Q. Within Fannie Mae's process for levelling a position, what impact, if at all, would any of the factors or the information outlined in there have on how to level a position?

A. So this information would not be factored in. The position levelling work that we do isn't based on the individual person.

Q. I believe you testified about Reese Aguilar was in your group?

A. Yes.

Q. Do you know Reese's nickname or do you know what his full name is?

A. His first name is Mauricio.

Q. Do you know if he's Latino or Hispanic?

A. He's Latino.

Q. Ms. Harris, if I could ask you, please, to turn to Defendant's Exhibit 12. I believe you had testified about a PEP request from Ms. Lapera?

A. Yes.

Page 567

Q. What do you recognize Defendant's Exhibit 12 to be?

A. To be information regarding the PEP request.

Q. All right. And are there PEP cycles in a year?

A. Yes. There are typically two to three in a year.

Q. Do they come at the same time every year, those two to three cycles?

A. Generally, they're pretty close to the same time frame.

Q. Could you please tell us when, I suppose, in 2011 the cycles were?

A. So there's usually one in the spring, so April/May-ish. At that point, I think we did have three. There would have been one a little later that year, July-ish maybe, and then usually one in the fall, September/October.

Q. Do you recall getting PEP requests for Ms. Lapera in July of 2011?

A. I don't remember a July PEP request.

13  (Pages 564 to 567)

Arbitration Day 3                                                November 5, 2014
                        Washington, D.C.

---

Page 568

Q.   And what about the one later in the year, October?

A.   I don't remember one in October.

Q.   Am I right, it's the business unit who makes a PEP request to comp?

A.   Yes, they do.

Q.   And so it goes without saying that if the business unit doesn't think that the employee warrants that, they don't make the request?

MR. BRANCH:  Objection.  Leading.

JUDGE ROBERTSON:  Sustained.

BY MR. WILSON:

Q.   Never mind.  And the spreadsheet that's attached on this, did you prepare it?

A.   No, I wouldn't have prepared it.

Q.   Do you understand that Ms. Matza would have prepared it or at least some of it?

A.   Yes.

Q.   And let's, if we can -- and I realize this is kind of split, so if you want to take them out -- so am I right there's parts to be completed by the division?  What's your understanding what that means?

---

Page 569

A.   So yes, there is information that we ask the division to complete around the request that they're making and then there's a section that compensation completes.

Q.   And then I gave you the part that says, "To be completed by comp"?

A.   Yes.

Q.   Or compensation.  And there's a line entry here, right, you see that says OPS plan?  It's page 9 on the spreadsheet?

A.   Yes.

MR. BRANCH:  I'm sorry, which page are you referring to?

MR. WILSON:  It's in Defendant's Exhibit 9.  You need to look at FNMB 001819 through 21.

MR. BRANCH:  I understand that, but there's a 9 on each one of those pages.

MR. WILSON:  1819 through 1820 and 21.

JUDGE ROBERTSON:  We're in Defendant's Exhibit 9?

MR. WILSON:  I'm sorry, we're on Defendant's Exhibit 12, Your Honor.

---

Page 570

BY MR. WILSON:

Q.   So could you look in what -- Ms. Harris, are we all -- everyone got it?

JUDGE ROBERTSON:  I've got what looks like three pages of the same spreadsheet or three different spreadsheets.  I'm not sure which I'm looking at.

MR. WILSON:  It's a spreadsheet, Your Honor, that goes from row A through Y.

JUDGE ROBERTSON:  All right.

BY MR. WILSON:

Q.   Ms. Harris, could you look at column N which is entitled rationale?

A.   Yes.

MR. WILSON:  Your Honor, that's on page --

JUDGE ROBERTSON:  I got it.

BY MR. WILSON:

Q.   And under the rationale for the line for the ops plan, did that come from the business unit?  Is that your understanding?

A.   Yes, the business unit would have provided that rationale.

---

Page 571

Q.   And so it says there, "Ana is responsible for managing the entire Lean Six Sigma and Operational Excellence Team.  As such, her level should be differentiated from the directors that she manages in her team."  Did I read that correctly?

A.   Yes.

Q.   Okay.  Then let's go out to column Y, sticking in the same row.

A.   Okay.

Q.   And this is a part, right, that was completed by compensation?

A.   Yes.

Q.   And let me read this.  "Average salary for SIX120 in operating plan is 170K.  Incumbents' salary range from 160 to 184K.  Moving Ana to the maximum of the range would create a 28K or 17 percent differential between her and her direct.  There is no higher level director job to move her into."

So what, if anything, is the recommendation here coming from compensation?

A.   So the feedback from compensation is that there is an opportunity, if the concern is

---

14  (Pages 568 to 571)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                November 5, 2014
Washington, D.C.

Page 572

differentiating Ms. Lapera from her peers, the opportunity to do that is to give an increase to base salary that would create that 17 percent difference.

Q.   So the recommendation from compensation is to give Ana Lapera more money?

A.   Yes.

JUDGE ROBERTSON:  But not to change the level?

THE WITNESS:  Correct.

BY MR. WILSON:

Q.   Why not change the level there?

A.   So as in the notes here, there is no higher level to move to.

Q.   I'm sorry, higher level or higher position?

A.   There's no higher level director position to move to.

Q.   Within that organization?

A.   Correct.  Yes, within that job family.

Q.   If there was an N level at the time, why wouldn't you put the position that she had at the time -- re-level it, at this time, in June of 2011?

Page 573

A.   So we wouldn't have re-levelled it based on an individual situation.  We would only re-level a position.  This was an individual ask to do something.

Q.   So PEP requests are based on -- those actually do take into account the individual?

A.   They do.

Q.   Okay.  And am I right, that's unlike the levelling of a position?

A.   Correct.

JUDGE ROBERTSON:  What did you mean when you said "within that job family"?

THE WITNESS:  So Fannie Mae calls job families the series of jobs that are similar.  So, for example, if we use the compensation job family, there is an analyst 1, 2, 3, 4 and then there's a director job.  That group of positions is called a job family.

JUDGE ROBERTSON:  And what is the job family that you were levelling Ms. Lapera's job within?

THE WITNESS:  This would have been the

Page 574

Lean Six Sigma job family.

MR. WILSON:  Your Honor, I think I can help you on this one.

JUDGE ROBERTSON:  You're coming to that?

BY MR. WILSON:

Q.   Could you flip back to Defendant's Exhibit 5, please?

JUDGE ROBERTSON:  Yes, I saw it in 5 and I wasn't sure what I was looking at.

BY MR. WILSON:

Q.   No, not Plaintiff's Exhibit 5, Ms. Harris.  Defendant's Exhibit 5.

A.   Yes.

Q.   Do you see that table there on page FNMB 001850 under position responsibilities?

A.   Yes.

Q.   Is that the Lean Six Sigma job family that you were just talking about?

A.   Yes, it is.

Q.   Care to elaborate so we all get an idea?

A.   Sure.  So in this job family, the first level is the "I" with the manager, the program

Page 575

manager, and then the highest available job is the director, Lean Six Sigma at the M.

Q.   So is it your understanding -- or what understanding, if any, do you have if the levelling of these positions would have been done through the same process?

A.   They would have been done through the same process.

Q.   And that involved looking at market data?

A.   Yes.

Q.   What's your understanding of market data on Lean Six Sigma positions?  Like is it esoteric and there's not a lot of market data, for instance?

A.   No, there is market data available for this position.

Q.   Ms. Harris, could you please go to Defendant's Exhibit 15 now?  I'm sorry, can you go to 13, please, first?

JUDGE ROBERTSON:  Thirteen?

MR. WILSON:  Yes, Your Honor, Defendant's Exhibit 13.  I'm sorry.

BY MR. WILSON:

15 (Pages 572 to 575)

Page 576

Q.   Ms. Harris, we established you were privy to this e-mail chain.  Could we go down here -- the e-mail, May 10, 2011 at 1:46 p.m. from Sonia Matza to you and Sonia asks, "Did you and Shandell have any further discussions about this?"  You agree with me she's talking there about the levelling, right?

A.   Yes, she is.

Q.   Okay.  And you responded to her in the following e-mail?

A.   Yes.

Q.   And you say you never had a follow-up call?

A.   Correct.

Q.   Did you get any follow-up information from Ms. Harris on the position?

A.   No, not that I recall.

Q.   And she would have been your source for feedback from the employee or the business unit if they were asking for levelling of the position?

A.   Yes, she would have.

Q.   Okay.  And the top one there, "Currently, my recommendation is to move her to the maximum of

Page 577

the range from 184 to 194," that's Ms. Matza's recommendation to you?

A.   Yes, it is.

Q.   Were you in agreement with that?

A.   Yes.  That was the opportunity to have flexibility to differentiate.

Q.   Okay.  Now can you please go to Defendant's Exhibit 15.  And if you could take a look at the e-mail that's June 24, 2011, 11:14, to you from Ms. Matza.

A.   Yes.

Q.   What was your understanding of what this e-mail is?

A.   So this e-mail looks like another look at the Lean Six Sigma position and Sonia going through and reviewing the information and giving me context around what her thoughts are.

Q.   Okay.  And she's not recommending that it be leveled at a higher level?

MR. BRANCH:  Objection.  Leading.

BY MR. WILSON:

Q.   What, if anything, is she recommending

Page 578

here, to your understanding?

A.   It doesn't look like she's recommending anything.  It looks like she's giving context.

Q.   And am I right here it says, "But snideness aside, the revised job description definitely had a corporate-wide scope and a strategic slant which the job summary for SIX120 does not."

Do you recognize what she was talking about there?

A.   Yes.  She was comparing the job description that -- the new job description that we received relative to our one that existed in the database and giving context that it looks like the scope and the strategic responsibilities are broader than what was in the prior one.

Q.   And just so we know what the prior one -- what you're referencing to the prior one.  Could you please turn back to Defendant's Exhibit 11 and go to FNMB 001810.  Is that what you mean by "prior one"?

A.   Yes.

Q.   So that e-mail there is dated June 24th.  Could I ask you to flip to Defendant's Exhibit 18?

Page 579

A.   Yes.

Q.   And the e-mail down there that's dated 10:59 a.m., do you recall getting that?

A.   Yes.

Q.   And what's your understanding of what that is?

A.   This was the relook at the Lean Six Sigma position.

Q.   And then let's go up to the e-mail later in time, 11:15 a.m., and that's from you to Ms. Harris, correct?

A.   Yes.

Q.   Now, you state that, "Yes, Sonia and I did."  What do you mean by that there?

A.   That we reviewed the information that was provided, the two different -- or the two job descriptions that were provided to us.

Q.   Okay.  Then it goes on, "We want to discuss an N level, but Bill said that he and Linda are discussing the future of the LSS space, so we shouldn't make any moves with Ana's job until future state is clearer."

Arbitration Day 3                                                                November 5, 2014
Washington, D.C.

Page 580

Could you elaborate on what you were stating there?

A.  Sure.  So Sonia and I had looked at the information that was provided and as was in the other notation, Sonia had said it looks like this has a broader scope, it looks like it's more strategic and so given that, we wanted to talk to Shandell to get additional information to consider the N level.

But it also says here that Bill believed -- Bill Fahey, who was the business partner, the director level business partner.  Linda Knight would have been the division head.  And that Bill and Linda were having discussions about changing the Lean Six Sigma space.  So I was indicating, if things are in flux, then this isn't the time to be making changes to positions.

Q.  You said Linda is the division head.  First, does Linda have a last name?

A.  Linda Knight.

Q.  What's Linda Knight's race?

A.  She's Caucasian.

Q.  And did the Lean Six Sigma division come

Page 581

under her at the time?

A.  Yes.  There was a point when it came under Linda.

Q.  And would that be common not to address re-levelling if the future state of something is uncertain of a division?

A.  Yes.  It's tough to make changes when things are in flux.  And we don't want to make a decision one day that may, then, be impacted after a change is complete.

Q.  I believe we established somewhere in the latter part of 2011, compensation was asked again to level a position that was held by Ms. Lapera, right?

A.  Yes.

Q.  Could you please turn to what's been marked as Defendant's Exhibit 20?  Do you recall getting this?

A.  Yes, I do.

Q.  And you say there, "Kathy wants to get away from calling the team Lean Six Sigma as that describes a tool that they use."

So who's Kathy referring there, to your

Page 582

understanding?

A.  It's Kathy Keller who, then, was responsible for the then Lean Six Sigma space.

Q.  And it says, "I also think it might be helpful for you to meet with me, Ana and Kathy to flesh out these job descriptions so you can review it and level appropriately"?

A.  Yes, it says that.

Q.  And did you have meetings after that?

A.  Yes, we did.

Q.  And if you can flip through and take a look at what is attached.  I take it compensation did re-level Ms. Lapera's position?

A.  We did.

Q.  Was it just hers or was it more broadly?  Did you look at also all the positions within the Lean Six Sigma family?

A.  The entire family changed.  It moved to process improvement.

Q.  And did you consider at that time the levelling of their positions as well, do you recall?  Or those other positions?

Page 583

A.  Yes.  We would have mapped them into the levels created for the process improvement job family.  So we would have looked at those positions as well.

Q.  What else, if anything, did you look at in levelling the position that was held by Ms. Lapera at this time?

A.  So again, we would have followed our process and we would have looked at this information that was provided.  We would have considered the feedback from the business and the discussions that we were having.  We would have looked at the market data as well.

Q.  I'm going to ask you to switch binders, if I can.  It's going to be volume 3.

Oh, before you get to that.  So the position held by Ms. Lapera at this time or shortly thereafter was ultimately leveled at an N level, as in Nancy, correct?

A.  Yes, it was.

Q.  Just so we're clear -- and you may have said this already and I apologize -- why was it

17  (Pages 580 to 583)

Arbitration Day 3                                                      November 5, 2014
Washington, D.C.

Page 584

leveled at an N at that time?

