# Exhibit B

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| **ANA LAPERA** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:15-cv-00447-BAH** |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE** | ) | **Judge Beryl A. Howell** |
| **ASSOCIATION d/b/a FANNIE MAE** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**<u>SWORN DECLARATION OF ANA LAPERA</u>**

I, Ana Lapera, hereby declare and state as follows:

1.    I am over the age of 18.  All statements in this Declaration are based on my personal knowledge and information.  I submit this Declaration in support of Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant Fannie Mae's Motion for Summary Judgment.

2.    I am a Hispanic female who was born in 1958 and was 55 years old in 2013, and I have a body size which may be perceived by some as being overweight.

3.    I worked at Fannie Mae for almost twenty years from January 1994 through November 1, 2013.

4.    During my approximately twenty years of service with Fannie Mae, I was consistently awarded performance ratings of "Exceeds Expectations" or higher.  I earned a Gold Belt from Six Sigma Academy in 2007, which includes a Black Belt education, plus training in Change Management.  I received frequent commendations and accolades for my

1

exceptional performance and unique contributions.  For instance, I was selected to be a representative for the Technology Compensation Advisory Group from 2003 to 2005, the Vice President of Internal Affairs of the Hispanic Employee Network Group from March 2008 to 2009, and a speaker and facilitator for the 2009 "Mentoring Circles" program.  I worked with the Process Improvement Strategy team since its inception, earned a Black Belt certification, and I was instrumental in establishing the Multiyear Investment Plan.

5.    I was selected to manage the new Lean Six Sigma team in 2009, and performed the duties of Director of Lean Six Sigma through the end of my employment with Fannie Mae.

6.    I worked side-by-side with two other Fannie Mae team leaders, Ted Carter (African American) and Michael MacFarland (Caucasian), to manage the organization of Fannie Mae's operations.  Mr. Carter was responsible for the operational risk side; Mr. MacFarland was responsible for the business architecture side; and I was responsible for the process improvement side.  These three teams worked in an integrated fashion and Mr. Carter leveraged the results of mine and Mr. MacFarland's teams to assess operational risk. My job was very similar to Mr. Carter's and Mr. MacFarland's positions, they had the same scope, breadth, and reach inside the company, and managed similar sized teams, but focused on different functions of Fannie Mae's operations.  I managed the largest of these three teams.  Mr. Carter and I both reported to Claude Wade.

7.    In June 2009, Fannie Mae announced a restructuring of salary scales using an A-Z scale, whereby the most prestigious, demanding and highly compensated positions were classified by letters in the alphabet.  Pursuant to this restructuring, I received notice that my position, Director of Lean Six Sigma, would be reclassified on August 16, 2009 from a "6"

2

salary grade to an "M" salary grade under the new structure, even though my duties and responsibilities would remain the same.

8.      The position of Director of Lean Six Sigma should have been classified as an "N," rather than an "M," in light of the demanding duties of this position, my consistently exemplary performance, and the classifications of similar positions, such as Directors of Project Management.  All of my peers in these type of corporate functions were classified under an "N" salary grade.  For example, Mr. Carter and Mr. MacFarland's positions, which were very similar to my position, were re-classified as level "N" positions.  Two of my direct reports were Directors, including Farley Price, who had an "M" rating and Dan Cousino, who had an "L" rating.  Other specific examples include Lea Nicotra (Caucasian, early 30s, slender), Jim Tomasello (Caucasian, late 40s, overweight), and Keith Smith (African American, mid to late 40s, slender), who were assigned significantly less responsibility than me, and were classified under an "N" salary grade.

9.      On July 18, 2009, I emailed Claude Wade (African American male, 45 years old, not overweight), the Senior Vice President of Operations Risk and Process Excellence and my manager at that time, challenging the classification of my position as an "M."  Mr. Wade denied my challenge to the salary grade of my position.  In April 2011, I again challenged the classification of my position at an "M" salary grade.  My challenge was denied on April 26, 2011.  Despite my requests for a reclassification of my position, my grade remained "M" through early 2012.

10.      The classification of my position as an "M" significantly limited my potential for salary increases and, consequently, pension benefits, because my salary as Director of Lean Six Sigma was near the top of the "M" salary scale.  The salary range for an "M" was

3

$112,000 to $194,000, whereas the salary range for an "N" was $129,000 to $222,000. Further, my bonus potential, at an "M" salary grade was 20 percent of my annual salary. My bonus potential as an "N" would have been 35 percent of my annual salary.

