# Exhibit T

Filed 8/26/14  Carter v. Fannie Mae CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CECELIA CARTER,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FANNIE MAE,<br><br>    Defendant and Appellant. | G049112<br><br>(Super. Ct. No. 30-2013-00647896)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Robert J. Moss, Judge.  Affirmed.

Sidley Austin, Wendy M. Lazerson, Michelle B. Goodman and Leah E. Abeles for Defendant and Appellant.

Bernnabei & Wachtel, Lynne Bernabei, Peter M. Whelan; Helmer Friedman, Andrew H. Friedman and Andrea K. Loveless for Plaintiff and Respondent.

\*          \*          \*

## I. INTRODUCTION

Plaintiff Cecelia Carter has sued her former employer, Federal National Mortgage Association (Fannie Mae), for whistleblower retaliation. She claims Fannie Mae fired her because she reported to Fannie Mae investigators that managers in its Irvine office were soliciting and receiving kickbacks from outside brokers seeking Fannie Mae business in disposing of foreclosed properties. Fannie Mae responded with a motion to compel arbitration, asserting Carter agreed to arbitration of her retaliation claim. As we explain below, while Carter and Fannie Mae did, indeed, have an implied-in-fact contract requiring her to arbitrate her claim, that contract cannot be enforced because it exempts the kind of claims that Fannie Mae is likely to bring against employees, such as trade secret claims. (See *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167 [arbitration agreement which exempted claims that employer is likely to bring against employee held substantively unconscionable].) Accordingly, we affirm the trial court's order denying Fannie Mae's motion to compel arbitration.

## II. FACTS

Cecelia Carter applied to Fannie Mae on July 27, 2008, using a pre-printed Fannie Mae employment application form. At the end of the form there were a number of fine-print "declarations" just before Carter's signature line. The fourth such declaration said: "I acknowledge that, as a condition of employment, all Fannie Mae employees must agree to be bound by Fannie Mae's Dispute Resolution Policy, which requires that *certain employment-related claims* be submitted to arbitration before a suit can be brought on them in court. A copy of the Dispute Resolution Policy will be produced at such time, if any, that an offer of employment is made." (Italics added.)

The next event was an email from Melissa Warner of Fannie Mae to Carter on August 19, 2008. When the email was sent, Warner and Carter were speaking to each other on the telephone. The email itself is not part of our record, but it had an attachment

2

— and only one attachment — which contained a formal letter offering Carter employment, also dated August 19, 2008.

The two-page, single-spaced letter of August 19, 2008, attached to the email is too long to quote in its entirety, but we can quote the several provisions which are germane to this appeal. The second paragraph of the letter had clear contingency language, so in no way could the offer be considered unconditional: "This offer of employment is contingent upon your successful completion of the drug screen, background investigation, and, if applicable, credit check, which are discussed below." And, in the fifth paragraph, the letter said both (a) it was "not a contract" *and* (b) by accepting "this employment," the recipient would be accepting Fannie Mae's dispute resolution policy and would agree to be "bound by its terms and conditions, which may change from time to time."

We reproduce the entirety of the fifth paragraph of the letter in the margin.[1] Significantly, the fifth paragraph said a copy of the dispute resolution policy was enclosed with the letter. But it wasn't. As mentioned, the letter itself was the sole attachment to the email.

Three days later, on August 22, someone from a firm known as "Verifications, Inc." telephoned Carter to say there was a "problem" with her credit report but did not otherwise indicate what the problem was. Carter called Warner, who then directed Carter to Dennis Truskey at Fannie Mae, but Carter was unable to reach him immediately. Finally, on August 27, Truskey telephoned Carter to say that because

---

[1]     "This offer of employment is not a contract. Your employment with Fannie [*sic*: no Mae] will be *at-will*, which means that you and Fannie Mae separately can terminate your employment at any time, for any reason, with or without cause, and with or without advance notice to each other. By accepting this employment, and all of the benefits that come with this job, you are also accepting Fannie Mae's Dispute Resolution Policy, and agree to be bound by its terms and conditions, which may change from time to time. Fannie Mae's Dispute Resolution Policy requires you and Fannie Mae to submit certain employment-related claims to the mandatory arbitration process for final resolution prior to filing these claims in a court of law. You should read the enclosed copy of the Dispute Resolution Policy and related materials for additional information about this policy and the arbitration process."

