## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **ANA LAPERA** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Case No. 1:15-cv-00447-BAH** |
| ) | |
| **FEDERAL NATIONAL MORTGAGE** ) | **Judge Beryl A. Howell** |
| **ASSOCIATION d/b/a FANNIE MAE** ) | |
| ) | |
| **Defendant** ) | |
| ) | |

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF HER MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FANNIE MAE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Ana Lapera hereby files this Statement of Disputed Material Facts in Support of Her Memorandum of Points and Authorities in Opposition to Defendant Fannie Mae's Motion for Summary Judgment.

Plaintiff disputes the following statements in Defendant Fannie Mae's Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment.

1-2.    Irrelevant.    Plaintiff also disputes Fannie Mae's unsupported and hearsay assertions.

4.  Disputes as a mischaracterization of Plaintiff's testimony.  Ms. Lapera stated that she thought her position was Director of Lean Six Sigma, not Director of Human Capital Performance.  Tr. 192:8-10.

5.  Disputed as an incomplete depiction of Ms. Lapera's duties and responsibilities.  Ex. E.  *See also* Plaintiff's Opposition at 6-7.

1

6-8.   Disputed as an incomplete and inaccurate depiction of the facts and Ms. Lapera's testimony.  Ms. Lapera worked side-by-side with two other Fannie Mae team leaders, Ted Carter (African American) and Michael MacFarland (Caucasian), to manage the organization of Fannie Mae's operations.  Tr. 74, 85.  Mr. Carter was responsible for the operational risk side; Mr. MacFarland was responsible for the business architecture side; and Ms. Lapera was responsible for the process improvement side.  Tr. 74.  These three teams worked in an integrated fashion and Mr. Carter leveraged the results of Ms. Lapera's and Mr. McFarland's teams to assess operational risk.   Tr. 75.   Ms. Lapera's job was very similar to Mr. Carter's and Mr. MacFarland's positions, they had the same scope, breadth, and reach inside the company, and managed similar sized teams, but focused on different functions of Fannie Mae's operations.  Tr. 85-87.  *Compare* Ex. E, F, and G[1].  Ms. Lapera managed the largest of these three teams.  In addition, Mr. Carter and Ms. Lapera both reported directly to Claude Wade.  Ex. B ¶ 6.

10-11.    Disputed  as  an  incomplete  and  inaccurate  depiction  of  the  facts.    The classification of Ms. Lapera's position as an "M" significantly limited her potential for salary increases and, consequently, pension benefits, because her salary as Director of Lean Six Sigma was near the top of the "M" salary scale.  Ex. B; Ex. L.  The salary range for an "M" was $112,000 to $194,000, whereas the salary range for an "N" was $129,000 to $222,000.  Ex. B; Ex. L.  Further, Ms. Lapera's bonus potential, at an "M" salary grade was 20 percent of her annual salary.  Ex. B; Ex. L.  Her bonus potential as an "N" would have been 35 percent of her annual salary.  Ex. B; Ex. L.

---

[1] Fannie Mae produced the position descriptions for Ms. Lapera, Mr. Carter and Mr. MacFarland, but did not produce Mr. Carter's position description dated 2009.  Tr. 75-82.  However, Ms. Lapera testified that Mr. Carter's position was the same in 2009 as it was in 2007, and therefore the 2007 position description accurately reflected his duties in 2009.  Tr. 83.

13.  Disputed as an inaccurate depiction of Ms. Westbrook's testimony to the extent that Fannie Mae is suggesting that the Compensation team was solely responsible for the classification of Ms. Lapera's position.   Tr. 526-27 (stating that it "isn't solely" "the responsibility of the compensation department to set the rate of compensation for employees.").

Plaintiff also disputes this statement as an inaccurate depiction of the relevant facts and legal standard to the extent that Fannie Mae is suggesting that Ms. Lapera has to demonstrate that the Compensation team harbored discriminatory animus.   It is well-settled that the discriminatory animus of an employee's supervisor will be imputed to an unbiased decisionmaker who acted as "the conduit of the supervisor's prejudice – his cat's paw." *Lee v. District of Columbia*, 920 F. Supp. 2d 127 (D.D.C. 2013) 138 n.8 (denying summary judgment where the Plaintiff demonstrated that he was terminated by an impartial decisionmaker based on a report by the biased supervisor and finding that a reasonable jury could conclude that the report was motivated by discriminatory animus) (*quoting Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).   *See also Gibbs v. Wash. Metro. Area Transit Auth.*, No. 12-1388, at *30-31 (D.D.C. Jul. 9, 2014) (denying summary judgment on Plaintiff's claims of discrimination because Plaintiff cited a genuine issue of material fact as to whether his first-level supervisor had proximately caused his termination and whether the actual decision maker acted as the supervisor's "cat's paw"); *and Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 288 (4th Cir. 2004).   "Applying a different anti-discrimination statute, the Supreme Court has held that 'cat's paw' claims are viable: 'if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable' for

3

intentional discrimination.  *Lee v. District of Columbia*, 920 F. Supp. 2d 127 (D.D.C. 2013) 138 n.8 (*quoting Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011)).

