Arbitration Day 1                                    November 3, 2014
                        Washington, D.C.

                        JAMS ARBITRATION

- - - - - - - - - - - - - - -    X

ANA LAPERA,                         :

     Plaintiff,                     :

          v.                        :   JAMS Ref. No.

FEDERAL NATIONAL MORTGAGE            :   1410006405

ASSOCIATION (FANNIE MAE),            :

     Defendant.                     :

- - - - - - - - - - - - - - -    X

                              Washington, D.C.

                              Monday, November 3, 2014

          Arbitration before THE HONORABLE JAMES

ROBERTSON, in the above-entitled matter, the

witnesses being duly sworn by MARY GRACE CASTLEBERRY,

a Notary Public in and for the District of Columbia,

taken at the offices of JAMS, 555 13th Street, N.W.,

Washington, D.C., at 10:00 a.m., Monday, November 3,

2014, and the proceedings being taken down by

Stenotype by MARY GRACE CASTLEBERRY, RPR, and

transcribed under her direction.

Arbitration Day 1                                            November 3, 2014
Washington, D.C.

Page 2

APPEARANCES:

On behalf of the Claimant:

DAVID A. BRANCH, ESQ.

Law Office of David A. Branch & Associates, PLLC

1828 L Street, N.W., Suite 820

Washington, D.C.  20036

(202) 785-2805

On behalf of the Respondent:

JOSEPH D. WILSON, ESQ.

Kelley Drye & Warren, LLP

3050 K Street, N.W., Suite 400

Washington, D.C.  20007

(202) 342-8504

and

DAMIEN G. STEWART, ESQ.

Associate General Counsel

Fannie Mae

3900 Wisconsin Avenue, N.W.

Washington, D.C.  20016-2892

(202) 752-7000

ALSO PRESENT:

MARVILA AREVALO, Legal Assistant

Page 3

CONTENTS

OPENING STATEMENT ON BEHALF OF PLAINTIFF        PAGE

By Mr. Branch                    5

OPENING STATEMENT ON BEHALF OF DEFENDANT

By Mr. Wilson                    17

WITNESS

ANA CRISTINA LAPERA  DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Branch        27

By Mr. Wilson            187

PATRICIA BRUMBAUGH  DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Branch        180

By Mr. Wilson

Afternoon Session - Page 120

Page 4

PROCEEDINGS

JUDGE ROBERTSON:  Good morning, everybody. This is an arbitration, Lapera versus Federal National Mortgage Association, Number 1410006405. That's a JAMS number.  Let me ask counsel to identify themselves and the people with them for the record.

Mr. Branch?

MR. BRANCH:  Good morning.  I'm David Branch.  I represent the claimant, Ana Lapera. Ms. Lapera is present.

JUDGE ROBERTSON:  Thank you.  Mr. Wilson?

MR. WILSON:  Good morning, Your Honor. Joe Wilson from the Kelley Drye & Warren law firm.  I represent the respondent, Fannie Mae.  With me today is Damien Stewart, associate general counsel within Fannie Mae's law department.  Also accompanying me and helping me out today for most of the hearing is my long-time assistant, Marvila Arevalo, who works with me at Kelley Drye.

JUDGE ROBERTSON:  Okay.  Then let's proceed.  If everybody's ready, we'll proceed. Mr. Branch, do you have an opening statement?

Page 5

MR. BRANCH:  Yes.  Thank you.  Good morning.

JUDGE ROBERTSON:  Good morning.

OPENING STATEMENT BY COUNSEL FOR PLAINTIFF

MR. BRANCH:  This case involves claims of discrimination based on race and personal appearance primarily under the D.C. Human Rights Act.  There is also a claim under Section 1981, 42 U.S.C. Section 1981.  The claimant is Ana Lapera.  Ms. Lapera is an Hispanic female.  She was born in Venezuela and she was employed at Fannie Mae for approximately 20 years.  She ended her employment in late 2013, approximately the last week of October.  I believe it was October 28th of 2013.

During Ms. Lapera's tenure at Fannie Mae, she was regarded as one of the sharpest minds at Fannie Mae.  She consistently received the highest performance appraisals.  She worked closely with one of the former CEOs, a gentleman named Mike Williams, assigned to tackle the toughest problems and assignments or projects at Fannie Mae.  She worked closely -- and she was handpicked by Mr. Williams who

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                    November 3, 2014

Washington, D.C.

Page 102

information that was different. The position and the responsibilities and the number of people reporting to the position were exactly the same.

Q.   And had you previously worked with Kathy Keller?

A.   Yes, I had.

Q.   And how so?

A.   Kathy Keller and I started together in the advanced technology division of Fannie Mae. Actually, she started there before I did, so we were peers for a while. And our careers moved in similar ways. And when I was in Dedicated Channel, Kathy reported to me as my manager of business requirements and then she left and went to the credit division and I went and did other things. And then we met again in 2011 and she became my manager in the -- at that time it was called the Corporate Initiative Program Office.

Q.   So did Ms. Keller get a new senior vice president in 2012?

A.   Yes. Anne Gehring became the vice president of -- she moved from FP&A, from Financial

Page 103

Planning and Analysis, and became the vice president for the Enterprise Program Management Office in September of 2012.

Q.   And had you worked with Ms. Gehring before September 2012?

A.   Yes, I had worked extensively with Anne and with Nicola before that. They were my clients. As Financial Planning and Analysis, their job was to oversee the budgets of the company. So my team did several engagements with them to reduce costs in Fannie Mae. So yes, I knew them very, very well.

And the other part is Financial Planning and Analysis was also the one who validated that the savings that we were claiming for the Six Sigma team, Lean Six Sigma team, were correct. So they did all of the numbers and validated from the financial perspective that we were not overstating our claims.

Q.   And what is Ms. Gehring's race?

A.   She's Caucasian.

Q.   And can you describe her personal or physical appearance?

A.   She's tall and slender.

Page 104

Q.   When did she become the SVP of EPMO?

A.   September 2012.

Q.   And just for the record, EPMO stands for?

A.   Enterprise Program Management Office.

Q.   EPMO, sorry.

A.   Correct.

Q.   Did Ms. Gehring make any changes when she arrived?

A.   Yes.

Q.   What major changes, if any, did she make when she arrived in this position?

A.   So when she arrived, there were two vice presidents in Financial Planning and Analysis, Kathy Keller and Carmen Oviedo, and they distributed their responsibilities for managing their -- let me start -- one second.

The Enterprise Program Management Office, one of -- their main responsibility was to allocate the funding for initiatives for projects that needed to be executed by the company. Carmen and Kathy shared that responsibility and one of the first things that Anne did was to say, no, I want to have

Page 105

somebody who is responsible for the planning and I want to have somebody who is responsible for execution.

So Kathy got all of the planning and alignment part and then Carmen actually got moved out of the EPMO into another division of the company. Carmen was also a vice president. And then the position -- that position became available and eventually got filled by Mike Choi, who became the execution branch of the Enterprise Program Management Office.

