**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANA LAPERA,<br><br>            Plaintiff,<br><br>      v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION d/b/a FANNIE MAE,<br><br>            Defendant. | Civil Action No. 15-cv-00447 (BAH)<br><br>Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Ana Lapera, brings this lawsuit against her former employer, the Federal National Mortgage Association ("Fannie Mae"), alleging race discrimination in violation of the Civil Rights Act, 42 U.S.C. § 1981, and age, race, and personal-appearance discrimination in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code Ann. § 2-1401 *et seq.* Compl. ¶¶ 1, 4, ECF No. 1-1. These claims are predicated on Ms. Lapera's allegations that Fannie Mae improperly classified her position's salary grade (and rejected Ms. Lapera's subsequent requests to relevel her salary grade), and declined to promote her on the basis of her race, age, and physical appearance. Pending before the Court is Fannie Mae's motion for summary judgment. Def.'s Mot. Summ. J. ("Def.'s MSJ"), ECF No. 11. For the reasons set forth below, this motion is granted in part and denied in part. Specifically, while Ms. Lapera has shown no genuine issue of material fact as to whether Fannie Mae discriminated against her on the basis of her race or personal appearance when it leveled her salary, she has adduced sufficient evidence to raise such an issue with respect to whether Fannie Mae's proffered reason for passing over Ms. Lapera for the position of Vice President of Planning and Alignment was pretextual.

1

I.     BACKGROUND

The pertinent factual and procedural history for consideration of the pending motion for summary judgment is summarized below.

A.     Facts

Ms. Lapera was born in Caracas, Venezuela, Plaintiff's Arbitration Transcript ("Pl.'s Arb. Tr.") at 28, ECF No. 14-1,[1]  and describes herself as having "a body size which may be perceived by some as being overweight," Compl. ¶ 6.  She holds a degree in systems engineering from a school in Venezuela as well as a master's degree in engineering administration from George Washington University.  Pl.'s Arb. Tr. at 29.  Ms. Lapera was employed by Fannie Mae, "a private, shareholder-owned company chartered by Congress," Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶ 1, ECF No. 11-1, in various positions for almost twenty years, from 1994 through 2013, Pl.'s Arb Tr. at 29.   Her career path at Fannie Mae is generally described below.

1.     Ms. Lapera's Early Career at Fannie Mae

Fannie Mae hired Ms. Lapera in 1994 to work as a manager in the advanced technology division of the IT department.  *Id.* at 30.  From there, Ms. Lapera transitioned to a development manager position, and then to a position in which she helped coordinate a smooth technological transition into the year 2000.  *Id.* at 31.  Thereafter, she was promoted to various Director-level positions.  *Id.* at 41.  For example, in 2008, Fannie Mae's President selected Ms. Lapera to head

---

[1]     Pursuant to Ms. Lapera's employment contract, she initially brought the instant claims before an arbitrator in November 2014. Def.'s SUF ¶ 98.  As described in more detail, *infra* Part I.B., the arbitration hearing involved the examination of witnesses by both sides and resulted in an arbitral award in favor of Fannie Mae.  Under the terms of the employment contract, the arbitral decision is in no way binding on this Court.  *See* Fannie Mae Dispute Resolution Policy ("DRP") at ¶ 14, ECF No. 16-2 ("If the employee rejects the Award, it will not become binding on the employee or the Company, and the employee may bring suit on the claim at his or her own expense.").  Both parties have submitted portions of the transcript from the arbitration hearing as factual support for their arguments in connection with the pending summary judgment motion.

the restructuring of operations and IT at Fannie Mae. *Id.* at 46. Then, in 2009, Ms. Lapera was selected to direct the new Lean Six Sigma team.[2] *Id.* at 49–50.

### 2. Ms. Lapera's New Salary Grade

In June 2009, Fannie Mae adopted a new salary scale for employees. Whereas salary grades had previously been on a numerical scale, the new scale was alphabetical, with letters later in the alphabet corresponding to a higher salary. As the Director of Lean Six Sigma, Ms. Lapera's salary grade shifted from a "6" to an "M." Pl.'s Arb. Tr. at 524–25; Decl. of Ana Lapera ("Lapera Decl.") ¶ 7, ECF No. 14-2. At the same time, employees whom Ms. Lapera perceived to be her professional peers received higher salary grades of "N," Pl.'s Arb. Tr. at 85; her direct reports received salary grades of "M" and "L," *id.* at 92; and several individuals who allegedly had less responsibility than Ms. Lapera received a salary grade of "N," Decl. of Ana Lapera ¶ 8. Moreover, Fannie Mae posted an available position that required less education and experience than Ms. Lapera's position and stated that the position would command an "N" grade salary. Pl.'s Arb. Tr. at 93–97.

On July 18, 2009, Ms. Lapera emailed her manager, Claude Wade, to explain why she believed that her position was assigned an improperly low salary grade and to request an "N" grade salary.[3] *Id.* at 86. In response, Mr. Wade advised Ms. Lapera that he had inquired with the human resources department and was informed that the "M" salary grade for her position would stand. *Id.* at 87. Ms. Lapera requested a salary upgrade to level "N" again in April 2011,

---

[2]      As described by Ms. Lapera during arbitration, Lean Six Sigma is a "process improvement methodology." Pl.'s Arb. Tr. at 50. "Lean" refers to "reduc[ing] waste" and "looking at everything from the customer perspective." *Id.* "Six Sigma" refers to "us[ing] statistics to make sure that you always g[e]t the output that your customer wants." *Id.* "So when you combine the two methodologies, it can be very, very powerful to streamline a company, streamline operations, and to make sure that the output . . . is exactly [right]." *Id.*

[3]      Ms. Lapera surmises, based on her employee compensation statements, that the "M" salary range was $112,000 to $194,000, and the "N" salary range was $129,000 to $222,000. Lapera Decl. ¶ 10; Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. L at 2–3, ECF No. 14-12.

which request was also denied.   Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. K,

ECF No. 14-11.  In 2012, Fannie Mae increased Ms. Lapera's salary by $28,000, however, as

part of the Promotion and Equity Process ("PEP"), which managers can use to that their

subordinates' salaries be increased based on performance.  Def.'s Arbitration Transcript ("Def.'s

Arb. Tr.") at 571, ECF No. 11-3.

### 3.    Fannie Mae's Non-Selection of Ms. Lapera for Vice President

In September 2012, Anne Gehring, who at that time worked in the Financial Planning and

Analysis division, was selected to be Senior Vice President of the Enterprise Program

Management Office ("EPMO").  Pl.'s Arb. Tr. at 102–03.[4]  As relevant in this case, Ms. Gehring

consistently emphasized that employees in her department should have "executive presence," *see*

Pl.'s Arb. Tr. at 714, a term she did not explicitly define.  The parties dispute the meaning of the

term:  Fannie Mae contends that the term "executive presence" "is widely used in business

circles to describe the ability to project mature self-confidence, a sense that you can take control

of difficult, unpredictable situations; make tough decisions in a timely way and hold your own

with other talented and strong-willed members of the executive team."  Def.'s Mem. Supp. Mot.

Dismiss ("Def.'s Mem.") at 22, ECF 11-2 (internal quotation marks omitted).  Ms. Lapera, on

the other hand, contends that Ms. Gehring used the term "to criticize the appearance of

overweight, older, and minority Fannie Mae employees."   Pl.'s Opp'n at 2; *id.* at 12 ("[Ms.