A.   So it was re-leveled at an N based on the additional information that we received, so the broader scope, the importance of the job within the organization at that time with the changes that had been happening in that kind of Lean Six Sigma process improvement space as well.

Q.   Now if I can ask you to flip to 243. Defendant's Exhibit 243. It's in volume 3.

A.   Okay.

Q.   Can you look that over, please?

A.   Yes.

Q.   Do you recognize this?

A.   I do.

Q.   What is it?

A.   This is information that I provided to Leslie Arrington as part of an investigation.

Q.   And if you flip to page FNMA 000248, you see an item or a paragraph that's labeled 2. What is that?

A.   This paragraph gives an explanation of the process around the levelling of the job as an N. So

Page 585

the history of our review of the position.

Q.   Okay. And you prepared that?

A.   Yes, I did.

Q.   Can we switch back to volume 1 again? Sorry. Turn to Defendant's Exhibit 25.

A.   Okay.

Q.   Do you recognize this document?

A.   Yes. This is an employee change form. So when we're changing information about an employee, we send this notice to our HR service center and they input the change into our employee data system for us.

Q.   And this was for the position held by Ms. Lapera at the time?

A.   Yes.

Q.   It's leveled at an N?

A.   Yes. This is the move to the process improvement position.

Q.   Now, can we go down there underneath the recommended changes?

A.   Yes.

Q.   It says, "New job code and title," and

Page 586

there's a Dir process improvement strategy/SIX122?

A.   Yes.

Q.   What is that?

A.   That is the new job code that we moved Ms. Lapera to in February.

Q.   Is the the SIX122 is the new job code?

A.   Yes, it is.

Q.   Okay. And what's the Dir process improvement strategy?

A.   That is the new job title.

Q.   So is her former job title, is that what's listed above?

A.   Yes, it is.

Q.   So she got a new job title?

A.   Yes.

Q.   Do you remember Plaintiff's Exhibit 5? Let's go back to that just briefly in the job family table that you talked about.

A.   Plaintiff's Exhibit 5?

Q.   Yes. I'm sorry, Defendant's Exhibit 5. It's on page FNMB 001850 in Exhibit 5.

A.   Yes.

Page 587

Q.   Is that a table of position responsibilities?

A.   Yes.

Q.   So was there actually a new position that was created in this job family?

A.   No.

Q.   Not in that table, but if you compare that table to Defendant's Exhibit 25, right, the table that we're looking at on Exhibit 5 doesn't list a Dir director process improvement strategy.

A.   Correct.

Q.   So am I led to believe in February 2012, was there a new position that was created for this family?

A.   There would have been a new -- there was a new process improvement family.

Q.   Oh. So the whole process improvement family changed?

A.   Yes.

JUDGE ROBERTSON: Mr. Wilson, just a time check here. It's 20 of 1:00. I have a conference call I need to take at 1 o'clock and we have another

Alderson Reporting Company
1-800-FOR-DEPO

Page 588

witness on the screen at 1:30.

MR. WILSON: Right.

JUDGE ROBERTSON: Can we finish this witness in 20 minutes?

MR. WILSON: I can finish what I think I need to do with her in five.

JUDGE ROBERTSON: All right.

MR. WILSON: Particularly, if I get a little bit of leeway.

JUDGE ROBERTSON: Okay.

BY MR. WILSON:

Q. So let's go to the levelling of the position that Ms. Lapera held. The process for levelling her position in late December/early 2012, how, if at all, was that process motivated by her race, ethnicity, age, weight or body shape?

A. The decision to re-level had nothing to do with any of those factors.

Q. And how, if at all, was that process motivated by the outward appearance of Ms. Lapera with regard to bodily condition or characteristics, manner or style of dress and manner or style of

Page 589

personal grooming, including, but not limited, to hairstyle and beards?

A. The re-levelling was not at all related to those factors.

Q. We're going to have to switch volumes. If you would go to volume 2, Ms. Harris, and Defendant's Exhibit 143. Do you see that?

A. Yes.

Q. Who prepared this, to your understanding?

A. I did.

Q. Where did you get the information for this?

A. This is from our employee data system.

Q. And briefly, am I right, it shows the division of people, various employees in Fannie Mae, a couple of points within years 2009 to 2013?

A. Yes, it does.

Q. And it also shows there those persons' salary leveling at that time?

A. Yes, it does.

Q. It shows their annualized salary at that time?

Page 590

A. Yes.

Q. All right. Let's look at what Ms. Lapera's salary or -- and that's a base salary, right?

A. Yes, it is.

Q. Okay. It doesn't take into account what they received for LTI, right?

A. Correct.

Q. Okay. Let's look at Ms. Lapera's base salary compared to the base salaries of Jim Tomasello, Keith Smith, Amilda Gjecovi and Lea Nicotra. Those last four people I mentioned, could you indicate where, if at all, their base salary was at any time higher than Ms. Lapera's as indicated on this spreadsheet?

A. There isn't a point at which their salaries are higher.

Q. Okay. Were Mr. Tomasello, Mr. Smith, Ms. Gjecovi and Ms. Nicotra, were they reports of Anne Gehring in EPMO, to your understanding?

A. Yes, my understanding is they were in EPMO.

Page 591

Q. I'm going to ask you to turn to what's been previously identified as Defendant's Exhibit 103. What is that document there?

A. This is a compensation statement. We issue this as part of the annual compensation planning process.

Q. So that comes out of the compensation group?

A. Yes, it does.

Q. And so you deal with these frequently?

A. Yes.

MR. WILSON: Your Honor, I have a summary that summarizes information on several of these for Ms. Lapera, Ms. Gjecovi and Ms. Tomasello. I list what the sources of them are. If I could do that rather than having her go over each of the comp statements, are you okay with that?

JUDGE ROBERTSON: I'm okay with that.

BY MR. WILSON:

Q. Ms. Harris, there is, in the pocket part to that volume, a spreadsheet.

MR. BRANCH: Do you have an exhibit number

Arbitration Day 3                                                    November 5, 2014
Washington, D.C.

Page 592

for what you're referring to?

MR. WILSON: Well, it hasn't been labeled, but we'll call it now Defendant's Exhibit 271.

MR. BRANCH: Okay. And what are you referring to?

MR. WILSON: It's in the pocket part. I also e-mailed this to you on Sunday. I have another copy for you.

MR. BRANCH: Yes, please. This has been the longest five minutes I've ever --

BY MR. WILSON:

Q. Ms. Harris, I'll represent to you that the information comes from various compensations for various performance years. And then you'll see the total of A and D deals with the merit increase amount, LTI installments.

Could you tell me, for the years 2009, 2010, 2011 and 2012, when, if at all, Ms. Lapera made less in total compensation than Ms. Gjecovi, Ms. Nicotra, Mr. Smith and Mr. Tomasello?

A. There is no point at which she made less.

Q. And let's flip to 2013. You would agree

Page 593

with me that her base salary was greater than Tomasello, Smith, Nicotra and Gjecovi, right?

A. Yes, it's higher.

Q. Now, if you factor in their bonuses, the compensation of those persons was higher, right?

A. Yes.

Q. Bonuses are paid out in the first quarter of the following calendar year?

A. Yes.

Q. So Ms. Lapera would have had to have been at the company in 2014 to get any bonus for 2013, right?

A. That's correct.

MR. WILSON: No more questions, Your Honor.

JUDGE ROBERTSON: Okay. Any re -- I think we're in recross. We'll call it redirect for the sake of clarity.

MR. BRANCH: Yes, Your Honor.

JUDGE ROBERTSON: All right, sir.

MR. BRANCH: First, I need to take a quick bathroom break, but I'm just trying to figure out --

Page 594

MR. WILSON: I guess we're going to have to take her off and call her after Ms. Gehring.

JUDGE ROBERTSON: Well, we hate to do that to you, Ms. Harris, but I think that's where we are.

MR. WILSON: Unless you have an idea -- hopefully, it's not a Joe Wilson five minutes on how long you'll be with her because we could possibly delay Ms. Gehring a little bit.

JUDGE ROBERTSON: Yeah. But you've added a lot to the game here. I'm not going to squeeze Mr. Branch with 10 or 15 minutes here. Your 1:30 witness is somewhere else and is going to be on the screen at 1:30, right? We can't put her off.

MR. WILSON: That's correct.

JUDGE ROBERTSON: Ms. Harris, go see a movie and come back.

MR. WILSON: I'm sorry, Nicole.

THE WITNESS: I understand.

MR. BRANCH: So back at 1:30?

JUDGE ROBERTSON: I think we're back here at 1:30, yes.

(Whereupon, at 12:50 p.m., the arbitration

Page 595

in the above-entitled matter was recessed, to reconvene at 1:34 p.m., this same day.)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                                                      November 5, 2014
Washington, D.C.

Page 596

AFTERNOON SESSION

(1:34 p.m.)

JUDGE ROBERTSON: All right. Proceed, Mr. Branch.

Whereupon,

ANNE GEHRING,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your name.

A.   Anne Gehring.

Q.   Ms. Gehring, my name is David Branch. Did you previously work at Fannie Mae?

A.   Yes.

Q.   What period of time did you work at Fannie Mae?

A.   September 2010 to October 2013.

Q.   What was your position at Fannie Mae?

A.   Initially, I was the senior vice president of Financial Planning and Analysis and then later, I

Page 597

became the senior vice president of Enterprise Program Management.

Q.   And Ms. Gehring, what's your date of birth?

A.   August 12th, 1964.

Q.   When did you become the senior vice president for EPMO?

A.   September of 2012.

Q.   When you became the senior vice president for EPMO, were there employees working in that division at the vice president level?

A.   Yes.

Q.   Who were those employees?

A.   I believe there was one -- I think there was one open position and then one position that was filled by Kathy Keller, but that's my recollection. I don't remember any other vice presidents.

Q.   Are you acquainted with an individual named Carmen Oviedo?

A.   Carmen Oviedo?

Q.   Yes.

A.   Yes.

Page 598

Q.   Was she a vice president in EPMO when you became the SVP for EPMO in September 2012?

A.   No, I don't believe so. I think she had moved on to her new role.

Q.   When did she move on to her new role?

A.   I don't know.

Q.   Did you ask her to move to the new role?

A.   No.

Q.   What role did she go to?

A.   She took a role in the -- she took a program management role in the securitization utility.

Q.   What was her position before she took this program manager role?

A.   I don't recall. She did not work for me. I don't recall.

Q.   And I'm sorry, the new role that she took, was the position program manager?

A.   I guess, yes. I mean, again, I don't recall.

Q.   Did you ask her to leave EPMO?

A.   No.

Page 599

Q.   Ms. Oviedo is a Hispanic female?

A.   Yes.

Q.   Ms. Gehring, after you became the SVP for EPMO, did you authorize an image consultant to come to Fannie Mae to make a presentation?

A.   Yes.

Q.   Did you direct the employees who worked in the EPMO group to attend this presentation?

A.   I invited all employees who worked in the EPMO to attend.

Q.   And was this presentation given over a two-day period?

A.   I believe it was a half-day presentation and it was conducted twice.

Q.   And did the session on the first day deal with personal appearance?

A.   Yes. Both sessions were identical.

Q.   And so for the first day, the emphasis was on personal appearance?

A.   Both days, part of the content was on personal appearance.

Q.   What were your duties as the SVP for EPMO?

21  (Pages 596 to 599)

Arbitration Day 3                                                      November 5, 2014
Washington, D.C.

Page 600

A. I was responsible for strategic alignment of $800 million in technology spend. I was responsible for the execution of a portfolio of $800 million in projects each year. And I was responsible for the training and education around the execution of those projects.

Q. And you are acquainted with Ms. Lapera?

A. Yes.

Q. And who did Ms. Lapera report to?

A. Well, I ran EPMO. Ana Lapera worked for Kathy Keller.

Q. Did Ms. Lapera have employees reporting to her?

A. Yes, she did.

Q. Was one of those employees an individual named Blythe Neumilller?

A. Yes. I believe that Blythe Neumilller worked for Ana Lapera for a short period of time.

Q. And was one of the employees a lady named Patricia Brumbaugh?

A. Yes, I believe so.

Q. Did you make comments about the personal

Page 601

appearance of Ms. Neumilller and Ms. Brumbaugh?

A. Yes.

Q. Did you tell Ms. Lapera that she should speak to Ms. Neumilller and Ms. Brumbaugh about how they looked and how they sat in meetings?

A. No.

Q. Did you mimic, in the presence of Ms. Lapera, how Ms. Neumilller walked?

A. No.

Q. Did you state that Ms. Neumiller waddled when she walked because she was so obese?

A. No.

Q. Did you make comments about the personal appearance of the federal regulators?

A. Yes. They were inappropriately dressed.

Q. Would that have been in the latter part of 2012?

A. I don't remember.

Q. And how is it that they were inappropriately dressed?

A. They had very casual attire on. One gentleman had holes in his clothing.

Page 602

Q. And did you make these comments at an all-hands meeting?

A. No.

Q. Who was present when you made these comments?

A. The other individuals who attended the meeting and I believe that they initiated the comments.

Q. Who were those individuals?

A. I agreed.

Q. Who were those individuals?

A. Keith Smith, Mike Choi, Amilda Gjecovi. I think that was it. I think.

Q. Are you acquainted with a former Fannie Mae employee named Michael Chen Young?

A. Yes.

Q. Did you call Mr. Chen Young a fat fucker during a meeting at Fannie Mae?

A. No. Michael Chen Young is a friend of mine. I certainly did not speak about Michael Chen Young in that way, no.

Q. And did you use those words to describe

Page 603

any employee at Fannie Mae?

A. No.

Q. Did you refer to any Fannie Mae employee -- or did you refer to a Fannie Mae employee as an asshole?

A. Perhaps.

Q. Who did you refer to as an asshole?

MR. WILSON: Objection. Relevance.

THE WITNESS: I don't know. I don't remember any specifics, but perhaps.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. Did you tell Ms. Lapera that she should tell her staff that their stomachs or tummies were showing in staff meetings?