11.    In February 2012, my manager, Ms. Keller, resubmitted my request for my position to be reclassified as an "N."  In response to Ms. Keller's request, on February 26, 2012, my position was reclassified as an "N" and my position title was changed to Director of Process Improvement Strategy.  The reclassification was not the result of any change in my position because my responsibilities were the same and I had the same number of direct reports in 2012 as in 2009.  Moreover, I did not provide any information in this request for reclassification that I had not provided to the compensation department and Human Resources in 2009 and March 2011.  I did not receive an increase in salary at this time, and the duties and responsibilities of my position were not changed pursuant to the reclassification.  Following the reclassification, I received a $48,772 bonus and Long Term Incentive (LTI) totaling $24,022.

12.    I believe that I was discriminated against with regards to my pay when Fannie Mae's failed to classify my position, Director of Lean Six Sigma, as a level "N" position, as opposed to a level "M" position, between August 16, 2009 and February 26, 2012.

13.    Fannie Mae underwent a change in leadership in September 2012, and Anne Gehring (Caucasian, approximately 50 years old, slender) was appointed the EPMO Senior Vice President.

14.    Ms. Gehring immediately began to target employees who did not meet her standard of an ideal personal appearance, which was Caucasian, young, and slender.  She forced out a Hispanic female, Carmen Oviedo, who reported to her from her senior level

position and replaced her with Mike Choi. She expressed dissatisfaction with the personal appearance and dress of the EPMO team and frequently stated that members of the EPMO team had to maintain a "sharp appearance." Ms. Gehring said that she only wanted people working in the EPMO that have the appearance of a business consultant, even though the Fannie Mae's dress code was business casual.

15.    In September 2012, Ms. Gehring began to criticize the appearance of Blythe Neumiller (Caucasian, 60s, overweight) and Patricia Brumbaugh (Caucasian, mid 40s, overweight). Ms. Gehring began to regularly use Ms. Neumiller and Ms. Brumbaugh as examples of employees who did not "fit the team's image." On a number of occasions, she referred to Ms. Neumiller and Ms. Brumbaugh as "these people" and criticized "the way they conduct[ed] themselves", "the way they s[a]t", and the way "their tummies sometimes show[ed]."

16.    Ms. Gehring used the term "executive presence" as a euphemism for the appearance of employees who were minorities, older, and overweight. She consistently characterized employees who were not Caucasian, young, and slender as lacking "executive presence." Ms. Gehring has indicated that Ms. Brumbaugh and Ms. Neumiller lack "executive presence."

17.    In October 2012, Ms. Gehring required the EPMO staff to attend a mandatory class on improving one's "image." During this meeting, an image consultant provided fashion advice to the EPMO staff, such as stating that female employees should always wear makeup and eye makeup and should never wear perfume, and female employees with gray hair should always dye their hair and roots. The image consultant also stated that employees should refrain from wearing colors that clash with their skin color.

5

18.    After this meeting, Ms. Brumbaugh and Dina Purcell (African American, 30s, overweight) told me they were concerned that their physical appearance would negatively impact their careers.

19.    Managers held yearly calibration sessions to discuss their suggested performance ratings of their subordinates and to calibrate all performance ratings in the EPMO to fit a curve.  During the calibration session in December 2012, I rated my team appropriately on a curve, and requested Ms. Braumbaugh be rated as a two because of the amazing deliverables that she produced in that year.  Ms. Gehring agreed that Ms. Braumbaugh's work was outstanding and that she had done a fantastic job in 2012, but said that Ms. Braumbaugh did not have "executive presence" and that Ms. Braumbaugh did not have the "look" Ms. Gehring wanted her team members to have.  Ms. Gehring spent an inordinate amount of time discussing Ms. Brumbaugh's appearance, stating that she did not like the way Ms. Brumbaugh dressed or the way she looked.  Ms. Gehring downgraded Ms. Brumbaugh's performance rating from "Exceeds Expectations" to "Meets Expectations."

20.    In addition, during the December 2012 calibration meeting, Ms. Gehring stated as long as Shirley Cruz Rodriguez has a Hispanic accent, she would not be able to progress or obtain any promotion at Fannie Mae.