Fannie Mae was in federal receivership, it couldn't employ anyone with an outstanding federal tax lien, and Carter had an outstanding federal tax lien. Carter disputed the statement, and asked what credit reporting bureau Truskey had received his information from. Truskey said he'd find out and get back to her.

The next day, August 28, Truskey got back to Carter via a FedEx'ed letter revoking Fannie Mae's offer of employment due to the outstanding federal tax lien.[2] Truskey followed up with a telephone call to Carter to say (a) it was a report from Equifax that showed the tax lien and (b) Fannie Mae was "no longer offering" her employment.[3]

Carter decided to keep on trying. After the bad news from Truskey on August 28, Carter faxed Verifications to inform the company the tax lien had been released. Then, on September 3, Carter was able to speak with Warner on the telephone. The revocation of the offer of employment seemed to be news to Warner, but Carter told Warner that she had faxed documentation to Verifications showing the lien had been released. Warner said "she would look into the matter" and "get back" to Carter.

Two days later, on September 5, 2008, Warner sent an email to Carter saying: "We're all set! Next step is for us to arrange your travel to Dallas to start 9/22." Those words are *all* we have in our record as far as the content of that email.

---

[2]    Carter did not keep the letter, so we only have her word for it. But in substantial evidence review, that's good enough. (See *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208 ["The testimony of a single credible witness – even if a party to the action – may constitute 'substantial evidence.'"].)

[3]    The trial court explicitly found that the earlier offer of employment had been rescinded, and the rescission is necessarily relevant to any decision as to whether Fannie Mae and Carter ever agreed to arbitrate. While the revocation of the offer is buried in a passing reference in Fannie Mae's briefing, it is conspicuously missing in Fannie Mae's statement of facts at the point where one would expect to find it. While we certainly do not think Fannie Mae's counsel has any intention of misleading this court (see *Di Sabatino v. State Bar* (1980) 27 Cal.3d 159, 162-163 ["concealment of material facts is just as misleading as explicit false statements, and accordingly, is misconduct calling for discipline"]), such omissions nevertheless are hardly confidence inspiring. Such omissions suggest that if the court had all the facts, an otherwise viable-looking appeal might be frivolous.

Carter began working for Fannie Mae on September 22, 2008. For the next 20 months or so Carter worked in the "REO" foreclosure section of Fannie Mae's Irvine office. (See *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1176, fn. 2 ["'REO' stands for 'real estate owned' and means a property the bank acquired through foreclosure."].) Her main duties included working with outside real estate brokers to help sell REO properties acquired by Fannie Mae from foreclosure. During her time with Fannie Mae, she allegedly reported to internal Fannie Mae investigators that managers in Fannie Mae's Irvine office were soliciting and receiving kickbacks from various real estate brokers who were the recipients of Fannie Mae's business.

Carter was fired on May 4, 2011, ostensibly for recording a performance review. According to Carter, the real reason for her May 2011 firing was to retaliate against her for reporting the Irvine office kickback scandal. She then brought this civil action for wrongful termination in violation of public policy. Fannie Mae responded with a motion to compel arbitration.

According to Melissa Warner's declaration submitted in conjunction with Fannie Mae's motion to compel arbitration, Fannie Mae has continuously maintained a copy of its dispute resolution policy on its "internal website." Warner also stated that employees could obtain a copy of the policy either from Fannie Mae's human resources department or "their recruiter." The policy itself, submitted by Fannie Mae in connection with its motion to compel, says that it covers "all" claims an employee might make involving a "legally protected right" relating directly or indirectly to the employee's employment, including civil rights or disability claims, are subject to arbitration, but specifically exempts workers' compensation claims, benefit claims, trade secret, breach of trust and fiduciary duty claims. It says: "The policy does not apply to any claim that is filed in court or with the EEOC or any other administrative or fair employment rights agency before the effective date of the Policy. The Policy also does not apply to any claim made in connection with workers' compensation benefits, unemployment

5

compensation benefits, or under any of Fannie Mae's employee welfare benefits, ERISA, or pension plans, *or to any claim of unfair competition, disclosure of trade secrets, or breach of trust or fiduciary duty*." (Italics added.)

The trial court denied the motion to compel. The court noted there was evidence establishing the August 19 offer letter was rescinded, and ruled that Carter's employment was pursuant to an offer made September 5, 2008. And, since there was no evidence the September 5 offer contained an arbitration provision, Carter never actually agreed to arbitration. Fannie Mae now appeals from the order of denial.