15-16, 18-25, 27-30.  Disputed.  *See* Statement of Disputed Material Fact ("SDMF") ¶ 13.

Ms. Lapera believes she was discriminated against with regards to her pay when her position, Director of Lean Six Sigma, was improperly re-classified as an "M" rather than an "N" between August 16, 2009 and February 26, 2012, including when her requests to reclassify the position were denied.  Ex. B ¶ 12.  In addition, Ms. Lapera sets forth the numerous facts supporting an inference of discrimination with regards to the improper classification of Ms. Lapera's position.  *See* Opposition at 32-34.  Plaintiff raised concerns that she was being treated differently than her non-protected peers when her position was inappropriately classified as an "M".  *See* Opposition at 8-10.  *See also* Ex. B ¶ 9; Ex. J; Ex. K.

Plaintiff also disputes that Shandell Harris assisted her in her April 2011 request to reclassify her position as a level "N".  Plaintiff testified that no one contacted her at any point in or around April 2011 to discuss her responsibilities or duties.  Tr. 97-98.  Furthermore, her position was reclassified in 2012 at a level "N", despite the fact that she had not provided any new information or support for her request and her duties had not changed.  Ex. B ¶ 11.  Considering these facts, it cannot be said that Ms. Harris assisted Ms. Lapera in good faith in her request to reclassify her position.

Further, Plaintiff disputes Fannie Mae's statements of intent by the decisionmakers as irrelevant for the purposes of summary judgment.  Overwhelming authority acknowledges that questions of intent are for the jury, not the court, to decide.  *Beckman v. Farmer*, 579 A.2d 618, 630 (D.C. 1990) ("summary judgment is likely to be inappropriate and should be used sparingly

in cases where motive or intent are material"); *Hollins v. Federal Nat. Mortg. Ass'n*, 760 A.2d 563, 570-71 (D.C. 2000) ("Courts are justifiably hesitant to throw out employment discrimination claims on summary judgment, since they almost always involve issues concerning the employer's [] motive or intent."); *Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999) (questions of motive and intent cannot be resolved on summary judgment); *Atkins v. Fisher*, 331 F.3d 988 (D.C. Cir. 2003) (questions of intent of parties create material disputes inappropriate for decision on summary judgment). "It is the responsibility of the jury (and not the judge) . . . to pass upon the credibility of the witnesses." *Lively v. Flexible Packaging Ass'n*, 765 A.2d 954, 960 (D.C. 2001). *See also Reeves*, 530 U.S. at 151 (courts considering a motion for summary judgment "must disregard all evidence favorable to the moving party that the jury is not required to believe", e.g., self-interested testimony by decisionmakers regarding the reasons for the adverse action); *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545 1552, 143 L.Ed.2d 731 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence.").

31-32, 34-37.  See SDMF ¶¶ 15-16, 18-25, 27-30.  Ms. Lapera's position was reclassified in 2012 at a level "N", despite the fact that her duties had not changed at that time.  Ex. B ¶ 11. In addition, as described above, Plaintiff disputes Fannie Mae's statements of intent by the decisionmakers and has set forth sufficient facts to support an inference of discrimination with regards to the improper classification of Ms. Lapera's position.  *See* Opposition at 32-34.

42.  Admitted, but irrelevant.  First, Ms. Lapera's claims that her position was improperly classified as an "N" span 2009 through February 2012, and she did not begin to report to Ms. Gehring until September 2012.  In addition, Ms. Lapera's peers and proper comparators were

Mr. Carter and Mr. MacFarland, and she was not properly classified as a Director considering that her subordinates included Directors. *See* Opposition at 8.

44. Disputed as an inaccurate and misleading depiction of the facts. First, statements of intent by the decisionmakers are irrelevant for the purposes of summary judgment. Next, Ms. Lapera disputes that Ms. Gehring was a good leader and has presented overwhelming evidence that Ms. Gehring's had difficulties communicating appropriately and harbored discriminatory animus against employees who were overweight, older, and minorities. *See* Opposition at 24-32.