Q.   So did you know Ms. Oviedo before?

A.   Oviedo, Carmen?

Q.   Yes.

A.   Yes. Carmen was one of the few remaining Hispanic officers, female officers in Fannie Mae.

Q.   And when you say she was one of the few remaining female officers, what do you mean by that?

A.   Fannie Mae had -- I don't know what happened. I cannot explain this, but Fannie Mae had a significant number of female executives that were Hispanic and that acted as mentors of the Hispanic

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1

November 3, 2014

Washington, D.C.

Page 106

population and everybody.  They were very generous with their mentoring advice.  Like Mercy Jimenez, like Maria Villar.  Carmen was one of them.

But little by little, somehow they have managed to reduce their population of Hispanic females that are directors or above to pretty much zero in the Washington, D.C. area.

So I had worked with Carmen.  We collaborated a lot on the Hispanic activities and Carmen used to be Mike Williams' chief of staff, so she had a lot of experience on communicating at the board level and with regulators.  But at that time, Anne decided that she wanted to keep Kathy and move Carmen to the securitization project, which was another project that was going on outside of EPMO.

Q.   So when was Ms. Oviedo moved?

A.   It was very shortly after Anne became the SVP for EPMO.

Q.   Did Ms. Oviedo want to leave her position?

A.   No, she didn't.

MR. WILSON:  Objection.  Foundation.

THE WITNESS:  Pardon me?

Page 107

JUDGE ROBERTSON:  Sustained.

BY MR. BRANCH:

Q.   How do you know Ms. Oviedo did not want to leave her position?

A.   Because Carmen was crying.  She --

MR. WILSON:  Objection.  Foundation.

JUDGE ROBERTSON:  Yes.  Because Carmen was crying?  I'm not -- you need a little better foundation than that, Mr. Branch.

BY MR. BRANCH:

Q.   Did you have any discussions with Ms. Oviedo concerning her vacating her position?

A.   Yes, we did.  We talked about the fact that she thought she was doing a good job and --

MR. WILSON:  Objection.

JUDGE ROBERTSON:  No, I'll allow this.

THE WITNESS:  We talked about the fact that she had been doing a very good job.  She felt that she and Kathy together partnered very well and their skills complimented each other and that she really had passion for this type of job.  And it was a normal progression for her career and she wanted to

Page 108

stay.  And she felt that moving to the securitization project, even though it was very important, was going to narrow the scope of things, of experiences that she could have.

BY MR. BRANCH:

Q.   What impression, if any, did you gather from your conversation with her?

A.   Carmen was upset.  Carmen was very, very upset that she was not given a choice.

MR. WILSON:  Objection.  Foundation.

JUDGE ROBERTSON:  I'll allow that.

BY MR. BRANCH:

Q.   Were there any other major changes made by Ms. Gehring once she became the SVP for EPMO?

A.   So after Carmen was transferred to the other position, then the people that reported to Carmen reported directly to Anne for a little bit until Mike Choi was hired.  And Anne also brought her trusted advisor, Amilda, over as part of the division, as part of the EPMO.

And then it's when she started doing the shift on all of the personal appearance and wanting

Page 109

the team to behave and look and act like consultants, which, by the way, we already were.  Particularly my team had acted as internal consultants all the way since its foundation.  I had recently acquired --

JUDGE ROBERTSON:  You're getting ahead of this.

BY MR. BRANCH:

Q.   Let's just start -- okay.  So we were talking about the major changes.  First, how did Ms. Gehring treat members of the team?

A.   It depends on --

Q.   Well, how did she treat members or people who reported to you?

A.   She didn't have as much one-on-one direct interactions with the people that reported directly to me.  The way that Anne structured the team communication was she had a staff meeting that was attended by her direct reports; in this case, it would have been Kathy Keller and Amilda.  And then she also had the directors.  So it was her senior leadership team.  So the directors would have been Keith Smith, Jim Tomasallo and Huai Nguyen and

28  (Pages 106 to 109)

Arbitration Day 1                                               November 3, 2014

Washington, D.C.

Page 110

myself. But then she had very little direct interaction with the teams. Her interactions were during staff meetings or whenever somebody, like, a member of my team will come and do presentations to her.

Q.   Did Ms. Gehring make any comments about the personal appearance of individuals who reported to you?

A.   Yes, she did.

Q.   What were those comments?

A.   After Anne became the vice president for --

JUDGE ROBERTSON:  When you tell me about these comments, I'm assuming that you heard or saw these yourself.

THE WITNESS:  Correct.

JUDGE ROBERTSON:  All right.

THE WITNESS:  I heard them --

JUDGE ROBERTSON:  I don't want to hear what somebody told you.

THE WITNESS:  You will not hear from me what somebody told me. She told me directly after

Page 111

the first meeting with the team -- when Anne became the senior vice president, she called for a town hall -- senior vice president for the EPMO, she called a town hall, which is a sign of a good leader. That's what a good leader does. They come into a new position, they want to meet the team and she explained what her vision was for EPMO. And those were town halls, which means everybody from the staff was present during the town hall. And she did that all the way during her tenure as SVP, which is exactly what a leader does.

After the first meeting, she called me and she wanted to know who were some of the individuals in the team and I told her these are the business architecture team that I manage. And she's like, whoa, those people are going to have a long way to go to be able to represent EPMO the way I want it represented. And I explained to her that many of the people that worked in business architecture had a technology background and that their expertise was different. It was more on helping people see the big picture or helping data. But she said, yeah, but the

Page 112

way they dress and the way they speak is not the way that I expect people to be. She specifically mentioned Blythe Neumilller and Tricia Brumbaugh and Dina Purcell, which were three ladies who were from business architecture. And --

Q.   Did these ladies report to you?

A.   Yes, they did.

Q.   And can you describe their personal or physical appearance?

A.   Yes. Blythe must have been in her 60s and she was fairly big and, therefore, she dressed with clothes that were very -- not tight, but just big clothes. Because she was so large, she also had problems walking. Anne, in front of me in one of her staff meetings said, yes, she waddles and she --

JUDGE ROBERTSON:  Anne --

THE WITNESS:  Gehring. Blythe waddles while she walks. Shortly after -- so Blythe was in her 60s, very overweight from everybody in the team. She was the person who was the most overweight.

BY MR. BRANCH:

Q.   Who was present when Anne Gehring said

Page 113

that Blythe waddles when she walks?

A.   I believe all of the directors were present because it was one of the staff meetings.

Q.   So is Ms. Neumiller severally obese?

A.   Yes, she is. And then she talked about Tricia Brumbaugh and she said, oh, my God, I could see her tummy from where I was sitting. And she told me, she directed me and she said, you better tell your team that they need to start dressing up better or they are not going to cut it, especially when we have meetings like this or when we're meeting with senior management, which my team, with very few exceptions, really had their direct relationships with senior management. It was -- on the business architecture side. On the process improvement side, yes, we did a lot.

Q.   And you said the other employee was Dina Purcell?

A.   So Dina Purcell was -- it's an African-American and she is slightly overweight, but I think the biggest comments came about Tricia Brumbaugh, who -- she's overweight. She's probably a

29 (Pages 110 to 113)

Arbitration Day 1                                                      November 3, 2014

Washington, D.C.

Page 114

little bit more overweight than I am. She's going to be one of the witnesses, so she's going to be here. And she told me, you need to tell them they need to dress up. So I went downstairs to where my team sat and relayed the comments back.