Gehring] consistently characterized employees who were not Caucasian, young, and slender as

lacking 'executive presence.'").  One Fannie Mae employee, Jim Tomasello, testified during

arbitration as follows:

> So the term "executive presence" was a theme that [Ms. Gehring] beat the
> drum on regularly and, really, from the beginning of the time that she was

---

[4]      The arbitrator opined that, "[b]y virtually all accounts, Ms. Gehring was a brash and unpopular executive."
JAMS Arbitration Award ("Arbitration Award") at 3, ECF No. 11-41.

over the EPMO.  It was a bar that she never really explained but was
talked about, you know, being able to be put in of executives and
basically evaluated people based off of that.  We as a group were sent to
an image training session where a consultant was brought in to speak
specifically about what executive presence meant and what it would take
for individuals to, in addition to delivering results, would have to exude to
be able to be considered, you know, for promotion or a well-performing
employee.

Pl.'s Arb. Tr. at 714.

As for Ms. Gehring's treatment of employees, Ms. Lapera's describes a disconcerting

pattern of comments and behavior.  *See, e.g.*, Compl. ¶ 14 ("Ms. Gehring began to regularly use

[two co-workers] as examples of employees who did not 'fit the team's image'. . . and criticized

'the way they conduct[ed] themselves', 'the way they s[a]t', and the way 'their tummies

sometimes show[ed].'"); Pl.'s Opp'n at 10, ECF No. 14. ("Ms. Gehring immediately began to

target employees who did not meet her standard of an ideal personal appearance, which was

Caucasian, young, and slender.").  Ms. Lapera testified during arbitration that, among other

things, Ms. Gehring (1) transferred a Hispanic female to a different group, Pl.'s Arb. Tr. at 105–

08; (2) frequently criticized the personal appearance of her subordinates, *id.* at 110–13

(explaining that Ms. Gehring chided one overweight employee for "waddling" in front of the

directors and commented that another overweight woman had her midriff exposed at work), *id.* at

137–39; (3) pressured staff to attend a class put on by an image consultant, *id.* at 118–29;

(4) regularly commented that she ate only a yogurt and banana for breakfast to keep her weight

down and that other employees should do the same, *id.* at 139; and (5) in conducting employee

reviews, took an employee's appearances and another employee's accent into account, *id.* at

133–35.

Less than one year after Ms. Gehring became Senior Vice President, one of her

subordinates, Kathy Keller, who was Vice President of EPMO Planning and Alignment and Ms.

Lapera's direct supervisor, left her position after Ms. Gehring "communicated to Kathy that it wasn't working out and instructed her to look for opportunities elsewhere in Fannie Mae." *Id.* at 142–43; *id.* at 606.[5]  On June 3, 2013, Fannie Mae solicited applications to fill Ms. Keller's position.  Pl.'s Opp'n, Ex. M, ECF No. 14-13.  Ms. Lapera applied.  *Id.*, Ex. O, ECF No. 14-15. Before the job was posted, Ms. Gehring noted that Joe Hallet, a Caucasian male already employed at Fannie Mae, might be a good candidate to fill the open position, and he applied for the position.  *Id.*, Ex. N, ECF No. 14-14.[6]  A third candidate, Nicola Fraser, did not initially apply, Pl.'s Arb. Tr. at 426–27, but after the formal deadline to apply had expired, Ms. Fraser, who was then a Vice President on maternity leave, Def.'s Arb. Tr. at 238, had dinner with Ms. Gehring and discussed the opening.  *Id.* at 332; Def.'s MSJ, Ex. 28, ECF No. 11-28.  Ms. Fraser then submitted her résumé to the Human Resources Department.  Def.'s Arb. Tr. at 431; Def.'s MSJ, Ex. 30, ECF No. 11-30.

All three candidates were interviewed by Shandell Harris from the Human Resources Department, Mike Choi, a Vice President in EPMO, and Ms. Gehring.  Def.'s MSJ, Ex. 34, ECF No. 11-34.  Ms. Fraser was ultimately selected to fill the Vice President of EPMO Planning and Alignment position.  Lapera Decl. ¶ 24; Pl.'s Arb. Tr. at 152.  Ms. Gehring relayed Fannie Mae's hiring decision to Ms. Lapera in a face-to-face meeting.  Pl.'s Arb. Tr. at 152.  Several months later, Ms. Lapera left Fannie Mae and became a consultant.  Def.'s SUF ¶ 96.

---

[5]     A human resources employee testified that Ms. Keller was not asked to resign from her position.  *See* Pl.'s Arb. Tr. at 467 ("Q. Was Ms. Keller asked to resign from her position?  A. No.  Q. And how do you know Ms. Keller was not asked to resign from her position?  A. Because Ms. Keller came to me and asked me for a package.").
[6]     Ms. Gehring flatly denied having pre-selected Mr. Hallet for the position during her arbitration testimony. *See* Pl.'s Arb. Tr. at 606-07 ("Q. [D]id you communicate to individuals in human resources that you wanted to place Joe Hallet in the position and you wanted to find out what was needed to get him through the process . . . ?  A. No.").

### B.       Procedural History

Ms. Lapera pursued her claims in nonbinding arbitration as required by her employment agreement. *See generally* Def.'s MSJ, Ex. 40 ("Demand for Arbitration"), ECF No. 11-40. Following an opportunity for discovery, the parties participated in a four-day hearing before the arbitrator, during which the parties presented witness testimony subject to cross-examination, submitted documentary evidence, and filed post-hearing briefs. *See* JAMS Arbitration Award ("Arbitration Award") at 2, ECF No. 11-41. The arbitrator ruled in favor of Fannie Mae. *Id.* at 6. As to Ms. Lapera's racial discrimination claims, the arbitrator found that "no evidence [] of race discrimination was adduced during the four days of trial." *Id.* at 2. As for Ms. Lapera's claim that Fannie Mae discriminated against her on account of her personal appearance in refusing to relevel her salary grade, the arbitrator concluded that "the . . . record demonstrates an orderly and regular, if slow, process that ultimately resulted in a significant salary increase for Ms. Lapera," and that "[n]o evidence or even hint of discrimination appears [in the] record." *Id.* at 3. Finally, the arbitrator rejected Ms. Lapera's non-promotion claim, finding that Ms. Lapera had not proven that Fannie Mae's proffered non-discriminatory reason for selecting Ms. Fraser was pretextual. *Id.* at 6 ("All of Ms[.] Lapera's testimony about Ms[.] Gehring's treatment of other employees was anecdotal, and most of it was either uncorroborated or disputed. Most importantly, however: except for Ms[.] Lapera's testimony about her own belief and her own self-image, there was no evidence in the record that anyone said, thought, or acted upon a perception that Ms[.] Lapera herself was overweight, or improperly dressed, or possessed of an unattractive body shape.").

As allowed under Fannie Mae's Dispute Resolution Policy, Ms. Lapera rejected the arbitral award and filed a complaint in D.C. Superior Court on January 27, 2015. *See* Fannie

Mae Dispute Resolution Policy ("DRP") at ¶ 14, ECF No. 16-2 ("The employee may, *within 30 calendar days of the date of issuance of the Award*, reject it, in its entirety, by sending a completed 'Rejection of Arbitration Award' form to JAMS and [Fannie Mae's Compliance and Ethics Department]."); *see also generally* Compl.  Fannie Mae removed the action to this Court on March 27, 2015.  *See generally* Notice of Removal, ECF No. 1.