A. No, I never said that.

Q. Did you tell Ms. Lapera and Ms. Keller that you could see that a KPMG consultant was smart by looking into that person's eyes?

A. No, I don't recall that.

Q. Did you participate in a calibration session in the fall of 2012 at Fannie Mae?

22 (Pages 600 to 603)

Arbitration Day 3                                            November 5, 2014

Washington, D.C.

Page 604

A.   Yes.

Q.   During this calibration session, did Ms. Lapera request a rating of level 2 for one of her employees, Ms. Brumbaugh?

A.   I don't remember.  There were 100 employees in EPMO and I don't remember a specific rating.

Q.   Did you tell Ms. Lapera that the rating was not acceptable based on Ms. Brumbaugh's personal appearance or how she looked?

A.   No.  We differentiated the employees based on leadership criteria as determined by Fannie Mae.

Q.   So you deny making any statements at this calibration session about Ms. Brumbaugh's personal appearance?

A.   I don't recall any statements during that session about her personal appearance.

Q.   Are you familiar with an employee named Ms. Cruz-Rodriguez?

A.   No.

Q.   Are you familiar with a Shirley Cruz-Rodriguez?

Page 605

A.   I don't remember a person by that name.

Q.   Do you recall an employee discussing with Ms. Lapera that Shirley Cruz-Rodriguez would not advance at Fannie Mae unless her accent and English improved?

A.   No.

Q.   Did you tell Ms. Lapera that you were pleased that she had convinced Blythe Neumilller to take another job because Ms. Neumilller could never represent the group?

A.   No.

Q.   At some point in 2013, did Ms. Keller's employment come to an end at Fannie Mae?

A.   Yes.

Q.   Did you have a conversation with Ms. Keller, prior to her employment ending, where you told her that you could help her look better with her body size?

A.   No.

Q.   Do you recall Ms. Keller telling you that "I'm short and I'm fat.  What do you want me to do"?

A.   No, I don't recall that.

Page 606

Q.   Did you ask Ms. Keller to leave her position?

A.   Yes.  In the fall of 2012 or early 2013, I had communicated to Kathy that it wasn't working out and instructed her to look for opportunities elsewhere in Fannie Mae.

Q.   After Ms. Keller was no longer in her position, was there an effort to fill the position?

A.   Yes.

Q.   After Ms. Keller was no longer in the position -- or actually, before Ms. Keller vacated the position, did you identify an internal candidate that you wanted to be placed in the position?

A.   After Kathy Keller vacated the position, we posted the job through the normal HR recruiting process for vice president level.

Q.   Before Ms. Keller vacated the position, did you identify an internal candidate, Joe Hallet, that you wanted to place in the position?

A.   No.  I had talked to Joe Hallet about joining my organization in general, but no.

Q.   Well, did you communicate to individuals

Page 607

in human resources that you wanted to place Joe Hallet in the position and you wanted to find out what was needed to get him through the process, the vice president selection process?

A.   No.

Q.   After Ms. Keller was no longer in the position, what actions did you take to fill the position of vice president of planning and alignment?

A.   Normal HR recruiting process for vice presidents.  Post the job, review the applicant, determine a slate, interview the candidates, make a selection.

Q.   And who were you working with in processing this selection?

A.   The HR recruiter.  Her name was Melissa. I don't recall her last name.

Q.   Do you know who John Hickman is?

A.   Yes.

Q.   Was Mr. Hickman an applicant for this position?

A.   I don't recall that he was.

Q.   Is Mr. Hickman obese?

23  (Pages 604 to 607)

Arbitration Day 3                                                    November 5, 2014
Washington, D.C.

Page 608

MR. WILSON: Objection. Relevance.

THE WITNESS: I don't recall that he is.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. Was Mr. Hickman excluded from consideration for this position?

A. I don't remember if John Hickman applied for the position.

Q. When were the interviews held?

A. I'm not sure -- you want to know the date? I don't remember.

Q. Do you recall the month?

A. No. May/June, that time frame maybe.

Q. So prior to the interviews being held, did you have dinner with Nicola Fraser to discuss the position?

A. Prior to the interviews being held, I had dinner with Nicola Fraser, yes.

Q. Did you ask her to apply for the position?

A. No.

Q. Did Nicola Fraser apply for the position?

A. Eventually, yes.

Page 609

Q. Did you conduct interviews for this position?

A. Yes.

Q. Did you identify the individuals who would be interviewed?

A. Yes.

Q. And who were those individuals?

A. I believe it was Ana Lapera, Joe Hallet and Nicola Fraser.

Q. And had you received Ms. Fraser's resume before you scheduled her for an interview?

A. I believe so, yes.

Q. So had you received her resume and application for this VP of planning and alignment position before she was scheduled for an interview?

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I believe so, yes.

BY MR. BRANCH:

Q. Were there other individuals who conducted the interviews?

A. Yes.

Page 610

Q. Who were those other individuals?

A. I don't recall the full group of interviewers. I usually give a selection of names. But I do know Mike Choi, who was also a VP in EPMO participated and the HR person always participates. That was Shandell Harris.

Q. Was Mike Choi an employee that you had hired earlier in 2013?

A. Yes.

Q. Did you meet with Ms. Harris or Mr. Choi before the interviews to discuss what the interview questions would be?

A. No.

Q. Did you develop a list of questions for the interviews?

A. No.

Q. Did you interview all three applicants for the position?

A. Yes.

Q. Were all three applicants asked the same questions by you during the interview?

A. No.

Page 611

Q. Did you take any notes during the interview?

A. No, not to my recollection.

Q. Did you rate or rank the applicants?

A. Generally, when I conduct an interview, at the conclusion of the interview, I send feedback to the recruiter.

Q. And the question was: Did you rate or rank the applicants that you interviewed?

A. I know that I sent the recruiter feedback, yes.

Q. Do you recall what questions you asked Ms. Lapera or Ms. Fraser or Mr. Hallet at the interview?

MR. WILSON: Asked and answered. Objection, Your Honor.

THE WITNESS: I don't.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. What was your response, ma'am?

A. So I don't remember the specific questions I asked them. I can tell you in generalities how I

24   (Pages 608 to 611)

Arbitration Day 3

Washington, D.C.

November 5, 2014

## Page 612

conduct an interview. I typically ask about their background, how they made decisions to switch jobs. I'll ask them about relevant experience. I'll ask them about how they build relationships across the organization. I ask them what they think they would do in the role.

Q. So is it true you have no idea what questions you asked Mr. Hallet or Ms. Fraser or Ms. Lapera?

A. No, I don't remember specifically what questions I asked them.

Q. How did Ms. Lapera perform at her interview?

A. I think Ana did a nice job at the interview.

Q. Was Ms. Lapera given a performance evaluation at the end of 2012 or the beginning of 2013?

A. I think all employees were given a performance evaluation at the end of 2012.

Q. So was the answer yes?

A. Yes.

## Page 613

Q. Do you recall what her rating was?

A. I think it was a good rating. I think it was an excellent rating.

Q. Was her rating a level 1?

A. Yes, I believe it was.

Q. Is that the highest rating you can get at Fannie Mae?

A. Yes.

Q. Did you approve her performance rating?

A. Yes.

Q. Who made the final decision on who would be selected for this position?

A. I did.

Q. And who did you select?

A. Nicola Fraser.

Q. Why was Ms. Lapera not selected for this position?

A. Ana Lapera has difficulties communicating at an executive level. Her written communications are inappropriate and her verbal communications are somewhat crass and unpredictable.

Q. Were any of these concerns about

## Page 614

Ms. Lapera's communication skills identified in her performance appraisal in 2012?

A. I did not conduct her performance appraisal in 2012. So I don't know.

Q. Did you approve her performance appraisal in 2012?

A. I approved her ranking, the one ranking that we discussed, but I don't recall -- I typically don't read performance appraisals.

Q. So you said that Ms. Lapera was not selected because of her written communication and verbal communication; did I hear you correctly?

A. Yes.

Q. What was the issue with her verbal communication?

A. This position was required to communicate to the senior executive team, the regulators, including FHFA and the Treasury, and the board of directors. And Ana's written communications were somewhat juvenile and cartoonish and her verbal communications were very unpredictable and she had a negative way of talking about the organization and

## Page 615

its objectives.

Q. Is this information that you knew before you scheduled Ms. Lapera for this interview?

A. Yes.

Q. So why was Ms. Lapera given an interview for this position?

A. Ana Lapera was a good performer, a strong performer and I wanted to be thoughtful and make sure that I evaluated all the candidates that were -- you know, I thought could do the job.

Q. So what information did you learn from this interview that you did not know before the interview about Ms. Lapera?

A. I thought that Ana did a nice job in the interview. So I guess I learned that if she wanted to, she could communicate pretty well. The problem was I couldn't rely on her consistency. Like I said, she did a nice job in the interview.

Q. What do you mean by your comment you couldn't rely upon her consistency?

A. I had worked closely with Ana Lapera for three years and I had seen a repeated pattern of poor

25 (Pages 612 to 615)

Arbitration Day 3                                                      November 5, 2014
                                    Washington, D.C.

Page 616

communication for an executive.

Q. And had you counseled her on any occasion about her verbal communications?

A. Yes.

Q. What is it that she said that caused you to counsel her on her verbal communications?

A. In a staff meeting, she second guessed the judgment of the president of the organization in front of more junior members of the staff.

Q. And how did she do that?

A. When I shared the vision that the president had rolled out for the organization, the vision and strategy, Ana said out loud, "Like that's going to happen."

Q. When did this staff meeting take place?

A. I don't remember.

Q. Was it during the time period when you were the SVP for EPMO?

A. Oh, yes.

Q. So it would have been sometime after September 2012?

A. Yes.

Page 617

Q. Did you document this statement anyplace?

A. No.

Q. Did you issue any type of counseling or discipline as a result of this statement?

A. No.

Q. And was this statement made before she was issued her yearend performance appraisal?

A. I don't remember.

Q. Do you recall if it was noted or documented anywhere in her performance appraisal?

A. Like I said, I didn't read her performance appraisal. I don't recall.

Q. And so this is the only example that you're able to provide of negative comments made by Ms. Lapera at a staff meeting; is that correct?

A. No. There were others. That's the one that I can recall and give you specific details. This was a pattern of behavior. She interrupted every single staff meeting I had with one of these comments.

Q. And how often would you have staff meetings where Ms. Lapera attended?

Page 618

A. Weekly.

Q. So from September 2012 through June 23rd, is it your testimony that at every staff meeting, Ms. Lapera interrupted the staff meeting and made a negative comment?

A. I don't know if it was every single staff meeting, but the majority of staff meetings, yes, she did make negative comments. She was a disruptive influence in group settings because of the way she communicated.

Q. And on any of those occasions where she was a disruptive influence in group settings at these meetings, did you ever counsel her or discipline her in any way?

A. I think in several meetings, I actually confronted her about it in front of the group.

Q. And you said what?

A. I don't remember.

Q. So those were the verbal comments that you believe Ms. Lapera made. What about the written work product? What was the issue with the written work product?

Page 619

A. It was somewhat preachy, juvenile and cartoonish. She liked to use a lot of clip art and had little figures in there, and that's just not appropriate at the executive level.

Q. And is it true that all the issues you had with Ms. Lapera's either verbal communication skills or written work product, you knew those before you interviewed her?

A. Yes.

Q. After the selection was made, did you meet with Ms. Lapera?

A. Yes.

Q. Did you tell Ms. Lapera that you had selected Nicola Fraser for this position?

A. I don't remember. I do, as a practice, meet with individuals who have interviewed for a position face to face to tell them that they did not get the position. I may have told her during that conversation that Nicola Fraser was the candidate that was selected, but I don't remember specifics of that conversation.

Q. Did you tell Ms. Lapera that Nicola Fraser

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                                November 5, 2014

Washington, D.C.

Page 620

was young, she was energetic and she would love working for her?

A. I don't recall saying that Nicola Fraser was necessarily young or energetic, but I may have said flattering comments about Nicola.

Q. Did you tell Ms. Lapera that you expected her to train Ms. Fraser?

A. No.

Q. Is it true that Ms. Fraser had no experience in program planning, business architecture or process improvement when she was selected for this VP of planning and alignment?

A. No.

Q. Do you recall coming to my office for a deposition -- I'm sorry, Mr. Wilson's office. Do you recall a deposition being scheduled in Mr. Wilson's office? You were in New York and we were in Mr. Wilson's office here in Washington, D.C. on October 30th?

A. Yes.

Q. Do you recall -- I'm looking at your deposition transcript. You don't have a copy.

Page 621

MR. WILSON: Your Honor, I'm going to object to this line of questions without the transcript in front of the witness.

THE WITNESS: I didn't have time to look at it, no.

BY MR. BRANCH:

Q. That wasn't the question.

MR. WILSON: Your Honor, I'm going to object to this line of questioning. The witness doesn't have the transcript.

JUDGE ROBERTSON: Whose fault is that? Go ahead and ask the question. She'll have ample time to consider her answer. Ask the question.

BY MR. BRANCH:

Q. Do you recall being asked the question, "Did Ms. Fraser have any experience in program planning, business architecture or process improvement before she was selected for the position?" This is at page 38, line 5. And you responded, "No."

A. Okay.

Q. So are you giving a different answer

Page 622

today?

A. When I answered today, I was thinking it would be difficult to say that any business executive has no experience in program management and process improvement.

Q. But when you answered on October 30th, your response was that, no, she did not have experience in program planning, business architecture or process improvement before she was selected for the position.

MR. WILSON: Mr. Branch, could you tell me what page and line you're on?

MR. BRANCH: Thirty-eight.

JUDGE ROBERTSON: I thought you were going to say asked and answered. Move on.