21.    In April 2013, I was present in a meeting with Ms. Gehring and Ms. Keller when Ms. Gehring commented about exercising and Ms. Keller's personal appearance. Ms. Keller told Ms. Gehring that God had made her short and fat and that there was nothing she could do about it, especially considering that she already had her clothes tailored to fit her.  Ms. Gehring did not deny that her issue with Keller's appearance was her weight, but

responded that she also used to be overweight and could help Ms. Keller. Then, Ms. Gehring turned and addressed me and said I could look better too.

22.    Shortly thereafter, Ms. Keller told me she was being forced from her position at Fannie Mae.

23.    On June 3, 2013, Fannie Mae solicited applications for Ms. Keller's prior position, the Vice President of EPMO-Planning. I applied for the position of Vice President of EPMO-Planning and Alignment before the June 10, 2013 deadline.

24.    I was notified on July 11, 2013 that I was one of three individuals who had been selected to interview for the open position. Nicola Fraser (Caucasian, 40s, not overweight), and Joseph Hallet (Caucasian, early 30s, not overweight) were also selected to interview for the position.

25.    I was scheduled for multiple interviews on Monday, July 15, 2013. During my interview with Ms. Gehring, she stated that I was a valuable member of the team who had done "a fantastic job turning around the Business Architecture Department." Ms. Gehring said she would announce the new Vice President on Friday, July 19, 2013, only four days after the interviews.

26.    Shandell Harris (African American female, mid 40s, slender) interviewed me and indicated that my only weakness in my leadership skills was my lack of "executive presence." Ms. Harris also declared that Ms. Gehring would announce her selection for the Vice President of EPMO-Planning and Alignment on Friday, July 19, 2013.

27.    The process for promoting a Fannie Mae employee to the position of Vice President that takes longer than one week to complete. Ms. Fraser was the only candidate for the position who could have been promoted within one week of her interview.

7

28. On Thursday, July 18, 2013, Ms. Gehring requested a meeting with me and informed me that Ms. Fraser had been selected for the position of Vice President of Planning and Alignment. She said that I was a strong candidate for the position but my sole weakness was my "executive presence." I responded that I already knew that Ms. Fraser would be selected for the position because Ms. Gehring and Ms. Harris had declared that the announcement of their selection would take place on Friday, July 19, 2013. Ms. Gehring did not deny this charge and, instead, said that I was "very perceptive." I relayed my concerns that Ms. Fraser's inexperience would make it very difficult for her to understand the needs of the EPMO Planning and Alignment staff. Ms. Gehring acknowledged Ms. Fraser's inexperience and suggested that I should not worry because I would train and teach Ms. Fraser. Ms. Gehring also informed me that I would love working for Ms. Fraser because she was young, energetic, and full of ideas.

29. Ms. Fraser was significantly less qualified for the position of Vice President of EPMO-Planning and Alignment than me because I had worked with the EPMO team since its inception and excelled as the Director of Process Improvement Strategy. In contrast, Ms. Fraser had no background in Process Improvement or Business Architecture, even though 80 percent of the staff in the Planning and Alignment team works in these areas. Also, Ms. Fraser's management experience was obtained from working with a significantly smaller and more junior team than my team. While Ms. Fraser had only three direct reports, my team was comprised of twenty-four of the thirty individuals in the EPMO Planning and Alignment team in 2013.

30. Ms. Gehring announced on Friday, July 19, 2013 that Ms. Fraser had been selected for the position of Vice President of EPMO-Planning and Alignment. Ms. Fraser

8

remained in the position for less than twelve months before she transferred to a new position.

31.     On August 7, 2013, Ms. Gehring met with me to issue my midyear review and invited Ms. Fraser to attend the meeting.  Ms. Gehring declared that I was a top performer and a "rock star" and commended me for transferring Ms. Neumiller because Ms. Gehring "couldn't ever see [Ms. Neumiller] conforming to the team's image."  Ms. Gehring stated that my only weakness was my "executive presence," even though I always dressed in an undeniably professional manner based on Fannie Mae's dress code.

I hereby certify under penalty of perjury that the foregoing statements in this sworn declaration are true and correct.

_____                          __November 12, 2015_____
Ana Lapera                                                Date

10