### III.  DISCUSSION

A. *The Implied-in-Fact Contract*

First, there can be no doubt that on August 28, when Truskey sent Carter a letter formally revoking Fannie Mae's offer of employment (and then followed up that letter with a phone call), that offer, including the proviso that Carter had to agree to Fannie Mae's dispute resolution policy, was well and truly revoked. That much is clear. "A proposal may be revoked at any time before its acceptance is communicated to the proposer, but not afterwards." (Civ. Code, § 1586; *T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 278.)

It is also reasonably clear that the 17 words – "We're all set!  Next step is for us to arrange your travel to Dallas to start 9/22" – cannot, by themselves, constitute a contract. The words convey no consideration, which is essential for a contract. (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 420-424 [general comments on finding consideration].) The words are a mere expression of things yet to be done. At *most*, the words merely indicate an acceptance by Fannie Mae of some previous request by Carter for employment. But they are devoid of anything remotely involving consideration or terms of employment, and, as we have just noted, when the September 5 email was sent there was no question Fannie Mae's original offer was off the table.

6

And *yet*, there is no question the parties *did* have a contract. Carter worked for Fannie Mae for 21 months; she got paid for her work. She worked during that time under an implied contract. The conduct of the parties, even absent an express agreement, can establish an enforceable contract. "The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." (*Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773.) This court echoed the same idea more recently when we said, "an implied-in-fact contract entails an actual contract, but one manifested in conduct rather than expressed in words." (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 455-456.)

In *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, our Supreme Court explored the *sources* from which the terms of an implied-in-fact contract could be derived. Those sources include an employer's policies, practices, and communications. (*Id.* at p. 680.) Given the entirety of the policies, practices, and communications in this case, one fact seems unavoidable: Despite the laxity of its human resources department in making absolutely sure that Carter actually got a copy of its dispute resolution policy, it is absolutely undisputable Carter was aware of the fact that Fannie Mae wasn't going to hire anybody who did not agree to its dispute resolution policy from the get-go. Moreover, it is also undisputable that Carter knew Fannie Mae's dispute resolution policy entails the arbitration of at least some "employment-related" claims. The point was made clearly in the standard employment application, and reiterated in the formal offer of employment of August 19, though that formal offer was later withdrawn.

The employment application is particularly important, because it set out basic ground rules which would govern any employment with Fannie Mae. And while that employment application was not a contract itself, it is still *evidence* of what the parties agreed to by way of their conduct. (See *Harden v. Maybelline Sales Corp.* (1991) 230 Cal.App.3d 1550, 1556.) Carter knew from her initial contact with Fannie Mae that

7

at least *some* "employment-related claims" were subject to arbitration. (Cf. *Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1508 [plaintiff never would have signed arbitration agreement in any event].) The fact she never received a copy of the full policy doesn't prove she didn't agree to the arbitration of at least some claims; it only proves she didn't know what those kinds of claims were. And Carter could easily have found out precisely what claims were subject to arbitration by simply calling up the human resources department. Arbitration agreements have been upheld where the reference to the actual arbitration agreement is more removed than in this case. In *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 790-791, for example, the preliminary title report referred to the insurance policy but did not refer to the policy's arbitration clause. Nonetheless, the court held there was an enforceable agreement because the policy was "easily available" to plaintiff.

Carter relies on this court's recent decision in *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, but that reliance is misplaced. *Avery* concerns a group of workers who were employed by a hospital which had an arbitration policy. The hospital was bought out, and the new owners tried to implement a new arbitration policy in a new employee handbook. We concluded the implied covenant of good faith and fair dealing meant that claims arising *prior* to the new policy had to be governed by the old policy, because the implied covenant prevented a *retroactive* change in the employment contract. (*Id.* at pp. 60-62.) Here, however, there is no question that Fannie Mae's dispute resolution policy has remained unchanged since 1998. So that part of *Avery* does not apply here.

Nor does the other major part of *Avery*, which dealt with implied-in-fact contracts. That part considered the argument of the new owners that one plaintiff, Gwendolyn Cade, had entered into an implied-in-fact agreement to arbitrate any claims because she continued to work at the hospital after the new handbook was issued. (See *Avery, supra*, 218 Cal.App.4th at p. 63.) That argument failed because employee Cade

8

never actually received the new handbook. (*Id.* at pp. 64-65.) In the case before us, Carter knew going into her employment that some of her employment-related claims would have to be arbitrated and knew, if she was concerned about which ones, to ask for a copy of an existent policy. We cannot find – in *Avery* or anywhere else – support for Carter's argument her employment contract did not include Fannie Mae's standard arbitration clause.