45. Disputed as an inaccurate and misleading depiction of the facts. The class on improving one's image was considered mandatory. Tr. 118-129, 183. During this meeting, an image consultant provided fashion advice to the EPMO staff, such as stating that female employees should always wear makeup and eye makeup and should never wear perfume, and female employees with gray hair should always dye their hair and roots. Tr. 122-124, Tr. 183. Also, the image consultant stated that employees should refrain from wearing colors that clash with their skin color. The consultant said, "In certain cultures, it is acceptable to wear bright colors. You are here, in corporate America, and you must conform to the norm by not wearing bright colors." Tr. 122. James Thomasello testified that a few female employees on his team commented that they were offended by the presentation at the class and said that the presentation was derogatory towards women and minorities. Tr. 722. After this meeting, Ms. Brumbaugh and Dina Purcell (African American, 30s, overweight) expressed concerns that their physical appearance would negatively impact their careers. Tr. 124.

46-48. Disputed. Fannie Mae's statements of intent by the decisionmakers as irrelevant for the purposes of summary judgment. Ms. Gehring used the term "executive presence" as a euphemism for the appearance of employees who were minorities, older, and overweight. She

consistently characterized employees who were not Caucasian, young, and slender as lacking "executive presence," which is a highly suspect term that specifically refers to the subjective assessment of an individual's appearance. Tr. 134, 166-67, 689-91. Ms. Gehring has indicated that Ms. Brumbaugh and Ms. Neumiller lack "executive presence." Tr. 134, 166-67, 689-91. James Thomasello also testified that Ms. Gehring used the term "executive presence" to refer to the appearance of Fannie Mae employees and said that Ms. Gehring never made derogatory comments about slender and well-dressed women. Tr. 714-15.

Ms. Gehring also criticized Ms. Keller's appearance and weight at staff meetings. Tr. 137-138. In April 2013, Ms. Lapera was present in a meeting with Ms. Gehring and Ms. Keller when Ms. Gehring commented about exercising and Ms. Keller's personal appearance. Tr. 137-38, 249. Ms. Keller told Ms. Gehring that God had made her short and fat and that there was nothing she could do about it, especially considering that she already had her clothes tailored to fit her. Tr. 138. Ms. Gehring did not deny that her issue with Keller's appearance was her weight, but responded that she also used to be overweight and could help Ms. Keller. Tr. 138. Then, Ms. Gehring turned and addressed Ms. Lapera and said Ms. Lapera could look better too. Tr. 138-39.

Shortly thereafter Ms. Keller was forced from her position as a Vice President at Fannie Mae by Ms. Gehring. Tr. 142-43. Ms. Lapera recalled that Ms. Keller was cried in her office because she was forced from her position by Gehring. Tr. 143. Ms. Keller did not want to end her employment because she had a disabled child who required severe medical treatment and she needed to remain employed for an additional two years before he became eligible for medical benefits. Tr. 142. On May 30, 2013, Ms. Keller resigned from her position as Vice President of EPMO-Planning and Alignment. Tr. 143-44. Gehring selected Nicola Fraser, a slender

Caucasian female, whom she promoted from Director to Vice President, to replace Kathy Keller even though Fraser had no substantive experience in the area of responsibility.  Ex. B.

49-54.  Disputed.  Ms. Lapera has presented uncontroverted evidence that Ms. Gehring pre-selected Ms. Fraser for the position and the selection process was a sham and pretext for unlawful discrimination.  See Opposition at 23-32.

In addition, the process for promoting a Fannie Mae employee to the position of Vice President requires the employee to conduct additional interviews with a panel of three Vice Presidents and, usually, the President of Fannie Mae, a process that takes longer than one week to complete.  Tr. 150, 322-23.  Thus, an employee who was not classified as a Vice President could not be selected for promotion to a Vice President position within a week.  Tr. 150, 322-23.  In fact, Melissa Werner, the Executive and Officer Hiring Lead, acknowledged that moving an employee from the position of director to vice president takes between forty-five and ninety days.  Tr. 405, 421.  Ms. Fraser was the only candidate for the position who could have been promoted within one week of her interview.  Tr. 150, 322-23.

55.  Disputed.  See SDMF ¶¶ 46-48.

56-58, 60-62, 66, 68.  Disputed.  It is clear from the facts that Ms. Gehring recruited Ms. Fraser for the VP position.  Ms. Fraser did not express any interest in the VP position until after she met with Ms. Gehring.   Tr. 328-337.  Furthermore, Ms. Fraser admitted that during her dinner with Ms. Gehring, Ms. Gehring "explained the job to [her] and asked if [she] was interested." Tr. 332.

In addition, Ms. Fraser never submitted an application for the VP position via her Fannie Mae email or other corporate systems.  Tr. 335, 434; Ex. Q.  Rather she submitted her resume for the position from her personal email address, after she had already been scheduled for an

interview for the position.  Tr. 335, 434; Ex. Q.  Nothing prevented Ms. Fraser from submitting her resume from her personal email address before the deadline.