Q. And what was their response?

A. They were all very concerned because they, up until now, had been very valued for the technical expertise that they brought into the company and by their understanding of how the functions worked together. And actually, Blythe decided that she would rather go with the securitization team and become a business architect with the securitization team and stay with Michael MacFarland there than come to -- than stay with my team, because she didn't think that there was a career.

Q. And when did Blythe leave your team?

A. Blythe left the team October/November, very early.

Q. In 2012?

A. Correct.

Q. And how long had Blythe worked on your

Page 115

team?

A. She had only worked on my team since August, when the business architecture team got transferred. But Blythe had worked at Fannie Mae 20 years, 25 years. She's been at Fannie forever. Same as Tricia. Tricia has been in Fannie 25 years.

Q. And did you report back to Ms. Gehring that Blythe Miller was leaving the team?

A. Yes, I did.

Q. And what was her response?

A. She congratulated me on getting Blythe to move voluntarily to the other team. I actually gave her a choice. I said, you know, I'll be happy to have your expertise, but if you want to have the opportunity in securitization, you are welcome to move there. And Anne thought it was great that Blythe had moved voluntarily to securitization because she said there is no way Blythe is ever going to cut it for the team.

Q. And was that based on Blythe's performance or something else?

A. No, it was based on Blythe's appearance.

Page 116

MR. WILSON: Objection.

JUDGE ROBERTSON: Sustained.

BY MR. BRANCH:

Q. Were there any issues with Ms. Neumiller's performance?

A. No, there weren't.

MR. WILSON: Objection.

JUDGE ROBERTSON: Overruled.

BY MR. BRANCH:

Q. Did Ms. Gehring make any comments about the personal appearance of any of the federal regulators that had oversight responsibilities for Fannie Mae?

A. Yes. Actually, during one of those town hall meetings that she held like every month or so, she mocked the regulators by the way they were dressed and she mocked the regulators saying the left hand doesn't know what the right hand is doing, we have to come and educate them and, you know, they really don't know what they are doing.

Q. And how many people would be present at these monthly town hall meetings?

Page 117

A. All of her staff. So I guess it was like maybe 80 people.

Q. And what specifically did she say about the personal appearance of the regulators?

A. That they didn't know how to dress, that some of them had holes in their clothes, that they wear polyester suits.

JUDGE ROBERTSON: Oh, no.

THE WITNESS: And they had pen protectors in their pockets. It was a no-no.

JUDGE ROBERTSON: Is there a pencil protector provision in any of the human rights or civil rights laws that we're talking about here?

MR. BRANCH: No.

THE WITNESS: No.

JUDGE ROBERTSON: Okay.

BY MR. BRANCH:

Q. Did Ms. Gehring -- first, let me just ask: In 2012, late 2012, was an image consultant brought in to do a presentation at Fannie Mae?

A. Yes. So Anne, when she came, she's like, we're going to rebrand this team. This team had gone

30 (Pages 114 to 117)

Arbitration Day 1                                          November 3, 2014
Washington, D.C.

Page 234

Q.   Okay.  That sounds like something she may have mentioned?

A.   Yes.  Plus, it was in the position description.

Q.   On your direct, I believe you testified that Anne Gehring is tall and slender?

A.   Correct.

Q.   Do you recall giving interrogatory responses back in July of this year in this proceeding?

A.   In July?

Q.   How about they were served on me in July of this year.  Does that sound right?

A.   Oh, yes.  Yes, I'm sorry.

Q.   And you yourself prepared those interrogatory responses?

A.   Yes, I did.

Q.   And do you recall me asking you in your deposition about 10 days ago if you stood by them or if there was anything to correct, right?

A.   I just didn't remember -- yes.

Q.   Pardon me.  Ms. Gehring, can I ask you to

Page 235

turn to Defendant's Exhibit 232, please?  It's defendant's exhibit.  I'm sorry, it's in volume 3. We haven't touched this one yet.  I have stock in the Mead Corporation, so if I use binders -- wow, that one did not go over well at all.

JUDGE ROBERTSON:  That one bombed.

MR. WILSON:  Is it the hour or is it my delivery?

JUDGE ROBERTSON:  Mr. Wilson was trying to make a joke, Ms. Lapera, and he failed.

MR. WILSON:  Miserably.

THE WITNESS:  Not only do you have stock in the binders, but also in the paper company.

BY MR. WILSON:

Q.   It's Defendant's 232.

A.   Yes, I'm there.

Q.   Do you recognize these were your answers to interrogatories?

A.   Yes.

Q.   Can I ask you to turn, please, to page 8 of that.  And the question there is, "How do you know or determine that someone is 'overweight' and

Page 236

'slender'?"  And you answer, "As the table above indicates, the criteria that I used is the dress size of a person, with women who wear 1X and above or men who wear 44 or above being overweight, and women who wear 6 or below classified as 'slender.'"

Did I read that correctly?

A.   Yes.

Q.   And then let's flip two pages prior and interrogatory number 7.  "For each person that you have described as being overweight, slender or not overweight in your demand for arbitration, state for each such person's height and weight at all times relevant to the allegations in your demand."

Have I read that correctly so far?

A.   Yes.

Q.   And then in your answer you say, "I have no way of knowing the exact height and weight of the persons named, so the numbers below describe them to the best of my ability."  So far so good?

A.   So far so good.

Q.   And then we go to the next page, right, and you list a table and you list Anne Gehring,

Page 237

right?  And that's estimated dress size as an 8, right?

A.   Yes.

Q.   So under your definition of slender, am I right, then, that Anne Gehring would not be slender?

A.   She's borderline.

Q.   Well, no, no.  Your definition --

A.   Under my definition, my precise definition, no.

Q.   Okay.  And you said in your direct testimony that Nicola Fraser was slender, right?

A.   Yes.

Q.   But under your definition you put in your interrogatory response, and if you look at the prior answer, it says, "Nicola Fraser's estimated dress size is a 12," right?  Ms. Fraser wouldn't be slender, right?

A.   She was coming back from maternity leave.

Q.   Okay.  She was coming back from maternity leave.  Had she lost her weight prior to -- after she came back?

A.   Not at that point.  Afterwards.

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 1                                                November 3, 2014

Washington, D.C.

Page 238

Q. But she was coming back from maternity leave and that's the time she applied for the vice presidency for planning and alignment?

A. Uh-huh.

Q. So the answer is, if Ms. Fraser, in your estimation, was a 12, she would not be slender, right?

A. According to this strict definition. She was in excellent shape for just having a baby. Yes, according to the strict definition, Joe, if we're going to mince words, yes, I was incorrect.

Q. I'm using your words, ma'am.

A. I'm incorrect.

Q. So you testified on direct that a few days after your interview with Ms. Gehring and Mr. Choi, you had a meeting with Ms. Gehring and she informed you that Nicola Fraser, but not you, had been selected for the vice presidency for planning and alignment, right?