Ms. Lapera's complaint asserts two claims against Fannie Mae under the DCHRA and § 1981.  In Count I, Ms. Lapera contends that Fannie Mae violated the DCHRA by "knowingly and intentionally engag[ing] in unlawful discrimination against [Ms. Lapera] based on her race, age and personal appearance" by, *inter alia*, assigning Ms. Lapera's position of Director of Lean Six Sigma a salary grade of "M" and denying Ms. Lapera a promotion to the position of Vice President of EPMO Planning and Alignment.  Compl. ¶ 30.  Similarly, in Count II, Ms. Lapera contends that Fannie Mae violated § 1981 by "knowingly and intentionally subject[ing] [Ms. Lapera] to discrimination based on her race, Hispanic American, when [Fannie Mae] failed to reclassify her position properly form [sic] 2009 through 2012 . . . ; discriminated against her in the evaluation of her performance . . . ; and denied Ms. Lapera a promotion to the position of Vice President of Planning and Alignment . . . ." *Id.* ¶ 35.  As relief, Ms. Lapera seeks a declaration that Fannie Mae violated the DCHRA and § 1981; a permanent injunction prohibiting Fannie Mae from engaging in any discriminatory employment practices; back pay and front pay in an amount to be determined at trial; an order prohibiting Fannie Mae from retaliating against Ms. Lapera or any other person for participating in this case; compensatory and punitive damages in amounts to be determined by an arbitrator; reasonable attorneys' fees, expert fees, and costs; and pre-judgment and post-judgment interest. *Id.* at 11.

Fannie Mae's motion for summary judgment is now ripe for consideration.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id*. at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party") (citation and internal quotation marks omitted)); *see also* Fed. R. Civ. P. 56(c) and (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *see also Burley v. AMTRAK*, 801 F.3d 290, 296 (D.C. Cir. 2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* Fed. R. Civ. P. 56(e).  If "'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is required to consider only the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

Ms. Lapera asserts that Fannie Mae discriminated against her on the basis of her age, race, and personal appearance by leveling her salary at the "M" level and by selecting a different candidate for the Vice President of Planning and Alignment position.  These claims are addressed *seriatim* below after first explaining the applicable legal framework.

### A.   Statutory Overview

#### 1.   Section 1981

Section 1981 guarantees the rights of all persons, regardless of their race, to "make and enforce contracts."  42 U.S.C. § 1981(a).  The statute defines the phrase "make and enforce

contracts" as "including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). A plaintiff asserting an employment discrimination claim under § 1981 "must demonstrate by a preponderance of the evidence that the actions taken by the employer were 'more likely than not based on the consideration of . . . race.'" *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 18 (D.D.C. 2009) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "[T]he plaintiff may either prove his claim with direct evidence of discrimination or he may indirectly prove discrimination under the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Olatunji v. Dist. of Columbia*, 958 F. Supp. 2d 27, 31 (D.D.C. 2013); *accord Walker v. McCarthy*, No. 14-266, 2016 WL 1118252, at *5 (D.D.C. Mar. 22, 2016).

Under *McDonnell Douglas*, discrimination claims are analyzed according to a three-step framework:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [action in question]." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).

"While this framework generally requires the plaintiff to bear the initial burden of making out a *prima facie* case of discrimination, the D.C. Circuit has clarified that courts 'need not—*and should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*,' where (1) 'an employee has suffered an adverse employment action' and

(2) 'an employer has asserted a legitimate, non-discriminatory reason for the decision.'" *Walker*, 2016 WL 1118252, at *6 (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original)).  In such cases, *Brady* instructs the Court to bypass *McDonnell Douglas* and instead consider "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?" *Brady*, 520 F.3d at 494.  To answer this question, the Court will consider "all the evidence, including '(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)).

### 2.    DCHRA

The DCHRA prohibits discrimination on the basis of, among other things, "race, . . . age, [and] personal appearance." D.C. Code § 2-1401.01.  As relevant here, the DCHRA expressly provides that an employer may not "fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee." D.C. Code § 2-1402.11.  DCHRA claims are evaluated under the same framework as § 1981 claims.  *See Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 24 (D.D.C. 2015) (citing *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572,

576 (D.C. Cir. 2013)).  That is, in the absence of direct evidence of discrimination, the Court

employs *McDonnell Douglas* to decide whether a plaintiff has marshaled enough evidence to

take her claims to a jury.  *Olatunji*, 958 F. Supp. 2d at 31.

### B.    Ms. Lapera's Age Discrimination Claims

Ms. Lapera's complaint asserts that Fannie Mae discriminated against her on the basis of

her age in violation of the DCHRA by (1) classifying her position at the "M" salary grade and

denying her subsequent requests to relevel her salary grade, and (2) failing to promote her to the

position of Vice President of EPMO Planning and Alignment.  Compl. ¶¶ 11–12, 23.  Fannie

Mae contends that it is "entitled to judgment as a matter of law on [Ms. Lapera's] age

discrimination claims brought under the DCHRA because they were not first arbitrated as

required by Fannie Mae's Dispute Resolution Policy (the 'DRP')."  Def.'s Mem. at 4.  Fannie

Mae is correct.

The arbitration policy governing Ms. Lapera's employment relationship with Fannie Mae

unambiguously provides that an employee "must arbitrate" "all claims . . . against Fannie Mae

. . . involving a legally-protected right, that directly or indirectly relate to . . . employment"

"before bringing suit . . . in court."  DRP ¶¶ 1–2.  Among the claims that an employee must

arbitrate before proceeding to court are "claims involving rights protected by . . . federal[] [and]

state . . . law."  *Id.* ¶ 2.  Consequently, if, as Fannie Mae asserts, Ms. Lapera did not first arbitrate

her age-discrimination claims, then this Court is not empowered to adjudicate such claims.  *See*

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 759 (D.C. Cir. 1988) ("It is

a necessary corollary of the principle that 'arbitration is a matter of contract' that when the

parties have provided that a particular type of dispute should be settled in arbitration, rather than

in litigation, a court may not override that agreement by itself deciding such a dispute." (emphasis omitted)).

Ms. Lapera's Demand for Arbitration failed to reference age discrimination in its introductory section and alleged only that "Fannie Mae engaged in discrimination against Ms. Lapera on the basis of *race and personal appearance* in compensation, evaluation of performance, and promotions."  Demand for Arbitration at 6.  Indeed, all three counts asserted in her Demand for Arbitration "sounded in race or personal appearance discrimination."  Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply") at 4, ECF 16-1; *see* Demand for Arbitration at 13 (alleging that Fannie Mae "engaged in unlawful discrimination against [Ms. Lapera] [in violation of the DCHRA] based on her race and personal appearance"); *id.* at 14 (alleging that Fannie Mae "engaged in unlawful discrimination against Ms. Lapera [in violation of Title VII] based on her race"); *id.* at 15 (alleging that Fannie Mae "subjected [Ms. Lapera] to discrimination based on her race, Hispanic American").

Ms. Lapera advances two arguments to overcome her apparent failure to raise any claim of age discrimination in arbitration.  *See*  Pl.'s Opp'n at 38–41.  First, she contends that she adequately alleged age discrimination because her Demand for Arbitration referenced her age as well as the age of the selectee, Ms. Fraser.  *Id.* at 38–39.  Mere reference to age does not, however, amount to an actual assertion of a cause of action for age discrimination for purposes of exhaustion.  *Cf. Coleman v. Johnson*, 19 F. Supp. 3d 126, 139 (D.D.C. 2014) (dismissing the plaintiff's race and age discrimination claims notwithstanding the complaint's "fleeting reference to his allegedly 'being subject to harassment because of age and race'"); *Allen v. Henifin*, No. 80-1418, 1980 WL 281, *3 (D.D.C. Dec. 10, 1980) (unpublished) (dismissing age discrimination claim for failure to administratively exhaust when plaintiff's references to

instituting litigation "never referred to an age discrimination claim" and therefore "can in no way

be construed to allege age discrimination or to constitute notice of intent to file such a suit").

Second, Ms. Lapera argues that Fannie Mae's Dispute Resolution Policy, which requires

employees to arbitrate their claims against Fannie Mae before proceeding to court, is

"unconscionable and unfairly lopsided."  Pl.'s Opp'n at 39.  In support of this argument, Ms.