BY MR. BRANCH:

Q. And have you used the term "executive presence"?

A. Yes.

Q. Did you tell Ms. Lapera that she lacked executive presence?

A. Yes.

Page 623

Q. And by "executive presence," you meant, in part, her personal appearance, correct?

A. No. We covered this last time. No.

Q. When you say "we covered this last time," you mean at the deposition?

A. Yes.

Q. And at page 44 of your deposition, line 8, you were asked the question, "What do you mean by executive presence?" And do you recall the response, "Executive presence. There are books written about executive presence, but executive presence is some combination of self-confidence and charisma, your personal appearance and your communication style. And in Ana's case, I was giving her feedback on her communication style and I think we've already covered the specifics of my feedback."

Do you recall that?

A. Yes.

MR. BRANCH: No additional questions.

JUDGE ROBERTSON: Mr. Wilson?

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

27 (Pages 620 to 623)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                    November 5, 2014

Washington, D.C.

Page 624

Q.   Ms. Gehring, how are you doing?

A.   Good.  How are you?

Q.   I'm doing well.  Nice to see you again. You're appearing here today voluntarily, right?

A.   Yes.

Q.   And you appeared at your deposition voluntarily?

A.   Yes.

Q.   Who is your current employer?

A.   JP Morgan Chase.

Q.   And what's your position?

A.   Managing director.

Q.   And so you're taking time out of your workday to be with us today?

A.   Yes.

Q.   Could you tell us about some of your hobbies?

MR. BRANCH:  Objection.

JUDGE ROBERTSON:  I'll allow it.

BY MR. WILSON:

Q.   You can answer that.  I can focus that a little bit more.  What experience do you have

Page 625

traveling internationally, if any?

A.   I worked for General Electric and lived in southeast Asia for two years in the '90s.  I lived in Europe.  I worked for Chiquita Brands International and I spent significant time in South and Central America.  And in my personal travel, I've probably traveled to 40 or 50 countries globally.  And I just took the last year off work and spent the majority of that time overseas.

Q.   Is there a lesbian, gay, bisexual and transgender employee group at Fannie Mae?

MR. BRANCH:  Objection.

JUDGE ROBERTSON:  Sustained.

MR. WILSON:  I was going to -- Your Honor, may I make a proffer?

JUDGE ROBERTSON:  I'd like to hear your proffer.

MR. WILSON:  Since discrimination is at issue with Ms. Gehring, Ms. Gehring served as the executive liaison for that group.

JUDGE ROBERTSON:  Sustained.

MR. WILSON:  Okay.

Page 626

BY MR. WILSON:

Q.   Ms. Gehring, I believe on your direct with Mr. Branch, you testified that Ms. Keller was asked to find another position within Fannie Mae.  Am I correct?

A.   Yes.

Q.   And you asked her that?

A.   Yes.

Q.   Could you explain to us why?

A.   A significant portion of the role that the EPMO organization played was to communicate to the senior leadership team, FHFA, the regulator and the board of directors, the strategy for the execution of this portfolio of projects.  And Kathy was unable to deliver presentations that were appropriate for that audience and she also was unable to participate in meetings with the senior leadership team and FHFA at an appropriate communication style.

Q.   When you say "appropriate communication style," could you elaborate on that, please?

A.   Kathy went into far too much detail for an executive.  I like to say you ask Kathy what time it

Page 627

is and she tells you how to make a watch.  At one point the CFO who I worked for, Dave Benson, asked her to stop the presentation and asked me to finish it.

Q.   So did Dave Benson put a premium on concise communications?

A.   Oh, my, yes.

Q.   Mr. Branch asked you a question or some questions on your examination about a conversation with Kathy Keller, you could help her look better, and I believe you said, no, you didn't have a conversation.

A.   Uh-huh.

Q.   Did you have some conversation at some time with Kathy Keller about dressing?

A.   Yes.

Q.   Could you elaborate on that conversation?

A.   I would be happy to.  Kathy shared with me that she was trying to lose weight and I shared with her that I had lost a considerable amount of weight and how hard it was.  And I encouraged her and she asked for the encouragement and she would share her

Alderson Reporting Company
1-800-FOR-DEPO

Page 628

success with me.

And one day she showed me how loose her clothes fit and it was pretty significant. It was, I would say, three sizes. And I offered to her, I said, you know, Kathy, when I lost my weight, I had a friend who also -- she had lost 100 pounds and this friend took me out and helped me dress for my new body shape. And I really had appreciated that and I would love to help you do that in the same way. And I think Kathy, you know, demurred and said, you know, she wasn't sure. And what I remember -- and I remember this very specifically. I said, one woman to another, I said, Kathy, you're a beautiful woman. You deserve this.

Q. Thank you. And I appreciate it.

So Ms. Keller did separate from Fannie Mae, correct?

A. Yes.

Q. I take it that process didn't occur overnight?

A. No.

Q. In your estimation, how long or when did

Page 629

it start, that process of her separating? Or that you knew she would not be working in the EPMO any longer?

A. I believe throughout the fall of 2012, she and I were having conversations about her shortcomings in the area of communication and that, you know, I needed to have somebody in the role that I could rely on to develop these presentations and to meet with these groups of people when I was unable to be there.

And then, I think, in early 2013 is when I shared with her, hey, listen, Kathy, I just don't think that this is going to work. I'd like to give you some time to look for other roles within Fannie Mae.

Q. Thank you. Now, Mr. Branch asked you on your direct, I believe in sum and substance, if you had identified Joe Hallet as the individual you wanted to take the VP for planning and alignment position, and I believe you answered no. Do you want to elaborate on that?

A. So I am always in the process of

Page 630

recruiting talent, always. In fact, I met with a person today in my new role because I think she's an impressive person and it's someone that could play a role in my organization in the future.

Joe Hallet was one of the best program leads that I interacted with and so I was building my relationship with Joe for a long time, thinking that if something came available in my organization, he would be someone I would be interested in having join the team.

Q. And when the position for vice president for planning and alignment was posted, what was Mr. Hallet's positional level within the company, do you recall?

A. I think he was a director.

Q. Today, do you know what his positional level is?

A. Today?

Q. Yes.

A. I think he's a VP now. I think he got promoted.

Q. Mr. Branch asked you or I think you

Page 631

testified on direct that you didn't develop questions with Mr. Choi and Ms. Harris for the interview for the vice president for planning and alignment position.

A. Yes.

Q. And I think you testified that no, you did not. Could you tell me why?

A. Because Mike Choi is a vice president, which is an executive officer. I'm an executive officer and Shandell Harris is a very senior and experienced HR partner and that's just not normal business practice to do that. You assume that these individuals know how to conduct an interview and I just don't -- I've never done that.

Q. We've heard some testimony in this case about lunches and dinners. When you were working in EPMO, when, if at all, had you ever -- or had you ever taken Ana Lapera to lunch or dinner?

A. Yes. I used my lunches to network and coach employees. And so I pretty much had lunch with an employee every single day, whether it was a peer or, you know, someone who was at a level lower than I

29 (Pages 628 to 631)

Arbitration Day 3                                                November 5, 2014
                          Washington, D.C.

Page 632

was in the organization. And I had dinners probably two or three nights a week.

Q. Before the vice president for planning and alignment position was posted, had you gone to lunch or dinner with Joe Hallet?

A. Yes. And Ana Lapera and Nicola Fraser and a long list of other people.

Q. Again, I want you to listen to the question closely, please. How, if at all, did race, ethnicity, national origin, age, weight or body shape motivate your decision to select Nicola Fraser for the position of vice president for planning and alignment and not select Ana Lapera for that position?

A. The question was how much?

Q. No. How, if at all, did --

A. Zero. Did not.

Q. Okay. Thanks. And then we go to how, if at all, did the outward appearance of Ms. Lapera, Nicola Fraser or anyone else affect -- or pardon me. Outward appearance with regard to bodily condition or characteristics, manner or style of dress and manner

Page 633

or style of personal grooming, including, but not limited to, hairstyle and beards affect that decision?

A. Not at all. They were all three very professionally dressed.

Q. Mr. Branch, on your direct examination, read to you testimony from your deposition in this case and I'll read it over again here. "Did you tell Ms. Lapera that Ms. Lapera, she lacked executive presence?

"Answer: Yes." And then he asked you, "What did you mean by executive presence?" You answered, "Executive presence. There are books written about executive presence, but executive presence is some combination of self-confidence and charisma and personal appearance and your communication style. And in Ana's case, I was giving her feedback on her communication style and I think we've already covered the specifics of my feedback."

Okay. So my question: In that testimony there, is there any connection -- or what connection, if any, is there between Ana's communication style

Page 634

and the definition that you had given of -- or the personal appearance and your definition of executive presence?

A. Can you repeat the question that you want me to answer? I understand the testimony, but I'm not clear on what the question is you want me to answer.

Q. Okay. What your testimony was -- you said you gave Ms. Lapera feedback on her communication style.

A. Yes.

Q. What, if any, reference would that communication style have to personal appearance?

A. Oh. None.

Q. Okay. With respect to any criticism of Ms. Lapera's executive presence --

A. Yes.

Q. -- that you may have had of her executive presence --

A. Yes.

Q. -- what, if any, basis for that was her personal appearance?

Page 635

A. None.

Q. Okay. You talked about a rating of 1 that was given for Ms. Lapera's rating for the year 2012 on your direct, correct?

A. Yes.

Q. What, if anything, did you have to do with respect to any other executives in the company to see that Ms. Lapera got that 1?

A. So the calibration sessions -- actually, if you go to more than one, you first have a calibration session within your own team and then those get combined with the next layer of the organization. In this case, it's the CFO. And he challenged me did I want to give Ana Lapera a 1 and I defended it and said, yes, I did.

MR. WILSON: No more questions, Your Honor.

JUDGE ROBERTSON: Anything further, Mr. Branch?

MR. BRANCH: Yes.

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

30  (Pages 632 to 635)

Arbitration Day 3                                                  November 5, 2014
                              Washington, D.C.

Page 636

Q.   Ms. Gehring, for the interviews for the VP of planning and alignment, did you conduct any of those interviews over lunch?

A.   You know, you asked me this during the deposition. I honestly don't remember. I don't remember. I could have, yes, because it is ordinary practice, when a candidate comes in, that someone takes them to lunch. But I don't decide who that is, right? It just shows up on my calendar and that's what I do. So it's possible that I took Nicola to lunch or -- it could be. I don't remember.

Q.   Did you take Ms. Lapera to lunch as part of the interview?

A.   I don't -- that, I don't think I did, because I remember Ana being in my office.

Q.   At the calibration session, is it true that the rating that an employee receives goes through a vetting process where other people who have worked with that employee are permitted to offer their opinion of the employee's performance?

A.   Yes.

Q.   And is it true that for Ms. Lapera to get

Page 637

this rating of a 1 through this calibration session, that meant that the folks who had worked with Ms. Lapera had to agree that her rating should be a level 1?

A.   No.

Q.   And why not? How could she get a rating of level 1 if the people who worked with her did not agree with it?

A.   The ultimate person who decides the rating is the employee's manager and the manager's manager and on up. But feedback is solicited from a broader group.

Q.   And the broader group that you're referring to are these folks who would have worked with Ms. Lapera during the course of the year?

A.   Yes.

Q.   And so after the feedback from the group that Ms. Lapera -- or individuals Ms. Lapera would have worked with for that year, the recommendation was that she receive a level 1 rating; is that correct?

A.   Yes, I supported that. Yes, I supported

Page 638

that.

Q.   Is it true that, during this conversation with Ms. Keller where there was some comment about her clothing fitting her, that at some point you turned to Ms. Lapera and told her, "I could help you look better as well"?

A.   Ana Lapera was not in the room when we had that conversation. That was a private conversation.

MR. BRANCH:  No additional questions, Your Honor.

MR. WILSON:  Your Honor, if I may, just one.

JUDGE ROBERTSON:  Go ahead.

RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q.   Ms. Gehring, why did you select Nicola Fraser for the vice president for planning and alignment position?

MR. BRANCH:  Objection. That's beyond --

MR. WILSON:  Well, no, I forgot the question on my direct.

JUDGE ROBERTSON:  I'll allow it. I mean,

Page 639

it's all going to be -- go ahead. Ask your question. It's the next thing to a leading question, but go ahead.

MR. WILSON:  It's open-ended.

JUDGE ROBERTSON:  It's a softball.  Go ahead and answer the question.

THE WITNESS:  I'm going to answer the question.  Look, in my role leading the EPMO, it seemed like a process improvement project, if that goes astray, I can fix that.  I just go fix the project, do damage control, no problem.

If I put someone in front of the board of directors, FHFA, Treasury and they communicate in an unprofessional way, my judgment of talent comes into question and I just wasn't willing to take that risk. And Nicola Fraser had preexisting relationships with the entire executive team, including Tim Mayopoulos and Dave Benson and many others on the executive team. She had previous relationships with FHFA and Treasury and had successfully presented to them on numerous occasions.  And she had previous relationships with the board of directors.  She had

31  (Pages 636 to 639)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                                November 5, 2014

Washington, D.C.

Page 640

prepared numerous, numerous, numerous presentations for these groups and that was the critical piece that was missing that I needed to hire. And so that's why I hired Nicola is I had to have someone who could do that.

MR. WILSON: That's it for me, Your Honor.

MR. BRANCH: Just a couple of follow-up.

JUDGE ROBERTSON: You may follow-up.

FURTHER REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. So Ms. Gehring, is it true that Ms. Fraser began employment in 2008 at Fannie Mae?

A. I don't know.

Q. And what period of time was it that Ms. Fraser -- or I'm sorry, what position did Ms. Fraser hold when she presented these numerous, numerous, numerous presentations before the board and regulators and other senior officials at Fannie Mae? What was her title?

A. She was a vice president in the Financial Planning and Analysis group.

Q. Okay. So is it true that Ms. --

Page 641

A. She prepared all the analysis on credit losses.

Q. She what?

A. She prepared all the analysis on credit losses.

Q. Okay. And is it true that Ms. Fraser became a vice president at Fannie Mae in early 2012?

A. I don't know.

Q. Were there any occasions where you observed Ms. Lapera making presentations to the board of directors or senior officials at Fannie Mae?