B. *Substantive Unconscionability*

But the mere fact the parties had an implied-in-fact employment contract to arbitrate "certain" employment-related claims does not mean that contract is enforceable as to this claim. In *Mercuro v. Superior Court, supra,* 96 Cal.App.4th 167, the appellate court considered an arbitration policy agreement almost identical to the one before us: It exempted the sort of claims most likely to be brought by an employer against an employee – trade secret claims being the most obvious – while requiring the usual sort of claims that an employee is likely to bring against an employer – such as civil rights and retaliation claims – be arbitrated. While *Mercuro* had plenty of other reasons to invalidate the arbitration agreement in that case, the court made it clear the substantive lopsidedness of the policy *by itself* justified a refusal to enforce it: "An employee terminated for stealing trade secrets, for example, must arbitrate his wrongful termination claim under the agreement but Countrywide can avoid a corresponding obligation to arbitrate its trade secrets claim against the employee by the simple expedient of requesting injunctive or declaratory relief. As the court stated in *Armendariz* [*v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 120], an arbitration agreement 'lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences.'" (*Mercuro, supra,* 96 Cal.App.4th at pp. 176-177, fn. omitted.)

9

The inspiration for *Mercuro,* of course, was *Armendariz*, the California Supreme Court decision which, for more than a decade now, has been the touchstone of California law on the topic of the conscionability of arbitration contracts. *Mercuro* has also been explicitly followed in *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 725 ["The ACT policy is unfairly one-sided because it compels arbitration of the claims more likely to be brought by Fitz, the weaker party, but exempts from arbitration the types of claims that are more likely to be brought by NCR, the stronger party."], and *O'Hare v. Municipal Resource Consultants* (2003) 107 Cal.App.4th 267, 278 [rejecting argument that injunctive relief needed to be exempted].

Moreover, *Mercuro's* basic idea that arbitration agreements cannot exempt the sort of claims likely to be filed by the stronger party, but include the sort of claims likely to be filed by the weaker party, was very recently applied in *Sabia v. Orange County Metro Realty, Inc.* (2014) ___ Cal.App.4th ___ [2014 WL 2761555 p. 8] ["The net effect of this provision creates a two-pronged form of one-sidedness. . . . As the decisions cited above make clear, this type of one-sidedness is substantively unconscionable."]. And most importantly, our Supreme Court's recent pronouncement on the topic of arbitrations, *Iskanian v. CLS Transp. Los Angeles, LLC* (2014) 59 Cal.4th 348 left intact California doctrine that refuses to enforce a substantively unconscionable arbitration contract.

It makes no difference that, arguably, the dispute resolution policy isn't entirely one-sided, or in some ways offers a good deal for its employees. (For example, here and there Fannie Mae alludes to the provision that a plaintiff might still go to court if dissatisfied with the results of a given arbitration.) Fannie Mae offers no authority that positive aspects of the agreement somehow save the agreement as a whole when it contains other provisions that have been clearly held to be unconscionable in the case law.

10

Rather, Fannie Mae confines its argument on unconscionability to a plea for severance. It urges us to simply discard the unconscionable aspects of the agreement. The *Sabia* court, however, explained nicely why severance is not an option in the context of arbitration contracts that are unfairly lopsided in what they do, and do not, apply to: "There is no language in this provision that could be severed to make it bilateral. Instead, it would have to be rewritten to state that either party may require the other to arbitrate its claims. However, our power to sever does not include the power to reform the contract by augmenting it with additional terms. [Citation.] Therefore severance is not an option." (*Sabia, supra,* ___ Cal.App.4th ___ [2014 WL 2761555 at p. 17].)

The contract before us is equally resistant to a severance remedy. We would have to rewrite the arbitration clause – which we cannot do – or somehow choose "what to leave in, what to leave out"[4] which is also beyond our mandate.

### IV. DISPOSITION

The order denying the motion to compel is affirmed. Respondent Carter shall recover her costs in this appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.

---

[4]    "Against the Wind," Bob Seger, 1980.

11