69.  Ms. Lapera submitted an application through Fannie Mae's online portal before she had to submit her resume separately due to a malfunction.  See Def.'s Ex. 51 at FNMA 425.

70.  Disputed as inaccurate and incomplete depiction of the facts.  See SDMF ¶¶ 56-58, 60-62, 66, 68.  Ms. Fraser was scheduled for an interview for the position before she had submitted her resume to

In addition, prior to announcing the position, Ms. Gehring contacted a human resources business partner to get assistance in getting an employee through the selection process, and before a panel of officers so he could be promoted to Vice President.  Tr. 416-419; Ex. N.  That employee was Joseph Hallett, a slender Caucasian male in his 30's, who was a director.  *Id.* Hallett was a director with experience in a limited area, and did not have the broad experience that Ms. Lapera had.  *Id.*

71-73.  Disputed.  Ms. Lapera has presented uncontroverted evidence that Ms. Gehring pre-selected Ms. Fraser for the position and the selection process was a sham and pretext for unlawful discrimination.  *See* Opposition at 23-32.  In addition, Fannie Mae's statements of intent by the decisionmakers as irrelevant for the purposes of summary judgment.  Moreover, Fannie Mae's statements concerning Ms. Harris's participation in the selection and Ms. Gehring's interview questions are irrelevant because the Ms. Fraser was preselected for the position.  *See* Opposition at 23-32.

75-82, 84-87.  Disputed.  Ms. Fraser provides a partial and misleading depiction of the VP position.  The duties of the position are outlined in the position description.  Ex. R. Furthermore, Ms. Lapera has shown that she has exemplary communication skills, as well as,

significantly more experience in all other duties and responsibilities of the VP position.  *See* Opposition at 25-32.  In addition, Fannie Mae's statements of intent by the decisionmakers as irrelevant for the purposes of summary judgment.   Moreover, Fannie Mae's statements concerning Ms. Harris's participation in the selection and Ms. Gehring's interview questions are irrelevant because the Ms. Fraser was preselected for the position.  *See* Opposition at 23-32.  Further, Fannie Mae has presented misleadingly selective depictions of Ms. Lapera's qualifications.  *See* Opposition at 26-32.

89.   Fannie Mae's statements of intent by the decisionmakers as irrelevant for the purposes of summary judgment.  In addition, Ms. Lapera has presented overwhelming evidence that Ms. Gehring's justifications for her non-selection are false and that she harbored discriminatory animus.  *See* Opposition 23-32.

91-92.  Disputed.  *See* Ex. R and Opposition at 18-20.  Ms. Lapera had worked with Ms. Keller for many years and was intimately familiar with the planning aspects of her job and twenty four of the thirty people on Ms. Keller's team reported directly to Ms. Lapera.  Tr. 145.  She already managed 80 percent of the team and already had many of the responsibilities for the other components of the position and knew the most about the position.  Tr. 146-47.  Ms. Keller's position was the next step up in the natural progression of Ms. Lapera's career because she was already performing the vast majority of the duties of the VP position.  *Id.*

Plaintiff also disputes these statements as irrelevant in that it is likely that Ms. Fraser spent very little of her time working on Lean Six Sigma and Business Architecture projects because she had little to no knowledge of this area.  Furthermore, Ms. Fraser's knowledge of the role is limited considering that she spent less than twelve months in the role.

93.  See SDMF ¶ 89.

10

95.    Disputed.   See Opposition at 24-25.   On August 7, 2013, Ms. Gehring stated that Ms. Lapera's only weakness was her "executive presence," a term Ms. Gehring used as a euphemism for slender, young and Caucasian employees.   Ex. B.   Ms. Lapera always dressed in an undeniably professional manner based on Fannie Mae's dress code.  Ex. B.

98, 100.   Disputed.   Ms. Lapera's Demand for Arbitration specifies that "Ms. Gehring selected Ms. Fraser, who is Caucasian, in her mid 40s, and slender, for the Vice President of Planning and Alignment position, even though Ms. Fraser lacked Ms. Lapera's superior qualifications and prior experience working for the EPMO team.   See Opposition at 38-40. Further, Fannie Mae's Dispute Resolution Policy is invalid and unconscionable and unfairly lopsided.  *Id.*

Respectfully submitted,

_____/s/_____

David A. Branch
Law Office of David A. Branch &
Associates, PLLC
1828 L Street, NW, Suite 820
Washington, D.C. 20036
202.785.2805 phone
202.785.0289 fax
davidbranch@dbranchlaw.com

11