A. Correct.

Q. And in that meeting, Ms. Gehring didn't say anything about your race, right?

Page 239

A. She did not.

Q. Nor did she say anything about your ethnicity, did she?

A. She did not.

Q. Nor did she say anything about your national origin, did she?

A. She did not.

Q. Nor did she say anything about your age and nor did she say anything about your weight?

A. Nope.

Q. Nor did she say anything about your body shape?

A. Nope.

Q. Nor did she say anything about anybody else's race, right?

A. Nope.

Q. Nor did she say anything about anybody else's ethnicity, right?

A. Nope.

Q. Nor did she say anything about anybody else's national origin?

A. Nope.

Page 240

Q. Nor did she say anything about anybody else's weight?

A. Nope.

Q. Nor did she say anything else about anybody's body shape, right?

A. Nope.

Q. Now, she did make a comment, based on your testimony, that Ms. Fraser was young, right?

A. Yes.

Q. Other than that comment, did she say anything about anybody else's age?

A. No.

Q. Going on here and sticking with the same topic more or less, at the time that you applied for the vice presidency for planning and alignment, you had had very little experience with presenting before Dave Benson who was the CFO at the time, right?

A. Yes. Dave Benson had been recently -- I don't remember how long Benson had been a CFO. But no, from all of the officers of the company, he was one of the ones with whom I had the least familiarity.

Page 241

Q. And you actually had done very limited work for Dave Benson, right?

A. Correct. He was one of the members of the MC, the management committee, so the other members were the head of single family and IT and legal.

Q. Pardon me. I'm looking for the job description. Here we go. Ms. Lapera, I'm showing you what's been marked as Plaintiff's Exhibit 57. I believe you went over that on your direct. It's the plaintiff's binder.

A. Yes, this is the position description for vice president of planning and alignment.

Q. Ms. Lapera, if we can go down to the section, key job functions and duties, in the first bullet where it says, "Responsibilities include act as a trusted advisor and independent lens to the SVP of the EPMO and the CFO." Right?

A. Correct.

Q. Do you see that? I read that correctly? And Dave Benson, again, was the CFO at the time?

A. Correct.

Q. And you had never made a presentation

Alderson Reporting Company
1-800-FOR-DEPO

Page 242

before the FHFA, correct?

A. Correct.

Q. And you had not presented to the whole management committee for several years prior to July of 2013, correct?

A. Correct.

Q. And am I right that you would acknowledge here that Ms. Fraser had more experience than you do in presenting to FHFA?

A. I assume that she had presented to FHFA.

Q. And you would also acknowledge that Ms. Fraser had more experience presenting to Fannie Mae upper management than you did?

A. I do.

Q. Do you agree with that statement?

A. I do.

Q. Thank you. And you would agree, also, that Ms. Fraser's relationship with Mr. Benson at the time of the selection for the vice presidency for planning and alignment in EPMO was stronger than your relationship with Mr. Benson?

A. So we're going to talk words again. So

Page 243

I'm going to answer the question and I'm going to say, yes, I do agree with that. However, given my prior records and all of my experience, that didn't mean that I couldn't develop the relationship with Dave Benson. I made it just as strong as Nicola had it. I did not have it at that time. However --

Q. Ms. Lapera, can we just stick with the question that I asked?

A. Well, we just have to be fair.

Q. Your counsel, if he would like, can ask follow-up questions.

Ms. Lapera, can I ask you, please, to turn to what has been previously marked as Defendant's Exhibit 222?

A. I'm there.

Q. Do you recognize this document?

A. It's the midyear evaluation for me.

Q. And you received this back in August of 2013?

A. This evaluation was received by me in August of 2013, after the position had been assigned to Nicola, yes.

Page 244

Q. And you understood that Ms. Gehring filled this midyear evaluation out?

A. Correct.

Q. Can we turn to the second page there of this? And I'm going to read I guess the first box underneath areas for development. "Ana should continue to focus on executive presence. There are two specific aspects to executive behavior that Ana could think about. The first is to remove herself from the ain't it awful crowd."

I could go on and read it, but did I read that first line or two correctly?

A. Correct.

Q. And it says what it says and I won't bore everybody here with this. But talking about the full commentary there in that areas for development, you understood that statement by Ms. Gehring to be referring to your communication aspects, right?

A. Yes.

Q. And Ms. Gehring, right, had -- you also met with Ms. Gehring to go over your midyear evaluation for 2013, right?

Page 245

A. In that midyear evaluation, it was Anne and Nicola were present.

Q. That was, what, August 7th?

A. Something like that.

Q. And you were given this document at that session?

A. Correct.

Q. And Ms. Gehring, am I right --

A. Ms. Gehring what?

Q. I'm sorry, Ms. Gehring talked about your executive presence at that session?

A. She at that point described executive presence as communications as you see in this paragraph.

Q. And at that review session there in August, Ms. Gehring didn't mention anything about your race, right?

A. Nope.

Q. Nor did she mention anything about your ethnicity, did she?

A. Nope.

Q. Nor did she mention anything about

62 (Pages 242 to 245)

Arbitration Day 1

Washington, D.C.

November 3, 2014

Page 246

national origin?

A. Nope.

Q. Nor did she mention anything about your weight?

A. Nope.

Q. Nor did she mention anything about your age?

A. Nope.

Q. Nor did she mention anything about your body shape?

A. Nope.

Q. With the exception of age, if I were to ask about those same topics, she didn't mention anything about that about anyone, right?

A. Correct.

Q. Now, you may have testified to this. Did she mention that Nicola Fraser is young and energetic?

A. I'm going to love working for Nicola, I think you're going to be a great team, things she doesn't know you're going to teach her and you guys are going to be great together.

Page 247

Q. So other than maybe referring to Ms. Fraser as being young, Ms. Gehring in that review session didn't mention anything about anyone else's age, correct?

A. Correct.

Q. Ms. Lapera, I believe on direct you testified that there was an instance that you and Ms. Keller and Ms. Gehring were together and Ms. Gehring used words to the effect about taking Ms. Keller shopping; is that right?

A. Right.

Q. Do you recall that?

A. Yes. And the circumstance was that Kathy said I'm short and fat, what do you want me to do? That's the way God made me.

Q. And that's what Ms. Keller said, that she herself is short and fat.

A. Right, that there was nothing she could do to alter those aspects of her physical presence. And that she already tailored 80 percent of her clothes because if not, they wouldn't fit her.

Q. Ms. Gehring didn't say Ms. Keller was

Page 248

short and fat, did she?

A. Kathy said it as a reaction of the comments from Anne.

Q. But Ms. Gehring -- the question is: Ms. Gehring did not say to Kathy Keller she was short and fat.

A. Anne did not, therefore, she didn't say that.

Q. So the answer is no?

A. Correct.

Q. Okay. And when was this conversation?

A. It was late 2012.

Q. Late 2012? Okay.

A. Or maybe early 2013, something like that.

Q. And I believe on direct you said that Ms. Gehring said also to you, you can also look better, too?

A. Correct.

Q. Could it have been that she said to you you could do better, too?

A. I heard "and you could do better, too," in terms of like looking better.

Page 249

Q. Is that what you understood it to be?

A. That's what I understood it to be.

Q. And was she referring to how you dressed?

A. Yes. Prior to that conversation, we had been talking about exercising.

Q. There is no question.

A. Okay.

Q. When you applied and were going through the interviews process for the vice presidency for planning and alignment position, was your weight and body shape more or less the same as it was back in late 2012/early 2013?