Lapera supplies an unadorned citation to a nonbinding, non-federal, out-of-circuit unpublished

decision by a California Court of Appeal, *Cecelia Carter v. Fannie Mae*, Cal. Super. Ct. No. 30-

2013-00647896 (Cal. Sup. Ct. Aug. 26, 2014).  Rather than follow a California State Court

decision, this Court instead adheres to the decisions by other Judges from this Court that enforce

the DPR's arbitration requirement.  *See, e.g.*, *Skrynnikov v. Fed. Nat'l Mortg. Ass'n*, 943 F.

Supp. 2d 172, 177–78 (D.D.C. 2013) (holding that the DPR's "broad and inclusive language"

does not render the agreement unenforceable).  Accordingly, Ms. Lapera's conceded failure to

pursue any age-discrimination claims in arbitration forecloses her attempt to do so here.[7]

### C.      Ms. Lapera's Race and Personal-Appearance Discrimination Claims

As for her remaining discrimination claims, which are properly before this Court, Ms.

Lapera contends that Fannie Mae discriminated against her on the basis of her race and personal

appearance by (1) classifying her position at the "M" salary grade, and (2) failing to promote her

to the position of Vice President of EPMO Planning and Alignment.[8]  Before turning to Ms.

Lapera's claims arising out of each incident, the parties' arguments as to whether Ms. Lapera's

Hispanic identity qualifies as race within the meaning of § 1981 are addressed first.

---

[7]      Thus Fannie Mae's alternative argument that Ms. Lapera's age-discrimination claims are barred by the
DCHRA's statute of limitations, *see* Def.'s Mem. at 10; Def.'s Reply at 7–8, need not be addressed.
[8]      Ms. Lapera's DCHRA and § 1981 racial discrimination claims are addressed together since, as noted, *supra*
Part III.A., the same standard applies.

### 1.      Hispanic Ethnicity is a Race for Purposes of § 1981

Section 1981 "forbid[s] all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987); *accord CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 459 n.1 (2008). Fannie Mae argues that § 1981 "does not provide a cause of action for [Ms. Lapera's] theories of discrimination based on her . . . alleged Hispanic *national origin*." Def.'s Mem. at 6 (emphasis added). Ms. Lapera responds that "District of Columbia courts have overwhelmingly recognized claims of race, ethnic and national origin discrimination under Section 1981 based on a plaintiff's Hispanic identity." Pl.'s Opp'n at 35 (collecting cases). While not entirely clear whether Fannie Mae's position is that Hispanic ethnicity is not a race for purposes of § 1981 or that Ms. Lapera's racial discrimination claims rely on her country of origin rather than her race, either way, Fannie Mae's argument fails.

After the parties submitted their briefing in this case, the Second Circuit addressed the issue whether Hispanic is a race under § 1981. *See Village of Freeport v. Barrella*, 814 F.3d 594, 600–10 (2d Cir. 2016). In *Village of Freeport*, the defendant–employer defended against the plaintiff–employee's § 1981 and Title VII claims on the ground that Hispanic is not a distinct race from Caucasian and, accordingly, the Hispanic plaintiff and his Caucasian coworker "are both white in the estimation of federal antidiscrimination statutes, and [the government official's] decision to promote one white candidate rather than another could not have constituted racial discrimination."[9] *Id.* at 601. The Second Circuit roundly rejected that argument, finding that "it has been clear since the Reagan Administration that § 1981 bars employers from

---

[9]      *Village of Freeport* had a slightly different posture than this case, as the plaintiff there was an Italian-American (*i.e.*, Caucasian) and argued that the defendant had hired a less qualified Hispanic for the position of police chief. *Id.* at 598. Nevertheless, the Second Circuit plainly held that "discrimination based on Hispanic ancestry or lack thereof constitutes racial discrimination under that statute." *Id.*

discriminating based on Hispanic ethnicity or lack thereof." *Id.* at 609; *see also id.* at 598 ("[W]e reiterate that 'race' includes ethnicity for purposes of § 1981, so that discrimination based on Hispanic ancestry or lack thereof constitutes racial discrimination under that statute."); *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999) (rejecting the argument that discrimination on the basis of being Hispanic is not actionable under § 1981 and upholding the district court's ruling in favor of the Hispanic plaintiff).

The Second Circuit's decision is persuasive and has unequivocal support in the Supreme Court's decision in *Saint Francis College*, 481 U.S. at 613. There, the Supreme Court addressed the question "whether a person of Arabian ancestry was protected from racial discrimination under § 1981." *Id.* at 607. In so doing, the Court considered the common understanding of race at the time that § 1981 was enacted (as found in dictionaries and encyclopedias) as well as the legislative history of § 1981, "which . . . had its source in the Civil Rights Act of 1866 [and] the Voting Rights Act of 1870." *Id.* at 610–13. The Court found that "dictionaries commonly referred to race as a 'continued series of descendants from a parent who is called the *stock*," *id.* at 610 (quoting N. Webster, An American Dictionary of the English Language 666 (New York 1860) (emphasis in original)), and that "[e]ncyclopedias of the 19th century also described race in terms of ethnic groups," *id.* at 611 (providing as examples "Finns," "gypsies," "Basques," "Hebrews," and many others). The legislative history "reflect[ed] this [] understanding" of race. *Id.* at 612. "Based on the history of § 1981," the Court had "little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*." *Id.* (emphasis added). Accordingly, no legitimate dispute remains that Hispanic ethnicity is a race for purposes of § 1981.

Likewise, any argument by Fannie Mae that Ms. Lapera has alleged discrimination on the basis of her country of origin, rather than her Hispanic race, fails.  No reasonable reading of Ms. Lapera's complaint or papers suggests that she believes she was discriminated against on account of her Venezuelan national origin.  Ms. Lapera has consistently stated that she was discriminated against based on her Hispanic ethnicity.  Thus, because Hispanic is a race for purposes of § 1981 and because Ms. Lapera's complaint alleges that she was discriminated against based upon her Hispanic ethnicity, her racial discrimination claims are legally cognizable.

### 2.      Salary Leveling Claims

Ms. Lapera asserts that Fannie Mae discriminated against her on the basis of her race and personal appearance when the company releveled salaries and assigned her position, Director of Lean Six Sigma, the salary grade of "M" rather than "N," and then rejected her requests to change her salary grade to an "N."  Fannie Mae contends that Ms. Lapera fails to make out a *prima facie* case of discrimination with this claim but that even if she had, Fannie Mae had "legitimate, non-discriminatory reasons" for declining to relevel Ms. Lapera's position's salary. Def.'s Mem. at 10.

In opposing summary judgment on her salary leveling claim, Ms. Lapera focuses exclusively on her *prima facie* case, arguing that several facts give rise to an inference of discrimination.[10]  *See*  Pl.'s Opp'n at 32–34.  Problematically for Ms. Lapera, however, Fannie Mae has proffered a legitimate, nondiscriminatory explanation as to why it initially assigned her position an "M" salary grade and why her subsequent requests for releveling were denied.  *See*

---

[10]      Ms. Lapera points to the fact that "Fannie Mae employees with similar qualifications and duties outside her protected classes were classified at level 'N'" and that her peers with "significantly less responsibility . . . were also classified under an 'N' salary grade."  Pl.'s Opp'n at 33.  Furthermore, one of Ms. Lapera's direct reports received her same salary grade of "M."  *Id.* at 34.  Finally, postings for positions with "fewer responsibilities and qualification requirements than Ms. Lapera's position were also posted at higher levels than her position."  *Id.*

*Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (explaining that a plaintiff's *prima facie* case is an "'unnecessary sideshow'" where the defendant proffers a legitimate rationale for its decision and admonishing the parties for devoting much of their briefing to the plaintiff's *prima facie* case (quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 510–11 (1993))).  In particular, Fannie Mae has asserted that its Compensation Department assigned *all* positions' salary grades by looking at market wages for a given job description and then slotting that position into the appropriate salary grade.[11]  *See* Def.'s Arb. Tr. at 525 ("[T]he structure was built based on available market data.  There are companies that produce compensation surveys and that's how we get our market data.  . . .  We use market data for positions to determine the grade level . . . .").  Critically, the Compensation Department did not consider in any way the characteristics or performance of the individual who occupied a given position.  *Id.* at 531 (explaining that the leveling "wasn't related to performance in any way . . . [and it] didn't consider the individual"); *id.* at 558–59 ("[W]hen we're levelling positions, we are not looking at individuals.  We are looking at the position itself."); *id.* at 566 ("The position levelling work that we do isn't based on the individual person.").[12]

Fannie Mae likewise offered a nondiscriminatory explanation as to why Ms. Lapera's subsequent requests to relevel her position's salary grade were denied.  As for her first request in April 2009, Ms. Lapera consulted her supervisor, Claude Wade, to ask whether her position was eligible for a salary upgrade.  Mr. Wade inquired with the Compensation Department, and the Compensation Department determined that a change was not appropriate, apparently because the

---

[11]       It is true that Fannie Mae supervisors interfaced with the Compensation Department to help the individual tasked with leveling a position understand the responsibilities and nature of that position, *see* Pl.'s Arb. Tr. at 532–33, but Ms. Lapera does not assert that her job description was inaccurate.
[12]       Ms. Lapera summarily takes issue with these statements in her Statement of Disputed Material Facts, *see* Pl.'s Statement of Disputed Material Facts ("SDMF") at 4–5, ECF No. 14-21, but points to no evidence in the record to refute the evidence showing that the salary grades were assigned based on objective markers and data.

salary grade had just been leveled and there was no obvious reason to change it.  *See* Pl.'s Arb.

Tr. at 535–36.[13]  As for the second request, Shandell Harris ("Ms. Harris"), a human resources

business partner, *id.* at 462, emailed the Director of Compensation, Nicole Harris Westwood

("Ms. Westwood"[14]), in the spring of 2011 asking Ms. Westwood to "look at [the Director of

Lean Six Sigma position] and level it."  *Id.* at 538.  The request contained no additional context,

*id.*,[15] and Ms. Westwood did not construe Ms. Harris's inquiry as a challenge, *id.* at 539.

Apparently, Ms. Westwood thought that Ms. Harris was asking her to determine what the salary

grade would be for a position with the position description that mirrored the description for

Director of Lean Six Sigma.  In considering Ms. Harris's inquiry, Ms. Westwood discovered that

the job already existed and that the salary grade for the position was "M."  She relayed that

information to Ms. Harris, evidently ending the inquiry.  *Id.* ("[The request] came to me as

['C]an you look at this and level it[?']  And so my translation was, oh, we have this job, and it's

the job that Ms. Lapera is in and it's an M.").

Finally, in May or June of 2011, Ms. Harris submitted a request as part of the Promotion

and Equity Process ("PEP").  Under PEP, a manager can submit, on behalf of his or her

subordinates, a request for a salary increase.  Unlike the leveling process, the PEP process

accounts for the employee's performance and personal characteristics.  *Id.* at 573.  A member of

the Compensation Department, Sonia Matza, reviewed Ms. Lapera's PEP request along with Ms.

---

[13]     Notably, the individual who responded to the reclassification request, Mauricio Aguilar, is a member of Ms. Lapera's racial class, Pl.'s Arb. Tr. at 566, which "further undermines any inference of discrimination."  *Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C. 2011).

[14]     Ms. Harris Westwood stated during her testimony that she goes by "Ms. Harris," Arb. Tr. at 523, but to avoid confusion, she is referred to as "Ms. Westwood."

[15]     Ms. Harris did attach a job description for the Director of Lean Six Sigma position to her email along with a job description for a different position that had been assigned an "N" salary grade. *Id.* at 540-41.  Ms. Westwood testified that she did not recall seeing the second job description and that, in any event, she did not perceive Ms. Harris to be challenging the salary grade for the Director of Lean Six Sigma position. *Id.*

Harris, *id.* at 548, and ultimately increased Ms. Lapera's salary by $28,000 to create a 17%

differential between Ms. Lapera's salary and her direct report's salary, *id.* at 571.

In sum, then, Fannie Mae has amply proffered a legitimate, nondiscriminatory basis for

its salary leveling decisions at issue in this case.  Thus, this Court need not analyze whether Ms.

Lapera has made out a *prima facie* case of discrimination on this ground.  *See Walker*, 2016 WL

1118252, at *6.  The only question is whether, based on all the evidence, a reasonable jury could

find that Fannie Mae's stated reason is pretexual, and that the classification decision was

motivated by racial or personal-appearance animus.  *See Brady*, 520 F.3d at 594; *Primas v. Dist.*

*of Columbia*, 719 F.3d 693, 697 (D.C. Cir. 2013) ("Without overt evidence of discriminatory

intent, [the plaintiff's] case turns on her attempts to show 'that the defendant's explanation is

unworthy of credence' and that a jury could 'reasonably infer from the falsity of the explanation

that the employer is dissembling to cover up a discriminatory purpose.'" (quoting *Reeves*, 530

U.S. at 147)).  As noted, in addressing her salary leveling claims, Ms. Lapera does not so much

as *mention* pretext, let alone point to evidence in the record that creates as a genuine issue of

material fact as to whether the Compensation Department acted with a discriminatory motive in

leveling Ms. Lapera's salary or in later declining to adjust her salary grade.  Accordingly, Fannie

Mae is entitled to summary judgment on Ms. Lapera's salary leveling claims.[16]

### 3.      Non-Selection Claims

Ms. Lapera's complaint asserts that Fannie Mae discriminated against her on the basis of

her race and personal appearance when Fannie Mae passed over Ms. Lapera for the position of

Vice President of Planning and Alignment and instead hired Ms. Fraser.  Compl. ¶¶ 30, 35.  In

---

[16]      Ms. Lapera's salary leveling claims are obviously unmeritorious given her failure to address pretext.
Accordingly, this Court need not address Fannie Mae's alternative argument that the statute of limitations ran on
Ms. Lapera's claim arising out of her 2009 request for reclassification of her position's salary grade.  *See* Def.'s
Mem. at 10; Def.'s Reply at 12.

particular, Ms. Lapera argues that Ms. Gehring declined to promote Ms. Lapera because she was Hispanic and overweight and that Ms. Gehring chose Ms. Fraser for the position because she was Caucasian and slender. [17]  Pl.'s Opp'n at 24.  "Where, as here, the employer claims a legitimate, nondiscriminatory explanation for its decision to promote one employee over another, the 'one central inquiry' on summary judgment is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'"  *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Adeyemi*, 525 F.3d at 1226).  In addressing this question, the Court considers "'the total circumstances of the case,' asking 'whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer."  *Hamilton*, 666 F.3d at 1351 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

Ms. Lapera contends that (1) she was significantly more qualified for the position than Ms. Fraser,  Pl.'s Opp'n at 27–29; (2) no evidence suggests that she had any communication