A. Yes.

Q. When did she make a presentation --

A. Not the board, but senior leaders.

Q. Was that during the time when you were at EPMO?

A. No. It was when I ran Financial Planning and Analysis.

Q. So on how many occasions did you observe Ms. Lapera making presentations to senior officials at Fannie Mae?

A. I don't know. A handful. But including

Page 642

me, maybe a lot.

Q. Well, setting yourself aside, on how many occasions did you witness her making presentations to senior officials at Fannie Mae when you were at FP&A?

A. A handful. Three maybe.

Q. Maybe three times?

A. Yes.

Q. Okay. And on how many occasions did you observe Ms. Lapera making presentations to the federal regulators?

A. I didn't.

Q. All right. So your conclusion that Ms. Lapera could not present to federal regulators or senior officials at Fannie Mae was based on observing her on three occasions make presentations?

A. No. Ana Lapera presented to me once a week at least. So my evaluation of her was also based on her ability to present to me. If an individual can't present to the senior vice president, you typically don't let them go on and present to the CFO or the board of directors or the regulators.

Page 643

Q. Do you know if Ms. Lapera had previously made presentations to the CEO, CFO, the regulators --

MR. WILSON: Your Honor, objection. This kind of goes well beyond my one question.

JUDGE ROBERTSON: Oh, I don't think so. Overruled. You can answer the question.

THE WITNESS: No, I don't know. I don't. Again, this was my personal experience. I was the hiring manager.

MR. BRANCH: No additional questions.

JUDGE ROBERTSON: All right. I think that completes your testimony. Thank you very much.

THE WITNESS: Thank you, sir.

MR. WILSON: Thank you, Ms. Gehring.

(Recess.)

Whereupon,

NICOLE HARRIS WESTBROOK,

was called as a witness by counsel for Plaintiff, and having been previously duly sworn by the Notary Public, was examined and testified as follows:

REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                    November 5, 2014
Washington, D.C.

Page 644

Q. Ms. Harris, is it true that any time from 2009 through 2012, Fannie Mae could have changed Ms. Lapera's level to N from M?

A. Yes. There was no restriction on changing job levels.

Q. And you were questioned about Defendant's Exhibit 143, if you want to pull that out.

A. Okay.

Q. So let's just start from the beginning of this document. You were questioned about, I think, the first four employees, Jim Tomasello, Keith Smith, Amilda Gjecovi and Lea Nicotra. So those employees were in positions junior to Ms. Lapera's position in 2009, correct?

A. Yes, they were.

Q. And the employees who were in positions most comparable to Ms. Lapera's position were Ted Carter and Michael MacFarland, correct?

A. Yes. They were also directors.

Q. And Ms. Lapera was a director, correct?

A. Yes.

Q. And they were at the level of 6, correct?

Page 645

A. Yes. All directors were level 6.

Q. And the other four employees were 5 or below, correct?

A. Yes.

Q. So at the end of 2009, Mr. Carter and Mr. MacFarland's position had been leveled to the letter N, correct?

A. Yes.

Q. And Ms. Lapera was still at M?

A. Yes.

Q. And the other employees, when their positions were converted, they were not converted to the M level. They were converted to levels below the M level, correct?

A. Yes.

Q. And even as far as titles are concerned, only Mr. MacFarland and Mr. Carter had director level titles at the end of 2009, correct?

A. Yes.

Q. And I'm sorry, you said for the level N, the person was eligible for a bonus up to -- was it 20 percent or 35 percent?

Page 646

A. For M?

Q. Yes.

A. LTI is 20 percent.

Q. Twenty percent. So at the end of 2009, Ms. Lapera would have been eligible for a 20 percent bonus?

A. Yes.

Q. And the two male employees, Mr. Carter and Mr. MacFarland, they were at the level N, so they would have been eligible for a, what, 35 percent bonus?

A. Thirty-five percent target.

Q. And their salaries, Ms. Lapera, Mr. Carter and Mr. MacFarland, were all at comparable levels at the end of 2009?

A. Yes.

Q. So now into 2010. Through midyear 2010, is it true that the position that Ms. Lapera held was most comparable to the positions held by Mr. Carter and Mr. MacFarland?

A. So comparable in terms of, yes, a director. Not necessarily comparable in terms of

Page 647

position responsibilities. They were different jobs.

Q. You don't know what the differences were in the job responsibilities, do you?

A. I can't tell you off the top of my head. I mean, certainly, the one for Michael MacFarland is a technology position.

Q. And the other four employees that Mr. Wilson asked you to compare Ms. Lapera to, they were all in positions lower than the level N, correct, through, I guess, midyear 2010?

A. Yes.

Q. And through midyear 2010, Ms. Lapera's salary was -- her base salary was less than Carter and MacFarland, correct?

A. Yes.

Q. I'm sorry, through the yearend 2010, Ms. Lapera's position was at level M, correct?

A. Yes.

Q. And the four employees that you compared her to were in positions less than level M, correct?

A. Yes.

Q. And through midyear 2011, Ms. Lapera was

33  (Pages 644 to 647)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                              November 5, 2014

Washington, D.C.

Page 648

still at level M, correct?

A.   Yes.

Q.   And the four employees that you compared her to were below level M.  They were at L or below, is that correct?

A.   In 2011, there was a change to -- I'm sorry, I'm not going to get her last name right. Amilda.

Q.   Okay.  So she became the director of financial analysis.

A.   Yes.

Q.   Through midyear 2011.

A.   Yes.

Q.   And her position was at a level N, correct?

A.   Yes.

Q.   And Ms. Lapera's position was still at a level M.

A.   Yes.

Q.   And throughout this period, Ms. Lapera's position could have been moved to a level N, correct?

A.   Yes, the position could have been

Page 649

re-leveled.

Q.   And through the yearend of 2011, is it true that all of the four employees that you compared Ms. Lapera to had their positions moved to a level N while Ms. Lapera remained at a level M?

A.   So they did move to the N.  I don't know the circumstances off the top of my head.

Q.   And once they moved to a level N, their bonus could be up to 35 percent of their base salary?

A.   Thirty-five percent would have been the target.

Q.   And so from 2009, all the way until the end of 2011, Ms. Lapera's position remained a level M; is that correct?

A.   Yes.

Q.   While employees who started out at grades lower than Ms. Lapera in 2009 actually were at the level -- N level by the end of 2011; is that correct?

A.   Yes.  Based on being promoted and the positions they moved into.

Q.   Well, they were all in director level positions, correct?

Page 650

A.   They all are director level positions.

Q.   And there was some testimony concerning the fact that there was a recommendation that Ms. Lapera's salary be adjusted, I think, to the top range of $194,000 a year.

A.   Yes, there was a PEP request.

Q.   And so why was her salary not adjusted?

A.   So that decision would have been that of the business.  It wouldn't have been a compensation decision.

Q.   When you say it would have been the decision of the business, who are you referring to?

A.   It would have been her management.

Q.   So do you know why her salary was not adjusted at the time that the recommendation was made that her salary be adjusted in midyear 2011?

A.   I don't know why her management decided not to make the increase.

Q.   Just one additional question on this chart.  So is it true that when Ms. Lapera's salary was actually raised to the level N, that there was no increase in her base salary?  In other words, at the

Page 651

end of 2011, her base salary was 183,888?

A.   That's correct.

Q.   And when her position was leveled to the N level, her base salary -- annualized salary remained at $183,888?

A.   That's true.

Q.   Do you have an explanation of why there was no adjustment in her salary when it went from an M to an N?

A.   Sure.  So when level grade changes are made, they're not always -- they don't always come with base salary increases.  If an individual is well within the salary range, an increase may not be made. So I believe the midpoint for the N is 175,000 and so at 183, almost 184, that would have been well within the range.

Q.   Who made the decision that there would be no adjustment in her salary when the position went from M to an N?

A.   So I don't believe that compensation made a recommendation to increase the salary and I don't believe there was an ask by the business to increase

34  (Pages 648 to 651)

Page 652

the salary.

Q. But compensation had previously requested that her salary be increased to 194,000, so there would be something like an 18 percent difference between her salary and the person that she supervised?

A. Yes. We made a recommendation at that time, because there wasn't another differentiator, meaning there were folks reporting in to Ms. Lapera that were at the M, but with the move to the position, there was differentiation there with the long-term incentive piece. So total comp opportunity is differentiated.

Q. When Ms. Lapera's position was re-leveled, was this re-levelling in the same job family?

A. When the re-levelling occurred, this was when the new job family came into play. So prior was the Lean Six Sigma job family. The new job family was process improvement.

Q. Was anyone else reclassified at the time Ms. Lapera's position was reclassified?

A. So I don't believe there were other grade

Page 653

level changes, but there were others who had title changes to move them into the process improvement family.

Q. Just so that we're clear on this point, I believe you testified previously that in April 2011, when you received notice that Ms. Lapera was interested in having her position changed, the only thing that you received from Shandell Harris was a position description for Ms. Lapera.

A. That's the only thing that I recall.

MR. BRANCH: No additional questions.

MR. WILSON: I'd like to ask a question. It's not within the scope of the redirect, if I could ask the Court's indulgence. It's very brief.

JUDGE ROBERTSON: You may open another door, but go ahead.

RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. WILSON:

Q. When was the restatement at Fannie Mae?

A. The financial restatement?

Q. Yes.

A. It was ongoing when I joined in 2005. So

Page 654

I believe it started in probably 2004 and ran through part of 2006.

MR. WILSON: That's it.

JUDGE ROBERTSON: Thank you, Ms. Harris. You're excused.

THE WITNESS: Thank you.

(Ms. Harris exited the arbitration room.)

JUDGE ROBERTSON: Now I think we're ready for a general recess. Ten minutes or so.

(Recess.)

JUDGE ROBERTSON: Okay. Folks, where are we at?

MR. BRANCH: From the claimant's perspective, Your Honor, we have two additional witnesses. Leslie Arrington and James Tomasello.

JUDGE ROBERTSON: Now, in light of Ms. Gehring's testimony, which we said after which we would review at least the Tomasello thing, what does Tomasello add or clarify?

MR. BRANCH: I think he's going to dispute, for the most part, just about -- I won't say everything, but a good part of what Ms. Gehring

Page 655

testified to. He was interviewed as part of an investigation. I have a copy of some of the notes -- or I have the notes from the interview. It's not complete, but I have notes from the interview.

He apparently reported to the investigator that Ms. Gehring was more positive about women who were slender and well dressed. He was present at this calibration session. Well, staff meetings as well. All of these staff meetings that Ms. Gehring claims that Ms. Lapera would interrupt and make disruptive comments. He was present at this two-day training session with the consultant, has comments about it was all about appearance, not skills, that he believed it was inappropriate.

JUDGE ROBERTSON: Okay. Fine. You can have Tomasello. What about Arrington?

MR. BRANCH: Arrington actually did the investigation for compliance and ethics. So in addition to Mr. Tomasello, she interviewed all of the other employees -- or a number of other employees as part of the investigation. So we're not trying to call all these different employees, but we have some

Arbitration Day 3                                    November 5, 2014
Washington, D.C.

## Page 656

of her notes in the record here and we'd like to get her on the record with these statements that were given to Fannie Mae about inappropriate comments made by Ms. Gehring about personal appearance of employees under her supervision.

JUDGE ROBERTSON: Are both of these witnesses within the control of Fannie Mae?

MR. STEWART: Yes.

MR. WILSON: Yes. But Your Honor, I mean, with respect to Arrington, she's just going to say what someone else told her in the interview and I think you've heard from half the people. I think she interviewed Nicole Harris, Melissa Werner. She did not interview Anne Gehring. She interviewed Tomasello. So what else is she going to add to the show? And the reliability, it's a step removed.

MR. BRANCH: There are a number of references in her notes, some Fannie Mae has redacted, but --

MR. WILSON: There is one redaction in her notes that we did for attorney-client privilege.

MR. BRANCH: Well, it doesn't say

## Page 657

attorney-client privilege.

MR. WILSON: Okay. You've got a privilege log on that.

MR. BRANCH: References in her notes to people that she interviewed and the information that they provided to her. For example, there's a reference here to John Hickman, the person who was excluded, that Anne Gehring said --

JUDGE ROBERTSON: Bring them both. Let's get it over with. Can you bring them tomorrow?

MR. STEWART: The only issue with Ms. Arrington is she did get a root canal. So barring any setbacks, she should be here tomorrow.

JUDGE ROBERTSON: I'll be very sympathetic.

MR. WILSON: We have a witness in the afternoon -- another one, should be relatively short -- that we're going to do by video. That's all Fannie has.

JUDGE ROBERTSON: If that's the case, I think we'll get this case done tomorrow.

MR. STEWART: I would expect so.

## Page 658

MR. WILSON: Your Honor, we talked about briefing in what I'll call our pretrial and you said you'd remain open to the issue. We would like to request procedural on these lines, in particular, given your comment of -- I don't want to put words in -- but lack of familiarity with the D.C. Human Rights Act in personal appearance.

In lieu of closing argument, we propose, within a relatively short time after we close the evidence, we submit short briefs, let's say 10-15 pages, no more than that to you, and then you can digest those and then we could come back at that point and make argument on that after you've had a chance to digest that.

JUDGE ROBERTSON: Somebody's gone to a lot of expense to have this excellent court reporter here making this record. I've listened to every word that's been said here and kept quite good notes. I don't know how long it's going to take for the transcript to be prepared and I'm not sure whether you contemplate giving me briefs that has extensive references to the transcript.

## Page 659

What I would rather have is a 15-page brief that talks about the law of this case. And then I will exercise my discretion as to whether I want you to come back and argue. I may decide on the briefs without further argument. Is that okay with you?

MR. STEWART: That's fine.