A. It was about the same.

Q. Could I ask you, please, Ms. Lapera, to turn to what's been marked as Defendant's Exhibit 221?

A. It's the yearend review for 2012.

Q. Right. And I think you talked about this and your counsel probably used a version that you have, but this is your end-of-the-year evaluation, right, for 2012?

A. Correct.

63 (Pages 246 to 249)

Washington, D.C.

Page 258

JAMS ARBITRATION

- - - - - - - - - - - - - - -    X

ANA LAPERA,                           :

     Plaintiff,                       :

          v.                          :   JAMS Ref. No.

FEDERAL NATIONAL MORTGAGE             :   1410006405

ASSOCIATION (FANNIE MAE),             :

     Defendant.                       :

- - - - - - - - - - - - - - -    X

                              Washington, D.C.

                              Tuesday, November 4, 2014

          Arbitration before THE HONORABLE JAMES

ROBERTSON, in the above-entitled matter, the

witnesses being duly sworn by MARY GRACE CASTLEBERRY,

a Notary Public in and for the District of Columbia,

taken at the offices of JAMS, 555 13th Street, N.W.,

Washington, D.C., at 10:10 a.m., Tuesday, November 4,

2014, and the proceedings being taken down by

Stenotype by MARY GRACE CASTLEBERRY, RPR, and

transcribed under her direction.

Arbitration Day 2                                          November 4, 2014
Washington, D.C.

Page 259

APPEARANCES:

On behalf of the Claimant:

DAVID A. BRANCH, ESQ.

Law Office of David A. Branch & Associates, PLLC

1828 L Street, N.W., Suite 820

Washington, D.C. 20036

(202) 785-2805

On behalf of the Respondent:

JOSEPH D. WILSON, ESQ.

Kelley Drye & Warren, LLP

3050 K Street, N.W., Suite 400

Washington, D.C. 20007-5108

(202) 342-8504

and

DAMIEN G. STEWART, ESQ.

Associate General Counsel

Fannie Mae

3900 Wisconsin Avenue, N.W.

Washington, D.C. 20016-2892

(202) 752-7000

ALSO PRESENT:

MARVILA AREVALO, Legal Assistant

Page 260

CONTENTS

WITNESS

ANA CRISTINA LAPERA    CROSS(RESUMED) REDIRECT

By Mr. Wilson    275

By Mr. Branch    313

NICOLA FRASER    DIRECT CROSS REDIRECT RECROSS

By Mr. Branch    318    384

By Mr. Wilson    350

MELISSA WERNER    DIRECT CROSS REDIRECT RECROSS

By Mr. Branch    404    457

By Mr. Wilson    447    459

SHANDELL HARRIS    DIRECT CROSS REDIRECT RECROSS

By Mr. Branch    461    494

By Mr. Wilson    482

JESUS LAPERA    DIRECT

By Mr. Branch    497

Afternoon Session - Page 384

Page 261

PROCEEDINGS

MR. WILSON: Your Honor, Mr. Branch has named on his list of witnesses various people who are under Fannie Mae control that he would like to call. Three in particular we object to. Keith Smith, John Hickman and Joe Hallet. We think their testimony would either be irrelevant or certainly cumulative and so we'd like to get a proffer for what he would call them for at a minimum.

JUDGE ROBERTSON: Well, how long has this objection process been going on? Didn't we work this out in advance of the trial?

MR. WILSON: Mr. Hickman, in particular, came out not in advance of trial. He was identified on Wednesday of last week as a new witness and, for the life of us, we don't know why he would be called.

JUDGE ROBERTSON: There was some discussion, wasn't there, in one of our telephone conferences about subpoenas? I don't think I ever received any subpoenas to sign so I didn't sign any.

MR. WILSON: Fannie Mae is making its people under its control -- let me just say its

Page 262

current employees available without subpoena. It does that pursuant to its dispute resolution policy in which this arbitration is brought. So if these people come, they don't have to be subpoenaed, but we just don't want to bother Mr. Hallet. He's a vice president and he was one of the three people interviewed, but he wasn't selected for the vice presidency for planning and alignment position so I don't know what he's going to add to the show here. And again, Mr. Hickman applied, but he was screened out. He wasn't even interviewed for the job. I don't think he met the requirements. And Mr. Smith, while he worked in EPMO, I have no idea what his relevance is to this case.

JUDGE ROBERTSON: Mr. Branch, do you want to respond to that?

MR. WILSON: Yes, Your Honor. First, for Mr. Hallet. Mr. Hallet did apply for this position and he was not selected for the position. He was initially -- and there is evidence and documents in the record that Ms. Gehring initially wanted to place him into the position -- and defense counsel is well

2 (Pages 259 to 262)

Arbitration Day 2                                    November 4, 2014

Washington, D.C.

Page 415

BY MR. BRANCH:

Q.   Fifty-seven.

A.   Fifty-seven.

Q.   Do you recognize this document?

A.   I recognize the e-mail at the bottom, but not the e-mail subsequent to that.

Q.   Are you looking -- let's see what binder you're looking at.

A.   Fifty-seven, did you say? I'm sorry. Oh, okay. My apologies. Am I familiar with this document?

Q.   Yes.

A.   Yes, I am.

Q.   And so what is it?

A.   It's a job description.

Q.   Is this for the VP of planning and alignment --

A.   Correct.

Q.   -- that we talked about previously?

A.   Yes.

Q.   Who was the hiring manager for this position?

Page 416

A.   Anne Gehring.

Q.   So prior to this position being posted, were you notified by Anne Gehring that she had an internal candidate that she wanted selected for this position?

A.   No, I was not.

Q.   Let's turn to Exhibit 63. Are you there?

A.   I am.

Q.   Do you recognize the e-mails on the first two pages here?

A.   Yes.

Q.   So it appears that, at the bottom of the first page, there is an e-mail from Karen Jez to you, Sonya Matza and Danielle Clarke concerning the VP planning and alignment position that's dated May 20th, 2013, correct?

A.   That's correct.

Q.   Did you receive this e-mail?

A.   Yes.

Q.   And you were informed in this e-mail that there is a candidate identified by Anne already whose name is Joe Hallet. Do you see that?

Page 417

A.   I do.

Q.   So you were notified May 20th of 2013 that Anne Gehring had an internal candidate that she wanted to place in this position?

A.   Yes, I was.

Q.   And this e-mail also indicates that Anne is concerned about the amount of time to weed others out of the process, correct? It's in the same e-mail that I just read.

A.   Yes, I see it.

Q.   It's at the top of the second page. So is this typical of how the interview process would begin for filling a VP position? An individual is identified and the hiring manager would send a request of how do we get him through the process and how do we weed out others? Is that something that would normally happen?

A.   In many jobs, it is common that there is a candidate that may be identified for a role. Technically, we wouldn't discuss them as -- other candidates who might apply for the job as being weeded out. We would definitely discuss putting them

Page 418

through an assessment process. So this -- this -- while part of our practice, in the sense that we may already know of talent in the organization who would apply for a role that we're posting, wouldn't necessarily be the best execution of this practice. I wouldn't use the word "weed out."

Q.   Okay. And so the question was: Did you learn on May 20th of 2013 that Anne Gehring wanted to have Joe Hallet placed in the position?

A.   I did learn that. But you'll note that I did respond accordingly with the comment that as long as there aren't a lot of other internal applicants and they aren't as qualified as Joe, then it should be reasonable to have a timely and efficient process.