---

[17]  Ms. Lapera contends that she has adduced direct evidence of discrimination as to her non-selection claims.  Pl.'s Opp'n at 24–25.  In fact, however, the "direct evidence" that Ms. Lapera points to is *indirect* evidence of discrimination rather than direct evidence.  The evidence that Ms. Lapera relies on suggests more broadly that Ms. Gehring exhibited discriminatory attitudes toward Hispanic employees and overweight employees.  None of the cited evidence, however, proves that Fannie Mae's selection of Ms. Fraser over Ms. Lapera for the Vice President of EPMO Planning position was the result of discrimination.  *See Ayissi-Etoh*, 712 F.3d at 576 (explaining that direct evidence of discrimination is, for example, a "'statement that itself showed racial or gender bias *in the* [*employment*] *decision*'" (emphasis added) (quoting *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011))); *Sims v. Dist. of Columbia*, 33 F. Supp. 3d 1, 9 (D.D.C. 2014) ("[D]irect evidence is 'a smoking gun showing that the decisionmaker *relied upon* a protected characteristic in taking an employment action.'" (emphasis in original) (quoting *PowerComm, LLC v. Holyoke Gas & Elec. Dep't*, 657 F.3d 31, 35 (1st Cir. 2011) (internal quotation marks omitted))); *Sykes v. Napolitano*, 710 F. Supp. 2d 122, 148 (D.D.C. 2010) ("Mr. Sykes fails to demonstrate any nexus between [an] email [containing a racially derogatory joke] and his own reassignment.").  Accordingly, Ms. Lapera's evidence of discrimination is properly analyzed as only indirect and circumstantial.

issues, which was the sole alleged basis for her non-selection, *id.* at 29; (3) the hiring process suffered so many procedural irregularities as to suggest a discriminatory motive, *id.* at 29–31; and (4) Ms. Gehring, who drove the selection decision, harbored significant biases against Hispanic and overweight employees, *id.* at 10–15, 24–25.  These contentions, and the evidence underlying them, are reviewed below.

### a.      The Candidates' Relative Qualifications

One way in which a plaintiff can establish pretext is by demonstrating that she was significantly more qualified than the selected applicant.  *See Hamilton* 666, F.3d at 1352; *Lathram v. Snow*, 336 F.3d 1085, 1091 (D.C. Cir. 2003) ("There was in fact evidence from which a reasonable juror could conclude that there was a wide and inexplicable gulf between the qualifications of Boyd and Lathram, and in such circumstances the jury could infer discrimination from the agency's choice of Boyd over Lathram.").  Here, the parties spill significant ink arguing over whether Ms. Lapera was significantly more qualified for the Vice President of Planning and Alignment position.  The position description informs the Court's analysis of the candidates' relative qualifications.

The first section of the position description, labeled "Overview of Job," states that the Vice President of Planning and Alignment is responsible for "facilitat[ing] consensus around a long term, integrated execution plan for the restructuring of Fannie Mae and the housing industry."   Pl.'s Opp'n, Ex. R at 1, ECF No. 14-18.  The job overview further states that "this role demands intensive interaction with the company's senior management team, initiative leaders, [Federal Housing Finance Agency ("FHFA")] and other key stakeholders throughout the company."  *Id.*  The next section of the position description, titled "Key Job Functions and Duties," sets out the responsibilities of the Vice President of Planning and Alignment, including:

(1) "acting as a trusted advisor" to the SVP of the EPMO and the CFO; (2) "[c]ommunicat[ing] effectively" about the Multi-Year Investment Plan, in writing and verbally, to the CFO, the Management Committee, regulators, and the Fannie Mae Board of Directors by "taking very complex concepts and explaining them in a simple and concise manner;" (3) "manag[ing] the EPMO's relationship with key external stakeholders, including FHFA;" (4) "support[ing] the goals and objectives of the [] EPMO" and "[b]uild[ing] very strong relationships with the leaders of each pillar;" (5) "[p]rovid[ing] expert advice and interpretation of corporate governance activities." *Id.* at 1–2.

The third section of the job description details the requisite qualifications, including 10 years of experience (required); 5 years of managerial experience (preferred); expertise in program/project management or related areas; a bachelor's degree (required); a master's degree (preferred); the ability to communicate verbally and in writing with various levels of management; demonstrated cross-function collaboration; an ability to anticipate and proactively solve problems; an ability to influence people to get things done; an ability to apply techniques for planning, monitoring, and control programs; and an ability to drive results in a swift and constructive manner. *Id.* at 2. The final section of the job description sets out the broad competencies that applicants should have, essentially repeating, in vaguer terms, the requisite qualifications outlined in the previous section of the job description. *Id.*

Fannie Mae has effectively conceded that Ms. Lapera had "better knowledge and experience than Ms. Fraser" as to the substantive areas within the position's purview. Def.'s Mem. at 21; *see also* Def.'s MSJ, Ex. 36 at 2, ECF No. 11-36 (interview notes of Mr. Choi, stating that Ms. Lapera possessed a "working knowledge of the EPMO, specifically the [Planning and Alignment] team; deep process expertise[;] [and] extensive Fannie Mae

experience and work").   Indeed, Ms. Lapera had long been a member of the EPMO team, Def.'s

MSJ, Ex. 31 at 1–2, whereas Ms. Fraser had most recently worked as Vice President for

Corporate Financial Planning and Analysis, Def.'s MSJ, Ex. 30 at 2, ECF No. 11-30.   Ms.

Lapera reported to the Vice President for Planning and Alignment (Ms. Keller) before she

applied for that position, and at that time she was "performing the vast majority of the duties of

the VP position" and already managed 24 of the 30 employees on Ms. Keller's team.   Pl.'s

Statement of Disputed Material Facts ("SDMF") at 10, ECF 14-21.   Ms. Lapera also had directed

teams as large as 35 people, *see* Def.'s MSJ, Ex. 31 at 2, and had mentored and groomed other

employees, *see id.*   In addition, Ms. Lapera had experience with "cross-function collaboration,"

*see, e.g.*, *id.* at 1 (listing in her résumé that she had "[c]reat[ed] partnerships with business and

corporate support functions (Finance, HR, Business Architecture, and Risk) to deliver results").

Finally, Ms. Lapera possessed the requisite *and* preferred educational credentials.   *Id.* at 2.

     Set against this background, Ms. Lapera contends that she was significantly more

qualified for the position of Vice President of Planning and Alignment than the selectee, Ms.

Fraser.   As for Ms. Fraser's qualifications, she was already serving as a vice president at Fannie

Mae when she was selected for the Vice President of Planning and Alignment position.   Def.'s

MSJ, Ex. 31 at 2.   Like Ms. Lapera, Ms. Fraser had experience with cross-function collaboration

and had groomed her team members for growth.   *Id.*   The undisputed evidence indicates that Ms.

Fraser had coordinated effectively and extensively with relevant stakeholders, including

regulators, the Board of Directors, and the CEO and CFO.   *See id.*; Def.'s Arb. Tr. at 638–39

(noting Ms. Fraser's strong relationships with the Fannie Mae CEO and CFO).   The evidence

suggests that Ms. Fraser also possessed many of the "soft" skills listed in the position

description.   In particular, Ms. Gehring testified that Ms. Fraser possessed strong communication

skills and had successfully presented to the regulators and Fannie Mae executives on numerous occasions.  *See* Def.'s Arb. Tr. at 638–39.  Mr. Choi echoed that sentiment in his interview notes, commenting that Ms. Fraser "has strong interpersonal and communication skills, which is imperative."  Def.'s MSJ, Ex. 36 at 2.

It is ultimately a close question whether a reasonable jury could find that Ms. Lapera was significantly more qualified for the position than Ms. Fraser.  Among other things, Ms. Lapera appears to have had significantly more expertise in the relevant subject matter, more experience managing a large team, and more relevant education than Ms. Fraser.  *See Hamilton*, 666 F.3d at 1356 ("[D]rawing all reasonable inferences in [the plaintiff's] favor, we believe that a reasonable jury could find that, by comparison to [the selected applicant], [the plaintiff] had much greater technical expertise, more [relevant] experience . . . , and far more formal training.").  Accordingly, this Court proceeds to consider the other evidence that Ms. Lapera marshals to demonstrate that Fannie Mae's stated reason for selecting Ms. Fraser was pretextual.  *See id.* at 1352 (explaining that it was a "close question" whether the jury would find that the plaintiff was significantly or markedly more qualified than the selected applicant, and therefore proceeding to "'review the record taken as a whole'" (quoting *Reeves*, 530 U.S. at 150)).