JUDGE ROBERTSON: What do you mean by relatively short period of time? Because the problem here for the finder of fact or the judge in a case is what used to be called the lawyer's bathtub mind. Do you know what the lawyer's bathtub mind is? You fill it up with facts and at the end of the case, you pull the plug, it goes. And you have to climb the learning curve all over again if there's a long wait. So I want briefs in two weeks, no more than that. Can you imagine that?

MR. WILSON: Yes.

JUDGE ROBERTSON: Mr. Branch?

MR. BRANCH: I think that's fine, Your Honor.

JUDGE ROBERTSON: Okay. Simultaneous

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 3                                                November 5, 2014
                          Washington, D.C.

Page 660

briefs?

MR. WILSON: Yes.

MR. BRANCH: That takes us to the 19th. Well, 21st?

JUDGE ROBERTSON: The advantage of that is that you can have Thanksgiving dinner and not have this hang over your head.

MR. BRANCH: That's fine.

MR. WILSON: So briefing by November 21? Fifteen pages, Your Honor?

JUDGE ROBERTSON: Fifteen pages. You can put whatever you like in 15 pages. In fact, you can exceed 15 pages if you like, but I'll only read 15.

MR. WILSON: Understood.

JUDGE ROBERTSON: All right. With that understanding, we're in recess until tomorrow morning at 9:30 with the expectation we'll be through tomorrow and then you'll give me briefs in two weeks thereafter, correct?

MR. WILSON: Yes, sir.

JUDGE ROBERTSON: Thank you very much. Have a pleasant evening.

Page 661

MR. WILSON: Thank you. You too.

(Whereupon, at 3:33 p.m., the instant arbitration adjourned, to reconvene at 9:30 a.m. on Thursday, November 6th, 2014.)

Page 662

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss.:
DISTRICT OF COLUMBIA      )

I, MARY GRACE CASTLEBERRY, RPR, the officer before whom the foregoing proceedings was taken, do hereby certify that the testimony of said proceedings was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this proceedings was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

---------------------------

Notary Public in and for
the District of Columbia

My commission expires: 07/14/2016

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4                                                November 6, 2014
                              Washington, D.C.

---

Page 664

APPEARANCES:

On behalf of the Claimant:
   DAVID A. BRANCH, ESQ.
   Law Office of David A. Branch & Associates, PLLC
   1828 L Street, N.W., Suite 820
   Washington, D.C. 20036
   (202) 785-2805

On behalf of the Respondent:
   JOSEPH D. WILSON, ESQ.
   Kelley Drye & Warren, LLP
   3050 K Street, N.W., Suite 400
   Washington, D.C. 20007-5108
   (202) 342-8504
      and
   DAMIEN G. STEWART, ESQ.
   Associate General Counsel
   Fannie Mae
   3900 Wisconsin Avenue, N.W.
   Washington, D.C. 20016-2892
   (202) 752-7000

---

Page 665

                    C O N T E N T S

WITNESS

LESLIE ARRINGTON    DIRECT  CROSS  REDIRECT  RECROSS
   By Mr. Branch      666
   By Mr. Wilson            700
JAMES TOMASELLO
   By Mr. Branch      707
   By Mr. Wilson            723
ANA CRISTINA LAPERA
   By Mr. Branch      728
   By Mr. Wilson            738

                    E X H I B I T S

| PLAINTIFF'S EXHIBIT NO. | MARKED FOR IDENTIFICATION | RECEIVED IN EVIDENCE |
|---|---|---|
| 90 | 735 | |
| 91 | 735 | |

| DEFENDANT'S EXHIBIT NO. | MARKED FOR IDENTIFICATION | RECEIVED IN EVIDENCE |
|---|---|---|
| 271 | 743 | |

(Exhibits were retained.)

---

Page 666

                    P R O C E E D I N G S

JUDGE ROBERTSON:  Good morning, everybody. Day 4 of Lapera versus Fannie Mae and Ms. Arrington is here.  Will the court reporter administer the oath to the witness.

Whereupon,

                    LESLIE ARRINGTON,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. BRANCH:

Q.   Please state your name, ma'am.

A.   Leslie Arrington.

Q.   Good morning, Ms. Arrington.  My name is David Branch.  Ms. Arrington, are you currently employed?

A.   Yes.

Q.   And where are you employed?

A.   Fannie Mae.

Q.   And what's your position there?

A.   I am the vice president of investigations.

---

Page 667

Q.   How long have you held that position?

A.   I think it's been about four and a half years I've been in that particular role.

Q.   And when you say you're vice president of investigations, for which department?

A.   Compliance and ethics.

Q.   What is the compliance and ethics department of Fannie Mae?

A.   The compliance and ethics is a division of Fannie Mae.  It's responsible for a variety of different programs within the company, including internal investigations, the enterprise antifraud program, the privacy program, the anti-money laundering program, compliance and legal and regulatory compliance program, the FM Ethics line, a hotline that Fannie Mae has, as well as our interactions with our regulator and with the FHFA OIG.  So there are several different programs within it.

Basically, if you sort of summarize, it's the second line of defense for the company looking at things like compliance issues, ensuring that we're

---

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4                                                November 6, 2014
Washington, D.C.

## Page 668

doing things ethically and correctly and hoping to establish a culture of compliance at the company.

Q.   Does your office have any responsibility for investigating complaints made by employees of violations of Fannie Mae's policies?

A.   Yes.

Q.   And can you explain what that level of responsibility is for your office?

A.   Yes. So the internal investigations group, which is one of the groups that I supervise, which is located in compliance and ethics, is responsible for investigating all allegations of violations of our code of conduct and policies.

And the role of that group is to conduct the investigation, do the fact gathering, draft a decision summarizing its findings and if a violation is found, that team, through me, is responsible for determining whether any action needs to be directed to address the violation with the approval of the chief compliance officer.

So we're solely responsible for making those decisions and solely responsible for

## Page 669

determining if any violations have occurred and whether any action needs to be directed.

Q.   Did any employees at Fannie Mae make any complaints to your office about the conduct of Anne Gehring?

A.   Yes.

Q.   How many employees made complaints to your office about the conduct of Anne Gehring?

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: I'll allow it.

THE WITNESS: What I can recall is that we had one individual who raised a concern about a statement that Anne Gehring made in the presence of other employees about his work. We had an officer who raised a concern about an e-mail that Anne Gehring sent to him.

I recall another vice president who primarily was raising performance-related concerns. I would deem them performance-related concerns. She was disagreeing with Anne Gehring's assessment of her performance, but in that disagreement and discussing those issues with us, she raised some concerns about

## Page 670

a couple of comments that Anne Gehring made. And then Ms. Lapera raised some concerns about Anne Gehring. That's what I recall.

BY MR. BRANCH:

Q.   So let's start with the first individual complaint. What was that specific complaint?

MR. WILSON: Same objection, Your Honor.

JUDGE ROBERTSON: I'm going to hear it.

THE WITNESS: My recollection of that incident is that Ms. Gehring was walking back after a meeting with, I believe it was the chief financial officer, and she was in a group of employees who reported to her and there was some concern about the quality of the work that was delivered to the chief financial officer and she raised concerns about that in the presence of the entire group. The allegation was that she had used some profanity or done something that was really inappropriate.

When we did our investigation, we actually found that it was just a matter of her chastising this employee's work in the presence of other employees. While it may have been warranted for her

## Page 671

to chastise him, our policy at Fannie Mae is that you don't do that in front of other employees. So we directed that she receive counseling.

BY MR. BRANCH:

Q.   Who was this employee?

A.   I don't recall the name.

Q.   And what was the statement made by Ms. Gehring?

A.   I don't recall that.

Q.   Well, generally what was the statement?

A.   Generally, what I recall is she said something to the effect of you can't put me in that position again with the chief financial officer to do something that isn't up to snuff or isn't up to quality. That's what I generally recall the statement being.

Q.   Do you recall a complaint being made against Ms. Gehring by an employee named Michael Chen Young?

A.   That may have been the person, but I don't recall. I really don't recall specifically.

Q.   And did Mr. Chen Young make an allegation

3 (Pages 668 to 671)

Page 672

that Ms. Gehring called him a "fat fucker"?

A. No. I have never heard that term at all. Nobody has ever, ever alleged to me that she used those words. I would remember that and that never happened.

Q. But you don't recall the allegations that this first employee made?

A. No, other than the general substance, that was it. But that term I would recall and I can adamantly tell you that nobody has ever said to me that Anne Gehring ever used that term.

Q. And what was the time period for this first complaint?

A. I don't recall. It was approximately maybe one to two years ago.

Q. So this is 2014. So either sometime in 2012 or 2013?

A. That's my general recollection.

Q. Was that complaint investigated?

A. Yes.

Q. Was there a report generated as part of that complaint?

Page 673

A. Yes.

MR. BRANCH: Judge Robertson, we requested that Fannie Mae produce any complaints made about Ms. Gehring. This should have been provided in discovery. It was not.

MR. WILSON: Your Honor, we objected to providing those on the basis of relevance, other than anything that had to deal with complaints about race or weight. We made our objections known as of July and Mr. Branch never took exception to that.

JUDGE ROBERTSON: Well, then, if there's been no motion to compel, I'm certainly not going to deal with one now. Let's proceed.

BY MR. BRANCH:

Q. The next complaint was an e-mail from an officer or to an officer?

A. Yes. My recollection of the next complaint was that Ms. Gehring and another officer at Fannie Mae, there was an e-mail exchange between the two of them. To give you a little context about that e-mail exchange, this officer and Ms. Gehring were actually very close and social friends in addition to

Page 674

being professional colleagues.

And this e-mail that Ms. Gehring sent to this particular officer was referencing her opinion that this officer, in terms of their personal social relationship, had somehow let her down or not been a friend to her when she expected him to be a friend to her. And so included within that e-mail -- the officer was uncomfortable with the e-mail and shared it with his human resources person. Then the e-mail was referred to us to say, is there anything we should do further with this.

I reviewed it, I looked at it. Because it was within the nature of a personal discussion between the two, the determination was made that there was not sufficient information within that e-mail to warrant an investigation because there was no real code of conduct or policy issue at issue there. And so therefore, we did a closing memo saying I reviewed it, I did not deem it to rise to the level of a matter that investigations should review, but I counseled Ms. Gehring that she should not use work e-mail to deal with personal concerns in

Page 675

the workplace.

Q. Who was the officer involved?

A. Pascal Boillat.

Q. And what did Ms. Gehring state in the e-mail?

A. I don't remember --

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Overruled.

THE WITNESS: I don't remember specifically what she stated. Apparently, she had been upset about a particular situation and she felt that Mr. Boillat was not sufficiently --

(Interruption.)

JUDGE ROBERTSON: Proceed.

THE WITNESS: My recollection is that Ms. Gehring was upset about a particular situation and she was upset with Mr. Boillat because she felt that he had not been sufficiently concerned about her because she viewed them as having a personal relationship and he did not make himself available to talk to her about the situation that she was upset about. That's my recollection of the general

Arbitration Day 4

November 6, 2014

Washington, D.C.

Page 676

substance of the e-mail.

My view, having read it, it was sort of typical of two individuals who viewed themselves -- one views themselves as a better friend of another individual than the other individual does, and there was sort of this disconnect in terms of the willingness to share sort of personal issues and those kinds of things.

BY MR. BRANCH:

Q.   Were there any disparaging comments in this e-mail about this individual's person?

A.   Not that I recall, no.

Q.   What was the time frame of this e-mail?

A.   Again, it was after the first incident and before 2014. So 2012, 2013. I'm not very -- I don't remember the exact dates.

Q.   What was the third incident? This incident concerning performance concerns?

A.   Yes. So Kathy Keller, who at that time was a vice president of the company, came to me and her primary concern was she felt that Ms. Gehring did not -- or was not appreciating the level of her

Page 677

performance; that she disagreed -- she believed that Ms. Gehring believed that she was not performing adequately and Ms. Keller believed she was performing adequately; and that she was concerned because when she tried to ask Ms. Gehring to give her information about what was lacking in her performance, Ms. Gehring didn't really give her a lot of details or a lot of information so she was unclear. She felt her performance wasn't being assessed fairly. She felt that Ms. Gehring, for whatever reason, didn't want her working in the position that she was working in.

So a lot of it was all this performance-related issues, all of which, by the way, we referred to HR to handle because we only handle if it raises to a level of a code of conduct or policy allegation. So that was most of what was going on.

But in her discussion to me, she mentioned that Ms. Gehring had made some comments that Ms. Keller said made her uncomfortable, that she felt were unprofessional and she gave me some examples. And she specifically stated to me that she knows this

Page 678

is kind of petty, because they were kind of offhand remarks that Anne Gehring had made, and she would never have raised them with me except for her concern that Ms. Gehring wasn't evaluating her performance fairly. So that's what I recall about that issue.

BY MR. BRANCH:

Q.   What were the comments Ms. Keller made to you?

A.   I remember specifically she mentioned that during a discussion, she -- sorry. Back up.

So they were on a conference call with some personnel from operations and technology about a project because they both worked in the EPMO. And I specifically remember Ms. Keller saying to me that during that conference call, Ms. Gehring sent her an e-mail saying, isn't this O&T officer slurring his words? And Ms. Keller responded back to the e-mail by saying, I don't know, maybe he's just tired. And she said to me, you know, she didn't think it was appropriate for Anne Gehring to send her that e-mail because it may have been indicating that she thought that this particular officer was drunk or something.

Page 679

So I remember that specific comment.

I remember her saying that at one time Anne Gehring referred to somebody as an ass. She didn't like that.

Q.   And who was she referring to?

A.   An officer with whom Ms. Gehring worked, a male officer.

Q.   Who was that officer?

A.   I don't remember who. It was somebody I think in operations and technology. It might have been George Vega. I don't remember. It was a male officer in O&T, that she didn't agree with his perspective on a particular project that EPMO was doing. EPMO was not giving him funding for something he wanted funding and she, within her team, said he was being an ass to Ms. Keller. That's my recollection.