Q.   Did Anne Gehring inform you on June 6th, 2013 that she had a strong internal candidate for the VP position?

A.   I don't recall.

Q.   Let's look at Exhibit 54.

MR. STEWART: Which exhibit, Counsel?

MR. BRANCH: Fifty-four.

BY MR. BRANCH:

Alderson Reporting Company
1-800-FOR-DEPO

Arbitration Day 2                                                November 4, 2014

Washington, D.C.

Page 443

interviewers are, they generally sit down with them, whether it's in person or through correspondence or over the phone, to discuss what attributes they're looking for in the role.

Q. What's the purpose of having the hiring manager sit down with the other people who are going to interview for the position to discuss the expectations for the role?

A. I think the general purpose is to build some sense of what the hiring manager is looking for and understand if there are needs that the interviewers see for the role that maybe the hiring manager isn't aware of. I think, conceptually, it's about making sure that the interview process is assessing the candidates consistently and with business objectives in mind.

Q. Is there any rating or ranking of applicants as part of the interview process?

A. Not to my knowledge.

Q. Did you actually discuss with Ms. Gehring her selection for this position?

A. Her finalist?

Page 444

Q. Yes, the person she selected for this position.

A. No, I did not.

Q. How did you learn who had been selected?

A. I don't recall directly. But generally, either the hiring manager or the HR business partner will advise me as to who the finalist is once the interviews are complete.

Q. Is it a common practice at Fannie Mae for hiring managers to schedule lunch interviews for applicants?

A. They can.

Q. And when hiring managers schedule lunch interviews for applicants, do they schedule lunch interviews for all the applicants or are they permitted to select who they want to have a lunch interview for?

A. I think it varies based on schedule and availability. So I don't know.

Q. Do you have any experience where a hiring manager has scheduled a lunch interview for an applicant?

Page 445

A. Yes.

Q. At the vice president level?

A. I have, yes.

Q. Were other applicants also given lunch interviews?

A. Yes.

Q. So for that instance where a position was being filled and there was a lunch interview, all of the applicants had lunch interviews.

A. In that particular instance, all of the applicants had lunch interviews with the hiring manager together.

Q. Do you have any experience where there has been an interview process where only one of the applicants is provided a lunch interview?

A. No.

Q. Would that be improper for a lunch interview for just one applicant and not the other applicants?

A. Yes.

Q. Do you expect all of the applicants to have the same length interviews?

Page 446

A. Yes. We do schedule them for equal time increments based on what the hiring manager or the key stakeholders prefer for time increments.

Q. So would it be improper for a hiring manager to schedule one applicant, for example, for a half hour interview and another applicant for a full hour interview?

A. I would say no, because there could be many factors that influence why the interviews go long. But I would also say we should be consistent with the length of time in the interview process.

Q. Do you know how long the interviews were scheduled for the applicants for this particular position?

A. I'm going to say off the top of my head, probably 30 minutes each. That's our standard interview time.

Q. Was Ms. Fraser scheduled for an hour interview?

A. I don't remember.

MR. BRANCH: I have no additional questions of this witness.

48 (Pages 443 to 446)

Arbitration Day 2                                              November 4, 2014

Washington, D.C.

Page 475

A.    Such as think about a time when you had to convince a group of stakeholders who were not on the same page, how you talked to them, how you moved them through the process to get to where you needed them to be.  It would have been those kinds of questions.

Q.    Did you have any issues with Ms. Lapera's answers to the questions in the interview?

A.    No.

Q.    And was it your belief that she performed fine during the interview?

A.    Yes.

Q.    Were you familiar with the other applicants that you interviewed before the interview?

A.    Nicola Fraser.

Q.    Only Nicola Fraser?

A.    Only Nicola.

Q.    You were not familiar with Joe Hallet before the interview?

A.    No.

Q.    How many employees does Fannie Mae have in the Washington, D.C. area?

A.    Just the D.C. campus?

Page 476

Q.    Yes.

A.    Approximately maybe 2,500 or 3,000, somewhere along that number.

Q.    In 2013, were there any director or vice president Hispanic female employees at Fannie Mae?

MR. WILSON:  Objection, Your Honor.  This is irrelevant.

JUDGE ROBERTSON:  Overruled.

THE WITNESS:  Were there any -- could you repeat the question?

BY MR. BRANCH:

Q.    Hispanic women who held the position of director or vice president or above.

A.    I don't know.  I believe so, but I'm not familiar with everyone at Fannie.

Q.    Are you familiar with Carmen Oviedo?

A.    Yes.

Q.    Was she a vice president at Fannie Mae in 2013?

A.    Yes, she was.

Q.    And in 2012?

A.    I believe so, yes.

Page 477

Q.    And she left employment at Fannie Mae?

A.    Yes.

Q.    Did she previously work for -- she was on the team that Anne Gehring supervised at some point?

A.    I'm not sure that she actually ever reported to Anne.  I believe she reported to Linda Knight.

Q.    Were you supporting Anne Gehring's team when Ms. Oviedo was moved to another team?

A.    When was Ms. Oviedo moved to another team?

Q.    So if I represent to you that occurred in 2012, were you supporting the team then?

A.    I didn't support the team the entire time of 2012.  So I guess I'm not remembering that.

Q.    Prior to your interview of the applicants for this VP of planning and alignment, did Ms. Gehring express to you that she was interested in placing Nicola Fraser in that position?

A.    When Nicola Fraser indicated she was interested in the position, Anne felt that she would be a very strong candidate for the role.

Q.    And that was before the interviews?

Page 478

A.    That was before the interviews, yes.

Q.    So are applicants at Fannie Mae permitted to apply for positions after the closing dates of the positions?

A.    I don't know.

Q.    Have you managed selections for vacant positions at Fannie Mae?

A.    I'm not really in the recruiting process.  So no.

Q.    Did you tell Ms. Lapera that your only concern about her was her executive presence?

A.    Yes.

Q.    Did that occur during the interview or after the interview?

A.    After the interview.

Q.    And what was it about her executive presence that caused you concern?

A.    It was a communication style.  Sometimes I observed that Ana could ramble, kind of not be on point.  I think it's important in communicating with executives that you are crisp and to the point and provide detail as requested.

56 (Pages 475 to 478)

Arbitration Day 3                                               November 5, 2014
                              Washington, D.C.

                              JAMS ARBITRATION

- - - - - - - - - - - - - - -    X

ANA LAPERA,                           :

     Plaintiff,                       :

          v.                          :   JAMS Ref. No.

FEDERAL NATIONAL MORTGAGE             :   1410006405

ASSOCIATION (FANNIE MAE),             :

     Defendant.                       :

- - - - - - - - - - - - - - -    X

                              Washington, D.C.

                              Wednesday, November 5, 2014

          Arbitration before THE HONORABLE JAMES

ROBERTSON, in the above-entitled matter, the

witnesses being duly sworn by MARY GRACE CASTLEBERRY,

a Notary Public in and for the District of Columbia,

taken at the offices of JAMS, 555 13th Street, N.W.,

Washington, D.C., at 11:12 a.m., Wednesday, November

5, 2014, and the proceedings being taken down by

Stenotype by MARY GRACE CASTLEBERRY, RPR, and

transcribed under her direction.