### b.    Whether Ms. Lapera Had Communication Issues

Ms. Lapera contends that "the evidence in the record and the testimony elicited at arbitration provided no basis upon which a reasonable factfinders could conclude that Ms. Gehring honestly believed Ms. Lapera lacked executive presence" or had communication issues.  Pl.'s Opp'n at 29.  Fannie Mae disagrees, noting that both Ms. Gehring and another interviewer, Shandell Harris, testified that Ms. Lapera would not be effective in communicating to Fannie Mae executives.  During arbitration, when asked why Ms. Lapera was not selected for the

26

position, Ms. Gehring stated that Ms. Lapera "has difficulties communicating at an executive

level. Her written communications are inappropriate and her verbal communications are

somewhat crass and unpredictable." Def.'s Arb. Tr. at 613. When pressed for more information,

Ms. Gehring explained that Ms. Lapera's "written communications were somewhat juvenile and

cartoonish and her verbal communications were very unpredictable and she had a negative way

of talking about the organization and its objectives." *Id.* at 614–15. Ms. Gehring provided

examples, noting that Ms. Lapera had second-guessed Fannie Mae's President's judgment in a

meeting with more junior staff and that she "interrupted every single staff meeting" with a

"negative comment." *Id.* at 617. Ms. Gehring described Ms. Lapera's written work product as

"somewhat preachy, juvenile and cartoonish." *Id.* at 619 (explaining that Ms. Lapera used clip

art, "and that's just not appropriate at the executive level").

Ms. Harris expressed similar concerns with Ms. Lapera's communication skills. In her

notes from Ms. Lapera's interview, Ms. Harris reported that Ms. Lapera's "real area of focus

would be her executive presence and communicating with the OC and MC. I think this area of

development . . . is critical given this role, so I would not see her as the best candidate." Def.'s

MSJ, Ex. 37 at 1, ECF. No. 11-37. During arbitration, Ms. Harris stated that she told Ms. Lapera

that her only reservation in selecting Ms. Lapera was her executive presence. Def.'s Arb. Tr. at

478. When asked what she meant by that, Ms. Harris confirmed: "It was a communication style.

Sometimes I observed that [Ms. Lapera] could ramble, kind of not be on point. I think it's

important in communicating with executives that you are crisp and to the point and provide

detail as requested." *Id.* Ms. Harris stated that she developed concerns about Ms. Lapera's

communication skills by observing her in staff meetings, where "she tended to be sometimes

emotional in the delivery of her message." *Id.* at 479. In sum, then, evidence from two persons

involved in the selection process indicates that they did not view Ms. Lapera as an effective communicator for senior executives at the company.

Ms. Lapera, however, disputes Fannie Mae's evidence with evidence of her own, contending that Fannie Mae's stated rationale that Ms. Lapera had poor communication skills, is false. *See Lathram*, 336 F.3d at 1089–90 ("In 'appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.'" (quoting *Reeves*, 530 U.S. at 147)). First, Ms. Lapera cites her own testimony that when she worked for the then-President of Fannie Mae, Mike Williams, around 2008, he "never expressed any concerns with [her] communications." Pl.'s Arb. Tr. at 49. Such self-serving testimony regarding her own assessment of her superior's view of her communication skills, standing alone, without corroboration, is not sufficient to raise a genuine issue of material fact as to whether Fannie Mae decisionmakers actually believed that Ms. Lapera had communication problems. *See Burley*, 801 F.3d at 298 ("[While] a plaintiff's own firsthand observations of relevant facts are probative evidence[] that [] must not [be] set [] aside merely because they come from a party who necessarily has a stake in the outcome," where contrary evidence is present, "the plausibility of those differing observations and inferences is not, without more," sufficient "grounds on which a factfinder reasonably could conclude that" the employer's stated reason "was a pretext for racial discrimination."); *Steele v. Carter*, ___ F. Supp. 3d ___, 2016 WL 3620722, at *16 (D.D.C. June 29, 2016) ("Plaintiff's own self-perception of why he was hired—standing alone without corroboration—does not offer any credible evidence of discriminatory intent."); *Lawrence v. Lew*, 156 F. Supp. 3d 149, 169 (D.D.C. 2015) ("Plaintiff's self-serving statement that she had the qualifications for GS-11 pay . . . cannot alone support a genuine dispute as to that fact."). There is more, however.

First, Ms. Lapera's coworker, Mr. Tomasello, flatly contradicted Ms. Gehring's testimony that Ms. Lapera was disruptive during staff meetings.  Mr. Tomasello testified during arbitration that Ms. Lapera's comments during meetings were "absolutely" appropriate for the audience and responded "yes" when asked if Ms. Lapera's comments were clear.  Pl.'s Arb. Tr. at 711–12.  Next, Ms. Lapera notes that her 2012 year-end performance review says nothing about communication difficulties.  *See generally* Pl.'s Opp'n, Ex. T, ECF No. 11-20.  Instead, the general tenor of the review is high praise for Ms. Lapera's work and leadership.  *See generally id.*  Although Ms. Gehring testified that she typically does not read performance reviews and does not recall reading Ms. Lapera's 2012 review, Pl.'s Arb. Tr. at 614, the fact remains that Ms. Lapera's supervisor did not raise any issues with Ms. Lapera's communication skills.  *Cf. Hamilton*, 666 F.3d at 1355 (noting that the absence of contemporaneous evidence in support of the proffered explanation is potentially probative of pretext).  In sum, then, it remains an open question whether Fannie Mae decisionmakers genuinely believed that Ms. Lapera had poor communication skills.  The issue ultimately hinges on a credibility determination—whether to believe Ms. Gehring and Ms. Harris in light of the competing evidence.  This question is squarely within the province of a jury.

### c.      Irregularities in the Hiring Process

Under certain circumstances, procedural irregularities can support a finding of pretext.  *See Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) ("Employees may cast doubt on the employer's proffered reason by, among other things, pointing to . . . 'the employer's failure to follow established procedures or criteria . . . .'"); *Lathram*, 336 F.3d at 1093–94 (holding that the employer's decision to open the position to applicants outside the employer's workforce when it did not always do so was evidence of pretext).  Here, Ms. Lapera notes that "Ms. Gehring

permitted Ms. Fraser to apply for the vice president position one month after the posting closed, scheduled her for an interview before she had applied for the position or sent in her resume, and scheduled her for an hour long interview with Ms. Gehring over lunch, while the other candidates were scheduled for half hour interviews in Ms. Gehring's office." Pl.'s Opp'n at 30–31. The evidence on these points is murky.

Regarding Fannie Mae's decision to accept Ms. Fraser's application after the closing date for the job posting, Ms. Westwood, the Director of Compensation, was asked during her arbitration testimony whether her office "would typically investigate[] an interview for a vacant position where you have a closing date and people are added after that closing date." Pl.'s Arb. Tr. at 692. Ms. Westwood answered, "No, absolutely not. That happens all the time." *Id.* Similarly, Ms. Werner, who headed the recruitment process for the position, testified that she might accept a late application "for any number of reasons, somebody was on vacation, they missed a deadline." *Id.* at 436 (explaining that Fannie Mae's practice is to accept applications via an online portal but that the formal policy is not so stringent). Ms. Lapera did not introduce any evidence to call this testimony into question. Thus, it appears that accepting a belated application from Ms. Fraser was not actually irregular.