I'm trying to think if there were others. That was sort of the type of comments that Ms. Keller brought up that she had concerns about what Ms. --

Q.   Did Ms. Keller also raise concerns about Ms. Gehring referencing her weight?

Alderson Reporting Company
1-800-FOR-DEPO

Page 680

A.   She didn't specifically say that. The one thing she said to me -- I do remember her talking about there was an occasion when Ms. Keller -- and I believe Ms. Lapera was there as well -- and Ms. Gehring were talking and they were talking about clothes. And I think Ms. Keller had stated that she, you know, wasn't really good about buying clothes. She couldn't give me the exact context. So she needed to go out shopping or something or she had difficulty finding clothes that she thought looked good. And she recalled that Ms. Gehring offered to go shopping with her because she knew how to dress, you know, if you felt like you were slightly overweight or something like that and she'd be willing to help her go out and pick out clothes.

So that's the one conversation. But Ms. Keller never stated that she had made any comments to Ms. Keller about her weight specifically. There was that one discussion about the clothes shopping.

Q.   What was the time frame for Ms. Keller's complaint?

Page 681

A.   I believe she raised it shortly before she left the company. It might have been 2013, but I'm not exactly sure.

Q.   Was her complaint investigated?

A.   Again, most of -- so I reviewed it, we analyzed it and basically we made the determination that 95 percent of what she was raising was an HR concern. So we drafted a memo referring all of her performance-related issues to human resources. We looked into the comments.

Basically, we drafted a closing memo because as I recall, what we decided was that these comments sort of predated a counseling session that was given to Ms. Gehring after the last incident I talked to you about, which was the officer e-mail situation. The CFO then subsequently counseled Ms. Gehring. None of the comments occurred after that counseling occurred. And I reviewed all of Ms. Gehring's e-mails for the relevant time period and found that after that counseling was done, none of these comments were made.

And so a lot of the comments that

Page 682

Ms. Keller referenced to me were fairly dated and so, therefore, given that there was counseling done, the conduct hadn't continued and we were aware that Ms. Gehring was leaving and none of the comments really rose to the level of code of conduct or policy violations because they weren't directed at anybody based on a protected class, they weren't directed at anybody in particular, in terms of an unprofessional conduct allegation, we drafted a closing memo and closed the matter out.

So it wasn't fully investigated. We did a preliminary review and determined that an investigation was not necessary.

Q.   What was the fourth complaint that was made against Ms. Gehring?

A.   Ms. Lapera's complaint.

Q.   We'll get to Ms. Lapera's complaint in a minute. Are you familiar with an employee named Carmen Oviedo?

A.   Yes.

Q.   Is she a Hispanic female?

A.   I actually don't know. I know she's a

Page 683

female. I think she would deem herself to be Hispanic. I've never discussed it with her.

Q.   And was she employed at Fannie Mae as a vice president for some period of time?

A.   Yes.

Q.   Was she employed in the EPMO division?

A.   I don't know if she was ever officially EPMO. I know she worked in compliance and ethics for a period of time and then she transferred -- I know she worked with Anne Gehring, but -- I assume she -- maybe she was assigned to EPMO. I don't know. I don't know where her official division assignment was.

Q.   Did she work for Anne Gehring for a period of time?

A.   I don't know, actually. I don't know if she reported to Anne Gehring or not.

Q.   And did Ms. Oviedo make a complaint about Anne Gehring?

A.   No.

Q.   Were you involved in the investigation of Ms. Lapera's complaint?

Page 684

A. Yes.

Q. During the course of your investigation of Ms. Lapera's complaint, did any employees confirm that Ms. Gehring treated people differently based on their weight?

A. No.

Q. Did any employees that you interviewed indicate that they believed that Ms. Gehring favored slender employees?

A. No. Other than Ms. Lapera. I should --

Q. During this investigation, did any employee corroborate Ms. Lapera's statement that Ms. Gehring seemed to direct most of her criticism about professional appearance towards individuals who the individual perceived as overweight?

MR. WILSON: Objection. Foundation.

JUDGE ROBERTSON: Read the question back. There's something wrong with that question.

BY MR. BRANCH:

Q. During the investigation, did any employees indicate to you or corroborate Ms. Lapera's statement that Ms. Gehring seemed to direct most of

Page 685

her criticisms about professional appearance toward individuals whom this individual perceived as overweight?

JUDGE ROBERTSON: What individual?

MR. BRANCH: The individual who made the statement to her.

MR. WILSON: Your Honor, we haven't seen --

BY MR. BRANCH:

Q. First, did anyone make that statement to you? And then --

JUDGE ROBERTSON: Wait, wait. Hold it, Mr. Wilson. The question is whether anybody corroborated Ms. Lapera's statement that somebody else perceived yet another person as overweight and that Ms. Gehring had treated that person different from the treatment that the other person who regarded this person -- one is lost in the triangulation of that question.

MR. BRANCH: Well, I'll rephrase it.

BY MR. BRANCH:

Q. During your investigation, did any

Page 686

employees corroborate Ms. Lapera's statement that Ms. Gehring seemed to treat overweight employees differently?

MR. WILSON: I'm going to object, Your Honor.

JUDGE ROBERTSON: That's a much simpler question. I'll allow it. Overruled.

THE WITNESS: Can you read back the question? I'm sorry, I lost it.

THE REPORTER: "Question: During your investigation, did any employees corroborate Ms. Lapera's statement that Ms. Gehring seemed to treat overweight employees differently?"

THE WITNESS: That specific statement, no.

BY MR. BRANCH:

Q. During your investigation, did any employees express their opinion that Ms. Gehring treated overweight employees differently?

A. Nobody ever stated to me that Ms. Gehring treated overweight employees differently. That statement was never made to me during the investigation.

Page 687

Q. There is a binder in front of you. I would like to direct your attention to Exhibit 249.

A. Yes.

Q. After you received Ms. Lapera's complaint, did you conduct an investigation?

A. Yes.

Q. And did you interview individuals who reported to -- who worked on the EPMO team as part of your investigation?

A. Yes.

Q. Did you interview Jim Tomasello?

A. Yes.

Q. And did you conduct that interview on or about March 24th, 2014?

A. Yes.

Q. Are these your notes from that interview?

A. Yes.

Q. Did you question Mr. Tomasello about the calibration session for 2012?

A. Yes.

Q. And the first note -- would you read your first note there?

7 (Pages 684 to 687)

Arbitration Day 4                                                November 6, 2014
Washington, D.C.

Page 688

A.   Sure. "He recalled the November 2012 calibration session, remembers Ana Lapera unhappy with the rating of a particular person."

Q.   And was that particular person Patricia Brumbaugh?

A.   He couldn't recall who the person was. I think he subsequently called back and said -- yes, it's down here on the bottom. He couldn't recall, when I initially interviewed him, who the person whose rating Ana Lapera was unhappy with, but then he called back, as you can see on the note on the bottom, and said the individual on the team was Patricia Brumbaugh.

Q.   And I guess the third entry down, will you read your third entry?

A.   Yes. "He could not recall Anne Gehring making any specific comments about weight, but his impression was she was generally more positive about women who were slender and well dressed."

MR. WILSON: Objection. Relevance.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Page 689

Q.   Did you also discuss with him the image consultant workshop?

A.   Yes.

Q.   And did he indicate to you that he believed the workshop was all about appearance and not skills?

A.   Yes.

Q.   And did he also inform you that Ms. Gehring had a tendency to make inappropriate comments?

A.   Yes, he said that.

Q.   And the quote is, it looks like, "God knows what will come out of her mouth"?

A.   Yes.

Q.   What are your notes following that comment?

A.   Yes. It was his impression that she created a negative morale around the team, did not seem to value strong performers, not based on pure merit. She frequently talked about a lack of leadership, lack of executive presence.

So from his perspective, what he said to

Page 690

me and what a lot of people said to me, is that Anne Gehring valued leadership and executive presence more than she valued technical skill. Some people appreciated that; some people didn't appreciate that. He did not appreciate that.

Q.   And then there is an entry that I believe says, "Believe affected her impression of K. Keller"?

A.   Yes.

Q.   Would you read that entry, please?

A.   Yes. So he said that because of Anne Gehring's focus on executive presence, the ability to communicate with senior leadership, the leadership skills that he was focused on --

Q.   Wait, I'm sorry, are you reading --

A.   No, that's what follows. You're asking me what follows. So this is a comment that follows from what he was saying. He was having a discussion about what Anne Gehring valued. "Anne Gehring valued leadership and executive presence more than she valued technical skills," and he said he believes that affected her impression of Kathy Keller because, you know, Kathy --

Page 691

Q.   What's the rest of the situation?

A.   Yes. "Jim Tomasello believed that Kathy Keller was a strong performer technically, but Anne Gehring did not like her out of the box," because of her lack of executive presence and her lack of leadership skills.

Q.   That's not in your notes, right?

A.   No, but that's what follows. That's the summary of what I said.

Q.   And did you also interview Melissa Werner as part of your investigation?

A.   I did.

Q.   Let's turn to Exhibit 247.

A.   Okay.

Q.   Are these your interview notes?

A.   Yes.

Q.   Your first entry looks like it says, "Recruiting hat - worried about this one"?

A.   Yes.

Q.   What does that mean?

A.   Yes. She was concerned, Melissa Werner, because she had a panel -- as I recall her stating,

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4

Washington, D.C.

November 6, 2014

Page 692

she had a panel of candidates for this particular position, and then late in the game, a second person was entered into it, Nicola Fraser, who was a vice president at the time at Fannie Mae. And what Melissa Werner told me was she doesn't like it when people come late to the interview process. And so she was very focused on this one and so she discussed why she recalled it more specifically than she did other officer recruitment issues.

Q. Is that something that your office would typically investigate, an interview for a vacant position where you have a closing date and people are added after the closing date?

A. No, absolutely not. That happens all the time.

Q. Well, the question is whether your office would investigate --

A. No, not in and of itself. That fact pattern would not warrant an investigation.

Q. And what's the next comment?

A. Yes. It says, "Anne Gehring is a little off the wall. She's very emotional in her reactions.

Page 693

Very emotional." She said Ana Lapera not ready. Needs to work on her executive presence. Nothing good on the interpersonal presentation to the operating committee and the management committee." She had mentioned that Anne Gehring had mentioned to her that Ana Lapera did not present --

Q. Wait, I'm just asking you what you --

A. Okay. So it's very vague, so I could give you context, but I'll just read what I wrote.

Q. Okay.

A. "Nothing on the interpersonal presentations for operating committee and management committee. Seemed very reactive."

Q. And when you say "seemed very reactive," is that Ms. Werner's comment or what does that mean, "seemed very reactive"? Who are you referring to?

A. I think that was what Melissa Werner said that Anne Gehring said about Ana Lapera in terms of her presentations to the operating committee and management committee, but I'm not sure. I don't remember exactly.

Q. And what's your next entry?

Page 694

A. "Anne Gehring" -- I don't know what that word is actually. "Quick personal judgments, not always rational or objective. Anne Gehring said nothing to her about weight, appearance or race. Anne Gehring said Ana Lapera not ready for the job. Doesn't make her feel good." And she was talking, then, about her presentations to operating committee and management committee. That was what that comment was about.

Q. And then the next portion is redacted. Do you know what was written there?

MR. WILSON: Objection. Privilege. We have redacted it with privilege. We put it on a privilege log months ago.

MR. BRANCH: There's no privilege. She's not an attorney.

MR. WILSON: She's an officer of the company. I can represent to you it was a statement made about a communication with legal counsel for Ms. Werner.

MR. BRANCH: I would request that the Court take a look at this entry to make that

Page 695

determination.

JUDGE ROBERTSON: Too late in the day for that. Denied.

BY MR. BRANCH:

Q. Two lines down, there is a reference to MW. What's the entry there?

A. Yes. "So Melissa Werner draws the line on any biases or any inappropriate comments during" --

Q. I'm sorry, wait, above that line.

A. Oh. "Melissa Werner also aware of other litigation by other parties against AG."

Q. Now, is that what Ms. Werner told you?

A. That's what she said.

Q. Did she indicate who was involved in the other litigation against Ms. Gehring?

A. No. She had no idea. She could give me no specifics about this.

Q. All right. And then there is a line that starts with, "AG." It looks like "very high energy"?

A. Yes.

Q. What's your comment there?

A. Well, what I wrote down is she said that

9 (Pages 692 to 695)

Arbitration Day 4                                                                November 6, 2014
Washington, D.C.

Page 696

Anne Gehring had very high energy.

Q.   And I'm sorry, the complete statement?

A.   Okay. "Anne Gehring had very high energy, said no way in hell get it." I don't know what that -- "because not ready."

Q.   Is that referencing John Hickman on the bottom line?

A.   I don't recall.

Q.   Okay. Well, what's the following line?

A.   "Also" --

Q.   Is that applied?

A.   "Applied," yeah. "Also applied," thank you. "Also applied John Hickman - declined. No policy requirements. John Hickman conversation. No one else on decision raised issues."

Q.   I'm sorry, so what does that mean?

A.   So I was asking her who had been declined or who had they discussed declining and I think she brought up John Hickman and she said he was declined because he didn't meet the policy requirements. She remembered a conversation with Anne Gehring about the fact that she was going to decline John Hickman.

Page 697

Q.   Well, it says, "Declined no policy requirements."

A.   Right. In that he didn't meet the policy requirements. That's what I remember her -- I remember Werner saying that.

Q.   Now that you've had a chance to review that, does that refresh your memory on what the line before means when it says, "No way he'll get it"?

A.   No.

Q.   Was that referring to Mr. Hickman?

A.   Might have been. I don't remember.

I remember I was discussing with her the application process and we were going over the candidates and I asked her what she recalled Anne Gehring saying about any of the candidates. And she specifically said that Anne Gehring said, you know, she had a high energy approach and said, you know, there was no way in hell this one person would get it because they weren't ready, but I don't remember who that was referring to. It might have been Hickman. It might have been someone else that she decided -- there was apparently a group, as I say down here, of

Page 698

10 to 11 candidates and there were some that she said weren't going to get it because they were a manager and they were applying for this particular VP slot. So no way in hell would they get it.