Arbitration Day 3                                                                 November 5, 2014
Washington, D.C.

Page 520

APPEARANCES:

On behalf of the Claimant:
    DAVID A. BRANCH, ESQ.
    Law Office of David A. Branch & Associates, PLLC
    1828 L Street, N.W., Suite 820
    Washington, D.C.  20036
    (202) 785-2805

On behalf of the Respondent:
    JOSEPH D. WILSON, ESQ.
    Kelley Drye & Warren, LLP
    3050 K Street, N.W., Suite 400
    Washington, D.C.  20007-5108
    (202) 342-8504
        and
    DAMIEN G. STEWART, ESQ.
    Associate General Counsel
    Fannie Mae
    3900 Wisconsin Avenue, N.W.
    Washington, D.C.  20016-2892
    (202) 752-7000

Page 522

CONTENTS

WITNESS

NICOLE HARRIS WESTBROOK    D   C   RD   RC
By Mr. Branch        523      643
By Mr. Wilson             55      653
ANNE GEHRING            D   C   RD   RC   FRD
By Mr. Branch        596      635      640
By Mr. Wilson             623      638

Afternoon Session - Page 596

Page 521

ALSO PRESENT:
    MARVILA AREVALO, Legal Assistant
    SEAN FLANNAGAN (Afternoon Session)

Page 523

PROCEEDINGS

Whereupon,

    NICOLE HARRIS WESTBROOK,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

    DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

        BY MR. BRANCH:

    Q.   Good morning, ma'am.  Please state your name.

    A.   Nicole Harris Westbrook.

    Q.   Ms. Westbrook?

    A.   Harris is fine.

    Q.   Harris.  Ms. Harris.  I have you in my notes as Harris so that's why I'm confused.

    A.   Yes.

    Q.   Ms. Harris, my name is David Branch and I have some questions for you this morning.

        Ms. Harris, are you currently employed?

    A.   Yes, I am.

    Q.   Where are you employed?

    A.   At Fannie Mae.

2 (Pages 520 to 523)

Page 596

AFTERNOON SESSION

(1:34 p.m.)

JUDGE ROBERTSON:  All right.  Proceed, Mr. Branch.

Whereupon,

ANNE GEHRING,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRANCH:

Q.   Please state your name.

A.   Anne Gehring.

Q.   Ms. Gehring, my name is David Branch.  Did you previously work at Fannie Mae?

A.   Yes.

Q.   What period of time did you work at Fannie Mae?

A.   September 2010 to October 2013.

Q.   What was your position at Fannie Mae?

A.   Initially, I was the senior vice president of Financial Planning and Analysis and then later, I

Page 597

became the senior vice president of Enterprise Program Management.

Q.   And Ms. Gehring, what's your date of birth?

A.   August 12th, 1964.

Q.   When did you become the senior vice president for EPMO?

A.   September of 2012.

Q.   When you became the senior vice president for EPMO, were there employees working in that division at the vice president level?

A.   Yes.

Q.   Who were those employees?

A.   I believe there was one -- I think there was one open position and then one position that was filled by Kathy Keller, but that's my recollection. I don't remember any other vice presidents.

Q.   Are you acquainted with an individual named Carmen Oviedo?

A.   Carmen Oviedo?

Q.   Yes.

A.   Yes.

Page 598

Q.   Was she a vice president in EPMO when you became the SVP for EPMO in September 2012?

A.   No, I don't believe so.  I think she had moved on to her new role.

Q.   When did she move on to her new role?

A.   I don't know.

Q.   Did you ask her to move to the new role?

A.   No.

Q.   What role did she go to?

A.   She took a role in the -- she took a program management role in the securitization utility.

Q.   What was her position before she took this program manager role?

A.   I don't recall.  She did not work for me. I don't recall.

Q.   And I'm sorry, the new role that she took, was the position program manager?

A.   I guess, yes.  I mean, again, I don't recall.

Q.   Did you ask her to leave EPMO?

A.   No.

Page 599

Q.   Ms. Oviedo is a Hispanic female?

A.   Yes.

Q.   Ms. Gehring, after you became the SVP for EPMO, did you authorize an image consultant to come to Fannie Mae to make a presentation?

A.   Yes.

Q.   Did you direct the employees who worked in the EPMO group to attend this presentation?

A.   I invited all employees who worked in the EPMO to attend.

Q.   And was this presentation given over a two-day period?

A.   I believe it was a half-day presentation and it was conducted twice.

Q.   And did the session on the first day deal with personal appearance?

A.   Yes.  Both sessions were identical.

Q.   And so for the first day, the emphasis was on personal appearance?

A.   Both days, part of the content was on personal appearance.

Q.   What were your duties as the SVP for EPMO?

21 (Pages 596 to 599)

Arbitration Day 3

Washington, D.C.

November 5, 2014

Page 600

A.   I was responsible for strategic alignment of $800 million in technology spend.  I was responsible for the execution of a portfolio of $800 million in projects each year.  And I was responsible for the training and education around the execution of those projects.

Q.   And you are acquainted with Ms. Lapera?

A.   Yes.

Q.   And who did Ms. Lapera report to?

A.   Well, I ran EPMO.  Ana Lapera worked for Kathy Keller.

Q.   Did Ms. Lapera have employees reporting to her?

A.   Yes, she did.

Q.   Was one of those employees an individual named Blythe Neumilller?

A.   Yes.  I believe that Blythe Neumilller worked for Ana Lapera for a short period of time.

Q.   And was one of the employees a lady named Patricia Brumbaugh?

A.   Yes, I believe so.

Q.   Did you make comments about the personal

Page 601

appearance of Ms. Neumilller and Ms. Brumbaugh?

A.   Yes.

Q.   Did you tell Ms. Lapera that she should speak to Ms. Neumilller and Ms. Brumbaugh about how they looked and how they sat in meetings?

A.   No.

Q.   Did you mimic, in the presence of Ms. Lapera, how Ms. Neumilller walked?

A.   No.

Q.   Did you state that Ms. Neumiller waddled when she walked because she was so obese?

A.   No.

Q.   Did you make comments about the personal appearance of the federal regulators?

A.   Yes.  They were inappropriately dressed.

Q.   Would that have been in the latter part of 2012?

A.   I don't remember.

Q.   And how is it that they were inappropriately dressed?

A.   They had very casual attire on.  One gentleman had holes in his clothing.

Page 602

Q.   And did you make these comments at an all-hands meeting?

A.   No.

Q.   Who was present when you made these comments?

A.   The other individuals who attended the meeting and I believe that they initiated the comments.

Q.   Who were those individuals?

A.   I agreed.

Q.   Who were those individuals?

A.   Keith Smith, Mike Choi, Amilda Gjecovi.  I think that was it.  I think.

Q.   Are you acquainted with a former Fannie Mae employee named Michael Chen Young?

A.   Yes.

Q.   Did you call Mr. Chen Young a fat fucker during a meeting at Fannie Mae?

A.   No.  Michael Chen Young is a friend of mine.  I certainly did not speak about Michael Chen Young in that way, no.

Q.   And did you use those words to describe

Page 603

any employee at Fannie Mae?