Another irregularity cited by Ms. Lapera was scheduling Ms. Fraser for an interview before receiving her application, but evidence regarding whether this chronology was unusual is minimal. *See* Pl.'s Arb. Tr. at 440 (discussing who decided to interview Ms. Fraser before she submitted her application but not stating whether that was atypical). Fannie Mae posits that the evidence is inconclusive as to whether it was inappropriate for Ms. Gehring to conduct Ms. Fraser's interview over lunch and for a longer period of time than the other interviews, which were conducted in Ms. Gehring's office. Def.'s Reply Mem. at 19. Ms. Werner initially testified

that she was not sure whether an interviewer would typically take only one candidate to lunch but thought that such activity might vary based on schedule and availability.  Pl.'s Arb. Tr. at 444.  Shortly thereafter though, Ms. Werner was asked, "Would [it] be improper for a lunch interview for just one applicant and not the other applicants?"  *Id.* at 445.  Ms. Werner responded "[y]es" and also stated that when she had conducted a lunch interview in the past, she did so for all applicants.  *Id.*  She further stated that interviews should be the same length of time, while also testifying that "there could be many factors that influence why interviews go long."  *Id.* at 445–46.

Consideration of all this evidence indicates that at least some of the cited "irregularities" are, in fact, not uncommon at Fannie Mae and therefore not probative of pretext.  Nevertheless, a reasonable jury could conclude, based on Ms. Werner's shifting responses to the questions about lunch interviews and interview durations, that something was amiss, which adds at least marginally to the evidence supporting a finding of pretext.

### d.    Ms. Gehring's Biases

Finally, Ms. Lapera points to evidence suggesting that Ms. Gehring was biased against Hispanic and overweight employees.  Pl.'s Opp'n at 10–15, 24–25.  Such evidence, if believed by a jury, can be probative of pretext.  *Evans*, 716 F.3d at 620 (explaining that pretext can be shown by, among other things, "'[an] employer's general treatment of minority employees; or discriminatory statements by the decisionmaker'" (quoting *Brady*, 520 F.3d at 495)).

According to Ms. Lapera's testimony, Ms. Gehring targeted overweight employees and Hispanic employees from the beginning of her tenure as Senior Vice President.  In September of 2012, when Ms. Gehring first became Senior Vice President, she called a town hall meeting.  Pl.'s Arb. Tr. at 110–11.  After the meeting, Ms. Gehring called Ms. Lapera and said that the

business architecture team managed by Ms. Lapera  is "going to have a long way to go to be able to represent EPMO the way I want it represented."  *Id.* at 111.  According to Ms. Lapera, Ms. Gehring specifically mentioned Blythe Neumiller, Patricia Brumbaugh, and Dina Purcell, all three of whom to varying degrees are overweight.  *Id.* at 112–13.  Ms. Neumiller was the largest member of the team and was so overweight that she had trouble walking, *id.* at 112, and, during a staff meeting, Ms. Gehring commented to a group of employees that Ms. Neumiller "waddles" while she walks, *id.*  When Ms. Neumiller later left the team, evidently due to concern about her career prospects under Ms. Gehring's leadership, Ms. Gehring allegedly "congratulated [Ms. Lapera] on getting [Ms. Neumiller] to move voluntarily to the other team," notwithstanding the lack of issues with Ms. Neumiller's performance.  *Id.* at 115–16.

Also after the town hall meeting, Ms. Gehring allegedly told Ms. Lapera that she "could see [Ms. Brumbaugh's] tummy from where [she] was sitting" and then instructed Ms. Lapera that her team needed to start "dressing up better."  *Id.* at 113.  In December of 2012, Ms. Lapera conducted her semi-annual performance ratings of her staff and recommended that Ms. Brumbaugh receive a rating of a "2"[18] to reflect "the amazing deliverables that she produced that particular year."  *Id.* at 132–33.  Although Ms. Gehring agreed that Ms. Brumbaugh's work was strong, she stated that Ms. Brumbaugh lacked "executive presence" and did not have the "look" that team members should have.  *Id.* at 133–34.  Accordingly, Ms. Gehring downgraded Ms. Brumbaugh's rating to a "3."  *Id.* 135.

Ms. Lapera also cites Ms. Gehring's treatment of Ms. Keller.  Ms. Lapera testified that, in April 2013 at a staff meeting, Ms. Gehring told Ms. Keller that she too used to be overweight and could help Ms. Keller achieve her weight loss goals.  *Id.* at 138.  Ms. Gehring then turned to

---

[18]     A rating of "2" equated to "exceeds expectations."  *Id.* at 132.

Ms. Lapera and told Ms. Lapera that she "could look better too." *Id.* Ms. Keller left her position shortly after the April 2013 staff meeting. *Id.* at 140. Finally, Ms. Lapera points out that Ms. Gehring arranged for an image consultant to come to Fannie Mae to speak with her subordinates about image improvement. Pl.'s Arb. Tr. at 118–29. Ms. Lapera and Mr. Tomasello testified that Ms. Gehring pressured the EPMO staff to attend the class, where the consultant told the women that they should wear make-up and avoid wearing colors that clash with their skin and color their gray hair. *Id.* at 122–24; *id.* at 714 ("Q. And what was the emphasis on at that image consulting session? A. Aesthetics. Mostly, you know, not delivering results, but, you know, wear a coat, wear a suit and tie if you're a man, make sure you have well-pressed clothes, your hair combed, wear the proper level of make-up.").

Ms. Lapera's evidence of Ms. Gehring's bias against Hispanic employees is less robust, but it is there. Ms. Lapera relies on her own testimony that Ms. Gehring commented that a Hispanic employee, Shirley Cruz Rodriguez, would "need to work on [her] accent because there is no way she's going to progress with an accent like the one she has." *Id.* at 137. Ms. Lapera testified that Ms. Rodriguez's accent did not affect her performance evaluation but that Ms. Gehring made clear that "unless [Ms. Rodriguez's] accent changed, she [would] not have any [] opportunities for promotion." *Id.*

To be sure, the testimony about Ms. Gehring's statements about Hispanic and overweight employees is disputed. Ms. Gehring denies having made the comments, *see* Def.'s Reply Mem. at 18 & n.3, and even if she did, some are susceptible of innocent interpretations, such as Ms. Gehring's offer to help Ms. Keller lose weight. If believed, however, this testimony permits the inference that Ms. Gehring held negative views of Hispanic and overweight employees, and a

jury could infer that Ms. Gehring acted upon those views in declining to select Ms. Lapera for the Vice President of Planning and Alignment position.

***

Although a close call, reviewing the record as a whole, Ms. Lapera has produced sufficient evidence to create a genuine issue as to whether Fannie Mae's rationale for selecting Ms. Fraser for the Vice President of Planning and Alignment position was pretextual.  "In the end, the record supports two plausible interpretations of what happened."  *Evans*, 716 F.3d at 622.  One view is that Ms. Gehring, who drove the hiring process, harbored biases toward Hispanic and overweight employees and selected Ms. Fraser not because she was more qualified but because she fit the mold in terms of demographics and personal appearance that Ms. Gerhing preferred.  The other view is that, notwithstanding her subject matter expertise, Ms. Lapera simply lacked the requisite communication skills to be effective in the Vice President of Planning and Alignment role.  Ultimately, a jury will get to choose between these "competing views."  *Id.*

## IV.     CONCLUSION

For the foregoing reasons, Fannie Mae's motion for summary judgment is granted in part and denied in part.  Specifically, this motion is granted as to all of Ms. Lapera's age discrimination claims as well as her salary leveling claims.  The motion is denied as to Ms. Lapera's non-selection claims alleging racial discrimination under 42 U.S.C. § 1981 and racial and personal-appearance discrimination under the DCHRA.  The parties are directed to jointly submit, by October 19, 2016, three proposed dates for trial on the claims remaining in this case.  The parties may request referral to the United States District Mediation Program, *see*

LCvR 84, or, alternatively, referral to a randomly selected U.S. Magistrate Judge to facilitate discussions of a disposition prior to trial.

An appropriate Order accompanies this Memorandum Opinion.

Date:  September 28, 2016

_____
BERYL A. HOWELL
Chief Judge