Q.   So you believe your comment here is no way in hell he'll get it?

A.   I believe that she said that -- I asked her what specifically she recalled Anne Gehring saying about any of the candidates who applied for this particular position. And she said she recalled, as I remember the conversation, that knowing how would a particular person get it because they weren't ready. She was using that as a demonstration of Anne Gehring's high energy way of phrasing things. That's how Melissa Werner referred to it. And I don't remember which of the 10 to 11 candidates for this position Anne Gehring used that phraseology. Melissa Werner was using it as an example to me of the types of comments that Anne Gehring would make when she said she's high energy, she's emotional and those kinds of things. So Melissa Werner was trying to give me some examples because I asked for them.

Page 699

Q.   And what's the next comment?

A.   Where?

Q.   "Behind the scenes conversations."

A.   Yes. So again, going back up to this first one, Melissa Werner --

Q.   Just the comment.

A.   It says, "Behind the scene conversation, Nicola Fraser became candidate." So Melissa Werner was not involved in these conversations, but at some point in time Nicola Fraser became a candidate for this particular position.

Q.   And did you also interview Deborah, looks like, Rosenberg for the position?

A.   Yes.

Q.   I'm sorry, for the investigation.

A.   Yes.

Q.   Okay. Who's Deborah Rosenberg?

A.   Deborah Rosenberg was a person who worked with EPMO. She's, I think, assigned to human resources. But the reason I interviewed her is she, I think, was part of the calibration session or was identified by Ms. Lapera as being part of the

10  (Pages 696 to 699)

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 4                                                                    November 6, 2014

Washington, D.C.

Page 708

A.   About 13 and a half years.

Q.   And how old are you, Mr. Tomasello?

A.   Forty-four.

Q.   Your date of birth is?

A.   10/12/70.

Q.   And what is your current position?

A.   I'm director of program management under the front end initiative.

Q.   What position did you hold in 2012?

A.   Director of the EPMO for program execution or portfolio execution.

Q.   What's EPMO?

A.   Enterprise Program Management -- Project Management Office.

Q.   When did you begin working in that office?

A.   September 2012.

Q.   Who did you report to in September 2012?

A.   Actually, can I correct that?

Q.   Sure.

A.   It was September 2011 that I started.

Q.   Started there?

A.   Yes.  And at that time I worked for Carmen

Page 709

Aviedo.  And I can answer the original question, which was 2012 and that was Anne Gehring.

Q.   Okay.  So how long did you work for Carmen Oviedo?

A.   About eight months.

Q.   When did she no longer serve as your supervisor?

A.   Around May.  And then we started reporting to Pascal Boillat.

Q.   And was Ms. Oviedo still in the department at the time?

A.   No.

Q.   What became of her?

A.   She moved on to the securitization effort, running EPMO.

Q.   Do you recall when she moved to securitization?

A.   Around the May time frame.

Q.   And are you familiar with Anne Gehring?

A.   Yes.

Q.   And what was Ms. Gehring's role in this May 2012 time frame?

Page 710

A.   She was head of the Financial Planning and Analysis group, FP&A.

Q.   And at some point, did she and Pascal Boillat serve kind of -- well, serve as co-managers for that department?

A.   There might have been a period of time when they were co-managing it.

Q.   Do you recall what that period of time was?

A.   I don't know the total elapsed time that it was, but it wasn't for long.

Q.   Was it in 2012?

A.   Yes.

Q.   And so as of September 2012, who were you reporting to?

A.   Anne Gehring.

Q.   And was she the SVP for EPMO?

A.   She was.

Q.   And did you have direct reports?

A.   Yes.  Underneath me?

Q.   Yes.

A.   I did.

Page 711

Q.   Did you attend weekly staff meetings with Anne Gehring?

A.   Yes.

Q.   And who else would be present at those weekly staff meetings?

A.   Directors across the EPMO, Enterprise Project Management Office, Anne's directs.

Q.   Approximately how many people?

A.   Eight.

Q.   During Ms. Gehring's staff meetings, was it essentially limited to the leadership team within EPMO?

A.   Yes.

Q.   And were employees encouraged to speak honestly and openly about issues or concerns?

A.   "Encouraged" is a strong word.  Probably not encouraged, but they did.

Q.   Do you recall Ms. Lapera making statements during those staff meetings?

A.   Yes.

Q.   When Ms. Lapera did speak during those staff meetings, were her comments appropriate for the

13  (Pages 708 to 711)

Page 712

audience?

A.   Absolutely.

Q.   Were her comments clear?

A.   Yes.

MR. WILSON:  Objection to relevance, Your Honor.

JUDGE ROBERTSON:  Overruled.

BY MR. BRANCH:

Q.   Let me ask this another way.  Was there anything inappropriate about her comments in those staff meetings?

MR. WILSON:  Same objection.

JUDGE ROBERTSON:  We're asking for this witness' belief and understanding.  Overruled.

THE WITNESS:  Nothing inappropriate.

BY MR. BRANCH:

Q.   Was there anything different from Ms. Lapera's comments -- well, let me ask:  Were Ms. Lapera's comments any different from the types of comments made by other directors in those meetings?

A.   No.

Q.   And did you attend these staff meetings

Page 713

starting in September under Ms. Gehring in 2012 until sometime in 2013, when she was no longer there?

A.   Yes.

Q.   And during the time period when you attended these meetings over that period from September 2012 until sometime in 2013, were there any occasions where Ms. Lapera made comments that were inappropriate?

A.   No.

Q.   Do you recall being interviewed by Leslie Arrington as part of an investigation of a complaint made to the Office of Compliance and Ethics?

A.   Yes.

Q.   Did Ms. Gehring make any comments in any of those staff meetings that you believe were inappropriate?

A.   Anne often made comments that were probably inappropriate, but I don't remember any specific in that staff meeting.

Q.   What type of comments would she make that were inappropriate in these meetings?

A.   I mean, I'm going to generalize because I

Page 714

don't remember specific examples, but profanity, reference to other folks at varying levels of the organization as being less than smart.  You know, very critical of others outside the EPMO.  But I can't recollect specific examples.  I mean, I heard lots of profanity while I worked for her.

Q.   What was Ms. Gehring's attitude toward the personal appearance of employees?

A.   In general?

Q.   Yes.

A.   So the term "executive presence" was a theme that she beat the drum on regularly and, really, from the beginning of the time that she was over the EPMO.  It was a bar that she never really explained but was talked about, you know, being able to be put in front of executives and basically evaluated people based off of that.

We as a group were sent to an image training session where a consultant was brought in to speak specifically about what executive presence meant and what it would take for individuals to, in addition to delivering results, would have to exude

Page 715

to be able to be considered, you know, for promotion or a well-performing employee.

Q.   And what was the emphasis on at that image consulting session?

A.   Aesthetics.  Mostly, you know, not delivering results but, you know, wear a coat, wear a suit and tie if you're a man, make sure you have well-pressed clothes, your hair combed, wear the proper level of makeup.  How you present yourself is a big contributor to how you're thought of.  And all around this concept of executive presence.

Q.   Was it your belief that Ms. Gehring was generally more positive about women who were slender and well dressed?

A.   Is it my opinion?

Q.   Yes.

A.   The observation that I made was that she never made any derogatory comments about slender and well-dressed women.  I mean, I don't have an opinion.

Q.   And when you say she didn't make derogatory comments about slender and well-dressed women, as compared to something else?

Page 724

Q.  Mr. Tomasello, thanks for being here this morning and taking time out of your workday.

I want to take you back to the calibration sessions and the discussion about Patricia Brumbaugh that you were testifying to about on direct.  Did Ms. Gehring say anything about Patricia Brumbaugh being overweight?

A.  No.

Q.  Did she say anything about Patricia Brumbaugh being fat?

A.  No.

Q.  Did you ever observe Ms. Gehring do or say anything to Ms. Lapera about Ms. Lapera's race, ethnicity or personal or physical appearance?

A.  Not personally, no.  I did not observe that.

Q.  And did Anne Gehring treat you unfairly?

A.  I was never unfairly treated.

MR. WILSON:  No more questions, Your Honor.

JUDGE ROBERTSON:  Thank you, Mr. Tomasello.  You're excused.

Page 725

THE WITNESS:  Thank you.

(Mr. Tomasello exits the arbitration room.)

MR. BRANCH:  Joe, do you have a witness?

MR. WILSON:  We have a witness lined up, a Fannie Mae employee who deals with pension issues, Your Honor.  She would discuss -- and she's going to testify remotely because she works out of Wisconsin.  She would explain to everyone how Ms. Lapera's pension hasn't been reduced.  Just the payments are now less because she retired earlier than if she had waited until she was 62, but she would get the same amount of money or probably, by taking early payments, maybe even get more.  Okay?

We have a letter to that effect from another of Fannie Mae's people who do pension work for the company.  If you'll allow that exhibit, which is 270, into evidence, we don't need to call the witness and we could be done here.  I mean, we have the witness on to go at 1:30.

MR. BRANCH:  Your Honor, I do need Ms. Lapera here to respond to that.

Page 726

JUDGE ROBERTSON:  Yes, I'm looking at the letter.

MR. WILSON:  Your Honor, if I can, I don't know how far you're into the letter, but I think on page 2, the second-to-last paragraph --

JUDGE ROBERTSON:  I've read the letter.

MR. WILSON:  Okay.

JUDGE ROBERTSON:  Mr. Branch, it's a fairly self-evident proposition that -- I mean, we might as well put this on the record.

There is a big dispute, and I remember doing it myself when I turned a certain age, and the question was do I start collecting my Social Security now or wait longer and the issue is do you get more when you're younger, but if you live longer, you get more.  You know, this is a very small issue in the case.  Do you have an objection to the receipt of that letter, Exhibit 270?

MR. BRANCH:  Your Honor, may I have just one minute with my client?

JUDGE ROBERTSON:  Of course.  In fact, why don't we just take a 10-minute break.

Page 727

MR. WILSON:  Thank you, Your Honor.

(Recess.)

JUDGE ROBERTSON:  All right.  Mr. Branch, I think the ball is in your court.  What are we going to do with Exhibit 270?

MR. BRANCH:  Your Honor, our position is we would prefer to be able to cross-examine the witness on the document, but what we will do is just offer Ms. Lapera as a witness to respond or to rebut the information that's on the document.  So if you want to submit it or offer it, and we'll have someone to testify.  We're not in agreement with that, but we're prepared to just respond to it.

JUDGE ROBERTSON:  Okay.  Then Exhibit 270 is received.  Is there anything further from Fannie Mae?

MR. WILSON:  No, Your Honor.

JUDGE ROBERTSON:  Mr. Branch, is there any rebuttal?  And I gather that what you want to do is put Ms. Lapera back on the stand to testify about that letter or about whatever?

MR. BRANCH:  That's correct, Your Honor.

Page 728

Your Honor, we have two additional exhibits that we're going to offer.

JUDGE ROBERTSON: Fine. Please proceed. Ms. Lapera, let's regard you as still under oath, okay?

THE WITNESS: I am.

JUDGE ROBERTSON: When you're ready, Mr. Branch.

MR. WILSON: Your Honor, these weren't produced during discovery so I'm going to object.

MR. BRANCH: It's rebuttal.

MR. WILSON: Same objection.

JUDGE ROBERTSON: Well, let's see what they are first.

Whereupon,

ANA CRISTINA LAPERA, was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q. Well, first, Ms. Lapera, there was some

Page 729

testimony from Ms. Gehring that she did not know who Carmen Oviedo was and had no interactions with her. Do you recall that?

A. Yes. I think she knew who she was, but she didn't know the role she played in the EPMO or the CIPO.

Q. Okay. So is that a true statement?

A. No.

Q. And what is the basis for your belief that is not a true statement?

A. Because during the -- either during the period that Pascal and Anne jointly had management of the EPMO or CIPO, however it was called at that time, and Anne decided that it was time for Carmen to go, she did a realignment of responsibilities. And when Anne got in, there were two vice presidents, Kathy Keller and Carmen Oviedo. And one of the first things that Anne did was to consolidate the responsibilities for planning under Kathy Keller and then Carmen was moved to securitization and the position for execution was left vacant for a while, which was eventually offered to Mike Choi.

Page 730

Q. All right. Turn to Defendant's Exhibit 40. Are you there?

A. Yes, I am.

Q. And what is this document?

A. This is an e-mail from Shandell Harris to the compensation department who is responsible for approving the final position. And in here, Shandell kind of like --

MR. WILSON: Objection, Your Honor. Ms. Lapera is not on this document. She is commenting about an e-mail that someone else wrote.

MR. BRANCH: This is your business record that you produced as your exhibit.

MR. WILSON: It's our exhibit. We produced it. It doesn't mean it's fair for this witness to comment on what someone else is saying.

JUDGE ROBERTSON: I'm going to hear her. Overruled. Proceed.

THE WITNESS: So in the e-mail, as you can see, Shandell is describing the changes that Anne did after she took over the EPMO and how the organization was restructured quite differently. And it's just

Page 731

what I just said, that there were two vice presidents, which Anne alluded to, but she couldn't remember who the other vice president was yesterday. And in here, it's very clear that the two VPs were Kathy Keller and Carmen Oviedo, but that there was no centralized planning, so she was restructuring. So Kathy will lead planning and this is when Carmen was shipped out to securitization.

BY MR. BRANCH:

Q. What's the final sentence in that paragraph, final two sentences?

A. "Anne will be looking to post"?

Q. No, in that paragraph, the first paragraph.

A. "This structure did not account for central accountability for project execution and planning. Anne has combined planning and execution under one VP, Mike Choi. Kathy has been leading planning. This is the role that will soon be open." And this is May 17th and Kathy left on May 30th.

Q. There was some testimony from -- well, let me just ask you the question. In 2011, when you

18  (Pages 728 to 731)