A.   No.

Q.   Did you refer to any Fannie Mae employee -- or did you refer to a Fannie Mae employee as an asshole?

A.   Perhaps.

Q.   Who did you refer to as an asshole?

MR. WILSON:  Objection.  Relevance.

THE WITNESS:  I don't know.  I don't remember any specifics, but perhaps.

JUDGE ROBERTSON:  Overruled.

BY MR. BRANCH:

Q.   Did you tell Ms. Lapera that she should tell her staff that their stomachs or tummies were showing in staff meetings?

A.   No, I never said that.

Q.   Did you tell Ms. Lapera and Ms. Keller that you could see that a KPMG consultant was smart by looking into that person's eyes?

A.   No, I don't recall that.

Q.   Did you participate in a calibration session in the fall of 2012 at Fannie Mae?

22 (Pages 600 to 603)

Arbitration Day 3                                                            November 5, 2014

Washington, D.C.

Page 604

A.   Yes.

Q.   During this calibration session, did Ms. Lapera request a rating of level 2 for one of her employees, Ms. Brumbaugh?

A.   I don't remember.  There were 100 employees in EPMO and I don't remember a specific rating.

Q.   Did you tell Ms. Lapera that the rating was not acceptable based on Ms. Brumbaugh's personal appearance or how she looked?

A.   No.  We differentiated the employees based on leadership criteria as determined by Fannie Mae.

Q.   So you deny making any statements at this calibration session about Ms. Brumbaugh's personal appearance?

A.   I don't recall any statements during that session about her personal appearance.

Q.   Are you familiar with an employee named Ms. Cruz-Rodriguez?

A.   No.

Q.   Are you familiar with a Shirley Cruz-Rodriguez?

Page 605

A.   I don't remember a person by that name.

Q.   Do you recall an employee discussing with Ms. Lapera that Shirley Cruz-Rodriguez would not advance at Fannie Mae unless her accent and English improved?

A.   No.

Q.   Did you tell Ms. Lapera that you were pleased that she had convinced Blythe Neumilller to take another job because Ms. Neumilller could never represent the group?

A.   No.

Q.   At some point in 2013, did Ms. Keller's employment come to an end at Fannie Mae?

A.   Yes.

Q.   Did you have a conversation with Ms. Keller, prior to her employment ending, where you told her that you could help her look better with her body size?

A.   No.

Q.   Do you recall Ms. Keller telling you that "I'm short and I'm fat.  What do you want me to do"?

A.   No, I don't recall that.

Page 606

Q.   Did you ask Ms. Keller to leave her position?

A.   Yes.  In the fall of 2012 or early 2013, I had communicated to Kathy that it wasn't working out and instructed her to look for opportunities elsewhere in Fannie Mae.

Q.   After Ms. Keller was no longer in her position, was there an effort to fill the position?

A.   Yes.

Q.   After Ms. Keller was no longer in the position -- or actually, before Ms. Keller vacated the position, did you identify an internal candidate that you wanted to be placed in the position?

A.   After Kathy Keller vacated the position, we posted the job through the normal HR recruiting process for vice president level.

Q.   Before Ms. Keller vacated the position, did you identify an internal candidate, Joe Hallet, that you wanted to place in the position?

A.   No.  I had talked to Joe Hallet about joining my organization in general, but no.

Q.   Well, did you communicate to individuals

Page 607

in human resources that you wanted to place Joe Hallet in the position and you wanted to find out what was needed to get him through the process, the vice president selection process?

A.   No.

Q.   After Ms. Keller was no longer in the position, what actions did you take to fill the position of vice president of planning and alignment?

A.   Normal HR recruiting process for vice presidents.  Post the job, review the applicant, determine a slate, interview the candidates, make a selection.

Q.   And who were you working with in processing this selection?

A.   The HR recruiter.  Her name was Melissa.  I don't recall her last name.

Q.   Do you know who John Hickman is?

A.   Yes.

Q.   Was Mr. Hickman an applicant for this position?

A.   I don't recall that he was.

Q.   Is Mr. Hickman obese?

23  (Pages 604 to 607)

Arbitration Day 3

November 5, 2014

Washington, D.C.

Page 624

Q.   Ms. Gehring, how are you doing?

A.   Good.  How are you?

Q.   I'm doing well.  Nice to see you again.  You're appearing here today voluntarily, right?

A.   Yes.

Q.   And you appeared at your deposition voluntarily?

A.   Yes.

Q.   Who is your current employer?

A.   JP Morgan Chase.

Q.   And what's your position?

A.   Managing director.

Q.   And so you're taking time out of your workday to be with us today?

A.   Yes.

Q.   Could you tell us about some of your hobbies?

MR. BRANCH:  Objection.

JUDGE ROBERTSON:  I'll allow it.

BY MR. WILSON:

Q.   You can answer that.  I can focus that a little bit more.  What experience do you have

Page 625

traveling internationally, if any?

A.   I worked for General Electric and lived in southeast Asia for two years in the '90s.  I lived in Europe.  I worked for Chiquita Brands International and I spent significant time in South and Central America.  And in my personal travel, I've probably traveled to 40 or 50 countries globally.  And I just took the last year off work and spent the majority of that time overseas.

Q.   Is there a lesbian, gay, bisexual and transgender employee group at Fannie Mae?

MR. BRANCH:  Objection.

JUDGE ROBERTSON:  Sustained.

MR. WILSON:  I was going to -- Your Honor, may I make a proffer?

JUDGE ROBERTSON:  I'd like to hear your proffer.

MR. WILSON:  Since discrimination is at issue with Ms. Gehring, Ms. Gehring served as the executive liaison for that group.

JUDGE ROBERTSON:  Sustained.

MR. WILSON:  Okay.

Page 626

BY MR. WILSON:

Q.   Ms. Gehring, I believe on your direct with Mr. Branch, you testified that Ms. Keller was asked to find another position within Fannie Mae.  Am I correct?

A.   Yes.

Q.   And you asked her that?

A.   Yes.

Q.   Could you explain to us why?

A.   A significant portion of the role that the EPMO organization played was to communicate to the senior leadership team, FHFA, the regulator and the board of directors, the strategy for the execution of this portfolio of projects.  And Kathy was unable to deliver presentations that were appropriate for that audience and she also was unable to participate in meetings with the senior leadership team and FHFA at an appropriate communication style.

Q.   When you say "appropriate communication style," could you elaborate on that, please?

A.   Kathy went into far too much detail for an executive.  I like to say you ask Kathy what time it

Page 627

is and she tells you how to make a watch.  At one point the CFO who I worked for, Dave Benson, asked her to stop the presentation and asked me to finish it.

Q.   So did Dave Benson put a premium on concise communications?

A.   Oh, my, yes.

Q.   Mr. Branch asked you a question or some questions on your examination about a conversation with Kathy Keller, you could help her look better, and I believe you said, no, you didn't have a conversation.

A.   Uh-huh.

Q.   Did you have some conversation at some time with Kathy Keller about dressing?

A.   Yes.

Q.   Could you elaborate on that conversation?

A.   I would be happy to.  Kathy shared with me that she was trying to lose weight and I shared with her that I had lost a considerable amount of weight and how hard it was.  And I encouraged her and she asked for the encouragement and she would share her

28 (Pages 624 to 627)